United States Bankruptcy Court
Southern District of Texas

**ENTERED**

April 27, 2023

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LOYALTY VENTURES INC., *et al.*,[1] | ) | Case No. 23-90111 (CML) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### ORDER CONFIRMING THE DEBTORS' JOINT
### CHAPTER 11 PLAN AND APPROVING ON A FINAL BASIS
### THE DISCLOSURE STATEMENT OF LOYALTY VENTURES INC. AND ITS
### DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

The above-captioned Debtors having:

a.  commenced, on March 10, 2023 (the "Petition Date"), these chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions in the United States Bankruptcy Court for the Southern District of Texas (this "Court") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code");

b.  continued to operate their businesses and manage their properties as debtors in possession in accordance with Bankruptcy Code sections 1107(a) and 1108;

c.  filed, on April 26, 2023, the *First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Loyalty Ventures Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 200] (as amended, the "Disclosure Statement," "Combined DS and Plan" or "Plan"), which is attached hereto as **Exhibit A**[2] as amended, supplemented or otherwise modified from time to time;

d.  obtained, on March 21, 2023, entry of the *Order: (I) Conditionally Approving the Disclosure Statement; (II) Approving the Combined Hearing Notice; (III) Approving the Solicitation and Notice Procedures; (IV) Approving the Forms of Ballot and Notices; (V) Approving Certain Dates and Deadlines in Connection with the Solicitation and Confirmation of the Plan; and (VI) Scheduling a Combined Hearing on (A) Final Approval of the Disclosure Statement and*

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' tax identification numbers, are: Loyalty Ventures Inc. (3472); LVI Lux Holdings S.à r.l (5350); LVI Sky Oak LLC (1657); and Rhombus Investments L.P. (7493). The location of the Debtors' service address for purposes of these chapter 11 cases is: 8235 Douglas Avenue, Suite 1200, Dallas, Texas 75225.

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

*(B) Confirmation of the Plan* [Docket No. 136] (the "Disclosure Statement Order"), which conditionally approved the Plan and Disclosure Statement, the solicitation procedures (the "Solicitation Procedures") and the related notices, forms and ballots (collectively, the "Solicitation Packages");

e.      caused the Solicitation Packages and the *Notice of (A) Deadline to Cast Votes to Accept or Reject the Plan, (B) Combined Hearing to Consider Approval of the Disclosure Statement and Confirmation of the Plan, (C) Deadline to Object to Confirmation, (D) Notice of Objection and Opt Out Rights and (E) Related Matters and Procedures* (the "Combined Hearing Notice") to be distributed on or about March 24, 2023, in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Disclosure Statement Order and the Solicitation Procedures, as evidenced by, among other things, the *Affidavits of Service of Mailings for the Period from March 22, 2023 through March 28, 2023* [Docket No. 171] (the "Solicitation Affidavit");

f.      filed, on April 13, 2023, the *Notice of Filing of Plan Supplement* [Docket No. 186]; and

g.      filed, on April 26, 2023, the *Declaration of Craig E. Johnson of Kroll Restructuring Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Joint Chapter 11 Plan of Loyalty Ventures Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 199] (the "Final Voting Report").

This Court having:

a.      entered the Disclosure Statement Order conditionally approving the Disclosure Statement on March 21, 2023;

b.      set April 20, 2023 at 4:00 p.m. (prevailing Central Time) as the deadline for voting on the Plan;

c.      set April 20, 2023 at 4:00 p.m. (prevailing Central Time) as the deadline for filing objections to the Plan and Disclosure Statement (the "Plan Objection Deadline");

d.      set April 27, 2023 at 1:00 p.m. (prevailing Central Time) as the date and time for the commencement of the hearing on final approval of the Disclosure Statement and confirmation of the Plan (the "Confirmation Hearing"), in accordance with Bankruptcy Rules 3017 and 3018 and Bankruptcy Code sections 1126, 1128 and 1129;

e.      reviewed the Plan and Disclosure Statement, the Plan Supplement, the Final Voting Report and all pleadings, exhibits, declarations, affidavits, statements, responses and comments regarding the Disclosure Statement and confirmation of the Plan, including all objections, statements and reservations of rights filed by parties in interest on the docket of these Chapter 11 Cases;

2

f.      held the Confirmation Hearing;

g.      heard the statements and arguments made by counsel in respect of confirmation of the Plan and final approval of the Disclosure Statement;

h.      considered all oral representations, live testimony, written direct testimony, exhibits, documents, filings and other evidence presented at the Confirmation Hearing;

i.      made rulings on the record at the Confirmation Hearing held on April 27, 2023;

j.      overruled any and all objections to the Disclosure Statement and to confirmation of the Plan, except as otherwise stated or indicated on the record, and overruled all statements and reservations of rights not consensually resolved or withdrawn unless otherwise indicated; and

k.      taken judicial notice of all papers and pleadings filed in these Chapter 11 Cases.

NOW, THEREFORE, this Court having found that notice of the Confirmation Hearing and the opportunity for any party in interest to object to confirmation of the Plan and final approval of the Disclosure Statement have been adequate and appropriate as to all parties affected or to be affected by the Combined DS and Plan and the transactions contemplated thereby; and this Court having considered the record in these Chapter 11 Cases, the Final Voting Report, the compromises and the settlements embodied in and contemplated by the Plan, the arguments regarding confirmation of the Plan, the evidence regarding confirmation of the Plan; and the Confirmation Hearing having been held on April 27, 2023; and after due deliberation, and based upon the additional findings of fact and conclusions of law on the record pursuant to Bankruptcy Rule 7052, which are incorporated herein, it is HEREBY DETERMINED, FOUND, ADJUDGED, DECREED, AND HELD THAT:

A.      **Jurisdiction and Venue**

1.      Venue in this Court was proper as of the Petition Date and continues to be proper under 28 U.S.C. §§ 1408 and 1409.  Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(2).  This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1334.

This Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed and to enter a final order with respect thereto.

**B.      Commencement of the Chapter 11 Cases**

2.      On the Petition Date, the Debtors commenced the Chapter 11 Cases.  The Debtors have operated their businesses and managed their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases.

**C.      Burden of Proof—Confirmation of the Plan**

3.      The Debtors, as proponents of the Plan, have met their burden of proving the applicable elements of Bankruptcy Code sections 1129(a) and 1129(b) by a preponderance of the evidence, which is the applicable evidentiary standard for confirmation of the Plan.  In addition, and to the extent applicable, the Plan is confirmable under a clear and convincing evidentiary standard.

**D.      Notice**

4.      As evidenced by the Solicitation Affidavit and the Final Voting Report, the Debtors provided due, adequate and sufficient notice of the Combined DS and Plan, the Confirmation Hearing and all of the other materials distributed by the Debtors in connection with the confirmation of the Plan in compliance with the Bankruptcy Rules, including Bankruptcy Rules 2002(b), 3017, 3019 and 3020(b), the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Local Rules") and the procedures set forth in the Disclosure Statement Order.  The Debtors provided due, adequate and sufficient notice of the Plan Objection Deadline, the Confirmation Hearing and any applicable bar dates and

hearings described in the Disclosure Statement Order in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules and the Disclosure Statement Order.

**E.**     **Voting**

5.     Votes to accept or reject the Plan have been solicited and tabulated fairly, in good faith and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules and the orders of this Court.  Class 1, Class 2 and Class 5 are unimpaired, presumed to accept and not entitled to vote on the Plan.  Class 6, Class 7, Class 8 and Class 9 are impaired, deemed to reject and not entitled to vote on the Plan.  Class 3 and Class 4 are impaired under the Plan and are entitled to vote on the Plan.  Class 3 voted to accept the Plan and Class 4 voted to reject the Plan.  *See* Docket No. 199.

**F.**     **Approval of Disclosure Statement and Confirmation of the Plan**

6.     The Disclosure Statement is APPROVED on a final basis under Bankruptcy Code section 1125, and all objections, statements and reservations of rights with respect to the Disclosure Statement are overruled.

7.     The Plan, a copy of which is attached hereto as **Exhibit A**, is CONFIRMED pursuant to Bankruptcy Code section 1129.  The terms of the Plan are incorporated by reference into, and are an integral part of, this Confirmation Order.

8.     Any resolution or disposition of objections to confirmation of the Plan explained or otherwise ruled upon by this Court on the record at the Confirmation Hearing is hereby incorporated by reference.  All parties had a full and fair opportunity to be heard on all issues raised by objections to confirmation of the Plan or approval of the Disclosure Statement.  Any and all objections to confirmation of the Plan or approval of the Disclosure Statement that have not been withdrawn or resolved as of the entry of this Confirmation Order are hereby overruled on their merits.  All withdrawn objections are deemed withdrawn with prejudice.

9.      The exhibits to the Plan and the documents contained in the Plan Supplement are integral to and part of the Plan and are approved by this Court, and the Debtors are authorized and directed to take all actions required or appropriate under the Plan and in all documents related to the Plan and the transactions contemplated thereby, including, for the avoidance of doubt, the transactions described more fully in <u>Article VIII</u> of the Plan.

10.     The terms of the Plan, the Plan Supplement and any exhibits thereto are incorporated herein by reference, and are nonseverable from, mutually dependent on and an integral part of this Confirmation Order.  The terms of the Plan, the Plan Supplement and all exhibits thereto, and all other relevant and necessary documents shall be effective and binding as of the Effective Date (unless (a) different date(s) is/are specified in the applicable foregoing documents, in which case the applicable terms shall be effective and binding on such date(s)) on the Debtors, any holder of a Claim or Interest, whether or not the Claim or Interest is impaired under the Plan and whether or not the holder of such Claim or Interest has accepted the Plan, and any other party in interest.  The failure to specifically include or refer to any particular article, section or provision of the Plan, the Plan Supplement or any related document in this Confirmation Order does not diminish or impair the effectiveness or enforceability of such article, section or provision.

11.     The compromises and settlements set forth in the Plan (including the Plan Supplement) are approved, and will be effective immediately and binding on all parties in interest on the Effective Date (unless (a) different date(s) is/are specified in the applicable foregoing documents, in which case the applicable terms shall be effective and binding on such date(s)).

12.     On the Effective Date (unless (a) different date(s) is/are specified in the applicable foregoing documents, in which case the applicable terms shall be effective and binding on such

date(s)), the Debtors are authorized to consummate the Plan and the transactions contemplated thereby, including the distributions of cash and payment of fees contemplated thereby.

G.   **Allowed Loan Claims**

13.   For purposes of the Plan:

a.   The Allowed Revolving Loan Claims include: (i) $32,000,000.00 of outstanding principal of the Revolving Loans, (ii) $448,312.80 of accrued interest on the Revolving Loans, (iii) $103,631.18 of accrued commitment fees, (iv) $5,235.00 of accrued letter of credit fees, and (v) $8,506.65 of accrued fronting fees. ~~In addition to the outstanding Revolving Loans, the following letters of credit (collectively, the "LCs") were also outstanding as of the Petition Date and remain outstanding as of the date of this Confirmation Order: (i) LCs in the face amount of 7,500,000 Euros issued for the account of Brand Loyalty France S.A.R.L. and (ii) LCs in the face amount of 700,000 Canadian dollars issued for the account of Loyalty One, Co. To the extent any of the LCs are drawn, the applicable amount(s) of such LC(s) shall be automatically added to the principal amount of the Allowed Revolving Loan Claims without the need for any further action or order of this Court.~~

b.   The Allowed Term A Loan Claims include: (i) $161,875,000.00 of outstanding principal of the Term A Loans, and (ii) $1,767,320.23 of accrued interest on the Term A Loans.

c.   The Allowed Term B Loan Claims include: (i) $ 462,500,000.00 of outstanding principal of the Term B Loans, (ii) $5,410,616.41 of accrued interest on the Term B Loans, and (iii) a prepayment premium in the amount of $9,250,000.00 (the "<u>Prepayment Premium</u>").

The amounts listed above reflect amounts owing under the Credit Agreement as of the Petition Date. Distributions on account of the Allowed Loan Claims under the Plan shall be in accordance with the Plan and the Liquidating Trust Agreement.   Notwithstanding anything to the contrary in the Plan, the inclusion of the Prepayment Premium as part of the Allowed Term B Claims is not a determination as to the entitlement to the payment of such amount under applicable law or the Credit Agreement and all parties' rights on those issues are reserved.

H.   **Assumption, Assignment and Rejection of Executory Contracts and Unexpired Leases**

14.   Except as otherwise previously approved by an order of this Court, entry of this Confirmation Order shall constitute an order, pursuant to Bankruptcy Code sections 365 and 1123, approving the assumptions, assumptions and assignments, and rejections of such Executory

Contracts and Unexpired Leases.   Notwithstanding anything to the contrary in the Plan, the Debtors and Liquidating Trustee, as applicable, may alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases (the "Schedule" or "Schedules") in accordance with the terms of the Transaction Support Agreement at any time through and including ninety (90) days after the Effective Date.   The Debtors or the Liquidating Trustee, as applicable, shall file any such amended Schedule(s) on the docket of these Chapter 11 Cases and serve any such amended Schedule(s) on each non-Debtor counterparty whose Executory Contract or Unexpired Lease is added or removed from the Schedule.   Unless otherwise indicated herein or the Plan Supplement, assumptions, assumptions and assignments, and rejections of Executory Contracts and Unexpired Leases pursuant to the Plan shall be effective on the ninetieth (90th) day after the Effective Date.   The assumption of Executory Contracts and Unexpired Leases under the Plan may include, among other things, the assignment of certain of such Executory Contracts and Unexpired Leases to Affiliates or Entities in connection with the Successful Bid under the SISP.

15.     To the maximum extent permitted by law, to the extent any provision (including, without limitation, any "change of control" provision) in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease, then such provision is hereby deemed modified such that the transactions contemplated by the Plan shall not entitle the counterparty thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto, except for asserting and pursuing payment of a Cure Claim consistent with the Plan.

16.     The Debtors shall continue to make payments in the ordinary course under each Executory Contract listed on the Schedule until such time as an Executory Contract is removed

from the Schedule and rejected.  With respect to any Executory Contract or Unexpired Lease assumed by the Debtors, any Cure Claim amount shall be satisfied, pursuant to Bankruptcy Code section 365(b)(1), by payment in the ordinary course or as soon as reasonably practicable thereafter, with the amount and timing of payment of any such Cure Claim dictated by the Debtors' ordinary course of business, the effective date of the assumption or as otherwise agreed or ordered by the Court.  With respect to any Executory Contract or Unexpired Lease assumed by the Debtors and assigned to a third party, any Cure Claim amount shall be satisfied by the assignee, pursuant to Bankruptcy Code section 365(b)(1), by payment on the effective date of such assumption and assignment or as soon as reasonably practicable thereafter or as otherwise agreed or ordered by the Court.

17.     Payment of an Allowed Cure Claim upon the effective date of the assumption of any Executory Contract or Unexpired Lease pursuant to the Plan  and in the ordinary course, shall result in the full release and satisfaction of any Cures, Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, under such Executory Contract or Unexpired Lease occurring at any time prior to the effective date of the assumption.

18.     A Claim for damages resulting from the rejection of an Executory Contract or Unexpired Lease shall be classified as a Convenience Claim or General Unsecured Claim, as applicable, and shall be treated in accordance with Article VII of the Plan.  The Holder of a Claim for damages resulting from the rejection of an Executory Contract or Unexpired Lease must file a Proof of Claim with the Debtors' Claims and Noticing Agent within thirty (30) days of the effective date of the rejection of the Executory Contract or Unexpired Lease, or its Claim shall be barred forever.

## I.    <u>Releases by the Debtors</u>

19.    The releases by the Debtors in <u>Article XII.B</u> of the Plan are approved as set forth below and in the Plan.

**Releases by the Debtors**

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY OTHER THAN <u>ARTICLE IV.K.2.</u> OF THE COMBINED DS AND PLAN, PURSUANT TO BANKRUPTCY CODE SECTION 1123(B) AND TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW, FOR GOOD AND VALUABLE CONSIDERATION, ON AND AFTER THE EFFECTIVE DATE, EACH RELEASED PARTY IS DEEMED RELEASED BY THE DEBTORS AND THEIR ESTATES FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS OR THEIR ESTATES, THAT THE DEBTORS OR THEIR ESTATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM AGAINST, OR INTEREST IN, A DEBTOR OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTORS AND THE OWNERSHIP THEREOF, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS AND CONTEMPLATED LIQUIDATION, ANY AVOIDANCE ACTIONS, ANY INTERCOMPANY TRANSACTION, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE TRANSACTION SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE TRANSACTION SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE CHAPTER 11 CASES, THE FILING OF THE CHAPTER 11 CASES, THE DIP FACILITY DOCUMENTS, SOLICITATION OF VOTES ON THE PLAN, THE PREPETITION NEGOTIATION AND SETTLEMENT OF CLAIMS, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE**

**DATE, EXCEPT FOR CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (A) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT EXECUTED TO IMPLEMENT THE PLAN, OR (B) OBLIGATIONS UNDER THE CREDIT AGREEMENT, OR DIP AND CASH COLLATERAL ORDERS THAT, BY THEIR EXPRESS TERMS, SURVIVE THE TERMINATION OF THE CREDIT AGREEMENT OR DIP AND CASH COLLATERAL ORDERS.**

**ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (A) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, INCLUDING, WITHOUT LIMITATION, THE RELEASED PARTIES' CONTRIBUTIONS TO FACILITATING THE CHAPTER 11 CASES AND IMPLEMENTING THE PLAN; (B) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (C) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (D) FAIR, EQUITABLE, AND REASONABLE; (E) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (F) A BAR TO ANY OF THE DEBTORS OR THE DEBTORS' ESTATES, AS APPLICABLE, ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.**

**FOR THE AVOIDANCE OF DOUBT: (i) NONE OF THE BREAD PARTIES SHALL BE RELEASED PARTIES UNDER THE PLAN, AND (ii) NO RELEASE PURSUANT TO THE PLAN SHALL BE PROVIDED TO ANY INDIVIDUAL OR ENTITY RELATED TO ANY SPINOFF CLAIM AND CAUSE OF ACTION. THE DEBTORS AND THEIR ESTATES ARE PRESERVING AND NOT RELEASING ANY SUCH CLAIMS OR CAUSES OF ACTION.**

## J.     Releases by the Releasing Parties

20.     The releases by the Releasing Parties in <u>Article XII.C</u> of the Plan are approved as set forth below and in the Plan.

**Releases by Holders of Claims and Interests**

NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, AS OF THE EFFECTIVE DATE, AND TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW, EACH RELEASING PARTY IS DEEMED TO HAVE RELEASED EACH DEBTOR AND RELEASED PARTY FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS OR THEIR ESTATES, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE MANAGEMENT, OWNERSHIP OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTORS AND THE OWNERSHIP THEREOF, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS AND CONTEMPLATED LIQUIDATION, ANY AVOIDANCE ACTIONS, ANY INTERCOMPANY TRANSACTION, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE TRANSACTION SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE TRANSACTION SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE CHAPTER 11 CASES, THE FILING OF THE CHAPTER 11 CASES, THE DIP FACILITY DOCUMENTS, SOLICITATION OF VOTES ON THE PLAN, THE PREPETITION NEGOTIATION AND SETTLEMENT OF CLAIMS, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, EXCEPT FOR CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL   MISCONDUCT OR GROSS NEGLIGENCE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (A) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT EXECUTED TO IMPLEMENT THE PLAN, OR (B) OBLIGATIONS UNDER THE CREDIT AGREEMENT, OR DIP AND CASH COLLATERAL ORDERS THAT, BY THEIR EXPRESS TERMS, SURVIVE

**THE TERMINATION OF THE CREDIT AGREEMENT OR DIP AND CASH COLLATERAL ORDERS.**

**ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS: (A) CONSENSUAL; (B) ESSENTIAL TO THE CONFIRMATION OF THE PLAN; (C) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, INCLUDING, WITHOUT LIMITATION, THE RELEASED PARTIES' CONTRIBUTIONS TO FACILITATING THE CHAPTER 11 CASES AND IMPLEMENTING THE PLAN; (D) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASE; (E) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS; (F) FAIR, EQUITABLE, AND REASONABLE; (G) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (H) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.**

**FOR THE AVOIDANCE OF DOUBT: (i) NONE OF THE BREAD PARTIES SHALL BE RELEASED PARTIES UNDER THE PLAN, AND (ii) NO RELEASE PURSUANT TO THIS PLAN SHALL BE PROVIDED TO ANY INDIVIDUAL OR ENTITY RELATED TO ANY SPINOFF CLAIM AND CAUSE OF ACTION. THE RELEASING PARTIES ARE PRESERVING AND NOT RELEASING ANY SUCH CLAIMS OR CAUSES OF ACTION.**

**K.**   **Exculpation**

21.   The exculpation of the Exculpated Parties in Article XII.D of the Plan is approved

as set forth below and in the Plan.

**Exculpation**

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, NO EXCULPATED PARTY SHALL HAVE OR INCUR LIABILITY FOR, AND EACH EXCULPATED PARTY IS RELEASED AND EXCULPATED FROM, ANY CAUSE OF ACTION FOR ANY CLAIM RELATED TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE TRANSACTION SUPPORT AGREEMENT AND RELATED NEGOTIATIONS, THE DIP FACILITY, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN**

SUPPLEMENT, OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE TRANSACTION SUPPORT AGREEMENT, AND RELATED NEGOTIATIONS. THE DIP FACILITY, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE CHAPTER 11 CASES, THE FILING OF THE CHAPTER 11 CASES, AND RELATED NEGOTIATIONS, THE DIP FACILITY DOCUMENTS, THE DIP FINANCING ORDERS, SOLICITATION OF VOTES ON THE PLAN, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR AFTER THE PETITION DATE AND ON OR BEFORE THE CONFIRMATION DATE, EXCEPT FOR CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN.

THE EXCULPATED PARTIES HAVE, AND UPON CONFIRMATION OF THE PLAN SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE LAWS WITH REGARD TO THE SOLICITATION OF VOTES ON, AND DISTRIBUTION OF CONSIDERATION PURSUANT TO, THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE EXCULPATION SET FORTH ABOVE DOES NOT RELEASE OR EXCULPATE ANY CLAIM RELATING TO (A) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT EXECUTED TO IMPLEMENT THE PLAN, OR (B) OBLIGATIONS UNDER THE CREDIT AGREEMENT, OR DIP AND CASH COLLATERAL ORDERS THAT, BY THEIR EXPRESS TERMS, SURVIVE THE TERMINATION OF THE CREDIT AGREEMENT OR DIP AND CASH COLLATERAL ORDERS.

FOR THE AVOIDANCE OF DOUBT: (i) NONE OF THE BREAD PARTIES SHALL BE EXCULPATED PARTIES UNDER THE PLAN, AND (ii) NO EXCULPATION PURSUANT TO THIS PLAN SHALL BE

**PROVIDED TO ANY INDIVIDUAL OR ENTITY RELATED TO ANY SPINOFF CLAIM AND CAUSE OF ACTION.**

**L.**   **Injunction**

22.   The injunction in <u>Article XII.E</u> of the Plan is approved as set forth below and in the Plan.

**Injunction**

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT:  (A) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (B) HAVE BEEN RELEASED PURSUANT TO <u>ARTICLE XII.B.</u> OF THE PLAN; (C) HAVE BEEN RELEASED PURSUANT TO <u>ARTICLE XII.C.</u> OF THE PLAN; (D) ARE SUBJECT TO EXCULPATION PURSUANT TO <u>ARTICLE XII.D.</u> OF THE PLAN; OR (E) ARE OTHERWISE RELEASED, SATISFIED, STAYED, OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (4) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW**

**OR OTHERWISE; AND (5) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, EXCULPATED, OR SETTLED PURSUANT TO THE PLAN.**

**FOR THE AVOIDANCE OF DOUBT, NO (I) CLAIM OR CAUSE OF ACTION AGAINST THE BREAD PARTIES OR (II) ANY SPINOFF CLAIM AND CAUSE OF ACTION SHALL BE ENJOINED UNDER THE PLAN.**

**M.**     **Gatekeeper Provision**

23.     The gatekeeper provision in Article XII.F of the Plan is approved as set forth below and in the Plan.

No party may commence, continue, amend, or otherwise pursue, join in, or otherwise support any other party commencing, continuing, amending, or pursuing, a Claim or Cause of Action of any kind against a Debtor or Released Party that arose or arises from or is related to any Covered Claim without first (i) requesting a determination from the Bankruptcy Court, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim against a Debtor or Released Party and is not a Claim that the Debtors released under the Plan, which request must attach the complaint or petition proposed to be filed by the requesting party and (ii) obtaining from the Bankruptcy Court specific authorization for such party to bring such Claim or Cause of Action against any such Debtor or Released Party. For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any Claims or Causes of Action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court *before* filing any such amendment in the court where such complaint or petition is pending. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and, only to the extent legally permissible, will have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action. For the avoidance of doubt, the Bread Parties shall not be beneficiaries of this Article XII.F.

**N.**     **No Release, Injunction or Exculpation of the Bread Parties or Related to the Spinoff Transaction**

24.     The provisions in Article XII.J of the Plan denying any release, injunction or exculpation to the Bread Parties or related to the Spinoff Transaction are approved as set forth below and in the Plan.

> Notwithstanding any other provision of the Plan, in no event are any of the Bread Parties released, exculpated, or the beneficiary of any injunction, gatekeeper provision or any other provision of this Article XII of the Plan.

> Further, notwithstanding any other provision of the Plan, in no event is any individual or Entity released, exculpated, or the beneficiary of any injunction, gatekeeper provision or any other provision of this Article XII of the Plan for any Spinoff Claim and Cause of Action.

**O.**     **Implementation of Other Necessary Documents and Agreements**

25.     The Debtors or the Liquidating Trustee, as applicable, are authorized, without further notice to, or action, order or approval of this Court or any other Person, to execute and deliver all agreements, documents, instruments and certificates relating to such documents and agreements and to perform their obligations thereunder, including, without limitation, to pay all fees, costs and expenses thereunder in accordance with the Plan.  The terms and conditions of such documents and agreements are reaffirmed or approved, as applicable, and shall, upon completion of documentation and execution, be valid, binding and enforceable.

**P.**     **No Action Required**

26.     Under Bankruptcy Code section 1142(b) and applicable nonbankruptcy law, no action of the managers or members of the Debtors are required to authorize the Debtors to enter into, execute, deliver, file, adopt, amend, restate, consummate or effectuate, as the case may be, the Plan and any contract, instrument or other document to be executed, delivered, adopted or amended in connection with the implementation of the Plan.

**Q.**     **Enforceability of Plan Documents**

27.     Pursuant to the provisions of this Confirmation Order and Bankruptcy Code sections 1123(a) and 1142(a), the Plan, the Disclosure Statement, this Confirmation Order, the Plan Supplement and all implementing Plan documents (collectively, the "Plan Documents") shall apply and be enforceable notwithstanding any otherwise applicable bankruptcy law.

**R.**     **Exemption from Transfer Tax and Recording Fees**

28.     Pursuant to Bankruptcy Code section 1146, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

**S.**     **Preservation of Preserved Estate Claims**

29.     Except as provided in the Plan, the Confirmation Order or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with Bankruptcy Code section 1123(b), the Liquidating Trust will retain and may enforce any Preserved Estate Claim that any Estate or Debtor may hold, including the Spinoff Claims and Causes of Action, against any Entity, including but not limited to the Bread Parties, but excluding the Lenders or the Administrative Agent.  The Liquidating Trust may pursue any such Preserved Estate Claims in accordance with the Plan and the Liquidating Trust Agreement. The Debtors' inclusion or failure to include or describe with sufficient specificity any Preserved Estate Claim on the Schedule of Preserved Estate Claims shall not be deemed an admission, denial or waiver of any Preserved Estate Claim that the Debtors or Estates may hold, other than with respect to the Administrative Agent and the Lenders. The Debtors have preserved all Preserved Estate Claims, other than any claim or Cause of Action against the Lenders or Administrative

Agent and any claim or Cause of Action against a Released Party (to the extent such claim or Cause of Action is released in <u>Article XII</u> of the Plan).  With respect to all Causes of Action, for the avoidance of doubt, no claim, Cause of Action or related enforcement action against the Administrative Agent, the Lenders or the DIP Lender and its directors and officers shall be preserved by the Debtors, nor shall the Liquidating Trustee have the right or authority to pursue claims and Causes of Action against the Administrative Agent, any of the Lenders or the DIP Lender and its directors and officers.

**T.      Prosecution of the Preserved Estate Claims**

30.      Pursuant to <u>Article VIII.N</u> of the Plan, the Debtors or the Liquidating Trustee, as applicable, are authorized to establish the Liquidating Trust in accordance with the Plan and the Liquidating Trust Agreement for the benefit of the Liquidating Trust Beneficiaries.   On the Effective Date, the Debtors are authorized to transfer to the Liquidating Trust all of the Debtors' and Estates' rights, title and interest in and to all of the Liquidating Trust Assets (which, for the avoidance of doubt, are defined to include the Preserved Estate Claims).  Concurrently with this transfer, the Liquidating Trustee is authorized to investigate, prosecute and settle Preserved Estate Claims, monetize the Liquidating Trust Assets and make distributions, each in accordance with the Plan, this Confirmation Order and the Liquidating Trust Agreement.  For the avoidance of doubt, the Liquidating Trust is an Entity organized for the purpose of carrying out the Plan, and the Liquidating Trustee's prosecution and liquidation, following the Effective Date, of the Preserved Estate Claims for the benefit of Liquidating Trust Beneficiaries (as provided in <u>Articles VI</u> and <u>VII</u> of the Plan) are important and integral elements of the implementation and execution of the Plan and are necessary for the consummation of the Plan.

U.    <u>**Release of Liens**</u>

31.    Except as otherwise specifically provided in the Plan, this Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Debtors and their successors and assigns, and all Claims against the Estates shall be fully released, in each case, without any further approval or order of the Court and without any action or Filing being required to be made by the Debtors, the Administrative Agent or any other Holder of a Secured Claim; provided, however, notwithstanding the foregoing or anything to the contrary contained in the Plan, on the later of (a)the Effective Date and (b) the date of the distribution of the cash proceeds (the "<u>BL Proceeds</u>") arising from the BL Closing, all mortgages, deeds of trust, Liens, pledges and/or other security interests in favor of the Administrative Agent securing the obligations under the Credit Agreement (other than any such mortgages, deeds of trust, Liens, pledges and/or other security interests in the assets of LoyaltyOne or the BL Proceeds that constitute collateral securing the obligations under the Credit Agreement) shall be automatically released, and all Claims against obligors under the Credit Agreement (other than Claims against LoyaltyOne) shall be released, in each case without any further approval or order of the Court and without any action, distribution or Filing being required to be made by the Debtors, LoyaltyOne, the Administrative Agent or any other Holder of a Secured Claim.  In addition, at the sole expense of the Debtors, the Administrative Agent shall execute and deliver all documents reasonably requested by the Debtors to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and such Claims and hereby authorizes the Debtors and their designees to file UCC-3

termination statements and other release documentation (to the extent applicable) with respect thereto.

## V.   **Plan Modification**

32.     All modifications made to the Plan after solicitation of votes on the Plan had commenced, as reflected in the First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Loyalty Ventures Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code and this Confirmation Order, satisfy the requirements of Bankruptcy Code section 1127(a) and Bankruptcy Rule 3019, and are not material or do not adversely affect the treatment and rights of the holders of any Claims or Equity Interests under the Plan who have not otherwise accepted such modifications.  Accordingly, the Debtors have satisfied Bankruptcy Code section 1127(c) and Bankruptcy Rule 3019 with respect to the Plan, as modified, and holders of Claims or Equity Interests that have accepted or rejected the Plan (or are deemed to have accepted or rejected the Plan) are deemed to have accepted or rejected, as the case may be, the Plan as modified pursuant to Bankruptcy Code section 1127(d) and Bankruptcy Rule 3019.

## W.   **Continued Effect of Stays and Injunctions**

33.     Unless otherwise provided in the Plan or this Confirmation Order, all injunctions or stays in effect in these Chapter 11 Cases pursuant to Bankruptcy Code sections 105 or 362 or any order of this Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**X.   Waiver of Any Additional Section 341 Meeting of Creditors or Equity Holders; Waiver of Filings**

34.    Any requirement under Bankruptcy Code section 341 for the U.S. Trustee to convene any additional meeting of creditors or equity holders is permanently waived as of the Confirmation Date.  Any requirement for the Debtors to file schedules of assets and liabilities and statements of financial affairs, any reports pursuant to Bankruptcy Rule 2015.3 or any other list, schedule or statement pursuant to Bankruptcy Code sections 521 or Bankruptcy Rule 1007 not filed on the Confirmation Date is permanently waived as of the Confirmation Date.

**Y.   Reporting**

35.    After the Effective Date, the Debtors or the Liquidating Trustee, as applicable, shall have no obligation to provide any reports to any parties otherwise required under any "first day" or other orders entered in the Chapter 11 Cases; *provided*, that the Liquidating Trustee shall provide such reports as required by the Liquidating Trust Agreement.

**Z.   Substantial Consummation**

36.    On the Effective Date, the Plan shall be deemed to be substantially consummated under Bankruptcy Code sections 1101 and 1127.

**AA.   Waiver of 14-Day Stay**

37.    Notwithstanding Bankruptcy Rule 3020(e), the terms and conditions of this Confirmation Order will be effective and enforceable immediately upon its entry, and not subject to any stay.

Signed:  April 27, 2023

_____
Christopher Lopez
United States Bankruptcy Judge

22

**<u>Exhibit A to the Confirmation Order</u>**
**Combined DS and Plan**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LOYALTY VENTURES INC., *et al.*,[1] | ) | Case No. 23-90111 (CML) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**FIRST AMENDED COMBINED DISCLOSURE STATEMENT**
**AND JOINT CHAPTER 11 PLAN OF LOYALTY VENTURES INC. AND**
**ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
J. Machir Stull (TX Bar No. 24070697)
Victoria Argeroplos (TX Bar No. 24105799)
1401 McKinney Street, Suite 1900
Houston, Texas 77010

Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email:   mcavenaugh@jw.com
            jwertz@jw.com
            mstull@jw.com
            vargeroplos@jw.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Philip C. Dublin (admitted *pro hac vice*)
Meredith A. Lahaie (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

Email:   pdublin@akingump.com
            mlahaie@akingump.com

-and-

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Marty L. Brimmage, Jr. (TX Bar No. 00793386)
Lacy M. Lawrence (TX Bar No. 24055913)
Rachel Biblo Block (TX Bar No. 24097382)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
Email:   mbrimmage@akingump.com
            llawrence@akingump.com
            rbibloblock@akingump.com

*Proposed Co-Counsel to the Debtors and Debtors in*
*Possession*

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' tax identification numbers, are: Loyalty Ventures Inc. (3472); LVI Lux Holdings S.à r.l. (5350); LVI Sky Oak LLC (1657); and Rhombus Investments L.P. (7493). The location of the Debtors' service address for purposes of these chapter 11 cases is:  8235 Douglas Avenue, Suite 1200, Dallas, TX 75225.

**IMPORTANT INFORMATION ABOUT THE COMBINED DISCLOSURE STATEMENT AND PLAN**

THE DEBTORS ARE SOLICITING VOTES ON THE *COMBINED DISCLOSURE STATEMENT AND JOINT CHAPTER 11 PLAN OF LOYALTY VENTURES INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE* FROM THE HOLDERS OF CLAIMS IN: <u>CLASS 3 LOAN CLAIMS AND CLASS 4 GENERAL UNSECURED CLAIMS</u>.

TO BE COUNTED FOR VOTING PURPOSES, YOUR BALLOT MUST BE RECEIVED BY THE CLAIMS AND NOTICING AGENT NOT LATER THAN APRIL 20, 2023 AT 4:00 P.M. (PREVAILING CENTRAL TIME).

| IF YOU HAVE A CLASS 3 <br> <u>LOAN CLAIM:</u> | IF YOU HAVE A CLASS 4 <br> <u>GENERAL UNSECURED CLAIM</u> |
|---|---|
| YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN. <br><br> DELIVERY OF BALLOTS <br><br> CLASS 3 LOAN CLAIM BALLOTS MAY BE RETURNED BY THE FOLLOWING METHODS: <br><br> <u>BY E-BALLOT AT:</u>  https://cases.ra.kroll.com/LVI <br><br> <u>BY FIRST CLASS MAIL, OVERNIGHT MAIL OR HAND DELIVERY AT:</u> <br><br> **Loyalty Ventures Inc. Ballot Processing Center** <br> **c/o Kroll Restructuring Administration LLC** <br> **850 Third Avenue, Suite 412** <br> **Brooklyn, NY 11232** <br><br> PLEASE CHOOSE ONLY <u>ONE</u> METHOD TO RETURN YOUR BALLOT. <br><br> CLASS 3 BALLOTS MUST BE <u>ACTUALLY RETURNED</u> TO THE SOLICITATION AGENT BY THE VOTING DEADLINE, AS DIRECTED ON THE BALLOT. | YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN. <br><br> DELIVERY OF BALLOTS <br><br> CLASS 4 GENERAL UNSECURED BALLOTS MAY BE RETURNED BY THE FOLLOWING METHODS: <br><br> <u>BY E-BALLOT AT:</u>  https://cases.ra.kroll.com/LVI <br><br> <u>BY FIRST CLASS MAIL, OVERNIGHT MAIL OR HAND DELIVERY AT:</u> <br><br> **Loyalty Ventures Inc. Ballot Processing Center** <br> **c/o Kroll Restructuring Administration LLC** <br> **850 Third Avenue, Suite 412** <br> **Brooklyn, NY 11232** <br><br> PLEASE CHOOSE ONLY <u>ONE</u> METHOD TO RETURN YOUR BALLOT. <br><br> CLASS 4 BALLOTS MUST BE <u>ACTUALLY RETURNED</u> TO THE SOLICITATION AGENT BY THE VOTING DEADLINE, AS DIRECTED ON THE BALLOT. |

**IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURE FOR
VOTING ON THE PLAN, PLEASE CONTACT THE SOLICITATION AGENT AT:**

**BY EMAIL TO:  LVIBALLOTS@RA.KROLL.COM, OR BY
TELEPHONE AT:  (833) 570-5238 (TOLL FREE, US AND CANADA),
(646) 440-4764 (INTERNATIONAL)**

The Bankruptcy Court has established April 20, 2023, at 4:00 p.m. (prevailing Central Time) as the deadline for filing and serving objections to the Confirmation of the Plan and the adequacy of information in the Disclosure Statement (the "<u>Combined DS and Plan Objection Deadline</u>").  Any objection to the Plan must: (a) be in writing; (b) conform to the Bankruptcy Rules; (c) state the name and address of the objecting party and the amount and nature of the Claim or Interest; (d) state with particularity the basis and nature of any objection to the Plan; (e) propose a modification to the Plan that would resolve such objection (if applicable); and (f) be filed with the Court and served, no later than the Combined DS and Plan Objection Deadline, on: (i) proposed co-counsel to the Debtors, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: Philip C. Dublin (pdublin@akingump.com) and Meredith A. Lahaie (mlahaie@akingump.com); (ii) proposed co-counsel to the Debtors, Jackson Walker LLP, 1401 McKinney Street, Suite 1900, Houston, Texas 77010, Attn: Matthew D. Cavenaugh (mcavenaugh@jw.com), and Jennifer F. Wertz (jwertz@jw.com), J. Machir Stull (mstull@jw.com), and Victoria Argeroplos (vargeroplos@jw.com); (iii) the Office of the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, Texas 77002; (iv) counsel to any statutory committee appointed in these cases; (v) counsel for Bank of America, National Association, as the administrative agent under the Credit Agreement, Haynes and Boone, LLP, 2323 Victory Avenue, Suite 700, Dallas, Texas 75219, Attn: Eli Columbus (eli.columbus@haynesboone.com) and James Markus (James.Markus@haynesboone.com); and (vi) counsel to the ad hoc group of Term B Loan Lenders under the Credit Agreement, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, New York 10166, Attn: Scott Greenberg (sgreenberg@gibsondunn.com) and Steven Domanowski (sdomanowski@gibsondunn.com); AnnElyse Scarlett Gains (agains@gibsondunn.com) and Stephen Silverman (ssilverman@gibsondunn.com).

A hearing to approve the adequacy of the Disclosure Statement and confirm the Plan (the "<u>Combined Hearing</u>") will commence on April 27, 2023, at 1:00 p.m. (prevailing Central Time), in the United States Bankruptcy Court for the Southern District of Texas before the Honorable Christopher M. Lopez, at 515 Rusk Street, Houston, Texas 77002.  Please be advised that the Combined Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such continuance being announced in open court or by a notice of continuance or reset being filed with the Bankruptcy Court and served on parties entitled to notice under Bankruptcy Rule 2002 or otherwise.  In accordance with the Plan, the Plan may be modified, if necessary, before, during or as a result of the Combined Hearing without further action by the Debtors and without further notice to or action, order or approval of the Court or any other Entity.

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**[2]

 **This Combined DS and Plan provides that the Liquidating Trust Interests (including beneficial interests in the Liquidating Trust) to be distributed to the Liquidating Trust Beneficiaries pursuant to this Combined DS and Plan shall not constitute "securities" under applicable law.  To the extent the Liquidating Trust Interests are considered "securities" under applicable law, the offer, sale and issuance of such interests will be exempt from registration under the Securities Act and any state securities laws ("<u>Blue Sky Laws</u>") requiring registration.  The Bankruptcy Court has not reviewed this Combined DS and Plan, and any securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act, or any securities regulatory authority of any state under any Blue Sky Laws.  This Combined DS and Plan has not been approved or disapproved by the SEC or any state regulatory authority and neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of the information contained in this Combined DS and Plan.  Any representation to the contrary is a criminal offense.  To the extent the Liquidating Trust Interests are considered securities under applicable law, the Debtors are relying on section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue Sky Laws the offer, issuance, and distribution, if applicable, of the Liquidating Trust Interests under this Combined DS and Plan, and to the extent such exemption is not available, the Liquidating Trust Interests will be offered, issued, and distributed under this Combined DS and Plan pursuant to other applicable exemptions from registration under the Securities Act and Blue Sky Laws.  Neither the solicitation of votes to accept or reject this Combined DS and Plan (the "<u>Solicitation</u>") nor this Combined DS and Plan constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized or is unlawful.**

---

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the <u>Article I</u> herein.

**DISCLAIMER**

This Combined DS and Plan contains summaries of certain provisions and certain other documents and financial information. The information included in this Combined DS and Plan is provided solely for the purpose of soliciting votes on the Combined DS and Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Combined DS and Plan. All Holders of Claims entitled to vote to accept or reject the Plan are advised and encouraged to read the Combined DS and Plan in its entirety before voting to accept or reject the Plan. The Debtors believe that the summaries contained in this Combined DS and Plan are fair and accurate. The summaries of the financial information and the documents that are attached to, or incorporated by reference in, this Combined DS and Plan are qualified in their entirety by reference to such information and documents. In the event of any inconsistency or discrepancy between a description in the Combined DS and Plan, on the one hand, and the financial information and documents incorporated in the Combined DS and Plan by reference, on the other hand, the financial information and documents, as applicable, shall govern for all purposes.

Except as otherwise provided in the Combined DS and Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement the Combined DS and Plan. The Bankruptcy Court's approval of the Combined DS and Plan does not constitute a guarantee of the accuracy or completeness of the information contained herein or the Bankruptcy Court's endorsement of the merits of the Combined DS and Plan. The statements and financial information contained in the Combined DS and Plan have been made as of the date hereof unless otherwise specified. Holders of Claims reviewing the Combined DS and Plan should not assume at the time of such review that there have been no changes in the facts set forth in the Combined DS and Plan since the date of the Combined DS and Plan. No Holder of a Claim should rely on any information, representations or inducements that are not contained in or are inconsistent with the information contained in the Combined DS and Plan and the documents attached to the Combined DS and Plan. The Combined DS and Plan does not constitute legal, business, financial or tax advice. Any Person or Entity desiring any such advice should consult with their own advisors.

The financial information contained in or incorporated by reference the Combined DS and Plan has not been audited, except as specifically indicated otherwise.

Regarding contested matters, adversary proceedings and other pending, threatened or potential litigation or other actions, the Combined DS and Plan does not constitute, and may not be construed as, an admission of fact, liability, stipulation or waiver by the Debtors or any other party, but rather constitutes, and is to be construed as, a statement made in the context of settlement negotiations in accordance with Rule 408 of the Federal Rules of Evidence and any analogous state or foreign laws or rules. As such, the Combined DS and Plan shall not be admissible in any non-bankruptcy proceeding involving the Debtors or any other party in interest, nor shall it be construed to be conclusive advice on the tax, securities, financial or other effects of the Combined DS and Plan to Holders of Claims against the Debtors or any other party in interest. Please refer to Article XVIII of the Combined DS and Plan, entitled "Plan-Related Risk Factors" for a discussion of certain risk factors that Holders of Claims voting on the Plan should consider.

Except as otherwise expressly set forth herein, all information, representations or statements contained herein have been provided by the Debtors. No Person is authorized by the Debtors in connection with the Combined DS and Plan or the solicitation of votes thereon to give any information or to make any representation or statement regarding the Combined DS and Plan other than as contained in the Combined DS and Plan and the exhibits attached hereto or as otherwise incorporated herein by reference or referred to herein. If any such information, representation or statement is given or made, it may not be relied upon as having been authorized by the Debtors.

The Combined DS and Plan contains forward-looking statements within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995, as amended, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic and competitive risks, including, but not limited to, those summarized herein. When used in the Combined DS and Plan, the words "believe," "expect," "anticipate," "estimate," "intend," "project," "plan," "likely," "may," "should" or other words or phrases of similar import generally identify forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved. These statements are only predictions and are not guarantees. Forward-looking statements are subject to risks and uncertainties that could cause actual results

iv

to differ materially from those contemplated by a forward-looking statement, including without limitation, our high level of indebtedness; increases in market interest rates; the potential failure to satisfy the closing conditions under the purchase agreement for our BrandLoyalty business, which may result in the sale transaction not being consummated; the potential failure to satisfy the borrowing conditions under the bridge loan agreement in connection with the sale of our BrandLoyalty business, which may result in the BrandLoyalty business not being able to obtain bridge loans, which could lead to the insolvency of the BrandLoyalty business; continuing impacts related to COVID-19, including variants, labor shortages, reduction in demand from clients, supply chain disruption for our reward suppliers and capacity constraints, rising costs or other disruptions in the airline or travel industries; changes in geopolitical conditions, including the Russian invasion of Ukraine and related global sanctions and Russian restrictions or actions with respect to local assets; fluctuation in foreign exchange rates; execution of restructuring plans and any resulting cost savings; loss of, or reduction in demand for services from, significant clients; loss of active AIR MILES Reward Program  Collectors or greater than expected redemptions by the same; unfavorable resolution of pending or future litigation matters; disruption to operations due to the separation from our former parent or failure of the separation to be tax-free; new regulatory limitations related to consumer protection or data privacy limiting our services; loss of consumer information due to compromised physical or cyber security; the Transaction Support Agreement may be terminated by certain of its parties if specified milestones are not achieved, amended or waived, or if certain other events occur; our ability to operate within the restrictions and the liquidity limitations of the CCAA DIP Facility and the DIP Facility; submission of other acquisition bids and negotiations with associated bidders in connection with the proposed SISP; and the ability to obtain relief from the Bankruptcy Court to facilitate the smooth operation of our businesses during the Chapter 11 Cases and other risks and uncertainties relating to the Chapter 11 Cases, including but not limited to, our ability to obtain approval of the Bankruptcy Court and the Ontario Court with respect to motions or other requests made to the Bankruptcy Court and the Ontario Court throughout the course of the Chapter 11 Cases and the CCAA Proceeding, as the case may be including with respect to the CCAA DIP Facility and the DIP Facility, the proposed SISP, and the Stalking Horse Transaction Agreement we entered into with BMO (each as defined below) or the consummation of the transactions contemplated therein, the effects of the Chapter 11 Cases on us and on the interests of various constituencies, Bankruptcy Court rulings in the Chapter 11 Cases and the outcome of the Chapter 11 Cases in general, the length of time we will operate under the Chapter 11 Cases, risks associated with third-party motions in the Chapter 11 Cases, regulatory approvals required to emerge from chapter 11, the potential adverse effects of the Chapter 11 Cases on our liquidity or results of operations and increased legal and other professional costs in connection with the Chapter 11 Cases.  All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in the Combined DS and Plan.  Forward-looking statements speak only as of the date on which they are made.  Except as required by law, the Debtors expressly disclaim any obligation to update or revise any forward-looking statement, whether as a result of new information, subsequent events, anticipated or unanticipated circumstances or otherwise.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND OTHER REFERENCES ........................................................ 5

    A.    Defined Terms ................................................................................................ 5
    B.    Rules of Interpretation ................................................................................ 16
    C.    Computation of Time ................................................................................... 17
    D.    Governing Law ............................................................................................ 17
    E.    Reference to Monetary Figures .................................................................. 17
    F.    Controlling Document ................................................................................. 17
    G.    Certain Consent Rights ............................................................................... 17

ARTICLE II. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW ................................................................................................................ 17

    A.    The Debtors' Corporate History ................................................................. 17
    B.    The Company's Business Operations .......................................................... 18
          1.    AIR MILES Reward Program ........................................................ 18
          2.    BrandLoyalty ................................................................................... 18
    C.    The Debtors' Prepetition Capital Structure ................................................ 19
          1.    Capital Structure ............................................................................. 19
    D.    Spinoff Agreements .................................................................................... 20
    E.    Intercompany Relationships ........................................................................ 20
    F.    Common Stock ............................................................................................ 20

ARTICLE III. EVENTS LEADING TO THE CHAPTER 11 FILINGS ................................. 20

    A.    Issues Arising from the Spinoff Transaction .............................................. 21
    B.    Operational Challenges ............................................................................... 22
    C.    Prepetition Negotiations with the Lenders .................................................. 23
    D.    Sale of BrandLoyalty and Bridge Loan Agreement .................................... 24
          1.    Purchase Agreement ....................................................................... 24
          2.    Bridge Loan Agreement .................................................................. 24
    E.    CCAA Proceeding of LoyaltyOne ............................................................. 24
          1.    The Stalking Horse Purchase Agreement ....................................... 25
          2.    The SISP .......................................................................................... 25
          3.    CCAA DIP Facility ........................................................................ 25

ARTICLE IV. EVENTS FOLLOWING THE FILING OF THE CHAPTER 11 CASES ........ 25

    A.    First Day Motions ....................................................................................... 25
    B.    Cash Collateral Motion ............................................................................... 25
    C.    Joint Administration Motion ....................................................................... 26
    D.    Redaction Motion ....................................................................................... 26
    E.    Cash Management Motion ........................................................................... 26
    F.    NOL Motion ............................................................................................... 26
    G.    Wages Motion ............................................................................................. 27

| H. | Utilities Motion | 27 |
|---|---|---|
| I. | Insurance Motion | 27 |
| J. | Claims Bar Date Motion | 27 |
| K. | Settlement with the Bread Parties | 28 |

**ARTICLE V. SUMMARY OF TREATMENT OF CLAIMS AND ESTIMATED RECOVERIES** ........... 29

**ARTICLE VI. ADMINISTRATIVE AND PRIORITY CLAIMS** .................................................. 29

| A. | Administrative Claims | 30 |
|---|---|---|
|  | 1. Administrative Claims | 30 |
|  | 2. Professional Fee Claims | 30 |
|  | 3. Administrative Claims Bar Date | 31 |
| B. | DIP Facility Claims | 31 |
| C. | Priority Tax Claims | 32 |
| D. | Statutory Fees | 32 |

**ARTICLE VII. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS** ....... 32

| A. | Classification of Claims and Interests | 32 |
|---|---|---|
| B. | Treatment of Claims and Interests | 32 |
| C. | Special Provision Governing Unimpaired Claims | 35 |
| D. | Controversy Concerning Impairment | 35 |
| E. | Elimination of Vacant Classes | 35 |
| F. | Voting Classes; Presumed Acceptance or Rejection by Non-Voting Classes | 35 |
| G. | Confirmation Pursuant to Bankruptcy Code Sections 1129(a)(10) and 1129(b) | 36 |
| H. | Subordinated Claims | 36 |

**ARTICLE VIII. MEANS FOR IMPLEMENTATION OF THE PLAN** ...................................... 36

| A. | General Settlement of Claims and Interests | 36 |
|---|---|---|
| B. | Transactions Related to the Plan | 36 |
| C. | Subordination | 37 |
| D. | Cancellation of Instruments, Certificates, and Other Documents | 37 |
| E. | Sources for Plan Distributions and Transfers of Funds Among Debtors | 38 |
| F. | Corporate Action | 38 |
| G. | Amended Organizational Documents | 38 |
| H. | Dissolution of Board of Directors | 38 |
| I. | Employment Agreements | 39 |
| J. | Section 1146(a) Exemption | 39 |
| K. | Preservation of Causes of Action | 39 |
| L. | Convenience Claim Distribution Reserve | 40 |
| M. | Winddown Reserve | 40 |
| N. | Liquidating Trustee | 40 |
|  | 1. Creation of the Liquidating Trust | 40 |
|  | 2. Liquidating Trust Reserve | 41 |

|  | 3. | Liquidating Trust Oversight Committee | 41 |
|  | 4. | The Liquidating Trustee | 41 |
|  | 5. | Reports to be Filed by the Liquidating Trustee | 42 |
|  | 6. | Substitution in Pending Legal Actions | 42 |
|  | 7. | Tax Treatment; No Successor in Interest | 42 |
|  | 8. | Abandonment of Liquidating Trust Assets | 43 |
|  | 9. | Securities Exempt | 43 |
|  | 10. | Dissolution of Liquidating Trust | 43 |
| O. | | Preservation of Preserved Estate Claims | 43 |
| P. | | Corporate Actions Regarding the Liquidating Trust | 44 |
| Q. | | Effectuating Documents; Further Transactions | 44 |
| R. | | Closing the Chapter 11 Cases | 44 |
| S. | | Consenting Lender and Administrative Agent Fees | 45 |

ARTICLE IX. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............ 45

| A. | Assumption and Rejection of Executory Contracts and Unexpired Leases | 45 |
| B. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases | 45 |
| C. | Rejection Damages Claims | 46 |
| D. | Indemnification | 46 |
| E. | Insurance Related Provisions | 46 |
| F. | Contracts and Leases After the Petition Date | 48 |
| G. | Reservation of Rights | 48 |
| H. | Nonoccurrence of Effective Date | 48 |

ARTICLE X. PROCEDURES FOR RESOLVING DISPUTED CLAIMS ................................ 48

| A. | Disputed Claims Process | 48 |
| B. | Allowance of Claims | 49 |
| C. | Claims Administration Responsibilities | 49 |
| D. | Adjustment to Claims Without Objection | 49 |
| E. | Time to File Objections to Claims | 49 |
| F. | Reservation of Rights to Object to Claims | 49 |
| G. | Estimation of Claims | 49 |
| H. | Reserved | 50 |
| I. | Disallowance of Claims | 50 |
| J. | Amendments to Proofs of Claim | 50 |
| K. | No Distributions Pending Allowance | 50 |
| L. | Distributions After Allowance | 51 |

ARTICLE XI. PROVISIONS GOVERNING DISTRIBUTIONS ................................ 51

| A. | Distributions on Account of Claims Allowed as of the Effective Date | 51 |
| B. | Rights and Powers of the Distribution Agent | 51 |
| | 1. Powers of Distribution Agent | 51 |
| | 2. Expenses Incurred On or After the Effective Date | 51 |

| | C. | Special Rules for Distributions to Holders of Disputed Claims | 52 |
| | D. | Delivery of Distributions | 52 |
| | | 1. | Record Date for Distributions | 52 |
| | | 2. | Distribution Process | 52 |
| | | 3. | Delivery of Distributions on Loan Claims | 52 |
| | | 4. | Delivery of Distributions on DIP Facility Claims | 52 |
| | | 5. | Compliance Matters | 52 |
| | | 6. | Foreign Currency Exchange Rate | 53 |
| | | 7. | Undeliverable, and Unclaimed Distributions | 53 |
| | | 8. | Minimum Distributions | 54 |
| | E. | Claims Paid or Payable by Third Parties | 54 |
| | F. | Setoffs | 54 |
| | G. | Allocation Between Principal and Accrued Interest | 54 |

ARTICLE XII. RELEASE, INJUNCTION AND RELATED PROVISIONS ................................ 55

| | A. | Termination of Interests; Compromise and Settlement of Claims, Interests and Controversies | 55 |
| | B. | Releases by the Debtors | 55 |
| | C. | Releases by Holders of Claims and Interests | 56 |
| | D. | Exculpation | 57 |
| | E. | Injunction | 58 |
| | F. | Gatekeeper Provision | 59 |
| | G. | Protection Against Discriminatory Treatment | 59 |
| | H. | Release of Liens | 59 |
| | I. | Reimbursement or Contribution | 60 |
| | J. | No Release, Injunction, or Exculpation of the Bread Parties or related to the Spinoff Transaction | 60 |
| | K. | Full Release of the Lenders and Administrative Agent | 60 |

ARTICLE XIII. CONFIRMATION OF THE PLAN ................................ 60

| | A. | Voting Procedures and Acceptance | 61 |
| | B. | The Confirmation Hearing | 61 |
| | C. | Confirmation Standard | 61 |
| | D. | Best Interests Test | 62 |
| | E. | Confirmation Without Acceptance by All Impaired Classes | 63 |
| | | 1. | No Unfair Discrimination | 63 |
| | | 2. | Fair and Equitable Test | 63 |

ARTICLE XIV. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN .................. 63

| | A. | Modification of Plan | 63 |
| | B. | Effect of Confirmation on Modifications | 64 |
| | C. | Revocation or Withdrawal of Plan | 64 |

ARTICLE XV. CONDITIONS TO EFFECTIVE DATE ................................ 64

A.     Conditions Precedent to the Confirmation Date ................................................. 64

B.     Conditions Precedent to the Effective Date .................................................... 64

C.     Waiver of Conditions Precedent ................................................................... 66

D.     Effect of Non-Occurrence of Conditions to Consummation ............................ 66

E.     Substantial Consummation ............................................................................ 66

ARTICLE XVI. RETENTION OF JURISDICTION ................................................... 66

ARTICLE XVII. MISCELLANEOUS PROVISIONS.................................................. 68

A.     Immediate Binding Effect ............................................................................. 68

B.     Additional Documents .................................................................................. 68

C.     Statutory Committees and Cessation of Fee and Expense Payment ................. 68

D.     Reservation of Rights .................................................................................... 68

E.     Successors and Assigns ................................................................................. 68

F.     Service of Documents .................................................................................... 68

G.     Term of Injunctions or Stays......................................................................... 70

H.     Entire Agreement ......................................................................................... 70

I.     Plan Supplement ........................................................................................... 70

J.     Non-Severability........................................................................................... 70

K.     Votes Solicited in Good Faith........................................................................ 71

L.     Closing of Chapter 11 Cases ......................................................................... 71

M.     Waiver or Estoppel ....................................................................................... 71

ARTICLE XVIII. PLAN-RELATED RISK FACTORS ................................................ 71

A.     General ......................................................................................................... 71

B.     Risks Relating to the Plan and Other Bankruptcy Law Considerations............. 71

1.     A Holder of a Claim or Interest May Object to, and the Bankruptcy Court May Disagree with, the Debtors' Classification of Claims and Interests ........... 71

2.     The Bankruptcy Court May Not Confirm the Plan or May Require the Debtors to Re-Solicit Votes with Respect to the Plan ......................................... 72

3.     Parties in Interest May Object to the Plan's Amount or Classification of Claims ............................................................................................................ 72

4.     Even if the Debtors Receive All Necessary Acceptances for the Plan to Become Effective, the Debtors May Fail to Meet All Conditions Precedent to Effectiveness of the Plan.............................................................................. 72

5.     There is a Risk of Termination of the Transaction Support Agreement ............. 73

6.     The Bankruptcy Court May Dismiss Some or All of the Chapter 11 Cases........ 73

7.     The United States Trustee or Other Parties May Object to the Plan on Account of the Debtor Releases, Third-Party Releases, Exculpations, or Injunction Provisions ..................................................................................................... 73

8.     The Debtors May Seek to Amend, Waive, Modify, or Withdraw the Plan at Any Time Prior to Confirmation ................................................................... 73

9.     The DIP Facility and the CCAA Proceeding ................................................. 73

10.     Use of Cash Collateral or the DIP Facility ................................................... 74

11.     The Allowed Amount of Claims May Differ from Current Estimates ................ 74

C.   Risks Relating to the Transactions Related to the Plan Generally ..................................... 74

   1.   The Debtors May be Subject to Employee Attrition ............................................. 74

   2.   The Support of the Consenting Lenders and Administrative Agent is Subject to the Terms of the Transaction Support Agreement Which is Subject to Termination in Certain Circumstances .................................................................. 74

   3.   Certain Tax Implications of the Plan ..................................................................... 74

   4.   Recoveries on Account of Preserved Estate Claims are Speculative and Uncertain ................................................................................................................. 74

   5.   Liquidating Trust Expenses May Exceed Current Expectations .......................... 75

D.   General Disclaimer ......................................................................................................... 75

   1.   Information Contained Herein Is Solely for Soliciting Votes ............................... 75

   2.   Combined DS and Plan May Contain Forward-Looking Statements .................... 75

   3.   This Combined DS and Plan Has Not Been Approved by the United States Securities and Exchange Commission ................................................................... 75

   4.   No Legal, Business, or Tax Advice Is Provided to You by This Disclosure Statement ............................................................................................................... 75

   5.   No Admissions Made ............................................................................................. 76

   6.   Failure to Identify Litigation Claims or Projected Objections .............................. 76

   7.   No Waiver of Right to Object or Right to Recover Transfers and Assets ............ 76

   8.   Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors ................................................................................................ 76

   9.   The Potential Exists for Inaccuracies and the Debtors Have No Duty to Update .................................................................................................................... 76

   10.  No Representations Outside of the Disclosure Statement Are Authorized .......... 76

ARTICLE XIX. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .......... 76

A.   Introduction .................................................................................................................... 76

B.   Certain U.S. Federal Income Tax Consequences to the Debtors and Effects of Liquidation on the Debtors ............................................................................................ 78

C.   Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Claims Entitled to Vote ............................................................................................................... 78

   1.   Loan Claims .......................................................................................................... 78

   2.   General Unsecured Claims .................................................................................... 78

   3.   Other Tax Considerations for U.S. Holders of Loan Claims ................................ 79

D.   Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Certain Claims Entitled to Vote .................................................................................................. 80

   1.   U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Loan Claims ........................................................................................................... 80

   2.   Gain Recognition .................................................................................................. 80

   3.   Accrued but Untaxed Interest (or OID) ................................................................ 81

E.   U.S. Federal Income Tax Treatment of the Liquidating Trust ....................................... 81

   1.   Formation of the Liquidating Trust ....................................................................... 81

   2.   General Tax Reporting by the Liquidating Trust and Liquidating Trust Beneficiaries .......................................................................................................... 82

3.      Tax Reporting for Assets Allocable to Disputed Claims ..................................... 83

F.      Information Reporting and Backup Withholding ............................................................ 83

**TABLE OF EXHIBITS**

**<u>Exhibit A</u>**          Organizational Chart

**<u>Exhibit B</u>**          Transaction Support Agreement

## Introduction

The above-captioned debtors and debtors in possession (collectively, the "Debtors") propose this *Combined Disclosure Statement and Joint Chapter 11 Plan of Loyalty Ventures Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as applicable, the "Disclosure Statement," the "Combined DS and Plan," or the "Plan") pursuant to Bankruptcy Code section 1125, to holders of Claims against, and Interests in, the Debtors in connection with the solicitation of votes on the Plan. The Debtors are the proponents of the Plan within the meaning of Bankruptcy Code section 1129. Other agreements and documents supplement this Plan and have been or will be filed with the Bankruptcy Court. Unless otherwise indicated, capitalized terms used herein shall have the meanings set forth in Article I, below. **FOR THE AVOIDANCE OF DOUBT, LOYALTYONE CO., IS A NOT A DEBTOR IN THE CHAPTER 11 CASES. CONTEMPORANEOUSLY WITH THE COMMENCEMENT OF THE CHAPTER 11 CASES, LOYALTYONE APPLIED FOR AND OBTAINED RELIEF UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT* (THE "CCAA") IN CANADA TO, AMONG OTHER THINGS, SELL SUBSTANTIALLY ALL OF ITS OPERATING ASSETS TO BANK OF MONTREAL ("BMO") (OR AN ALTERNATIVE PURCHASER), SUBJECT TO (I) THE COMPLETION OF A COURT-SUPERVISED SALE AND INVESTMENT SOLICITATION PROCESS (THE "SISP"), AND (II) APPROVAL OF THE TRANSACTION SELECTED PURSUANT TO THE SISP BY THE ONTARIO COURT OVERSEEING THE CCAA PROCEEDING.**

## The Solicitation

This Combined DS and Plan is submitted by the Debtors to be used in connection with the solicitation of votes on the Plan. The Debtors will request that the Bankruptcy Court hold a hearing on conditional approval of the Disclosure Statement contained in this Combined DS and Plan with respect to whether the Disclosure Statement contains "adequate information" in accordance with Bankruptcy Code section 1125. At the hearing, the Bankruptcy Court will determine whether to enter an order conditionally approving the Disclosure Statement contained in the Combined DS and Plan as containing adequate information (the "Conditional Disclosure Statement Order"). Pursuant to Bankruptcy Code section 1125(a)(1), "adequate information" is defined as "information of a kind, and in sufficient detail, as far as reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan . . . ." 11 U.S.C. § 1125(a)(1).

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS COMBINED DS AND PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

**The Bankruptcy Court has established April 20, 2023, at 4:00 p.m. (prevailing Central Time) as the deadline for filing and serving objections to the Confirmation of the Plan and the adequacy of information in the Disclosure Statement (the "Combined DS and Plan Objection Deadline"). Any objection to the Plan must: (a) be in writing; (b) conform to the Bankruptcy Rules; (c) state the name and address of the objecting party and the amount and nature of the Claim or Interest; (d) state with particularity the basis and nature of any objection to the Plan; (e) propose a modification to the Plan that would resolve such objection (if applicable); and (f) be filed with the Court and served, no later than the Combined DS and Plan Objection Deadline, on: (i) proposed co-counsel to the Debtors, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: Philip C. Dublin (pdublin@akingump.com) and Meredith A. Lahaie (mlahaie@akingump.com); (ii) proposed co-counsel to the Debtors, Jackson Walker LLP, 1401 McKinney Street, Suite 1900, Houston, Texas 77010, Attn: Matthew D. Cavenaugh (mcavenaugh@jw.com), and Jennifer F. Wertz (jwertz@jw.com), J. Machir Stull (mstull@jw.com), and Victoria Argeroplos (vargeroplos@jw.com); (iii) the Office of the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, Texas 77002; (iv) counsel to any statutory committee appointed in these cases; (v) counsel for Bank of America, National Association, as the administrative agent under the Credit Agreement, Haynes and Boone, LLP, 2323 Victory Avenue, Suite 700, Dallas, Texas 75219, Attn: Eli Columbus (eli.columbus@haynesboone.com) and James Markus (James.Markus@haynesboone.com); and (vi) counsel to the ad hoc group of Term B Loan Lenders under the Credit Agreement, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, New York 10166, Attn: Scott Greenberg (sgreenberg@gibsondunn.com) and Steven**

Domanowski (sdomanowski@gibsondunn.com); AnnElyse Scarlett Gains (agains@gibsondunn.com) and Stephen Silverman (ssilverman@gibsondunn.com).

A hearing to approve the adequacy of the Disclosure Statement and confirm the Plan (the "**Combined Hearing**") will commence on **April 27, 2023, at 1:00 p.m.** (prevailing Central Time), in the United States Bankruptcy Court for the Southern District of Texas before the Honorable Christopher M. Lopez, at 515 Rusk Street, Houston, Texas 77002.  Please be advised that the Combined Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such continuance being announced in open court or by a notice of continuance or reset being filed with the Bankruptcy Court and served on parties entitled to notice under Bankruptcy Rule 2002 or otherwise.  In accordance with the Plan, the Plan may be modified, if necessary, before, during or as a result of the Combined Hearing without further action by the Debtors and without further notice to or action, order or approval of the Court or any other Entity.

<u>**Answers to Commonly Asked Questions**</u>

**What is chapter 11 of the Bankruptcy Code?**

Chapter 11 is a chapter of the Bankruptcy Code that allows financially distressed businesses to reorganize their debts or liquidate their assets in a controlled and value maximizing fashion.  The commencement of a chapter 11 case creates an "estate" containing all of the legal and equitable interests of the debtor in property as of the date the bankruptcy case is filed. During a chapter 11 bankruptcy case, the debtor remains in possession of its assets unless the bankruptcy court orders the appointment of a trustee.

**What entities filed chapter 11 cases?**

Loyalty Ventures Inc. and three of its subsidiaries (LVI Sky Oak LLC, LVI Lux Holdings S.à r.l. and Rhombus Investments L.P.) commenced chapter 11 cases.

**Did LoyaltyOne file a chapter 11 case?**

No, LoyaltyOne did not file a chapter 11 case.  LoyaltyOne commenced a proceeding and obtained initial relief, under the CCAA on March 10, 2023.

**What is the CCAA?**

The CCAA is Canada's principal insolvency statute used for the restructuring or reorganization of large corporations.  The CCAA process is similar to chapter 11 in the United States, with some differences.  The CCAA can be used to effect balance sheet or operational restructurings, sales, or liquidations.

**What will happen to the AIR MILES Reward Program?**

AIR MILES' anchor partner, BMO, has signed an agreement to acquire the leading loyalty program, which agreement will serve as the "stalking horse bid" in the proposed SISP, in each case subject to the approval of the Ontario Court in the CCAA Proceeding.  As part of the CCAA Proceeding, LoyaltyOne intends to seek approval of the proposed SISP pursuant to which interested parties will be able to submit higher and better bids.  Ultimately the Successful Bid (as defined below) in the proposed SISP will be subject to approval of the Ontario Court.

**When will the sale of AIR MILES to BMO be completed?**

LoyaltyOne brought a motion returnable March 20, 2023 before the Ontario Court seeking approval of, among other things, the SISP and the BMO transaction solely for the purposes of acting as the "stalking horse bid" in

the SISP.  If approved, the SISP will set out the procedures for interested parties to submit binding and value maximizing bids for the business and/or assets of LoyaltyOne.

The proposed terms of the SISP provide that all binding offers must be submitted by 5:00 p.m. (Eastern Time) on April 27, 2023 (as such date may be extended by LoyaltyOne for up to seven days with the consent of the Monitor (as defined below), or by further order of the Ontario Court).  If necessary, an auction among qualified bidders will take place by no later than 10:00 a.m. (Eastern Time) on May 4, 2023, following which the Successful Bidder (as defined below) will be announced.  Subject to the availability of the Ontario Court, a motion will be brought by LoyaltyOne to approve the highest or otherwise best bid received in, and selected in accordance with the proposed SISP (the "Successful Bid") on or about May 18, 2023 (or earlier if no auction is required), and such transaction will close expeditiously in accordance with its terms thereafter.

The outside date of the proposed SISP is June 30, 2023 (subject to limited extension rights in the event regulatory approvals are needed), by which time any Successful Bid is to have closed, subject to certain extensions set forth in the proposed SISP.

**Will the commencement of the CCAA or the Chapter 11 Cases have any impact on the rewards under the AIR MILES Reward Program?**

The Ontario Court provided LoyaltyOne with authority to continue to honor Collector obligations, including AIR MILES Reward Miles (as defined below) and existing Collector redemptions and to continue to obtain services from LVI so that there is no impact on the AIR MILES Reward Program resulting from the commencement of the CCAA Proceeding or the Chapter 11 Cases.

**How do I determine how my Claim or Interest is classified?**

Under the Plan, DIP Facility Claims, Administrative Claims and Priority Tax Claims are unclassified and will be treated in accordance with Article VI herein.  All other Claims and Interests are classified in a series of Classes, as described in Article V and Article VII herein.  You may review such Articles to determine how your Claim or Interest is classified.

**How do I determine what I am likely to recover on account of my Claim or Interest?**

After you determine the classification of your Claim or Interest, you can determine the likelihood and range of potential recovery under the Plan with respect to your Claim or Interest by referring generally to classification and treatment of Claims and Interests in the chart below and in Article V herein.

| Class | Claims or Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 3 | Loan Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Convenience Claims | Unimpaired | Presumed to Accept |
| 6 | 510 Claims | Impaired | Deemed to Reject |
| 7 | Intercompany Claims | Impaired | Deemed to Reject |
| 8 | Intercompany Interests | Impaired | Deemed to Reject |
| 9 | Interests | Impaired | Deemed to Reject |

**What is necessary to confirm the Plan?**

Under applicable provisions of the Bankruptcy Code, Confirmation of the Plan requires that, among other things, at least one Class of Impaired Claims votes to accept the Plan. Acceptance by a Class of Claims means that at

least two-thirds in total dollar amount and more than one-half in number of the Allowed Claims actually voting in the Class vote to accept the Plan. Because only those Holders of Claims who vote on the Plan will be counted for purposes of determining acceptance or rejection of the Plan by an Impaired Class, the Plan can be approved with the affirmative vote of members of an Impaired Class who own less than two-thirds in amount and one-half in number of the Claims in that Class. In addition to acceptance of the Plan by a Class of Impaired Claims, the Bankruptcy Court must find that the Plan satisfies a number of statutory requirements before it may confirm the Plan.

If other applicable sections of the Bankruptcy Code have been satisfied for the Plan to be confirmed, the Debtors will still request that the Bankruptcy Court confirm the Plan under Bankruptcy Code section 1129(b) with respect to rejecting Classes. In such case, the Debtors will be required to demonstrate that the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Impaired Claims or Interests that has rejected the Plan. This method of confirming a plan is commonly called a "cramdown." In addition to the statutory requirements imposed by the Bankruptcy Code, the Plan itself also provides for certain conditions that must be satisfied for the Plan to be confirmed and go effective.

**Is there an official committee of unsecured creditors in this case?**

No.  An official committee of unsecured creditors has not been appointed as of the filing of the Plan.  A committee may be formed in the future.

**Are the Debtors reorganizing or selling their assets?**

The Debtors are liquidating their assets and seeking Confirmation of the Plan to, among other things, authorize the formation of a liquidating trust to hold, investigate and pursue, as appropriate, claims and causes of action against the Bread Parties and/or other parties, should such claims or causes of action be determined to exist.

**When is the deadline for returning my ballot?**

**TO BE COUNTED FOR VOTING PURPOSES, YOUR BALLOT MUST BE RECEIVED BY THE CLAIMS AND NOTICING AGENT NOT LATER THAN APRIL 20, 2023 AT 4:00 P.M. (PREVAILING CENTRAL TIME).**

**It is important that all Holders of Claims entitled to vote on the Plan submit their votes timely. The Debtors believe that the Plan provides the best possible recovery to Holders of Claims entitled to a recovery under the Plan. The Debtors believe that acceptance of the Plan is in the best interest of Holders of Claims entitled to a recovery under the Plan and recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan.**

If you would like to obtain additional copies of this Combined DS and Plan or any of the documents attached or referenced herein, or have questions about the solicitation and voting process or these Chapter 11 Cases generally, please contact Kroll Restructuring Administration LLC, the Debtors' Claims and Noticing Agent, by either (i) visiting the Debtors' restructuring website at https://cases.ra.kroll.com/LVI, (ii) calling (833) 570-5238 (Toll Free, US and Canada) or (646) 440-4764 (International) or (iii) emailing LVIInfo@ra.kroll.com and referencing "Loyalty Ventures" in the subject line.

# ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND OTHER REFERENCES

**A.      Defined Terms**

1.        "*Accrued Professional Compensation*" means, at any date, all accrued fees and reimbursable expenses (including success fees) for services rendered by all Retained Professionals in the Chapter 11 Cases through and including the Effective Date, to the extent that such fees and expenses have not been previously paid and regardless of whether a fee application has been filed for such fees and expenses.

2.        "*Administrative Agent*" means Bank of America, N.A., solely in its capacity as administrative agent under the Credit Agreement.

3.        "*Administrative Claim*" means a Claim, other than DIP Facility Claims incurred by the Debtors on or after the Petition Date and before the Effective Date for a cost or expense of administration of the Chapter 11 Cases entitled to priority under Bankruptcy Code sections 503(b), 507(a)(2) or 507(b), including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Fee Claims; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

4.        "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims (other than requests for payment of Professional Fee Claims and Administrative Claims arising under Bankruptcy Code section 503(b)(9)), which shall be thirty (30) days after the Effective Date.

5.        "*Ad Hoc Group of Term B Loan Lenders*" means the ad hoc group of Term B Loan Lenders.

6.        "*Affiliate*" means an affiliate as defined in Bankruptcy Code section 101(2).

7.        "*Allowed*" means, with respect to any Claim:  (a) a Claim as to which (i) no objection has been filed, (ii) the relevant objection deadline has not expired and (iii) that is evidenced by a Proof of Claim, as applicable, timely filed by the applicable bar date, if any, or that is not required to be evidenced by a filed Proof of Claim, as applicable, under the Plan, the Bankruptcy Code or a Final Order; (b) a Claim that is scheduled by the Debtors as neither disputed, contingent, nor unliquidated and as for which no Proof of Claim has been timely filed; or (c) a Claim that is Allowed (i) pursuant to the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court or (iii) pursuant to any contract, instrument, indenture or other agreement entered into or assumed in connection herewith.  Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest, late fees or other similar related charges on such Claim from and after the Petition Date. No Claim of any Entity subject to Bankruptcy Code section 502(d) shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Liquidating Trustee, as applicable.

8.        "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other claims, actions or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under Bankruptcy Code sections 502, 510, 542, 544, 545, 547 through and including Bankruptcy Code sections 553 and 724(a) or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

9.        "*Ballot*" means the ballots accompanying this Combined DS and Plan upon which certain Holders of Impaired Claims entitled to vote on the Plan shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the procedures governing the solicitation process as set forth in this Combined DS and Plan.

10.        "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as may be amended from time to time.

11.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas or such other court having jurisdiction over the Chapter 11 Cases.

12.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court.

13.     "*Bread*" mean Bread Financial Holdings, Inc. (formerly known as Alliance Data Systems Corporation).

14.     "*Bread Parties*" means (i) Joseph L. Motes III, (ii) Bread, and (iii) Bread's current and former Affiliates (except for the Debtors and the Debtors' direct and indirect non-Debtor subsidiaries), and Bread's and its current and former Affiliates' directors, managers, officers, control persons, advisors, equity holders, predecessors, successors, assigns and subsidiaries, but excludes any individual that meets both of the following: (y) who served as a director, manager or officer for any Debtor or non-Debtor direct or indirect subsidiary of a Debtor at any time after the completion of the Spinoff Transaction (as defined and described below) and (z) did not serve in any such capacity for Bread or its Affiliates (except for the Debtors and the Debtors' direct and indirect non-Debtor subsidiaries) at any time after completion of the Spinoff Transaction.

15.     "*Business Day*" means any day, other than a Saturday, Sunday or a legal holiday, as defined in Bankruptcy Rule 9006(a).

16.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

17.     "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties and franchises of any kind or character whatsoever, whether known or unknown, choate or inchoate, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) the right to object to, subordinate, disallow, or otherwise contest Claims or Interests; (d) claims or causes of action pursuant to Bankruptcy Code sections 362, 510, 542, 543, 544 through 550, or 553; (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in Bankruptcy Code section 558; (f) any Avoidance Action, (g) Spinoff Claims and Causes of Action, and (h) with respect to each of the Bread Parties, all of the aforementioned items that can be or may be asserted against any Bread Party.

18.     "*CCAA*" means the Companies' Creditor Arrangement Act (Canada) R.S.C. 1985, c. C 36, as amended.

19.     "*CCAA Proceeding*" means the proceeding commenced under the CCAA by LoyaltyOne in the Ontario Court.

20.     "*Certificate*" means any instrument evidencing a Claim or an Interest.

21.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the chapter 11 case filed for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases for all of the Debtors.

22.     "*Claim*" means any claim, as defined in Bankruptcy Code section 101(5), against any of the Debtors.

23. "*Claims and Noticing Agent*" means Kroll Restructuring Administration LLC, the claims, noticing and solicitation agent proposed to be retained by the Debtors in the Chapter 11 Cases.

24. "*Claims Register*" means the official register of Claims against the Debtors maintained by the Claims and Noticing Agent.

25. "*Class*" means a category of Claims or Interests under Bankruptcy Code section 1122(a).

26. "*Combined DS and Plan*" means this combined disclosure statement and joint chapter 11 plan, including all appendices, exhibits, schedules and supplements hereto (including any appendices, exhibits, schedules and supplements that are contained in the Plan Supplement), as it may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and the Transaction Support Agreement.

27. "*Company*" means the Debtors and their non-Debtor direct and indirect subsidiaries.

28. "*Conditional Disclosure Statement Order*" has the meaning set forth in the Introduction, and is subject to the terms of the Transaction Support Agreement.

29. "*Confirmation*" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

30. "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

31. "*Confirmation Hearing*" means the hearing before the Bankruptcy Court under Bankruptcy Code section 1128 at which the Debtors seek entry of the Confirmation Order, as such hearing may be continued from time to time in accordance with the milestones in the Transaction Support Agreement.

32. "*Confirmation Order*" means an order of the Bankruptcy Court (a) approving the adequacy of the disclosure in the Combined DS and Plan pursuant to Bankruptcy Code section 1125 and (b) confirming the Combined DS and Plan pursuant to Bankruptcy Code section 1129, including all exhibits, appendices, supplements and related documents, which order shall be subject to the terms of the Transaction Support Agreement.

33. "*Consenting Lenders*" means, collectively, the Consenting Term A Loan Lenders, the Consenting Term B Loan Lenders and the Consenting Revolver Lenders.

34. "*Consenting Revolver Lenders*" means Holders of Revolving Loan Claims that have executed and delivered counterpart signature pages to the Transaction Support Agreement.

35. "*Consenting Term A Loan Lenders*" means Holders of Term A Loan Claims that have executed and delivered counterpart signature pages to the Transaction Support Agreement.

36. "*Consenting Term B Loan Lenders*" means Holders of Term B Loan Claims that have executed and delivered counterpart signature pages to the Transaction Support Agreement.

37. "*Consummation*" means the occurrence of the Effective Date.

38. "*Convenience Claim*" means any General Unsecured Claim against one or more of the Debtors that is Allowed in an amount greater than $0 but less than or equal to $1,500,000.00.

39. "*Convenience Claim Distribution Reserve*" means an account funded by the Debtors and/or LoyaltyOne on the Effective Date in an amount sufficient to render all Holders of Convenience Claims Unimpaired to be held by the Liquidating Trust for distribution to Holders of Allowed Convenience Claims.

40.     "*Covered Claims*" means any claim or Cause of Action related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing of the Transaction Support Agreement and related prepetition transactions, the DIP Facility, the Combined DS and Plan, the Plan Supplement or any contract, instrument, release or other agreement or document created or entered into in connection with the Transaction Support Agreement, the DIP Facility, the Combined DS and Plan, the Plan Supplement, the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the DIP Facility Documents, the DIP and Cash Collateral Orders, solicitation of votes on the Plan, the prepetition negotiation and settlement of claims, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or after the Petition Date and on or before the Effective Date. For the avoidance of doubt, Covered Claims do not include Spinoff Claims and Causes of Action or any claim or Cause of Action that can be or is being asserted against the Bread Parties.

41.     "*Credit Agreement*" means, that certain Credit Agreement dated as of November 3, 2021 (as amended by Amendment No. 1 to Credit Agreement (Financial Covenant), dated as of July 29, 2022 and the Consent dated as of March 1, 2023), among LVI and certain of its subsidiaries, as borrowers, certain other subsidiaries of LVI, as guarantors, Bank of America, N.A., as administrative agent, and the lenders from time to time party thereto (as further amended, amended and restated, supplemented or otherwise modified from time to time).

42.     "*Cure*" or "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under Bankruptcy Code section 365 or 1123, other than a default that is not required to be cured pursuant to Bankruptcy Code section 365(b)(2).

43.     "*D&O Liability Insurance Policies*" means all directors', managers' and officers' liability insurance policies (including any "tail policy" or excess policies and all agreements, documents or instruments related thereto) of any of the Debtors that have been issued or provide coverage at any time to current and/or former directors, managers, officers and employees of the Debtors.

44.     "*Debtor Release*" means the releases set forth in <u>Article XII.B</u>.

45.     "*Debtors*" has the meaning set forth in the Introduction.

46.     "*Definitive Documents*" has the meaning set forth in the Transaction Support Agreement.

47.     "*DIP and Cash Collateral Orders*" means the Interim Cash Collateral Order and the Final DIP Order in accordance with the terms hereof and the Transaction Support Agreement.

48.      "*DIP Facility*" means that proposed senior secured superpriority debtor in possession credit facility to be provided to LVI, as borrower, and the other Debtors, as guarantors, on the term and conditions set forth in the DIP Term Sheet, as it may be altered, amended, modified, or supplemented from time to time in accordance with the terms thereof and otherwise consistent with the terms of the Transaction Support Agreement.

49.     "*DIP Facility Claims*" means Claims arising under the DIP Facility.

50.     "*DIP Facility Documents*" means any documents governing the DIP Facility that are entered into in accordance with the DIP Term Sheet and the DIP and Cash Collateral Orders and any amendments, modifications and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents and instruments (including any amendments, restatements, supplements or modifications of any of the foregoing) related to or executed in connection therewith, as each may be altered, amended, modified, or supplemented from time to time in accordance with the terms thereof and the Transaction Support Agreement.

51.     "*DIP Lender*" means LoyaltyOne, in its capacity as lender under the DIP Facility.

52.     "*DIP Motion*" means the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Continue the Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing and (VII) Granting Related Relief* [Docket No. 116].

53.     "*DIP Orders*" means the Interim DIP Order and the Final DIP Order.

54.     "*DIP Term Sheet*" means that certain term sheet for the DIP Facility attached to the Transaction Support Agreement.

55.     "*Disallowed*" means, with respect to a Claim or portion thereof: (a) an objection has been filed to the Claim, (b) the Claim has been disallowed, subordinated or expunged, in whole or in part, by a Final Order; (c) the Claim has been withdrawn, in whole or in part; (d) the Claim is listed in any schedules as zero or as disputed, contingent or unliquidated and in respect of which a Proof of Claim has not been timely filed or deemed timely filed pursuant to the Combined DS and Plan, the Bankruptcy Code or any Final Order of the Bankruptcy Court; (e) the Claim has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the filed amount of any Proof of Claim; (f) the Claim is evidenced by a Proof of Claim which has been filed, or which has been deemed to be filed under applicable law or order of the Bankruptcy Court or which is required to be filed by order of the Bankruptcy Court but as to such Proof of Claim, was not timely or properly filed; or (g) any and all Claims asserted by Bread or any of the Bread Parties including pursuant to Bankruptcy Code section 502(d).

56.     "*Disclosure Statement*" has the same meaning as the Combined DS and Plan.

57.     "*Disputed*" means, with respect to a Claim, (a) any such Claim to the extent neither Allowed or Disallowed under the Plan or a Final Order nor deemed Allowed under Bankruptcy Code section 502, 503, or 1111, or (b) to the extent the Debtors, on or before the Effective Date, or after the Effective Date, the Liquidating Trustee, or any party in interest has interposed a timely objection before the deadlines imposed by the Confirmation Order, which objection has not been withdrawn or determined by a Final Order. To the extent only the Allowed amount of a Claim is disputed, such Claim shall be deemed Allowed in the amount not disputed, if any, and Disputed as to the balance of such Claims. Any and all Claims asserted by any of the Bread Parties are Disputed. For avoidance of doubt, none of the Claims asserted by the Lenders against the Estate shall be Disputed by the Debtors or the Liquidating Trustee.

58.     "*Disputed Claims Reserve*" has the meaning set forth in the Liquidating Trust Agreement.

59.     "*Distribution Agent*" means, as applicable, any Entity selected by the Requisite Consenting Lenders (in consultation with the Debtors), including the Liquidating Trustee or any Entity the Liquidating Trustee selects pursuant to the terms of the Liquidating Trust Agreement to make or to facilitate distributions in accordance with the Plan.

60.     "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Liquidating Trustee, on or after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims entitled to receive distributions under the Plan.

61.     "*Distribution Record Date*" has the meaning set forth in Article XI.D.1.

62.     "*E&O Liability Insurance Policies*" means all errors and omissions insurance policies (including any "tail policy" or excess policies and all agreements, documents or instruments related thereto) of any of the Debtors.

63.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent to the occurrence of the Effective Date set forth in Article XV.B. have been (i) satisfied or (ii) waived pursuant to Article XV.B.; and (c) the Debtors declare

the Plan effective.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter and is otherwise in compliance with the milestones in the Transaction Support Agreement.

64.    "*Entity*" means an entity as defined in Bankruptcy Code section 101(15).

65.    "*Estate*" means the estate of any Debtor created under Bankruptcy Code sections 301 and 541 upon the commencement of the applicable Debtor's Chapter 11 Case.

66.    "*Exculpated Party*" means the Debtors.

67.    "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under Bankruptcy Code sections 365 or 1123.

68.    "*Federal Judgment Rate*" means the federal judgment rate in effect pursuant to 28 U.S.C. § 1961 as of the Petition Date, compounded annually.

69.    "*File*," "*Filed*" or "*Filing*" means file, filed or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim, the Claims and Noticing Agent.

70.    "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

71.    "*Final DIP Order*" means the Final Order approving the DIP Facility, incorporating the stipulations and releases and other terms, as appropriate, of the Interim Cash Collateral Order, authorizing the Debtors' use of cash collateral and granting adequate protection and releases, among other items, to the Lenders and the Administrative Agent that is subject to the terms of the Transaction Support Agreement as applicable and that must be in form and substance acceptable to the Requisite Consenting Lenders and Administrative Agent.

72.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified or amended, and as to which the time to appeal, seek leave to appeal, or seek certiorari has expired and no appeal or petition for certiorari or motion for leave to appeal has been timely taken, or as to which any appeal that has been taken or any petition for certiorari or motion for leave to appeal that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari or leave to appeal could be sought or the new trial, reargument, leave to appeal or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

73.    "*General Unsecured Claim*" means any Claim (other than an Administrative Claim, a DIP Facility Claim, a Professional Fee Claim, a Secured Tax Claim, an Other Secured Claim, a Priority Tax Claim, an Other Priority Claim, a Loan Claim, an Intercompany Claim or a Section 510 Claim) against one or more of the Debtors including, without limitation (a) Claims arising from the rejection of Unexpired Leases and Executory Contracts and (b) Claims arising from any litigation or other court, administrative or regulatory proceeding, including damages or judgments entered against, or settlement amounts owing by a Debtor related thereto provided, that, for the avoidance of doubt, a Claim in the amount of $1,500,000.00 or less that would otherwise be a General Unsecured Claim shall be treated as a Convenience Claim for purposes of this Plan.

74.    "*Governmental Unit*" has the meaning set forth in Bankruptcy Code section 101(27).

75.    "*Holder*" means an Entity holding a Claim or an Interest in a Debtor or the Liquidating Trust.

76.    "*Impaired*" means, with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of Bankruptcy Code section 1124.

77.    "*Indemnification Provisions*" means each of the Debtors' indemnification provisions in effect as of the Petition Date, whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, management or indemnification agreements, employment contracts or otherwise providing a basis for any

obligation of a Debtor to indemnify, defend, reimburse or limit the liability of, or to advances fees and expenses to, any of the Debtors' current and former directors, officers, equity holders, managers, members, employees, accountants, investment bankers, attorneys, other professionals and professionals of the Debtors, and such current and former directors', officers' and managers' respective Affiliates.

78.     "*Insurance Contracts*" means all insurance policies (including, but not limited to, the D&O Liability Insurance Policies and expressly excluding any surety bonds, surety indemnity agreements or surety related products) that have been issued (or provide coverage) at any time to any of the Debtors (or any of their predecessors) and all agreements, documents or instruments relating thereto.

79.     "*Insurance Coverage Rights*" means any direct or derivative rights, interests, claims, entitlements or Causes of Action of any Debtor under any of the Insurance Contracts, including the rights of any Debtor to proceeds, indemnification, reimbursement, contribution, benefits or other payment arising out of or under the Insurance Contracts.

80.     "*Insurer*" means any company, third party administrator or other entity that issued or entered into an Insurance Contract and any respective predecessors, successors and/or affiliates of any of the foregoing, but shall not include any companies or other entities in their role as issuer of bonds, surety indemnity agreements or surety related products.

81.     "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor or an Affiliate of a Debtor or any Claim held by an Affiliate of a Debtor against a Debtor, in each case other than a DIP Facility Claim. In no event shall any claim held by the Debtors against any of the Bread Parties or any Spinoff Claim and Cause of Action be considered an Intercompany Claim.

82.     "*Intercompany Interest*" means any Interest in a Debtor held by another Debtor.

83.     "*Interest*" mean, collectively, any shares (or any class thereof) of common stock or preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor, and any options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into any shares (or any class thereof) of, common stock or preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (in each case whether or not arising under or in connection with any employment agreement) other than Intercompany Interests.

84.     "*Interim Cash Collateral Order*" means the interim order authorizing the Debtors' use of cash collateral and granting adequate protection to the Lenders and the Administrative Agent, as entered by the Bankruptcy Court at Docket No. 65.

85.     "*L/C Obligations*" has the meaning set forth in Section 1.01 of the Credit Agreement.

86.     "*Law*" means any federal, state, local or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

87.     "*Lenders*" means, collectively, the Holders of Loan Claims.

88.      "*Lien*" means a lien as defined in Bankruptcy Code section 101(37).

89.     "*Liquidating Trust*" means the trust established pursuant to <u>Article VIII</u> of the Plan, the Confirmation Order and the Liquidating Trust Agreement.

90.     "*Liquidating Trust Agreement*" means the agreement governing the Liquidating Trust to be included in the Plan Supplement, which agreement shall be in form and substance (i) reasonably acceptable to the Debtors and (ii) acceptable to the Requisite Consenting Lenders and the Administrative Agent.

91.     "*Liquidating Trust Assets*" means the following assets: (i) the Preserved Estate Claims; (ii) Insurance Coverage Rights; (iii) any unencumbered or unsecured property, interests and rights of the Debtors and the Estates as of the Effective Date; and (iv) collateral secured by a properly perfected lien of the Lenders; *provided however*, the proceeds of such collateral shall not be used to pay a General Unsecured Claim unless and until all Loan Claims have been indefeasibly paid in full.

92.     "*Liquidating Trust Beneficiaries*" means Holders of the Liquidating Trust Interests.

93.     "*Liquidating Trust Expenses*" means the reasonable and documented fees and expenses incurred by the Liquidating Trust and reimbursable pursuant to the Liquidating Trust Agreement.

94.     "*Liquidating Trust Interests*" means the interests in the Liquidating Trust which shall not be certificated and shall not be transferrable (except as set forth in the Liquidating Trust Agreement).

95.     "*Liquidating Trust Oversight Committee*" means a committee as described in the Liquidating Trust Agreement that will be appointed on the Effective Date by the Requisite Consenting Lenders, in consultation with the Debtors and the Administrative Agent, or after the Effective Date, in accordance with the Liquidating Trust Agreement.

96.     "*Liquidating Trust Proceeds*" means net Cash proceeds of the Liquidating Trust Assets, excluding the Liquidating Trust Reserve, available first to repay the DIP Facility Claims (to the extent not previously repaid by any excess proceeds in the Winddown Reserve) unless otherwise agreed by the relevant parties, and then for distribution to Liquidating Trust Beneficiaries in accordance with the Plan, the Confirmation Order and the Liquidating Trust Agreement.

97.     "*Liquidating Trust Reserve*" means, collectively, the (a) Convenience Claim Distribution Reserve, (b) Professional Fee Escrow Account and (c) Winddown Reserve.

98.     "*Liquidating Trustee*" means the Person appointed by the Requisite Consenting Lenders, in consultation with the Debtors and Administrative Agent, to serve as trustee of the Liquidating Trust, who will be identified in the Plan Supplement.

99.     "*Loan Claims*" means, collectively, the Term A Loan Claims, the Term B Loan Claims and the Revolving Loan Claims.

100.     "*Loans*" means, collectively, the Revolving Loans, the Swing Line Loans, the L/C Obligations, the Term A Loan and the Term B Loan.

101.     "*LoyaltyOne*" means LoyaltyOne, Co., a Nova Scotia unlimited company.

102.     "*Lux Financing*" means LVI Lux Financing S.à r.l, a private limited liability company incorporated under the laws of Luxembourg.

103.     "*LVT*" means Debtor Loyalty Ventures Inc., a Delaware corporation.

104.     "*Ontario Court*" means the Ontario Superior Court of Justice (Commercial List).

105.     "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under Bankruptcy Code section 507(a).

106.     "*Other Secured Claim*" means any Secured Claim against the Debtors, including any Secured Tax Claim, other than a Loan Claim.

107.     "*Person*" means a person as defined in Bankruptcy Code section 101(41).

108.     "*Petition Date*" means March 10, 2023, the date on which the first of the Chapter 11 Cases is commenced.

109.     "*Plan*" has the same meaning as the Combined DS and Plan.

110.     "*Plan Supplement*" means the compilation of documents and forms of documents, schedules and exhibits (or substantially final forms thereof), in each case subject to the terms and provisions of the Transaction Support Agreement, to be filed no later than the Plan Supplement Filing Date, as may be amended, modified or supplemented from time to time through and including the Effective Date, which may include, as and to the extent applicable:  (a) the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) the Schedule of Preserved Estate Claims; (c) the Liquidating Trust Agreement; (d) the Amended Organizational Documents; (e) the Liquidation Analysis; and (f) any and all other documentation that is contemplated by the Plan.

111.     "*Plan Supplement Filing Date*" means the date that is at least seven (7) days before the deadline to object to Confirmation of the Plan.

112.     "*Preserved Estate Claims*" means (i) the Spinoff Claims and Causes of Action and (ii) all Causes of Action of the Debtors that are not released or waived pursuant to the Plan and are identified in the Plan Supplement, including, for the avoidance of doubt, all Causes of Action against the Bread Parties, whether or not described in the Schedule of Preserved Estate Claims or in Article III.A. hereof, provided further that no claim or Cause of Action against the Lenders or against a Released Party (to the extent such claim or Cause of Action is released in Article XII) shall be a Preserved Estate Claim.

113.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in Bankruptcy Code section 507(a)(8).

114.     "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that respective Class.

115.     "*Professional Fee Claim*" means all Administrative Claims for the compensation of Retained Professionals and the reimbursement of expenses incurred by such Retained Professionals through and including the Effective Date under Bankruptcy Code sections 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.

116.     "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Reserve Amount as set forth in Article VI.A.

117.     "*Professional Fee Reserve Amount*" means the aggregate amount of Retained Professional Fee Claims and other unpaid fees and expenses that the Retained Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Effective Date, which estimates Retained Professionals shall deliver to the Debtors and the Consenting Term B Lenders and the Administrative Agent as set forth in Article VI.A.

118.     "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

119.     "*Reinstate*," "*Reinstated*" or "*Reinstatement*" means leaving a Claim Unimpaired under the Plan.

120.     "*Released Party*" means each of the following, solely in its capacity as such:  (a) the Debtors; (b) the DIP Lender; (c) each Lender; (d) the Administrative Agent; and (e) with respect to the foregoing clauses (a) through (d), each such Entity's current and former Affiliates, directors, board observers, managers, officers, control persons, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, participants, managed accounts or funds, fund advisors, predecessors, successors, assigns, subsidiaries, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, investment managers, and other professionals, each in their capacity as such; *provided* that none of the Bread Parties shall be a "Released Party," *provided further*, that none

of the Loan Parties (as defined in the Credit Agreement), other than the Debtors, shall be released (i) in relation to the BL Purchase Agreement and related documentation, or (ii) from any Claims arising under the Credit Agreement.

121.    "*Releasing Party*" means each of the following, solely in its capacity as such:  (a) the Debtors; (b) the DIP Lender; (c) each Lender; (d) the Administrative Agent; (e) Holders of Claims; (f) Holders of Interests; with respect to the foregoing clauses (a) through (d), each such Entity's current and former Affiliates, directors, board observers, managers, officers, control persons, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, participants, managed accounts or funds, fund advisors, predecessors, successors, assigns, subsidiaries, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, investment managers and other professionals, each in their capacity as such; *provided that* a Holder of a Claim or Interest shall not be a Releasing Party if such Entity:  (x) elects to opt out of the releases contained in the Plan; or (y) timely files with the Bankruptcy Court, on the docket of the Chapter 11 Cases, an objection to the releases contained in the Plan that is not resolved before Confirmation.

122.    "*Requisite Consenting Lenders*" means, at any applicable time of determination, Consenting Lenders holding at least a majority of the aggregate outstanding principal amount held by all of the Consenting Lenders of: (i) the Revolving Loans; (ii) the L/C Obligations; (iii) the Swing Line Loan; (iv) the Term A Loan and (v) the Term B Loan, taken together.

123.    "*Retained Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with Bankruptcy Code sections 327, 363 or 1103 and to be compensated for services rendered prior to or on the Effective Date pursuant to (i) Bankruptcy Code sections 327, 328, 329, 330 or 331 or (ii) an order entered by the Bankruptcy Court authorizing such retention; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to Bankruptcy Code section 503(b)(4).

124.    "*Revolver Lenders*" means the lenders under the Revolving Loans, the L/C Obligations and the Swing Line Loans as defined in the Credit Agreement.

125.    "*Revolving Loans*" has the meaning set forth in Section 2.01(a) of the Credit Agreement.

126.    "*Revolving Loan Claims*" means any Claims against a Debtor arising under, derived from, secured by, based on, or related to the Revolving Loans, the L/C Obligations and/or any Swing Line Loans.  For the avoidance of doubt, the Revolving Loan Claims, shall be deemed Allowed and not Disputed by the Debtors or the Liquidating Trustee in the amount specified herein.

127.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means a schedule that will be Filed as part of the Plan Supplement, as may be amended, and will include a list of all Executory Contracts and Unexpired Leases that the Debtors intend to assume and assume and assign.

128.    "*Schedule of Preserved Estate Claims*" means the schedule of certain Causes of Action of the Debtors that are not released or waived pursuant to the Plan, as the same may be amended, modified or supplemented from time to time, to be included in the Plan Supplement, and which for the avoidance of doubt, shall include any and all Causes of Action against the Bread Parties and Spinoff Claims and Causes of Action.

129.    "*SEC*" means the United States Securities and Exchange Commission.

130.    "*Section 510 Claim*" means any Claim against any Debtor: (a) arising from the rescission of a purchase or sale of a Security of any Debtor or an affiliate of any Debtor; (b) for damages arising from the purchase or sale of such a Security; (c) for reimbursement or contribution Allowed under Bankruptcy Code section 502 on account of such a Claim; or (d) any and all Claims which may be equitably subordinated under Bankruptcy Code section 510(c).

131.    "*Secured Claim*" means, when referring to a Claim, a Claim: (a) secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected and enforceable pursuant to applicable law or

by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to Bankruptcy Code section 553, to the extent of the value of the creditor's interest in such Debtor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Bankruptcy Code section 506(a); or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a Secured Claim.

132.   "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under Bankruptcy Code section 507(a)(8) (determined irrespective of time limitations), including any related Secured Claim for penalties.

133.   "*Securities Act*" means the Securities Act of 1933, as amended.

134.   "*Security*" shall have the meaning set forth in Bankruptcy Code section 101(49).

135.   "*Servicer*" means an agent or other authorized representative of Holders of Claims.

136.   "*Solicitation Agent*" means Kroll Restructuring Administration LLC, in its capacity as the notice, claims, and solicitation agent in the Chapter 11 Cases.

137.   "*Spinoff Claims and Causes of Action*" means any Claim or Cause of Action that may be or can be asserted against (i) any individual or (ii) any Entity (other than the Lenders or the Administrative Agent), for his, her, or its involvement in, directly or indirectly, the Spinoff Transaction or any transaction related to the Spinoff Transaction; *provided however*, that any such Spinoff Claims and Causes of Action shall not include claims or causes of action against any individual that meets both of the following:  (y) who served as a director, manager or officer for any Debtor or non-Debtor direct or indirect subsidiary of a Debtor at any time after the completion of the Spinoff Transaction (as defined and described below) and (z) did not serve in any such capacity for Bread or its Affiliates (except for the Debtors and the Debtors' direct and indirect non-Debtor subsidiaries) at any time after completion of the Spinoff Transaction.

138.   "*Swing Line Loans*" has the meaning set forth in Section 2.05(a) of the Credit Agreement.

139.   "*Tax Code*" means the Internal Revenue Code of 1986, as amended from time to time.

140.   "*Term A Loan*" has the meaning set forth in Section 2.01(b) of the Credit Agreement.

141.   "*Term A Loan Claims*" means any Claim against a Debtor arising under, derived from, secured by, based on or related to the Term A Loan as defined in the Credit Agreement.  For the avoidance of doubt, the Term Loan A Claims, shall be deemed Allowed and not Disputed by the Debtors or the Liquidating Trustee in the amount specified herein.

142.   "*Term A Loan Lenders*" means the lenders under the Term A Loan as defined in the Credit Agreement.

143.   "*Term B Loan*" has the meaning set forth in Section 2.01(c) of the Credit Agreement.

144.   "*Term B Loan Claims*" means any Claim against a Debtor arising under, derived from, secured by, based on, or related to the Term B Loan as defined in the Credit Agreement.  For the avoidance of doubt, the Term Loan B Claims, shall be deemed Allowed and not Disputed by the Debtors or the Liquidating Trustee in the amount specified herein.

145.   "*Term B Loan Lenders*" means the lenders under the Term B Loan as defined in the Credit Agreement.

146.   "*Third-Party Release*" means the releases set forth in Article XII.C.

147.     "*Transaction Support Agreement*" means that certain Transaction Support Agreement entered into on March 10, 2023 by and among the Debtors and certain of their non-Debtor subsidiaries and the Consenting Lenders party thereto, as may be amended from time to time pursuant to the terms thereof, and attached as <u>Exhibit B</u> to the Combined DS and Plan.

148.     "*TSA Definitive Document Requirements*" means the respective consent rights of the Debtors and the Consenting Lenders who are party to the Transaction Support Agreement as set forth therein with respect to the Definitive Documents.

149.     "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Texas.

150.     "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not:  (a) accepted a particular distribution; (b) given notice to the Debtors or Liquidating Trustee, as applicable, of an intent to accept a particular distribution; (c) responded to the Debtors' or Liquidating Trustee's, as applicable, requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

151.     "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under Bankruptcy Code section 365.

152.     "*Unimpaired*" means, with respect to a Class of Claims, a Class consisting of Claims that are not impaired within the meaning of Bankruptcy Code section 1124.

153.     "*Voting Deadline*" means the date and time by which the Solicitation Agent must actually receive the Ballots, as set forth on the Ballots.

154.     "*Winddown Reserve*" means the amounts funded out of the DIP Facility, by the Debtors as of the Effective Date, or as may be funded by LoyaltyOne or another party, to pay Allowed Cure Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Claims in Classes 1 and 2, Liquidating Trust Expenses, and any other amounts as specified in the Plan or the Liquidating Trust Agreement.

**B.     Rules of Interpretation**

For purposes of this Combined DS and Plan:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule or exhibit, shall mean such document, schedule or exhibit, as it may have been or may be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) the words "herein," "hereof" and "hereto" refer to the Combined DS and Plan in its entirety rather than to any particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) unless otherwise specified herein, the rules of construction set forth in Bankruptcy Code section 102 shall apply; (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (i) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (j) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims" and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like as applicable; (k) references to "shareholders," "directors" and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws or applicable foreign law; and (l) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation."

**C.      Computation of Time**

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

**D.      Governing Law**

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles.

**E.      Reference to Monetary Figures**

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

**F.      Controlling Document**

In the event of any inconsistency among this Combined DS and Plan or any exhibit or schedule hereto, the provisions of this Combined DS and Plan shall govern.  In the event of any inconsistency among this Combined DS and Plan and any document or agreement filed in the Plan Supplement, such document or agreement filed in the Plan Supplement shall control.  In the event of any inconsistency among this Combined DS and Plan or any document or agreement filed in the Plan Supplement and the Confirmation Order, the Confirmation Order shall control.

**G.      Certain Consent Rights**

Notwithstanding anything in the Combined DS and Plan to the contrary, any and all consent rights of the Consenting Lenders and Administrative Agent set forth in the Transaction Support Agreement with respect to the form and substance of this Combined DS and Plan, the Plan Supplement, and any other Definitive Document (as defined in the Transaction Support Agreement), including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I hereof) and fully enforceable as if stated in full herein.

## ARTICLE II.
## THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

**A.      The Debtors' Corporate History**

On November 5, 2021, Bread, a Delaware corporation then known as Alliance Data Systems Corporation ("ADS"), completed a corporate spinoff (the "Spinoff Transaction") of its loyalty programs business line, which included (i) the AIR MILES Reward Program, Canada's most recognized coalition loyalty program, and (ii) its Netherlands-based BrandLoyalty business ("BrandLoyalty").  As a result of the Spinoff Transaction, LVI, a newly formed independent, publicly-traded company, became the ultimate parent of the entities that own and operate the AIR MILES and BrandLoyalty businesses.

Pursuant to the Spinoff Transaction, 81% of the outstanding shares of LVI were distributed pro rata to the holders of ADS common stock based on the outstanding shares of ADS common stock at the close of business on the record date of October 27, 2021 and ADS retained 19% of the outstanding shares of LVI.[3]  In addition, and as described

---

[3]      ADS stockholders of record that did not sell their rights to receive LVI stock before the close of business on November 5, 2021 received one share of LVI common stock for every two and one-half (2.5) shares of ADS common stock.

in more detail below, as part of the Spinoff Transaction, ADS caused LVI and subsidiaries comprising the spun business to make cash distributions totaling $750 million to ADS on November 3, 2021.[4]  On November 8, 2021, "regular-way" trading of LVI common stock began on the Nasdaq Global Select Market under the symbol "LYLT".

**B.     The Company's Business Operations**

LVI's non-Debtor indirect subsidiaries own and operate two business segments:  AIR MILES and BrandLoyalty.  Through the AIR MILES and BrandLoyalty businesses, the Company provides tech-enabled, data-driven customer loyalty solutions by way of reward programs with partnering businesses, including financial institutions, retailers, grocers and other consumer-facing enterprises.  These solutions are focused on helping partnering businesses achieve their strategic and financial objectives, including increased consumer basket size, shopper traffic and frequency, digital reach and enhanced program reporting and analytics.  The Company also helps its partners create and increase consumer loyalty across multiple touch points, from traditional to digital to mobile and emerging technologies.  The Company looks to create value for its stakeholders through the continued development of loyalty platforms for the tech-forward business and consumer era.

The Company is headquartered in Dallas, Texas.  As of December 2022, the Company employed approximately 1204 individuals in 18 countries around the world and provided services to over 300 participating businesses (with over 10 million Canadians actively participating in the AIR MILES Reward Program) in 41 countries worldwide through the AIR MILES and BrandLoyalty businesses.  As of the December 2022, the Company leased approximately 29 properties worldwide, which are used to carry out the Company's operational, sales and administrative functions and include general office properties, warehouses, data centers, customer care centers, automobiles and equipment.  The Company's principal leased facilities are located in Canada and the Netherlands.

**1.     AIR MILES Reward Program**

The AIR MILES Reward Program is a full-service outsourced coalition loyalty program, which assists its partners in acquiring and retaining loyal and continuing customers.  Consumers enrolled in the program ("Collectors") earn miles ("Reward Miles") at more than 300 leading Canadian, global and online brands and at thousands of retail and service locations across Canada the can be redeemed (i) toward in-store purchases and (ii) for travel, merchandise, donations or other rewards.  As noted above, over 10 million Canadians actively participate in the AIR MILES Reward Program. The information generated from Collectors' exercise of their Reward Miles powers an extensive dataset that, along with LoyaltyOne's analytics and marketing capabilities, enables AIR MILES' clients to better inform and refine their marketing activities.  The majority of the business is focused on a small group of partners (typically referred to as "Sponsors") that pay LoyaltyOne a fee per Reward Mile issued to, and, in one case, redeemed by the Collectors, in return for which LoyaltyOne provides a number of services to both Sponsors and Collectors, including, but not limited to, all marketing (including the use of the AIR MILES Reward Miles brand), analytics, customer services and redemption management.

On the Petition Date, LoyaltyOne, which together with its subsidiary, LoyaltyOne Travel Services Co. / Cie Des Voyages LoyaltyOne ("Travel Services"), owns and operates the AIR MILES Reward Program, was granted relief under the CCAA by the Ontario Court pursuant to the Initial Order (as defined below).  The CCAA Proceeding is described in more detail in Article III.E.

**2.     BrandLoyalty**

BrandLoyalty provides purpose-driven, tailor-made, campaign-based loyalty solutions for grocers and other high-frequency retailers.  Through BrandLoyalty, the Company works to design campaigns to drive consumers' shopping behavior and engender long-term loyalty to partnering brands. BrandLoyalty clients pay the Company a fee, based on the number of redemptions, to create and implement customized campaigns.  The BrandLoyalty campaigns typically last between six and 20 weeks under contract terms generally less than one year in length. BrandLoyalty

---

[4]     The distribution qualified as a tax-free reorganization and a tax-free distribution to ADS and its stockholders for U.S. federal income tax purposes. Further, in connection with the Spinoff Transaction, the LVI and ADS indemnified each other for certain liabilities.

does not generally maintain long-term agreements with its clients, meaning that client agreements must be renegotiated for each campaign, including with respect to key terms such as volume, pricing or new campaign rewards.

The Company has BrandLoyalty retailer clients operating on six continents.  Many BrandLoyalty clients are leading grocery retailers in their respective countries.  In addition, BrandLoyalty manages a broad portfolio of reward suppliers balanced between exclusive contracts, licenses and proprietary suppliers.  As described in greater detail below, the Company entered into a Sale and Purchase Agreement on March 1, 2023 with Opportunity Partners B.V., a private company with limited liability incorporated under the laws of the Netherlands, for the purchase of the BrandLoyalty business for an aggregate purchase price of $6 million.

**C.     The Debtors' Prepetition Capital Structure**

     **1.     <u>Capital Structure</u>**

In connection with the Spinoff Transaction, certain of the Debtors and certain of their non-Debtor subsidiaries entered into the Credit Agreement with the Administrative Agent and the Lenders.  The Credit Agreement provided for (a) the $175 million Term A Loan, (b) the $500 million Term B Loan, issued at 98.0% of the aggregate principal amount and (c) the Revolving Loans in the maximum principal amount of $150 million.  $650 million in Loan proceeds were used to finance a portion of the $750 million distributed from LVI to ADS in connection with the Spinoff Transaction.

| Facility | Approximate Principal Amount Outstanding as of Petition Date | Current Interest Rate as of the Petition Date | Maturity Date |
|---|---|---|---|
| Term A Loan | $161,875,000 | 10.5% | November 3, 2026 |
| Term B Loan | $462,500,000[5] | 11.2% | November 3, 2027 |
| Revolving Loans | $32,000,000 [6] | 10.5% | November 3, 2026 |
| Total: | $656,375,000 | | |

Under the Credit Agreement, the Company is required to make quarterly principal amortization payments in equal installments in an aggregate amount of 7.5% per annum of the initial aggregate principal amount of each of the Term A Loan and the Term B Loan.  Additionally, beginning with the fiscal year ending December 31, 2022, the Credit Agreement requires, on an annual basis, the prepayment of the Term B Loan with either 0%, 25% or 50% of Excess Cash Flow (as defined in the Credit Agreement) depending on the Consolidated Secured Leverage Ratio (as defined in the Credit Agreement).

The Credit Agreement was amended on July 29, 2022 (the "<u>July Amendment</u>").  Pursuant to the July Amendment, Section 7.11 of the Credit Agreement was modified to, among other things, (i) adjust the financial maintenance covenant applicable to the Term A Loan and Revolving Loans, (ii) adjust the definition of "Consolidated EBITDA" for purposes of computing the financial maintenance covenant, (iii) provide for periodic permanent reductions of commitments under the Revolving Loans and (iv) provide for new limitations on the incurrence of additional indebtedness and the making of certain restricted payments.

On February 28, 2023, LoyaltyOne made an intercompany loan to LVI in the amount of CAD $18 million (the "<u>LoyaltyOne Intercompany Loan</u>") to permit LVI to pay certain fees, costs and expenses, including employee

---

[5]    In addition to this amount, the Allowed Term Loan B Claims will include the prepayment premium under the Credit Agreement of $9,250,000.

[6]    As of the Petition Date, the L/C Obligations include the following: (i) L/C in the amount of 7,500,000 Euros issued for the account of BrandLoyalty France S.A.R.L; (ii) L/C in the amount of $200,000 issued for the account of BrandLoyalty Sourcing USA, Inc.; and (iii) L/C in the amount of 100,000 Canadian dollars issued for the account of LoyaltyOne, Co., which amounts are not included in the principal amount of the Revolving Loans.  As of the Petition Date, there were no outstanding Swing Line Loans.

expenses, incurred by LVI both in the ordinary course and in contemplation of the Chapter 11 Cases and to support the continuity of LVI's operations.  The LoyaltyOne Intercompany Loan matures on May 26, 2023.

**D.      Spinoff Agreements**

In conjunction with the Spinoff Transaction, the Company entered into several agreements with ADS/Bread that govern the relationship of the parties.  These agreements include, among others, the following:

- Tax Matters Agreement, dated as of November 5, 2021 (the "TMA"):  The TMA addresses the rights and obligations of ADS/Bread, LVI and, purportedly, their respective subsidiaries with respect to various tax obligations and refunds. Under the TMA, ADS/Bread caused LVI to agree to pay over to ADS/Bread a tax refund of approximately CAD $100 million to which LoyaltyOne may become entitled within thirty (30) days of receipt thereof.

- Transition Services Agreement, dated as of November 5, 2021 (the "TSA"): The TSA provides that, despite the Spinoff Transaction, ADS/Bread and LVI would continue to provide each other with certain corporate, administrative and information technology services in substantially the same form as they did during the previous year and LVI would make a monthly payment to ADS for such services.

- Employee Matters Agreement, dated as of November 5, 2021 (the "Employee Matters Agreement"): The Employee Matters Agreement provides for the allocation of employees, employee compensation and benefit plan and programs between ADS/Bread and LVI.

**E.      Intercompany Relationships**

As is customary for a global enterprise of the Company's size and scale, the Debtors and their non-Debtor subsidiaries and Affiliates (exclusive of the Bread Parties) are parties to a series of relationships with each other and their non-Debtor Affiliates (exclusive of any Bread Parties), with whom the Debtors transact on a regular basis in the ordinary course of conducting their global business.  The Debtors engage in such intercompany transactions in order to, among other things, provide enterprise-wide support services, divide the costs of management fees, complete transactions with administrative ease and facilitate daily. These transactions are recorded in a number of different ways, including through accounts receivable/payable relationships, intercompany loans and dividends.

**F.      Common Stock**

As of March 2, 2023: (i) LVI had 24,725,000 shares of common stock outstanding, with 83 holders of record, as well as an aggregate of 173,189,763 shares of common stock authorized but not issued and not reserved for specific purposes; (ii) LVI had reserved 2,084,337 shares of common stock for issuance under the Company's employee benefit plans; and (iii) Bread held 19% of LVI's outstanding common stock.

**ARTICLE III.
EVENTS LEADING TO THE CHAPTER 11 FILINGS**

A confluence of events and circumstances contributed to the Debtors' need to commence the Chapter 11 Cases, as well as LoyaltyOne's commencement of the CCAA Proceeding, beginning with issues arising prior to the Spinoff Transaction and following on with issues arising from the financial condition in which the Company was left as a result of the Spinoff Transaction.  Following the Spinoff Transaction, various operational challenges accelerated the timeline for the Debtors to exhaust their liquidity and confront their massive debt obligations.  Despite the Company's best efforts, months of engagement with their lenders did not lead to an out of court solution or an in court balance sheet restructuring; instead, the Company intends to conduct the orderly sale or wind-down, as applicable, of its assets through the following proceedings and/or transactions:  (1) the Chapter 11 Cases in respect of the Company's corporate holding company infrastructure; (2) the sale of the BrandLoyalty business; and (3) the sale of the AIR MILES business either to BMO or to the entity otherwise designated as the Successful Bidder in the proposed SISP in connection with the CCAA Proceeding.

A.      **Issues Arising from the Spinoff Transaction**[7]

Prior to the Spinoff Transaction, the businesses that would come to comprise the Company were part of ADS's "LoyaltyOne" business segment, which included the AIR MILES and BrandLoyalty business segments. Historically, the AIR MILES and BrandLoyalty business segments had experienced consistent declines in revenue and earnings for several years, including well before any impacts from the COVID pandemic. As part of the Spinoff Transaction, ADS transferred those businesses from its (then) wholly-owned, indirect subsidiary, Alliance Data International LLC ("ADILC") to LVI, which was, at the time, another wholly-owned, indirect subsidiary of ADS. ADS then distributed 81% of LVI's common stock to ADS's stockholders, while retaining the remaining 19% of LVI's common stock.

ADS conditioned the Spinoff Transaction on the Company's entry into the Credit Agreement, which, among other things, contained quarterly amortization rates (equal to 7.5% of the initial $675 million principal balance per annum) plus, additional annual prepayments equal to up to 50% of the Company's excess cash flow depending on the Company's consolidated secured leverage ratio—which quarterly amortization payments severely strained the Company's available cash flows. ADS also required LVI to absorb $25 million of the debt issuance and other transaction costs associated with the Spinoff Transaction.

ADS then caused the Company to distribute $750 million—consisting of the remaining $650 million in debt proceeds, along with $100 million of cash swept from the businesses that would comprise the Company—to ADS in connection with the consummation of the Spinoff Transaction. ADS then used the $750 million to pay down its own debts, with no benefit conferred upon the Company. At the same time, ADS required the Company to assume liability for certain class action lawsuits consisting of claims that were based on and arose from actions that the board of directors of ADS had directed prior to the Spinoff Transaction. Through the TMA, ADS also purported to obligate LVI to pay over to ADS substantial anticipated tax refunds, which may be as much as CAD $100 million.

LVI's agreement to all these terms and conditions was authorized and directed by LVI's then sole director, Joseph L. Motes III ("Motes"), who was ADS's Executive Vice President, General Counsel, Secretary and Chief Administrative Officer. The day before the Spinoff Transaction was completed, but after he and ADS had approved its terms, Motes resigned from LVI's board, while continuing in his positions at ADS.

The Debtors are vesting all claims and causes of action against the Bread Parties, and all other Preserved Estate Claims, including and all claims related to the Spinoff (i.e. the Spinoff Claims and Causes of Action) in a Liquidating Trust, and, through the Liquidating Trust, intend to have the Liquidating Trustee pursue claims that ADS, Motes and other Bread Parties implemented the Spinoff Transaction to improve ADS's own balance sheet at the expense of LVI and the Lenders and contrary to the fiduciary duties Motes and ADS owed to LVI.

Further, the Debtors, through the Liquidating Trust, intend to have the Liquidating Trustee allege that ADS's and Motes's self-dealing and breaches of fiduciary duties at every step of the Spinoff Transaction—and their actions taken in concert with one another—rendered LVI insolvent and unable to pay its debts as they came due, and form the basis of the Causes of Action for breach of fiduciary duties that LVI, through the Liquidating Trust, intend to have the Liquidating Trustee allege against Bread and Motes and seek damages. As LVI's controlling shareholder, ADS also breached ADS's fiduciary duties to LVI, which fiduciary duties prohibited ADS from taking actions that would render LVI insolvent. By orchestrating and effectively standing on both sides of the Spinoff Transaction, and pushing for consummation of the Spinoff Transaction despite the fact that LVI would be rendered insolvent as a result, ADS breached its fiduciary duties to LVI. In his capacity as LVI's sole director prior to the Spinoff Transaction, Motes acted solely in the interests of ADS in matters related to the Spinoff Transaction despite the fiduciary duties that he owed to LVI. At the same time he served as LVI's sole director, Motes was and continues to be a longtime ADS senior executive. Motes was conflicted with divided loyalties at all relevant times.

In addition to these fiduciary duty claims, LVI's transfer of approximately $650 million in net debt proceeds (i.e. the debt issued pursuant to the Credit Agreement net of the approximately $25 million of absorbed debt issuance

---

[7]     Jackson Walker LLP and Friedman Kaplan Seiler Adelman & Robbins LLP prepared this subsection addressing the Debtors' claim against the Bread Parties and Motes as well as all other portions herein addressing or relating to the Bread Parties.

and transaction costs) to ADILC (and ultimately, ADS) should be avoided as both an actual and constructive fraudulent transfer under both the Bankruptcy Code and the Texas Uniform Fraudulent Transfer Act.  As part of the Spinoff Transaction, LVI transferred $650 million in debt proceeds to ADILC in exchange for all issued and outstanding stock of the ADS subsidiaries comprising the AIR MILES and BrandLoyalty businesses, which was not an exchange of reasonably equivalent value. ADILC then distributed the $650 million up its own corporate chain to ADS, which used those proceeds to pay down ADS's outstanding debt.  As a result of the transfer, LVI was rendered insolvent, was unable to pay its debts as they came due, and was left with unreasonably small capital to operate its business. For those reasons, LVI through the Liquidating Trust, intends to have the Liquidating Trustee seek to avoid the transfer and recover its value from ADS (either as subsequent transferee, or as the Entity for whose benefit the transfer was made, or as the successor-in-interest to the initial transferee ADILC), together with an award of prejudgment and postjudgment interest, for the benefit of the Estate.

If the Liquidating Trustee, on behalf of LVI prevails on its intended avoidance and recovery claim against ADS, any otherwise allowable Claim of Bread will be Disallowed pursuant to section 502(d) of the Bankruptcy Code unless and until it returns the entirety of the $650 million transfer.

## B.    Operational Challenges

In connection with the challenges existing prior to the Spinoff Transaction and the high leverage and debt service obligations resulting from the Spinoff Transaction, the Company has faced several challenges that have accelerated revenue declines and operational issues. Among other factors, these include, (i) the loss of Sobeys—at the time, the second largest Sponsor in the AIR MILES Reward Program—as a Sponsor and concurrent negotiations with other Sponsors that resulted in less beneficial contracts in respect of the AIR MILES Reward Program and (ii) supply chain issues that were compounded by the impact of the Russian invasion of Ukraine.

In late 2020, Sobeys informed ADS that it was considering exercising its early termination rights and renegotiating or discontinuing its participation in the AIR MILES Reward Program before the expiration of its contract. Sobeys then announced on June 7, 2022 that it would discontinue its participation in the AIR MILES Reward Program beginning in August 2022.

In addition to the direct impact from the loss of revenue and earnings attributable to the loss of Sobeys (or any of the AIR MILES business's major Sponsors), a departure of one would have a broader "network effect" on the value of the entire AIR MILES Reward Program to the remaining Sponsors and Collectors. Much like an anchor tenant in a mall, Sobeys was critical to the AIR MILES Reward Program because consumers tend to visit grocery stores on a weekly basis, creating regular and frequent opportunities for Collectors to earn and redeem reward miles.

Sobeys's departure had the previously expected consequence of causing the remaining two of the AIR MILES Reward Program's top three customers (BMO and Shell Canada) to demand and obtain substantial price concessions upon renewal of their contracts. The Company also negotiated a contract renewal with Metro Ontario Inc. ("Metro") in late 2022. In light of the Company's limited negotiating power (due to the customer concentration risk represented by those three clients) and crippling debt burden, along with the reduced network effect as a result of Sobeys's exit, these contract renewals incorporated reduced economics, shorter terms and certain termination risks. The price concessions substantially compressed the AIR MILES business's earnings margin.

The AIR MILES business began to feel the cash impact of the loss of the Sobeys relationship and the repricing of the BMO, Shell Canada and Metro contracts in late 2022, but will experience a substantial negative earnings impact over the next three years.  The renegotiated contract with BMO alone will result in approximately $40 million less in pre-tax cash flow realized by the AIR MILES business than under the previous contract terms.

The Company was also hampered by ongoing supply chain issues, which were further exacerbated by the Russian invasion of Ukraine in February 2022 that hastened the Company's already extensive revenue decline, which conflict also resulted in rising energy prices, additional supply chain disruptions and increased economic uncertainty in Europe and the United States.

The supply chain crisis of 2021 resulted in BrandLoyalty being unable to source and deliver reward merchandise reliably or efficiently, constraining BrandLoyalty's ability to execute successful programs.  To prevent similar challenges in 2022, the BrandLoyalty business increased its inventory orders in 2021 for 2022 delivery in an attempt to create more certainty around the ability to deliver and execute on the BrandLoyalty programs planned for 2022. However, economic uncertainty at that time resulted in BrandLoyalty's 2022 campaigns not resonating with consumers. Retailers subsequently returned the unredeemed inventory and the BrandLoyalty business was therefore left with significant surplus inventory on which it had already expended its liquidity. This created a net working capital strain for the BrandLoyalty business.

As a result, the Company provided the BrandLoyalty business with additional working capital throughout 2022 to order new inventory for 2023 delivery and meet the changing customer preferences for its 2023 programs. This represented an ongoing drain on the Company's liquidity position.

The BrandLoyalty business also refocused its strategy towards familiar geographies and proven reward categories to reduce execution risk, including providing alternative reward merchandise, with a focus on digital-first campaigns to bypass supply chain challenges.

These measures have not alleviated the liquidity issues imposed on the Company as a result of the Spinoff Transaction, nor have they addressed the Company's inability to service the debt imposed on it through the Spinoff Transaction, resulting in the need for these Chapter 11 Cases, the CCAA Proceeding and the additional transactions described herein.

## C.      Prepetition Negotiations with the Lenders

Following Sobeys's public announcement that it would exit the AIR MILES Reward Program in mid-2022, and concurrently with the Company's negotiations with BMO and Shell, the Company experienced liquidity issues less than a year after the Spinoff Transaction that threatened its ability to comply with certain covenants under the Credit Agreement. In the summer of 2022, the Company with its existing counsel, Akin Gump Strauss Hauer & Feld LLP and PJT Partners LP, negotiated an amendment to the Credit Agreement to provide needed covenant relief, resulting in the July Amendment. The Company thereafter extended its engagement with its existing counsel, Akin Gump Strauss Hauer & Feld LLP and Cassels Brock & Blackwell LLP, as Canadian counsel to LoyaltyOne, to assist it in restructuring discussions with its Lenders.

Around October of 2022, the Ad Hoc Group of Term B Loan Lenders formed and retained, among other advisors, Gibson Dunn & Crutcher LLP as counsel and Piper Sander & Co as investment banker (together with Bennett Jones LLP, as Canadian counsel to the Term B Loan Lenders, the "Ad Hoc Group Advisors"). The Company and its counsel and advisors over the course of several months commenced discussions with the Ad Hoc Group Advisors regarding long-term solutions for the Company to address its unsustainable debt obligations. In light of year-end deadlines to pay certain interest and amortization payments, in December of 2022, the Lenders in the Ad Hoc Group of Term B Loan Lenders signed non-disclosure agreements and negotiations began in earnest at the principal level as the Company's deadline to pay interest and amortization at year end loomed. Haynes and Boone LLP, counsel for the Administrative Agent, and FTI Consulting, Inc., financial advisor for the Administrative Agent, also participated in these discussions. Ultimately, the Company made the year-end interest and amortization payments required under the Credit Agreement.

In late January 2023, the parties recommenced discussion towards a holistic solution for the Company. In the midst of those negotiations, the Company was approached by a party interested in purchasing the BrandLoyalty business and began negotiations with its largest Sponsor concerning a potential sale of the AIR MILES business, BMO. These discussions ultimately culminated in the proposed transactions and the Transaction Support Agreement described in more detail below.

As of March 16, 2023, the Debtors and their non-Debtor subsidiaries and affiliates and Lenders holding in excess of 72% of the Loans outstanding under the Credit Agreement entered into the Transaction Support Agreement. Pursuant to the Transaction Support Agreement, the parties have agreed to work cooperatively to implement the following global transactions and/or proceedings in respect of the Company and its business lines:  (x) the sale of the AIR MILES business by LoyaltyOne in connection with the CCAA Proceeding; (y) the consummation of the Plan in

connection with the Chapter 11 Cases, in connection with which the Debtors intend to transfer the claims and causes of action against the Bread Parties and the Spinoff Claims and Cause of Actions to a liquidating trust and otherwise wind-down their assets and operations; and (z) the sale of the Brand Loyalty Business pursuant to the BL Purchase Agreement (defined below).

**D.      Sale of BrandLoyalty and Bridge Loan Agreement**

**1.      Purchase Agreement**

On March 1, 2023, Lux Financing, a private limited liability company (société à responsabilité limitée) incorporated under the laws of Luxembourg, a wholly-owned indirect subsidiary of LVI, entered into a Sale and Purchase Agreement (the "BL Purchase Agreement") with Opportunity Partners (the "Buyer"), pursuant to which the Buyer agreed to acquire from Lux Financing 100% of all issued and outstanding shares (the "Shares") in the capital of Apollo Holdings B.V., a private company with limited liability incorporated under the laws of the Netherlands ("Apollo Holdings") and the legal and beneficial owner, directly or indirectly, of all of the shares of the subsidiaries of Lux Financing that constitute the BrandLoyalty business. Apollo Holdings and each of its direct and indirect subsidiaries are collectively referred to herein as the "BL Entities."

Upon the terms and conditions set forth in the BL Purchase Agreement, the Buyer has agreed to purchase the Shares from Lux Financing for a fixed aggregate purchase price of $6 million to be paid in cash at the closing of the sale transaction contemplated by the BL Purchase Agreement (the "BL Closing"). Pursuant to the BL Purchase Agreement, the Buyer also agreed to assume all liabilities of the BL Entities as of the BL Closing other than those arising under the Credit Agreement.

**2.      Bridge Loan Agreement**

Also on March 1, 2023, certain of the BL Entities entered into a bridge loan agreement with Opportunity Partners (the "Bridge Loan Agreement"). Under the terms of the Bridge Loan Agreement, Opportunity Partners has agreed to lend such BL Entities up to €25,000,000 for the purpose of funding the working capital needs of the BrandLoyalty business in the period between the signing of the Purchase Agreement and the BL Closing (the "Bridge Loan"). The BL Entities' obligations under the Bridge Loan will be assumed by the Buyer in connection with the BL Closing and none of the Debtors nor LoyaltyOne have any obligations with respect to the Bridge Loan.

**E.      CCAA Proceeding of LoyaltyOne**

On the Petition Date, LoyaltyOne brought an application before the Ontario Court for an initial order (the "Initial Order"), among other things, granting a temporary stay of enforcement actions and proceedings as against LoyaltyOne, LoyaltyOne's subsidiary, Travel Services, and their respective property, businesses, directors and officers (other than Motes and any other person who, at any time after November 5, 2021, has served as a director, officer, or employee of (i) Bread or (ii) any other entity that, at any time after November 5, 2021, was or is a direct or indirect subsidiary of Bread), and other typical application relief under the CCAA. The Initial Order was granted on the Petition Date. LoyaltyOne intends to bring a motion before the Ontario Court on March 20, 2023 to seek approval of, among other things, (i) the SISP to solicit interest in a sale or investment transaction concerning LoyaltyOne and/or its assets, and (ii) the CCAA DIP Facility to be provided by BMO in the maximum principal amount of $70 million that is intended to provide operating liquidity to the LoyaltyOne, as well as the Company (through the CCAA DIP Facility). In connection with the SISP, and subject to the approval of the Ontario Court, BMO has agreed to serve as a "stalking horse bidder" for substantially all of the operating assets of LoyaltyOne, including the equity interests of LoyaltyOne's subsidiary, Travel Services, for a total purchase price of $160,000,000, subject to certain adjustments as set forth therein, pursuant to the terms of the Stalking Horse Transaction Agreement (as defined and described below).

Pursuant to the Initial Order, KSV Restructuring Inc. was appointed as the monitor (the "Monitor") in the CCAA Proceeding. Publicly filed materials and other information in respect of the CCAA Proceeding are available on the Monitor's website at https://www.ksvadvisory.com/experience/case/loyaltyone.

1. **The Stalking Horse Purchase Agreement**

On March 9, 2023, LoyaltyOne and BMO entered into an asset purchase agreement (the "Stalking Horse Transaction Agreement") pursuant to which BMO has agreed to: (i) purchase all or substantially all of the operating assets of LoyaltyOne, including the equity interests in Travel Services; and (ii) assume certain liabilities associated with the continued operation of the AIR MILES business.  The sale is conditional upon, among other things: (a) the Stalking Horse Transaction Agreement being selected as the Successful Bid in accordance with the proposed SISP; (b) a sale approval and vesting order being granted by the Ontario Court, among other things, approving the Stalking Horse Transaction Agreement and, upon closing, vesting the purchased assets in BMO free and clear of all encumbrances, except Permitted Encumbrances (as such term is defined in the Stalking Horse Transaction Agreement), and (c) regulatory approvals.

2. **The SISP**

If approved by the Ontario Court, the proposed SISP will allow LoyaltyOne and its advisors to canvass the market to determine if there are any other competing bids that would offer a more favorable outcome to its stakeholders than that provided under the Stalking Horse Transaction Agreement. While the proposed SISP is conducted, the Stalking Horse Transaction Agreement will provide critical stability to the business and LoyaltyOne's stakeholders by ensuring a going concern outcome in the CCAA Proceeding.  Upon the completion of the SISP, LoyaltyOne will seek an order approving the sale to the purchaser making the Successful Bid (the "Successful Bidder") in the SISP.

3. **CCAA DIP Facility**

Subject to the approval of the Ontario Court, LoyaltyOne and BMO have signed a term sheet pursuant to which BMO will provide a DIP financing facility (the "CCAA DIP Facility") to LoyaltyOne.  If approved by the Ontario Court, the CCAA DIP Facility will enable LoyaltyOne to: (i) operate throughout the pendency of the CCAA Proceeding; (ii) provide necessary liquidity to administer the SISP; and (iii) advance necessary funds to LVI via the DIP Facility to conduct the Chapter 11 Cases and, subject to Bankruptcy Court approval, provide critical services to LoyaltyOne during the CCAA Proceeding. The cash consideration payable under the Stalking Horse Transaction Agreement would, if such transaction is selected as the Successful Bid in the proposed SISP and closes in accordance with its terms, provide funds necessary to satisfy in full any potential amounts payable in connection with the court-ordered charges granted pursuant to the Initial Order, as amended from time to time, and those anticipated to be granted during the pendency of the CCAA Proceeding, any other amounts that may be in priority to the obligations owing under the CCAA DIP Facility, as well as to repay the outstanding balance of the CCAA DIP Facility to BMO, in its capacity as lender under the CCAA DIP Facility. Subject to the approval of the Ontario Court, funds remaining following satisfaction of the foregoing priority amounts are expected to be distributed to the Administrative Agent as a partial recovery of Claims of Lenders.

**ARTICLE IV.**
**EVENTS FOLLOWING THE FILING OF THE CHAPTER 11 CASES**

A. **First Day Motions**

On the Petition Date, the Debtors filed several motions designed to facilitate the administration of the Chapter 11 Cases by, among other things, stabilizing the Debtors' operations, protecting employees and obtaining needed funding.  Copies of these motions, and corresponding orders in connection therewith, and all other pleadings in these Chapter 11 Cases, can be obtained for free on the Solicitation Agent's website at  https://cases.ra.kroll.com/LVI or for a fee at the Bankruptcy Court's website https://ecf.txsb.uscourts.gov/.

B. **Cash Collateral Motion**

On the Petition Date, the Debtors filed the *Debtors' Emergency Motion for Entry of an Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay and (IV) Granting Related Relief* [Docket No. 19] (the "Cash Collateral Motion").  Pursuant to the Cash Collateral Motion, the Debtors sought authorization to use cash collateral on hand for working capital and other general corporate

purposes. On March 10, 2023, the Bankruptcy Court entered the interim order [Docket No. 65] granting interim approval of the use of cash collateral. The final hearing on the Cash Collateral Motion is set for April 4, 2023, at 10:00 a.m. (prevailing Central Time).

**C.      Joint Administration Motion**

On the Petition Date, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 2] (the "Joint Administration Motion"). Pursuant to the Joint Administration Motion, the Debtors sought entry of an order (i) directing procedural consolidation and joint administration of these Chapter 11 Cases and (ii) granting related relief. On March 10, 2023, the Bankruptcy Court entered the order [Docket No. 41] approving the Joint Administration Order.

**D.      Redaction Motion**

On the Petition Date, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Waiving the Requirement to File a List of and Provide Notice Directly to Equity Security Holders, (II) Authorizing the Debtors to Redact Certain Personally Identifiable Information, (III) Approving the Form and Manner of the Notice of Commencement, (IV) Extending the Deadline for the Debtors to File Schedules and SOFAs, (V) Extending the Time by Which the Debtors file 2015.3 Financial Reports, and (VI) Granting Related Relief* [Docket No. 38] (the "Redaction Motion"). On March 10, 2023, the Bankruptcy Court entered the order [Docket No. 73] (i) waiving the requirement to file a list of, and provide notice directly to, equity security holders of LVI, (ii) authorizing the Debtors to redact certain personally identifiable information, (iii) approving the form and manner of notifying creditors of the commencement of these Chapter 11 Cases, (iv) extending the deadline to file their schedules and SOFAs to May 8, 2023, (v) extending the deadline to file their 2013.5 reports to May 8, 2023, and (iv) granting related relief.

**E.      Cash Management Motion**

On the Petition Date, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Account, (B) Maintain Existing Business Forms and (C) Perform Intercompany Transactions and (II) Granting Related Relief* [Docket No. 20] (the "Cash Management Motion"). Pursuant to the Cash Management Motion, the Debtors sought entry of an order: (i) authorizing the Debtors to continue to (a) operate their Cash Management System (as defined therein) and maintain their existing Bank Accounts (as defined therein), including honoring certain prepetition obligations related thereto, (b) maintain existing Business Forms (as defined therein) and (c) perform Intercompany Transactions (as defined therein); and (ii) granting related relief. On March 10, 2023, the Bankruptcy Court entered an interim order [Docket No. 55] granting interim approval of the Cash Management Motion. The final hearing on the Cash Management Motion is set for April 4, 2023, at 10:00 a.m. (prevailing Central Time).

**F.      NOL Motion**

On the Petition Date, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Approving Notification and Hearing Procedures for Certain Transfers of Beneficial Ownership and Declarations of Worthlessness with Respect to Common Stock and (II) Granting Related Relief* [Docket No. 6] (the "NOL Motion"). Pursuant to the NOL Motion, the Debtors sought entry of an order: (i) approving certain notification and hearing procedures related to certain transfers of any Beneficial Ownership (as defined therein) in, or declarations of worthlessness with respect to, existing common stock of LVI or any beneficial interest therein, as set forth in Exhibit 1 to the proposed order (the "Procedures"); (ii) directing that any purchase, sale, other transfer of or declaration of worthlessness with respect to common stock in violation of the Procedures shall be null and void *ab initio*; and (iii) granting related relief. On March 10, 2023, the Bankruptcy Court entered an interim order [Docket No. 68] granting interim approval of the NOL Motion. The final hearing on the NOL Motion is set for April 4, 2023, at 10:00 a.m. (prevailing Central Time).

### G.      Wages Motion

On the Petition Date, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing, But Not Directing, Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation and Reimbursable Employee Expenses and (B) Continue Compensation and Benefits Programs and (II) Granting Related Relief* [Docket No. 7] (the "Wages Motion").  Pursuant to the Wages Motion, the Debtors seek entry of an order: (i) authorizing, but not directing, the Debtors to (a) pay prepetition wages, salaries, other compensation and reimbursable employee expenses and (b) continue compensation and benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto; and (ii) granting related relief.  On March 10, 2023, the Bankruptcy Court entered an order [Docket No. 66] granting the Wages Motion.

### H.      Utilities Motion

On the Petition Date, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment for Future Utility Services; (II) Approving Adequate Assurance Procedures; (III) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service; and (IV) Granting Related Relief* [Docket No. 23] (the "Utilities Motion").  Pursuant to the Utilities Motion, the Debtors sought entry of an order: (i) approving the Debtors' proposed adequate assurance of payment for future utility services; (ii) approving the Debtors' proposed procedures for resolving additional adequate assurance requests; (iii) prohibiting utility providers from altering, refusing or discontinuing service; and (iv) granting related relief.  On March 10, 2023, the Bankruptcy Court entered an order [Docket No. 69] granting the Utilities Motion.

### I.       Insurance Motion

On the Petition Date, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to (A) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend or Purchase Insurance Policies and (C) Purchase Tail Coverage Under Their Insurance Policies and (II) Granting Related Relief* [Docket No. 5] (the "Insurance Motion").  Pursuant to the Insurance Motion, the Debtors sought entry of an order: (i) authorizing the Debtors to (a) continue insurance coverage entered into prepetition and satisfy prepetition obligations related thereto in the ordinary course, (b) renew, amend, supplement, extend or purchase insurance coverage in the ordinary course and (c) purchase tail coverage under certain of their insurance policies; and (ii) granting related relief. On March 10, 2023, the Bankruptcy Court entered an order [Docket No. 67] granting the Insurance Motion.

### J.       Claims Bar Date Motion

On the Petition Date, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Setting the Claims Bar Dates, (II) Setting the Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(B)(9) Requests, and (IV) Approving Notice of Bar Dates* [Docket No. 39] (the "Claims Bar Date Motion").  Pursuant to the Claims Bar Date Motion, the Debtors sought entry of an order to, among other things establish deadlines by when Proofs of Claim must be filed.  On March 12, 2023, the Bankruptcy Court entered an order [Docket No. 77] (the "Claims Bar Date Order") setting: (i) a general claims bar date, including section 503(B)(9) requests, of April 10, 2023, at 5:00 p.m. prevailing Central Time; (ii) a governmental bar date of September 6, 2023, at 5:00 p.m. prevailing Central Time; and (iii) a rejection damages bar date of the later of (a) the general claims bar date or governmental bar date, as applicable, or (b) 5:00 p.m. prevailing Central Time on the date that is 30 days after the entry of an order approving the rejection of the executory contract or unexpired lease.

Notwithstanding anything to the contrary in the Claims Bar Date Order or elsewhere in the Plan or Confirmation Order, the Lenders and the Administrative Agent shall not be required to File any Proof of Claims in the Chapter 11 Cases or against the Estates for any claim or cause of action that they have or may have and all such claims or causes of action are hereby preserved to the fullest extent of the law.  For the avoidance of doubt, nothing in this Article IV.J. shall allow, or should be interpreted to allow, the Lenders or the Administrative Agent to assert claims or causes of action that are expressly released pursuant to the Plan or Confirmation Order.

**K.**  **Settlement with the Bread Parties**

Following the Petition Date, the Debtors, the Consenting Stakeholders and the Bread Parties reached an agreement to resolve the Bread Parties' objection to the DIP Motion and any potential objection by the Bread Parties to entry of the Final DIP Order and the Confirmation Order on the terms set forth below (the "Bread Settlement"). The provisions of this Bread Settlement are incorporated herein as operative terms of this Combined DS and Plan and shall supersede any other conflicting provisions of this Combined DS and Plan:

1.      Nothing in the Combined DS and Plan, the Confirmation Order, the Interim Cash Collateral Order or the Interim DIP Order (and the Final DIP Order) shall impair or eliminate any alleged direct, non-derivative claims the Bread Parties may assert against the Prepetition Secured Parties or any defenses or arguments that any of the Bread Parties may have in connection with any Spinoff Claims and Causes of Action that are Preserved Estate Claims, including, without limitation, the Bread Parties' ability to assert the following:  (i) shared liability or judgment reduction doctrines that limit or eliminate the Bread Parties' liability to the estate or the Liquidating Trust; (ii) that the Spinoff Claims and Causes of Action should be dismissed or that any liability of the Bread Parties should be eliminated, reduced or mitigated by virtue of the actions of the beneficiaries of the Liquidating Trust (or the predecessors of such beneficiaries) or eliminated, reduced or mitigated because the beneficiaries of the Liquidating Trust (or the predecessors of such beneficiaries) are not proper beneficiaries (through the Liquidating Trust) of the proceeds of any Spinoff Claims and Causes of Action against any Bread Parties; and (iii) defenses such as *in pari delicto*, unclean hands or similar defenses or doctrines.

2.      The Challenge Period (as defined in the Interim DIP Order) and, solely with respect to the limited potential estate claims described in this paragraph, any related statute of limitations and the effectiveness of the Debtor Release of the Prepetition Secured Parties in the Combined DS and Plan and any Confirmation Order) shall be tolled until 30 days following the conclusion of any litigation by the Debtors or the Liquidating Trust against any of the Bread Parties for any Spinoff Claims and Causes of Action, solely to permit any of the Bread Parties to seek standing to commence any claims or causes of action against the Prepetition Secured Parties, and solely to the extent any of the Bread Parties are held liable to the Debtors or the Liquidating Trust for any Spinoff Claims and Causes of Action by a court of competent jurisdiction (a "Preserved Challenge").  The sole remedy that the Bread Parties may seek in a Preserved Challenge shall be the reduction of amounts to be paid to the Prepetition Secured Parties from the Liquidating Trust or the disgorgement of amounts previously paid to the Prepetition Secured Parties from the Liquidating Trust, in both cases limited to the actual amounts that the Bread Parties were held liable to pay to the Debtors or the Liquidating Trust as a result of any Spinoff Claims and Causes of Action.  The Bread Parties will not seek standing to commence a Challenge other than a Preserved Challenge that complies with the terms of the prior sentence, and all other parties reserve the right to contest standing, to contest any Preserved Challenge and to contest the amount of reduction or disgorgement that the Bread Parties seek.

3.      To the extent any Bread Parties have Allowed Claims in the Chapter 11 Cases, those Allowed Claims shall participate in the Liquidating Trust with respect to any recoveries from assets that were unencumbered as of the Petition Date or, to the extent securing DIP Facility Claims or adequate protection claims under any of the DIP Orders, not applied to satisfy such claims, other than the proceeds of claims against the Bread Parties (if any).  The Debtors and all parties in interest retain their rights to object to any proof of claim filed by any Bread Parties, and all rights and defenses of the Bread Parties in respect thereto are also preserved.

4.      The Bread Parties may raise any objections and arguments in connection with the Debtors' Executory Contracts with any of the Bread Parties, including the Debtors' assumption or rejection thereof, and the rights of the Debtors and all other parties in interest with respect thereto are also preserved.

5.      For the avoidance of doubt, the Bread Parties may opt out of the Third-Party Release.

6.      The Bread Parties have agreed not to object to confirmation of the Plan or the DIP Orders, and have agreed that any objections raised in connection with paragraph 4 above will not be styled as, or argued by the Bread Parties to be, "confirmation objections" that seek to delay, hinder or prolong entry of the Confirmation Order or the Effective Date of the Plan.

## ARTICLE V.
## SUMMARY OF TREATMENT OF CLAIMS AND ESTIMATED RECOVERIES

The Plan classifies Claims and Interests into nine (9) different Classes. The following chart provides a summary of the Debtors' estimate of the anticipated recoveries for each Class of Claims and Interests.[8]  The treatment provided in this chart is for informational purposes only and is qualified in its entirety by Article VII herein.

| Class | Claims or Interests | Status | Voting Rights | Estimated Amount of Allowed Claims or Interests | Estimated Recoveries for Allowed Claims and Interests |
|---|---|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept | $0 | 100% |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept | $300,000 | 100% |
| 3 | Loan Claims | Impaired | Entitled to Vote | Approximately $664 million | less than 100% |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote | $0[9] | less than 100% |
| 5 | Convenience Claims | Unimpaired | Presumed to Accept | Approximately $5.5 million | 100% |
| 6 | Section 510 Claims | Impaired | Deemed to Reject | $0 | 0% |
| 7 | Intercompany Claims | Impaired | Deemed to Reject | N/A | 0% |
| 8 | Intercompany Interests | Impaired | Deemed to Reject | N/A | 0% |
| 9 | Interests | Impaired | Deemed to Reject | N/A | 0% |

## ARTICLE VI.
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims, DIP Facility Claims, Professional Fee Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Articles V and VII.

---

[8]   The amounts contained in this Article V represent the Debtors' estimate of the Claims that they believe ultimately may be Allowed based on their review of their books and records, and do not represent amounts actually asserted by Creditors in Proofs of Claim or otherwise. The Debtors have not completed their analysis of Claims in the Chapter 11 Cases and such Claims remain subject to objection as necessary or appropriate. Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time. The actual amount of the Allowed Claims may be greater or lower than estimated. *See* Art. XVIII.  Likewise, because the recoveries in litigation are speculative, the range of recoveries for Classes 3 and 4 cannot be estimated with certainty.

[9]   The Debtors are currently unaware of any Claims that would constitute Class 4 Claims other than potential Claims that may be asserted by the Bread Parties.  The Debtors maintain that any Claims asserted by the Bread Parties should be Disallowed in full and will file an appropriate Claims objection as and when appropriate.

A.     **Administrative Claims**

1.     <u>**Administrative Claims**</u>

Except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment, in full and final satisfaction, settlement and release of and in exchange for each Allowed Administrative Claim, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by such Holder and the Debtors, or the Liquidating Trustee, as applicable; or (e) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

2.     <u>**Professional Fee Claims**</u>

a.     *<u>Final Fee Applications</u>*

All final requests for Professional Fee Claims shall be filed no later than forty-five (45) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court and paid from the Professional Fee Escrow Account and, to the extent such account is insufficient, first from the Winddown Reserve then from cash held by the Debtors or the Liquidating Trustee.

b.     *<u>Professional Fee Escrow Account</u>*

On the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Retained Professionals.  Such funds shall not be considered property of the Estates of the Debtors or the Liquidating Trust, as applicable. Professional Fee Claims shall be paid in Cash to such Retained Professionals from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order. When all such Allowed amounts owing to Retained Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall be paid to the Winddown Reserve without any further action or order of the Bankruptcy Court. To the extent that funds held in the Professional Fee Escrow Account are unable to satisfy the amount of Professional Fee Claims owed to the Retained Professionals, such Retained Professionals shall have Allowed Administrative Claims for any such deficiency, which shall be satisfied in accordance with <u>Article VI.A.2.</u> hereof.

Notwithstanding anything to the contrary set forth herein, professional fees and expenses of professionals incurred in connection with the CCAA Proceeding shall in all cases continue to be paid in accordance with the terms of the orders of the Ontario Court.

c.     *<u>Professional Fee Reserve Amount</u>*

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Retained Professionals shall estimate their Accrued Professional Compensation prior to and as of the Effective Date and shall deliver such estimate to the Debtors, the Administrative Agent and the Consenting Lenders, five (5) days before the Effective Date. If a Retained Professional does not provide such estimate, the Debtors may estimate the unbilled fees and expenses of such Retained Professional; *provided* that such estimate shall not be considered an admission or

30

limitation with respect to the fees and expenses of such Retained Professional. The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

      **d.**      ***Payment of Certain Fees and Expenses***

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Liquidating Trustee shall pay in Cash from the Winddown Reserve the reasonable and documented fees and expenses incurred by the Liquidating Trustee (as applicable) after the Effective Date in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court. The Liquidating Trustee shall pay all reasonable and documented fees and expenses in accordance with the terms and conditions of the Plan, the DIP Orders and the Transaction Support Agreement, and if any such fee and/or expense is unpaid as of the Effective Date, such fee and/or expense shall be paid on the Effective Date. Upon the Effective Date, any requirement that Retained Professionals comply with Bankruptcy Code sections 327 through 331 and 1103 in seeking retention or compensation for services rendered after such date shall terminate, and the Liquidating Trustee may, in accordance with the Liquidating Trust Agreement, employ and pay any Retained Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

      **e.**      ***Substantial Contribution Compensation and Expenses***

Any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to Bankruptcy Code sections 503(b)(3), (4), and (5) must file an application and serve such application on counsel for the Debtors or Liquidating Trustee, as applicable, and as otherwise required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules on or before the Administrative Claims Bar Date.

      **3.**      **Administrative Claims Bar Date**

All requests for payment of an Administrative Claim (other than DIP Facility Claims or Professional Fee Claims) that accrued on or before the Effective Date that were not otherwise accrued in the ordinary course of business must be filed with the Bankruptcy Court and served on the Debtors and Liquidating Trustee no later than the Administrative Claims Bar Date. Holders of Administrative Claims (other than DIP Facility Claims or Professional Fee Claims) that are required to, but do not, file and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed barred as of the Effective Date.

The Debtors, with the consent of the Consenting Lenders, or the Liquidating Trustee (as applicable), in accordance with the terms of the Transaction Support Agreement, may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval. The Debtors, or Liquidating Trustee (as applicable) may also choose to object to any Administrative Claim no later than ninety (90) days after the Administrative Claims Bar Date, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court. Unless the Debtors or Liquidating Trustee (as applicable), or any other party in interest, objects to a timely-filed and properly served Administrative Claim, such Administrative Claim will be deemed Allowed in the amount requested. In the event that the Debtors or Liquidating Trustee (as applicable) object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be allowed and, if so, in what amount.

**B.**      **DIP Facility Claims**

Except to the extent that the relevant parties agree otherwise, in full and final satisfaction, compromise, settlement and release of, and in exchange for, Allowed DIP Facility Claim, the Holder of the Allowed DIP Facility Claim shall receive payment in Cash, first from any excess proceeds of the Winddown Reserve, and then from the Liquidating Trust from available proceeds of the Preserved Estate Claims prior to any distribution to the Liquidating Trust Beneficiaries on account of the Liquidating Trust Interests.

C.      **Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement and release of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in Bankruptcy Code section 1129(a)(9)(C) and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with Bankruptcy Code sections 511 and 1129(a)(9)(C).  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the Debtors or the Liquidating Trustee (as applicable), in accordance with the terms of the Transaction Support Agreement, and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business.

D.      **Statutory Fees**

Prior to the Effective Date, the Debtors shall File reports for each month (including any fraction thereof) when they become due, in a form reasonably acceptable to the U.S. Trustee. All fees due and payable pursuant to section 1930 of title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtors inclusive of any interest due and payable under 31 U.S.C. § 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' business (or such amount agreed to with the U.S. Trustee), for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.  On and after the Effective Date, the Liquidating Trustee shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports for each quarter (including any fraction thereof) in a form reasonably acceptable to the U.S. Trustee, until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

**ARTICLE VII.**
**CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS**

A.      **Classification of Claims and Interests**

The Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in <u>Article VI</u> herein, all Claims and Interests are classified in the Classes set forth below in accordance with Bankruptcy Code section 1122.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving Distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.  The votes of each Class shall be tabulated on a Debtor-by-Debtor basis.

B.      **Treatment of Claims and Interests**

Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, settlement, release and in exchange for, such Holder's Allowed Claim.

> *(a)*     *Class 1 — Other Secured Claims*
>
> (1)     *Classification*:  Class 1 consists of all Other Secured Claims.
>
> (2)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of its Allowed Other Secured Claim, in full and final satisfaction, settlement, release and in exchange for each Allowed Other Secured Claim, each such Holder shall receive, at the option of the applicable Debtor(s), either:
>
> > (A)     payment in full in Cash;

(B)      delivery of collateral securing such Allowed Other Secured Claim; or

(C)      such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with Bankruptcy Code section 1124.

(3)      *Voting*:  Class 1 is Unimpaired and Holders of Allowed Other Secured Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f).  Therefore, Holders of Allowed Other Secured Claims in Class 1 are not entitled to vote to accept or reject the Plan.

**(b)      Class 2 — Other Priority Claims**

(1)      *Classification*:  Class 2 consists of all Other Priority Claims.

(2)      *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, on the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release and in exchange for such Allowed Other Priority Claim, each Holder thereof shall receive either:

(A)      payment in full in Cash; or

(B)      such other treatment rendering its Allowed Other Priority Claim Unimpaired in accordance with Bankruptcy Code section 1124.

(3)      *Voting*:  Class 2 is Unimpaired and Holders of Allowed Other Priority Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f).  Therefore, Holders of Allowed Other Priority Claims in Class 2 are not entitled to vote to accept or reject the Plan.

**(c)      Class 3 —Loan Claims**

(1)      *Classification*:  Class 3 consists of Loan Claims.

(2)      *Allowance*:  The Loan Claims shall be deemed Allowed in the principal amount outstanding under the Credit Agreement plus the L//C Obligations and any and all other obligations related thereto, including accrued and unpaid interest, costs, fees, and indemnities as of the Petition Date.

(3)      *Treatment*:  Except to the extent that a Holder of an Allowed Loan Claim agrees to less favorable treatment, on the Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement and in exchange for each Allowed Loan Claim, as applicable, each Holder thereof shall receive its share of:

(a)      the cash proceeds of any collateral securing the Loan Claims immediately upon the Debtors' or Liquidating Trustee's receipt thereof, and

(b)      the Liquidating Trust Interests on a Pro Rata basis based on the aggregate Allowed Claims in Classes 3 and 4, after application of the cash proceeds of any collateral securing the Loan Claims to the Class 3 Claims.

(5)      *Voting*:  Class 3 is Impaired.  Therefore, Holders of Class 3 Loan Claims are entitled to vote to accept or reject the Plan.

*(d)*     ***Class 4 —General Unsecured Claims***

(1)     *Classification*:  Class 4 consists of General Unsecured Claims.

(2)     *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on the Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement and in exchange for each Allowed General Unsecured Claim, as applicable, each Holder thereof shall receive its share of the Liquidating Trust Interests on a Pro Rata basis based on the aggregate amount of all Allowed Claims in Classes 3 and 4, after application of the cash proceeds of any collateral securing the Loan Claims to the Class 3 Claims; *provided* that to the extent that any Bread Parties have any Allowed Claims in Class 4, such Allowed Claims shall participate in the Liquidating Trust with respect to any recoveries from assets that were unencumbered as of the Petition Date or, to the extent securing DIP Facility Claims or adequate protection claims under any of the DIP Orders, not applied to satisfy such claims; *provided further* that, other than pursuant to the Bread Settlement, in no event shall any Bread Party receive any distribution on account of any Liquidating Trust Asset, including any proceeds received from Preserved Estate Claims or related proceeds from any Insurance Coverage Right on account of any recoveries obtained by the Liquidating Trust through the prosecution and/or settlement of Spinoff Claims and Causes of Action and all claims or Causes of Action asserted against the Bread Parties.

(3)     *Voting*:  Class 4 is Impaired.  Therefore, Holders of Class 4 General Unsecured Claims are entitled to vote to accept or reject the Plan.

*(e)*     ***Class 5 — Convenience Claims***

(1)     *Classification*:  Class 5 consists of all Convenience Claims.

(2)     *Treatment*:  Except to the extent that a Holder of an Allowed Convenience Claim agrees to less favorable treatment, on the Effective Date or as soon as reasonably practicable thereafter, and subject to Article XI, each Allowed Convenience Claim shall receive payment in full in Cash from the Convenience Claim Distribution Reserve.

(3)     *Voting*:  Class 5 is Unimpaired.  Therefore, Holders of Class 5 Convenience Claims are conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code Section 1126(f).  Therefore, Holders of Class 5 Convenience Claims are not entitled to vote to accept or reject the Plan.

*(f)*     ***Class 6 — Section 510 Claims***

(1)     *Classification*:  Class 6 consists of all Section 510 Claims.

(2)     *Treatment*:  Holders of Section 510 Claims shall not receive or retain any property or interest in property on account of such Section 510 Claims.

(3)     *Voting*:  Holders of Section 510 Claims are deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g).  Therefore, Holders of Section 510 Claims are not entitled to vote to accept or reject the Plan.

*(g)*     ***Class 7 — Intercompany Claims***

(1)     *Classification*:  Class 7 consists of all Intercompany Claims.

(2)     *Treatment*:  On the Effective Date or as soon as reasonably practicable, each Intercompany Claim shall be cancelled, settled and released without any distribution.

(3)     *Voting*:  Holders of Intercompany Claims are Impaired, and such Holders of Intercompany Claims are conclusively presumed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g).  Therefore, Holders of Allowed Intercompany Claims are not entitled to vote to accept or reject the Plan.

**(h)     *Class 8 — Intercompany Interests***

(1)     *Classification*:  Class 8 consists of all Intercompany Interests.

(2)     *Treatment*:  On the Effective Date or as soon as reasonably practicable, Intercompany Interests shall be deemed to be cancelled, settled and extinguished without any distribution; *provided, however*, notwithstanding the foregoing, the Liquidating Trustee may determine to delay the cancellation, settlement and extinguishment of certain Intercompany Interests pursuant to <u>Article VIII.B.</u> in order to maximize the recovery of assets and effectuate an efficient winddown of the Debtors and non-Debtor Affiliates.

(3)     *Voting*:  Holders of Intercompany Interests are Impaired, and such Holders of Intercompany Interests are conclusively presumed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g).  Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

**(i)     *Class 9 — Interests***

(1)     *Classification*:  Class 9 consists of all Interests.

(2)     *Treatment*:   On the Effective Date, all Interests will be cancelled, released, and extinguished, and will be of no further force or effect.

(3)     *Voting*:  Class 9 is Impaired and Holders of Allowed Class 9 Interests are conclusively presumed to have rejected the Plan.  Therefore, Holders of Allowed Class 9 Interests are not entitled to vote to accept or reject the Plan.

**C.     Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

**D.     Controversy Concerning Impairment**

If a controversy arises as to whether any Claims or Interests, or any Class thereof, is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**E.     Elimination of Vacant Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest, or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing, shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to Bankruptcy Code section 1129(a)(8).

**F.     Voting Classes; Presumed Acceptance or Rejection by Non-Voting Classes**

If a Class contains Claims eligible to vote and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

Claims in Classes 1, 2 and 5 are not Impaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f) and their votes will not be solicited.

Claims in Classes 3 and 4 are Impaired under the Plan and are entitled to vote.  Classes 3 and 4 (with respect to each applicable Debtor) will each have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims in each of Classes 3 and 4 (other than any Claims of creditors designated under Bankruptcy Code section 1126(e)) that have voted to accept or reject the Plan.

Claims in Class 6 and 7 and the Interests in Class 8 and 9 are Impaired and will not receive a Distribution under the Plan. Pursuant to Bankruptcy Code section 1126(g), the Holders of Claims and Interests in such Classes are deemed to reject the Plan and their votes will not be solicited.

**G.**     **Confirmation Pursuant to Bankruptcy Code Sections 1129(a)(10) and 1129(b)**

The Debtors will seek Confirmation of the Plan pursuant to Bankruptcy Code section 1129(b) with respect to a rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article XIV herein (subject to the terms of the Transaction Support Agreement) to the extent that Confirmation pursuant to Bankruptcy Code section 1129(b) requires modification, including by (a) modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules and (b) withdrawing the Plan as to an individual Debtor at any time before the Confirmation Date.

**H.**     **Subordinated Claims**

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions, if any, and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, Bankruptcy Code section 510 or otherwise. Pursuant to Bankruptcy Code section 510 and subject to the Transaction Support Agreement, the Debtors or the Liquidating Trustee, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Interest (other than a Loan Claim) in accordance with any contractual, legal or equitable subordination relating thereto, which right includes, among others, the right to seek to subordinate any Claims asserted by the Bread Parties.

**ARTICLE VIII.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

**A.**     **General Settlement of Claims and Interests**

Pursuant to Bankruptcy Code section 1123 and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and Interests and is fair, equitable, and is within the range of reasonableness.  Subject to Article XI herein, all distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

**B.**     **Transactions Related to the Plan**

On, before, or after the Effective Date, the Debtors or the Liquidating Trustee, as applicable, may take all actions as may be necessary or appropriate to effectuate the transactions described in, approved by, contemplated by, or necessary to effectuate the Plan, including:  (a) the execution and delivery of any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, formation,

organization, dissolution or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including the documents comprising the Plan Supplement; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (c) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, amalgamation, consolidation, conversion, or dissolution pursuant to applicable state law; (d) the cancelation, extinguishment or transfer of any of the Debtors' interests in the equity of any non-Debtor Affiliates; (e) approval of any plan of liquidation, appointment of a liquidator, or any other comparable or similar transaction or action (including in a Debtor's capacity as an equity holder or managing member of another Debtor or other wholly-owned non-Debtor subsidiary); (f) such other transactions that are required to effectuate the transactions contemplated by the Plan and the Transaction Support Agreement and such actions shall be made in the most efficient and non-adverse manner for the Consenting Lenders, including in regard to tax matters and any mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; and (g) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law, and/or retaining the corporate existence and structure of the Debtors and non-Debtor Affiliates for a sufficient time to maximize the recovery of assets and effectuate an efficient winddown of the Debtors and non-Debtor Affiliates.

The Confirmation Order shall and shall be deemed to, pursuant to Bankruptcy Code section 1123, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

**C.      Subordination**

The allowance, classification, and treatment of satisfying all Claims and Interests under the Plan takes into consideration any and all subordination rights, whether arising by contract or under general principles of equitable subordination, Bankruptcy Code section 510 or otherwise. On the Effective Date, any and all subordination rights or obligations that a Holder of a Claim or Interest may have with respect to any distribution to be made under the Plan will be terminated, and all actions related to the enforcement of such subordination rights will be enjoined permanently. Accordingly, distributions under the Plan to Holders of Allowed Claims will not be subject to turnover or payment to a beneficiary of such terminated subordination rights, or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights; *provided*, that any such subordination rights shall be preserved in the event the Confirmation Order is vacated, the Effective Date does not occur in accordance with the terms hereunder or the Plan is revoked or withdrawn.

**D.      Cancellation of Instruments, Certificates, and Other Documents**

On the Effective Date, except as otherwise provided in the Plan:  (a) the obligations of the Debtors under the DIP Facility, the Credit Agreement and any Interests, Certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors giving rise to any Claim or Interest, including, for the avoidance of doubt, any and all shareholder or similar agreements related to Interests, shall be cancelled and none of the Debtors or the Liquidating Trust (as applicable) shall have any continuing obligations thereunder; and (b) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, Certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be released; *provided* that notwithstanding Confirmation or the occurrence of the Effective Date, any such agreement that governs the rights of the Holder of an Allowed Claim shall continue in effect solely for purposes of enabling such Holder to receive distributions under the Plan on account of such Allowed Claim as provided herein; *provided*, *further*, that the preceding proviso shall not affect the resolution of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Debtors or the Liquidating Trustee, as applicable, except to the extent set forth in or provided for under the Plan.

Notwithstanding Confirmation, the occurrence of the Effective Date or anything to the contrary herein, those matters that, by their express terms, survive the termination of the DIP Facility and the Credit Agreement shall survive

the occurrence of the Effective Date, including the rights of the Administrative Agent to expense reimbursement, indemnification and similar amounts.

**E.      Sources for Plan Distributions and Transfers of Funds Among Debtors**

Distributions under the Plan shall be funded, as applicable, with: (a) Cash on hand, including cash from the proceeds of the DIP Facility or by LoyaltyOne following the closing of the Successful Bid and if necessary, with the approval of the Ontario Court; and (b) the Liquidating Trust Assets. For the avoidance of doubt, the Debtors shall transfer all cash on hand on the Effective Date into the Liquidating Trust Reserve pursuant to the applicable budget under the DIP Facility. Cash payments to be made pursuant to the Plan will be made by the Debtors, the Liquidating Trustee or the Distribution Agent, as applicable.  The Debtors or the Liquidating Trustee, as applicable, will be entitled to transfer funds between and among the Debtors and non-Debtor subsidiaries as the Debtors or Liquidating Trustee, as applicable as necessary or appropriate to enable the payments and distributions required by the Plan, *provided* that such transfers do not adversely impact the Administrative Agent, or Lenders or any tax or other treatment of the Administrative Agent or Lenders.

**F.      Corporate Action**

Subject to the Transaction Support Agreement and, where required, approval of the Ontario Court, and except as set forth herein, upon the Effective Date, all actions contemplated by the Plan (including any document contemplated by the Plan Supplement) shall be deemed authorized, and approved, without any requirement for further action by Holders of Claims or Interests, directors, managers, or officers of the Debtors, the Liquidating Trustee or any other Entity, including, in each case, as applicable:  (a) rejection or assumption, as applicable, of Executory Contracts and Unexpired Leases; (b) implementation of the transactions contemplated by the Transaction Support Agreement; and (c) all other acts or actions contemplated, or reasonably necessary or appropriate to promptly consummate the transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan (including any document contained in the Plan Supplement) involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, authorized persons or officers of the Debtors or Liquidating Trustee.  On or before the Effective Date, the appropriate officers of the Debtors or Liquidating Trustee, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents and instruments contemplated by the Plan (or necessary or desirable to effectuate the transactions related to the Plan) in the name of and on behalf of the Debtors to the extent not previously authorized by the Bankruptcy Court, if and as applicable. The authorizations and approvals contemplated by this <u>Article VIII.F.</u> shall be effective notwithstanding any requirements under non-bankruptcy law.

**G.      Amended Organizational Documents**

On the Effective Date, the organizational documents of each of the Debtors shall be amended, amended and restated, or replaced as may be necessary to effectuate the transactions contemplated or permitted by this Plan and the Liquidating Trust Agreement. To the extent required under this Plan or applicable non-bankruptcy law, on the Effective Date, the Liquidating Trustee or each of the Debtors, as applicable, will file its Amended Organizational Documents with the applicable Secretary of State and/or other applicable authorities in its respective state or country of incorporation. The Amended Organizational Documents will prohibit the issuance of nonvoting equity securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code. After the Effective Date, the Liquidating Trustee or Debtors, as applicable, may amend and restate the Amended Organizational Documents, and the Liquidating Trustee or Debtors, as applicable, may file their respective certificates or articles of incorporation, bylaws, or such other applicable formation or dissolution documents, and other constituent documents as permitted by the laws of the respective states or countries of incorporation, the Liquidating Trust Agreement, and the Amended Organizational Documents.

**H.      Dissolution of Board of Directors**

As of the Effective Date, any remaining directors and officers of LVI shall be dismissed without further action required on the part of LVI or any other party; *provided, however*, for the avoidance of doubt, the Liquidating

Trustee, in accordance with the Liquidating Trust Agreement, may determine to retain any director, officer, manager or managing member of LVI or any other Debtor.

**I.      Employment Agreements**

To the extent that the Debtors intend for any employment, retirement, indemnification or other agreement with its respective directors, officers, managing members and employees to remain in place after the Effective Date, the Debtors, with the consent of the Consenting Lenders and Administrative Agent, will list such agreement on the list of "Assumed Executory Contracts and Unexpired Leases" contained in the relevant exhibit of the Plan, and such agreement will be assumed as of the Effective Date. If the Debtors do not list such agreement on the list of "Assumed Executory Contracts and Unexpired Leases" in the relevant exhibit, such agreement shall be deemed rejected. If contemplated or permitted by the Liquidating Trust Agreement, the Debtors, with the consent of the Consenting Lenders and Administrative Agent, may also enter into new employment arrangements and/or change in control agreements with individuals who will serve as officers after the Effective Date.

**J.      Section 1146(a) Exemption**

To the fullest extent permitted by Bankruptcy Code section 1146(a), any transfers (whether from a Debtor to the Liquidating Trustee or to any other Person) of property under the Plan or pursuant to:  (a) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Debtors; (b) the creation, modification, consolidation, termination, refinancing and/or recording of any mortgage, deed of trust, or other security interest or the securing of additional indebtedness by such or other means; (c) the making, assignment or recording of any lease or sublease; or (d) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales or use tax or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of Bankruptcy Code section 1146(c), shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**K.      Preservation of Causes of Action**

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including pursuant to Article XII herein, the DIP and Cash Collateral Orders or a Final Order, in accordance with Bankruptcy Code section 1123(b), the Liquidating Trustee shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Liquidating Trustee's  rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. **No Entity (other than the Administrative Agent and the Lenders) may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Liquidating Trustee will not pursue any and all available Causes of Action against them. The Debtors and Liquidating Trustee expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.** For the avoidance of doubt, any and all Spinoff Claims and Causes of Action and any and all Causes of Action against the Bread Parties are hereby preserved. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan, including pursuant to Article XII herein, the DIP and Cash Collateral Orders or a Final Order, the Liquidating Trustee expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation  For the avoidance of doubt, in no instance will any **Cause of**

**Action** preserved pursuant to this Article VIII.K. include any claim or Cause of Action with respect to, or against, a Released Party.

In accordance with Bankruptcy Code section 1123(b)(3), any Causes of Action preserved pursuant to the first paragraph of this Article VIII.K. that a Debtor may hold against any Entity shall vest in the Liquidating Trust on the Effective Date. The Liquidating Trustee, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action in accordance with this Plan and the Liquidating Trust Agreement. Subject to the terms of this Plan and the Liquidating Trust Agreement, the Liquidating Trustee shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order or approval of the Bankruptcy Court.

For the avoidance of doubt, no claim, Cause of Action, or related enforcement action against the Administrative Agent, Lenders or the DIP Lender and its directors and officers shall be preserved by the Debtors, nor shall the Litigation Trustee have the right or authority to pursue claims and Causes of Action against the Administrative Agent, any of the Lenders or the DIP Lender and its directors and officers.

**L.     Convenience Claim Distribution Reserve**

On the Effective Date, the Debtors and/or LoyaltyOne shall establish and fund the Convenience Claim Distribution Reserve with Cash in an amount as specified in the applicable budget to the DIP and Cash Collateral Orders, to be held by the Liquidating Trust for payment of Allowed Convenience Claims. The Convenience Claim Distribution Reserve shall be segregated from all other Liquidating Trust Assets and shall be maintained in trust by the Liquidating Trust solely for the benefit of Holders of Allowed Convenience Claims. Such funds shall not be considered Liquidating Trust Assets.

**M.     Winddown Reserve**

On the Effective Date, the Debtors and/or LoyaltyOne shall establish and fund the Winddown Reserve with Cash in an amount as specified in the applicable budget to the DIP and Cash Collateral Orders, to be held by the Liquidating Trust for payment of Cure Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Claims in Classes 1 and 2, Liquidating Trust Expenses, and any other amounts as specified in the Liquidating Trust Agreement. The Winddown Reserve shall be segregated from all other Liquidating Trust Assets and shall be maintained in trust by the Liquidating Trust.

**N.     Liquidating Trustee**

**1.     Creation of the Liquidating Trust**

Subject to the Liquidating Trust Agreement in all respects, on the Effective Date, the Debtors and the Liquidating Trustee shall execute the Liquidating Trust Agreement and shall take all steps necessary to establish the Liquidating Trust in accordance with the Plan and for the benefit of the Liquidating Trust Beneficiaries. Additionally, on the Effective Date, the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Liquidating Trust all of the Debtors' and Estates' rights, title, and interest in and to all of the Liquidating Trust Assets and, in accordance with section 1141 of the Bankruptcy Code, the Liquidating Trust Assets shall automatically vest in the Liquidating Trust free and clear of all Claims, Liens, encumbrances, or interests, subject to the terms of this Plan and the Liquidating Trust Agreement. The act of transferring the Liquidating Trust Assets to the Liquidating Trust shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Liquidating Trust as if the asset or right was still held by the Debtors. The Liquidating Trust shall be governed by the Liquidating Trust Agreement to be filed with the Plan Supplement and shall supplement and amend anything in the Combined DS and Plan that contradicts the terms of the Liquidating Trust Agreement.

2. **Liquidating Trust Reserve**

On the Effective Date, the Debtors and/or LoyaltyOne shall fund the Liquidating Trust Reserve in accordance with the Liquidating Trust Agreement, which shall vest in the Liquidating Trust free and clear of all Claims, Liens, encumbrances, and charges. The Liquidating Trust Reserve shall be held separately from the Liquidating Trust Assets and shall be used to (a) satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, and any other amounts to be paid pursuant to Articles VI and VII, not paid by the Debtors on or prior to the Effective Date and (b) fund the Liquidating Trust Expenses. Any excess funds in the Liquidating Trust Reserve remaining after the payment or funding of amounts required under the preceding clauses shall be deemed to be Liquidating Trust Proceeds and shall be available for Distribution first to repay the DIP Facility Claims and then to Liquidating Trust Beneficiaries in accordance with the Plan and Liquidating Trust Agreement.

The Convenience Claim Distribution Reserve, the Professional Fee Escrow Account and the Winddown Reserve shall be held separately from the Liquidating Trust Assets. Any excess funds in the (x) Convenience Claim Distribution Reserve remaining after the payment or funding of amounts required to pay all Allowed Convenience Claims, (y) Professional Fee Reserve Account after paying all Professional Fee Claims, or (z) Winddown Reserve shall be deemed to be Liquidating Trust Proceeds and shall be available for Distribution first to repay the DIP Facility Claims and then to the Liquidating Trust Beneficiaries in accordance with the Plan and Liquidating Trust Agreement.

The Liquidating Trustee shall transfer any net Cash proceeds from the Preserved Estate Claims to the Liquidating Trust Reserve until such time as (a) all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Other Secured Claims have been paid in full or otherwise resolved or (b) the Administrative Claims Bar Date and any other applicable Claims bar date has expired.

3. **Liquidating Trust Oversight Committee**

On the Effective Date, the Requisite Consenting Lenders, in consultation with the Debtors and the Administrative Agent, may appoint a Liquidating Trust Oversight Committee to oversee the Liquidating Trust and Liquidating Trustee, subject to the terms of the Liquidating Trust Agreement. If appointed on the Effective Date, the identities of the Liquidating Trust Oversight Committee members will be disclosed in advance of the Effective Date. If the Requisite Consenting Lenders do not appoint the Liquidating Trust Oversight Committee on the Effective Date, one may be established pursuant to the terms of the Liquidating Trust Agreement.

4. **The Liquidating Trustee**

The Liquidating Trust shall be administered by the Liquidating Trustee, who shall be appointed by the Requisite Consenting Lenders, in consultation with the Debtors and Administrative Agent, and whose identity will be disclosed in the Plan Supplement. The Liquidating Trustee shall be the exclusive trustee of the Liquidating Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3). The powers, rights, and responsibilities of the Liquidating Trustee shall be specified in the Liquidating Trust Agreement and shall include, without limitation, the power to (a) hire and compensate professionals and advisors selected by the Liquidating Trustee with the consent of the Consenting Lenders, in consultation with the Liquidating Trust Oversight Committee, if applicable (but without application to or order of the Bankruptcy Court); (b) object to and settle Disputed Claims after the Effective Date, *provided* that the Consenting Lenders shall have a consent right over any settlement with any Bread Party or related to any Spinoff Claim or Cause of Action; (c) investigate, prosecute and settle Preserved Estate Claims, *provided* that the Consenting Lenders shall have a consent right over any settlement with any Bread Party or related to any Spinoff Claim or Cause of Action; (d) monetize the Liquidating Trust Assets; (e) make Distributions; and (f) close the Chapter 11 Cases, in each case in accordance with the Plan, the Confirmation Order and the Liquidating Trust Agreement. The compensation of the Liquidating Trustee shall be governed by the Liquidating Trust Agreement.

5.        **Reports to be Filed by the Liquidating Trustee**

Following the Effective Date, the Liquidating Trustee shall file with the Bankruptcy Court (and provide to any other party entitled to receive any such report pursuant to the Liquidating Trust Agreement), no later than 15 days after June 30 and December 31 of each calendar year, a semi-annual report regarding the administration of property subject to its ownership and control pursuant to this Plan, distributions made by it, and other matters relating to the implementation of this Plan. Without limiting the generality of the foregoing, each such report shall include an update regarding the status of the Liquidating Trust Assets, including any Causes of Action being prosecuted by the Liquidating Trust.

6.        **Substitution in Pending Legal Actions**

On the Effective Date, the Liquidating Trust or the Liquidating Trustee, as applicable, shall be deemed to be substituted as the party to any litigation in which the Debtors are a party and shall be authorized, but not required, to file notices or other pleadings in such actions to effectuate its substitution for the applicable Debtor or Debtors. Such substitution shall not result in Holders of Claims, including litigation Claims, against the Debtors receiving greater rights in or against the Liquidating Trust than they are otherwise entitled to under the Plan and Liquidating Trust Agreement on account of such Claims.

7.        **Tax Treatment; No Successor in Interest**

The Liquidating Trust is intended to be treated for U.S. federal income tax purposes as a liquidating trust described in Treasury Regulation section 301.7701-4(d), subject to the Liquidating Trustee's ability to timely elect to treat any portion of the Liquidating Trust attributable to the disputed claims as one or more Disputed Claims Reserves (as defined in the Liquidating Trust Agreement) treated as disputed ownership funds described in Treasury Regulation section 1.468B-9. Pursuant to the Liquidating Trust Agreement, all relevant parties shall treat, for U.S. federal income tax purposes, the transfer of assets by the Debtors to the Liquidating Trust as (a) in part as the transfer of assets by the Debtors to the Holders of Allowed Claims entitled to Distributions from the Liquidating Trust Assets, subject to any liabilities of the Debtors or the Liquidating Trust payable from the proceeds of such assets, followed by the transfer of such assets (subject to such liabilities) by such Holders to the Liquidating Trust in exchange for the beneficial interests in the Liquidating Trust, and (b) in part as the transfer of assets by the Debtors to one or more Disputed Claims Reserves. Notwithstanding the foregoing provisions of this Article VIII.J.7, in the event of a final determination under section 1313(a) of the Internal Revenue Code that the Liquidating Trust does not qualify as a grantor trust, the Liquidating Trust Beneficiaries and the Liquidating Trustee intend that the Liquidating Trust be treated as a partnership for U.S. federal income tax purposes and will take all actions reasonably necessary to cause the Liquidating Trust to be treated as such a partnership. See Article XIX for a more detailed discussion of the U.S. federal income tax treatment of the Plan.

a.        *Purpose of the Liquidating Trust*

The Liquidating Trust shall be established for the primary purpose of liquidating and distributing the assets transferred to it, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Accordingly, the Liquidating Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Liquidating Trust Assets, make timely Distributions to the Liquidating Trust Beneficiaries and not unduly prolong its duration. The Liquidating Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in this Plan or in the Liquidating Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Liquidating Trustee expressly for such purpose.

The Liquidating Trust is intended to qualify as a "grantor trust" as governed by sections 671 through section 679 of the Internal Revenue Code for U.S. federal income tax purposes with the Liquidating Trust Beneficiaries treated as grantors and owners of the Liquidating Trust. For all U.S. federal income tax purposes, all parties (including the Debtors, the Liquidating Trustee and the Liquidating Trust Beneficiaries) shall treat the transfer of the Liquidating Trust Assets (other than the assets in any Disputed Claims Reserves) by the Debtors to the Liquidating Trust, as set forth in the Liquidating Trust Agreement, as a transfer of such assets by the Debtors to the Holders of Allowed Claims entitled to Distributions from the Liquidating Trust Assets, followed by a transfer by such Holders to the Liquidating Trust. As soon as practicable after the Effective Date, the Liquidating Trustee shall make a good faith determination of the fair market value of the Liquidating Trust Assets as of the Effective Date. This valuation shall be used consistently by all parties (including the Debtors, the Liquidating Trustee and the Liquidating Trust Beneficiaries) for all U.S. federal income tax purposes. See Article XIX for a more detailed discussion of the U.S. federal income tax treatment of the Plan.

### 8.    Abandonment of Liquidating Trust Assets

Subject to the Liquidating Trust Agreement, after the Effective Date, the Liquidating Trustee may abandon any Liquidating Trust Assets which the Liquidating Trustee determines in his or her reasonable discretion to be of *de minimis* value or burdensome to the Liquidating Trust.

### 9.    Securities Exempt

The Liquidating Trust Interests (including beneficial interests in the Liquidating Trust) to be distributed to the Liquidating Trust Beneficiaries pursuant to the Combined DS and Plan shall not constitute "securities" under applicable law.  Such interests shall not be transferrable (except under limited circumstances set forth in the Liquidating Trust Agreement) and shall not have consent or voting rights or otherwise confer on the Liquidating Trust Beneficiaries any rights similar to the rights of stockholders of a corporation in respect of actions to be taken by the Liquidating Trustee and the Liquidating Trust Oversight Committee (if any) in connection with the Liquidating Trust (except as otherwise provided in the Liquidating Trust Agreement).  To the extent the Liquidating Trust Interests are considered securities under applicable law, the offer, issuance, and distribution of such interests satisfies the requirements of Bankruptcy Code section 1145 and, therefore, such offer, issuance, and distribution is exempt from registration under the Securities Act and any state or local law requiring registration, and to the extent such exemption is not available, the Liquidating Trust Interests will be offered, issued, and distributed under this Combined DS and Plan pursuant to other applicable exemptions from registration under the Securities Act and Blue Sky Laws.  To the extent any "offer or sale" of the Liquidating Trust Interests may be deemed to have occurred, such offer or sale is under the Plan and in exchange for Claims against one or more of the Debtors, or principally in exchange for such Claims and partly for cash or property, within the meaning of section 1145(a)(1) of the Bankruptcy Code.

### 10.    Dissolution of Liquidating Trust

Subject to the terms of the Liquidating Trust Agreement, the Liquidating Trust Oversight Committee and the Liquidating Trust shall be discharged or dissolved as provided therein.

### O.    Preservation of Preserved Estate Claims

Except as provided in this Plan, the Confirmation Order, or in any contract, instrument, release or other agreement entered into or delivered in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Trust will retain and may enforce any Preserved Estate Claim that any Estate or Debtor may hold, including the Spinoff Claims and Causes of Action, against any Entity, including but not limited to the Bread Parties. The Liquidating Trust may pursue any such Preserved Estate Claims in accordance with this Plan and the Liquidating Trust Agreement. The Debtors' inclusion or failure to include or describe with sufficient specificity any Preserved Estate Claim on the Schedule of Preserved Estate Claims shall not be deemed an admission, denial or waiver of any

Preserved Estate Claim that the Debtors or Estates may hold, other than with respect to the Administrative Agent and the Lenders. The Debtors intend to preserve all Preserved Estate Claims, other than any claim or Cause of Action against the Lenders or Administrative Agent and any claim or Cause of Action against a Released Party (to the extent such claim or Cause of Action is released in Article XII). No preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to the Preserved Estate Claims upon or after the entry of the Confirmation Order or the Effective Date of the Plan based on the Plan or the Confirmation Order, including any argument of waiver on account of the failure to include or describe with sufficient specificity any Preserved Estate Claim on the Schedule of Preserved Estate Claims.

## P.      Corporate Actions Regarding the Liquidating Trust

The entry of the Confirmation Order shall constitute authorization for the Debtors and the Liquidating Trustee, as applicable, to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including, without limitation: (a) the establishment of the Liquidating Trust and the appointment of the Liquidating Trustee and Liquidating Trust Oversight Committee; (b) the transfer of assets to the Liquidating Trust; (c) the adoption, execution, delivery and implementation of all contracts, instruments, releases and other agreements or documents related to any of the foregoing; and (d) the other matters provided for under this Plan involving the corporate structure of the Debtors or corporate action to be taken by or required by the Debtors or the Liquidating Trustee. Notwithstanding any requirement under non-bankruptcy law, all matters provided for in the Plan or deemed necessary or desirable by the Debtors or the Liquidating Trustee, as applicable, before, on, or after the Effective Date involving the corporate structure of the Debtors, including the dissolution of the Debtors shall be deemed to have occurred and shall be in effect on the Effective Date or as otherwise provided under the Plan, without any requirement of further action by the security holders, directors, managers, members or officers of the Debtors.

## Q.      Effectuating Documents; Further Transactions

The Debtors and the Liquidating Trustee are authorized to and may issue, execute, deliver, file, or record such contracts, instrument, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and evidence the terms and conditions of this Plan, in each case, in the name of and on behalf of the Debtors or the Liquidating Trust, as applicable, without the need for any approvals, authorization or consents except those expressly required pursuant to this Plan.

## R.      Closing the Chapter 11 Cases

As soon as practicable after the Effective Date, the Liquidating Trustee shall, and shall be authorized to, close the Chapter 11 Cases except for LVI's Chapter 11 Case, which shall be designated as the lead case. All contested matters and adversary proceedings relating to any of the Debtors, including objections to Claims, shall be filed, administered and adjudicated in LVI's Chapter 11 Case without the need to reopen any of the other Chapter 11 Cases; *provided* that for purposes of sections 546 and 550 of the Bankruptcy Code, the Chapter 11 Cases shall be deemed to remain open until LVI's Chapter 11 Case is closed.

The Liquidating Trustee shall be permitted to close LVI's Chapter 11 Case in accordance with the Liquidating Trust Agreement.

**S.**     **Consenting Lender and Administrative Agent Fees**

On the Effective Date, the Debtors shall pay all fees and expenses owed to the advisors to the Consenting Lenders and the Administrative Agent to the extent not already paid. After the Effective Date, the Liquidating Trust shall pay all fees and expenses owed to the Consenting Lenders and Administrative Agent, to the extent not already paid by the Debtors, in accordance with the Liquidating Trust Agreement from the Winddown Reserve.

## ARTICLE IX.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.**     **Assumption and Rejection of Executory Contracts and Unexpired Leases**

Except as otherwise provided in the Plan, the Plan Supplement, or a Final Order, each Executory Contract and Unexpired Lease shall be deemed to be rejected, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the ninetieth (90th) day after the Effective Date, pursuant to Bankruptcy Code section 365, unless such Executory Contract or Unexpired Lease:  (a) was previously assumed, assumed and assigned, or rejected; (b) was previously expired or terminated pursuant to its own terms; (c) is the subject of a motion to assume or assume and assign Filed on or before the Confirmation Date; or (d) is designated specifically, or by category, as an Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates or the Entity with the Successful Bid under the SISP. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions and assignments or rejections, all pursuant to Bankruptcy Code sections 365(a) and 1123 and effective on the ninetieth (90th) day after the Effective Date.

Except as otherwise provided herein or agreed to by the Debtors or the Liquidating Trustee, as applicable, and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Notwithstanding anything to the contrary in the Plan, the Debtors or Liquidating Trustee, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases in accordance with the terms of the Transaction Support Agreement at any time through and including ninety (90) days after the Effective Date.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

**B.**     **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

The Debtors shall file the Schedule of Assumed Contracts and Unexpired Leases as part of the Plan Supplement identifying such contracts that the Debtors, with the consent of the Requisite Consenting Lenders and the Administrative Agent, determine shall be assumed by the Debtors in connection with the Plan.  Prior to the Effective Date, the Debtors, using cash on hand or from the DIP Facility, or after the Effective Date, the Liquidating Trustee from the Winddown Reserve, as applicable, shall pay Cure Claims as set forth on the Schedule of Assumed Contracts and Unexpired Leases, if any, on the Effective Date or as soon as reasonably practicable thereafter, with the amount and timing of payment of any such Cure dictated by the Debtors' ordinary course of business or as otherwise agreed. To the extent that a Cure Claim with respect to any contract set forth on the Schedule of Assumed Contracts and Unexpired Leases is the same as the Cure Claim as previously set forth on a notice filed by the Debtors on the docket of the Chapter 11 Cases, counterparties shall not have an additional opportunity to object to such Cure Claim.  Any Cure shall be deemed fully satisfied and released upon payment by the Debtors, Liquidating Trustee, or any other Entity, as applicable, of the Cure in the Debtors' ordinary course of business; *provided*, *however*, that nothing herein

shall prevent the Debtors, or Liquidating Trustee, as applicable, from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure. The Debtors, or Liquidating Trustee, as applicable, with the consent of the Consenting Lenders also may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to this <u>Article IX.B.</u> in the amount and at the time dictated by the Debtors' ordinary course of business, shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article IX.B., in the Debtors' ordinary course of business, shall be deemed Disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

## C.    Rejection Damages Claims

In the event that the rejection of an Executory Contract or Unexpired Lease results in damages to the other party or parties to such contract or lease, Claims for such damages shall be classified as General Unsecured Claims or Convenience Claims, as applicable, and shall be treated in accordance with <u>Article VII</u> herein.

## D.    Indemnification

On and as of the Effective Date, the Indemnification Provisions will be assumed by the Debtors and will survive the effectiveness of the Plan, and notwithstanding anything in the Plan to the contrary, none of the Debtors or Liquidating Trustee will amend and/or restate the Indemnification Provisions before or after the Effective Date to terminate or adversely affect any of the Indemnification Provisions; *provided* that none of the Indemnification Provisions providing for indemnification of the Bread Parties by the Debtors or their subsidiaries shall be assumed, and such Indemnification Provisions shall be rejected as of the Effective Date with regard to the Bread Parties, unless specifically and expressly assumed by the Debtors. For the avoidance of doubt, the Liquidating Trust is not assuming or being assigned the Debtors' Indemnification Provisions pursuant to the Plan or the Confirmation Order. Unless otherwise agreed to in writing by the Liquidating Trustee, the Liquidating Trust shall have no liability of any kind for any claims or obligations related to the Debtors' assumption of the Indemnification Provisions.

## E.    Insurance Related Provisions

Notwithstanding anything to the contrary in the Combined DS and Plan, the Confirmation Order, the Liquidating Trust Agreement, any bar date notice or Claim objection, any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction or release, confers Bankruptcy Court jurisdiction, or requires a party to opt out of any releases):

(a)    nothing, including the dissolution or winding down of the Debtors, the vesting of the Insurance Contracts (other than the D&O Liability Insurance Policies and the E&O Liability Insurance Policies) with the Liquidating Trust or any relief permitting any Entity to pursue proceeds available under any Insurance Contracts granted pursuant to this Combined DS and Plan, the Confirmation Order or any other order of the Bankruptcy Court, shall impair, expand, or modify: (i) the rights and obligations of the Debtors (and their Estates), the Liquidating Trust, named insureds or any insured or beneficiary or any of the Insurers under any of the Insurance Contracts; (ii) the coverage and benefits provided under the Insurance Contracts; (iii) the obligations, terms and conditions of the Insurance Contracts; or (iv) the enforceability of the Insurance Contracts;

(b)    on and after the Effective Date: (i) all Insurance Contracts (other than the D&O Liability Insurance Policies and the E&O Liability Insurance Policies) which identify any of the Debtors as first named

insureds or as a counterparty thereto shall vest unaltered in their entireties with the Liquidating Trust; (ii) any non-monetary obligations together with direct or derivative rights, interests, claims, entitlements or Causes of Action of any Debtor under any of the Insurance Contracts, including the rights of any Debtor to proceeds, indemnification, reimbursement, contribution, benefits or other payment arising out of or under the Insurance Contracts, shall vest with the Liquidating Trust; (iii) the Liquidating Trust shall have standing to pursue the Insurance Coverage Rights; and (iv) the Liquidating Trust shall be authorized to perform any administrative responsibilities on behalf of any named insured under the Insurance Contracts;

(c)     to the extent the Debtors (or, after the Effective Date, the Liquidating Trust) seek coverage or payment under any Insurance Contracts, the Insurers shall be entitled to payment or reimbursement in full from the applicable Debtor or Liquidating Trust, to the extent required under the applicable Insurance Contract and applicable non-bankruptcy law, in the ordinary course and without the need for the Insurer to file a Proof of Claim, Cure Claim or a request, application, claim, proof or motion for payment or affiance of any Administrative Claim; *provided*, that any and all rights of the Debtors and Liquidating Trust to dispute such payments or reimbursements are expressly reserved; *provided, however*, without limiting the Insurance Coverage Rights granted to the Liquidating Trust, the Liquidating Trust shall not be an "insured" or "named insured" (as defined or described in the Insurance Contracts) under the Insurance Contracts at any time without the express written consent of the applicable Insurer; *provided, further*, for the avoidance of doubt, any amounts payable on account of Claims covered by the Insurance Contracts (i) up to the applicable self-insured retention amount under such applicable Insurance Contract or (ii) that exceed the aggregate amount payable under such applicable Insurance Contract, shall be treated in accordance with the Plan; and

(d)     injunctions set forth in <u>Article XII.E</u> of the Combined DS and Plan, if and to the extent applicable, shall be deemed lifted without further order of this Bankruptcy Court, solely to permit the Insurers to: (i) administer, handle, defend, settle and/or pay, in the ordinary course (A) Claims where a claimant has been granted relief to proceed with it Claims pursuant to this Combined DS and Plan, the Confirmation Order or by any other order of the Bankruptcy Court, and (B) all costs in relation to each of the foregoing; and (ii) take other actions relating to the Insurance Contracts in the ordinary course (including effectuating a setoff) permitted under the Insurance Contracts and/or applicable non-bankruptcy law; *provided, however*, that each applicable Insurer is prohibited from, and the Confirmation Order shall include an injunction against, denying, refusing, altering or delaying coverage on any basis regarding or related to the Chapter 11 Cases, this Plan or any provision within this Plan, including the treatment or means of liquidation set out within this Plan for any insured Claim or Causes of Action.

None of the Debtors or the Liquidating Trustee, as applicable, shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy or any E&O Liability Insurance Policy in effect prior to the Effective Date, and any current and former directors, officers, managers and employees of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, subject to the terms and conditions thereof, regardless of whether such directors, officers, managers and employees remain in such positions after the Effective Date. Notwithstanding anything to the contrary in the Plan, the Debtors and the Liquidating Trustee (as applicable) shall retain the ability to supplement such D&O Liability Insurance Policy or E&O Liability Insurance Policy as the Debtors or Liquidating Trustee may deem necessary.

No distributions under the Plan, other than to Holders of Claims in Classes 3 and 4, shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Contracts until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Contract. Except for Claims being pursued by the Liquidating Trustee, to the extent that one or more of the Debtors' Insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such Insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

Payments to Holders of Claims in Classes 1, 2, and 5 shall be made in accordance with the provisions of any applicable Insurance Contract. Notwithstanding anything to the contrary herein (including Article XII) nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Claim or Cause of Action that the Debtors or any other Entity may hold against any other Entity, including Insurers, under any Insurance Contracts or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers.

**F.        Contracts and Leases After the Petition Date**

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under Bankruptcy Code section 365, will be performed by the applicable Debtor or the Liquidating Trustee in the ordinary course of its business.

**G.        Reservation of Rights**

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or the Liquidating Trustee has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Liquidating Trustee, as applicable, shall have ninety (90) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

Notwithstanding anything to the contrary contained herein, the Bread Parties may raise any objections and arguments in connection with the Debtors' Executory Contracts with any of the Bread Parties, including the Debtors' assumption or rejection thereof, and the rights of the Debtors and all other parties in interest with respect thereto are also preserved.

**H.        Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to Bankruptcy Code section 365(d)(4), unless such deadline(s) have expired.

**ARTICLE X.**
**PROCEDURES FOR RESOLVING DISPUTED CLAIMS**

Subject to the Bread Settlement, this Article X shall not apply to DIP Facility Claims, or Loan Claims, which Claims shall be Allowed in accordance with the Plan and not be subject to any avoidance, reductions, set off, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection or any other challenges under any applicable law or regulation by any Person or Entity.

**A.        Disputed Claims Process**

The Liquidating Trustee in consultation with the Consenting Lenders, shall have the exclusive authority to (i) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a claim subject to any Proof of Claim that is Filed is Allowed and (ii) file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan. Except as otherwise provided herein, all Proofs of Claim Filed after the applicable Claims bar date shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor, without the need for any objection by the Liquidating Trustee, or any further notice to or action, order, or approval of the Bankruptcy Court.

B.      **Allowance of Claims**

Except as otherwise set forth in the Plan, after the Effective Date, the Liquidating Trustee shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date.  Except as specifically provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed in accordance with the Plan.

C.      **Claims Administration Responsibilities**

Except as otherwise specifically provided in the Plan, after the Effective Date, pursuant to the terms of the Liquidating Trust Agreement the Liquidating Trustee shall have the authority to: (1) File, withdraw, or litigate to judgment, objections to Claims; (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, the Liquidating Trustee shall have and retain any and all rights and defenses held by any of the Debtors immediately prior to the Effective Date with respect to any Disputed Claim, including the Causes of Action retained pursuant to the Plan Supplement or as otherwise provided in this Plan.

D.      **Adjustment to Claims Without Objection**

Any Claim that has been paid, satisfied, amended, superseded, cancelled, or otherwise expunged (including pursuant to the Plan) may be adjusted or expunged on the Claims Register at the direction of the Liquidating Trustee, without the need to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court. Additionally, any Claim that is duplicative or redundant with another Claim against the same Debtor may be adjusted or expunged on the Claims Register at the direction of the Liquidating Trustee without the need to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      **Time to File Objections to Claims**

Any objections to Disputed Claims shall be Filed on or before the later of (1) the first Business Day following the date that is 180 days after the Effective Date and (2) such later date as may be specifically fixed by the Bankruptcy Court.  For the avoidance of doubt, the Bankruptcy Court may extend the time period to object to Disputed Claims.

F.      **Reservation of Rights to Object to Claims**

The failure of the Liquidating Trustee to object to any Claim shall not be construed as an admission to the validity or amount of any such Claim, any portion thereof, or any other claim related thereto, whether or not such claim is asserted in any currently pending or subsequently initiated proceeding, and shall be without prejudice to the right of the Debtors or the Liquidating Trustee, as applicable, to contest, challenge the validity of, or otherwise defend against any such Claim in the Bankruptcy Court or non-bankruptcy forum.

G.      **Estimation of Claims**

Before the Effective Date, the Debtors, with the consent of the Consenting Lenders, and on or after the Effective Date, the Liquidating Trustee, may (but are not required to) in accordance with the terms of the Liquidating Trust Agreement, at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to Bankruptcy Code section 502(c) for any reason, regardless of whether any party in interest previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim during the pendency of any appeal relating to such objection.  Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or

has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan and may be used as evidence in any supplemental proceedings, and the Debtors or the Liquidating Trustee, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

Notwithstanding Bankruptcy Code section 502(j), in no event shall any Holder of a Claim that has been estimated pursuant to Bankruptcy Code section 502(c) or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

## H.   Reserved

## I.   Disallowance of Claims

Any Claims held by Entities from which the Bankruptcy Court has determined that property is recoverable under Bankruptcy Code section 542, 543, 550 or 553 or that is a transferee of a transfer that the Bankruptcy Court has determined is avoidable under Bankruptcy Code section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) unless such Entity or transferee has paid the amount, or turned over any such property, for which such Entity or transferee is liable under section 522(i), 542, 543, 550 or 553 of this title, shall be deemed Disallowed pursuant to Bankruptcy Code section 502(d), and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and the full amount of such obligation to the Debtors has been paid or turned over in full.  All Proofs of Claim Filed on account of an indemnification obligations shall be deemed satisfied and Disallowed as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court. All Proofs of Claim Filed on account of an employee benefit shall be deemed satisfied and Disallowed as of the Effective Date to the extent the Liquidating Trustee elect to honor such employee benefit, without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as provided herein or otherwise agreed to by the Debtors or the Liquidating Trustee, in their or its sole discretion, any and all Proofs of Claim Filed after the applicable bar date shall be deemed Disallowed as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.

## J.   Amendments to Proofs of Claim

On or after the later of the Effective Date or the deadline established by the Bankruptcy Court, a Proof of Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Debtors or the Liquidating Trustee, in consultation with the Consenting Lenders, as applicable, and any such new or amended Proof of Claim Filed that is not so authorized before it is Filed shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court absent prior Bankruptcy Court approval or agreement by the Debtors or Liquidating Trustee, in consultation with the Consenting Lenders, as applicable.

## K.   No Distributions Pending Allowance

Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

**L.**     **Distributions After Allowance**

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

For the avoidance of doubt, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

## ARTICLE XI.
## PROVISIONS GOVERNING DISTRIBUTIONS

**A.**     **Distributions on Account of Claims Allowed as of the Effective Date**

Except as otherwise provided herein, in a Final Order, or as otherwise agreed to by the Debtors or Liquidating Trustee, as the case may be, and the Holder of the applicable Claim, on the first Distribution Date, the Distribution Agent shall make initial distributions under the Plan on account of Claims Allowed on or before the Effective Date or as soon as reasonably practical thereafter; *provided*, *however*, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims shall be paid in accordance with Article VI. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors or the Liquidating Trustee, as applicable, and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business. In no event shall the first Distribution Date for Convenience Claims or General Unsecured Claims be prior to the date set by the Bankruptcy Court as the deadline for filing proofs of claims for Convenience Claims and General Unsecured Claims.

**B.**     **Rights and Powers of the Distribution Agent**

     **1.**     **Powers of Distribution Agent**

The Distribution Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; and (c) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

     **2.**     **Expenses Incurred On or After the Effective Date**

The Debtors or the Liquidating Trustee, as applicable, shall pay to the Distribution Agent all reasonable and documented fees and expenses of the Distribution Agent without the need for any approvals, authorizations, actions, or consents, except as otherwise ordered by the Bankruptcy Court from the Winddown Reserves.  The Distribution Agent shall submit detailed invoices to the Debtors or the Liquidating Trustee, as applicable, for all fees and expenses for which the Distribution Agent seeks reimbursement, and the Debtors or the Liquidating Trustee, as applicable, shall pay those amounts that they deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtors or the Liquidating Trustee, as applicable, deem to be unreasonable.  In the event that the Debtors or the Liquidating Trustee, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Debtors or Liquidating Trustee, as applicable, and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses.  In the event that the Debtors or the Liquidating Trustee, as applicable, and the Distribution Agent

are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

**C.      Special Rules for Distributions to Holders of Disputed Claims**

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Claims have been Allowed or expunged.

**D.      Delivery of Distributions**

**1.      Record Date for Distributions**

On the Effective Date, the various transfer registers for each class of Claims as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims (the "Distribution Record Date").  The Distribution Agent shall have no obligation to recognize any transfer of Claims occurring on or after the Distribution Record Date.  In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, none of the Debtors, the Liquidating Trustee, or the Distribution Agent (as applicable) shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount.

**2.      Distribution Process**

Except as otherwise provided in the Plan, the Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the applicable register or in the Debtors' records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder; *provided* that the manner of such distributions shall be determined at the discretion of the Debtors or Liquidating Trustee, as applicable.

**3.      Delivery of Distributions on Loan Claims**

The Administrative Agent shall be deemed to be the Holder of all Allowed Loan Claims in Class 3 for purposes of distributions to be made hereunder, and all distributions on account of such Allowed Loan Claims shall be made to the Administrative Agent.  As soon as practicable following compliance with the requirements set forth in Article XI herein, the Administrative Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of Allowed Loan Claims in accordance with the terms of the Credit Agreement and the Plan. Notwithstanding anything in the Plan to the contrary, and without limiting the exculpation and release provisions of the Plan, the Administrative Agent shall not have any liability to any Entity with respect to distributions made or directed to be made by the Administrative Agent.

**4.      Delivery of Distributions on DIP Facility Claims**

The DIP Lender shall be deemed to be the Holder of all DIP Facility Claims for purposes of distributions to be made hereunder, and all distributions on account of such DIP Facility Claims shall be made to the DIP Lender.

**5.      Compliance Matters**

In connection with the Plan, to the extent applicable, the Debtors and Liquidating Trustee, as applicable, and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Debtors and Liquidating Trustee, as

applicable, and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes and withholding distributions pending receipt of information necessary to facilitate such distributions; provided that, the Debtors or Liquidating Trustee, as applicable, and the Distribution Agent shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable amount of time (not less than sixty (60) days) to respond.  The Debtors and Liquidating Trustee, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.  Any amounts withheld or reallocated pursuant to this Article XI.D.5 shall be treated as if distributed to the Holder of the Allowed Claim.

### 6.   Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in Bloomberg News on the Petition Date.

### 7.   Undeliverable, and Unclaimed Distributions

a.   *Undeliverable Distributions*.  If any distribution to a Holder of an Allowed Claim is returned to the Distribution Agent as undeliverable, no further distributions shall be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such Holder on the next Distribution Date.  Undeliverable distributions shall remain in the possession of the Debtors or the Liquidating Trustee, as applicable, until such time as a distribution becomes deliverable, such distribution reverts to the Debtors or the Liquidating Trustee, as applicable, or is cancelled pursuant to Article XI.D.7.b. below, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

b.   *Failure to Present Checks*.  Checks issued by the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the issuance of such check.  Requests for reissuance of any check shall be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued.

Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within one hundred and eighty (180) days after the date of mailing or other delivery of such check shall have its Claim for such un-negotiated check discharged and be discharged and forever barred, estopped, and enjoined from asserting any such Claim against the Debtors or their property.

Within ninety (90) days after the mailing or other delivery of any such distribution checks, notwithstanding applicable escheatment laws, all such distributions shall revert to the Debtors or the Liquidating Trustee, as applicable.  Nothing contained herein shall require the Debtors or the Liquidating Trustee, as applicable, to attempt to locate any Holder of an Allowed Claim.

c.   *Reversion*.  Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after distribution shall be deemed unclaimed property under Bankruptcy Code section 347(b), and such Unclaimed Distribution shall revest in the applicable Debtor or with the Liquidating Trustee, as applicable.  Upon such revesting, the Claim of the Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

8. <u>**Minimum Distributions**</u>

Notwithstanding anything herein to the contrary, the Distribution Agent shall not be required to make distributions or payments of less than $250 (whether Cash or otherwise). No fractional shares of Liquidating Trusts Interests shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number Liquidating Trusts Interests that is not a whole number, the actual distribution of Liquidating Trusts Interests shall be rounded as follows: (a) fractions of one-half or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half shall be rounded to the next lower whole number with no further payment therefore.

**E.      Claims Paid or Payable by Third Parties**

A Claim shall be correspondingly reduced, and the applicable portion of such Claim shall be Disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor, Liquidating Trustee or Distribution Agent. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, Liquidating Trustee or a Distribution Agent on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the Debtors or Liquidating Trustee, as applicable, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen-day grace period specified above until the amount is repaid.

**F.      Setoffs**

Except as otherwise expressly provided for herein, each Debtor or the Liquidating Trustee, as applicable, pursuant to the Bankruptcy Code (including Bankruptcy Code section 553), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or the Liquidating Trustee (on behalf of such Debtor), as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, however, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor or Liquidating Trustee as applicable, of any such Claims, rights, and Causes of Action that such Debtor or Liquidating Trustee (on behalf of such Debtor), as applicable, may possess against such Holder. In no event shall any Holder of a Claim be entitled to set off any such Claim against any Claim, right or Cause of Action of the Debtor, unless such Holder has indicated in any timely filed Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to Bankruptcy Code section 553 or otherwise. For the avoidance of doubt, any setoff right with respect to LoyaltyOne shall be subject to approval of the Ontario Court.

This <u>Article XI.F.</u> shall not apply to any Claims of the Lenders.

**G.      Allocation Between Principal and Accrued Interest**

Except as otherwise provided herein, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to interest, if any, on such Allowed Claim accrued through the Effective Date.

For the avoidance of doubt, unless otherwise specifically provided for in the Plan, the Confirmation Order, or Final Order of the Bankruptcy Court, or required by applicable bankruptcy or non-bankruptcy law (including, without limitation, as required pursuant to section 506(b) and section 511 of the Bankruptcy Code), postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the applicable Petition Date on any such prepetition

Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

## ARTICLE XII.
## RELEASE, INJUNCTION AND RELATED PROVISIONS

A.     **Termination of Interests; Compromise and Settlement of Claims, Interests and Controversies**

**Except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created pursuant to the Plan and to the fullest extent allowed by applicable law:  (a) the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction and release, effective as of the Effective Date, of any and all Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Debtors or Liquidating Trustee, as applicable), Interests (including any Intercompany Interests Reinstated or cancelled and released after the Effective Date by the Debtors, or Liquidating Trustee, as applicable), and Causes of Action against the Debtors of any nature whatsoever including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such liability relates to services performed by employees of the Debtors prior to the Effective Date and that arises from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, all debts of the kind specified in Bankruptcy Code sections 502(g), 502(h), or 502(i), any interest accrued on Claims or Interests from and after the Petition Date, and all other liabilities against, liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties; (b) the Plan shall bind all holders of Claims and Interests; (c) all Claims and Interests shall be satisfied and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under Bankruptcy Code section 502(g); and (d) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates,  their successors and assigns, and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, in each case regardless of whether or not:  (i) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to Bankruptcy Code section 501; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to Bankruptcy Code section 502; (iii) the Holder of such a Claim or Interest has accepted, rejected or failed to vote to accept or reject the Plan; or (iv) any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests.  The Confirmation Order shall be a judicial determination of the release and satisfaction of all Claims and Interests subject to the occurrence of the Effective Date.**

**Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.    The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date the Liquidating Trustee may compromise and settle Claims and Causes of Action against the Debtors and their Estates and against other Entities.**

B.     **Releases by the Debtors**

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY OTHER THAN ARTICLE IV.K.2. OF THIS COMBINED DS AND PLAN, PURSUANT TO BANKRUPTCY CODE SECTION 1123(B) AND TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW, FOR GOOD AND VALUABLE CONSIDERATION, ON AND AFTER THE EFFECTIVE DATE, EACH RELEASED PARTY IS DEEMED RELEASED BY THE DEBTORS AND THEIR ESTATES FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY**

DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS OR THEIR ESTATES, THAT THE DEBTORS OR THEIR ESTATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM AGAINST, OR INTEREST IN, A DEBTOR OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTORS AND THE OWNERSHIP THEREOF, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS AND CONTEMPLATED LIQUIDATION, ANY AVOIDANCE ACTIONS, ANY INTERCOMPANY TRANSACTION, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE TRANSACTION SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE TRANSACTION SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE CHAPTER 11 CASES, THE FILING OF THE CHAPTER 11 CASES, THE DIP FACILITY DOCUMENTS, SOLICITATION OF VOTES ON THE PLAN, THE PREPETITION NEGOTIATION AND SETTLEMENT OF CLAIMS, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, EXCEPT FOR CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (A) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT EXECUTED TO IMPLEMENT THE PLAN, OR (B) OBLIGATIONS UNDER THE CREDIT AGREEMENT, OR DIP AND CASH COLLATERAL ORDERS THAT, BY THEIR EXPRESS TERMS, SURVIVE THE TERMINATION OF THE CREDIT AGREEMENT OR DIP AND CASH COLLATERAL ORDERS.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (A) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, INCLUDING, WITHOUT LIMITATION, THE RELEASED PARTIES' CONTRIBUTIONS TO FACILITATING THE CHAPTER 11 CASES AND IMPLEMENTING THE PLAN; (B) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (C) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (D) FAIR, EQUITABLE, AND REASONABLE; (E) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (F) A BAR TO ANY OF THE DEBTORS OR THE DEBTORS' ESTATES, AS APPLICABLE, ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

FOR THE AVOIDANCE OF DOUBT: (i) NONE OF THE BREAD PARTIES SHALL BE RELEASED PARTIES UNDER THE PLAN, AND (ii) NO RELEASE PURSUANT TO THIS PLAN SHALL BE PROVIDED TO ANY INDIVIDUAL OR ENTITY RELATED TO ANY SPINOFF CLAIM AND CAUSE OF ACTION. THE DEBTORS AND THEIR ESTATES ARE PRESERVING AND NOT RELEASING ANY SUCH CLAIMS AND CAUSES OF ACTION.

C.      Releases by Holders of Claims and Interests

NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, AS OF THE EFFECTIVE DATE, AND TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW, EACH RELEASING PARTY IS DEEMED TO HAVE RELEASED EACH DEBTOR AND RELEASED PARTY

FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS OR THEIR ESTATES, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE MANAGEMENT, OWNERSHIP OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTORS AND THE OWNERSHIP THEREOF, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS AND CONTEMPLATED LIQUIDATION, ANY AVOIDANCE ACTIONS, ANY INTERCOMPANY TRANSACTION, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE TRANSACTION SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE TRANSACTION SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE CHAPTER 11 CASES, THE FILING OF THE CHAPTER 11 CASES, THE DIP FACILITY DOCUMENTS, SOLICITATION OF VOTES ON THE PLAN, THE PREPETITION NEGOTIATION AND SETTLEMENT OF CLAIMS, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, EXCEPT FOR CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (A) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT EXECUTED TO IMPLEMENT THE PLAN, OR (B) OBLIGATIONS UNDER THE CREDIT AGREEMENT, OR DIP AND CASH COLLATERAL ORDERS THAT, BY THEIR EXPRESS TERMS, SURVIVE THE TERMINATION OF THE CREDIT AGREEMENT OR DIP AND CASH COLLATERAL ORDERS.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS:  (A) CONSENSUAL; (B) ESSENTIAL TO THE CONFIRMATION OF THE PLAN; (C) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, INCLUDING, WITHOUT LIMITATION, THE RELEASED PARTIES' CONTRIBUTIONS TO FACILITATING THE CHAPTER 11 CASES AND IMPLEMENTING THE PLAN; (D) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASE; (E) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS; (F) FAIR, EQUITABLE, AND REASONABLE; (G) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (H) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.

FOR THE AVOIDANCE OF DOUBT: (i) NONE OF THE BREAD PARTIES SHALL BE RELEASED PARTIES UNDER THE PLAN, AND (ii) NO RELEASE PURSUANT TO THIS PLAN SHALL BE PROVIDED TO ANY INDIVIDUAL OR ENTITY RELATED TO ANY SPINOFF CLAIM AND CAUSE OF ACTION. THE RELEASING PARTIES ARE PRESERVING AND NOT RELEASING ANY SUCH CLAIMS AND CAUSES OF ACTION.

D.    Exculpation

NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, NO EXCULPATED PARTY SHALL HAVE OR INCUR LIABILITY FOR, AND EACH EXCULPATED PARTY

IS RELEASED AND EXCULPATED FROM, ANY CAUSE OF ACTION FOR ANY CLAIM RELATED TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE TRANSACTION SUPPORT AGREEMENT AND RELATED NEGOTIATIONS, THE DIP FACILITY, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE TRANSACTION SUPPORT AGREEMENT, AND RELATED NEGOTIATIONS, THE DIP FACILITY, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE CHAPTER 11 CASES, THE FILING OF THE CHAPTER 11 CASES, AND RELATED NEGOTIATIONS, THE DIP FACILITY DOCUMENTS, THE DIP FINANCING ORDERS, SOLICITATION OF VOTES ON THE PLAN, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR AFTER THE PETITION DATE AND ON OR BEFORE THE CONFIRMATION DATE, EXCEPT FOR CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN.

THE EXCULPATED PARTIES HAVE, AND UPON CONFIRMATION OF THE PLAN SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE LAWS WITH REGARD TO THE SOLICITATION OF VOTES ON, AND DISTRIBUTION OF CONSIDERATION PURSUANT TO, THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE EXCULPATION SET FORTH ABOVE DOES NOT RELEASE OR EXCULPATE ANY CLAIM RELATING TO (A) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT EXECUTED TO IMPLEMENT THE PLAN, OR (B) OBLIGATIONS UNDER THE CREDIT AGREEMENT, OR DIP AND CASH COLLATERAL ORDERS THAT, BY THEIR EXPRESS TERMS, SURVIVE THE TERMINATION OF THE CREDIT AGREEMENT OR DIP AND CASH COLLATERAL ORDERS.

FOR THE AVOIDANCE OF DOUBT: (i) NONE OF THE BREAD PARTIES SHALL BE EXCULPATED PARTIES UNDER THE PLAN, AND (ii) NO EXCULPATION PURSUANT TO THIS PLAN SHALL BE PROVIDED TO ANY INDIVIDUAL OR ENTITY RELATED TO ANY SPINOFF CLAIM AND CAUSE OF ACTION.

E.     Injunction

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT: (A) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (B) HAVE BEEN RELEASED PURSUANT TO ARTICLE XII.B. OF THIS PLAN; (C) HAVE BEEN RELEASED PURSUANT TO ARTICLE XII.C. OF THIS PLAN; (D) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE XII.D. OF THIS PLAN; OR (E) ARE OTHERWISE RELEASED, SATISFIED, STAYED, OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES:  (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT,

**AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (4) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (5) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, EXCULPATED, OR SETTLED PURSUANT TO THE PLAN.**

**FOR THE AVOIDANCE OF DOUBT, NO (I) CLAIM OR CAUSE OF ACTION AGAINST THE BREAD PARTIES OR (II) ANY SPINOFF CLAIM AND CAUSE OF ACTION SHALL BE ENJOINED UNDER THE PLAN.**

**F.      Gatekeeper Provision**

No party may commence, continue, amend, or otherwise pursue, join in, or otherwise support any other party commencing, continuing, amending, or pursuing, a Claim or Cause of Action of any kind against any of the Debtors or the Released Parties that arose or arises from or is related to any Covered Claim without first (i) requesting a determination from the Bankruptcy Court, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim against a Debtor or a Released Party, as applicable, and is not a Claim that the Debtors released under the Plan, which request must attach the complaint or petition proposed to be filed by the requesting party and (ii) obtaining from the Bankruptcy Court specific authorization for such party to bring such Claim or Cause of Action against a Debtor or a Released Party, as applicable.   For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any Claims or Causes of Action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court *before* filing any such amendment in the court where such complaint or petition is pending. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and, only to the extent legally permissible, will have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action. For the avoidance of doubt, the Bread Parties shall not be beneficiaries of this Article XII.F.

**G.      Protection Against Discriminatory Treatment**

In accordance with Bankruptcy Code section 525, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Debtor, or any Entity with which a Debtor has been or is associated, solely because such Debtor was a debtor under chapter 11 or may have been insolvent before the commencement of the Chapter 11 Cases.

**H.      Release of Liens**

Except as otherwise specifically provided in the Plan, Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Debtors and their successors and assigns, and all Claims against the Estates shall be fully released, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors, the Administrative Agent or any other Holder of a Secured Claim; *provided, however*, notwithstanding the foregoing or anything to the contrary contained in the Plan, on the later of (a) the Effective Date and (b) the date of the distribution

of the cash proceeds (the "BL Proceeds") arising from the BL Closing, all mortgages, deeds of trust, Liens, pledges and/or other security interests in favor of the Administrative Agent securing the obligations under the Credit Agreement (other than any such mortgages, deeds of trust, Liens, pledges and/or other security interests in the assets of LoyaltyOne or the BL Proceeds that constitute collateral securing the obligations under the Credit Agreement) shall be automatically released, and all Claims against obligors under the Credit Agreement (other than Claims against LoyaltyOne) shall be released, in each case without any further approval or order of the Bankruptcy Court and without any action, distribution or Filing being required to be made by the Debtors, LoyaltyOne, the Administrative Agent or any other Holder of a Secured Claim.  In addition, at the sole expense of the Debtors, the Administrative Agent shall execute and deliver all documents reasonably requested by the Debtors to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and such Claims and hereby authorizes the Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto.

To the extent that any Holder of a Secured Claim that has been satisfied in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, as applicable, that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

**I.      Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to Bankruptcy Code section 502(e)(1)(B), then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever Disallowed notwithstanding Bankruptcy Code section 502(j), unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent, or (b) the relevant Holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

**J.      No Release, Injunction, or Exculpation of the Bread Parties or related to the Spinoff Transaction**

Notwithstanding any other provision of the Plan, in no event are any of the Bread Parties released, exculpated, or the beneficiary of any injunction, gatekeeper provision or any other provision of this Article XII of the Plan.

Further, notwithstanding any other provision of the Plan, in no event is any individual or Entity released, exculpated, or the beneficiary of any injunction, gatekeeper provision or any other provision of this Article XII of the Plan for any Spinoff Claim and Cause of Action.

**K.      Full Release of the Lenders and Administrative Agent**

In consideration for consents, agreements and contributions of the Lenders and Administrative Agent provided under the Transaction Support Agreement, the Plan, the DIP and Cash Collateral Orders, among others, and notwithstanding any other provision of the Plan, and in accordance with Bankruptcy Rule 9019 and Bankruptcy Code section 1123(b), the DIP Lender, the Debtors and the Debtors' non-Debtor subsidiaries pursuant to the Plan and any corresponding operative document expressly waive, relinquish, exculpate, release, compromise, and/or settled any and all Claims and Causes of Action that such parties have or may have against the Lenders, and Administrative Agent and all of the Lenders and Administrative Agent are hereby released and/or are the beneficiary of every releases, injunction, gatekeeper provision and any other provision of this Article XII of the Plan to the fullest extent of the law.

**ARTICLE XIII.**
**CONFIRMATION OF THE PLAN**

The following is a brief summary of the Confirmation process.  Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code and to consult with their own advisors.

## A.      Voting Procedures and Acceptance

The Debtors are providing copies of this Combined DS and Plan and Ballots to all known Holders of Claims in Classes 3 and 4. **Ballots must be returned to the Claims and Noticing Agent in accordance with the procedures set forth on the Ballot.**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a chapter 11 plan accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest, each as more specifically set forth in Bankruptcy code section 1124.

Bankruptcy Code section 1126(c) defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

Claims in Classes 1, 2 and 5 are not Impaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f) and their votes will not be solicited.

Claims in Classes 3 and 4 are Impaired under the Plan and are entitled to vote. Class 3 and Class 4 (with respect to each applicable Debtor) will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims in each of Class 3 and Class 4 (other than any Claims of creditors designated under section Bankruptcy Code section 1126(e)) that have voted to accept or reject the Plan.

Claims in Classes 6 and 7 and the Interests in Classes 8 and 9 are Impaired and will not receive a recovery under the Plan. Pursuant to Bankruptcy Code section 1126(g) of the Bankruptcy Code, the Holders of Claims and Interests in such Classes are deemed to reject the Plan and their votes will not be solicited.

## B.      The Confirmation Hearing

After the Petition Date, under Bankruptcy Code section 1128(a), the Bankruptcy Court, after notice, may schedule the Confirmation Hearing in respect of the Plan. The Conditional Disclosure Statement Order will set the date and time for the Confirmation Hearing. The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules, without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to Bankruptcy Code section 1127 and the Transaction Support Agreement, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, Bankruptcy Code section 1128(b) provides that a party in interest may object to Confirmation. **Objections to Confirmation of the Plan must be made in writing and must be filed with the Bankruptcy Court and served on counsel for the Debtors in accordance with the Conditional Disclosure Statement Order.**

## C.      Confirmation Standard

Among the requirements for Confirmation are that the Plan (a) is accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and

equitable" as to such Class; (b) is feasible; and (c) is in the "best interests" of Holders of Claims and Interests that are Impaired under the Plan.

The following requirements must be satisfied pursuant to Bankruptcy Code section 1129(a) before a bankruptcy court may confirm a plan. The Debtors believe that the Plan fully complies with all the applicable requirements of Bankruptcy Code section 1129 set forth below, other than those pertaining to voting, which has not been completed.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the Debtors or by a Person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, in connection with the Plan and incident to the Chapter 11 Cases is subject to the approval of the Bankruptcy Court as reasonable.

- With respect to each Holder within an Impaired Class of Claims or Interests, as applicable, each such Holder (a) has accepted the Plan or (b) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such Holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

- With respect to each Class of Claims or Interests, such Class has either (i) accepted the Plan, (ii) is Unimpaired under the Plan, or (iii) has rejected the Plan. The Plan meets the requirements of the Bankruptcy Code as to any such rejecting Class because (a) the Plan otherwise satisfies the requirements for Confirmation, (b) at least one Impaired Class of Claims has accepted the Plan without taking into consideration the votes of any insiders in such Class and (c) the Plan is "fair and equitable" and does not "discriminate unfairly" as to any rejecting Class.

- The Plan provides for treatment of Claims in accordance with the provisions of Bankruptcy Code section 507(a).

- All fees payable under 28 U.S.C. § 1930 have been paid or the Plan provides for the payment of all such fees on the Effective Date.

**D.      Best Interests Test**

As described above, Bankruptcy Code section 1129(a)(7) requires that each Holder of an Impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. The Debtors believe that the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would be no greater than the value of distributions under the Plan. As a result, the Debtors believe Holders of Claims and Interests in all Impaired Classes will recover at least as much as a result of Confirmation of the Plan as they would recover through a hypothetical chapter 7 liquidation.

If not filed sooner, the Plan Supplement will include a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors. The Debtors believe that the liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims as compared to distributions contemplated under the Plan. Consequently, the Debtors believe that Confirmation of the Plan will provide Holders of Claims and Interests no less than such Holders would receive in a liquidation under chapter 7 of the Bankruptcy Code.

E.      **Confirmation Without Acceptance by All Impaired Classes**

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as (a) the plan otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted the plan without taking into consideration the votes of any insiders in such class and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan.  These so-called "cramdown" provisions are set forth in Bankruptcy Code section 1129(b).

1.      <u>No Unfair Discrimination</u>

The no "unfair discrimination" test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests.  The Debtors believe the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation.

2.      <u>Fair and Equitable Test</u>

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims or interests receive more than 100 percent of the amount of the allowed claims or interests in such class.  As to a dissenting class, the test sets forth different standards depending on the type of claims or interests in such class.  In order to demonstrate that a plan is fair and equitable with respect to a dissenting class, the plan proponent must demonstrate the following:

- <u>Secured Creditors</u>:  Each holder of a secured claim (a) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the chapter 11 plan, of at least the allowed amount of such claim, (b) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof), or (c) receives the "indubitable equivalent" of its allowed secured claim.

- <u>Unsecured Creditors</u>:  Either (a) each holder of an impaired unsecured claim receives or retains under the chapter 11 plan property of a value equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the non-accepting class will not receive any property under the chapter 11 plan.

- <u>Holders of Interests</u>:  Either (a) each holder of an impaired interest will receive or retain under the chapter 11 plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest or (b) the holders of interests that are junior to the non-accepting class will not receive or retain any property under the chapter 11 plan.

The Debtors believe that the Plan and treatment of all Classes of Claims and Interests therein satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan.

**ARTICLE XIV.**
**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

A.      **Modification of Plan**

Effective as of the date hereof:  (a) the Debtors reserve the right (subject to the terms of the Transaction Support Agreement and the consents required therein, including the TSA Definitive Document Requirements) in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order consistent with the terms set forth herein; and (b) after the entry of the Confirmation Order, the Debtors (subject to the terms of the Transaction Support Agreement and the consents required therein, including the

TSA Definitive Document Requirements) or the Liquidating Trustee, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with Bankruptcy Code section 1127(b), remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

**B.**      **Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation of votes thereon pursuant to Bankruptcy Code section 1127(a) and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**C.**      **Revocation or Withdrawal of Plan**

The Debtors reserve the right to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then:  (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (c) nothing contained in the Plan shall (1) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (2) prejudice in any manner the rights of any Debtor or any other Entity, or (3) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

**ARTICLE XV.**
**CONDITIONS TO EFFECTIVE DATE**

**A.**      **Conditions Precedent to the Confirmation Date**

It shall be a condition to Confirmation of the Combined DS and Plan that the following conditions shall have been satisfied or waived with the consent of the Requisite Consenting Lenders and Administrative Agent:

1.   The Transaction Support Agreement shall be in full force and effect;

2.   The Plan Supplement documents have been filed and are in form and substance, in accordance with the terms of the Transaction Support Agreement; and

3.   The proposed Confirmation Order shall be in form and substance in accordance with the terms of the Transaction Support Agreement.

**B.**      **Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived:

1.   The Bankruptcy Court shall have approved the Disclosure Statement as containing adequate information with respect to the Plan within the meaning of Bankruptcy Code section 1125.

2.   The Bankruptcy Court shall have entered the Confirmation Order, which shall (a) have become a Final Order that has not been stayed or modified or vacated and (b) satisfy the TSA Definitive Document Requirements (including that the Confirmation Order shall be in form and substance reasonably acceptable to the Debtors, the Administrative Agent and the Requisite Consenting Lenders) and shall:

   a.     authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, and other agreements or documents created in connection with the Plan;

b.      decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

c.      authorize the Liquidating Trustee or the Debtors, as applicable or necessary, to: (a) make all distributions as required under the Plan, including Cash; and (b) enter into any agreements as set forth in the Plan Supplement;

d.      authorize the implementation of the Plan in accordance with its terms; and

e.      provide that, pursuant to Bankruptcy Code section 1146, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

3.   All governmental and material third party approvals and consents, including Bankruptcy Court approval, that are necessary to implement the transactions related to the Plan shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions.

4.   The Final DIP Order shall not have been stayed or modified or vacated.

5.   The Debtors shall not be in default under the DIP Facility or the Final DIP Order (or, to the extent that the Debtors are in default on the proposed Effective Date, such default shall have been waived by the Requisite Consenting Lenders and the DIP Lender or cured by the Debtors in a manner consistent with the DIP Facility and the Final DIP Order).

6.   The final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the Plan shall be consistent with the Transaction Support Agreement and the Definitive Documents shall have satisfied the TSA Definitive Document Requirements.

7.   The Transaction Support Agreement shall not have terminated as to all parties thereto and shall remain in full force and effect and the Debtors and the applicable Requisite Consenting Lenders then party thereto shall be in compliance therewith.

8.   All professional fees and expenses of Retained Professionals approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in a Professional Fee Escrow Account pending approval by the Bankruptcy Court.

9.   All accrued and unpaid professional fees and expenses of the Consenting Lenders and Administrative Agent as of the Effective Date shall have been indefeasibly paid in full in Cash.

10.  All compromises of Claims of LoyaltyOne or releases to be given by LoyaltyOne, or payments to be made by LoyaltyOne under this Plan have been approved by order of the Ontario Court in the CCAA Proceeding.

11.  With respect to all actions, documents and agreements necessary to implement the Plan: (a) all conditions precedent to such documents and agreements (other than any conditions precedent related to the occurrence of the Effective Date) shall have been satisfied or waived pursuant to the terms of such documents or agreements; (b) such documents and agreements shall have been tendered for

delivery to the required parties and been approved by any required parties and, to the extent required, filed with and approved by any applicable Governmental Units in accordance with applicable laws; and (c) such documents and agreements shall have been effected or executed.

12. All material authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and the transactions contemplated herein shall have been obtained.

## C.      Waiver of Conditions Precedent

The Debtors (with the prior consent of the Requisite Consenting Lenders and the Administrative Agent), may waive any of the conditions to the Confirmation Date or the Effective Date set forth in Article XV at any time without any notice to any other parties in interest and without any further notice to or action, order or approval of the Bankruptcy Court, *except* with respect to any condition concerning the DIP Facility and the releases to be given by LoyaltyOne, a waiver of such shall also require the consent of LoyaltyOne. The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of such rights or any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time (subject to the prior consent of the Requisite Consenting Lenders and Administrative Agent).

## D.      Effect of Non-Occurrence of Conditions to Consummation

If the Confirmation Order is vacated pursuant to a Final Order, then (except as provided in any such Final Order): (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan, the Confirmation Order, the Disclosure Statement or the Transaction Support Agreement shall: (i) constitute a waiver or release of any Claims, Interests, or Causes of Action; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## E.      Substantial Consummation

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE XVI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to Bankruptcy Code sections 105(a) and 1142, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim against a Debtor, including the resolution of any request for payment of any Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims;

2.      Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Retained Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      Resolve any matters related to Executory Contracts or Unexpired Leases, including:  (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to Bankruptcy Code section 365; (b) any potential contractual obligation under

any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.      Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

7.      Enforce any order for the sale of property pursuant to Bankruptcy Code sections 363, 1123, or 1146(a);

8.      Grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to Bankruptcy Code section 365(d)(4);

9.      Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.     Hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including, among other things:  (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article XI herein; (b) with respect to the releases, injunctions and other provisions contained in Article XII herein, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation or enforcement of the Plan, the Confirmation Order and contracts, instruments, releases, and other agreements or documents created in connection with the Plan; or (d) related to Bankruptcy Code section 1141;

11.     Hear and determine all disputes with respect to the Liquidating Trust Agreement;

12.     Hear and determine all disputes with respect to any Liquidating Trust Assets;

13.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

14.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

15.     Hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code sections 346, 505, and 1146;

16.     Enter an order or Final Decree concluding or closing the Chapter 11 Cases;

17.     Enforce all orders previously entered by the Bankruptcy Court; and

18.     Hear any other matter not inconsistent with the Bankruptcy Code.

*provided*, *however*, that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers

disputes to a different court and any disputes concerning documents contained in the Plan Supplement that contain such clauses shall be governed in accordance with the provisions of such documents.

## ARTICLE XVII.
## MISCELLANEOUS PROVISIONS

**A.      Immediate Binding Effect**

Subject to <u>Article XV.B.</u> hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon, as applicable, the Debtors and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

**B.      Additional Documents**

On or before the Effective Date, the Debtors (in consultation with the Administrative Agent and Requisite Consenting Lenders and subject to any consent rights set forth in the Transaction Support Agreement or the Plan) may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Liquidating Trustee, as applicable, and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**C.      Statutory Committees and Cessation of Fee and Expense Payment**

On the Effective Date, any official committee appointed in the Chapter 11 Cases pursuant to Bankruptcy Code section 1102(a) shall dissolve and members thereof shall be released from all rights and duties from, or related to, the Chapter 11 Cases. The Debtors and the Liquidating Trust shall not be responsible for paying any fees or expenses incurred by the members of, or advisors to, any statutory committee after the Effective Date.

**D.      Reservation of Rights**

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

**E.      Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

**F.      Service of Documents**

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or the Liquidating Trustee shall be served on:

| The Debtors | Counsel to the Debtors |
|---|---|
| Loyalty Ventures Inc.<br>8235 Douglas Avenue, Suite 1200<br>Dallas, Texas 75225<br>Attention: General Counsel<br>Email: generalcounsel@loyalty.com | Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park<br>New York, NY 10036<br>Attention: Philip C. Dublin; Meredith A. Lahaie<br>Email: pdublin@akingump.com;<br>mlahaie@akingump.com<br><br>Akin Gump Strauss Hauer & Feld LLP<br>2300 N. Field Street, Suite 1800<br>Dallas, TX 75201<br>Attention: Rachel Biblo Block<br>Email: rbibloblock@akingump.com<br><br>Jackson Walker LLP<br>1401 McKinney Suite 1900<br>Houston, TX 77010<br>Attention: Matthew D. Cavenaugh; Jennifer F. Wertz<br>Email: mcavenaugh@jw.com; jwertz@jw.com |
| **The U.S. Trustee** | **Counsel to the Ad Hoc Group of<br>Term B Loan Lenders** |
| Office of the United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002<br>Attention: Stephen D. Statham<br>(stephen.statham@usdoj.gov) | Gibson, Dunn & Crutcher LLP<br>200 Park Avenue<br>New York, New York 10166<br>Attention: Scott J. Greenberg; Steven A. Domanowski;<br>AnnElyse S. Gains<br>Email: sgreenberg@gibsondunn.com;<br>sdomanowski@gibsondunn.com;<br>agains@gibsondunn.com<br><br>and<br><br>Bennett Jones LLP<br>100 King Street West, Suite 3400<br>Toronto, ON M5X 1A4<br>Attention: Kevin J. Zych; Jesse Mighton<br>Email: zychk@bennettjones.com;<br>mightonj@bennettjones.com |
| **Counsel to the Administrative Agent** | **Counsel to the DIP Lender** |
| Haynes and Boone, LLP<br>2323 Victory Avenue<br>Suite 700<br>Dallas, TX 75219<br>Attention: Eli Columbus, James Markus, Frasher<br>Murphy, and Matt Ferris<br>Email: eli.columbus@haynesboone.com;<br>james.markus@haynesboone.com;<br>frasher.murphy@haynesboone.com;<br>matt.ferris@haynesboone.com | Cassels Brock & Blackwell LLP<br>40 King St. West, Suite 2100<br>Toronto, ON M5H 3C2<br>Attention:  Ryan C. Jacobs; Jane O. Dietrich; Natalie<br>Levine<br>Email:  rjacobs@cassels.com; jdietrich@cassels.com;<br>nlevine@cassels.com |

After the Effective Date the Liquidating Trustee has the authority to send notices to Entities requiring that they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date

the Liquidating Trustee is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

In accordance with Bankruptcy Rules 2002 and 3020(c), within fourteen (14) calendar days of the date of entry of the Confirmation Order, the Debtors shall serve the Notice of Confirmation by United States mail, first class postage prepaid, by hand, or by overnight courier service to all parties served with the Confirmation Hearing Notice; *provided* that no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed a Confirmation Hearing Notice, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address. To supplement the notice described in the preceding sentence, within twenty-one (21) calendar days of the date of the Confirmation Order, and in any event prior to the Effective Date, the Debtors shall publish the Notice of Confirmation once in *The New York Times* (national edition) or a similar publication. Mailing and publication of the Notice of Confirmation in the time and manner set forth in this paragraph shall be good and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c), and no further notice is necessary.

**G.      Term of Injunctions or Stays**

**Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to Bankruptcy Code sections 105 or 362 or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

**H.      Entire Agreement**

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**I.      Plan Supplement**

All exhibits and documents included in the Plan Supplement (as same may be amended from time to time) are incorporated into and are a part of the Plan as if set forth in full in the Plan. Except as otherwise provided in the Plan, such exhibits and documents included in the Plan Supplement shall initially be filed with the Bankruptcy Court on or before the Plan Supplement Filing Date, and may be amended from time to time thereafter. After the exhibits and documents are filed, copies of such exhibits and documents shall have been available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://cases.ra.kroll.com/LVI or the Bankruptcy Court's website at https://www.txs.uscourts.gov/page/bankruptcy-court.

**J.      Non-Severability**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; *provided*, that, absent the prior consent of the Administrative Agent and Requisite Consenting Lenders, such alteration or interpretation is not inconsistent with the Transaction Support Agreement. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant

to its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' and Requisite Consenting Lenders' prior consent, consistent with the terms set forth herein; and (c) nonseverable and mutually dependent.

## K.      Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to Bankruptcy Code section 1125(e), the Debtors and each of the Consenting Lenders and each of their respective Affiliates, agents, representatives, members, principals, equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, neither any of such parties or individuals will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

## L.      Closing of Chapter 11 Cases

The Liquidating Trustee shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close any of the Chapter 11 Cases.

## M.      Waiver or Estoppel

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, the Transaction Support Agreement, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

**ARTICLE XVIII.**
**PLAN-RELATED RISK FACTORS**

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

**ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE PLAN AND ITS IMPLEMENTATION.**

## A.      General

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive.  In considering whether to vote to accept or reject the Plan, Holders of Claims should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise incorporated by reference in this Disclosure Statement.

## B.      Risks Relating to the Plan and Other Bankruptcy Law Considerations

### 1.      A Holder of a Claim or Interest May Object to, and the Bankruptcy Court May Disagree with, the Debtors' Classification of Claims and Interests

Bankruptcy Code section 1122 provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.

The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created nine (9) Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. However, a Holder of a Claim or Interest could challenge the Debtors' classification.  In such an event, the cost of the Chapter 11 Cases and the time needed to confirm the Plan may increase, and there can be no assurance that the Bankruptcy Court will agree with the Debtors' classification.  If the Bankruptcy Court concludes that the classifications of Claims and Interests under the Plan do not comply with the requirements of the Bankruptcy Code, the Debtors may need to modify the Plan (subject to the terms of the Transaction Support Agreement).  The Plan may not be confirmed if the Bankruptcy Court determines that the Debtors' classification of Claims and Interests is not appropriate.

> **2.**      **The Bankruptcy Court May Not Confirm the Plan or May Require the Debtors to Re-Solicit Votes with Respect to the Plan**

The Debtors cannot assure you that the Plan will be confirmed by the Bankruptcy Court.  Bankruptcy Code section 1129 sets forth the requirements for confirmation of a plan, and requires, among other things, a finding by the Bankruptcy Court that the plan is "feasible," that all claims and interests have been classified in compliance with the provisions of Bankruptcy Code section 1122, and that, under the plan, each holder of a claim or interest within each impaired class either accepts the plan or receives or retains cash or property of a value, as of the date the plan becomes effective, that is not less than the value such Holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  With respect to impaired classes of claims or interests that do not accept the plan, section 1129(b) requires that the plan be fair and equitable (including, without limitation the "absolute priority rule") and not discriminate unfairly with respect to such classes.  There can be no assurance that the Bankruptcy Court will conclude that the feasibility test and other requirements of Bankruptcy Code section 1129 (including, without limitation, finding that the Plan satisfies the "new value" exception to the absolute priority rule, if applicable) have been met with respect to the Plan.  If and when the Plan is filed, there can be no assurance that modifications to the Plan would not be required for Confirmation, or that such modifications would not require a re-solicitation of votes on the Plan.

The Bankruptcy Court could fail to finally approve this Disclosure Statement and determine that the votes in favor of the Plan could be disregarded.  The Debtors would then be required to recommence the solicitation process, which could include re-filing a plan and disclosure statement.

If the Plan is not confirmed, the Chapter 11 Cases may be converted into cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 of the Bankruptcy Code would result in, among other things, smaller distributions being made to creditors and interest Holders than those provided for in the Plan.

> **3.**      **Parties in Interest May Object to the Plan's Amount or Classification of Claims**

Except as otherwise provided in the Plan, the Debtors and other parties in interest reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

> **4.**      **Even if the Debtors Receive All Necessary Acceptances for the Plan to Become Effective, the Debtors May Fail to Meet All Conditions Precedent to Effectiveness of the Plan**

Although the Debtors believe that the Effective Date would occur very shortly after the Confirmation Date, there can be no assurance as to such timing.

The Confirmation and Consummation of the Plan are subject to certain conditions that may or may not be satisfied.  The Debtors cannot assure you that all requirements for Confirmation and effectiveness required under the Plan will be satisfied.  If each condition precedent to Confirmation is not met or waived, the Plan will not be confirmed,

and if each condition precedent to Consummation is not met or waived, the Effective Date will not occur.  In the event that the Plan is not confirmed or is not consummated, the Debtors may seek Confirmation of an alternative plan.

5.      **There is a Risk of Termination of the Transaction Support Agreement**

To the extent that events giving rise to termination of the Transaction Support Agreement occur, the Transaction Support Agreement may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by important creditor constituencies, which could adversely affect the Debtors' ability to confirm and consummate the Plan.  If the Plan is not consummated, there can be no assurance that the Chapter 11 Cases would not be converted to chapter 7 liquidation cases or that any new chapter 11 plan would be as favorable to Holders of Claims as the current Plan.

6.      **The Bankruptcy Court May Dismiss Some or All of the Chapter 11 Cases**

Certain parties in interest may contest the Debtors' authority to commence and/or prosecute the Chapter 11 Cases.  If, pursuant to any such proceeding, the Bankruptcy Court finds that some or all of the Debtors could not commence the Chapter 11 Cases for any reason, the Debtors may be unable to consummate the transactions contemplated by the Transaction Support Agreement and the Plan.  If some or all of the Chapter 11 Cases are dismissed, the Debtors may be forced to liquidate their businesses in another forum to the detriment of all parties in interest.

7.      **The United States Trustee or Other Parties May Object to the Plan on Account of the Debtor Releases, Third-Party Releases, Exculpations, or Injunction Provisions**

Any party in interest, including the U.S. Trustee, could object to the Plan on the grounds that the (i) debtor releases contained in Article XII are to be given without adequate consideration, (ii) third-party releases contained in Article XII.C. are not given consensually or in a permissible non-consensual manner or (iii) the injunction contained in Article XII.E. is overly broad. In response to such an objection, the Bankruptcy Court could determine that any of these provisions are not valid under the Bankruptcy Code.  If the Bankruptcy Court makes such a determination, the Plan could not be confirmed without modifying the Plan to alter or remove the applicable provision.  This could result in substantial delay in Confirmation of the Plan, the Plan not being confirmed at all, or the loss of support for the Plan from the non-Debtor parties to the Transaction Support Agreement.

8.      **The Debtors May Seek to Amend, Waive, Modify, or Withdraw the Plan at Any Time Prior to Confirmation**

The Debtors reserve the right, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Transaction Support Agreement, and consistent with the terms of the Plan, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are consistent with the terms of the Transaction Support Agreement and necessary or desirable to consummate the Plan.  The potential impact of any such amendment or waiver on the Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. All Holders of Claims and Interests will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court.  If, after receiving sufficient acceptances, but prior to Confirmation of the Plan, the Debtors seek to modify the Plan, the previously solicited acceptances will be valid only if (1) all Classes of adversely affected creditors accept the modification in writing, or (2) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of Holders of accepting Claims or is otherwise permitted by the Bankruptcy Code.

9.      **The DIP Facility and the CCAA Proceeding**

As will be set forth in the DIP Motion, LoyaltyOne is the Debtors' proposed DIP Lender.  LoyaltyOne cannot, however, provide funding under the DIP Facility until the CCAA DIP Facility is approved in the CCAA Proceeding by the Ontario Court and LoyaltyOne is authorized by the Ontario Court to advance funds to the Debtors pursuant to the DIP Facility.  The Debtors' ability to fund the Chapter 11 Cases and Consummate the Plan (if and when confirmed)

is thus dependent upon the Ontario Court's approval of the CCAA DIP Facility and authorization for LoyaltyOne to fund the DIP Facility, and if required, fund additional amounts under the Plan, the Bankruptcy Court's subsequent approval of the DIP Facility and LoyaltyOne's continued ability to comply with the terms of the CCAA DIP Facility and other Orders of the Ontario Court.

### 10.     Use of Cash Collateral or the DIP Facility

If the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust their available cash collateral and postpetition financing.  There is no assurance that the Debtors will be able to obtain the right to further postpetition financing and/or the use of cash collateral, in which case, the liquidity necessary for the orderly functioning of the Debtors' businesses may be impaired materially.

### 11.     The Allowed Amount of Claims May Differ from Current Estimates

There can be no assurance that the Debtors' estimated Claim amounts are correct, and the actual amount of Allowed Claims may differ from the estimates.  The estimated amounts are subject to certain risks, uncertainties, and assumptions.  Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from the Debtors' estimates.  Further, a number of additional Claims may be filed, including on account of rejection damages for executory contracts and unexpired leases rejected pursuant to the Plan.  Any such additional Claims may result in a greater amount of Convenience Claims and/or General Unsecured Claims than the Debtors' current estimates.

## C.     Risks Relating to the Transactions Related to the Plan Generally

### 1.     The Debtors May be Subject to Employee Attrition

Uncertainty about the effects of the Plan on employees may have an adverse effect on the Debtors.  These uncertainties may impair the Debtors' ability to retain and motivate key personnel, and the Debtors are highly dependent on the efforts and performance of their senior management team.  If key employees depart because of uncertainty about their future roles and potential complexities of the Plan, the Debtors' ability to consummate the Plan could be adversely affected.

### 2.     The Support of the Consenting Lenders and Administrative Agent is Subject to the Terms of the Transaction Support Agreement Which is Subject to Termination in Certain Circumstances

Pursuant to the Transaction Support Agreement, the Consenting Lenders and the Administrative Agent have agreed to support the transactions set forth in the Plan.  Nevertheless, the Transaction Support Agreement is subject to termination upon the occurrence of certain termination events (including the failure of the Debtors to satisfy the milestones set forth therein).  Accordingly, the Transaction Support Agreement may be terminated after the date of this Disclosure Statement, and such a termination would present a material risk to Confirmation and/or Consummation of the Plan because the Plan may no longer have the support of the Consenting Lenders and the Administrative Agent.

### 3.     Certain Tax Implications of the Plan

Holders of Allowed Claims should carefully review Article XIX, entitled "Certain U.S. Federal Income Tax Consequences of the Plan" to determine how the tax implications of the Plan may adversely affect the Holders of certain Claims.  Each Holder should consult its own tax advisors regarding the tax consequences of the Plan, based upon the particular circumstances pertaining to such Holder.

### 4.     Recoveries on Account of Preserved Estate Claims are Speculative and Uncertain

The ultimate recoveries, if any, that could be obtained by the Liquidating Trustee on behalf of Holders of Allowed Claims in Class 3 and 4 are almost entirely contingent on the Preserved Estate Claims.  Recoveries on account

of any of the Preserved Estate Claims are speculative and uncertain due to the risk of success on the merits and the potential difficulties of collection and enforcement of any judgments.

5. **Liquidating Trust Expenses May Exceed Current Expectations**

The ultimate amount of Cash available to satisfy the amount of Allowed Claims in Class 3 depends, in part, on the manner in which the Liquidating Trustee operates the Liquidating Trust and the Liquidating Trust Expenses that it incurs. Such Liquidating Trust Expenses may include, without limitation, the reasonable and necessary expenses of administering the Liquidating Trust, including the costs to liquidate the Liquidating Trust Assets, investigate and prosecute the Preserved Estate Claims, prosecute objections to Claims, and make distributions. The expenses of the Liquidating Trustee will be paid from the Liquidating Trust Reserve. As a result, if the Liquidating Trustee incurs professional or other expenses in excess of current expectations, the amount of distributable assets remaining to satisfy Allowed Claims in Class 3 will decrease.

D. **General Disclaimer**

1. **Information Contained Herein Is Solely for Soliciting Votes**

The information contained in this Combined DS and Plan is for the purpose of soliciting acceptances of the Plan and may not be relied upon for any other purpose. Specifically, this Combined DS and Plan is not legal advice to any Person or Entity. The contents herein should not be construed as legal, business, or tax advice. Each reader should consult its own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim or Interest. This Combined DS and Plan may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan and whether to object to Confirmation.

2. **Combined DS and Plan May Contain Forward-Looking Statements**

The Combined DS and Plan contains forward-looking statements within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995, as amended, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic and competitive risks, including, but not limited to, those summarized herein. When used in the Combined DS and Plan, the words "believe," "expect," "anticipate," "estimate," "intend," "project," "plan," "likely," "may," "should" or other words or phrases of similar import generally identify forward-looking statements. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement, including without limitation, those risks described in this Article and the Disclaimer to this Combined DS and Plan.

3. **This Combined DS and Plan Has Not Been Approved by the United States Securities and Exchange Commission**

This Combined DS and Plan has not and will not be filed with the SEC or any state regulatory authority. Neither the SEC nor any state regulatory authority has approved or disapproved of the securities described in this Combined DS and Plan or has passed upon the accuracy or adequacy of this Combined DS and Plan, or the exhibits or the statements contained in this Combined DS and Plan.

4. **No Legal, Business, or Tax Advice Is Provided to You by This Disclosure Statement**

**THIS COMBINED DS AND PLAN IS NOT LEGAL, BUSINESS, OR TAX ADVICE TO YOU.** The contents of this Combined DS and Plan should not be construed as legal, business, or tax advice. Each Holder of a Claim or Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Combined DS and Plan may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation.

### 5.   No Admissions Made

The information and statements contained in this Combined DS and Plan will neither (1) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (2) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Interests, or any other parties-in-interest.

### 6.   Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim is, or is not, identified in this Combined DS and Plan.  All Parties, including the Debtors, reserve the right to continue to investigate Claims and file and prosecute objections to Claims.

### 7.   No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors to object to that Holder's Allowed Claim, or to bring Causes of Action or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

### 8.   Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Combined DS and Plan.  Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Combined DS and Plan, they have not independently verified the information contained herein.

### 9.   The Potential Exists for Inaccuracies and the Debtors Have No Duty to Update

The Debtors make the statements contained in this Combined DS and Plan as of the date hereof, unless otherwise specified herein, and the delivery of this Combined DS and Plan after that date does not imply that there has not been a change in the information set forth herein since such date.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Combined DS and Plan and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered by the Bankruptcy Court.

### 10.   No Representations Outside of the Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  In deciding whether to vote to accept or reject the Plan, you should not rely upon any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, unless otherwise indicated herein.  You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

## ARTICLE XIX.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**A.   Introduction**

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and certain Holders of Claims entitled to vote on the Plan, and it does not address the U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote on the Plan.  This summary is based on the Tax Code, the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial

decisions, revenue rulings and revenue procedures of the Internal Revenue Service (the "IRS"), and any other published administrative rules and pronouncements of the IRS, all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes in the Applicable Tax Law or new interpretations of Applicable Tax Law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority, and no legal opinion of counsel will be rendered, with respect to the tax consequences discussed herein. The discussion below is not binding upon the IRS or the courts, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address the Canadian federal, provincial, municipal or local or other non-U.S., state, local, or non-income tax consequences of the Plan (including such consequences with respect to the Debtors), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the Tax Code, persons liable for alternative minimum tax, U.S. Holders whose functional currency is not the U.S. dollar, U.S. expatriates, certain former citizens or long-term residents of the United States, broker-dealers, banks, mutual funds, insurance companies, financial institutions, retirement plans, small business investment companies, regulated investment companies, real estate investment trusts, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, partnerships (or other entities treated as partnerships or other pass-through entities), beneficial owners of partnerships (or other entities treated as partnerships or other pass-through entities), subchapter S corporations, Holders who hold or who will hold Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy). Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds such a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the Claims to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. This discussion does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to accept or deemed to reject the Plan. Additionally, this discussion does not address any consideration being received other than in a person's capacity as a Holder of a Claim.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim (including a beneficial owner of Claims) that is: (a) an individual citizen or resident of the United States for U.S. federal income tax purposes; (b) a corporation (or other Entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (i) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is neither a U.S. Holder nor a partnership (or other Entity treated as a partnership or other pass-through Entity for U.S. federal income tax purposes).

If a partnership (or other Entity treated as a partnership or other pass-through Entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the Entity. Partners (or other beneficial owners) of partnerships (or other entities treated as partnerships or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, NON-U.S., NON-INCOME, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**B.      Certain U.S. Federal Income Tax Consequences to the Debtors and Effects of Liquidation on the Debtors**

As of December 31, 2022, the Debtors had approximately $28 million of U.S. federal net operating loss carryforwards ("NOLs") and $51.2 million of interest deductions that may be (or become) available under section 163(j) of the Tax Code (the "163(j) Deductions").  The Debtors may generate additional tax attributes in the current tax year including during the pendency of these Chapter 11 Cases.  The Debtors do not currently believe that they have any other material tax attributes.  Realized gains, if any, may be offset by current-year losses and deductions, which may include 163(j) Deductions and NOLs from prior years (subject to applicable limitations, including a limitation on NOLs incurred on or after January 1, 2018, which can be carried forward indefinitely but are subject to an annual limitation of 80% of taxable income); *provided*, that any such gain that is ordinary in nature may not be offset by capital losses.  Any taxable gain remaining after such offsets would result in a cash tax obligation.

**C.      Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Claims Entitled to Vote**

The following discussion assumes that the Debtors will undertake the transactions currently contemplated by the Plan.  U.S. federal income tax considerations relating to the transactions are complex and subject to uncertainties.  No assurance can be given that the IRS will agree with the Debtors' interpretations of the tax rules applicable to, or tax positions taken with respect to, the transactions undertaken to effect the transactions.  U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of the transactions.

**1.      Loan Claims**

Pursuant to the Plan, in full and final satisfaction, compromise, settlement or release of, and in exchange for each Allowed Loan Claim, each Holder thereof shall receive its Pro Rata share of the Liquidating Trust Interests.

A U.S. Holder of a Loan Claim should be treated as receiving its Pro Rata share of the Liquidating Trust Interest in a fully taxable exchange under section 1001 of the Tax Code.  Other than with respect to any amounts received that are attributable to accrued but untaxed interest, a U.S. Holder should recognize gain or loss in an amount equal to the difference, if any, between (a) the fair market value of its undivided interest in the Liquidating Trust Assets consistent with its economic rights in the trust received in respect of its Claim, and (b) its adjusted tax basis in its Claim.  The character of such gain as capital gain or ordinary income will be determined by a number of factors, including the tax status of a U.S. Holder, the rules regarding "market discount" (as discussed below) and accrued but untaxed interest, whether the Claim constitutes a capital asset in the hands of a U.S. Holder and whether and to what extent a U.S. Holder had previously claimed a bad debt deduction with respect to its Claim.  If recognized gain or loss is capital in nature, it generally would be long-term capital gain if a U.S. Holder held its Claim for more than one year at the time of the exchange.

As discussed below, each U.S. Holder of a Loan Claim that receives a Liquidating Trust Interest should be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the Liquidating Trust Assets (consistent with its economic rights in the trust).  Pursuant to the Plan, the Liquidating Trustee will make a good faith determination of the fair market value of the Liquidating Trust Assets as of the Effective Date, and all parties to the Liquidating Trust (including the Debtors, the Liquidating Trustee and the Liquidating Trust Beneficiaries) must use this valuation for all U.S. federal income tax purposes.  A U.S. Holder's tax basis in its respective share of the Liquidating Trust Assets will equal the fair market value of such respective share, and the U.S. Holder's holding period generally will begin the day following the establishment of a Liquidating Trust.

**2.      General Unsecured Claims**

Pursuant to the Plan, in full and final satisfaction, compromise, settlement or release of, and in exchange for each Allowed General Unsecured Claim, each Holder thereof shall receive its Pro Rata share of the Liquidating Trust Interests.

A U.S. Holder of a General Unsecured Claim should be treated as receiving its Pro Rata share of the Liquidating Trust Interest in a fully taxable exchange under section 1001 of the Tax Code.  Other than with respect to

any amounts received that are attributable to accrued but untaxed interest, a U.S. Holder should recognize gain or loss in an amount equal to the difference, if any, between (a) the fair market value of its undivided interest in the Liquidating Trust Assets consistent with its economic rights in the trust received in respect of its Claim, and (b) its adjusted tax basis in its Claim. The character of such gain as capital gain or ordinary income will be determined by a number of factors, including the tax status of a U.S. Holder, the rules regarding "market discount" (as discussed below) and accrued but untaxed interest, whether the Claim constitutes a capital asset in the hands of a U.S. Holder and whether and to what extent a U.S. Holder had previously claimed a bad debt deduction with respect to its Claim. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if a U.S. Holder held its Claim for more than one year at the time of the exchange.

As discusses below, each U.S. Holder of a General Unsecured Claim that receives a Liquidating Trust Interest should be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the Liquidating Trust Assets (consistent with its economic rights in the trust). Pursuant to the Plan, the Liquidating Trustee will make a good faith determination of the fair market value of the Liquidating Trust Assets as of the Effective Date, and all parties to the Liquidating Trust (including the Debtors, the Liquidating Trustee and the Liquidating Trust Beneficiaries) must use this valuation for all U.S. federal income tax purposes. A U.S. Holder's tax basis in its respective share of the Liquidating Trust Assets will equal the fair market value of such respective share, and the U.S. Holder's holding period generally will begin the day following the establishment of a Liquidating Trust.

### 3.  Other Tax Considerations for U.S. Holders of Loan Claims

#### a.  *Accrued but Untaxed Interest (or OID)*

A portion of the consideration received by a U.S. Holder of a Loan Claim may be attributable to accrued but untaxed interest on such Claim. Such amount should be taxable to that U.S. Holder as ordinary interest income if such accrued interest has not been previously included in a U.S. Holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of such Claims may be able to recognize a deductible loss to the extent that any accrued interest on such Claims was previously included in such U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

Under the Plan, the consideration received is not sufficient to fully satisfy all principal and interest on Allowed Loan Claims. As a result, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear. Pursuant to the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Loan Claims will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to untaxed interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The IRS could take the position that the consideration received by such U.S. Holders should be allocated in some way other than as provided in the Plan. U.S. Holders of Loan Claims should consult their respective tax advisors regarding the proper allocation of the consideration received by them pursuant to the Plan between principal and accrued but untaxed interest in such event.

#### b.  *Market Discount*

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder in the surrender of its Allowed Loan Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's initial tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with original issue discount ("OID"), its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of an Allowed Loan Claim (as described below) that was acquired with market discount should be treated as ordinary income to the extent of the market

discount that accrued thereon while such Claim was considered to be held by such U.S. Holder (unless such U.S. Holder elected to include market discount in income as it accrued).

Section 451 of the Tax Code generally requires accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in section 451 of the Tax Code) to include certain items of income (such as market discount) no later than the time such amounts are reflected on such a financial statement. The application of this rule to income of a debt instrument with market discount is effective for taxable years beginning after December 31, 2018. However, the IRS issued the proposed Treasury Regulations in 2019, on which taxpayers generally may rely, confirming that taxpayers may continue to defer income (including market discount income) for tax purposes until there is a payment or sale at a gain. Accordingly, although market discount may have to be included in income currently as it accrues for financial accounting purposes, taxpayers may continue to defer the income for tax purposes. U.S. Holders are urged to consult their own tax advisors concerning the application of the market discount rules to their Loan Claims.

### c.    *Medicare Tax*

Certain U.S. Holders of Loan Claims that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders of Loan Claims that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received pursuant to the Plan.

### d.    *Limitation on Use of Capital Losses*

A U.S. Holder of an Allowed Loan Claim who recognizes capital losses as a result of the distributions made pursuant to the Plan will be subject to limits on its use of capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (i) $3,000 ($1,500 for married individuals filing separate returns) or (ii) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. A corporate U.S. Holder that has more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in other tax years. Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

**D.    Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Certain Claims Entitled to Vote**

### 1.    <u>U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Loan Claims</u>

The following discussion assumes that the Debtors will undertake the Plan currently contemplated and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, and local and the non-U.S. tax consequences of the Consummation of the Plan to such Non-U.S. Holder.

### 2.    <u>Gain Recognition</u>

Any gain realized by a Non-U.S. Holder on the exchange of its Loan Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for one hundred and eighty-three (183) days or more during the taxable year in which the Plan Consummation occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States). Whether a Non-U.S. Holder would realize any gain for U.S. federal income tax purposes is be determined under the principles discussed above with respect to U.S. Holders under "<u>U.S. Federal Income Tax Consequences to the U.S. Holders of Claims Entitled to Vote</u>."

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 3.      Accrued but Untaxed Interest (or OID)

Payments made to a Non-U.S. Holder pursuant to the Plan that are attributable to accrued but untaxed interest (or OID) generally will not be subject to U.S. federal income or withholding tax; *provided*, that (a) such Non-U.S. Holder is not a bank, (b) such Non-U.S. Holder does not actually or constructively own 10% or more of the total combined voting power of all classes of the stock of LVI, and (c) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E, as applicable, or other applicable IRS Form W-8) establishing that the Non-U.S. Holder is not a U.S. person, unless such interest (or OID) is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, *provided* the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (i) generally will not be subject to withholding tax, but (ii) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest (or OID) at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest (or OID) that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest (or OID).  A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN-E, as applicable (or a successor form), or other applicable IRS Form W-8, upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, as applicable, or other applicable IRS Form W-8, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

**BOTH U.S. HOLDERS AND NON-U.S. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THE FATCA RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF THEIR CLAIMS PURSUANT TO THE PLAN.**

**E.      U.S. Federal Income Tax Treatment of the Liquidating Trust**

### 1.      Formation of the Liquidating Trust

The Liquidating Trust shall be established on the Effective Date. It is intended that the Liquidating Trust be treated as a "liquidating trust" under Treasury Regulation Section 301.7701-4(d) and to qualify as a "grantor trust" as governed by IRC Sections 671 through 679 of the Tax Code (other than in respect of any portion of the Liquidating Trust Assets allocable to, or retained on account of, Disputed Claims, as discussed below). In order to qualify the Liquidating Trust as a grantor trust, the Liquidating Trust Agreement requires all relevant parties to treat, for U.S. federal income tax purposes, the transfer of the assets to the Liquidating Trust as (a) the transfer of assets by the Debtors to the Holders of Allowed Claims entitled to Distributions from the Liquidating Trust Assets, subject to any liabilities of the Debtors or the Liquidating Trust payable from the proceeds of such assets, followed by (b) the transfer of such assets (subject to such liabilities) by such Holders to the Liquidating Trust in exchange for the beneficial

interests in the Liquidating Trust. Accordingly, except with respect to the assets transferred to any Disputed Claims Reserve, the Liquidating Trust Beneficiaries should be treated for U.S. federal income tax purposes as the grantors and owners of their respective shares of the Liquidating Trust Assets.

While the following discussion assumes that the Liquidating Trust would be so treated for U.S. federal income tax purposes, no ruling will be requested from the IRS concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust as a grantor trust. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Liquidating Trust and the Holders of Claims could vary from those discussed herein.

## 2. General Tax Reporting by the Liquidating Trust and Liquidating Trust Beneficiaries

For all U.S. federal income tax purposes, all parties must treat the Liquidating Trust as a grantor trust of which the Holders of interests in the Liquidating Trust are the owners and grantors, and treat the Holders of interests in the Liquidating Trust as the direct owners of an undivided interest in the Liquidating Trust Assets (other than any assets allocable to Disputed Claims), consistent with their economic interests therein. The Liquidating Trustee will file tax returns for the Liquidating Trust treating the Liquidating Trust as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a). The Liquidating Trustee also will send annually to each Holder of a Liquidating Trust Interest a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes and will instruct all such Holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such Holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

Allocations of taxable income, gain, loss, deduction, and/or credit of the Liquidating Trust (other than such items allocable to any assets allocable to, or retained on account of, Disputed Claims, if such items are otherwise accounted for in a "disputed ownership fund") among the Holders of interests in the Liquidating Trust, as well as amounts realized by Holders on the Effective Date, will be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, and, if applicable, other than assets allocable to Disputed Claims) to the Holders of interests in the Liquidating Trust, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets for purposes of allocating taxable income and loss shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Liquidating Trust shall make a good faith valuation of the Liquidating Trust Assets. All parties to the Liquidating Trust (including, without limitation, the Debtors, the Liquidating Trustee, and Holders of interests in the Liquidating Trust) must consistently use such valuation for all U.S. federal income tax purposes. The Liquidating Trust shall also file (or cause to be filed) any other statements, returns or disclosures relating to the Liquidating Trust that are required by any Governmental Unit for tax purposes. Taxable income or loss allocated to a Holder of interests in the Liquidating Trust will be treated as income or loss with respect to such Holder's undivided interest in the Liquidating Trust Assets, and not as income or loss with respect to its prior Allowed Claim. The character of any income and the character and ability to use any loss will depend on the particular situation of the Holders of interests in the Liquidating Trust.

The U.S. federal income tax obligations of a Holder with respect to its interest in the Liquidating Trust are not dependent on the Liquidating Trust distributing any Cash or other proceeds. Thus, a Holder may incur a U.S. federal income tax liability with respect to its allocable share of the Liquidating Trust's income even if the Liquidating Trust does not make a concurrent distribution to the Holder. In general, other than in respect of Cash retained on account of Disputed Claims and distributions resulting from undeliverable distributions (the subsequent distribution of which still relates to a Holder's Claim), a distribution of Cash by the Liquidating Trust will not be separately taxable

to a Holder of interests in the Liquidating Trust since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the Liquidating Trust). Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of Cash originally retained by the Liquidating Trust on account of Disputed Claims.

The Liquidating Trustee will comply with all applicable governmental withholding requirements. Thus, in the case of any Holders of interests in the Liquidating Trust that are not U.S. persons, the Liquidating Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate or is otherwise excluded from withholding).

### 3.      Tax Reporting for Assets Allocable to Disputed Claims

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trust of an IRS private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee (a) may, elect to treat any Liquidating Trust Assets allocable to, or retained on account of, Disputed Claims (i.e., a Disputed Claims Reserve) as a "disputed ownership fund" governed by Treasury Regulations Section 1.468B-9 if applicable, and (b) to the extent permitted by applicable law, will report consistently for state and local income tax purposes. Accordingly, if a "disputed ownership fund" election is made with respect to a Disputed Claims Reserve, such reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the Liquidating Trust Assets that are allocable to, or retained on account of, the Disputed Claims Reserve (including any gain recognized upon the disposition of such assets). All distributions from such reserves (which distributions will be net of the expenses, including taxes, relating to the retention or disposition of such assets) will be treated as received by Holders in respect of their Claims as if distributed by the Debtors. All parties (including, without limitation, the Debtors, the Liquidating Trustee, and the Holders of interests in the Liquidating Trust) will be required to report for tax purposes consistently with the foregoing. A Disputed Claims Reserve will be responsible for payment, out of the assets of the Disputed Claims Reserve, of any taxes imposed on the Disputed Claims Reserve or its assets. In the event, and to the extent, any Cash in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the distribution of the assets in such reserve), assets of the Disputed Claims Reserve may be sold to pay such taxes.

### F.      Information Reporting and Backup Withholding

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Loan Claim pursuant to the Plan. Additionally, under the backup withholding rules, a Holder of a Loan Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 or, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). The current backup withholding rate is 24%. Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the Holder against whom such withholding is made to a refund from the IRS to the extent the withholding results in an overpayment of tax, *provided*, that the required information is provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the treatment under the Plan would be subject to these Treasury Regulations and require disclosure on the Holders' tax returns.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A LOAN CLAIM OR A GENERAL UNSECURED CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX

**SITUATION. ALL HOLDERS OF LOAN CLAIMS AND GENERAL UNSECURED CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES APPLICABLE TO THEM, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-U.S., NON-INCOME, OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## CONCLUSION AND RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated: April 26, 2023

Loyalty Ventures Inc.
on behalf of itself and each of its Debtor affiliates

*/s/ Charles Horn*
_____

Charles Horn
Chief Executive Officer and President
Loyalty Ventures Inc.

**<u>EXHIBIT A</u>**
**ORGANIZATIONAL CHART**

# Exhibit A

## Organizational Chart



**KEY**

Debtor

Non-Debtor

○ Borrower under Credit Agreement

● Guarantor under Credit Agreement

Loyalty Ventures Inc.

LVI Sky Oak LLC

LVI Lux Holdings S.à r.l.

LP 1%

GP 99%

Rhombus Investments L.P.

LVI Lux Financing S.à r.l.

Apollo Holdings B.V.

BrandLoyalty entities[1]

LoyaltyOne, Co.

LoyaltyOne Travel Services Co.

(1) Certain of the entities that own and operate the BrandLoyalty business are borrowers and guarantors under the Credit Agreement.

**EXHIBIT B**
**TRANSACTION SUPPORT AGREEMENT**

THIS TRANSACTION SUPPORT AGREEMENT AND THE DOCUMENTS ATTACHED HERETO COLLECTIVELY DESCRIBE TRANSACTIONS INVOLVING THE COMPANY PARTIES THAT MAY BE EFFECTUATED (I) THROUGH THE FILING OF CHAPTER 11 CASES IN THE BANKRUPTCY COURT (AS DEFINED BELOW) AND (II) UNDER THE CCAA (AS DEFINED BELOW).

THIS TRANSACTION SUPPORT AGREEMENT IS NOT AN OFFER, ACCEPTANCE OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES AS TO ANY CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE OR ANY PLAN UNDER THE CCAA.  ANY SUCH OFFER, ACCEPTANCE OR SOLICITATION WILL ONLY BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES LAWS, THE BANKRUPTCY CODE, THE CCAA AND OTHER APPLICABLE LAW.  NOTHING CONTAINED IN THIS TRANSACTION SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, BE DEEMED BINDING ON ANY OF THE PARTIES HERETO.

THIS TRANSACTION SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO AND, ACCORDINGLY, IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

THIS TRANSACTION SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTIONS SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.

### *TRANSACTION SUPPORT AGREEMENT*

This TRANSACTION SUPPORT AGREEMENT (together with all exhibits, schedules, annexes and other attachments hereto, as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "<u>Agreement</u>"), dated as of March 10, 2023, is entered into by and among:

    i. Loyalty Ventures Inc., a Delaware corporation ("<u>LVI</u>"), and its undersigned direct and indirect subsidiaries (collectively with LVI, the "<u>Company Parties</u>" and each a "<u>Company Party</u>");

ii. (a) each of the record or beneficial holders (or providers of investment management or advisory services on behalf of such holders) of Term B Loan Claims (as defined below) identified on the signature pages hereto (such persons and entities described in this clause (ii)(a), each, an "Initial Consenting Term B Loan Lender" and, collectively, the "Initial Consenting Term B Loan Lenders") and (b) each of the other record or beneficial holders (or providers of investment management or advisory services on behalf of such holders) of Term B Loan Claims that becomes a party to this Agreement after the Agreement Effective Date (as defined below) in accordance with the terms hereof by executing and delivering a Joinder Agreement (as defined below) (such persons and entities described in this clause (ii)(b), each, an "Additional Consenting Term B Loan Lender" and, collectively, the "Additional Consenting Term B Loan Lenders" and, together with the Initial Consenting Term B Loan Lenders, the "Consenting Term B Loan Lenders");

iii. (a) each of the record or beneficial holders of Term A Loan Claims (as defined below) identified on the signature pages hereto (such persons and entities described in this clause (iii)(a), each, an "Initial Consenting Term A Loan Lender" and, collectively, the "Initial Consenting Term A Loan Lenders") and (b) each of the other record or beneficial holders of Term A Loan Claims that becomes a party to this Agreement after the Agreement Effective Date in accordance with the terms hereof by executing and delivering a Joinder Agreement (such persons and entities described in this clause (iii)(b), each, an "Additional Consenting Term A Loan Lender" and, collectively, the "Additional Consenting Term A Loan Lenders" and, together with the Initial Consenting Term A Loan Lenders, the "Consenting Term A Loan Lenders");

iv. (a) each of the record or beneficial holders of Revolving Loan Claims (as defined below) identified on the signature pages hereto (such persons and entities described in this clause (iv)(a), each, an "Initial Consenting Revolver Lender," and, collectively, the "Initial Consenting Revolver Lenders," and, collectively with the Initial Consenting Term B Loan Lenders and the Initial Consenting Term A Loan Lenders, the "Initial Consenting Lenders") and (b) each of the other record or beneficial holders of Revolving Loan Claims that becomes a party to this Agreement after the Agreement Effective Date in accordance with the terms hereof by executing and delivering a Joinder Agreement (such persons and entities described in this clause (iv)(b), each, an "Additional Consenting Revolver Lender," and, collectively, the "Additional Consenting Revolver Lenders," and, together with the Initial Consenting Revolver Lenders, the "Consenting Revolver Lenders," and, collectively with the Consenting Term A Loan Lenders and the Consenting Term B Loan Lenders, the "Consenting Lenders"); and

v. the Administrative Agent (as defined below), in its capacity as administrative agent under the Credit Agreement (as defined below) (together with the Consenting Lenders, the "Consenting Stakeholders").

The Company Parties and each of the Consenting Stakeholders are referred to herein as the "Parties" and individually as a "Party".

## RECITALS

**WHEREAS**, as of the date hereof: (i) the Initial Consenting Term B Loan Lenders collectively hold, in the aggregate, in excess of 69% of the aggregate outstanding principal amount of the Term B Loan (as defined below) under that certain Credit Agreement, dated as of November 3, 2021, (as amended by Amendment No. 1 to Credit Agreement (Financial Covenant), dated as of July 29, 2022), among LVI and certain of its subsidiaries, as borrowers, certain other subsidiaries of LVI, as guarantors, Bank of America, N.A., as administrative agent (the "<u>Administrative Agent</u>"), and the lenders (the "<u>Lenders</u>") from time to time party thereto (as further amended, amended and restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"); (ii) the Initial Consenting Term A Loan Lenders collectively hold, in the aggregate, 0% of the aggregate outstanding principal amount of the Term A Loan (as defined below) under the Credit Agreement; and (iii) the Initial Consenting Revolver Lenders collectively hold, in the aggregate, 0% of the aggregate outstanding amount of Revolving Credit Exposure (as defined below) under the Credit Agreement;

**WHEREAS**, the Company Parties and the Consenting Stakeholders have agreed to implement, support, and/or consent to, as applicable, those certain transactions with respect to the Company Parties contemplated by and in accordance with and subject to the terms and conditions set forth in the following documents (collectively, and including any CCAA Transaction (as defined below), the "<u>Transactions</u>"): (i) that certain Asset Purchase Agreement attached hereto as <u>Exhibit A</u> by and between LoyaltyOne Co., an indirect subsidiary of LVI and a Company Party ("<u>LoyaltyOne</u>"), as seller, and an entity owned or controlled by Bank of Montreal, as Buyer, with respect to the sale of certain assets of the AIR MILES business (including any exhibits, schedules, annexes and other attachments thereto, each as may be modified in accordance with the terms thereof and hereof, the "<u>AIR MILES Transaction Agreement</u>," and, such transactions contemplated thereby and approved in accordance with the SISP (as defined below), the "<u>AIR MILES Sale Transaction</u>"); (ii) that certain term sheet for the Chapter 11 DIP Facility (as defined below) (including any exhibits, schedules, annexes and other attachments thereto, each as may be modified in accordance with the terms thereof and hereof, the "<u>Chapter 11 DIP Term Sheet</u>"); (iii) that certain term sheet for the CCAA DIP Facility attached hereto as <u>Exhibit B</u> (as defined below) (including any exhibits, schedules, annexes and other attachments thereto, each as may be modified in accordance with the terms thereof and hereof, the "<u>CCAA DIP Term Sheet</u>" and, together with the Chapter 11 DIP Term Sheet, the "<u>DIP Term Sheets</u>"); (iv) the *Combined Disclosure Statement and Joint Chapter 11 Plan of Loyalty Ventures Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (including any exhibits, schedules, annexes and other attachments thereto, each as may be modified in accordance with the terms thereof and hereof, the "<u>Combined DS and Plan</u>"); and (v) (a) that certain Sale and Purchase Agreement with respect to the sale of the BrandLoyalty business (including any exhibits, schedules, annexes and other attachments attached thereto, each as may be modified in accordance with the terms thereof), (b) that certain Bridge Loan Agreement (including any exhibits, schedules, annexes and other attachments attached thereto, each as may be modified in accordance with the terms thereof) and (c) that certain Intercreditor Agreement Including Inventory Pledge (including any exhibits, schedules, annexes and other attachments attached thereto, each as may be modified in accordance with the terms thereof), in each case, attached hereto as <u>Exhibit C</u> (collectively, the "<u>BrandLoyalty Transaction Agreements</u>" and the transactions contemplated by the foregoing clauses (a) through (c), the "<u>BrandLoyalty Sale Transaction</u>" and, collectively, the AIR MILES Transaction

Agreement, the DIP Term Sheets, the Combined DS and Plan, and the BrandLoyalty Transaction Agreements, the "Transaction Documents");

**WHEREAS**, certain of the Consenting Stakeholders are party to that certain Consent, dated March 1, 2023 (the "BL Consent Agreement"), by and among LVI and Brand Loyalty Group B.V., Brand Loyalty Holding B.V. and Brand Loyalty International B.V. each a Guarantor (as defined in the Credit Agreement) party thereto, such Consenting Lenders constituting Required Lenders under and as defined in the Credit Agreement, and the Administrative Agent, pursuant to which such Consenting Stakeholders party thereto have consented, *inter alia*, to the BrandLoyalty Sale Transaction, including the entry by the Company Parties into the BrandLoyalty Transaction Agreements, the incurrence of indebtedness and granting of liens pursuant to and as contemplated by the BrandLoyalty Transaction Agreements, and the sale of assets and collateral pursuant to and as contemplated by the BrandLoyalty Transaction Agreements (such consents, approvals, covenants and agreements contemplated thereby, collectively, the "BrandLoyalty Consents");

**WHEREAS**, the Transaction Documents will set forth the material terms and conditions of the Transactions, as supplemented by the terms and conditions of this Agreement;

**WHEREAS**, pursuant to this Agreement, the Company Parties intend to, among other things: (a) implement the Transactions with respect to the Chapter 11 Debtors (as defined below) by commencing voluntary, prepackaged cases under chapter 11 (the "Chapter 11 Cases") of title 11 of the United States Code (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"); and (b) with respect to LoyaltyOne, commence a proceeding before the Ontario Superior Court of Justice (Commercial List) (the "Ontario Court") under the *Companies' Creditors Arrangement Act* (the "CCAA" and, such proceeding under the CCAA, the "CCAA Proceeding") for the purpose of conducting the sales and investment solicitation process (in the form attached hereto as Exhibit D, the "SISP"), in connection with which the AIR MILES Transaction Agreement shall serve as the stalking horse bid; and

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed herein.

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

*AGREEMENT*

1.     **Certain Definitions.**

As used in this Agreement, the following terms have the following meanings:

(a)     "Additional Consenting Revolver Lender" and "Additional Consenting Revolver Lenders" have the meanings ascribed to such terms in the Preamble.

(b)      "Additional Consenting Term A Loan Lender" and "Additional Consenting Term A Loan Lenders" have the meanings ascribed to such terms in the Preamble.

(c)      "Additional Consenting Term B Loan Lender" and "Additional Consenting Term B Loan Lenders" have the meanings ascribed to such terms in the Preamble.

(d)      "Administrative Agent" has the meaning ascribed to such term in the Recitals.

(e)      "Agreement" has the meaning ascribed to such term in the Preamble.

(f)      "Agreement Effective Date" has the meaning ascribed to such term in Section 9 hereof.

(g)      "AIR MILES Sale Transaction" has the meaning ascribed to such term in the Recitals.

(h)      "AIR MILES Transaction Agreement" has the meaning ascribed to such term in the Recitals.

(i)      "Alternative AIR MILES Transaction" means any plan, proposal or offer of dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, amalgamation, arrangement, joint venture, partnership, sale of assets, shares or restructuring of any of the Company Parties, in each case, that is an alternative to a CCAA Transaction.

(j)      "Alternative BL Transaction" means any plan, proposal or offer of dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, amalgamation, arrangement, joint venture, partnership, sale of assets, shares or restructuring of any of the Company Parties, in each case, that is an alternative to the BrandLoyalty Sale Transaction.

(k)      "Alternative Plan Transaction" means any plan, proposal or offer of dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, amalgamation, arrangement, joint venture, partnership, sale of assets, shares or restructuring of any of the Company Parties, in each case, that is an alternative to the Combined DS and Plan.

(l)      "Alternative Transaction" means an Alternative BL Transaction, Alternative AIR MILES Transaction or Alternative Plan Transaction.

(m)      "Alternative Transaction Proposal" means any inquiry, bid, term sheet, discussion or agreement with respect to any Alternative Transaction.

(n)      "Bankruptcy Code" has the meaning ascribed to such term in the Recitals.

(o)      "Bankruptcy Court" has the meaning ascribed to such term in the Recitals.

(p)      "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

(q)     "BL Consent Agreement" has the meaning ascribed to such term in the Recitals.

(r)     "BrandLoyalty Consents" has the meaning ascribed to such term in the Recitals.

(s)     "BrandLoyalty Sale Transaction" has the meaning ascribed to such term in the Recitals.

(t)     "BrandLoyalty Transaction Agreements" has the meaning ascribed to such term in the Recitals.

(u)     "Canadian Securities Laws" means the Ontario Securities Act, together with all applicable securities laws, rules and regulations and published policies thereunder or under the securities laws of any other province or territory of Canada.

(v)     "Cash Collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents whenever acquired in which a Chapter 11 Debtor, the Administrative Agent or a Consenting Lender have an interest.

(w)     "Cash Collateral Order" means any order of the Bankruptcy Court authorizing the Chapter 11 Debtors' use of Cash Collateral.

(x)     "CCAA" has the meaning ascribed to such term in the Recitals.

(y)     "CCAA ARIO" means the amended and restated CCAA Initial Order, in the form attached hereto as Exhibit E.

(z)     "CCAA DIP Cash Flow Projection Materials" means (i) the Cash Flow Projection (as defined in the CCAA DIP Term Sheet) and any amendments or restatements thereof, (ii) each Proposed Amended Cash Flow Projection (as defined in the CCAA DIP Term Sheet) and (iii) the related weekly materials and information provided with respect thereto pursuant to the terms of the CCAA DIP to the CCAA DIP Lender and the CCAA Monitor, including (x) the actual cash flow results from the immediately preceding one week period and (y) a comparison of the actual cash flow results from the immediately preceding one week period as against the DIP Agreement Cash Flow Projection (as defined in the CCAA DIP Term Sheet) for such week.

(aa)    "CCAA DIP Facility" means a debtor in possession financing facility on the terms and conditions set forth in the CCAA DIP Term Sheet to be entered into by and among LoyaltyOne and the CCAA DIP Lender.

(bb)    "CCAA DIP Facility Documents" means any documents governing the CCAA DIP Facility that are entered into in accordance with the CCAA DIP Term Sheet, the CCAA Initial Order and the CCAA ARIO and any amendments, modifications and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents and instruments (including any amendments, restatements, supplements or modifications of any of the foregoing) related to or executed in connection therewith.

(cc)    "CCAA DIP Lender" means the lender under the CCAA DIP Facility.

(dd)    "CCAA DIP Term Sheet" has the meaning ascribed to such terms in the Recitals.

(ee)    "CCAA Initial Order" means an order of the Ontario Court, *inter alia*, granting LoyaltyOne protection under the CCAA, in the form attached hereto as Exhibit F.

(ff)    "CCAA KERP" means those certain employee retention plans as provided for in the CCAA ARIO, (i) which shall provide for the payment of no greater than CAD$12,215,402 in the aggregate, (ii) which payments shall be secured by a charge as set forth in the CCAA ARIO of no greater than CAD$5,350,000 and (iii) which payments shall be made in accordance with the materials disclosed by the applicant on the application for the CCAA Initial Order.

(gg)    "CCAA Monitor" means KSV Restructuring Inc., in its capacity as proposed (and once appointed) Ontario Court appointed monitor in the CCAA Proceeding.

(hh)    "CCAA Proceeding" has the meaning ascribed to such term in the Recitals.

(ii)    "CCAA Transaction" means the sale of the AIR MILES business pursuant to the AIR MILES Transaction Agreement or such other purchase or sale agreement approved by the Ontario Court as the successful bid resulting from the SISP.

(jj)    "CCAA Transaction Order" means a final order of the Ontario Court approving the CCAA Transaction, in the form attached hereto as Exhibit G.

(kk)    "Chapter 11 Cases" has the meaning ascribed to such term in the Recitals.

(ll)    "Chapter 11 Debtors" means those Company Parties that commence Chapter 11 Cases.

(mm)    "Chapter 11 DIP Facility" means a debtor in possession financing facility in an amount not to exceed $30,000,000 and on the terms and conditions set forth in the Chapter 11 DIP Term Sheet to be entered into by and among the Chapter 11 Debtors, as debtors in possession, and the Chapter 11 DIP Lender.

(nn)    "Chapter 11 DIP Facility Documents" means any documents governing the Chapter 11 DIP Facility that are entered into in accordance with the Chapter 11 DIP Term Sheet and the Chapter 11 DIP Orders and any amendments, modifications and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents and instruments (including any amendments, restatements, supplements or modifications of any of the foregoing) related to or executed in connection therewith.

(oo)    "Chapter 11 DIP Facility Motion" means a motion that will be filed by the Chapter 11 Debtors seeking Bankruptcy Court approval of the Chapter 11 DIP Facility.

(pp)    "Chapter 11 DIP Lender" means LoyaltyOne in its capacity as the lender under the Chapter 11 DIP Facility.

(qq)    "Chapter 11 DIP Orders" means the Chapter 11 Interim DIP Order and the Chapter 11 Final DIP Order.

(rr)    "Chapter 11 DIP Term Sheet" means has the meaning ascribed to such terms in the Recitals.

(ss)    "Chapter 11 Final DIP Order" means a final order of the Bankruptcy Court approving the Chapter 11 DIP Facility and the Chapter 11 DIP Facility Documents and, as applicable, authorizing the Chapter 11 Debtors' use of Cash Collateral.

(tt)    "Chapter 11 Interim DIP Order" means an interim order of the Bankruptcy Court approving the Chapter 11 DIP Facility and the Chapter 11 DIP Facility Documents and, as applicable, authorizing the Chapter 11 Debtors' use of Cash Collateral.

(uu)    "Chapter 11 KERP" means that certain key employee retention plan for which the Chapter 11 Debtors will seek Bankruptcy Court approval in the Chapter 11 Cases, which shall provide for the payment of no greater than $743,617 in the aggregate.

(vv)    "Chapter 11 Solicitation" means the solicitation of votes in connection with the Combined DS and Plan pursuant to Bankruptcy Code sections 1125 and 1126.

(ww)    "Claims" has the meaning ascribed to it in Bankruptcy Code section 101(5).

(xx)    "Combined DS and Plan" has the meaning ascribed to such term in the Recitals.

(yy)    "Comeback Hearing" means the comeback motion in the CCAA Proceeding to be heard by the Ontario Court no later than March 20, 2023.

(zz)    "Company Claims/Interests" means any Claim against, or Equity Interest in, a Company Party.

(aaa)    "Company Party" and "Company Parties" have the meanings ascribed to such terms in the Preamble.

(bbb)    "Company Termination Events" has the meaning ascribed to such term in Section 4(b).

(ccc)    "Company Termination Notice" has the meaning ascribed to such term in Section 4(b).

(ddd)    "Conditional Disclosure Statement Order" means an order of the Bankruptcy Court (i) approving, among other things, the adequacy of the disclosures in the Combined DS and Plan on a conditional basis and the Chapter 11 Solicitation and (ii) scheduling the hearing on confirmation of the Combined DS and Plan.

(eee)    "Confidentiality Agreement" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other disclosure of material non-public information agreement between any Company Party and any Consenting Lender, including any confidentiality provisions or obligations under the Credit Agreement.

(fff)    "Confirmation Order" means an order of the Bankruptcy Court (i) approving the adequacy of the disclosure in the Combined DS and Plan pursuant to Bankruptcy Code section 1125 and (ii) confirming the Combined DS and Plan pursuant to Bankruptcy Code section 1129, including all exhibits, appendices, supplements and related documents.

(ggg)    "Consenting Lenders" has the meaning ascribed to such term in the Preamble.

(hhh)    "Consenting Revolver Lenders" has the meaning ascribed to such term in the Preamble.

(iii)    "Consenting Revolver/Term A Loan Lenders' Advisors" means (i) Haynes and Boone, LLP, as counsel, (ii) Borden Ladner Gervais LLP, as Canadian counsel and (iii) FTI Consulting, Inc., as financial advisor.

(jjj)    "Consenting Stakeholders" has the meaning ascribed to such term in the Preamble.

(kkk)    "Consenting Term A Loan Lenders" has the meaning ascribed to such term in the Preamble.

(lll)    "Consenting Term B Loan Lenders" has the meaning ascribed to such term in the Preamble.

(mmm)  "Consenting Term B Loan Lenders' Advisors" means (i) Gibson, Dunn & Crutcher LLP, as lead counsel, (ii) any local counsel retained by the Consenting Term B Loan Lenders, which shall be limited to one local counsel in the State of Texas, (iii) Bennett Jones LLP, as Canadian counsel and (iv) Piper Sandler & Co., as financial advisor.

(nnn)    "Credit Agreement" has the meaning ascribed to such term in the Recitals.

(ooo)    "Definitive Documents" means all material agreements, instruments, pleadings, motions, orders and other related documents, exhibits, schedules and annexes utilized, filed or executed in connection with the Transactions or to obtain approval and confirmation of the Combined DS and Plan, and any amendment, modification or supplement thereto, or restatement thereof, including this Agreement, the Combined DS and Plan, the Plan Supplement, the Solicitation Materials, the Conditional Disclosure Statement Order, the Cash Collateral Order, the Confirmation Order, the Chapter 11 DIP Facility Motion, the Chapter 11 Interim DIP Order, the Chapter 11 DIP Facility Documents, the Chapter 11 Final DIP Order, the First Day Pleadings, the CCAA Initial Order, the CCAA ARIO, the CCAA DIP Facility Documents, the DIP Term Sheets, the SISP Approval Order, the SISP, the AIR MILES Transaction Agreement, any definitive transaction agreement in respect of any other CCAA Transaction, the CCAA Transaction Order, the CCAA DIP Cash Flow Projection Materials, any other projections or budgets provided in respect of the CCAA DIP Facility or the Chapter 11 DIP Facility, and the BrandLoyalty Transaction Agreements, each of which shall contain terms and conditions consistent with this Agreement (including the Transaction Documents attached hereto) and shall otherwise be in form and substance acceptable to the Company Parties and the Requisite Consenting Lenders.

(ppp)    "DIP Term Sheets" has the meaning ascribed to such term in the Recitals.

(qqq)   "Equity Interests" means, collectively, any shares (or any class thereof) of common stock or preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and any options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into any shares (or any class thereof) of, common stock or preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

(rrr)   "First Day Pleadings" means the first day pleadings to be filed in connection with the Chapter 11 Cases, including any orders attached thereto.

(sss)   "Forbearance" has the meaning ascribed to such term in Section 2(b).

(ttt)   "Initial Consenting Lender" and "Initial Consenting Lenders" have the meanings ascribed to such terms in the Preamble.

(uuu)   "Initial Consenting Revolver Lender" and "Initial Consenting Revolver Lenders" have the meanings ascribed to such terms in the Preamble.

(vvv)   "Initial Consenting Term A Loan Lender" and "Initial Consenting Term A Loan Lenders" have the meanings ascribed to such terms in the Preamble.

(www)   "Initial Consenting Term B Loan Lender" and "Initial Consenting Term B Loan Lenders" have the meanings ascribed to such terms in the Preamble.

(xxx)   "Joinder Agreement" has the meaning ascribed to such term in Section 2(e).

(yyy)   "Lenders" has the meaning ascribed to such term in the Recitals.

(zzz)   "Loan Claims" means, collectively, the Revolving Loan Claims, the Term A Loan Claims and the Term B Loan Claims.

(aaaa)   "LoyaltyOne" has the meaning ascribed to such term in the Recitals.

(bbbb)   "LVI" has the meaning ascribed to such term in the Preamble.

(cccc)   "LVI Lux Dissolution" means the dissolution and liquidation of LVI Lux Financing.

(dddd)   "LVI Lux Financing" means LVI Lux Financing S.à r.l., a private limited liability company (société à responsabilité limitée) incorporated under the laws of Luxembourg, with registered office at 11-13, boulevard de la Foire, L-1528 Luxembourg, Grand Duchy of Luxembourg, registered with the Luxembourg Trade and Companies Register under the number B181593.

(eeee)   "Milestones" means the applicable milestones set forth on Section 4(c).

(ffff)   "Ontario Court" has the meaning ascribed to such term in the Recitals.

(gggg) "<u>Ontario Securities Act</u>" means the Securities Act (Ontario) and the rules, regulations and published policies made thereunder.

(hhhh) "<u>Party</u>" and "<u>Parties</u>" have the meanings ascribed to such terms in the Preamble.

(iiii) "<u>Petition Date</u>" means the date on which the first of the Chapter 11 Cases is commenced.

(jjjj) "<u>Plan Effective Date</u>" means the date on which all conditions precedent to the effectiveness of the Combined DS and Plan have been satisfied or waived in accordance with the terms of the Combined DS and Plan and the Confirmation Order, and the Combined DS and Plan is substantially consummated according to its terms.

(kkkk) "<u>Plan Supplement</u>" means the compilation of documents and forms of documents, schedules and exhibits to the Combined DS and Plan that, subject to the terms and conditions provided in this Agreement, will be filed by the Chapter 11 Debtors with the Bankruptcy Court.

(llll) "<u>Qualified Marketmaker</u>" means an entity that (i) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker and (ii) is, in fact, regularly in the business of making a market in claims against issuers and borrowers (including debt securities or other debt).

(mmmm) "<u>Remedial Action</u>" has the meaning ascribed to such term in Section 2(b).

(nnnn) "<u>Requisite Consenting Lenders</u>" means, at any applicable time of determination, Consenting Lenders holding at least a majority of the aggregate outstanding principal amount held by all of the Consenting Lenders of: (i) the Revolving Credit Exposure, (ii) the Term A Loan and (iii) the Term B Loan, taken together.

(oooo) "<u>Revolving Credit Exposure</u>" has the meaning set forth in Section 1.01 of the Credit Agreement.

(pppp) "<u>Revolving Loan Claims</u>" means any and all Claims related to the Revolving Credit Exposure arising under the Credit Agreement.

(qqqq) "<u>RSA Trust</u>" means any fund or trust secured for the benefit of collectors of AIR MILES, including that certain Reserve Fund established pursuant to, and defined in (i) that certain Amended and Restated Security Agreement, dated as of December 31, 2001, by and between Loyalty Management Group Canada Inc. and Royal Trust Corporation of Canada, and (ii) that certain Amended and Restated Redemption Reserve Agreement, dated as of December 31, 2001, by and between Loyalty Management Group Canada Inc. and Royal Trust Corporation of Canada (in each case as may be further amended, modified, supplemented or amended and restated from time to time).

(rrrr) "<u>Securities Act</u>" has the meaning ascribed to such term in Section 7(a)(iii).

(ssss)   "SISP" has the meaning ascribed to such term in the Recitals.

(tttt)   "SISP Approval Order" means an order of the Ontario Court in the CCAA Proceeding, *inter alia*, approving and authorizing LoyaltyOne to conduct the SISP, in the form attached hereto as Exhibit H.

(uuuu) "Solicitation Materials" means all documents, forms and other materials provided in connection with solicitation of votes on the Combined DS and Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

(vvvv) "Stakeholder Termination Event" has the meaning set forth in Section 4(a) of this Agreement.

(wwww)      "Stakeholder Termination Notice" has the meaning ascribed to such term in Section 4(a).

(xxxx) "Term A Loan" has the meaning set forth in Section 2.01(b) of the Credit Agreement.

(yyyy) "Term A Loan Claims" means any and all Claims related to the Term A Loan arising under the Credit Agreement.

(zzzz) "Term B Loan" has the meaning set forth in Section 2.01(c) of the Credit Agreement.

(aaaaa)"Term B Loan Claims" means any and all Claims related to the Term B Loan arising under the Credit Agreement.

(bbbbb)      "Termination Date" means the date on which termination of this Agreement as to a Party is effective in accordance with Section 4.

(ccccc)"Termination Events" has the meaning ascribed to such term in Section 4(b).

(ddddd)      "Termination Notice" has the meaning ascribed to such term in Section 4(b).

(eeeee)"Transaction Documents" has the meaning ascribed to such term in the Recitals.

(fffff)  "Transaction Effective Date" means the later of (i) the consummation of the CCAA Transaction, (ii) the consummation of the transactions contemplated by the BrandLoyalty Purchase Agreement, (iii) the Plan Effective Date, and (iv) the consummation of the LVI Lux Dissolution.

(ggggg)      "Transaction Support Period" means, with respect to a Party, the period commencing on the Agreement Effective Date and ending on the earlier of (i) the Transaction Effective Date and (ii) the Termination Date applicable to such Party.

(hhhhh)      "Transactions" has the meaning ascribed to such term in the Recitals.

(iiiii)   "Transfer" has the meaning ascribed to such term in Section 2(e).

2.    **Agreements of the Consenting Stakeholders.**

(a)    <u>Support of Transactions</u>. Subject in all respects and giving full effect to the consent rights of the Requisite Consenting Lenders contained herein and any consent rights of the Requisite Consenting Lenders in the Definitive Documents, each of the Consenting Stakeholders or the Consenting Lenders, as applicable, agrees that, for the duration of the Transaction Support Period, unless otherwise consented to in writing by the Company Parties, such Consenting Stakeholder or Consenting Lender, as applicable, shall:

(i)    with respect to the Consenting Stakeholders, support, and take all reasonable actions necessary (or reasonably requested by the Company Parties) to facilitate the implementation and consummation of the Transactions; *provided* that no Consenting Stakeholder shall be obligated to waive or amend any condition to the consummation of the Transactions;

(ii)    with respect to the Consenting Stakeholders, and subject in all respects to the Milestones (as may be extended or waived by the Company Parties and the Requisite Consenting Lenders), to the extent any legal or structural impediment arises that would prevent, hinder or delay the consummation of any of the Transactions contemplated herein, take all steps reasonably necessary to address any such impediment, including to negotiate in good faith appropriate additional or alternative provisions (consistent with the terms of this Agreement) to address any such impediment;

(iii)    with respect to the Consenting Lenders, validly and timely deliver, and not withdraw, the consents, proxies, signature pages, tenders or other means of voting or participating in the Transactions with respect to all of its Company Claims/Interests;

(iv)    with respect to the Consenting Lenders, support the release and exculpation provisions contained in the Combined DS and Plan and in the CCAA Transaction Order;

(v)    with respect to the Consenting Lenders, not opt out of the release provisions contained in the Combined DS and Plan;

(vi)    with respect to the Consenting Stakeholders, use commercially reasonable efforts to support, and to instruct its respective advisors to support, all motions, applications and other pleadings filed by (A) the Chapter 11 Debtors in the Chapter 11 Cases and (B) LoyaltyOne in the CCAA Proceeding, in each case, that are consistent with and in furtherance of this Agreement, the Transactions and the Combined DS and Plan;

(vii)    with respect to the Consenting Stakeholders, consent (A) to the Chapter 11 DIP Facility and entry of the Chapter 11 Interim DIP Order and the Chapter 11 Final DIP Order on terms and conditions consistent with the Chapter 11 DIP Term Sheet, and (B) to entry of the Cash Collateral Order;

(viii)    with respect to the Consenting Lenders, (A) subject to the receipt by the Consenting Lenders of the Combined DS and Plan, timely vote, or cause to be voted, its Claims against the Chapter 11 Debtors, and exercise any powers or rights available to it (including in any process requiring voting or approval to which they are legally entitled to participate in their capacity as holders of Company Claims/Interests), to accept the Combined DS and Plan by

delivering its duly executed and completed ballot accepting the Combined DS and Plan on a timely basis following commencement of the Chapter 11 Solicitation; and (B) not change, withdraw or revoke such vote (or cause or direct such vote to be changed, withdrawn or revoked); *provided* that any such vote may be withdrawn or revoked (and upon such withdrawal or revocation, be deemed void *ab initio*) by the applicable Consenting Lender in the event this Agreement is terminated pursuant to <u>Section 4</u> with respect to such Consenting Lender;

(ix)    with respect to the Consenting Stakeholders, support, and not object to, the motion seeking approval of the Chapter 11 KERP;

(x)    with respect to the Consenting Stakeholders: (A) support the relief sought in the CCAA Initial Order and the CCAA ARIO, including approval of each of the charges provided therein, the CCAA KERP and the CCAA DIP Facility on terms and conditions consistent with the CCAA DIP Term Sheet (and the use of the CCAA DIP Facility proceeds in accordance therewith); (B) support the SISP Approval Order; (C) not submit (as to the Consenting Lenders), or direct the Administrative Agent to submit, a credit bid in the SISP; (D) support the CCAA Transaction resulting from the SISP; and (E) support the CCAA Transaction Order;

(xi)    with respect to the Consenting Stakeholders, not: (A) directly or indirectly seek, propose, support, assist, solicit or vote for any Alternative Transaction; (B) support or encourage the termination or modification of the Chapter 11 Debtors' exclusive periods for the filing or soliciting of a plan in the Chapter 11 Cases; or (C) take any other action, including, to the extent applicable, initiating any legal proceedings or enforcing rights as a holder of Company Claims/Interests that is inconsistent with this Agreement or the Definitive Documents, or could prevent, interfere with, delay or impede the implementation or consummation of the Transactions (including (1) the Ontario Court's approval of the applicable Definitive Documents and the CCAA Transaction and the entry of the CCAA Transaction Order and consummation of the CCAA Transaction, (2) the Bankruptcy Court's approval of the applicable Definitive Documents and confirmation and consummation of the Combined DS and Plan, (3) consummation of the BrandLoyalty Sale Transaction or (4) the Bankruptcy Court's approval or the Ontario Court's approval and consummation of the other Transactions, as applicable);

(xii)    with respect to the Consenting Stakeholders, not object to and not support any other person's efforts to oppose or object to, in each case, directly or indirectly, the approval of the First Day Pleadings and other motions, applications and pleadings, in each case, consistent with this Agreement and filed by the Chapter 11 Debtors in furtherance of the Transactions;

(xiii)    with respect to the Consenting Lenders, to the extent applicable, timely vote or cause to be voted its Claims against the Chapter 11 Debtors against and not consent to, or otherwise directly or indirectly support, solicit, assist, encourage or participate in the formulation, pursuit or support of, any Alternative Transaction (unless the Company Parties and Requisite Consenting Lenders consent in writing otherwise);

(xiv)    with respect to the Consenting Stakeholders, not exercise any right or remedy for the enforcement, collection or recovery of any of the Company Claims/Interests, or of any of the Company Parties, in each case, other than in accordance with this Agreement and the Definitive Documents;

(xv)   with respect to the Consenting Lenders, give any notice, order, instruction or direction to the Administrative Agent reasonably necessary to give effect to the Transactions;

(xvi)   with respect to the Consenting Stakeholders, not file or have filed on its behalf any motion, pleading or other document with the Ontario Court, the Bankruptcy Court or any other court that, in whole or in part, is inconsistent with this Agreement, any other Definitive Document or the Transactions;

(xvii)   with respect to the Consenting Stakeholders, not initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the CCAA Proceeding, the Chapter 11 Cases, this Agreement or the Transactions against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(xviii)  with respect to the Consenting Stakeholders, provide such reasonable assistance, as may be requested by the Company Parties, in connection with satisfying the Milestones (as may be extended or waived by the Requisite Consenting Lenders);

(xix)   with respect to the Consenting Stakeholders, refrain from taking any action not required by law that is inconsistent with, or that would delay or impede approval, confirmation or consummation of the Combined DS and Plan or the Transactions, and that is otherwise inconsistent with the express terms of this Agreement and/or the Combined DS and Plan;

(xx)   with respect to the Consenting Stakeholders, and following the consummation of the CCAA Transaction, cooperate with LoyaltyOne to expeditiously satisfy in full and/or discharge, as applicable, all of the Charges (as defined in the CCAA ARIO); *provided* that in all cases any court order necessary to effect the foregoing shall be in form and substance acceptable to the Consenting Lenders and LoyaltyOne, each acting reasonably;

(xxi)   with respect to the Consenting Stakeholders, reasonably cooperate in good faith and coordinate with the Company Parties to structure and implement the Transactions in a tax efficient manner; and

(xxii)  with respect to the Consenting Stakeholders, negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Transactions as contemplated by this Agreement.

Notwithstanding anything to the contrary in this Section 2(a), no Consenting Stakeholder shall be required to incur any unreimburseable out-of-pocket fees, expenses or other monetary obligations in connection with fulfilling any of its obligations herein, in each case, other than such fees, expenses or other monetary obligations with respect to which the Company Parties have agreed in writing to pay or reimburse.

(b)      Forbearance and Waiver.[1]   Each Consenting Lender, during the Transaction Support Period, hereby agrees to, and directs the Administrative Agent to, and the Administrative Agent agrees to, forbear (the "Forbearance") from exercising their rights and remedies under the Credit Agreement and the other Loan Documents and applicable law (collectively, a "Remedial Action") against the Company Parties (including LVI Lux Financing) (or any of their respective assets or properties, whether or not constituting Collateral) after the occurrence of any Event of Default under the Credit Agreement, including as a result of (whether or not constituting an Event of Default):

(i)      any of the steps, actions or transactions required by, specified or contemplated in and/or implemented by or undertaken pursuant to this Agreement or the commencement of the Chapter 11 Cases, the CCAA Proceeding (including the CCAA Transaction and the BrandLoyalty Sale Transaction) or any insolvency, liquidation or similar proceeding for any of the Company Parties should the BrandLoyalty Sale Transaction not be consummated;

(ii)      any of the Company Parties failing to make any payment of principal, amortization, interest or other amounts due under the Credit Agreement, including to the Administrative Agent; or

(iii)      the failure by any of the Company Parties or their Subsidiaries to comply with any covenant, term or other provision under the Credit Agreement.

For the avoidance of doubt, during the Transaction Support Period, each Consenting Lender agrees that it shall not deliver any notice or instruction directing the Administrative Agent to exercise any Remedial Action against the Company Parties (including LVI Lux Financing). Each of the Consenting Lenders hereby expressly acknowledges that the Forbearance by the Consenting Lenders during the Transaction Support Period (including with respect to any Remedial Action against LVI Lux Financing or any of its assets or properties) is a fundamental and material inducement to the Company Parties' entry into this Agreement.

Each of the Consenting Lenders and the Administrative Agent (acting at the direction of the Consenting Lenders that constitute Required Lenders) hereby consents to and agrees that, upon the closing of the LVI Lux Dissolution and contingent upon the payment of any proceeds remaining and available to be distributed under applicable law at the closing of the LVI Lux Dissolution to the Lenders pursuant to the terms of the Credit Agreement: (i) all guaranties by LVI Lux Financing in respect of the "Obligations" under the Credit Agreement shall be immediately, automatically and irrevocably released, terminated and discharged, with no further action on the part of the Consenting Lenders, the Administrative Agent, any other party to the Credit Agreement or any other party; (ii) the Credit Agreement and the other Loan Documents with respect to LVI Lux Financing will be immediately, automatically and irrevocably terminated, cancelled and be of no further force and effect with respect thereto, with no further action on the part of the Consenting Lenders, the Administrative Agent, any other party to the Credit Agreement or any other party; (iii) all of the Administrative Agent's, Consenting Lenders' and any other Lenders' security interests in, and other Liens, encumbrances or charges of whatever nature on, all real and personal

---

[1]     Capitalized terms used but not defined in this Section 2(b) shall have the meanings ascribed to them in the Credit Agreement.

property assets and rights of LVI Lux Financing providing collateral for the liabilities or otherwise under the Loan Documents will be immediately, automatically and irrevocably terminated, discharged and released, with no further action on the part of the Consenting Lenders, the Administrative Agent, any other party to the Credit Agreement or any other party and (iv) all of the other respective obligations of LVI Lux Financing under the Credit Agreement and the Loan Documents will be immediately, automatically and irrevocably terminated, discharged and released, with no further action on the part of the Consenting Lenders, the Administrative Agent, any other party to the Credit Agreement or any other party.

(c)      BrandLoyalty Sale Transaction. In the event any of the BrandLoyalty Transaction Agreements are terminated or the sale of the BrandLoyalty business is not consummated in accordance with the BrandLoyalty Transaction Agreements, the Forbearance shall terminate with respect to the BL Entities (as defined in the BL Consent Agreement) upon notice to the Company Parties from the Administrative Agent.

(d)      Rights of Consenting Stakeholders Unaffected. Notwithstanding anything herein to the contrary, nothing contained herein shall:

(i)      limit the rights of the Consenting Stakeholders under any applicable proceeding under the CCAA, the Bankruptcy Code or any applicable bankruptcy, receivership, insolvency, foreclosure or similar proceeding, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the CCAA Proceeding or the Chapter 11 Cases, in each case, so long as such consultation or appearance is consistent with the Consenting Stakeholders' obligations hereunder and under any applicable Confidentiality Agreement and is not intended or reasonably likely to hinder, delay or prevent approval, confirmation or the consummation of the Transactions (including the Ontario Court's approval of the applicable Definitive Documents and the CCAA Transaction, and the Bankruptcy Court's approval of the applicable Definitive Documents, the Chapter 11 Solicitation and confirmation and consummation of the Combined DS and Plan);

(ii)      except as otherwise expressly provided herein, limit any Consenting Stakeholders' rights under the Credit Agreement, any other loan document, or applicable law to appear and participate as a party in interest in any matter to be adjudicated in any case in the Bankruptcy Court or in the Ontario Court concerning the Company Parties (subject to the terms of any applicable intercreditor agreement), so long as such appearance and the positions advocated in connection therewith are not inconsistent with any terms of this Agreement;

(iii)      affect the ability of any Consenting Stakeholder to consult with any other Party hereto, any other holder or prospective holder of Company Claims/Interests, or any party in interest in the Chapter 11 Cases or CCAA Proceeding (including any official committee, ad hoc committee, the office of the United States Trustee and the CCAA Monitor), in each case, so long as such consultation or appearance is consistent with the Consenting Stakeholders' obligations hereunder and under any applicable Confidentiality Agreement and is not intended or reasonably likely to materially hinder, delay or prevent approval, confirmation or the consummation of the Transactions (including the Ontario Court's approval of the applicable Definitive Documents and the CCAA Transaction, and the Bankruptcy Court's approval of the applicable Definitive

Documents, the Chapter 11 Solicitation and confirmation and consummation of the Combined DS and Plan);

(iv)   except as otherwise expressly provided herein, constitute a waiver or amendment of any provision of the Credit Agreement or any other loan document, each of which shall remain in full force and effect; or

(v)   prevent any Consenting Stakeholder from taking any action that is required by applicable law or require any Consenting Stakeholder to take any action that is prohibited by applicable law or to waive or forego the benefit of any applicable legal privilege.

(e)   Transfers Generally. Each Consenting Lender agrees that, for the duration of the Transaction Support Period, such Consenting Lender shall not sell, transfer, loan, issue, pledge, hypothecate, assign, grant or sell a participation or sub-participation in, or otherwise dispose of, directly or indirectly, in whole or in part, any ownership (including any beneficial ownership as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any of its Company Claims/Interests, or any option thereon or any right or interest therein (including granting any proxies, depositing any Company Claims/Interests into a voting trust or entering into a voting agreement with respect to any Company Claims/Interests) (collectively, "Transfer"), unless: (i) the prior written consent of the Company Parties is obtained; or (ii) prior to or effective upon such Transfer, the transferee agrees in writing to become a Consenting Lender and to be bound by all of the terms of this Agreement (including with respect to any and all Company Claims/Interests it already may hold prior to such Transfer) by executing a joinder agreement in the form attached hereto as Exhibit I (the "Joinder Agreement"), and delivering an executed copy thereof, within two (2) business days of closing of such Transfer, to Akin Gump Strauss Hauer & Feld LLP, as counsel to the Company Parties, in which event (x) the transferee shall be deemed to be a Consenting Lender hereunder solely to the extent of such transferred rights and obligations (and all Company Claims/Interests it already may hold prior to such Transfer) and (y) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement solely to the extent of such transferred rights and obligations; *provided*, that each Consenting Lender agrees that any Transfer of any Company Claims/Interests that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company Parties and each other Consenting Stakeholder shall have the right to enforce the voiding of such transfer. Notwithstanding anything contained herein to the contrary, during the Transaction Support Period, a Consenting Lender may offer, sell or otherwise Transfer any or all of its Company Claims/Interests to any entity that, as of the date of Transfer, controls, is controlled by, or is under common control with, such Consenting Lender; *provided*, that such entity shall automatically be (A) subject to the terms of this Agreement and (B) deemed a party hereto and shall execute a Joinder Agreement hereto.

(f)   Notwithstanding anything to the contrary herein, the restrictions on Transfer set forth in Section 2(e) shall not apply to the grant of any liens or encumbrances on any Company Claims/Interests in favor of a bank or broker-dealer holding custody of such Company Claims/Interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such Company Claims/Interests.

(g)     The Parties understand that the Consenting Lenders may be engaged in a wide range of financial services and businesses, and, in furtherance of the foregoing, the Parties acknowledge and agree that the obligations set forth in this Agreement shall only apply to the trading desk(s) and/or business group(s) of each Consenting Lender that manage and/or supervise such Consenting Lender's Company Claims/Interests and shall not apply to any other trading desk or business group of such Consenting Lender, so long as it is not acting at the direction or for the benefit of such Consenting Lender or unless it becomes party hereto.

(h)     <u>Additional Company Claims/Interests; Transfers to Consenting Lenders</u>. Notwithstanding anything to the contrary contained in Section 2(e), a Consenting Lender may Transfer its Company Claims/Interests to another Consenting Lender. To the extent any of the Consenting Lenders acquires additional Company Claims/Interests, each such Consenting Lender agrees that any such Company Claims/Interests shall automatically and immediately (regardless of when notice is provided) be deemed subject to this Agreement and such acquiring Consenting Lender shall promptly (and, in no event, later than two (2) business days following such acquisition) inform Akin Gump Strauss Hauer & Feld LLP, as counsel to the Company Parties, of such acquisition and such Consenting Lender's aggregate ownership of Company Claims/Interests, and that, for the duration of the Transaction Support Period, it shall vote (or cause to be voted), to the extent applicable, any such additional Company Claims/Interests in a manner consistent with Section 2(a) hereof.

(i)     <u>Qualified Marketmakers</u>. Notwithstanding Section 2(e), a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Joinder Agreement in respect of such Company Claims/Interests if: (i) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) business days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund or affiliated entity with a common investment advisor; (ii) the transferee otherwise is a permitted transferee under Section 2(e); and (iii) the Transfer otherwise is a permitted Transfer under Section 2(e). To the extent that a Consenting Lender is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Lender without the requirement that the transferee be a permitted transferee. For the avoidance of doubt, if a Qualified Marketmaker acquires any Company Claims/Interests from a Consenting Lender and is unable to transfer such Company Claims/Interests within the five (5) business day-period referred to above, the Qualified Marketmaker shall promptly execute and deliver a Joinder Agreement in respect of such Company Claims/Interests.

(j)     With respect to the Transfer of any Equity Interests only, such Transfer shall not in the reasonable business judgment of the Company Parties and their legal and tax advisors adversely affect (i) the Company Parties' ability to maintain the value of and utilize their net operating loss carryforwards or other tax attributes or (ii) the Company Parties' ability to obtain the regulatory consents or approvals necessary to effectuate the Transactions.

3.      **Agreements of the Company Parties.**

(a)      <u>Affirmative Covenants</u>. Subject to Section 22 hereof, the Company Parties, jointly and severally, agree that, for the duration of the Transaction Support Period, unless otherwise consented to in writing by the Requisite Consenting Lenders, the Company Parties shall:

(i)      support, and take all reasonable actions necessary to facilitate the implementation and consummation of the Transactions (including (A) the Bankruptcy Court's approval of the applicable Definitive Documents and confirmation and consummation of the Combined DS and Plan, (B) the Ontario Court's entry of the CCAA Initial Order, the CCAA ARIO and the SISP Approval Order, (C) the implementation and consummation of the SISP, (D) the Ontario Court's entry of the CCAA Transaction Order, (E) the implementation of the AIR MILES Sale Transaction (if selected as the successful bid) or other CCAA Transaction and (F) the implementation and consummation of the BrandLoyalty Sale Transactions);

(ii)      subject in all respects to the Milestones (as may be extended or waived by the Company Parties and the Requisite Consenting Lenders), to the extent any legal or structural impediment arises that would prevent, hinder or delay the consummation of the Transactions contemplated herein, take all steps reasonably necessary to address any such impediment, including to negotiate in good faith appropriate additional or alternative provisions (consistent with the terms of this Agreement) to address any such impediment;

(iii)      satisfy the Milestones (as may be extended or waived by the Requisite Consenting Lenders);

(iv)      support the release and exculpation provisions in the Combined DS and Plan, as described in the Transaction Documents and in the CCAA Transaction Order;

(v)      use commercially reasonable efforts to obtain any required government, regulatory and/or third party approvals for the Transactions;

(vi)      oppose any objections and any appeals by parties in interest relating to the Transactions, including the First Day Pleadings, the Combined DS and Plan, the Confirmation Order and the CCAA Transaction Order.

(vii)      negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Transactions as contemplated by this Agreement;

(viii)      provide those Consenting Lenders then subject to a Confidentiality Agreement with the Company Parties with reasonable access to information regarding the Company Parties' operations and financial condition reasonably promptly following any request therefore;

(ix)      provide draft copies of all material (A) motions, (B) documents and (C) other pleadings to be filed in the Chapter 11 Cases (excluding any retention applications) or the CCAA Proceeding to the Consenting Revolver/Term A Loan Lenders' Advisors and the Consenting Term B Loan Lenders' Advisors as soon as reasonably practicable, but in no event less

than two (2) business days prior to the date when the applicable Company Parties file such documents, and, without limiting any approval rights set forth herein, consult in good faith with the Consenting Revolver/Term A Loan Lenders' Advisors and the Consenting Term B Loan Lenders' Advisors regarding the form and substance of any such proposed filing; *provided*, that in the event not less than two (2) business days' notice is impossible or impracticable under the circumstances, the Company Parties shall provide draft copies of any motions, documents or other pleadings (excluding any retention applications) to the Consenting Revolver/Term A Loan Lenders' Advisors and the Consenting Term B Loan Lenders' Advisors as soon as practicable before the date when the applicable Company Parties file any such motion, document or other pleading;

(x)     timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order: (A) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4) of the Bankruptcy Code); (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (C) dismissing the Chapter 11 Cases or (D) modifying or terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization;

(xi)     following the consummation of the CCAA Transaction, cooperate with the Consenting Lenders to expeditiously satisfy in full and/or discharge, as applicable, all of the Charges (as defined in the CCAA ARIO) and thereafter take those steps necessary to promptly ensure that the directors of LoyaltyOne have resigned without liability; provided that in all cases any court order necessary to effect the foregoing shall be in form and substance acceptable to the Consenting Lenders and LoyaltyOne, each acting reasonably, and LoyaltyOne and its advisors shall not be required to incur any unreimbursed fees, out of pocket expenses, or other monetary obligations in connection therewith;

(xii)     provide to the Consenting Stakeholders copies of the CCAA DIP Cash Flow Projection Materials as and when provided to the CCAA DIP Lender and the CCAA Monitor; and

(xiii)     provide to the Consenting Stakeholders any notices of any default or breach of the CCAA DIP Facility as and when provided by the CCAA DIP Lender.

(b)     <u>Negative Covenants</u>. Unless otherwise consented to in writing by the Requisite Consenting Lenders and subject to Section 22 hereof, the Company Parties shall not:

(i)     modify the Combined DS and Plan, in whole or in part, in a manner that is inconsistent with any material aspect of this Agreement;

(ii)     directly or indirectly propose, file, support, or consent to any Alternative Transaction, or encourage any other person or entity to take any such action, subject to the Company Parties' rights in Section 22 hereof;

(iii)     except in accordance with the Transactions and subject to the terms of the CCAA ARIO, directly or indirectly redeem or make or declare any dividends, distributions, or other payments on account of its Equity Interests, or otherwise make any transfers or payments on account of its Equity Interests, except as otherwise approved in an order of the Bankruptcy Court or Ontario Court, or as otherwise necessary to consummate the Transactions;

(iv)     file any other Definitive Document that is inconsistent with the terms of this Agreement;

(v)     file or otherwise support any motion or pleading challenging the amount, validity, enforceability, priority, or perfection, or seeking avoidance, subordination, recharacterization or other similar relief with respect to the Revolving Loan Claims, Term A Loan Claims, and Term B Loan Claims, as applicable, or the liens and security interests securing the Revolving Loan Claims, Term A Loan Claims, and Term B Loan Claims, as applicable, and timely object to any motion seeking standing to bring such challenges, in each case, except in accordance with the Transactions contemplated by the CCAA DIP Facility or the Chapter 11 DIP Facility;

(vi)     except in accordance with the Transactions, the CCAA KERP or the Chapter 11 KERP, directly or indirectly enter into or amend, grant, establish, adopt, restate, supplement, increase, or otherwise modify or accelerate any indemnification, compensation, incentive, success, retention, bonus, benefit plan or agreement, or any other compensatory or benefit arrangements, policies, programs, plans, or agreements, including, without limitation, offer letters, employment agreements, consulting agreements, severance arrangements, retention arrangements, or change in control arrangements with or for the benefit of any employee or consultant, except as required by applicable law;

(vii)     settle, compromise, release, transfer or dispose of, directly or indirectly, (i) any claims or causes of action that the Company Parties have or may have against Bread Financial Holdings, Inc., any of its direct or indirect affiliates, or any of their present or former officers or directors, and all proceeds of such claims and causes of action, including any insurance proceeds, or (ii) any of the Company Parties' tax attributes, including any amounts payable or that may become payable to the Company Parties, or any of their direct or indirect affiliates, from the Canada Revenue Agency, by refund or otherwise, in each case, without the consent of the Requisite Consenting Lenders;

(viii)     fund any proceeds of the Chapter 11 DIP Facility or CCAA DIP Facility into the RSA Trust, except as expressly contemplated by the CCAA DIP Term Sheet or the CCAA DIP Cash Flow Projection Materials;

(ix)     seek approval from the Bankruptcy Court or the Ontario Court of the Chapter 11 DIP Facility, CCAA DIP Facility, or any other financing, in each case, prior to the Comeback Hearing;

(x)     modify, or permit any modification of, the funding rate of the RSA Trust as compared to the currently operative historical rate (which, for the avoidance of doubt, is the applicable rate as of the date hereof), including in respect of the Required Reserve Amount or any Reserve Deficiency (each as defined in the RSA Trust documentation); or

(xi)     take any action or file any motion, pleading or other Definitive Document in the Ontario Court or the Bankruptcy Court (including any modifications or amendments thereof) that is materially inconsistent with this Agreement or the Combined DS and Plan.

4.    **Termination of Agreement.**

(a)    <u>Stakeholder Termination Events</u>. The Requisite Consenting Lenders, on behalf of the Consenting Stakeholders, may terminate this Agreement, upon written notice (the "<u>Stakeholder Termination Notice</u>") delivered in accordance with Section 19 hereof, at any time after the occurrence of any of the following events (each, a "<u>Stakeholder Termination Event</u>"), unless waived in writing by the Requisite Consenting Lenders:

(i)    the breach in any material respect by the Company Parties of any of their covenants, obligations, representations or warranties under this Agreement, any Definitive Document or the terms of any material Order issued by the Ontario Court or the Bankruptcy Court, as the case may be, the effect of which would have a material adverse effect on the ability of the Company Parties to consummate the Transactions, and such breach remains uncured for a period of five (5) business days from the receipt of the Stakeholder Termination Notice; *provided,* that in no event shall a Stakeholder Termination Event arise if the BrandLoyalty Transaction Agreements are terminated or if the BrandLoyalty Sale Transaction is not consummated;

(ii)    the failure of the Company Parties to satisfy any of the Milestones (unless the applicable Milestone is extended or waived by the Requisite Consenting Lenders)*; provided,* that the right to terminate this Agreement under this Section 4(a)(ii) shall not be available to the Requisite Consenting Lenders if the failure of such Milestone to be achieved is caused by, or results from, the breach by any Consenting Lender comprising the terminating Requisite Consenting Lenders of its covenants, agreements or other obligations under this Agreement;

(iii)    the issuance by any governmental authority, including any regulatory authority, or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of a material portion of the Transactions, unless, in each case, (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of any Consenting Stakeholder or such ruling, judgment or order is subject to a bona fide challenge or appeal, or, in all other circumstances, such ruling, judgment or order has not been stayed, reversed or vacated within ten (10) business days after such issuance or (B) such ruling, judgment or order is solely with respect to, or solely enjoins, the consummation of the BrandLoyalty Sale Transaction;

(iv)    any Definitive Document or the Combined DS and Plan is amended, supplemented or otherwise modified without the consent of the Requisite Consenting Lenders;

(v)    the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a chapter 11 trustee, unless the motion or request seeking such relief is withdrawn prior to the earlier of (x) ten (10) business days after filing such motion or request with the Bankruptcy Court and (y) entry of an order by the Bankruptcy Court approving the requested relief, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing the Chapter 11 Cases or (D) denying confirmation or approval of the Combined DS and Plan;

(vi)    the AIR MILES Transaction Agreement is terminated without contemporaneous entry into another CCAA Transaction that is acceptable to the Requisite Consenting Lenders;

(vii)    the Company Parties withdraw the Combined DS and Plan and such Combined DS or Plan is not refiled in form and substance acceptable to the Requisite Consenting Lenders within five (5) business days thereof;

(viii)    an order is entered by a court of competent jurisdiction (including by the Bankruptcy Court granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code) authorizing any person or entity to proceed against any asset of the Company Parties with a fair market value in excess of $2,000,000;

(ix)    the Company Parties fail to pay any fees and expenses of the Consenting Revolver/Term A Loan Lenders' Advisors or the Consenting Term B Loan Lenders' Advisors as and when required pursuant to the terms of this Agreement, and such fees and expenses remain outstanding for a period of ten (10) business days following the delivery of notice of such failure by the applicable advisor to the Company Parties;

(x)    the Company Parties file any motion or pleading in a court of competent jurisdiction (including the Bankruptcy Court) seeking relief that is materially inconsistent with this Agreement;

(xi)    the Company Parties file any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance, recharacterization, or subordination of, any portion of the Company Claims/Interests held by the Consenting Stakeholders, or any liens securing such Company Claims/Interests, in each case, except in accordance with the Transactions contemplated by the CCAA DIP Facility or the Chapter 11 DIP Facility;

(xii)    the entry of an order by the Bankruptcy Court terminating the Chapter 11 Debtors' exclusive right to file a chapter 11 plan or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code; or

(xiii)    the Company Parties terminate this Agreement pursuant to Section 4(b)(iii) hereof or otherwise consent to, support or agree to support an Alternative Transaction.

(b)    Company Termination Events. The Company Parties may terminate this Agreement as to all Parties, upon written notice (the "Company Termination Notice") delivered in accordance with Section 19 hereof, upon the occurrence of any of the following events (each, a "Company Termination Event" and, together with the Stakeholder Termination Events, the "Termination Events") unless waived in writing by the Company Parties:

(i)    the breach in any material respect by one or more of the Consenting Stakeholders of any of the covenants, obligations, representations or warranties under this Agreement or the BL Consent Agreement, which breach remains uncured for a period of five (5) business days from the receipt of the Company Termination Notice; provided that so long as the non-breaching Consenting Lenders continue to hold or control at least 66 ⅔ % of the Loan Claims, such termination shall be effective only with respect to such breaching Consenting Stakeholders;

(ii)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the

consummation of a material portion of the Transactions, unless, in each case, such ruling, judgment or order has been issued at the request of or with the acquiescence of the Company Parties or such ruling, judgment or order is subject to a bona fide challenge or appeal, or, in all other circumstances, such ruling, judgment or order has not been stayed, reversed or vacated within ten (10) business days after such issuance;

(iii)    consistent with Section 22 hereof, the board of directors, board of managers or similar governing body of a Company Party, after consultation with counsel, reasonably determines in good faith that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law, in each case, excluding any termination of the BrandLoyalty Transaction Agreements;

(iv)    if it is determined that the Combined DS and Plan cannot meet the requirements set forth in Bankruptcy Code sections 1126(c), unless it is established that such requirements can be met within ten (10) business days after such determination;

(v)    the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a chapter 11 trustee, unless such order is revoked within ten (10) business days thereafter, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or (C) dismissing the Chapter 11 Cases;

(vi)    the Requisite Consenting Lenders terminate this Agreement pursuant to Section 4(a) hereof; or

(vii)    the AIR MILES Transaction Agreement is terminated without contemporaneous entry into another CCAA Transaction that is acceptable to the Requisite Consenting Lenders.

(c)    _Milestones_.    The following Milestones shall apply to this Agreement unless extended or waived in writing by each of the Company Parties and the Requisite Consenting Lenders:

(i)    Milestones for the Chapter 11 Cases:

(A)    By no later than March 10, 2023, the Chapter 11 Cases shall have been commenced.

(B)    By no later than March 15, 2023, the Bankruptcy Court shall have entered the Conditional Disclosure Statement Order.

(C)    By no later than March 24, 2023, the Bankruptcy Court shall have entered the Chapter 11 Interim DIP Order.

(D)    By no later than May 1, 2023, the Bankruptcy Court shall have entered the Chapter 11 Final DIP Order.

(E)    By no later than April 28, 2023, the Bankruptcy Court shall have entered the Confirmation Order.

(F)     By no later than May 5, 2023, the effective date of the Combined DS and Plan shall have occurred.

(ii)    Milestones for the CCAA Proceeding:

(A)     By no later than March 10, 2023, the CCAA Proceeding shall have been commenced.

(B)     By no later than March 20, 2023, the Ontario Court shall have entered the SISP Approval Order.

(C)     By no later than May 30, 2023, the Ontario Court shall have entered the CCAA Transaction Order.

(D)     By no later than the Outside Date (as such term is defined in the SISP), the CCAA Transaction shall have been consummated.

(d)     <u>Mutual Termination</u>. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among the Company Parties and the Requisite Consenting Lenders.

(e)     <u>Automatic Termination</u>. This Agreement shall terminate automatically without any further required action or notice upon the Transaction Effective Date.

(f)     <u>Effect of Termination</u>. Upon the termination of this Agreement in accordance with this Section 4, and except as provided in Section 13 herein, this Agreement shall forthwith become void and of no further force or effect and each Party shall, except as otherwise expressly provided in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to any of the Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law, the Credit Agreement and any ancillary documents or agreements thereto; *provided*, that in no event shall any such termination relieve a Party hereto from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination. Notwithstanding anything to the contrary herein, any of the Termination Events may be waived in accordance with the procedures established by Section 8 hereof, in which case the Termination Event so waived shall be deemed not to have occurred, this Agreement shall be deemed to continue in full force and effect, and the rights and obligations of the Parties hereto shall be restored, subject to any modification set forth in such waiver. Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date. No purported termination of this Agreement shall be effective under this Section 4 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement.

5.     **Good Faith Cooperation; Further Assurances; Acknowledgement.**

The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable and appropriate and subject to the terms hereof) in respect of (a) all matters relating to their rights hereunder in respect of the Company Parties or otherwise in connection with their relationship with the Company Parties, (b) all matters concerning, or related to, the implementation of the Transactions and (c) the pursuit and support of the Transactions. This Agreement is not, and shall not be deemed, a solicitation of votes for the acceptance of a chapter 11 plan. The acceptance of the Combined DS and Plan by the Consenting Lenders will not be solicited until the Consenting Stakeholders have received the Combined DS and Plan and related ballots.

6.     **Definitive Documents.**

Each Party hereby covenants and agrees to:  (i) negotiate in good faith the Definitive Documents (and, consistent with Section 8, any modifications, restatements, supplements or amendments to any Definitive Document), each of which (inclusive of any such modifications, restatements, supplements or amendments) shall (x) contain terms consistent in all material respects with the terms set forth in this Agreement and (y) except as otherwise expressly provided for herein, be in form and substance acceptable to the Company Parties and the Requisite Consenting Lenders; and (ii) execute (to the extent such Party is a party thereto) and otherwise support the Definitive Documents, as applicable.

7.     **Representations and Warranties.**

(a)     Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or as of the date a Consenting Stakeholder becomes a party hereto):

(i)     such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out or otherwise support the Transactions contemplated under this Agreement and perform its obligations contemplated under this Agreement, and the execution and delivery of this Agreement and the performance of such Party's obligations under this Agreement have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)     the execution, delivery and performance by such Party of this Agreement does not and will not violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries;

(iii)     the execution, delivery and performance by such Party of this Agreement does not and will not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or governmental authority, regulatory body or commission, except such filings as may be necessary or required under the Securities Act of 1933, as amended (the "Securities Act"), the Securities Exchange Act of 1934, as amended, or any rule or regulation promulgated thereunder, "blue sky" laws, Canadian Securities Laws, or in connection

with the Combined DS and Plan, the CCAA Transaction and the BrandLoyalty Sale Transaction; and

(iv)    subject to the provisions of Bankruptcy Code sections 1125 and 1126, this Agreement is the legally valid and binding obligation of such Party, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court or the Ontario Court.

(b)    Each Consenting Lender severally (and not jointly), represents and warrants to the Company Parties that, as of the date hereof (or as of the date such Consenting Lender becomes a Party), such Consenting Lender (i) is the beneficial owner of the principal amount or number of Company Claims/Interests, as applicable, set forth below its name on the signature page hereof (or below its name on the signature page of a Joinder Agreement for any Consenting Lender that becomes a party hereto after the date hereof), and/or (ii) has, with respect to the beneficial owners of such Company Claims/Interests, as applicable, (A) sole investment or voting discretion with respect to such Company Claims/Interests, (B) full power and authority to vote on and consent to matters concerning such Company Claims/Interests, or to exchange, assign and Transfer such Company Claims/Interests or (C) full power and authority to bind or act on behalf of such beneficial owners.

(c)    Each Consenting Lender severally (and not jointly), represents and warrants to the Company Parties that such Consenting Lender has made no prior assignment, sale, participation, grant, conveyance or other Transfer of, and has not entered into any other agreement to assign, sell, participate, grant, convey or otherwise Transfer, in whole or in part, any portion of its right, title, or interests in any Company Claims/Interests that is inconsistent with the other representations and warranties of such Consenting Lender herein or would render such Consenting Lender otherwise unable to comply with this Agreement and perform its obligations hereunder.

(d)    Each Consenting Lender severally (and not jointly), represents and warrants to the Company Parties that its Company Claims/Interests are free and clear of any option, proxy, voting restriction, right of first refusal or other limitation on disposition of any kind, that might adversely affect in any way the performance by such Consenting Lender of its obligations contained in this Agreement at the time such obligations are required to be performed.

(e)    Each Consenting Lender severally (and not jointly), represents and warrants to the Company Parties that it is (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (ii) not a U.S. person (as defined in Regulation S of the Securities Act) or (iii) an institutional accredited investor (as defined in the Rules of the Securities Act).

## 8.    Amendments and Waivers.

Except as otherwise expressly provided herein, this Agreement, including any exhibits or schedules hereto, may not be modified, amended, waived or supplemented except in a writing signed by (a) the Company Parties and the Requisite Consenting Lenders and (b) solely to the extent such modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on the economic rights arising hereunder of any individual Consenting Stakeholders

(for the avoidance of doubt, without giving effect to any Consenting Stakeholder's specific holdings of Company Claims/Interests, specific tax or economic position or any other matters personal to such Consenting Stakeholder), such materially, disproportionately, and adversely affected Consenting Stakeholder. In determining whether any such modification, amendment, waiver or supplement, or any consent, extension or approval has been given or obtained by the Requisite Consenting Lenders, an affected Consenting Stakeholder and/or all Consenting Lenders, as applicable, any then-existing Consenting Lender that is in material breach of its covenants, obligations or representations under this Agreement (and the portion of the Revolving Loan, Term A Loan or Term B Loan held by such breaching Consenting Lenders) shall be excluded from such determination and the portion of the Revolving Loan, Term A Loan and/or Term B Loan held by such breaching Consenting Lender shall be treated as if they were not outstanding. Any proposed modification, amendment, waiver or supplement that does not comply with this Section 8 shall be ineffective and void *ab initio*.

## 9.    Effectiveness.

This Agreement shall become effective and binding on the Parties upon the first date and time on which the following conditions have been satisfied or waived in accordance with this Agreement (the "Agreement Effective Date"):

(a)    counterpart signature pages to this Agreement have been executed and delivered by (i) the Company Parties, (ii) holders of at least 66 ⅔ % of the aggregate Loan Claims, and (iii) the Administrative Agent;

(b)    the Company shall have paid all reasonable and documented fees, costs and expenses of the Consenting Revolver/Term A Loan Lenders' Advisors and the Consenting Term B Loan Lenders' Advisors for which a corresponding invoice has been delivered; and

(c)    the Company Parties shall have given notice to the Consenting Revolver/Term A Loan Lenders' Advisors and the Consenting Term B Loan Lenders' Advisors that the foregoing conditions in this Section 9 have been satisfied.

Upon the Agreement Effective Date, the Transaction Documents shall be deemed effective solely for the purposes of this Agreement and thereafter the terms and conditions therein may only be amended, modified, waived or otherwise supplemented as set forth in Section 8 hereof. With respect to any Consenting Stakeholder that becomes a party to this Agreement by executing and delivering a Joinder Agreement after the Agreement Effective Date, this Agreement shall become effective at the time such Joinder Agreement is delivered to the Company Parties. Notwithstanding the foregoing, the obligations or LoyaltyOne in this Agreement shall only become effective upon approval of this Agreement by the Ontario Court.

## 10.    Conflicts Between Definitive Documents.

In the event of any conflict among the Definitive Documents and this Agreement, the Definitive Documents shall control. The BL Consent Agreement is not, in any way, superseded, amended, or modified by this Agreement, and no party to the BL Consent Agreement is required to become a party to this Agreement nor is any party to this Agreement required to become a party to the BL Consent Agreement. In the event of any conflict among the terms and provisions of the

Combined DS and Plan, this Agreement or the Definitive Documents, the terms and provisions of the Combined DS and Plan shall control. In the event of any conflict among the terms and provisions of the Confirmation Order, the Combined DS and Plan, this Agreement or the Definitive Documents, the terms of the Confirmation Order shall control. Notwithstanding the foregoing, nothing contained in this Section 10 shall affect, in any way, the requirements set forth herein for the amendment of this Agreement or any Definitive Document.

## 11.   GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.

THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION. Notwithstanding the foregoing consent to jurisdiction in either a state or federal court of competent jurisdiction in the State and County of New York, upon the commencement of the Chapter 11 Cases, each of the Parties hereby agrees that, if the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto. Notwithstanding the foregoing, during the pendency of the CCAA Proceeding, the Ontario Court shall have jurisdiction over actions arising out of or in connection therewith.

## 12.   Specific Performance/Remedies.

(a)   Specific Performance. It is understood and agreed by the Parties that, without limiting any other remedies at law or in equity, money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorney's fees and costs) as a remedy of any such breach, in addition to any other remedy to which such non-breaching Party may be entitled, at law or in equity, without the necessity of proving the inadequacy of money damages as a remedy, including, an order of the Bankruptcy Court and/or the Ontario Court requiring any Party to comply promptly with any of its obligations hereunder. Each Party agrees to waive any requirement for the securing or posting of a bond or to provide proof of actual damages in connection with such remedy.

(b)   Remedies Cumulative. All rights, powers and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

13.     __Survival.__

Notwithstanding the termination of this Agreement pursuant to Section 4 hereof, the agreements and obligations of the Parties in this Section 13 and Sections 4(f), 8, 9, 11, 12, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24 and 25 hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof.

14.     __Interpretation.__

For purposes of this Agreement:

(a)     In the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender;

(b)     Capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)     Unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)     Unless otherwise specified, any reference herein to an existing document, schedule or exhibit shall mean such document, schedule or exhibit, as it may have been or may be amended, restated, supplemented or otherwise modified from time to time; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)     Unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)     The words "herein," "hereof" and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)     The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement;

(h)     References to "shareholders," "directors" and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company or similar laws; and

(i)     The use of "include" or "including" is without limitation, whether stated or not.

15.     **Successors and Assigns; Severability; Several Obligations.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators and representatives; *provided*, that nothing contained in this Section 15 shall be deemed to permit sales, assignments or other Transfers of Company Claims/Interests other than in accordance with Section 2(h) of this Agreement. If any provision of this Agreement, or the application of any such provision to any person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect.

16.     **No Third-Party Beneficiaries.**

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.

17.     **Prior Negotiations; Entire Agreement.**

This Agreement, including the exhibits and schedules hereto, constitutes the entire agreement of the Parties, and supersedes all other prior negotiations and agreements, oral or written, with respect to the subject matter hereof, except that the Parties acknowledge the BL Consent Agreement and that any Confidentiality Agreements heretofore executed between any of the Company Parties and any Consenting Stakeholders shall continue in full force and effect.

18.     **Counterparts.**

This Agreement may be executed in several counterparts and by way of electronic signature and delivery, each such counterpart shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by facsimile or otherwise, which shall be deemed to be an original for the purposes of this Section 18.

19.     **Notices.**

All notices hereunder shall be deemed given if in writing and delivered, if sent by electronic mail, facsimile, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers (or at such other addresses or facsimile numbers as shall be specified by like notice):

       **If to the Company Parties**:

       Loyalty Ventures Inc.
       8235 Douglas Avenue, Suite 1200
       Dallas, Texas 75225
       Attention: General Counsel
       Email: generalcounsel@loyalty.com

**with a copy to (which shall not constitute notice):**

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036-6745
Facsimile: (212) 872-1002
Attention: Philip C. Dublin; Meredith A. Lahaie; Iain Wood; Alan L. Laves
Email: pdublin@akingump.com; mlahaie@akingump.com;
iwood@akingump.com; alaves@akingump.com

and

Cassels, Brock & Blackwell LLP
Scotia Plaza, Suite 2100
40 King Street West
Toronto, ON M5H 3C2
Attention: Ryan C. Jacobs; Jane O. Dietrich; Natalie E. Levine
Email: rjacobs@cassels.com; jdietrich@cassels.com; nlevine@cassels.com

**If to the Consenting Term B Loan Lenders:**

To each Consenting Term B Loan Lender at the addresses or facsimile numbers
set forth below the Consenting Term B Loan Lender's signature to this
Agreement or as set forth in their Joinder Agreement, as applicable

**with a copy to (which shall not constitute notice):**

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166
Attention: Scott J. Greenberg; Steven A. Domanowski; AnnElyse S. Gains
Email: sgreenberg@gibsondunn.com; sdomanowski@gibsondunn.com;
agains@gibsondunn.com

and

Bennett Jones LLP
100 King Street West, Suite 3400
Toronto, ON M5X 1A4
Attention: Kevin J. Zych; Jesse Mighton
Email: zychk@bennettjones.com; mightonj@bennettjones.com

**If to the Consenting Revolver Lenders or the Consenting Term A Loan
Lenders:**

To each Consenting Revolver Lender or Consenting Term A Loan Lender, as
applicable, at the addresses or facsimile numbers set forth below the signature of

the Consenting Revolver Lender or the Consenting Term A Loan Lender, as applicable, to this Agreement or Joinder Agreement, as applicable

**with a copy to (which shall not constitute notice)**:

Haynes and Boone, LLP
2323 Victory Avenue
Suite 700
Dallas, TX 75219
Attention: Eli Columbus; James Markus; Frasher Murphy; Matt Ferris
Email: eli.columbus@haynesboone.com; james.markus@haynesboone.com; frasher.murphy@haynesboone.com; matt.ferris@haynesboone.com

Any notice given by delivery, mail or courier shall be effective when received. Any notice given by electronic mail or facsimile shall be effective upon oral, machine or electronic mail (as applicable) confirmation of transmission.

## 20.  Reservation of Rights; No Admission.

Except as expressly provided in this Agreement and in any amendment among the Parties, nothing herein is intended to, or does, in any manner, waive, limit, impair or restrict the ability of each of the Parties to protect and preserve its rights, remedies and interests, including, without limitation, its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation the CCAA Proceeding, the Chapter 11 Cases or any similar proceeding filed by any of the Company Parties. Except as expressly provided in this Agreement and in any amendment among the Parties, if the transactions contemplated by the Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms. This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

## 21.  Prevailing Party.

If any Party brings an action or proceeding against any other Party based upon a breach by such Party of its obligations hereunder, the prevailing Party shall be entitled to the reimbursement of all reasonable fees and expenses incurred, including reasonable attorneys', accountants', investments bankers' and financial advisors' fees in connection with such action or proceeding, from the non-prevailing Party.

22.    **Fiduciary Duties.**

Notwithstanding anything to the contrary in this Agreement, (i) nothing in this Agreement shall require a Company Party or the board of directors, board of managers or similar governing body of a Company Party (including any directors, officers, managers or employees of an equity holder in their capacity as a member of any such body), after consulting with counsel, to take any action or to refrain from taking any action with respect to this Agreement or the Transactions, to the extent taking or failing to take such action would be inconsistent with applicable law or its fiduciary obligations under applicable law, and (ii) any action or inaction pursuant to this Section 22 shall not be deemed to constitute a breach of this Agreement, and such persons or entities may take such action or refrain from taking such action without incurring any liability to any Party under this Agreement.

Notwithstanding anything to the contrary in this Agreement, but subject to the terms of this Section 22, and except as may be permitted or required by the terms of the SISP Approval Order (if applicable), each Company Party and its respective directors, partners, officers, employees, investment bankers, attorneys, accountants, consultants and other advisors, agents or representatives shall have the right to: (a) consider, respond to and facilitate Alternative Transaction Proposals; (b) provide access to non-public information concerning any Company Party to any person or entity or enter into Confidentiality Agreements or nondisclosure agreements with any person or entity; (c) maintain or continue discussions or negotiations with respect to Alternative Transaction Proposals; (d) otherwise cooperate with, assist, participate in or facilitate any inquiries, proposals, discussions or negotiation of Alternative Transaction Proposals; and (e) enter into or continue discussions or negotiations with holders of Company Claims/Interests (including any Consenting Stakeholder) or any other person or entity regarding the Transactions or any Alternative Transaction Proposals; *provided*, in each case, the Company Parties shall, to the extent permitted following the Company Parties exercising commercially reasonable efforts to obtain such permission, (i) provide notice and a copy of any bona fide Alternative Transaction Proposal or any written response thereto, each on a strictly confidential basis, to the Consenting Revolver/Term A Loan Lenders' Advisors and the Consenting Term B Loan Lenders' Advisors within one (1) business day following receipt.

Notwithstanding anything to the contrary herein, nothing in this Agreement shall create any additional fiduciary obligations on the part of any Company Party or any members, partners, managers, managing members, equity holders, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents or other representatives of the same or their respective affiliated entities, in such person's capacity as a member, partner, manager, managing member, equity holder, officer, director, employee, advisor, principal, attorney, professional, accountant, investment banker, consultant, agent or other representative of such Company Party or its affiliated entities, that such persons or entities did not have prior to the execution of this Agreement.

23.    **Representation by Counsel.**

Each Party acknowledges that it has been represented by counsel, or has had the opportunity to be represented by counsel, in connection with the negotiation of this Agreement and the Transactions contemplated herein. Accordingly, any rule of law or any legal decision that

would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

### 24.    Independent Analysis.

Each of the Consenting Stakeholders hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it deemed appropriate.

### 25.    Miscellaneous.

(a)    Several, Not Joint, Claims. Except where otherwise specified, the agreements, representations, warranties and obligations of the Parties under this Agreement are, in all respects, several and not joint.

(b)    Capacities of Consenting Lenders. Each Consenting Lender has entered into this Agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

(c)    Enforceability of Agreement. Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines such relief is required.

(d)    Public Announcements. Other than as may be required by applicable law and regulation or by any governmental or regulatory authority, no Party shall disclose to any person (including for the avoidance of doubt, any other Consenting Lender), other than legal, accounting, financial and other advisors to the Company Parties (who are under obligations of confidentiality to the Company Parties with respect to such disclosure, and whose compliance with such obligations the Company Parties shall be responsible for), the principal amount or percentage of the Company Claims/Interests held by any Consenting Lender or any of its respective subsidiaries (including, for the avoidance of doubt, any Company Claims/Interests acquired pursuant to any Transfer); *provided*, that the Company Parties shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, any class of Company Claims/Interests held by the Consenting Lenders collectively. Notwithstanding the foregoing, the Consenting Lenders hereby consent to the disclosure of the execution, terms and contents of this Agreement by the Company Parties in the Definitive Documents or as otherwise required by law or regulation; *provided*, that (a) if any of the Company Parties determines that they are required to attach a copy of this Agreement or any Joinder Agreement to any Definitive Documents or any other filing or similar document relating to the transactions contemplated hereby, they will redact any reference to or concerning a specific Consenting Lender's holdings of Company Claims/Interests (including before filing any pleading with the Bankruptcy Court) and (b) if disclosure of additional identifying information of any Consenting Lender is required by

applicable law, advance notice of the intent to disclose, if permitted by applicable law, shall be given by the disclosing Party to each Consenting Lender (who shall have the right to seek a protective order prior to disclosure). The Company Parties further agree that such information shall be redacted from "closing sets" or other representations of the fully executed Agreement or any Joinder Agreement. Notwithstanding the foregoing, the Company Parties will submit to the Consenting Revolver/Term A Loan Lenders' Advisors and the Consenting Term B Loan Lenders' Advisors all press releases, public filings, public announcements or other communications with any news media, in each case, to be made by the Company Parties relating to this Agreement or the Transactions contemplated hereby and any amendments thereof at least two (2) business days (it being understood that such period may be shortened to the extent there are exigent circumstances that require such public communication to be made to comply with applicable law) in advance of release. Nothing contained herein shall be deemed to waive, amend or modify the terms of any Confidentiality Agreement.

(e)     _Email Consents._ Where a written consent, acceptance, approval or waiver is required pursuant to or contemplated by this Agreement, including written approval by the Company Parties or the Requisite Consenting Lenders, such written consent, acceptance, approval or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representation or warranties of any kind of behalf of such counsel.

## 26.     Fees and Expenses.

Subject to the terms of the Chapter 11 DIP Orders, the CCAA Initial Order, the CCAA ARIO and any other applicable orders of the Bankruptcy Court and the Ontario Court (including applicable notice and review procedures and periods required pursuant to the foregoing), the Company Parties shall timely pay in full and in cash as and when invoiced all reasonable and documented fees, costs and expenses related to the Transactions, the CCAA Proceedings, and the Chapter 11 Case (including, for the avoidance of doubt, all reasonable and documented fees and expenses incurred prior to the date hereof or following the Transaction Effective Date) of the Consenting Revolver/Term A Loan Lenders' Advisors and the Consenting Term B Loan Lenders' Advisors; _provided_, that no Company Party shall be obligated to pay any such fees, costs and expenses under this Section 26 to the extent such fees, costs and expenses are incurred after date on which this Agreement is terminated. Subject to applicable law and applicable orders of the Bankruptcy Court, the occurrence of each of the consummation of the CCAA Transaction and the Plan Effective Date shall be conditioned upon and subject to the payment by the Chapter 11 Debtors of all reasonable and documented fees, costs and expenses of Akin Gump Strauss Hauer & Feld LLP, Jackson Walker LLP, Friedman Kaplan Seiler Adelman & Robbins LLP, Alvarez & Marsal North America, LLC, the Consenting Revolver/Term A Loan Lenders' Advisors and the Consenting Term B Loan Lenders' Advisors, in each case, that are then due and owing after receipt of applicable invoices. Notwithstanding anything to the contrary contained herein, the Parties agree that in the event that an applicable Company Party (including any Chapter 11 Debtor) does not have sufficient readily available funds to pay the amounts contemplated to be paid by this Section 26, then such amounts will be paid prior to the distribution of any proceeds to the Lenders, whether pursuant to the Combined DS and Plan, proceeds from the CCAA Transaction, any applicable order with respect thereto, or otherwise.

*[Signature pages follow]*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**COMPANY PARTIES:**

**LOYALTY VENTURES INC.**

By: _____
Name: J. Jeffrey Chesnut
Title: Executive Vice President, Chief
Financial Officer

**LOYALTYONE, CO.**

By: _____
Name: Shawn D. Stewart
Title: President

**LVI LUX HOLDINGS S.À R.L.**

By: _____
Name: Cynthia L. Hageman
Title: Class A Manager

By: _____
Name: Stéphane Hepineuze
Title: Class B Manager

**[Transaction Support Agreement Signature Page]**

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

COMPANY PARTIES:

**LOYALTY VENTURES INC.**

By: _____
Name: J. Jeffrey Chesnut
Title:  Executive Vice President, Chief
        Financial Officer

**LOYALTYONE, CO.**

By: _____
Name: Shawn D. Stewart
Title:  President

**LVI LUX HOLDINGS S.À R.L.**

By: *Cynthia L. Hageman*
Name: Cynthia L. Hageman
Title:  Class A Manager

By: _____
Name: Stéphane Hepineuze
Title:  Class B Manager

**[Transaction Support Agreement Signature Page]**

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**COMPANY PARTIES:**

**LOYALTY VENTURES INC.**

By: _____
Name: J. Jeffrey Chesnut
Title:  Executive Vice President, Chief
        Financial Officer

**LOYALTYONE, CO.**

By: _____
Name: Shawn D. Stewart
Title:  President

**LVI LUX HOLDINGS S.À R.L.**

By: _____
Name: Cynthia L. Hageman
Title:  Class A Manager

By: _____
Name: Stéphane Hepineuze
Title:  Class B Manager

**[Transaction Support Agreement Signature Page]**

**LVI LUX FINANCING S.À R.L.**

By: _Cynthia L. Hageman_
Name: Cynthia L. Hageman
Title:   Class A Manager


By: _____
Name: Stéphane Hepineuze
Title:   Class B Manager

**RHOMBUS INVESTMENTS L.P.**

By: LVI Lux Holdings  S.à r.l., its general partner


By: _Cynthia L. Hageman_
Name: Cynthia L. Hageman
Title:   Class A Manager


By: _____
Name: Stéphane Hepineuze
Title:   Class B Manager

**LVI SKY OAK LLC**

By: LVI Lux Holdings  S.à r.l., its sole member


By: _Cynthia L. Hageman_
Name: Cynthia L. Hageman
Title:   Class A Manager


By: _____
Name: Stéphane Hepineuze
Title:   Class B Manager


**[Transaction Support Agreement Signature Page]**

**LVI LUX FINANCING S.À R.L.**

By: _____
Name: Cynthia L. Hageman
Title:  Class A Manager


By: _____
Name: Stéphane Hepineuze
Title:  Class B Manager

**RHOMBUS INVESTMENTS L.P.**

By: LVI Lux Holdings  S.à r.l., its general partner


By: _____
Name: Cynthia L. Hageman
Title:  Class A Manager


By: _____
Name: Stéphane Hepineuze
Title:  Class B Manager

**LVI SKY OAK LLC**

By: LVI Lux Holdings  S.à r.l., its sole member


By: _____
Name: Cynthia L. Hageman
Title:  Class A Manager


By: _____
Name: Stéphane Hepineuze
Title:  Class B Manager


**[Transaction Support Agreement Signature Page]**

## EXHIBIT A
## AIR MILES TRANSACTION AGREEMENT

Execution Version

# ASSET PURCHASE AGREEMENT

**LOYALTYONE, CO.**

**as Seller**

- and -

**BANK OF MONTREAL**

**as Buyer**

**March 9, 2023**

**THIS DOCUMENT SHALL BE KEPT CONFIDENTIAL PURSUANT TO THE TERMS OF THE CONFIDENTIALITY AGREEMENT DATED FEBRUARY 22, 2023, ENTERED INTO BY THE SELLER AND THE BUYER, WITH RESPECT TO THE SUBJECT MATTER HEREOF.**

# TABLE OF CONTENTS

**ARTICLE 1 INTERPRETATION** ................................................................................ **2**
    1.1    Definitions ........................................................................................ 2
    1.2    Schedules .......................................................................................... 24
    1.3    Statutes ............................................................................................ 24
    1.4    Headings and Table of Contents .................................................... 24
    1.5    Gender and Number ........................................................................ 24
    1.6    Interpretation .................................................................................. 24
    1.7    Further Rules ................................................................................... 24
    1.8    No Presumption .............................................................................. 25
    1.9    Disclosure Letter and Exhibits ...................................................... 25
    1.10   Currency ......................................................................................... 25
    1.11   Invalidity of Provisions .................................................................. 25
    1.12   Entire Agreement ........................................................................... 25
    1.13   Waiver, Amendment ....................................................................... 25
    1.14   Governing Law; Jurisdiction and Venue ....................................... 25

**ARTICLE 2 PURCHASE AND SALE** .................................................................... **26**
    2.1    Agreement to Purchase and Sell Purchased Assets ...................... 26
    2.2    Excluded Assets .............................................................................. 30
    2.3    Assumption of Liabilities ............................................................... 31
    2.4    Excluded Liabilities ....................................................................... 32
    2.5    Assignment of Assumed Contracts and Payment of Cure Costs ........................ 33
    2.6    Changes to Purchased Assets and Assumed Liabilities ................ 34
    2.7    Purchase and Sale of Travel Services Shares ................................ 35
    2.8    Purchase and Sale of Purchased Assets ........................................ 35

**ARTICLE 3 PURCHASE PRICE AND RELATED MATTERS** ........................... **35**
    3.1    Purchase Price ................................................................................. 35
    3.2    Delivery of Estimate ...................................................................... 36
    3.3    Payment of Purchase Price at Closing ........................................... 36
    3.4    Closing Statement .......................................................................... 37
    3.5    Purchase Price Allocation .............................................................. 40
    3.6    As Is, Where Is ............................................................................... 40

**ARTICLE 4 REPRESENTATIONS AND WARRANTIES BY THE SELLER** ................ **41**
    4.1    Incorporation and Status ................................................................ 41
    4.2    Due Authorization and Enforceability of Obligations .................. 41
    4.3    Title to Purchased Assets ............................................................... 42
    4.4    Validity of and Compliance with Reserve Agreement and Security
             Agreement ....................................................................................... 42
    4.5    No Consents or Conflicts ............................................................... 42
    4.6    Dataroom Disclosures .................................................................... 43
    4.7    Sufficiency of Assets ...................................................................... 43
    4.8    Redemption Liabilities ................................................................... 43
    4.9    Approvals and Consents ................................................................. 43

| | | |
|---|---|---|
| 4.10 | Financial Statements | 44 |
| 4.11 | Liabilities and Guarantees | 44 |
| 4.12 | Absence of Unusual Transactions and Events | 44 |
| 4.13 | Non-Arm's Length Transactions | 45 |
| 4.14 | Material Contracts | 45 |
| 4.15 | Material Customers and Suppliers | 46 |
| 4.16 | Insurance | 46 |
| 4.17 | Permits and Licenses | 46 |
| 4.18 | Employment Matters | 47 |
| 4.19 | Intellectual Property | 47 |
| 4.20 | Computer Systems and Software | 48 |
| 4.21 | Real Property | 49 |
| 4.22 | No Subsidiaries | 51 |
| 4.23 | Compliance with Laws | 51 |
| 4.24 | Anti-Money Laundering; Sanctions; Anti-Corruption | 51 |
| 4.25 | Litigation and Other Proceedings | 53 |
| 4.26 | Books and Records | 53 |
| 4.27 | Residence of the Seller | 53 |
| 4.28 | HST and QST Registration | 53 |
| 4.29 | Tax Matters Relating to Seller | 53 |
| 4.30 | U.S. Presence | 54 |

**ARTICLE 5 REPRESENTATIONS AND WARRANTIES BY THE BUYER ... 54**
| | | |
|---|---|---|
| 5.1 | Incorporation and Status | 54 |
| 5.2 | Due Authorization and Enforceability of Obligations | 54 |
| 5.3 | No Conflicts | 54 |
| 5.4 | Approvals and Consents | 54 |
| 5.5 | Residence of the Buyer | 55 |
| 5.6 | HST and QST Registration | 55 |
| 5.7 | Brokers | 55 |
| 5.8 | Sufficiency of Funds | 55 |
| 5.9 | Investment Canada Act | 55 |

**ARTICLE 6 ADDITIONAL REPRESENTATIONS AND WARRANTIES SPECIFIC TO TRAVEL SERVICES ... 55**
| | | |
|---|---|---|
| 6.1 | Incorporation and Status | 55 |
| 6.2 | Capitalization | 55 |
| 6.3 | Liabilities and Guarantees | 56 |
| 6.4 | Non-Arm's Length Transactions | 57 |
| 6.5 | Employment Matters | 57 |
| 6.6 | Authorizations and Conduct of the Business | 57 |
| 6.7 | Banking Information and Power of Attorney | 58 |
| 6.8 | Tax Matters Relating to Travel Services | 58 |
| 6.9 | Brokers | 61 |

**ARTICLE 7 CONDITIONS ... 61**
| | | |
|---|---|---|
| 7.1 | Conditions for the Benefit of the Buyer and the Seller | 61 |

7.2     Conditions for the Benefit of the Buyer ........................................................ 62
7.3     Conditions for the Benefit of the Seller ....................................................... 63
7.4     Monitor's Certificate .................................................................................... 64

**ARTICLE 8 ADDITIONAL AGREEMENTS OF THE PARTIES ....................................... 65**
8.1     Access to Information and Update of Disclosure Schedules ........................ 65
8.2     Conduct of Business Until Closing Time ..................................................... 66
8.3     Conduct in Respect of Travel Services Until Closing Time ........................ 68
8.4     Misallocated Assets ..................................................................................... 69
8.5     Reserve Agreement Assignment and Assumption ....................................... 69
8.6     Approvals and Consents ............................................................................... 70
8.7     Access of the Seller to Books and Records ................................................. 72
8.8     Further Assurances ....................................................................................... 72
8.9     Tax Matters ................................................................................................... 73
8.10    Employee Matters ......................................................................................... 75
8.11    Fees and Expenses ........................................................................................ 78
8.12    Name Discontinuance .................................................................................. 78
8.13    Release .......................................................................................................... 79
8.14    Wind-Up ....................................................................................................... 79
8.15    Reserve Agreement Reporting ..................................................................... 79
8.16    Replacement of BofA Letter of Credit ......................................................... 80

**ARTICLE 9 CCAA PROCEEDINGS ....................................................................................... 80**
9.1     CCAA Proceedings ...................................................................................... 80
9.2     Expense Reimbursement and Break Fee ...................................................... 81

**ARTICLE 10 TERMINATION ................................................................................................. 82**
10.1    Termination – Buyer and Seller ................................................................... 82
10.2    Termination – Buyer ..................................................................................... 83
10.3    Termination – Seller ..................................................................................... 83
10.4    Effect of Termination ................................................................................... 83

**ARTICLE 11 CLOSING ........................................................................................................... 84**
11.1    Location and Time of Closing ...................................................................... 84
11.2    Closing Deliveries ........................................................................................ 84

**ARTICLE 12 GENERAL MATTERS ...................................................................................... 85**
12.1    Confidentiality .............................................................................................. 85
12.2    Transaction Personal Information ................................................................. 85
12.3    Public Notices ............................................................................................... 86
12.4    Assignment; Buyer Designees; Binding Effect ........................................... 87
12.5    Notices .......................................................................................................... 87
12.6    No Survival ................................................................................................... 89
12.7    Counterparts; Electronic Signatures ............................................................ 89

**SCHEDULE A CONSENTS AND APPROVALS ...................................................................**

**SCHEDULE B SALE AND INVESTMENT SOLICITATION PROCEDURES** ................

**SCHEDULE C APPROVAL AND VESTING ORDER** ..........................................

**SCHEDULE D INITIAL ORDER** ........................................................................

**SCHEDULE E A&R INITIAL ORDER** ................................................................

**SCHEDULE F SISP ORDER** ...............................................................................

**SCHEDULE G FINANCIAL STATEMENTS** ......................................................

**SCHEDULE H TRUST CERTIFICATE** ...............................................................

LEGAL*58340993.2

## ASSET PURCHASE AGREEMENT

**THIS AGREEMENT** is made as of March 9, 2023

B E T W E E N:

>**LOYALTYONE, CO.**, an unlimited company incorporated under the laws of Nova Scotia,
>
>(the "**Seller**")
>
>- and -
>
>**BANK OF MONTREAL**, a Schedule I bank under the *Bank Act* (Canada),
>
>(the "**Buyer**")

**RECITALS:**

A.   The Seller: (i) operates end-to-end customer loyalty rewards programs (including the "AIR MILES®" rewards program) that help clients drive increased customer engagement and retention with their brands across Canada; and (ii) provides advertisers the ability to buy ad placements both on and off Seller's digital platforms (collectively, the "**Business**"). The term "Business" shall also be deemed in this Agreement to include all business conducted by Travel Services.

B.   Subject to Court approval, the Seller will be indebted to Bank of Montreal ("**BMO**", or the "**DIP Lender**") under the DIP Term Sheet (as defined herein) in a maximum principal amount of up to $70,000,000, together with all interest, fees and costs incurred or accruing on or thereafter or relating thereto.

C.   The Buyer is the DIP Lender.

D.   The Seller intends to seek the Initial Order and the A&R Initial Order (both as defined below) from the Ontario Superior Court of Justice (Commercial List) (the "**Court**") to obtain protection from its creditors under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**" and the "**CCAA Proceedings**").

E.   The Seller will seek the SISP Order (as defined herein) in order to obtain Court approval of this Agreement as a "stalking horse bid" and the SISP (as defined herein).

F.   In the event that this Agreement is selected as the Successful Bid (as defined in the SISP Order) in accordance with the terms of the SISP, the Seller shall sell and the Buyer shall purchase the Business and substantially all of the Seller's property and assets used in connection with the Business (except as specifically provided herein), and the Buyer shall assume certain liabilities in connection therewith, as set out herein.

- 2 -

G.    The Seller has determined that it is in the best interests of the Seller and its stakeholders to enter into this Agreement and, subject to the Court approval and the terms of the SISP, to consummate the transactions contemplated herein on the terms set forth herein.

**NOW THEREFORE** in consideration of the mutual covenants and agreements contained in this Agreement and other good and valuable consideration (the receipt and sufficiency of which are acknowledged), the Parties agree as follows:

## ARTICLE 1
## INTERPRETATION

### 1.1    Definitions

In this Agreement,

(a)    "**A&R Initial Order**" means the amended and restated initial order of the Court substantially in the form attached hereto as Schedule E, and as may be further amended or restated from time to time, in each case in form and substance acceptable to the Buyer and the Seller;

(b)    "**ABAC Laws**" has the meaning given to such term in Section 4.24(b);

(c)    "**Adjustment Escrow Amount**" has the meaning given to such term in Section 3.3(a);

(d)    "**Advance Ruling Certificate**" means an advance ruling certificate issued by the Commissioner pursuant to subsection 102(1) of the Competition Act in respect of the Transaction, such advance ruling certificate having not been modified or withdrawn prior to the Closing Time;

(e)    "**affiliate**" of any Person means, at the time such determination is being made, any other Person controlling, controlled by or under common control with such first Person, in each case, whether directly or indirectly through one or more intermediaries, and "control" and any derivation thereof means the control by one Person of another Person in accordance with the following: a Person ("**A**") controls another Person ("**B**") where A has the power to determine the management and policies of B by contract or status (for example the status of A being the general partner of B) or by virtue of beneficial ownership of a majority of the voting interests in B; and, for certainty, if A owns shares to which are attached more than 50% of the votes permitted to be cast in the election of directors (or other Persons performing a similar role) of B, then A controls B for this purpose;

(f)    "**Agency License**" means all Permits and Licenses required in connection with the operation of a travel agency, including in respect of the sale of travel insurance, in the jurisdictions in which Travel Services conducts business;

(g)    "**Agreement**" means this Asset Purchase Agreement and all attached Schedules, and the Disclosure Letter, in each case as the same may be supplemented, amended,

- 3 -

restated or replaced from time to time, and the expressions "hereof", "herein", "hereto", "hereunder", "hereby" and similar expressions refer to this Agreement and all attached Schedules and unless otherwise indicated, references to Articles, Sections and Schedules are to Articles, Sections and Schedules in this Agreement;

(h)   "**Air Miles License Agreements**" means the Amended and Restated License To Use The Air Miles® Trade Marks In Canada dated as of July 24, 1998, between Air Miles International Holdings N.V. and Loyalty Management Group Canada Inc., and the Amended and Restated License To Use And Exploit The Air Miles® Scheme In Canada dated as of July 24, 1998, between Air Miles International Holdings N.V. and Loyalty Management Group Canada Inc., as they may be amended from time to time;

(i)   "**Air Miles Program**" means the AIR MILES® Reward Program operated by the Seller in Canada;

(j)   "**AMEX Contract**" means the Master Licensing, Co-Branding and Program Participation Agreement between Loyalty Management Group Canada Inc. and Amex Bank Canada dated January 1, 2006, as amended by product addendum no. 1 dated June 24, 2010, and as further amended by product addendum no. 3 dated June 24, 2010, and as further amended by a product addendum no. 4 dated June 24, 2010, and as further amended by product addendum no. 2 dated October 7, 2011, and as further amended by a letter amendment agreement dated May 31, 2012, and as further amended by a second letter amendment agreement dated September 24, 2012, and as further amended by a third letter amendment agreement dated November 26, 2012, and as further amended by an amending agreement dated January 1, 2013, and as further amended by a product addendum no. 6 dated September 24, 2013, and as further amended by a fourth letter amendment agreement dated May 29, 2019, and as further amended by a second amending agreement dated September 16, 2019, and as further amended by a fifth letter amendment agreement dated December 16, 2020, and as further amended by a sixth letter amendment agreement dated December 16, 2021, and as further amended by a seventh letter amendment agreement dated February 10, 2022, and as further amended by all other addendums and amendments thereto; the Corporate Charge Card Agreement between Loyalty Management Group Canada Inc. and Amex Bank of Canada March 8, 2004; and the Termination Letter from American Express dated December 13, 2022;

(k)   "**AML Laws**" means all Applicable Law concerning or related to money laundering, corruption, bribery or financing terrorism including, but not limited to, the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada);

(l)   "**AMs**" means AIR MILES® Reward Miles issued to Collectors as part of and pursuant to the Air Miles Program;

(m)   "**Applicable Law**" means any domestic or foreign statute, law (including the common law), directive, decree, code, ordinance, rule, regulation, restriction, by-

- 4 -

law (zoning or otherwise), order (whether preliminary, interlocutory or Final), or any consent, exemption, approval or License of any Governmental Authority, including all guidelines and policies of federal and provincial Governmental Authorities (whether or not having the force of law), that applies in whole or in part to the Transaction, the Seller, the Buyer, Travel Services, the Business or any of the Purchased Assets or Assumed Liabilities;

(n)　"**Approval and Vesting Order**" means the approval and vesting order of the Court substantially in the form attached as Schedule C to this Agreement;

(o)　"**Assumed Contracts**" has the meaning given to such term in Section 2.1(b);

(p)　"**Assumed Employees**" has the meaning given to such term in Section 8.10(c);

(q)　"**Assumed Liabilities**" has the meaning given to such term in Section 2.3;

(r)　"**BMO**" means Bank of Montreal;

(s)　"**BMO LCs**" means all letters of credit issued by BMO for the benefit of the Seller;

(t)　"**BMO Sponsorship Agreement**" means that certain Amended and Restated Program Participation Agreement between LoyaltyOne and BMO dated as of November 1, 2017, as amended;

(u)　"**Books and Records**" has the meaning given to such term in Section 2.1(n);

(v)　"**Bread**" has the meaning given to such term in Section 2.2(b);

(w)　"**Break Fee**" has the meaning given to such term in Section 9.2;

(x)　"**Business**" has the meaning given to such term in Recital A;

(y)　"**Business Day**" means any day, other than a Saturday or Sunday, on which the principal commercial banks in Toronto are open for commercial banking business during normal banking hours;

(z)　"**Business IT Systems**" has the meaning given to such term in Section 4.20(a);

(aa)　"**Buyer**" has the meaning given to such term in the preamble to this Agreement;

(bb)　"**Cash Purchase Amount**" has the meaning given to such term in Section 3.1;

(cc)　"**CASL**" means the Canadian Anti-Spam Legislation enacted by way of *An Act to promote the efficiency and adaptability of the Canadian economy by regulating certain activities that discourage reliance on electronic means of carrying out commercial activities, and to amend the Canadian Radio-television and Telecommunications Commission Act, the Competition Act, the Personal Information Protection and Electronic Documents Act and the Telecommunications Act*, S.C. 2010, c. 23, as amended;

- 5 -

(dd)  "**CCAA**" has the meaning given to such term in Recital D;

(ee)  "**CCAA Proceedings**" has the meaning given to such term in Recital D;

(ff)  "**Chapter 11 Cases**" means those cases commenced under Chapter 11 of Title 11 of the United States Code by LVI and certain of its affiliates in the United States Bankruptcy Court for the Southern District of Texas;

(gg)  "**Claims**" has the meaning given to such term in Section 8.13;

(hh)  "**Closing**" means the completion of the Transaction at the Closing Time;

(ii)  "**Closing Date**" means: (i) the date that is three (3) Business Days following the day on which the last of the conditions to Closing set out in Article 7 (other than those conditions that by their nature can only be satisfied as of the Closing Date, but assuming the satisfaction or waiver of such conditions on the Closing Date, as applicable) has been satisfied or waived by the appropriate Party; or (ii) such later date as the Parties may agree in writing, acting reasonably;

(jj)  "**Closing Documents**" means all contracts, agreements and instruments required by this Agreement to be delivered at or before the Closing, including: (i) this Agreement; and (ii) an agreement setting out the Parties' allocation of the Purchase Price in accordance with Section 3.5;

(kk)  "**Closing Statement**" has the meaning given to such term in Section 3.4(a);

(ll)  "**Closing Time**" means 12:01 a.m. (Toronto time) on the Closing Date or such other time on the Closing Date as the Parties agree in writing that the Closing Time shall take place;

(mm)  "**Collecting Party**" has the meaning given to such term in Section 8.9(c);

(nn)  "**Collective Agreements**" has the meaning given to such term in Section 4.18(a);

(oo)  "**Collector**" means any Person participating or enrolled in the Air Miles Program for whom the Seller maintains or is under an obligation to maintain an account relating to or in respect of AMs;

(pp)  "**Collector Account**" means each account established and maintained, or required to be established and maintained, by the Seller pursuant to an agreement with a Collector under the Air Miles Program;

(qq)  "**Collector Data**" means the following as and to the extent applicable and relating to the Collector Accounts and maintained, possessed or controlled, whether directly or indirectly through third party service providers, by the Seller:

- 6 -

    (i)    the files and information reflected on the data processing system maintained or used by the Seller to process and service the Collector Accounts, to the extent relating to or in respect of the Collector Accounts;

    (ii)    the historical reflection of the files and information referred to in clause (i), in whatever medium such files and information are stored;

    (iii)    all correspondence between the Seller or its affiliates and any Collectors, and all customer service and collections correspondence, notes and other documentation;

    (iv)    to the extent authorized by Applicable Law, all correspondence with Governmental Authorities relating to any Collector complaints and compliance with Applicable Laws;

    (v)    all Collector applications, documentation and correspondence with past or current Collectors, personal information of past or current Collectors, Collector agreements, documentation of finance and other charges, and credit, redemption and payment history with respect to the Collector Accounts, and electronic statements of historical credit, redemption and payment activity; and

    (vi)    any other written records or materials of whatever form or nature (excluding, however, electronic media but including the information contained therein) arising from or relating to any of the foregoing to the extent related to a Collector Account;

(rr)    "**Commissioner**" means the Commissioner of Competition appointed under the Competition Act or any Person duly authorized to exercise powers of the Commissioner of Competition;

(ss)    "**Competition Act**" means the *Competition Act*, R.S.C., 1985, c. C-34, as amended, and the regulations promulgated thereunder;

(tt)    "**Competition Act Approval**" means that: (i) the Commissioner shall have issued an Advance Ruling Certificate; (ii) both of: (A) the applicable waiting period under section 123 of the Competition Act shall have expired or been waived by the Commissioner, or the obligation to submit a notification shall have been waived under paragraph 113(c) of the Competition Act; and (B) the Commissioner shall have issued a No Action Letter; or (iii) at the election of the Buyer only, the waiting period, including any extension of such waiting period, under section 123 of the Competition Act shall have expired or been terminated.

(uu)    "**Conditions Certificates**" has the meaning given to that term in Section 7.4;

(vv)    "**Confidential Information**" means all non-public, confidential, personal or proprietary information, documents or materials (in every form and media) relating to the Business and/or the Purchased Assets;

- 7 -

(ww)  "**Confidentiality Agreement**" means that certain confidentiality agreement dated February 22, 2023, between an affiliate of the Buyer and the Seller;

(xx)  "**Consents and Approvals**" means the consents, approvals, Permits and Licenses, notifications or waivers from, and filings with, third parties (including any Governmental Authority) as may be required in connection with or to complete the Transaction, in form and substance satisfactory to the Buyer, acting reasonably, as set forth in Schedule A, which Schedule A shall be updated in accordance with Section 2.5;

(yy)  "**Contracts**" means contracts, licenses, deeds, leases, agreements, commitments, entitlements or engagements to which the Seller or Travel Services is a party or by which the Seller or Travel Services is bound;

(zz)  "**Court**" means the Ontario Superior Court of Justice (Commercial List);

(aaa)  "**Credit Agreement**" means the credit agreement among LVI, Brand Loyalty Group B.V., Brand Loyalty Holding B.V., and Brand Loyalty International B.V. as the Borrowers, LVI and certain subsidiaries of LVI, as Guarantors., Bank of America, N.A., as Administrative Agent, Swing Line Lender and an L/C Issuer, and the other Lenders party thereto, and Bank of America., N.A., Deutsche Bank Securities, MUFG Bank, Ltd., RBC Capital Markets, LLC, Morgan Stanley Senior Funding., Inc., Regions Capital Markets, A Division of Regions Bank, Citizens Bank, National Association, Fifth Third Bank, National Association, Trust Securities, Inc., Wells Fargo Securities, LLC, Mizuho Bank, Ltd., JPMorgan Chase Bank, N.A., and Texas Capital Bank, as Joint Lead Arrangers and Joint Bookrunners, dated as of November 3, 2021, as amended by Amendment No. 1 to Credit Agreement (Financial Covenant) dated as of July 29, 2022 and by Consent dated as of March 1, 2023, as may be amended, restated, supplemented, or otherwise modified from time to time;

(bbb)  "**Cure Cap**" means $10,000,000;

(ccc)  "**Cure Cap Adjustment**" means: (i) if the aggregate amount of the Cure Costs exceeds the Cure Cap, the amount of that excess; or (ii) if the aggregate amount of the Cure Costs is less than or equal to the Cure Cap, nil;

(ddd)  "**Cure Costs**" means the aggregate of: (i) if an Assumed Contract is assigned to the Buyer pursuant to section 11.3 of the CCAA, the amounts, if any, that are required to be paid to cure any monetary defaults of the Seller as of the Closing Time under such Assumed Contract; or (ii) if an Assumed Contract is not assigned pursuant to section 11.3 of the CCAA, the amounts, if any, payable to cure any monetary defaults in respect of such Assumed Contract;

(eee)  "**Cure Costs Schedule**" has the meaning given to such term in Section 2.5(e);

(fff)  "**Data Breach**" means any confirmed or reasonably suspected loss or theft of, or unauthorized or unlawful Processing of, Personal Information;

- 8 -

(ggg) "**Data Security Requirements**" means, collectively, all of the following to the extent relating to Processing of Personal Information and applicable to Purchased Assets or the Business: (i) the Seller's and Travel Services' own rules, policies, and procedures relating to privacy, data protection or cybersecurity; (ii) Applicable Laws and requirements of any Governmental Authority relating to privacy, data protection or cybersecurity; and (iii) Contracts to which the Seller or Travel Services is bound relating to the Processing of Personal Information under the Seller's or Travel Services' control;

(hhh) "**DIP Facility**" means the debtor-in-possession credit facility to be made available and advanced by BMO to the Seller pursuant to the DIP Term Sheet;

(iii) "**DIP Lender**" has the meaning given to such term in Recital B;

(jjj) "**DIP Term Sheet**" means the term sheet expected to be dated as of March 10, 2023 between the DIP Lender and the Seller providing for the DIP Facility;

(kkk) "**Disclosure Letter**" means the letter entitled "Disclosure Letter" delivered by the Seller to the Buyer on the date hereof;

(lll) "**Disputed Items**" has the meaning given to such term in Section 3.4(d);

(mmm)"**Draft Closing Statement**" has the meaning given to such term in Section 3.4(a);

(nnn) "**Employee Plans**" means all oral or written plans, arrangements, agreements, programs, policies, practices or undertakings, with the exception of statutory or government sponsored plans, with respect to the Assumed Employees of the Seller or the beneficiaries or dependents of any such Assumed Employees to which the Seller is a party to or bound by or to which the Seller has an obligation to contribute relating to:

(i) bonus, profit sharing or deferred profit sharing, performance compensation, deferred or incentive compensation, share compensation, share purchase or share option purchase, share appreciation rights, phantom stock, employee loans, or any other compensation or perquisites (including vehicles) in addition to salary or wages;

(ii) retirement or retirement savings, including registered or unregistered pension plans, pensions, supplemental pensions, registered retirement savings plans and retirement compensation arrangements;

(iii) insured or self-insured benefits for or relating to income continuation or other benefits during absence from work (including short-term disability, long-term disability and workers compensation), hospitalization, health, welfare, legal costs or expenses, medical or dental treatments or expenses, life insurance, accident, death or survivor's benefits, vacation or vacation pay, sick pay, supplementary employment insurance, day care, tuition or

- 9 -

professional commitments or expenses or similar employment benefits and post-employment benefits; or

(iv)     any plans, programs, or practices similar to the foregoing,

but excluding any statutory benefit plans that the Seller is required to participate in or comply with, including the Canada and Quebec Pension Plans and plans administered pursuant to applicable health tax, workplace safety insurance and employment insurance legislation;

(ooo)    "**Employee Plans (Travel Services)**" means all oral or written plans, arrangements, agreements, programs, policies, practices or undertakings, with the exception of statutory or government sponsored plans, with respect to the employees of Travel Services or the beneficiaries or dependents of any such employees to which Travel Services is a party to or bound by or to which Travel Services has an obligation to contribute relating to:

(i)      bonus, profit sharing or deferred profit sharing, performance compensation, deferred or incentive compensation, share compensation, share purchase or share option purchase, share appreciation rights, phantom stock, employee loans, or any other compensation or perquisites (including vehicles) in addition to salary;

(ii)     retirement or retirement savings, including registered or unregistered pension plans, pensions, supplemental pensions, registered retirement savings plans and retirement compensation arrangements;

(iii)    insured or self-insured benefits for or relating to income continuation or other benefits during absence from work (including short-term disability, long-term disability and workers compensation), hospitalization, health, welfare, legal costs or expenses, medical or dental treatments or expenses, life insurance, accident, death or survivor's benefits, vacation or vacation pay, sick pay, supplementary employment insurance, day care, tuition or professional commitments or expenses or similar employment benefits and post-employment benefits; or

(iv)     any plans, programs, or practices similar to the foregoing,

but excluding any statutory benefit plans that Travel Services is required to participate in or comply with, including the Canada and Quebec Pension Plans and plans administered pursuant to applicable health tax, workplace safety insurance and employment insurance legislation;

(ppp)    "**Employees**" has the meaning given to that term in Section 8.10(a);

(qqq)    "**Encumbrance**" means:

- 10 -

      (i)     any security interest, debenture, lien (statutory or other), deemed trust, prior claim, charge, consignment, deed of trust, hypothec, hypothecation, assignment (as security), deposit arrangement, reservation of ownership, pledge, encumbrance, mortgage, royalty interest, defect of title or adverse claim of any nature or kind;

      (ii)    the interest of a vendor or a lessor under any conditional sale agreement, capital or financial lease, or title retention agreement having substantially the same economic effect as any of the foregoing, relating to any property;

      (iii)   any purchase option, call or similar right of a third party in respect of securities; and

      (iv)   any other arrangement having the effect of creating a lien or security interest;

(rrr)    "**Environmental Law**" means any Applicable Law concerning pollution or protection of the environment, protection of human health or safety, including all those relating to the use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control or clean-up of any hazardous material;

(sss)    "**Escrow Agreement**" means the escrow agreement to be entered into between the Seller, the Buyer and the Monitor on or before the Closing Date;

(ttt)    "**Estimate**" has the meaning given to such term in Section 3.2;

(uuu)   "**Estimated Cash Purchase Amount**" shall be: (i) $160,000,000; *less* (ii) the amount by which the Estimated Value of the Reserve Fund is less than the Estimated Required Reserve Amount; *less* (iii) the Estimated Trade Creditor Amount; *less* (iv) the Estimated Cure Cap Adjustment;

(vvv)   "**Estimated Purchase Price**" shall be: (i) the Estimated Cash Purchase Amount; *plus* (ii) the amount of the Assumed Liabilities as of the Closing Time;

(www) "**Estimated Reserve Deficiency**" means the Estimated Required Reserve Amount less the Estimated Value of the Reserve Fund;

(xxx)   "**Estimated Value of the Reserve Fund**" has the meaning given to such term in Section 3.2;

(yyy)   "**Excluded Assets**" has the meaning given to such term in Section 2.2;

(zzz)   "**Excluded Cash**" has the meaning given to such term in Section 2.2;

(aaaa) "**Excluded Claims**" has the meaning given to such term in Section 2.4(j);

(bbbb) "**Excluded Contracts**" has the meaning given to such term in Section 2.4(d);

- 11 -

(cccc)  "**Excluded Liabilities**" has the meaning given to such term in Section 2.4;

(dddd)  "**Expense Reimbursement**" has the meaning given to such term in Section 9.2;

(eeee)  "**Expense Reimbursement and Break Fee Charge**" has the meaning given to such term in Section 9.2;

(ffff)   "**FACFOA**" has the meaning given to such term in Section 4.24(b);

(gggg)  "**Final**" with respect to any order of any court of competent jurisdiction, means that: (i) such order shall not have been stayed, appealed, varied (except with the consent of the Buyer and Seller) or vacated, and all time periods within which such order could at law be appealed shall have expired; or (ii) such order is no longer the subject of any continuing proceedings seeking to stay, appeal, vary (except with the consent of the Buyer and the Seller) or vacate such order, all such proceedings having been discontinued, denied, dismissed, and otherwise unsuccessfully concluded, and the time for appealing or further appealing the disposition of such proceedings shall have expired;

(hhhh)  "**Final Closing Date Amount**" means the Cash Purchase Amount, as calculated pursuant to the Closing Statement;

(iiii)   "**Final Required Reserve Amount**" means the Required Reserve Amount, as finally determined pursuant to Section 3.4(c), (d) and/or (e);

(jjjj)   "**Final Reserve Deficiency**" means the value of the Reserve Deficiency, as finally determined pursuant to Section 3.4(c), (d) and/or (e);

(kkkk)  "**Final Trade Creditor Amount**" means the Trade Creditor Amount, as finally determined pursuant to Section 3.4(c), (d) and/or (e);

(llll)   "**Final Value of the Reserve Fund**" means the Value of the Reserve Fund, as finally determined pursuant to Section 3.4(c), (d) and/or (e);

(mmmm)     "**Financial Statements**" means the internally prepared balance sheet and income statement of the Seller dated as of the Financial Statements Date attached as Schedule G to this Agreement;

(nnnn)  "**Financial Statements Date**" means February 28, 2023;

(oooo)  "**Fundamental Representations (Buyer)**" means the representations and warranties made by the Buyer in Sections: (i) 5.1 (*Incorporation and Status*); (ii) 5.4 (*Approvals and Consents*);

(pppp)  "**Fundamental Representations (Seller)**" means the representations and warranties made by the Seller in Sections: (i) 4.1 (*Incorporation and Status*); (ii) 4.2 (*Due Authorization and Enforceability of Obligations*); (iii) 4.3 (*Right to Sell, and Title to, Purchased Assets*); (iv) 4.4 (*Validity of and Compliance with Reserve*

- 12 -

*Agreement*); (v) 4.9 (*Approvals and Consents*); (vi) 6.1 (*Incorporation and Status*); and (vii) 6.2 (*Capitalization*);

(qqqq)  "**Governmental Authority**" means any government, regulatory authority, governmental department, agency, commission, bureau, court, judicial body, arbitral body or other law, rule or regulation-making entity, including any Taxing Authority:

    (i)  having jurisdiction over the Seller, the Buyer, Travel Services, the Purchased Assets or the Assumed Liabilities on behalf of any country, province, state, locality or other geographical or political subdivision thereof; or

    (ii)  exercising or entitled to exercise any administrative, judicial, legislative or regulatory power;

(rrrr)  "**HST**" means all goods and services tax and harmonized sales tax imposed under the HST Legislation, and any provincial, territorial or foreign legislation imposing a similar value added or multi-staged tax;

(ssss)  "**HST Legislation**" means Part IX of the *Excise Tax Act*, R.S.C., 1985, c. E-15, and any corresponding provincial legislation, in each case as amended;

(tttt)  "**IFRS**" means International Financial Reporting Standards;

(uuuu)  "**Individual Travel Agent**" means a Person who engages in the business or occupation of selling or otherwise providing, to the public, travel services supplied by another Person on behalf of Travel Services or in connection with the Business;

(vvvv)  "**Individual Travel Agent License**" means a license to engage in the business or occupation of Individual Travel Agent;

(wwww)  "**Initial Order**" means the initial order of the Court substantially in the form attached hereto as Schedule D;

(xxxx)  "**Insolvency Proceedings**" means any action, application, petition, suit or other proceeding under any bankruptcy, receivership arrangement, reorganization, dissolution, liquidation, insolvency, winding-up or similar law of any jurisdiction now or hereafter in effect, for the relief from or otherwise affecting creditors of the Seller, including under the *Bankruptcy and Insolvency Act*, R.S.C., 1985, c. B-3, as amended (including the filing of a notice of intention to make a proposal), the CCAA (including the CCAA Proceedings), the *Winding-up and Restructuring Act*, R.S.C., 1985, c. W-11, as amended, or the United States Bankruptcy Code by, against, or in respect of the Seller;

(yyyy)  "**Insurance Policies**" has the meaning given thereto in 4.16;

(zzzz)  "**Intellectual Property**" has the meaning given to such term in Section 2.1(j);

- 13 -

(aaaaa) "**Intercompany DIP**" has the meaning given to such term in Section 2.1(r);

(bbbbb)       "**Inventory**" has the meaning given to such term in Section 2.1(f);

(ccccc) "**Investment**" means any intangibles, documents of title, instruments, investment property, or other assets or property of the Seller, including, without limitation: (i) negotiable or transferable money market instruments, in bearer form, or in registered form and registered in the name of RBC Investor Services Trust; (ii) instruments in registered form registered in the name of RBC Investor Services Trust and representing deposit obligations (including, without limitation, certificates of deposit, guaranteed investment certificates, deposit receipts or evidence of demand deposits); (iii) letters of credit, guarantees or similar obligations of any bank, trust company, loan company or other financial institution; and (iv) the benefit of any security interest in favour of Seller in any monies and/or in any investments;

(ddddd)       "**Investment Canada Act**" means the *Investment Canada Act*, R.S.C. 1985, C. 29 (1st Supp.), as amended and the regulations promulgated thereunder;

(eeeee) "**Key Employee Retention Agreements**" means key employee retention and bonus arrangements set out in Section 1.1(eeeee) of the Disclosure Letter;

(fffff) "**knowledge of the Seller**" or "**the Seller's knowledge**" shall mean the knowledge of Shawn Stewart, Jeff Chesnut, Jeff Fair, Jack Taffe, Dimitri Benak and Laura Santillan of the Seller after reasonable inquiry;

(ggggg)       "**L/C**" has the meaning given to such term in Section 8.16;

(hhhhh)       "**Leased Real Property**" means all real property used in connection with the Business in which the Seller or Travel Services has a valid leasehold interest or sub-leasehold interest pursuant to the Real Property Lease, as set out in Section 4.21 of the Disclosure Letter;

(iiiii) "**Legal Proceedings**" has the meaning given to such term in Section 4.25;

(jjjjj) "**Licensed Air Miles IP**" means the rights (including intellectual property rights) licensed to the Seller under the Air Miles License Agreements;

(kkkkk)       "**LVI**" means Loyalty Ventures, Inc.;

(lllll) "**LVI Promissory Note**" has the meaning given to such term in Section 2.1(r);

(mmmmm)    "**Material Adverse Change**" or "**Material Adverse Effect**" means any change, development, effect, event, circumstance, fact or occurrence that, individually or in the aggregate with such other changes, developments, effects, events, circumstances, facts or occurrences, is, or would reasonably be expected to be, material and adverse to: (A) the operations or results of operations of the Business, the Purchased Assets and the Assumed Liabilities; other than any change,

- 14 -

development, effect, event, circumstance, fact or occurrence arising out of, attributable to or resulting from: (i) any action expressly required by this Agreement, the CCAA Proceedings or the SISP; (ii) general political, economic or financial conditions in Canada or elsewhere in the world; (iii) any change generally affecting the industries in which the Business is conducted (including changes in prices, costs of materials, labor, or shipping, general market prices, or regulatory changes in any such industry); (iv) acts of terrorism or war (whether or not declared); (v) any changes to existing Applicable Law (including the interpretation thereof); (vi) any changes to IFRS or the adoption, implementation or proposal of any new accounting principles; (vii) hurricanes, earthquakes, storms, floods or other natural disasters, epidemics, pandemics, outbreak or escalation of hostilities, the declaration of war, acts of terrorism, or acts of God; (viii) any action consented to in writing by the Buyer; or (ix) any change in the operations or results of operations of the Business, the Purchased Assets and the Assumed Liabilities following the public announcement of the CCAA Proceedings or the Transaction, including any increase in Collector redemption cadence following such public announcement; provided that any change, development, effect, event, circumstance, fact or occurrence referred to in clauses (ii), (iii), (iv), (v), (vi) or (vii) shall be taken into account in determining whether a Material Adverse Change has occurred or would reasonably be expected to occur to the extent that such change, development, effect, event, circumstance, fact or occurrence has a disproportionate effect on the Business, the Purchased Assets, the Assumed Liabilities and/or Travel Services compared to other participants in the industries in which the Seller and/or Travel Services, as applicable, conducts the Business; or (B) the ability of the Seller to timely consummate the Transaction and the related Closing Documents or perform its obligations under the Transaction or the Closing Documents;

(nnnnn)     "**Material Contracts**" means:

(i)     each Contract with a Material Customer including, for certainty, that certain Program Participation Agreement dated October 1, 2022 between the Seller and Shell Canada Products and that certain Program Participation Agreement dated July 1, 2022 between the Seller and Metro Ontario Inc.;

(ii)     each Contract with a Material Supplier;

(iii)     each Contract relating to the sale of goods, or the provisions of any services by, the Seller or Travel Services involving aggregate consideration in excess of $350,000 and that, in each case, cannot be cancelled by the Seller or Travel Services without penalty or by giving less than 90 days' notice;

(iv)     each Contract that requires the Seller or Travel Services to purchase their total requirements of any product or service from a third party or that contain "take or pay" provisions;

(v)     each Contract relating to or requiring the acquisition or disposition by the Seller or Travel Services of any business, division or product line (including

- 15 -

any material asset of the Business) or the capital stock of any other Person, in each case pursuant to which any earn-outs or deferred, contingent purchase price or material indemnification obligations or any other obligations of the Seller or Travel Services remain outstanding;

(vi)     each Contract providing for the incurrence, assumption, surety or guarantee of, or that relate to evidence of, any of outstanding indebtedness as of the date of this Agreement or the making of any outstanding loans as of the date of this Agreement;

(vii)    each Contract with any Governmental Authority to which the Seller or Travel Services is a party;

(viii)   each Contract: (A) containing a covenant expressly limiting in any material respect the freedom of the Seller or Travel Services (or that would limit in any material respect the freedom of the Buyer after the Closing) to engage in any business with any Person or to compete with any Person in any geographic area or during any period of time, other than Contracts containing customary non-solicitation and no-hire provisions entered into in the Ordinary Course; (B) expressly limiting in any material respect the ability of the Seller or Travel Services to incur indebtedness for borrowed money; (C) obligating the Seller or Travel Services to purchase or otherwise obtain any product or service exclusively from a single party or sell any product or service exclusively to a single party; or (D) containing any provision that grants any Person a right of first refusal, first offer or similar right to purchase any right, asset or property of the Seller or Travel Services; or any equity interest in Travel Services;

(ix)     the Air Miles License Agreements, along with each other Contract pursuant to which the Seller or Travel Services have provided funds to or made any loan, capital contribution or other investment in, or assumed any liability or obligation of, any Person, including take-or-pay contracts or keepwell agreements;

(x)      each Contract providing for indemnification by the Seller or Travel Services of any Person with respect to Claims relating to the Business or the Purchased Assets other than Contracts with customers and suppliers entered into in the Ordinary Course;

(xi)     each Contract to sell, lease or otherwise dispose of any material asset of the Business (other than in the Ordinary Course) that have obligations that have not been satisfied or performed;

(xii)    each Contract with any labor union, works council, employee association, trade union, or other similar employee representative body or employee committee;

- 16 -

(xiii)  each Contract that obligates the Seller or Travel Services to make any capital expenditure or investment in excess of $100,000;

(xiv)  each Contract that includes a sale or retention bonus or similar payment, commitment or arrangement that will be triggered by the Transaction other than the Key Employee Retention Agreements;

(xv)  each Contract relating to Travel Services that requires a consent to or otherwise contain a provision relating to a "change of control," or that would prohibit or delay the consummation of the Transaction;

(xvi)  each Contract reflecting a settlement of any threatened or pending Legal Proceedings or Claim that has obligations of Seller or Travel Services that have not been satisfied or performed, other than releases entered into with former employees or independent contractors of the Seller or Travel Services, on an individual (and not class or collective basis), in the Ordinary Course in connection with the routine cessation of such employee's or independent contractor's employment with the Seller or Travel Services;

(xvii)  each operating lease (as lessor or lessee) of tangible personal property (other than any such lease calling for payments of less than $100,000 per year);

(xviii) each Contract that results in any Person holding a power of attorney from the Seller or Travel Services that relates to the Business or the Purchased Assets;

(xix)  the Air Miles License Agreements, along with each other Contract to which the Seller or Travel Services is a named party and: (A) licenses in Intellectual Property exclusively or for consideration in excess of $100,000; or (B) licenses out exclusively or for Intellectual Property for consideration in excess of $100,000, in each case, other than ordinary course non-exclusive license agreements, non-exclusive customer agreements, non-disclosure agreements, and/or agreements for generally commercially available "off-the-shelf" software that is licensed on standard and non-negotiable commercial terms;

(xx)  each Contract to which the Seller or Travel Services is a party that provide for: (A) any joint venture, partnership or similar arrangement by the Seller or Travel Services; and/or (B) mergers, asset or stock purchases or divestitures that are material to the Business; and

(xxi)  each shareholder agreement, pooling agreement, voting trust or similar agreement with respect to the ownership or voting of any of the Travel Services Shares or restriction of the power of the directors of the Seller or Travel Services to manage, or supervise the management of, the business and affairs of the Seller or Travel Services;

- 17 -

(ooooo)      "**Material Customers**" has the meaning given to such term in Section 4.15(a);

(ppppp)      "**Material Permits and Licenses**" means any Permit and License that is material to the Seller, Travel Services, or the Business;

(qqqqq)      "**Material Suppliers**" has the meaning given to such term in Section 4.15(b);

(rrrrr)   "**Monitor**" means KSV Restructuring Inc. in its capacity as monitor in the CCAA Proceedings, as contemplated to be appointed by the Court under the Initial Order;

(sssss)   "**Monitor's Certificate**" means the certificate, substantially in the form to be attached as Schedule "A" to the Approval and Vesting Order, to be delivered by the Monitor to the Seller and the Buyer in accordance with Section 7.4, and thereafter filed by the Monitor with the Court;

(ttttt)   "**No Action Letter**" means written confirmation from the Commissioner that the Commissioner does not, at that time, intend to make an application under section 92 of the Competition Act in respect of the Transaction, such written confirmation having not been modified or withdrawn prior to the Closing Time;

(uuuuu)      "**Notice of Arbitration**" has the meaning given to such term in Section 3.4(e);

(vvvvv)      "**Notice of Objection**" has the meaning given to such term in Section 3.4(c);

(wwwww)      "**OFAC**" has the meaning given to such term in Section 4.24(b);

(xxxxx)      "**Ordinary Course**", when used in relation to the conduct of the Business, means any transaction that constitutes an ordinary day-to-day business activity of the Seller or Travel Services, as applicable, conducted in a manner consistent with the Seller's or Travel Services', as applicable, past practice in respect of the Business since November 3, 2021, and, with respect to transactions that occur from and after the date of the Initial Order to and including the Closing Date, shall also mean in accordance with the DIP Agreement Cash Flow Projection (as that term is defined in the DIP Term Sheet);

(yyyyy)      "**Organizational Documents**" means any trust document, charter, certificate or articles of incorporation or amalgamation, articles of amendment, articles of association, articles of organization, articles of continuance, bylaws, as amended, partnership agreement or similar formation or governing documents of a Person (excluding individuals);

(zzzzz) "**Outside Date**" means June 30, 2023; provided that: (i) the Parties may at any time extend the Outside Date by written agreement; and (ii) if the Closing Date has not occurred by such date solely as a result of the failure to satisfy any of the conditions set forth in Section 7.1(g), then either Party may elect by notice in writing delivered

- 18 -

to the other Party by no later than the date that is three Business Days before such date, to extend the Outside Date up to two times by 45 day increments for a maximum of 90 days;

(aaaaaa)  "**Parties**" means the Seller and the Buyer together, and "**Party**" means either the Seller or the Buyer;

(bbbbbb)  "**Permits and Licenses**" has the meaning given to such term in Section 2.1(o);

(cccccc)  "**Permitted Encumbrances**" means all:

(i)  Encumbrances in respect of the Reserve Agreement and the Security Agreement;

(ii)  Encumbrances with respect to trust accounts required to be maintained by or for Travel Services under Applicable Law of the provincial travel and insurance regulators;

(iii)  Encumbrances contained within any Assumed Contracts in favour of the counterparties to such Assumed Contracts;

(iv)  To the extent not included in the Encumbrances listed in clause (ii) above of this definition of "Permitted Encumbrances", normal and customary rights of setoff or compensation upon deposits in favour of depository institutions, and liens of a collecting bank on cheques and other payments in the course of collection;

(v)  Encumbrances associated with, and financing statements evidencing, the rights of equipment lessors under any of the Personal Property Leases that are registered under the PPSA;

(vi)  Encumbrances in favour of the DIP Lender;

(vii)  the right reserved to or vested in any municipality or government, or to any statutory or public authority, by the terms of any lease, license, franchise, grant or permit required by the Seller or any statutory provision to terminate any such lease, license, franchise, grant or permit, or to require annual or other periodic payments as a condition to the continuance thereof; and

(viii)  Encumbrances listed in Section 1.1(cccccc) of the Disclosure Letter;

(dddddd)  "**Person**" means any individual, partnership, limited partnership, limited liability company, joint venture, syndicate, sole proprietorship, company or corporation with or without share capital, unincorporated association, trust, trustee, executor, administrator or other legal personal representative, Governmental Authority or other entity however designated or constituted;

- 19 -

(eeeeee) "**Personal Information**" means any information: (i) about an identified or identifiable individual, including without limitation Collectors and Employees; or (ii) that constitutes "personal information" under Applicable Laws relating to privacy or data protection;

(ffffff) "**Personal Property Leases**" has the meaning given to such term in Section 2.1(i);

(gggggg) "**Post-Closing Claims**" means Claims (other than the Assigned Claims) and orders (including injunctions, judgments, administrative complaints, decrees, rulings, awards, assessments, directions, instructions, penalties or sanctions issued, filed or imposed by any Governmental Authority or arbitrator and includes remedial orders), assessments or reassessments and judgments flowing from any past, current or future Legal Proceedings, contingent or otherwise, whether liquidated or unliquidated, matured or unmatured, disputed or undisputed, contractual, legal or equitable, or tort, arising from or in relation to any facts, circumstances, events or occurrences existing or arising from and after the Closing Date, in in respect of or relating to the Purchased Assets and the Assumed Liabilities;

(hhhhhh) "**Post-Closing Tax Period**" means a Taxation year or other fiscal period that begins at or after the Closing Time and, with respect to a Tax Straddle Period, the portion of such taxation year or period beginning at the Closing Time;

(iiiiii) "**PPSA**" means the *Personal Property Security Act*, R.S.O. 1990, c. P.10, as amended;

(jjjjjj) "**Pre-Closing Tax Period**" means a Taxation year or other fiscal period that ends on or before the Closing Time;

(kkkkkk) "**Processed**" or "**Processing**" means the collection, use, retention or disclosure, of any Personal Information or confidential information (whether in electronic or any other form or medium);

(llllll) "**Purchase Price**" has the meaning given to such term in Section 3.1;

(mmmmmm) "**Purchased Assets**" has the meaning given to such term in Section 2.1;

(nnnnnn) "**QST**" means the Québec sales tax payable under *an Act respecting Québec sales tax* (Québec);

(oooooo) "**RBC**" means RBC Investor Services Trust;

(pppppp) "**RBC Accounts**" means the bank accounts at RBC Investor & Treasury Services held in the name of the Seller and bearing account numbers: 116462003 and 116462005;

(qqqqqq) "**Real Property**" means all real or immoveable property, and all plants, buildings, structures, improvements, appurtenances and fixtures (including fixed

- 20 -

machinery and fixed equipment) thereon, forming part thereof or benefiting such real or immoveable property;

(rrrrrr)   "**Real Property Lease**" has the meaning given to such term in Section 4.21 of the Disclosure Letter;

(ssssss)      "**Released Parties**" has the meaning given to such term in Section 8.13;

(tttttt)   "**Representatives**" means as to any Person, such Person's affiliates, and its and their respective directors, officers, employees, managing members, partners, general partners, agents, advisors and consultants (including legal advisors, financial advisors and accountants);

(uuuuuu)      "**Required Reserve Amount**" for any month shall mean the "Required Reserve Amount" as set forth in the Trust Certificate for such month;

(vvvvvv)      "**Reserve Agreement**" means that certain Amended and Restated Redemption Reserve Agreement dated as of December 31, 2001, between Loyalty Management Group Canada Inc. and Royal Trust Corporation of Canada, as amended by the Amending Agreement made with effect as of January 1, 2006, between Loyalty Management Group Canada Inc. and RBC Dexia Investor Services Trust, as successor to Royal Trust Corporation of Canada;

(wwwwww)   "**Reserve Agreement Assignment and Assumption**" has the meaning given to such term in Section 8.5;

(xxxxxx)      "**Reserve Deficiency**" for any month shall mean the Required Reserve Amount less the Value of the Reserve Fund;

(yyyyyy)      "**Reserve Fund**" has the meaning given to such term in the Reserve Agreement and the Security Agreement;

(zzzzzz)      "**Security Agreement**" means that certain Amended and Restated Security Agreement dated as of December 31, 2001, between Loyalty Management Group Canada Inc. and Royal Trust Corporation of Canada, as amended by the Amending Agreement made with effect as of January 1, 2006, between Loyalty Management Group Canada Inc. and RBC Dexia Investor Services Trust, as successor to Royal Trust Corporation of Canada;

(aaaaaaa)      "**Seller**" has the meaning given to such term in the preamble to this Agreement;

(bbbbbbb)   "**Seller Registered IP**" has the meaning given to such term in Section 4.19;

(ccccccc)      "**SEMA**" has the meaning given to such term in Section 4.24(b);

(ddddddd)      "**Settlement Date**" has the meaning given to such term in Section 3.4(g);

- 21 -

(eeeeee)    "**Settlement Payment**" is the amount by which the Final Cash Purchase Amount is greater than the Estimated Cash Purchase Amount, if any, up to a maximum amount equal to the Adjustment Escrow Amount;

(fffffff)"**SISP**" means those certain sale and investment solicitation procedures attached as Schedule B hereto;

(ggggggg)    "**SISP Order**" means an order of the Court substantially in the form attached hereto as Schedule F;

(hhhhhhh)    "**Sobeys Contract**" means the Program Participation Agreement between Seller and Sobeys Capital Incorporated dated as of May 1, 2014, including all amendments, notices and extensions thereto, and all other Program Participation Agreements between Seller and any member of the Sobeys group of companies, including all amendments, extensions, notices thereto;

(iiiiiii)  "**Successful Bid**" has the meaning set out in the SISP;

(jjjjjjj)  "**Tax**" and "**Taxes**" means any and all:

(i)      taxes, surtaxes, duties, fees, excises, premiums, assessments, imposts, levies, dues and other charges or assessments of any kind whatsoever imposed or collected by any Governmental Authority, whether disputed or not, including those with respect to income, goods and services, harmonized sales, sales, value added, transfer, land transfer, use, real or personal property, registration fees, franchise, capital, tangible, withholding, employment, employer health, payroll, social security, social contribution, unemployment compensation, disability, excise, customs duties, consumption, gross receipts, stamp, countervail, and any instalments thereof;

(ii)     all related charges, interest, penalties, fines, additions to tax or other additional amounts imposed by any Governmental Authority on or in respect of amounts of the type described in clause (i) above or this clause (ii);

(iii)    all Canada Pension Plan contributions and employment insurance premiums or similar contributions/premiums required in any jurisdictions; and

(iv)     any liability for any of the foregoing as a result of any express or implied obligation to indemnify any other Person or as transferee, guarantor, successor, or by contract, operation of law or otherwise;

(kkkkkkk)    "**Tax Act**" means the *Income Tax Act* (Canada) as amended, and any relevant provincial legislation imposing tax similar to the *Income Tax Act* (Canada);

(lllllll)  "**Tax Attributes**" has the meaning given to such term in Section 2.2(g);

- 22 -

(mmmmmmm)　　"**Tax Dispute**" means the dispute with the Canada Revenue Agency relating to a portion of the reserve made by the Seller pursuant to paragraph 20(1)(m) of the Tax Act for the Seller's 2013 taxation year and any subsequent taxation year;

(nnnnnnn)　　"**Tax Returns**" means all returns (including any withholding Tax Returns and information returns), declarations, reports, elections, designations, filings, statements, schedules, notices, forms or other documents or information (whether in tangible or intangible form and including any amendments, schedules, attachments, supplements, appendices and exhibits thereto), filed or required to be filed in respect of the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement of any legal requirement relating to any Tax;

(ooooooo)　　"**Tax Straddle Period**" means a taxation period that begins before, and ends after, the Closing Time. For the purposes of allocating Taxes in respect of any Tax Straddle Period, the amount of Taxes allocable to the portion of the Tax Straddle Period ending immediately before the Closing Time shall be deemed to be: (i) in the case of Taxes imposed on a periodic basis (such as real or personal property Taxes), the amount of such Taxes for the entire period (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding period) multiplied by a fraction, the numerator of which is the number of days in the Tax Straddle Period ending on and including the Closing Date and the denominator of which is the number of days in the entire relevant Tax Straddle Period; and (ii) in the case of Taxes not described in clause (i) above (such as franchise Taxes, withholding Taxes, Taxes that are based upon or related to income or receipts, based upon occupancy or imposed in connection with any sale or other transfer or assignment of property (real or personal, tangible or intangible)), the amount of any such Taxes shall be determined as if such taxable period ended immediately before the Closing Time. All determinations necessary to give effect to or relevant to the foregoing allocations will be made by Travel Services acting in good faith, taking into account the prior practice of Travel Services and Applicable Law;

(ppppppp)　　"**Taxing Authority**" means any Governmental Authority having jurisdiction over the assessment, determination, collection, or other imposition of any Tax;

(qqqqqqq)　　"**Trade Creditor Amount**" means the amount of trade creditor liabilities and obligations that are (i) not represented by either Assumed Contracts or Excluded Contracts, (ii) are incurred after the date hereof and on or prior to the Closing Date, (iii) and are required pursuant to their terms to be paid; and (iv) were contemplated to be paid prior to the Closing Date in accordance with the DIP Agreement Cash Flow Projection (as that term is defined in the DIP Term Sheet), in each case that were not paid and such non-payment is not in the Ordinary Course, but for the avoidance of doubt excluding all Cure Costs;

- 23 -

(rrrrrrr) "**Trade Obligations**" has the meaning given to such term in Section 2.3(d);

(sssssss)   "**Transaction**" means, collectively, the sale and purchase of the Business and the Purchased Assets and assumption of the Assumed Liabilities pursuant to this Agreement, the Approval and Vesting Order and all other transactions contemplated by this Agreement or entered into in order to give effect to this Agreement that are to occur contemporaneously or otherwise in connection with the sale and purchase of the Business and the Purchased Assets;

(ttttttt) "**Transaction Personal Information**" means any Personal Information in the possession, custody or control of the Seller or Travel Services at or before the Closing Date that is disclosed to the Buyer or any representative or affiliate of the Buyer in connection with the Transaction;

(uuuuuuu)   "**Transfer Taxes**" has the meaning given to such term in Section 8.9(c);

(vvvvvvv)   "**Transition Services**" means those services to be provided to the Seller pursuant to the Transition Services Agreement;

(wwwwwww) "**Transition Services Agreement**" means the Acknowledgement Agreement between LVI and the Seller dated as of the date hereof;

(xxxxxxx)   "**Travel Services**" means LoyaltyOne Travel Services Co. / Cie Des Voyages LoyaltyOne;

(yyyyyyy)   "**Travel Services Approvals**" means approvals from Governmental Authorities in respect of the Material Permits and Licenses maintained by Travel Services;

(zzzzzzz)   "**Travel Services Shares**" has the meaning given to such term in Section 2.1;

(aaaaaaaa)   "**Trust Certificate**" the Corporate Certificate (as defined in the Reserve Agreement) that has been delivered in the Ordinary Course in compliance with the terms of the Reserve Agreement;

(bbbbbbbb)   "**Ultimate Redemption Rate**" means the estimated percentage of AMs issued to Collectors that the Seller has determined, using methodologies consistent with past practice and taking into account relevant historical data, will be redeemed by such Collectors, and which calculation the Seller has provided to the Buyer prior to the date hereof together with all reasonable supporting documentation requested by the Buyer in connection therewith;

(cccccccc)   "**Value of the Reserve Fund**" for any month shall mean the "Value of the Reserve Fund" as set out in the Trust Certificate for such month; and

- 24 -

(dddddddd)  "**WestJet Contract**" means that certain Sales Agreement entered into by and between WestJet (an Alberta Partnership) and the Seller as of November 16, 2022, as may be amended from time to time.

**1.2  Schedules**

The following Schedules form part of this Agreement:

| | | |
|---|---|---|
| Schedule A | - | Consents and Approvals |
| Schedule B | - | Sale and Investment Solicitation Procedures |
| Schedule C | - | Approval and Vesting Order |
| Schedule D | - | Initial Order |
| Schedule E | - | A&R Initial Order |
| Schedule F | - | SISP Order |
| Schedule G | - | Financial Statements |
| Schedule H | - | Trust Certificate |

**1.3  Statutes**

Unless specified otherwise, reference in this Agreement to a statute refers to that statute as it may be amended, or to any restated or successor legislation of comparable effect.

**1.4  Headings and Table of Contents**

The inclusion of headings and a table of contents in this Agreement is for convenience of reference only and shall not affect the construction or interpretation hereof.

**1.5  Gender and Number**

In this Agreement, unless the context otherwise requires, words importing the singular include the plural and vice versa and words importing gender include all genders.

**1.6  Interpretation**

In this Agreement: (i) the words "include", "includes" and "including" shall be deemed to be followed by the words "without limitation"; (ii) the word "or" is not exclusive; and (iii) the words "herein", "hereof", "hereby", "hereto" and "hereunder" refer to this Agreement as a whole.

**1.7  Further Rules**

Unless the context otherwise requires, references herein: (i) to Articles, Sections and Exhibits mean the Articles and Sections of, and Exhibits attached to, this Agreement; (ii) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof

- 25 -

**1.8     No Presumption**

This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

**1.9     Disclosure Letter and Exhibits**

The Disclosure Letter and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**1.10     Currency**

Except where otherwise expressly provided, all amounts in this Agreement are stated and shall be paid in United States dollars.

**1.11     Invalidity of Provisions**

Each of the provisions contained in this Agreement is distinct and severable and a declaration of invalidity or unenforceability of any such provision or part thereof by a court of competent jurisdiction shall not affect the validity or enforceability of any other provision hereof.

**1.12     Entire Agreement**

This Agreement, the Disclosure Letter, the Approval and Vesting Order, the agreements and other documents required to be delivered pursuant to this Agreement and to effect the Transaction and, subject to Section 12.1, the Confidentiality Agreement, constitute the entire agreement between the Parties and set out all the covenants, promises, warranties, representations, conditions and agreements between the Parties in connection with the subject matter of this Agreement and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, pre-contractual or otherwise. There are no covenants, promises, warranties, representations, conditions, understandings or other agreements, whether oral or written, pre-contractual or otherwise, express, implied or collateral between the Parties in connection with the subject matter of this Agreement except as specifically set forth in this Agreement and any document required to be delivered pursuant to this Agreement.

**1.13     Waiver, Amendment**

Except as expressly provided in this Agreement, no amendment or waiver of this Agreement shall be binding unless executed in writing by all Parties hereto. No waiver of any provision of this Agreement shall constitute a waiver of any other provision nor shall any waiver of any provision of this Agreement constitute a continuing waiver unless otherwise expressly provided.

**1.14     Governing Law; Jurisdiction and Venue**

This Agreement, the rights and obligations of the Parties under this Agreement, and any Claims or controversy directly or indirectly based upon or arising out of this Agreement or the

- 26 -

Transaction (whether based on contract, tort, or any other theory), including all matters of construction, validity and performance, shall in all respects be governed by, and interpreted, construed and determined in accordance with, the laws of the Province of Ontario and the federal laws of Canada applicable therein, without regard to the conflicts of law principles thereof. The Parties consent to the jurisdiction and venue of the courts of Ontario for the resolution of any such disputes arising under this Agreement. Each Party agrees that service of process on such Party as provided in Section 12.5 shall be deemed effective service of process on such Party.

**ARTICLE 2**
**PURCHASE AND SALE**

**2.1     Agreement to Purchase and Sell Purchased Assets**

Upon and subject to the terms and conditions of this Agreement (including the provisions of Section 2.6) and at the times specified in Section 2.7 and 2.8, the Seller shall sell and the Buyer shall purchase, free and clear of: (i) all Encumbrances other than Permitted Encumbrances; and (ii) Claims (other than the Assumed Liabilities), all of the Seller's right, title and interest in, to and under, or relating to, the assets, property, interests, undertaking and other rights of the Seller, relating to or owned or used in connection with the Business other than the Excluded Assets (collectively the "**Purchased Assets**"), including, but not limited to, the following:

(a)     *Cash and Accounts Receivable* – except as set forth in Sections 2.2(d), 2.2(e), 2.2(f) and 2.2(g) all cash and all accounts receivable (including unbilled revenue and holdbacks), bills receivable, trade accounts, trade debts and book debts due or accruing, including any refunds and rebates receivable relating to the Purchased Assets and the full benefit of all security (including cash deposits), guarantees and other collateral held by the Seller, and amounts receivable (or that may become receivable) by the Seller under agreements whereby the Seller has disposed of a business, facility or other assets, or under royalty (or other) agreements or documents related thereto, and any asset-backed commercial paper or other investments, and, to the extent practicable, all bank accounts agreed upon by the Parties;

(b)     *Assumed Contracts* – all Contracts relating to the Business and/or the Purchased Assets, including, without limitation, those Contracts listed in Section 2.1(b) the Disclosure Letter (collectively, the "**Assumed Contracts**") but excluding all Contracts with a person not dealing at arm's length with the Seller for purposes of the Tax Act (other than pursuant to Section 2.1(m)); provided that the Seller shall update Section 2.1(b) of the Disclosure Letter in accordance with Section 8.1;

(c)     *Reserve Agreement* – all of the Seller's rights, powers and interests under and in respect of the Reserve Agreement and the Security Agreement, and all accounts (including the RBC Account), deposits, funds (including the Reserve Fund) and monies relating thereto including, for greater certainty, in respect of or related to the RBC Accounts and the Reserve Fund: (i) all Investments which are at any time or from time to time deposited with or specifically assigned to RBC or its agent by the Seller for the purposes of the Reserve Agreement  and all Investments derived

- 27 -

from the Investment of any monies or other Investments which, in each case, are part of the Reserve Fund (as defined in the Reserve Agreement); (ii) without limiting (i), the right of the Seller to be paid or receive any and all Redemption Fees (as defined in the Reserve Agreement) payable at any time or from time to time thereunder; (iii) all substitutions, accretions and additions to any of the monies or Investments described in the foregoing, including without limitation, all interest, dividends or other amounts earned or derived therefrom; (iv) all certificates and instruments evidencing the foregoing; (v) all proceeds of any of the foregoing of any nature and kind including, without limitation, goods, intangibles, documents of title, instruments, investment property, or other personal property; and (vi) goods, intangibles, documents of title, instruments, investment property, or other personal property and any other assets or property forming part of the Reserve Fund;

(d)     *Travel Services Shares* – all of the issued and outstanding shares in the capital of Travel Services (the "**Travel Services Shares**");

(e)     *Prepaid Expenses* – the full benefit of all advances, prepaid assets, security and other deposits, prepayments and other current assets relating to, or used of or held for use in connection with, the Business or the Purchased Assets (but excluding all prepaid assets relating to Excluded Assets and any retainers paid to professional service advisors);

(f)     *Inventory* – all items that are held by the Seller for sale, license, rental, lease or other distribution in the Ordinary Course, or are being produced for sale, or are to be consumed, directly or indirectly, in the production of goods or services to be available for sale, of every kind and nature and wheresoever situate relating to the Business including inventories of raw materials, spare parts, work-in-progress, finished goods and by-products, operating supplies and packaging materials (collectively, the "Inventory");

(g)     *Fixed Assets and Equipment* – all machinery, equipment, office equipment, communications equipment, furnishings, furniture, parts, dies, molds, tooling, tools, computer hardware, information technology infrastructure, supplies, accessories and other tangible personal and moveable property (other than Inventory) owned or used or held by the Seller for use in or relating to the Business, whether located on the Seller's premises or elsewhere;

(h)     *Vehicles* – all motor vehicles, including all trucks, vans, cars and forklifts owned or used or held by the Seller for use in or relating to the Business;

(i)     *Personal Property Leases* – all leases of personal or moveable property that relate to the Business, including all benefits, rights and options pursuant to such leases and all leasehold improvements forming part thereof (the "**Personal Property Leases**");

(j)     *Intellectual Property* – all right, title and interest of the Seller to all intellectual property held for, used in or relating to the Business, including each item listed in

- 28 -

Section 2.1(j) of the Disclosure Letter and the Licensed Air Miles IP, (collectively, the "**Intellectual Property**") including:

(i)　all trademarks, trade names, websites and domain names, certification marks, service marks, and other source indicators, and the goodwill of any business symbolized thereby, patents, copyrights, works, computer systems, code, applications, systems, databases, data, website content, know-how, formulae, processes, inventions, technical expertise, research data, trade secrets, industrial designs and other similar property;

(ii)　all registrations and applications for registration thereof;

(iii)　any and all licenses, sub-licenses or any other evidence of a right to use any of the foregoing;

(iv)　the right to obtain renewals, extensions, substitutions, continuations, continuations-in-part, divisions, re-issues, re-examinations or similar legal protections related thereto, subject to the terms and conditions of licenses for Licensed Air Miles IP; and

(v)　the right to bring an action at law or equity for the infringement of the foregoing before the Closing Time, including the right to receive all proceeds and damages therefrom, owned, or used or held by the Seller for use in or relating to the Business, subject to the terms and conditions of licenses for Licensed Air Miles IP;

(k)　*Computer Software* – all software and documentation therefor used in the Business, including, all electronic data processing systems, program specifications, source codes, object code, input data, report layouts, formats, algorithms, record file layouts, diagrams, functional specifications, narrative descriptions, flow charts, operating manuals, training manuals and other related material;

(l)　*Goodwill* – subject to the terms and conditions of licenses for Licensed Air Miles IP, the goodwill of the Business and relating to the Purchased Assets, and information and documents relevant thereto including lists of customers and suppliers, credit information, telephone and facsimile numbers, e-mail addresses, research materials, research and development files and Confidential Information and the exclusive right of the Buyer to represent itself as carrying on the Business in succession to the Seller;

(m)　*Transition Services* – all rights, power, title and interests of the Seller in and to all Contracts in respect of or related to services that the Seller receives pursuant to the Transition Services Agreement;

(n)　*Books and Records* – all books, records and files (whether written, electronic or in any other medium) of the Business, including all files and data related to Assumed Employees, advertising and promotional materials and similar items, all sales related materials, the general ledger and accounting records relating to the Business,

- 29 -

all customer lists and lists of suppliers, all operating manuals, plans and specifications and all of the right, interest and benefit, if any, thereunder and to and in the domain names, telephone numbers, facsimile numbers and e-mail addresses, related to, used for or held for use in connection with the Business or the Purchased Assets, and all records, files and information necessary or desirable for Buyer to conduct or pursue the rights described in Section 2.1(q) (collectively, the "**Books and Records**"), however Books and Records shall not include the Seller's Organizational Documents (other than Organizational Documents in respect of or relating to Travel Services) and any books and records solely relating to Excluded Assets and Excluded Liabilities, whether privileged or not; provided, however, that the Seller may retain copies of all books and records included in the Purchased Assets solely to the extent necessary for the administration of any Insolvency Proceedings, the filing of any Tax Return, compliance with any Applicable Law or the terms of this Agreement, to support any Excluded Assets or required to initiate, prosecute, advance or defend any Claims forming part of the Excluded Assets or consummate any wind-up of the Seller.  To the extent that any Books and Records includes materials subject to the attorney work-product doctrine or attorney-client privilege, the Seller is not waiving and shall not be deemed to have waived or diminished its attorney work- product protections, attorney-client privileges or similar protections and privileges as a result of disclosing any Books and Records (including any information related to pending or threatened litigation) to Buyer, and the Parties agree that they have a commonality of interest with respect to such matters. All Books and Records that are entitled to protection under the work-product doctrine, attorney-client privilege or other applicable privilege shall remain entitled to such protection under these privileges, this Agreement and the joint-defense-doctrine;

(o)      *Permits and Licenses* – all permits, licenses, approvals, authorizations, orders, certificates, consents, directives, notices, variances, registrations or other rights issued to or held or used or required by the Seller relating to the Business or any of the Purchased Assets by or from any Governmental Authority (the "**Permits and Licenses**");

(p)      *Insurance* –

(i)      the interests of the Seller in all Insurance Policies, to the extent such interests are assignable, but excluding any director and officer and any errors and omissions Insurance Policies;

(ii)      any proceeds, net of any deductibles and retention, recovered by the Seller under all other Contracts of insurance, insurance policies (excluding for certainty proceeds paid directly by the insurer to or on behalf of directors and officers under directors' and officers' insurance policies) and insurance plans after the Closing Date; and

(iii)      the full benefit of the Seller's rights to insurance Claims (excluding for certainty proceeds paid directly by the insurer to or on behalf of directors

- 30 -

and officers under directors' and officers' insurance policies) and amounts recoverable in respect thereof net of any deductible;

(q)  *Claims* – all: (i) Claims that have been, or that may in the future be, asserted, commenced, pursued or exercised by the Seller as against any Person or property in respect of occurrences, events, accidents or losses suffered prior to the Closing Time; (ii) proceeds flowing from any Claims or Legal Proceeding in respect thereof; and (iii) in respect of the foregoing, rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, in each case held by the Seller as of the Closing Date (regardless of whether such rights are currently exercisable) (collectively, the "**Assigned Claims**"), including those Claims set out in Section 2.1(q) of the Disclosure Letter; but excluding all Claims constituting Excluded Assets under Section 2.2(b), 2.2(g) and any Claims constituting Excluded Liabilities under Section 2.4(j);

(r)  *Loans* – any loans or debts in respect of or relating to the operation of the Business due prior to the Closing Date to the Seller, but excluding all amounts now or hereafter owing by LVI to the Seller under and pursuant to: (i) the promissory note dated February 26, 2023 (the "**LVI Promissory Note**") evidencing a loan made by the Seller to LVI in the amount of CAD$18,000,000.00; and (ii) the Senior Secured Superpriority Debtor in Possession Credit Facility Term Sheet to be entered into between the Seller as lender and LVI as borrower to evidence a loan to be made by the Seller to LVI (the "**Intercompany DIP**");

(s)  *Warranty Rights* – all warranty rights against manufacturers, builders, contractors or suppliers relating to any of the Purchased Assets, to the extent the foregoing are transferable; and

(t)  *Confidentiality Agreements, etc.* – all rights (but not any obligations) of the Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with current and former employees to the extent primarily relating to the Purchased Assets, Assumed Liabilities or the Business (or any portion thereof).

**2.2  Excluded Assets**

Notwithstanding any provision of this Agreement to the contrary, the Purchased Assets shall not include any of the following assets of the Seller (collectively, the "**Excluded Assets**"):

(a)  *Non-Canadian Assets* – assets, if any, that: (i) are located exclusively outside of Canada; and (ii) do not relate to the Business;

(b)  *Bread Financial Holdings* – all Claims against Bread Financial Holdings, Inc. f/k/a Alliance Data Systems Corporation ("**Bread**") and any of its current affiliates or their respective present and former direct and indirect shareholders, officers, directors, employees, advisors (including financial advisors), legal counsel and agents, but excluding all Claims against Bread relating to Bread's provision of services to the Seller;

- 31 -

(c)     *Excluded Contracts* – the Excluded Contracts;

(d)     *DIP Proceeds* – all cash that is advanced to the Seller pursuant to the DIP Term Sheet;

(e)     *Purchase Price* – all cash that is paid in satisfaction of the Purchase Price;

(f)     *Excluded Cash* – cash in the amount of $2,000,000 (the "**Excluded Cash**");

(g)     *Tax Attributes* – all Tax assets, Tax refunds, Tax payments, Tax credits, or other Tax attributes (including: (i) any amounts that are owed or may become owing to the Seller from any Taxing Authority and any Claims in respect thereof; and (ii) the Tax Dispute) ("**Tax Attributes**") of the Seller; excluding, however, any Tax Attributes relating to, or attributable to, Travel Services and/or the Travel Services Shares; and

(h)     *LVI Intellectual Property* – all right, title and interest of the Seller to all intellectual property listed on Section 2.2(h) of the Disclosure Letter.

**2.3**     **Assumption of Liabilities**

The Buyer shall assume as of the Closing Date and shall pay, discharge and perform, as the case may be, from and after the Closing Date, the following liabilities and obligations of the Seller with respect to the Business and/or the Purchased Assets other than the Excluded Liabilities (collectively, the "**Assumed Liabilities**"), which shall, for greater certainty, not include the Excluded Liabilities:

(a)     *Obligations under Contracts, etc.* – all liabilities and obligations arising under the Assumed Contracts, from and after the Closing Date, including all Cure Costs, in each case provided that such contracts are assigned to the Buyer (whether as of right, on consent, or by Court order) from and after the Closing Date;

(b)     *Permits and Licenses* – all liabilities and obligations arising from and after the Closing Date pursuant to or in respect of Permits and Licenses;

(c)     *Reserve Agreement* – all of the Seller's present and future liabilities and obligations under the Reserve Agreement and the Security Agreement, in both cases which are and shall be assigned to the Buyer (whether as of right, on consent, or by an order of the Court);

(d)     *Trade Obligations* – all trade obligations payable or accrued (including, for certainty, customer credit balances and open purchase orders) of the Business from and after the Closing Date (collectively, the "**Trade Obligations**");

(e)     *Letters of Credit* – the BMO LCs;

- 32 -

(f)   *Obligations to Collectors* – all liabilities and obligations of the Seller to any Collector in respect of the Air Miles Program, in accordance with the terms and conditions of the Air Miles Program; and

(g)   *Employee Matters* – all liabilities and obligations of the Buyer as expressly set out in Section 8.10.

## 2.4   Excluded Liabilities

Except as expressly assumed pursuant to Section 2.3, all debts, obligations, Contracts and liabilities of the Seller, of any kind or nature, shall remain the sole responsibility of the Seller, and the Buyer shall not assume, accept or undertake any debt, obligation, duty, contract or liability of the Seller of any kind, whatsoever, whether accrued, contingent, known or unknown or otherwise, and specifically excluding the following liabilities or obligations that shall be retained by, and that shall remain the sole responsibility of the Seller (collectively, the "**Excluded Liabilities**"):

(a)   *Intercompany Obligations* – all liabilities and obligations due or accruing due prior to the Closing Date from the Seller to any of its affiliates or its affiliates' respective present and former direct and indirect shareholders, officers, directors, employees, advisors (including financial advisors), legal counsel, advisors and agents (except all liabilities and obligations expressly assumed by Buyer pursuant to Section 2.3(g)), excluding liabilities and obligations as between the Seller and Travel Services;

(b)   *Credit Agreement* – all liabilities and obligations of the Seller under the Credit Agreement or as a guarantor or indemnitor of any obligation or liability thereunder;

(c)   *Excluded Assets* – all liabilities and obligations relating to or otherwise arising, whether before, on or after the Closing, out of, or in connection with the Excluded Assets;

(d)   *Excluded Contracts* – all liabilities and obligations in connection with the Contracts listed in Section 2.4(d) of the Disclosure Letter (such contracts, the "**Excluded Contracts**");

(e)   *KEIP / KERP Obligations* – all liabilities and obligations relating to any key employee retention plan or key employee incentive plan, to the extent that the Seller enters into any such plan(s) during Insolvency Proceedings;

(f)   *Non-Assumed Employees* – all liabilities and obligations of the Seller arising out of, relating to or with respect to current or former employees, contractors or consultants that are not explicitly assumed by the Buyer pursuant to Section 8.10;

(g)   *Employee Plans* – all liabilities and obligations relating to or with respect to the Employee Plans;

(h)   *Taxes* – all liabilities and obligations for Taxes of the Seller whether in respect of the period before, on or after the Closing;

- 33 -

(i)     *Transaction Expenses* – all liabilities and obligations for costs and expenses (including legal and other advisory and professional fees) of the Seller or its affiliates in connection with the Transaction and the CCAA Proceedings whether in respect of the period before, on or after the Closing Date;

(j)     *Claims* – Claims and orders (including injunctions, judgments, administrative complaints, decrees, rulings, awards, assessments, directions, instructions, penalties or sanctions issued, filed or imposed by any Governmental Authority or arbitrator and includes remedial orders), assessments or reassessments and judgments flowing from any past, current or future Legal Proceedings, contingent or otherwise, whether liquidated or unliquidated, matured or unmatured, disputed or undisputed, contractual, legal or equitable, or tort, arising from or in relation to any facts, circumstances, events or occurrences existing or arising prior to, on or after the Closing Date, in all such cases: (A) against the Seller or any of its affiliates (other than Travel Services), or their respective present and former direct and indirect shareholders, officers, directors, employees, advisors (including financial advisors), legal counsel and agents, including Claims relating to any breach of law, product liability claims, and any Claims relating to the environment or occupational health and safety, including: (i) Claims arising in connection with properties owned, leased or operated by the Seller at any time prior to, on or after the Closing Date; (ii) Claims arising in connection with facilities or properties to which the Seller sent hazardous material for disposal prior to, on or after the Closing Date; (iii) Claims arising in connection with any hazardous material generated, used, emitted, released, stored, transported or disposed of prior to, on or after the Closing Date in connection with the Business or by the Seller; (iv) Claims that constitute fines, penalties or other liabilities arising from violations of or non-compliances with Environmental Law or environmental Permits and Licenses occurring prior to, on or after the Closing Date, all to the maximum extent permitted by Applicable Law; and (v) the Tax Dispute; (B) all Claims: (i) that are not Assigned Claims; or (ii) that are held by the Seller against any of the Seller's affiliates but excluding any Claims as between the Seller and Travel Services; or (C) all Claims as set forth in Section 2.4(j) of the Disclosure Letter (collectively, the "**Excluded Claims**"), provided that, for greater certainty, Excluded Claims shall not include any Post-Closing Claims; and

(k)     *Unrelated Matters* – all Claims of the Seller or any of its affiliates that are unrelated to the Purchased Assets or the Assumed Liabilities.

## 2.5     Assignment of Assumed Contracts and Payment of Cure Costs

(a)     Promptly following the date hereof and, in any event, no later than 20 calendar days following the date hereof, the Seller shall deliver to Buyer an updated Schedule A listing Consents and Approvals.

(b)     Promptly following the date hereof, the Seller shall use commercially reasonable efforts to obtain all Consents and Approvals that are required from contractual counterparties to assign the Assumed Contracts to the Buyer and shall continue to

- 34 -

use such commercially reasonable efforts as Schedule A is updated. The Buyer shall cooperate, using commercially reasonable efforts, with and assist the Seller in obtaining all such Consents and Approvals.

(c)     To the extent that any Assumed Contract is not assignable without the consent of the counterparty or any other Person, and such consent has not been obtained prior to the hearing before the Court for the Seller's motion for the Approval and Vesting Order and such Assumed Contract is one that is capable of being assigned pursuant to section 11.3 of the CCAA: (A) the Seller's rights, benefits and interests in, to and under such Assumed Contract may be assigned to the Buyer pursuant to the Approval and Vesting Order or further order made pursuant to section 11.3 of the CCAA; (B) the Seller will use commercially reasonable efforts to obtain the Approval and Vesting Order or such further order made pursuant to section 11.3 of the CCAA on such terms as are necessary to give effect to such assignment and on requisite notice to the affected contractual counterparty(ies); and (C) if such a assignment occurs, the Buyer shall accept the assignment of such Assumed Contract on the terms provided by the Approval and Vesting Order or such further order made pursuant to section 11.3 of the CCAA.

(d)     Unless the Parties otherwise agree, to the extent that any Cure Cost is payable with respect to any Assumed Contract, Buyer shall: (A) where such Assumed Contract is assigned pursuant to the Approval and Vesting Order or such further order made pursuant to section 11.3 of the CCAA, pay such Cure Cost in accordance with such order; and (B) where such Assumed Contract is not assigned pursuant to the Approval and Vesting Order or such further order made pursuant to section 11.3 of the CCAA, pay such Cure Cost in the manner set out in the contract in question or the consent of the applicable counterparty, or as otherwise may be agreed to by the Buyer and such counterparty.

(e)     No earlier than seven (7) Business Days before and no later than two (2) Business Days before the Closing Date (or such other date as the Parties may agree to in writing), the Seller shall use its commercially reasonable efforts to deliver to the Buyer a schedule (the "**Cure Costs Schedule**") that contains a true and complete list of each Assumed Contract, the Seller's good faith estimate of the Cure Cost payable with respect to such Assumed Contract, a brief description of such Assumed Contract, and the name of the counterparty(ies) to the Assumed Contract.

**2.6     Changes to Purchased Assets and Assumed Liabilities**

The Parties agree that, notwithstanding any other provision of this Agreement:

(a)     the Buyer shall retain the right for a period of thirty (30) days following the execution of this Agreement to revise the scope of the Purchased Assets and the Excluded Assets: (i) in its sole and absolute discretion, so as to: (A) remove any asset from the list of Purchased Assets (including in respect of the Sobeys Contract and the AMEX Contract); (B) add any asset to the list of Excluded Assets; or (C) add or remove any Contract to or from the Assumed Contracts and Excluded

- 35 -

Contracts lists, respectively; and (ii) with the Seller's consent, not to be unreasonably withheld, conditioned or delayed, so as to: (A) add any asset to the list of Purchased Assets; or (B) remove any asset from the list of Excluded Assets; provided, however, that none of the foregoing actions shall result in a decrease to the Cash Purchase Amount;

(b)     the Buyer shall retain the right for a period of thirty (30) days following the execution of this Agreement to add to the scope of the Excluded Liabilities and, with the Seller's consent, not to be unreasonably withheld, conditioned or delayed, to add to the scope of the Excluded Liabilities and, revise the scope of the Assumed Liabilities; provided, however, that any such further revisions shall not result in a decrease to the Cash Purchase Amount; and

(c)     notwithstanding any of the foregoing, the Buyer shall not be permitted to move any Excluded Asset to the list of Purchased Assets or move any Assumed Liability to the list of Excluded Liabilities.

**2.7     Purchase and Sale of Travel Services Shares**

On the terms of this Agreement, the Seller agrees that it will, as of the Closing Time, sell, assign, convey and transfer, and the Buyer agrees that it will, as of the Closing Time, purchase and accept the assignment, conveyance and transfer of all right, title, and interest of the Seller in and to all Travel Services Shares, free and clear of any Encumbrances. Each of the Seller and the Buyer acknowledges and agrees that the Parties intend that the purchase and sale of the Travel Services Shares occur as of the Closing Time.

**2.8     Purchase and Sale of Purchased Assets**

On the terms of this Agreement, the Seller agrees that it will, as of five (5) minutes following completion of the transaction described in Section 2.7, sell, assign, convey and transfer, and the Buyer agrees that it will, as of five (5) minutes following completion of the transaction described in Section 2.7, purchase and accept the assignment, conveyance and transfer of all right, title, and interest of the Seller in and to the Purchased Assets (excluding, for greater certainty, the Travel Services Shares purchased pursuant to Section 2.7).

**ARTICLE 3**
**PURCHASE PRICE AND RELATED MATTERS**

**3.1     Purchase Price**

The purchase price payable by the Buyer to the Seller for the Purchased Assets (the "**Purchase Price**") shall be:

(a)     $160,000,000; *less*

 (i)     the amount of the Final Reserve Deficiency, if any; *less*

 (ii)    the Final Trade Creditor Amount; *less*

- 36 -

(iii)    the Final Cure Cap Adjustment,

(collectively, the foregoing (i) to (iii), the "**Final Cash Purchase Amount**"); *plus*

(b)      the amount of the Assumed Liabilities as of the Closing Time.

**3.2      Delivery of Estimate**

Each of the Parties acknowledges that it is not possible to determine the Cash Purchase Amount until the same is finally determined in accordance with Section 3.4. Accordingly, not later than two (2) Business Days prior to the Closing Date, the Seller shall deliver to the Buyer a certificate detailing the Seller's good faith estimate of (including reasonably detailed calculations of the components thereof and such information as reasonably requested by the Buyer as may be necessary to support such calculations) (the "**Estimate**"): (i) the Value of the Reserve Fund (the "**Estimated Value of the Reserve Fund**"), the Required Reserve Amount (the "**Estimated Required Reserve Amount**") and the resulting Estimated Reserve Deficiency, in each case calculated for the most recent month ended prior to the Closing Date, on the basis of the principles and methodology used by the Seller to prepare the Trust Certificate, and only to the extent, in the case of the Estimated Reserve Deficiency, that such deficiency has not been remedied by the Seller prior to the Closing Time; (ii) the Trade Creditor Amount as of the Closing Date (the "**Estimated Trade Creditor Amount**"); (iii) the Cure Cap Adjustment as of the Closing Date (the "**Estimated Cure Cap Adjustment**"); and on the basis of the foregoing estimates, (v) the Estimated Cash Purchase Amount. The Estimate shall be prepared on a basis consistent with the preparation of the most recent Financial Statements, the relevant Trust Certificate and the cash flow statement attached hereto as Schedule H, as applicable. Prior to the Closing, the Seller shall afford the Buyer the opportunity to review and comment on the Estimate, and the Seller shall consider in good faith any comments from the Buyer thereon; provided that, for greater certainty, in the event of any disagreement between the Buyer and the Seller, the Estimate delivered by the Seller shall be used for purposes of the Closing.

**3.3      Payment of Purchase Price at Closing**

The Buyer shall satisfy the Estimated Purchase Price at the Closing Time: (i) as to the amount of the Assumed Liabilities by assuming such Assumed Liabilities and (ii) as to the Estimated Cash Purchase Amount:

(a)      by depositing $10,000,000 (the "**Adjustment Escrow Amount**") in immediately available funds into an escrow account maintained by the Monitor pursuant to the Escrow Agreement as security for any Settlement Payment; and

(b)      by delivering, by way of wire transfer of immediately available funds to an account designated in writing by the Seller to the Buyer, the balance of the Estimated Cash Purchase Amount after deducting the payment of the Adjustment Escrow Amount in accordance with Section 3.3(a) above.

The Buyer shall pay any applicable Transfer Taxes in addition to the Estimated Purchase Price in accordance with Section 8.9(c).

- 37 -

The amounts held by the Monitor pursuant to this Section 3.3 shall be invested and distributed as provided in the Escrow Agreement and this Agreement.

**3.4    Closing Statement**

(a)    <u>Delivery of Draft Closing Statement</u>. Not later than 90 calendar days after the Closing Date, the Buyer shall cause a draft statement to be prepared and delivered to the Seller, with a copy to the Monitor, which shall set forth in reasonable detail the Buyer's good faith calculation of:

(i)    the Value of the Reserve Fund, the Required Reserve Amount and the resulting Reserve Deficiency, in each case calculated for the most recent month ended prior to the Closing Date, on the basis of the principles and methodology used by the Seller to prepare the Trust Certificate, and only to the extent, in the case of the Reserve Deficiency, that such deficiency has not been remedied by the Seller prior to the Closing Time;

(ii)    the Trade Creditor Amount as of the Closing Date;

(iii)    the Cure Cap Adjustment as of the Closing Date; and

(iv)    the resulting Settlement Payment, based on such amounts

(the "**Draft Closing Statement**" and, as finally determined pursuant to the provisions of this Section 3.4 the "**Closing Statement**").

(b)    <u>Cooperation</u>. Upon reasonable request: (i) the Seller shall cooperate fully with the Buyer to the extent required to prepare the Draft Closing Statement; and (ii) at any time after the delivery of the Draft Closing Statement, the Buyer shall provide to the Seller access to all work papers of the Buyer, its accounting and financial books and records and the appropriate personnel to verify the accuracy, presentation and other matters relating to the preparation of the Draft Closing Statement during normal business hours and provided that such access is not unduly disruptive to the Business.

(c)    <u>Objection Period</u>. Within 30 calendar days following delivery of the Draft Closing Statement, the Seller shall notify the Buyer in writing, with a copy to the Monitor, if the Seller has any objections to the Draft Closing Statement (the "**Notice of Objection**"). The Notice of Objection must state in reasonable detail the basis of each objection and the approximate amounts in dispute. The Seller shall be deemed to have accepted the Draft Closing Statement to be the Closing Statement if the Seller does not deliver a Notice of Objection within such period of 30 calendar days and: (i) the Value of the Reserve Fund in the Draft Closing Statement shall be deemed to be the Final Value of the Reserve Fund; (ii) the Required Reserve Amount in the Draft Closing Statement shall be deemed to be the Final Required Reserve Amount; (iii) the Reserve Deficiency in the Draft Closing Statement shall be deemed to the Final Reserve Deficiency; (iv) the Trade Creditor Amount in the Draft Closing Statement shall be deemed to be the Final Trade Creditor Amount;

- 38 -

and (iv) the Cure Cap Adjustment in the Draft Closing Statement shall be deemed to be the Final Cure Cap Adjustment.

(d)    <u>Settlement of Dispute</u>. If the Seller sends a Notice of Objection in accordance with Section 3.4(c), then the Buyer and the Seller shall work expeditiously and in good faith within a further period of 20 calendar days after the date of the delivery of the Notice of Objection in an attempt to resolve objections as to the computation of any item in the Draft Closing Statement that has been specifically identified in the Notice of Objection the Notice of Objection, failing which, the items that remain in dispute (the "**Disputed Items**") may be submitted in writing by the Seller or the Buyer for determination to the Monitor, and items for which there is not disagreement or dispute shall be deemed to be agreed to by the Buyer and the Seller. The Buyer and the Seller shall use commercially reasonable efforts to cause the Monitor to complete its work within 30 calendar days of the submission of the Disputed Items to the Monitor in writing and shall provide the Monitor with full cooperation and shall make reasonable efforts to be available when requested by the Monitor. While the Monitor is performing its engagement, the Parties shall not communicate with the Monitor on the Disputed Items, except by joint conference call, joint meeting or letter with copy simultaneously delivered to the other Party. The Monitor shall allow the Buyer and the Seller to present their respective positions regarding the Disputed Items, as applicable, and each of the Buyer and the Seller shall have the right to present additional documents, materials and other information, and make an oral presentation to the Monitor regarding the Disputed Items. The Monitor shall consider such additional documents, materials and other information and such oral presentations and the Monitor shall make its determination solely based on presentations by the Seller and the Buyer and not by independent review, provided that nothing in this sentence shall be construed so as to restrict the Monitor from consulting with counsel or such other advisors as it considers necessary or appropriate. Any such other documents, materials or other information must be copied to the Buyer and the Seller and each of the Buyer and the Seller shall be entitled to attend any such oral presentation, and to reply thereto. With respect to each Disputed Item, the Monitor shall adopt a position that is either equal to the Buyer's proposed position, equal to the Seller' proposed position, or between (but not necessarily the "midpoint" of) the positions proposed by the Seller and the Buyer. Unless arbitration is commenced in accordance with Section 3.4(e), the determination of the Monitor shall be final and binding upon the Parties and shall not be subject to appeal, absent manifest error. The Monitor shall be acting as an expert and not as an arbitrator.

(e)    <u>Arbitration</u>. In the event that: (i) the Monitor's determination of the Settlement Payment rendered in accordance with Section 3.4(d) is greater than 10% (in either direction) of the Buyer's calculation of the Settlement Payment as set out in the Draft Closing Statement; and (ii) the Seller, the Buyer or both dispute the Monitor's position that was rendered in accordance with Section 3.4(d), the disputing Party shall send the other Party a written notice (the "**Notice of Arbitration**") within five (5) days of the Monitor's delivery of such position, following which the dispute shall be finally resolved in accordance with the following arbitration provisions:

- 39 -

(i) the arbitration tribunal shall consist of one arbitrator appointed by unanimous agreement of the parties to the arbitration who is qualified by education and training to pass upon the dispute, or in the event of failure to agree within ten (10) days, any of the Parties may apply to a Judge of the Ontario Superior Court of Justice to appoint an arbitrator;

(ii) the arbitrator shall be instructed that time is of the essence in proceeding with his or her determination of any Disputed Item and, in any event, the arbitration award must be rendered within thirty (30) days of the submissions of such dispute to arbitration;

(iii) the arbitration shall take place in Toronto, Ontario, and the law to be applied in connection with the arbitration shall be the laws of Ontario;

(iv) the arbitrator's decision on any Disputed Item shall be given in writing and shall be final and binding on the Parties, not subject to any appeal on a matter of law, a matter of fact or a matter of mixed fact and law;

(v) the arbitrator's decision shall deal with the question of costs of arbitration and all matters related thereto; and

(vi) any arbitration hereunder shall be conducted in accordance with the provisions of the *Arbitration Act, 1991*, S.O. 1991, c. 17, as amended, except as varied or excluded by the express provisions of this Section 3.4(e).

(f) <u>Only Dispute Resolution</u>. The Parties agree that the procedures set forth in this Section 3.4 for resolving disputes with respect to the Closing Statement shall be the sole and exclusive method for resolving any such disputes; provided that this provision shall not prohibit the Buyer or its Representatives from instituting litigation to enforce any final determination of the Cash Purchase Amount in accordance with this Section 3.4 or to compel any Party to submit any dispute arising in connection with this Section 3.4 pursuant to and in accordance with the terms and conditions of this Section 3.4, in any court or other tribunal of competent jurisdiction.

(g) <u>Final Settlement</u>.

(i) On the third Business Day following the later of: (x) the date on which the Seller and the Buyer agree to the Closing Statement (or are deemed to have agreed to the Closing Statement pursuant to Section 3.4(c)); (y) the date on which a determination in respect of a Notice of Objection is made by the Monitor pursuant to Section 3.4(d); and (iii) the date on which a determination in respect of a Notice of Arbitration is made by the arbitration pursuant to Section 3.4(e) (such date, the "**Settlement Date**"):

(A) if the Final Closing Date Amount is less than the Estimated Cash Purchase Amount, then the Seller shall pay to the Buyer an aggregate amount of cash equal to the Settlement Payment, which

- 40 -

shall be satisfied by the distribution to the Buyer (or as the Buyer may direct) of that portion of the Adjustment Escrow Amount equal to (i) such Settlement Payment, *plus* (ii) the portion of the Transfer Taxes paid by the Buyer pursuant to Section 3.3 applicable to such Settlement Payment. For greater certainty, the amount to be paid pursuant to this Section 3.4(g)(i)(A) shall not exceed the Adjustment Escrow Amount.  Any portion of the Adjustment Escrow Amount remaining after payment of the Settlement Payment shall be distributed to the Seller; and

(B)     if the Final Closing Date Amount is equal to the Estimated Cash Purchase Amount, the entire amount of the Adjustment Escrow Amount shall be distributed to the Seller; and

(C)     if the Value of the Reserve Fund as of the Closing Date is greater than the Final Value of the Reserve Fund, the excess shall be removed from the Reserve Account and paid to the Seller or, as designated by the Seller, the administrative agent under the Credit Agreement.

(ii)     On the Settlement Date, the Buyer and the Seller shall provide a joint notice and direction to the Monitor, pursuant to this Agreement and the Escrow Agreement, for the release of the Adjustment Escrow Amount in such amount(s) and to such Party(ies) (or as such Party(ies) may direct) who are entitled to receive such amount(s) in accordance with this Section 3.4(g).

**3.5     Purchase Price Allocation**

The Purchase Price shall be allocated among the Purchased Assets as agreed by the Parties prior to the Closing Date, acting reasonably. Such allocation shall be binding and the Buyer and the Seller shall report the purchase and sale of the Purchased Assets and file all filings that are necessary or desirable under the Tax Act to give effect to such allocations and shall not take any position or action inconsistent with such allocation.  If the Purchase Price is adjusted pursuant to Section 3.4, the Purchase Price allocation pursuant to this Section 3.5 shall be adjusted on a *pro rata* basis.

**3.6     As Is, Where Is**

(a)     The Purchased Assets shall be sold and delivered to the Buyer on an "as is, where is" basis. Other than those representations and warranties contained herein and any certificate or documentation delivered in connection with the Agreement, the Buyer acknowledges and agrees that: (i) no representation, warranty or condition is expressed or can be implied as to title, encumbrances, description, fitness for purpose, merchantability, condition or quality or in respect of any other matter or thing whatsoever, including with respect to the Purchased Assets; and (ii) the Monitor has not provided any representations and warranties in respect of any matter or thing whatsoever in connection with the Transaction contemplated

- 41 -

hereby, including with respect to the Purchased Assets. The disclaimer in this Section 3.6 is made notwithstanding the delivery or disclosure to the Buyer or its directors, officers, employees, agents or representatives of any documentation or other information (including financial projections or supplemental data not included in this Agreement). Without limiting the generality of the foregoing and unless and solely to the extent expressly set forth in this Agreement or in any documents required to be delivered pursuant to this Agreement, any and all conditions, warranties or representations, expressed or implied, pursuant to Applicable Law do not apply hereto and are hereby expressly waived by the Buyer.

(b)     Without limiting the generality of the foregoing, except as may be expressly set out in this Agreement and any certificate or documentation delivered in connection with the Agreement, no representations or warranties have been given by any Party with respect to the liability any Party has with respect to Taxes in connection with entering into this Agreement, the issuance of the Approval and Vesting Order, the consummation of the Transaction or for any other reason. Each Party is to rely on its own investigations in respect of any liability for Taxes payable, collectible or required to be remitted by the Seller or any other Party on or after Closing and the quantum of such liability, if any.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES BY THE SELLER

The Seller represents and warrants to the Buyer, as of the date hereof and as of the Closing, and acknowledges that the Buyer is relying upon the following representations and warranties in connection with its purchase of the Purchased Assets the matters set out below:

### 4.1     Incorporation and Status

The Seller is an unlimited company duly incorporated, organized and validly existing under the laws of Nova Scotia, is in good standing under such laws and has the power and authority to enter into, deliver and, subject to the granting of the SISP Order and the Approval and Vesting Order, perform its obligations under this Agreement.

### 4.2     Due Authorization and Enforceability of Obligations

Subject to obtaining the SISP Order and the Approval and Vesting Order, the Seller has all necessary power, authority and capacity to enter into this Agreement and to carry out its obligations under this Agreement. The execution and delivery of each of this Agreement, the Closing Documents and the consummation of the Transaction has been duly authorized by all necessary corporate action of the Seller. This Agreement is, and at the Closing Time the Closing Documents will be, duly executed and delivered by the Seller and constitutes valid and binding obligations of the Seller enforceable against it in accordance with its terms, as such enforceability may be limited by bankruptcy, insolvency, moratorium, reorganization and similar laws affecting creditors generally and by general principles of equity.

- 42 -

**4.3     Title to Purchased Assets**

The Seller is the legal owner of all of the Purchased Assets.

**4.4     Validity of and Compliance with Reserve Agreement and Security Agreement**

(a)     Except for any Royal Bank of Canada standard form agreements relating to the operation of bank or securities accounts, Section 4.4 of the Disclosure Letter sets forth the particulars of the bank accounts (the "**Accounts**") in which deposits, funds and monies are held pursuant to the Reserve Agreement.

(b)     The Reserve Agreement and the Security Agreement are the only agreements and arrangements governing or in respect of the Accounts. Section 4.4(b) of the Disclosure Letter sets forth any and all Encumbrances in respect of the Accounts.

(c)     The Seller is in compliance with each of the terms and conditions of the Reserve Agreement and Security Agreement, in all respects, and there is currently no breach or default by the Seller of any of its obligations thereunder.

(d)     The Seller has satisfied all of its obligations under the Reserve Agreement and the Security Agreement, all reserves and other accounts that the Seller is required to fund and/or maintain under or related to the Reserve Agreement and the Security Agreement, if applicable, and the Reserve Fund has been funded in amounts required by the terms of the Reserve Agreement and the Security Agreement, as applicable.

(e)     The Seller, in preparing, estimating and considering any calculations in respect of or related to the Reserve Agreement used good faith efforts, methodologies consistent with past practice, relevant historical data and any other information that would reasonably be required to prepare a good faith calculation of any such amounts.

**4.5     No Consents or Conflicts**

Subject to the terms of the SISP Order and the Approval and Vesting Order, the execution, delivery and performance by the Seller of this Agreement, its obligations hereunder in respect of the Reserve Agreement and Security Agreement, and the other Closing Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the Organizational Documents of the Seller or Travel Services; (b) conflict with or result in a violation or breach of any provision of any Applicable Law applicable to the Seller or Travel Services; or (c) except for the Consents and Approvals, require the consent, notice or other action by any person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Material Contract to which the Seller or Travel Services is a party or by which the Seller is bound or to which any of their respective assets are subject or any of the Permits and Licenses affecting

- 43 -

the Purchased Assets or the Business; or (d) result in the creation or imposition of any Encumbrance other than Permitted Encumbrances on any assets of the Seller or Travel Services.

**4.6     Dataroom Disclosures**

The Seller has provided the Buyer with true and complete copies of the following materials and all such materials are true and correct in all respects:

(a)     the calculations prepared by the Seller in respect of the Reserve Fund and Redemption Fees (each as defined in the Reserve Agreement) for the Corporation Certificate (as defined in the Reserve Agreement) dated December 2022 and January 2023, which calculations have been prepared in the Ordinary Course consistent with past practice;

(b)     all Contracts between the Seller and a Material Customer or a Material Supplier that have not been terminated;

(c)     the Reserve Agreement and the Security Agreement; and

(d)     the Air Miles License Agreement.

**4.7     Sufficiency of Assets**

The Purchased Assets as defined as at the date hereof (and not adjusted pursuant to 2.6) (together with all Transition Services) are sufficient for the continued conduct of the Business after the Closing in all material respects and for performance of Seller's obligations under the Assumed Contracts in substantially the same manner as conducted prior to the Closing and constitute all of the rights, property, and assets necessary to conduct the Business as conducted currently and during the twelve (12) month period prior to the date of this Agreement. None of the Excluded Assets as defined as at the date hereof (and not adjusted pursuant to 2.6) are required for the operation of the Business.

**4.8     Redemption Liabilities**

The Seller has implemented internal controls in order to track Collectors' AMs in the Air Miles Program. The model used as part of the process to support the Ultimate Redemption Rate uses data that is sourced from the system used to track AMs. The output of such model used to support the Ultimate Redemption Rate is reviewed for reasonableness in comparison to actual observed data and other evidence related to the Air Miles Program to support the estimate. To the knowledge of the Seller, there have been no significant issues identified in the internal controls, processes and systems outlined in this Section 4.8, nor in the calculations used to determine the Ultimate Redemption Rate.

**4.9     Approvals and Consents**

Except for the SISP Order, the Approval and Vesting Order, the Competition Act Approval, the Travels Services Approvals and the Consents and Approvals, no authorization, consent or approval of, or filing with or notice to, any Governmental Authority is required in

connection with the execution, delivery or performance of this Agreement by the Sellers and each of the Closing Documents to be executed and delivered by the Seller hereunder or the purchase of any of the Purchased Assets hereunder.

**4.10     Financial Statements**

The Financial Statements present fairly, in all material respects, the financial position of the Seller and Travel Services as of the dates and throughout the periods indicated, and the results of the operations and cash flows for the periods therein indicated. The Financial Statements are based on the Books and Records of the Seller and Travel Services and have been prepared in accordance with **U.S.** GAAP applied on a basis consistent with the preceding period.

**4.11     Liabilities and Guarantees**

Except as set out in Section 4.11 of the Disclosure Letter, the Seller does not have any outstanding liabilities, contingent or otherwise, and are not bound by any agreement of guarantee, support, indemnification, assumption or endorsement of, or any other similar commitment with respect to the obligations, liabilities (contingent or otherwise) or indebtedness of any Person, other than, in each case, those set out in the Financial Statements and those incurred in the Ordinary Course of the Business since the Financial Statements Date.

**4.12     Absence of Unusual Transactions and Events**

(a)     Since the Financial Statements Date, except in respect of the CCAA Proceedings, there has not been any effect, event, change, occurrence, state of facts, development or circumstance that, individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect or any event that would or could reasonably be expected to materially impair or delay the ability of the Seller to consummate the Transaction or otherwise perform its obligations under the Closing Documents.

(b)     The Seller and Travel Services have not, since the Financial Statements Date, except in respect of the CCAA Proceedings and as otherwise set forth in Section 4.12(b) of the Disclosure Letter, conducted the Business or entered into any Contract or transaction other than in the Ordinary Course, and, without limiting the generality of the foregoing, have not since such date taken any action as set out below:

(i)     sold, licensed or otherwise disposed of any of the assets of the kind comprising Purchased Assets or cancelled any Claims comprising part of the Purchased Assets except in the Ordinary Course;

(ii)     imposed any Encumbrance upon any of the Purchased Assets, except for Permitted Encumbrances;

(iii)     accelerated, terminated, materially amended or cancelled any Assumed Contracts or Permits and Licenses, except in the Ordinary Course;

- 45 -

(iv)    made any material change in the manner of its billings, or the credit terms made available by them, to any of their customers;

(v)     paid, declared or agreed to pay any dividends or similar distributions to any shareholders;

(vi)    other than the LVI Promissory Note and the Intercompany DIP, made, or received any loans to, any affiliate, or otherwise entered into a transaction with any affiliate outside of the Ordinary Course;

(vii)   taken any action following such date that would be prohibited by Section 8.2 or 8.3, as applicable, if such action were taken after the date of this Agreement;

(viii)  given any promotions, made any increase in the compensation or other benefits payable or to become payable to the employees, contractors and consultants of the Seller, other than pursuant to existing written agreements, including Collective Agreements, disclosed to the Buyer to the extent required under Section 4.18, Key Employee Retention Agreements or in the Ordinary Course; or

(ix)    authorized or agreed or otherwise become committed to do any of the foregoing.

**4.13    Non-Arm's Length Transactions**

There are no outstanding accounts receivable due to Seller from any affiliate, officer, director, employee or any other Person with whom the Seller is not dealing at arm's length (within the meaning of the Tax Act), except for the LVI Promissory Note and the Intercompany DIP.

**4.14    Material Contracts**

(a)     Section 4.14 of the Disclosure Letter sets out a true and complete list of all Material Contracts of the Seller and Travel Services; provided that, as of the date hereof, such Section 4.14 of the Disclosure Letter may not list all such Material Contracts but the Seller shall, in accordance with Section 8.1 hereof provide the Buyer with an updated Section 4.14 of the Disclosure Letter.

(b)     Each Material Contract: (i) is a valid and binding agreement of the Seller or Travel Services, as applicable, and, to the knowledge of the Seller, the other parties thereto; and (ii) is in full force and effect and is enforceable in accordance with its terms, except to the extent any Material Contract terminates in accordance with its terms after the date of this Agreement and prior to the Closing (subject to Applicable Laws relating to Insolvency Proceedings).

(c)     The Seller and, to the knowledge of the Seller, each of the other parties thereto, except as a result of the CCAA Proceedings and the Chapter 11 Cases are not in breach of, default or violation under, any of such Material Contracts and no event

- 46 -

has occurred other than events in respect of the CCAA Proceedings and the Chapter 11 Cases that with notice or lapse of time, or both, would constitute such a breach, default or violation.

(d)     Except as set out in Section 4.14 of the Disclosure Letter, the Seller has not received any written notice of any termination, default or event that with notice or lapse of time, or both, would constitute a default by the Seller under any Material Contract.

## 4.15    Material Customers and Suppliers

(a)     Section 4.15(a) of the Disclosure Letter sets forth: (i) the Seller's top ten customers based on an aggregate consideration paid to the Seller and Travel Services for goods or services rendered in the two most recent financial years (collectively, the "**Material Customers**"); and (ii) the amount of consideration paid by each Material Customer during such periods. Other than as set out in Section 4.15(a) of the Disclosure Letter, neither the Seller nor Travel Services has received any notice, nor do they have reason to believe, that any of their Material Customers has ceased, or intends to cease after the Closing, to use their goods or services or to otherwise terminate or materially reduce its relationship with the Seller or Travel Services.

(b)     Section 4.15(b) of the Disclosure Letter sets forth: (i) the Seller's top ten suppliers based on consideration paid by the Seller and Travel Services for goods or services rendered in the two most recent financial years (collectively, the "**Material Suppliers**"); and (ii) the amount of purchases from each Material Supplier during such periods. Other than as set out in Section 4.15(b) of the Disclosure Letter, neither the Seller nor Travel Services has received any notice, nor do they have reason to believe, that any of their Material Suppliers has ceased, or intends to cease, to supply goods or services to the Seller or Travel Services or to otherwise terminate or materially reduce its relationship with the Seller or Travel Services.

## 4.16    Insurance

Section 4.16 of the Disclosure Letter sets forth a true and complete list of all current policies, binders or Contracts of fire, liability, product liability, umbrella liability, real and personal property, workplace safety and insurance, workers' compensation, vehicle, directors' and officers' liability, fiduciary liability and other casualty and property insurance maintained by the Seller and Travel Services that relate to the Purchased Assets, Assumed Liabilities, Business, operations and employees of the Seller or Travel Services (collectively, the "**Insurance Policies**"). The Insurance Policies are in full force and effect.

## 4.17    Permits and Licenses

Section 4.17 of the Disclosure Letter sets out a correct and complete list of all Material Permits and Licenses. The Material Permits and Licenses include all the Permits and Licenses that the Seller holds, or are required to hold, in connection with their ownership of the Purchased Assets or the operation of the Business as presently conducted. The Material Permits and Licenses are in full force and effect; the Seller is in material compliance with all the terms and conditions relating to the Material Permits and Licenses; and there are no proceedings in progress, pending or, to the

- 47 -

knowledge of the Seller, threatened that may result in revocation, cancellation, suspension, rescission or any material adverse modification of any of the Material Permits and Licenses.

**4.18    Employment Matters**

(a)    Neither the Seller nor Travel Services is a party to or bound by any collective bargaining agreements together with any related letters of understanding, letters of intent or other written agreements with any trade union, council of trade unions, employee bargaining agent or affiliated bargaining agent (collectively, the "**Collective Agreements**"). At the date hereof, the Seller has not conducted negotiations with respect to any future Collective Agreement. To the knowledge of the Seller, there are no current or threatened attempts to organize or establish any trade union or employee association with respect to the employees of the Seller.

(b)    None of the Employee Plans or Employee Plans (Travel Services) provide benefits beyond retirement or other termination of service to current or former directors, officers, employees, contractors or consultants or to the beneficiaries or dependents of such directors, officers, employees, contractors or consultants.

(c)    To the knowledge of the Seller, the Seller is in compliance with all Applicable Laws relating to employees, including with respect to Taxes, except where non-compliance would not reasonably be expected to be material to the Business.

(d)    No Employee Plans or Employee Plans (Travel Services) contain a "defined benefit provision" as that term is defined in section 147.1(1) of the Tax Act.

(e)    There is no material work stoppage or, to the knowledge of the Seller, threatened against the Seller.

(f)    Except as set out in Section 4.18 of the Disclosure Letter and except for grievances or notices of potential Claims arising in the Ordinary Course of the Business and in any event that would not reasonably be expected to be material to the Business, there is no Claim or Legal Proceedings pending or, to the knowledge of the Seller, threatened involving any employee of the Seller or benefits pending or, to the knowledge of the Seller, any Employee Plan or its assets.

**4.19    Intellectual Property**

Section 2.1(j) of the Disclosure Letter sets forth a complete and accurate listing of all applications and registrations of Intellectual Property owned or held by the Seller and Travel Services (the "**Seller Registered IP**"). Immediately prior to the Closing, either the Seller or Travel Services shall be the owner of record for each item of Seller Registered IP. Except as set out in Section 4.19 of the Disclosure Letter:

(a)    the Seller or Travel Services owns all right, title and interest in and to, or has the valid right to use all the Licensed Air Miles IP and all other Intellectual Property that is material to the conduct of the Business, as currently conducted, including for certainty all Intellectual Property relating to the Air Miles Program;

- 48 -

(b)     no affiliate of Seller (other than Travel Services) owns or hold any: (i) Intellectual Property relating to the Air Miles Program; or (ii) other intellectual property used in the conduct of the Business, other than such items to be provided to Buyer under the Transition Services Agreement;

(c)     to the knowledge of the Seller, the conduct of the Business does not infringe, misappropriate, violate or otherwise conflict with or harm the intellectual property rights of any other Person and no actions or proceedings have been instituted or are pending or threatened in respect thereof. No Claim has been received by the Seller or Travel Services alleging any such infringement, misappropriation, violation, conflict or harm of any intellectual property rights of any other Persons; and

(d)     to the knowledge of the Seller, no other Person has infringed, misappropriated, violated or otherwise conflicted with or harmed the Intellectual Property.

**4.20    Computer Systems and Software**

(a)     The computer systems and software of and used by the Seller and Travel Services or made available to the Seller or Travel Services by means of cloud computing, including servers, personal computers and special purpose systems, websites, databases, telecommunications equipment and facilities and other information technology systems are, in each case included in the Purchased Assets (together, the "**Business IT Systems**") and are operational in all material resects and are together adequate for the current needs of the Seller and Travel Services in the conduct of the Business. The Purchased Assets include, or the Assumed Contracts include the right to access at no cost at all times, all documentation required for the operation of the Business IT Systems, including the Air Miles Program's web platform and mobile software platform. The Seller has obtained and has held at all times all necessary rights, licenses and permissions from third parties to use the Business IT Systems and any other computer systems and software used by the Seller for purposes of operation of the Business.

(b)     No affiliate of the Seller (other than Travel Services) owns, hold or control any Business IT Systems, other than such items to be provided to the Buyer under the Transition Services Agreement. The Business IT Systems to be provided under the Transition Services Agreement are neither required for the operation of the Air Miles Program nor (except as set out in Section 4.20 of the Disclosure Letter) material to the operation of the Business.

(c)     The Collector Data on Business IT Systems represents all of the Collector Data with respect to each member of the Air Miles Program. The Collector Data accurately reflects in all respects the status of the Collector Accounts. All disputes raised by Collectors of the Air Miles Program in respect of the Collector Accounts are accurately reflected in the Collector Data, and recorded in the Seller's computer systems in the Ordinary Course of the Business.

- 49 -

(d)     The Seller and Travel Services have implemented policies and procedures that are necessary to comply with, and have fully complied in all material respects with, the requirements of all Applicable Laws and Data Security Requirements concerning: (i) the safeguarding of Collector Data; (ii) the acquisition, operation and use of all computer systems, including concerning the outsourcing of business activities, functions and services to third parties; and (iii) the identification and reporting of technology and cybersecurity incidents. Such policies and procedures include: technical, administrative, organizational and physical safeguards, controls and measures in place to protect the computer systems against unauthorized access or use and to safeguard the security, confidentiality, and integrity of data; and incident response procedures.

(e)     There are no restrictions in any Contract that would limit or restrict the Buyer's ability to use Collector Data in accordance with the Seller's or Travel Services' respective privacy policies and procedures, or otherwise to conduct the Business in substantially the same manner as conducted prior to the Closing.

(f)     The Seller and Travel Services have conducted security assessments and tests of the computer systems for vulnerabilities and security threats on no less than an annual basis and to the extent that any vulnerabilities have been detected, all such vulnerabilities have been addressed.

(g)     The Seller and Travel Services have implemented appropriate tools and procedures consistent with industry practice to protect the computer systems from any virus, trojan horse, worm, or other software routines or hardware components designed to permit unauthorized access, to disable, erase, distort, modify, replicate or otherwise harm software, hardware, or data.

(h)     The Seller and Travel Services have implemented back-up systems and disaster recovery and business continuity plans to provide for the business continuity of the Business in material respects.

(i)     Except as set out in Section 4.20 of the Disclosure Letter, neither the Seller nor Travel Services have experienced any material technology or cybersecurity incidents.

## 4.21    Real Property

(a)     Owned Real Property:

(i)     Neither the Seller nor Travel Services own any legal and/or beneficial interest in Real Property.

(ii)    Neither the Seller nor Travel Services have agreed to acquire or are subject to any agreement or option to own, legally and/or beneficially, any Real Property or any interest in any Real Property, other than the Real Property Lease.

- 50 -

(b)     Leased Real Property:

(i)     The Seller or Travel Services, as applicable, has a good and valid leasehold interest in all Leased Real Property set forth on Section 4.21 of the Disclosure Letter, free and clear of all Encumbrances other than Permitted Encumbrances and enjoy peaceful and undisturbed possession of such Leased Real Property.

(ii)    The Real Property Lease as set forth on Section 4.21 of the Disclosure Letter is in full force and effect, binding and enforceable on the Seller in accordance with its respective terms.

(iii)   All rent that is due by the lessee under each Real Property Lease has been paid and except for any default under the Real Property Lease in connection with the CCAA Proceedings, there are no outstanding defaults or breaches under the Real Property Lease on the part of the Seller. Furthermore, except for the CCAA Proceedings, no event has occurred, or circumstance exists which, with the delivery of notice, passage of time or both, would constitute such a default or breach. Seller has not received any written notice from any lessor or sublessor of such Leased Real Property of, nor does there exist any default, event or circumstance that, with notice or lapse of time, or both, would constitute a default by the party that is the lessee or lessor of such Leased Real Property.

(iv)    As of the date of this Agreement, no written notice has been received by the Seller from any Governmental Authority advising of any defects in the construction of the buildings located on the Leased Real Property or any installations therein, or related to any work order, deficiency notice or non-compliance with any building restrictions, zoning by-laws, fire codes or other regulations or agreements with governmental or quasi-governmental authorities, in each case in respect of the Leased Real Property, which has not been addressed or remedied.

(v)     To the Seller's knowledge, the Leased Real Property is in working order and repair for the operation of the Business as currently conducted. To the Seller's knowledge, all buildings, structures, fixtures and other improvements, situated on the Leased Real Property are supplied with utilities and other services necessary for the operations of the Business presently conducted on such Leased Real Property.

(vi)    To the Seller's knowledge, the Seller has in full force and effect all Permits and Licenses required in connection with the use of the Leased Real Property, and the use and occupancy by the Seller of the Leased Real Property is not in breach, violation or non-compliance of or with any applicable Laws in any material respect.

- 51 -

(vii)　To the Seller's knowledge, no part of the Leased Real Property has been taken, condemned or expropriated by any Governmental Authority and the Seller has not received any written notice of the commencement of, or any intention or proposal to commence, any proceeding in respect thereof.

(viii)　There are no Contracts to which the Seller is a party granting to any third party any sublease, license or other right to use, occupy, possess or otherwise encumber any portion of the Leased Real Property.

(ix)　To the Seller's knowledge, there are no amounts or concentrations of any hazardous materials at, on, above, in or under any of the property subject to the Real Property Lease, other than in accordance with Environmental Law.

**4.22    No Subsidiaries**

Except for the Seller's ownership of the Travel Services Shares, the Seller does not have any subsidiaries, and Travel Services does not have any subsidiaries.

**4.23    Compliance with Laws**

(a)　The Seller and Travel Services are conducting and have at all times during the past five (5) years conducted the Business in compliance in all material respects with all Applicable Laws.

(b)　Travel Services is conducting and has at all times during the past five (5) years conducted the Business in compliance in all material respects with all applicable industry codes and guidelines (whether or not having the force of law) that relate to insurance or to the marketing, advertising, sale or administration of insurance policies.

(c)　The Seller and Travel Services have: (i) implemented reasonable policies, security measures and training to comply with Data Security Requirements and CASL and to protect Personal Information in their possession, custody or control against Data Breaches; and (ii) have maintained records to demonstrate their compliance with Data Security Requirements and CASL.

(d)　Except as set out in Section 4.23 of the Disclosure Letter, neither the Seller nor Travel Services, during the past five (5) years, has experienced any Data Breach and, to the knowledge of the Seller, no service provider to the Seller or Travel Services has reported any Data Breach involving Personal Information under the control of the Seller or Travel Services.

**4.24    Anti-Money Laundering; Sanctions; Anti-Corruption**

Except as set out in Section 4.24 of the Disclosure Letter, none of the Seller, Travel Services or any of their respective Representatives:

- 52 -

(a)   has violated, and the Seller's execution and delivery of and performance of its obligations under this Agreement will not violate, any AML Laws;

(b)   has, in the course of its actions for, or on behalf of, the Seller and/or Travel Services, as applicable: (i) knowingly used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) offered, provided, paid or received any bribe or otherwise unlawfully offered, provided paid or received, directly or indirectly, anything of value to or from any foreign or domestic government employee or official or any other Person; (iii) violated or taken any act that would violate any applicable provision of the *Criminal Code* (Canada), the *Corruption of Foreign Public Officials Act* (Canada), the *Foreign Corrupt Practices Act of 1977* (United States), and the *Bribery Act* (UK) or other similar laws of other jurisdictions to the extent such laws are applicable to the Seller or Travel Services (collectively, "**ABAC Laws**"); (iv) violated or taken any act that would violate the *Special Economic Measures Act* (Canada) ("**SEMA**") or other similar laws of other jurisdictions to the extent such laws are applicable to the Seller or Travel Services; or (v) violated or taken any act that would violate the *Freezing Assets of Corrupt Foreign Public Officials Act* (Canada) ("**FACFOA**") or other similar laws of other jurisdictions to the extent such laws are applicable to the Seller or Travel Services, in each case to which the Seller and/or Travel Services are subject;

(c)   has been, in the course of its actions for, or on behalf of, the Seller and/or Travel Services, as applicable: (i) convicted of a violation of applicable anti-corruption, bribery or fraud laws or regulations including the ABAC Laws; or (ii) the subject of an investigation by a Governmental Authority for a violation of ABAC Laws;

(d)   has, directly or indirectly, taken any action in violation of any export restrictions, anti-boycott regulations, embargo regulations or other similar Applicable Laws;

(e)   is a "specially designated national" or "blocked person" under United States sanctions administered by the Office of Foreign Assets Control of the United States Department of the Treasury ("**OFAC**"), a Person identified under SEMA, FACFOA, the *United Nations Act* (Canada) or otherwise a target of economic sanctions under other similar Applicable Laws; or

(f)   has engaged in any business with any Person with whom, or in any country in which it is prohibited for a Person to engage under SEMA, FACFOA, the *United Nations Act* (Canada) or any other Applicable Laws.

The representations and warranties given in this Section 4.24 shall not be made by nor apply to the Seller and/or Travel Services in so far as such representation or warranty would result in a violation of or conflict with the *Foreign Extraterritorial Measures Act* (Canada) or any other Applicable Law in effect in Canada from time to time.

- 53 -

**4.25    Litigation and Other Proceedings**

Except as set out in Section 4.25 of the Disclosure Letter, there is no court, administrative, regulatory or similar proceeding (whether civil, quasi-criminal or criminal); arbitration or other dispute settlement procedure; investigation or inquiry by any Governmental Authority; or any similar matter or proceeding (collectively, "**Legal Proceedings**") against Travel Services or against the Seller in respect of the Business, the Purchased Assets, or any Employee Plan (whether in progress, pending or, to the knowledge of the Seller, threatened) that seeks non-monetary relief or damages in excess of $25,000 and, except as set out in Section 4.25 of the Disclosure Letter, there is no material judgment, decree, injunction, rule, award or order of any Governmental Authority outstanding against Travel Services or the Seller in respect of the Purchased Assets or the Business.

**4.26    Books and Records**

Financial transactions of Travel Services, or the Seller relating to the Business, as applicable have been accurately recorded in such Books and Records in all material respects.

**4.27    Residence of the Seller**

The Seller is not a non-resident of Canada and is not a partnership for the purposes of the Tax Act.

**4.28    HST and QST Registration**

The Seller and Travel Services are registered for purposes of the *Excise Tax Act* (Canada) and, if applicable, *an Act respecting Québec sales tax* (Québec), and their HST and, if applicable, QST registration numbers are set out in Section 4.28 the Disclosure Letter.

**4.29    Tax Matters Relating to Seller**

Except, in each case, as set out in Section 4.29 of the Disclosure Letter:

(a)    there are no Encumbrances for Taxes upon any of the Purchased Assets nor, to the Seller's knowledge, is any Governmental Authority in the process of imposing any Encumbrance for Taxes on any of the Purchased Assets;

(b)    there are no unpaid Taxes which, to the Seller's knowledge, are capable of forming or resulting in a lien on the Purchased Assets or becoming a liability or obligation of the Buyer; and

(c)    there are no inquiries, investigations, disputes, audits, actions, objections, appeals, suits or other proceedings or claims in progress, or, to the Seller's knowledge, pending or threatened by or against the Seller by any Governmental Authority with respect of any Taxes in respect of the Seller that can result in a lien on the Purchased Assets. The Seller has withheld, collected and remitted to the proper Governmental Authority all amounts required to have been withheld, collected and remitted by it in respect of Taxes, on a timely basis  and in respect of such amounts withheld that

- 54 -

are not yet required to be remitted, has properly set aside such amounts for such purpose.

**4.30    U.S. Presence**

The Business does not have any operations, offices or other physical locations in the United States, and no employees of the Business reside or are located in the United States.

**ARTICLE 5**
**REPRESENTATIONS AND WARRANTIES BY THE BUYER**

The Buyer represents and warrants to the Seller as follows, and acknowledges that the Seller is relying upon the following representations and warranties in connection with their sale of the Purchased Assets:

**5.1    Incorporation and Status**

The Buyer is a legal person duly incorporated, organized and validly existing under the laws of Canada, is in good standing under such laws and has the power and authority to enter into, deliver and perform its obligations under this Agreement.

**5.2    Due Authorization and Enforceability of Obligations**

Subject to obtaining the SISP Order and the Approval and Vesting Order, the Buyer has all necessary power, authority and capacity to enter into this Agreement and to carry out its obligations under this Agreement. The execution and delivery of each of this Agreement, the Closing Documents and the consummation of the Transaction has been duly authorized by all necessary corporate action of the Buyer. This Agreement has been, and at the Closing Time the Closing Documents will be (subject to the Transaction being the "Successful Bid" pursuant to the SISP), duly executed and delivered by the Buyer and constitutes a valid and binding obligation of the Buyer enforceable against it in accordance with its terms, as such enforceability may be limited by bankruptcy, insolvency, moratorium, reorganization and similar laws affecting creditors generally and by general principles of equity.

**5.3    No Conflicts**

The execution, delivery and performance by the Buyer of this Agreement and any other Closing Document to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the Organizational Documents of Buyer; or (b) conflict with or result in a violation or breach of any provision of any Applicable Law applicable to the Buyer.

**5.4    Approvals and Consents**

Except for: (a) approval of the Court through the SISP Order and the Approval and Vesting Order; and (b) the Competition Act Approval, no authorization, consent or approval of, or filing with or notice to, any Governmental Authority, court or other Person is required in connection with the execution, delivery or performance of this Agreement by the Buyer and each of the

- 55 -

agreements to be executed and delivered by the Buyer hereunder or the purchase of any of the Purchased Assets hereunder.

## 5.5 Residence of the Buyer

The Buyer is not a non-resident of Canada and is not a partnership for the purposes of the Tax Act.

## 5.6 HST and QST Registration

The Buyer, or its assignee(s) acquiring the Purchased Assets, is, or at the Closing Time will be, registered for purposes of the *Excise Tax Act* (Canada) and, if applicable, *an Act respecting Québec sales tax* (Québec), and will provide its registration numbers to the Seller.

## 5.7 Brokers

No broker, finder or investment banker is entitled to any brokerage commission, finder's fee or other similar payment in connection with the Transaction based upon arrangement made by or on behalf of the Buyer.

## 5.8 Sufficiency of Funds

The Buyer has, or will have at the Closing, sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the Transaction.

## 5.9 Investment Canada Act

The Buyer is not a "non-Canadian" within the meaning of the Investment Canada Act.

## ARTICLE 6
## ADDITIONAL REPRESENTATIONS AND WARRANTIES SPECIFIC TO TRAVEL SERVICES

The Seller represents and warrants to the Buyer and acknowledges that the Buyer is relying upon the following representations and warranties in connection with its purchase of the Travel Services Shares the matters set out below:

## 6.1 Incorporation and Status

Travel Services is an unlimited company duly organized and validly existing under the laws of Nova Scotia and in good standing under such laws.

## 6.2 Capitalization

(a) Section 6.2 of the Disclosure Letter contains a complete and accurate list showing, as of the date of this Agreement, Travel Services' authorized and issued and outstanding share capital, securities or other ownership interests (together with the holders thereof).

- 56 -

(b) As of the Closing, the Travel Services Shares: (i) represent all of the issued and outstanding share capital, securities and other ownership interests in the capital of Travel Services; (ii) are duly authorized and validly issued and are fully paid and non-assessable; (iii) are owned directly by the Seller, free and clear of all Encumbrances and Seller is the record owner of and beneficially owns the Travel Services Shares; and (iv) are not issued in violation of any pre-emptive or similar rights.

(c) The Travel Services Shares have been issued in compliance with all Applicable Laws.

(d) Travel Services does not own, or have any interest in, any shares or have securities, or another ownership interest, in any other Person.

(e) Other than as set forth in Section 6.2 the Disclosure Letter, there is no:

(i) outstanding security held by any Person that is convertible into, or exchange-able or exercisable for, shares, securities or rights in the capital of Travel Services;

(ii) subscription, option, warrant, convertible security, plan, Contract, right or commitment of any nature whatsoever (pre-emptive, contingent or other-wise), written or oral, requiring or that may require, whether or not subject to conditions, Travel Services to issue, sell, redeem, purchase or transfer any of its securities (including shares) or any securities convertible into, or exchangeable or exercisable for, or otherwise evidencing a right to sub-scribe for or acquire, any of its securities;

(iii) agreement, commitment or understanding of any nature whatsoever, written or oral (other than this Agreement) that grants to any Person the right to purchase or otherwise acquire or have a Claim against issued and outstanding securities (including shares) of Travel Services;

(iv) shareholders' agreement, partnership agreement, voting trust, voting agreement, pooling agreement, proxy or similar arrangement with respect to any shares, securities or other ownership interests of Travel Services; or

(v) partnership, trust, joint venture, association or similar jointly owned business undertaking of whatsoever nature involving Travel Services.

**6.3    Liabilities and Guarantees**

Except as set out in Section 6.3 of the Disclosure Letter, Travel Services does not have any indebtedness for borrowed money and is not bound by any guarantee or support agreement with respect to indebtedness for borrowed money of any Person other than those incurred in the Ordinary Course.

**6.4      Non-Arm's Length Transactions**

(a)      Travel Services has not made any payment or loan to, or borrowed any monies from or is otherwise indebted to, any affiliate, officer, director, employee or any other Person with whom Travel Services is not dealing at arm's length (within the meaning of the Tax Act), except compensation paid in the Ordinary Course.

(b)      Except for Contracts of employment entered into in the Ordinary Course and Key Employee Retention Agreements, Travel Services is not a party to any Contract with any affiliate, officer, director, employee or any other Person with whom Travel Services is not dealing at arm's length (within the meaning of the Tax Act).

(c)      There are no outstanding notes payable to, accounts receivable from or advances by Travel Services with respect to its business relating to any affiliate, officer, director, employee or any other Person with whom Travel Services is not dealing at arm's length (within the meaning of the Tax Act).

**6.5      Employment Matters**

No employees are employed by Travel Services and there are no Employee Plans (Travel Services).

**6.6      Authorizations and Conduct of the Business**

(a)      Section 6.6 of the Disclosure Letter sets forth a list of all Agency Licenses issued to Travel Services and Individual Travel Agent Licenses issued to the Individual Travel Agents, and such Agency Licenses and Individual Travel Agent Licenses are the only Permits and Licenses necessary for Travel Services to conduct its business as presently conducted. The Business is being conducted in compliance with all such Agency Licenses and Individual Travel Agent Licenses in all material respects. All such Agency Licenses and Individual Travel Agent License are valid and in full force and effect. Travel Services has not received written notice of any Claim that could reasonably be expected to result in the termination, revocation, suspension or restriction of any Agency License or Individual Travel Agent License or the imposition of any material fine, penalty or other sanctions for violation of any requirements or conditions relating to any such Agency License or Individual Travel Agent License or for contravention of Applicable Laws.

(b)      Since January 1, 2018 there has not been any examination, investigation, review or inquiry, or similar, of Travel Services issued by any Governmental Authority that identified any material deficiencies or violations, or potential deficiencies or violations, that have not been resolved, in all material respects to the satisfaction of the Governmental Authority that noted such deficiencies or violations.

(c)      Since January 1, 2018, there has not been any material complaint regarding Travel Services, whether reported to Travel Services by the Person affected, a Governmental Authority or by another source.

- 58 -

**6.7**     **Banking Information and Power of Attorney**

Section 6.7 of the Disclosure Letter sets forth the name and location (including municipal address) of each bank, trust company or other financial institution in which Travel Services has an account, money on deposit or a safety deposit box. Section 6.7 of the Disclosure Letter sets out a true and complete list of any and all outstanding power of attorney, agency and mandate granted by Travel Services to any Person, copies of which have been provided to the Buyer prior to the date hereof.

**6.8**     **Tax Matters Relating to Travel Services**

Except, in each case, as set out in Section 6.8 of the Disclosure Letter:

(a)     Travel Services has filed all Tax Returns that it was required to file by all Applicable Laws and all such Tax Returns are true, correct and prepared in compliance with all Applicable Laws. The information contained in such Tax Returns is correct and complete in all material respects;

(b)     Travel Services has timely paid in full all material Taxes due and owing by it (whether or not shown on any Tax Return) and has paid all assessments and reassessments it has received in respect of Taxes. Travel Services has paid all installments on account of Taxes for its current taxation year. Travel Services has made adequate provision in its Books and Records and the Financial Statements for all Taxes for the period covered thereby.

(c)     Travel Services does not have any outstanding agreements, arrangements, waivers or objections extending the statutory limitations period or providing for an extension of time with respect to the assessment or reassessment of Taxes of Travel Services or the filing of any Tax Return by, or any payment of Taxes by, Travel Services, nor is there any outstanding written request for any such agreement, waiver, objection or arrangement. Travel Services has not made any elections, designations or similar filings with respect to Taxes or entered into any agreement in respect of Taxes or Tax Returns that have an effect for any period ending after the Closing Date except as delivered to the Buyer. Travel Services has not requested, received or entered into any advance Tax rulings or advance pricing agreements from or with any Governmental Authority;

(d)     Travel Services has timely withheld and timely paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any Employee, independent contractor, creditor, or other person, as required under Applicable Laws;

(e)     No material deficiencies or assessments or reassessments for any Taxes have been proposed, asserted or assessed in writing by any Governmental Authority against Travel Services that are still pending, and there are no matters (including any Tax Return filed by Travel Services) under discussion, examination, audit or appeal with or by any Governmental Authority, and there are no proceedings, claims,

- 59 -

demands, audits, investigations, or actions now pending or threatened against Travel Services in writing in each case with respect to Taxes;

(f)    There are no Encumbrances for Taxes on any assets of Travel Services;

(g)    Travel Services has collected from each receipt from any of its past and present customers (or other persons paying amounts to Travel Services) the amount of all Taxes required to be collected and have paid and remitted such Taxes when due, in the form required under Applicable Laws. Without limiting the generality of the foregoing, Travel Services has charged, collected and remitted on a timely basis all Taxes as required under Applicable Law on any sale, supply or delivery whatsoever, made by it;

(h)    All tax credits, refunds, rebates, overpayments and similar adjustments of Taxes claimed by each of Travel Services has been validly claimed and correctly calculated as required by Applicable Laws, and Travel Services has retained all documentation prescribed by Applicable Laws to support such claims;

(i)    Travel Services has complied with all registration, reporting, payment, collection and remittance requirements in respect of HST, QST and any other sales and use Taxes and Transfer Taxes;

(j)    Travel Services has not acquired property from any person in circumstances where it became liable for any Taxes of such person. Travel Services has not entered into any agreement with, or provided any undertaking to, any person pursuant to which they have assumed liability for the payment of Taxes owing by such person;

(k)    Travel Services has delivered, or will deliver within ten (10) days of the date hereof, to the Buyer a true copy of all material Tax Returns filed by Travel Services for 2018-2022 and all material correspondence with any Governmental Authority relating to Taxes, including all notices of assessment or reassessment;

(l)    Travel Services has maintained and continues to maintain all Books and Records required to be maintained by it under the Tax Act and all other Applicable Laws in respect of Taxes;

(m)    Travel Services has not been engaged in a trade or business in any country, other than Canada, by virtue of having an office, employees, or a permanent establishment in such country. To the knowledge of the Seller, no claim has ever been made by a Governmental Authority in a jurisdiction where Travel Services does not file Tax Returns that it is or may be subject to the imposition of any Tax by, or required to file Tax Returns in, that jurisdiction;

(n)    Travel Services is not required to include any item of income in, or to the knowledge of the Seller, exclude any item of deduction from, taxable income for any Post-Closing Tax Period as a result of any (i) change in accounting method for any Pre-Closing Tax Period, (ii) installment sale, open transaction or other transaction made on or prior to the Closing Date, (iii) prepaid amount received on

- 60 -

or prior to the Closing Date, or are otherwise required to include any item of income in, or exclude any item of deduction from, taxable income for any Post-Closing Tax Period attributable to income that accrued, or that was required to be reported for financial accounting purposes, in a prior taxable or fiscal period but that was not included in taxable income for that or another prior taxable or fiscal period, or (iv) forgiveness of any debt incurred by Travel Services prior to the Closing Time. Travel Services has not claimed any reserves for purposes of the Tax Act (or any other Applicable Law) for the most recent Tax or fiscal period ended prior to the date of this Agreement or for any Tax period ending as a result of the completion of the Transaction;

(o)    To the knowledge of the Seller, there are no circumstances which exist and could result in, or have existed and resulted in, the application of any of sections 17, 79, 79.1 or 80 to 80.04, inclusive, of the Tax Act (or any similar provision under any Applicable Law in respect of Taxes) to Travel Services and, for greater certainty, the cost amount to Travel Services of each debt obligation, if any, owed to it (taking into account the assumptions in paragraphs 80.01(a) and (b) and subparagraphs 80.01(c)(i) and (ii)) is equal to the principal amount of such debt obligation plus any accrued and unpaid interest;

(p)    To the knowledge of the Seller, Travel Services has not incurred any deductible outlay or expense owing to a person not dealing at arm's length for purposes of the Tax Act with it the amount of which would, assuming there is no agreement filed under paragraph 78(1)(b) of the Tax Act, be included in its income for Canadian income tax purposes, as the case may be, for any taxation year or fiscal period beginning on or after the Closing Date under paragraph 78(1)(a) of the Tax Act or any analogous provision of any comparable Law of any province or territory of Canada;

(q)    The terms and conditions made or imposed in respect of every material transaction (or series of transactions) between Travel Services and any person that is not dealing at arm's length with Travel Services for purposes of the Tax Act do not differ from those that would have been made between persons dealing at arm's length for purposes of the Tax Act;

(r)    Travel Services has, on a timely basis, made or obtained records or documents that meet the requirements of paragraphs 247(4)(a) to (c) of the Tax Act as may be needed to demonstrate that the terms of any such transaction entered into at any time by Travel Services is and was on comparable terms of similar transactions by arm's length persons and has delivered copies of all such records and documents to the Buyer;

(s)    To the knowledge of the Seller, Travel Services has not participated in a "reportable transaction" within the meaning of the Tax Act or a "notifiable transaction" (each as modified by or defined in (respectively) the revised legislative proposals to amend the Tax Act released by the Department of Finance (Canada) on August 9,

- 61 -

2022) (or any similar transaction that is reportable or notifiable under any applicable analogous provisions of Applicable Laws); and

(t)     Travel Services is not a party to, bound by, and does not have any obligation under, any Tax allocation or sharing agreement or similar contract or arrangement or any agreement that obligates it to make any payment computed by reference to the Taxes, taxable income or taxable losses of any other Person. Travel Services has not acquired property from any Person in circumstances where it became liable for any Taxes of such Person. Travel Services has not entered into any agreement with, or provided any undertaking to, any Person pursuant to which it has assumed liability for or provided an indemnification for the payment of Taxes owing by such Person.

## 6.9     Brokers

No broker, finder or investment banker is entitled to any brokerage commission, finder's fee or other similar payment in connection with the Transaction based upon arrangement made by or on behalf of Travel Services.

**ARTICLE 7**
**CONDITIONS**

## 7.1     Conditions for the Benefit of the Buyer and the Seller

The respective obligations of the Buyer and of the Seller to consummate the Transaction are subject to the satisfaction of, or compliance with, at or prior to the Closing Time, each of the following conditions:

(a)     the Initial Order shall have been obtained and shall be Final;

(b)     the A&R Initial Order shall have been obtained and shall be Final;

(c)     the SISP Order shall have been obtained and shall be Final;

(d)     this Agreement shall be the Successful Bid (as determined pursuant to the SISP);

(e)     the Approval and Vesting Order, and to the extent applicable in accordance with this Agreement, such further order pursuant to section 11.3 of the CCAA, shall have been obtained and shall be Final;

(f)     the Reserve Agreement Assignment and Assumption Agreement shall have been executed and delivered by each of the Seller and the Buyer;

(g)     the Competition Act Approval shall have been obtained; and

(h)     no provision of any Applicable Law and no judgment, injunction, order or decree that prohibits the consummation of the purchase of the Purchased Assets pursuant to this Agreement shall be in effect.

- 62 -

The Parties acknowledge that the foregoing conditions are for the mutual benefit of the Buyer and Seller. None of the conditions set out in this Section 7.1 may be waived by the Buyer, the Seller or both of them, save and except that the Parties may mutually waive in writing any requirement that any of the orders referred to in this Section 7.1 shall be Final.

**7.2      Conditions for the Benefit of the Buyer**

The obligation of the Buyer to consummate the Transaction is subject to the satisfaction of, or compliance with, or waiver by the Buyer of, at or prior to the Closing Time, each of the following conditions (each of which is acknowledged to be for the exclusive benefit of the Buyer):

(a)      the SISP shall have been conducted in accordance with its terms and the terms of the SISP Order;

(b)      the Approval and Vesting Order shall have been obtained by no later than May 31, 2023, or such later date as the Buyer may agree to in writing, and shall be Final;

(c)      the Fundamental Representations (Seller) shall be true and correct in all but *de minimis* respects on and as of the Closing Date with the same effect as though made at and as of such date;

(d)      the representations and warranties in Section 4.5 (*No Consents or Conflicts)* and Section 4.14(c) (*Material Contracts*) shall be true and correct in all material respects on and as of the Closing Date with the same effect as through made at and as of such date;

(e)      except as would not have or would not reasonably be expected to have a Material Adverse Effect, either individually or in the aggregate, all representations and warranties of the Seller set out in this Agreement, including those set forth in Article 4 and Article 6, other than the Fundamental Representations (Seller) and the representations and warranties in Section 4.5 (*No Consents or Conflicts)* and Section 4.14(c) (*Material Contracts*), shall be true and correct as of the date hereof and the Closing Date with the same force and effect as if such representations or warranties were made on and as of such date; provided, however, that: (i) if a representation and warranty is qualified by a materiality or Material Adverse Effect qualification, such qualification shall be disregarded for the purposes of this Section 7.2(e); and (ii) if a representation or warranty speaks only as of a specific date it only needs to be true and correct as of that date;

(f)      the covenants contained in this Agreement to be performed by the Seller at or prior to the Closing Time shall have been performed in all material respects as at the Closing Time;

(g)      from the date of this Agreement, there shall not have occurred any Material Adverse Change;

(h)      the Buyer shall have received a certificate confirming the satisfaction of the conditions contained in Sections 7.2(c), 7.2(e), 7.2(f) and 7.2(g) signed for and on

- 63 -

behalf of the Seller without personal liability by an executive officer of the Seller or other Persons reasonably acceptable to the Buyer, in each case in form and substance reasonably satisfactory to the Buyer;

(i)    the Buyer shall have received Consents and Approvals in respect of Contracts with Materials Customers, Material Suppliers (including the WestJet Contract) and any Permits and Licenses from a Governmental Authority;

(j)    the Buyer shall have obtained any consents that are necessary, as determined in the Buyer's sole discretion, acting reasonably, to effect the Reserve Agreement Assignment and Assumption such that the Reserve Agreement Assignment and Assumption Agreement shall have become effective, or shall become effective contemporaneously with Closing;

(k)    the Seller shall have delivered the Cure Costs Schedule to the Buyer by no later than seven (7) days prior to the Closing Date, or such other date as the Buyer may agree to in writing; and

(l)    the Buyer shall have received from the Seller each of the closing deliveries listed in Section 11.2(a), together with all such other instruments of assignment or conveyance, and other documents, instruments and certificate, duly executed by the Seller as shall be reasonably requested by the Buyer, in the form and substance reasonably acceptable to the Buyer, or reasonably necessary to transfer the Purchased Assets to the Buyer free and clear of all Encumbrances (other than Permitted Encumbrances) in accordance with this Agreement.

The foregoing conditions are for the exclusive benefit of the Buyer. Any condition in this Section 7.2 may be waived by the Buyer in whole or in part, without prejudice to any of its rights of termination in the event of non-fulfillment of any other condition in whole or in part. Any such waiver shall be binding on the Buyer only if made in writing.

## 7.3    Conditions for the Benefit of the Seller

The obligation of the Seller to consummate the Transaction is subject to the satisfaction of, or compliance with, or waiver where applicable, by the Seller of, at or prior to the Closing Time, each of the following conditions (each of which is acknowledged to be for the exclusive benefit of the Seller):

(a)    the Fundamental Representations (Buyer) shall be true and correct in all but *de minimis* respects on and as of the Closing Date with the same effect as though made at and as of such date;

(b)    except as would not have or would not reasonably be expected to have a Material Adverse Effect, either individually or in the aggregate, all representations and warranties of the Buyer set out in this Agreement, including those set forth in Article 5, other than the Fundamental Representations (Buyer) shall be true and correct in all material respects as of the date hereof and the Closing Date with the same force and effect as if such representations or warranties were made on and as

- 64 -

of such date; provided, however, that: (i) if a representation and warranty is qualified by materiality, such qualification shall be disregarded for the purposes of this Section 7.3(b); and (ii) if a representation or warranty speaks only as of a specific date it only needs to be true and correct as of that date

(c)     the covenants contained in this Agreement to be performed by the Buyer at or prior to the Closing Time shall have been performed in all material respects as at the Closing Time;

(d)     the Approval and Vesting Order shall have been obtained by no later than May 31, 2023, or such later date as the Seller may agree to in writing, and shall be Final;

(e)     the Seller shall have received a certificate confirming the satisfaction of the conditions contained in Sections 7.3(a), 7.3(b) and 7.3(c) signed for and on behalf of the Buyer without personal liability by an executive officer of the Buyer or other persons reasonably acceptable to the Seller, in each case in form and substance reasonably satisfactory to the Seller;

(f)     the Seller shall have received from the Buyer each of the closing deliveries listed in Section 11.2(b) together with all such other instruments of assignment or conveyance, and other documents, instruments and certificate, duly executed by the Buyer as shall be reasonably requested by the Seller, in the form and substance reasonably acceptable to the Seller; and

(g)     all amounts due and payable by BMO under the BMO Sponsorship Agreement as of the Closing Date shall have been paid in accordance with the terms of the BMO Sponsorship Agreement.

The foregoing conditions are for the exclusive benefit of the Seller. Any condition in this Section 7.3 may be waived by the Seller in whole or in part, without prejudice to any of its rights of termination in the event of non-fulfillment of any other condition in whole or in part. Any such waiver shall be binding on the Seller only if made in writing.

**7.4     Monitor's Certificate**

(a)     When the conditions to Closing set out in Sections 7.1, 7.2 and 7.3 have been satisfied and/or waived by the Seller and/or the Buyer, as applicable, the Seller and the Buyer or their respective counsel will each deliver to the Monitor confirmation that such conditions of Closing, as applicable, have been satisfied and/or waived (the "Conditions Certificates"). Upon receipt of the Conditions Certificates, the Monitor shall: (a) issue forthwith its Monitor's Certificate concurrently to the Seller and the Buyer, at which time the Closing will be deemed to have occurred; and (b) file as soon as practicable a copy of the Monitor's Certificate with the Court (and shall provide a true copy of such filed certificate to the Seller and the Buyer). In the case of (a) and (b) above, the Monitor will be relying exclusively on the basis of the Conditions Certificates without any obligation whatsoever to verify the satisfaction or waiver of the applicable conditions.

- 65 -

(b)     The Parties agree and acknowledge that the Monitor shall have no liability to the Parties in connection with the Monitor's Certificate or otherwise in connection with the Transaction, including in its capacity as Escrow Agent and in performing the engagement contemplated by Section 3.4(d) hereof, and in performing such roles the Monitor shall be acting in its capacity as such and shall have all of the rights, protections, limitations on liability and benefits of the CCAA, the Initial Order, the A&R Initial Order, any other order of the Court made in the CCAA Proceedings and as an officer of the Court.

## ARTICLE 8
## ADDITIONAL AGREEMENTS OF THE PARTIES

**8.1     Access to Information and Update of Disclosure Schedules**

Until the Closing Time, the Seller shall give to the Buyer's personnel engaged in the Transaction and their Representatives during normal business hours reasonable access to its premises and to all books and records and other materials relating to the Business, the Purchased Assets and the Assumed Liabilities and to members of the Seller's senior management, shall furnish them with all such information relating to the Business, the Purchased Assets and the Assumed Liabilities as the Buyer may reasonably request in connection with the Transaction, including as the Buyer may request in order to complete additional confirmatory due diligence: (i) as may be applicable in respect of Section 2.6; and/or (ii) relating to consumer protection and similar matters, and shall coordinate reasonable access by the Buyer to the customers and suppliers of the Business. Notwithstanding anything in this Section 8.1 to the contrary, any such investigation shall be conducted upon reasonable advance notice and in such manner as does not materially disrupt the conduct of the Business and shall be subject to restrictions under Applicable Law and nothing in this Section 8.1 or otherwise shall require the Seller to furnish to the Buyer any unredacted competitively sensitive material or unredacted confidential materials prepared by the Seller's financial advisors or legal advisors or any materials subject to any solicitor-client or other privilege, provided that the Seller shall use commercially reasonable efforts to coordinate with the Buyer regarding any processes or systems that can be put in place, including use of a "clean team", in order to facilitate such disclosure. In connection with any such access and examination, the Buyer and its Representatives shall cooperate with the Seller and Travel Services and their Representatives and shall use their commercially reasonable efforts to minimize any disruption to the business of the Seller and Travel Services. The Seller shall also deliver to the Buyer authorizations to Governmental Authorities necessary to permit the Buyer to obtain information in respect of the Purchased Assets from the files of such Governmental Authorities. No investigation by the Buyer or other information received by the Buyer or its representatives shall operate as a waiver or otherwise affect any representation, warranty, covenant or agreement given or made by the Seller in this Agreement or any other Closing Document. Promptly after the date hereof, the Seller shall, using good faith efforts, update Section 4.14 of the Disclosure Letter in respect of Material Contracts and provide an updated Disclosure Letter that sets out a true and complete list of all Material Contracts of the Seller and Travel Services, as of the date hereof, and no later than fourteen (14) days prior to the Closing Date, deliver such updated Disclosure Letter to the Seller. For greater certainty, the condition to closing threshold set forth in Section 7.2(e) shall apply, as set forth herein, to such updated Disclosure Letter.

- 66 -

**8.2     Conduct of Business Until Closing Time**

From the date hereof and until the Closing Time, except: (1) as expressly required by this Agreement; (2) as required by the DIP Term Sheet; (3) with the prior written consent of the Buyer (not to be unreasonably withheld, conditioned or delayed); (4) provided for in any of the orders made in the CCAA Proceedings; or (5) as required by Applicable Law, the Seller shall and shall cause Travel Services to:

(a)     operate the Business in the Ordinary Course and not amend any material term of the Air Miles Program nor make any changes to the Air Miles Program that may be expected to have an adverse impact on retaining Collectors as members of the Air Miles Program;

(b)     use commercially reasonable efforts to preserve the Business, including the services of their respective officers and employees (other than any termination of employees' employment in the Ordinary Course), and their respective business relationships and goodwill with customers, suppliers and others having business dealings with it;

(c)     not: (i) materially amend any Assumed Contract, other than in the Ordinary Course; (ii) disclaim, terminate or repudiate any Assumed Contract without the Buyer's written consent, not to be unreasonably withheld; and (iii) except as permitted by the A&R Initial Order, keep all Assumed Contracts in good standing;

(d)     consistent with past practice: (i) preserve the present Business operations, organizations, rights and goodwill of the Seller and Travel Services; and (ii) preserve the rights, goodwill and present relationships with customers and suppliers of the Seller and Travel Services;

(e)     keep and maintain (including defending and protecting) the Seller's and Travel Services' assets and properties in good repair and normal operating condition, subject to reasonable wear and tear;

(f)     maintain, and cause Travel Services to maintain, in good standing all Permits and Licenses held as of the date hereof, including the renewal of any Permits and Licenses scheduled to expire before Closing;

(g)     maintain the Books and Records in accordance with past practice;

(h)     not make any loans, advances or capital contributions to any Person, except as otherwise provided in this Agreement;

(i)     continue to fulfil all of its obligations under the Reserve Agreement and Security Agreement;

(j)     not exercise its right to remove or replace RBC under the Reserve Agreement;

- 67 -

(k)     not withdraw any amounts or monies from the Reserve Fund including any portion or all of the Reserve Excess (as defined in the Reserve Agreement), except in the Ordinary Course in respect of Collector point redemptions;

(l)     not exercise a termination right or trigger an Event of Termination (as defined in the Reserve Agreement) under the Reserve Agreement;

(m)    not transfer, assign, sell, abandon, lease, sublease, fail to maintain or dispose of any of the Purchased Assets or cancel any debts or entitlements;

(n)     not transfer, assign or grant any license or sublicense of any material rights under or with respect to any of the Intellectual Property or any intellectual property of Travel Services;

(o)     not impose any Encumbrance upon any of the Purchased Assets (including in respect of or related to the RBC Accounts);

(p)     not make or agree to make any write off or write down, or any determination to write off or write down, or revalue, any material amount of the Purchased Assets, or to change in any respect any reserves associated therewith, or to waive or release any material right or claim associated therewith;

(q)     continue to fulfil all of its obligations in respect of the Air Miles Program, including all of its obligations owed to BMO under the BMO Sponsorship Agreement;

(r)     not increase the compensation or benefits of any Assumed Employee or any employee, contractor or consultant of Travel Services;

(s)     other than the Key Employee Retention Agreements, not: (i) grant any bonuses, whether monetary or otherwise, or increase any wages, salary, severance, pension or other compensation or benefits in respect of its current or former employees, officers, directors, independent contractors or consultants, other than as provided for in any written agreements, required by Applicable Law or permitted by any key employee retention plan or key employee incentive plan; (ii) change the terms of employment for any employee or any termination of any employees for which the aggregate costs and expenses exceed $50,000; or (iii) accelerate the vesting or payment of any compensation or benefit for any current or former employee, officer, director, independent contractor or consultant;

(t)     not waive or release any material Claims held by it related to the Business that are included in the Purchased Assets;

(u)     not make any changes in the selling, distribution, advertising, promotion, terms of sale or collection practices of the Business, other than in the Ordinary Course;

(v)     pay Taxes of the Business when due;

- 68 -

(w)     not make or rescind any express or deemed election, information schedule, return or designation relating to Taxes, or file any amended Tax Returns; make a request for a Tax ruling or enter into a settlement agreement with any Governmental Authority with respect to Taxes; settle or compromise any claim, assessment, reassessment, liability, action, suit, litigation, proceeding, arbitration, investigation, audit or controversy relating to Taxes; surrender any right to claim Tax abatement, reduction, deduction, exemption, credit or refund; make any changes to methods, principles, policies or practices of reporting income, deductions or accounting for Tax purposes (with respect to those employed prior to the date of this Agreement), except as required under Applicable Laws, or consent to the extension or waiver of the limitation period applicable to any Tax matter;

(x)     not waive, release, permit the lapse of, relinquish or assign any rights of the Business under any Assumed Contract other than in the Ordinary Course;

(y)     accelerate the delivery or sale of services or products, or offer discounts or price protection on the sale of services or products or premiums on the purchase of any materials other than in the Ordinary Course; and

(z)     not agree or make a commitment, whether in writing or otherwise, to do any of the foregoing.

Nothing in this Agreement gives the Buyer the right, directly or indirectly, to control or direct the Seller's operations for purposes of any applicable antitrust laws before receipt of any applicable approvals and consummation of the Transaction.

**8.3     Conduct in Respect of Travel Services Until Closing Time**

Except: (1) as expressly required by this Agreement; (2) as required by the DIP Term Sheet; (3) with the prior written consent of the Buyer (not to be unreasonably withheld or delayed); (4) as provided for in any of the orders made in the CCAA Proceedings; or (5) as required by Applicable Law, from the date hereof until the Closing Time, neither the Seller nor Travel Services shall:

(a)     amend Travel Services' Organizational Documents;

(b)     split, consolidate or reclassify any shares in Travel Services;

(c)     issue, sell or otherwise dispose of any shares in Travel Services, or grant any options, warrants or other rights to purchase or obtain (including upon conversion, exchange or exercise) any shares in Travel Services; or

(d)     declare or pay any dividends or distributions on or in respect of any shares in Travel Services or redeem, retract, purchase or acquire its shares.

- 69 -

**8.4     Misallocated Assets**

(a)      If after the Closing: (i) the Buyer or any of its affiliates holds, is the owner of, receives or otherwise comes to possess any Excluded Assets or Excluded Liabilities; or (ii) the Seller or any of its affiliates hold, is the owner of, receives or otherwise comes to possess any Purchased Assets or Assumed Liabilities, the Buyer or the Seller, as applicable, will: (A) promptly give written notice to the other Party; and (B) promptly transfer assign, convey and deliver (or cause to be transferred, assigned, conveyed and delivered) such assets or assume (or cause to be assumed) such Assumed Liabilities or Excluded Liabilities to or from (as applicable) the other Party. Prior to any such transfer, the Party receiving or possessing any such asset will hold it in trust for the benefit of such other Party. Each Party will cooperate with the other Party and use its commercially reasonable efforts to set up procedures and notifications as are reasonably necessary or advisable to effectuate the assignment, transfer, conveyance and delivery, or assumption, contemplated by this Section 8.4.  Following the Closing, the Seller will, and will cause its affiliates to, deliver as promptly as practicable any Purchased Assets that were not provided to the Buyer at the Closing. Without duplication or limitation of the foregoing, in the event that: (x) the Seller or any of its affiliates receives any payment, invoice or other correspondence from customers, suppliers or other contracting parties related to the Purchased Assets or the Assumed Liabilities, after the Closing, the Seller agrees to promptly remit (or cause to be promptly remitted) such funds, invoices or other correspondence to the Buyer; or (y) the Buyer or any of its affiliates receive any payment, invoice or other correspondence from customers, suppliers or other contracting parties of the Seller, or otherwise related to the Excluded Assets or the Excluded Liabilities, after the Closing, the Buyer agrees to promptly remit (or cause to be promptly remitted) such funds, invoices or other correspondence to the Seller.

(b)      If any Party hereto brings a Legal Proceeding in connection with any controversy, disagreement or dispute arising under this Section 8.4, the losing Party in any such Legal Proceeding shall reimburse the prevailing Party for its reasonable and documented costs and expenses (including reasonable and documented attorneys' fees) in connection with such Legal Proceeding.

(c)      Prior to the Closing, the Seller shall, and as applicable shall cause Travel Services to, update the owner of record for each item of Seller Registered IP to be the Seller or Travel Services, where any such item has on the date of this Agreement as the owner of record any entity or name other than the name of the Seller or Travel Services, as applicable, immediately prior to Closing.

**8.5     Reserve Agreement Assignment and Assumption**

With regard to the assignment by the Seller to the Buyer of all of the Seller's rights and interests under the Reserve Agreement and the Security Agreement and the assumption by the Buyer of all of the Seller's present and future liabilities and obligations under the Reserve Agreement and the Security Agreement (the "**Reserve Agreement Assignment and Assumption**"):

- 70 -

(a) the Seller shall, promptly after the date hereof, use commercially reasonable efforts provide to third parties such notice or other documentation of the Reserve Agreement Assignment and Assumption (which will become effective on the Closing) as may be required by the Seller's Contracts;

(b) the Seller and the Buyer shall enter into on the Closing Date an assignment and assumption agreement (the "**Reserve Agreement Assignment and Assumption Agreement**") to document the Reserve Agreement Assignment and Assumption, which assignment and assumption shall be in form and substance satisfactory to each of the Seller and Buyer, acting reasonably, and, for certainty, shall not include any additional representations or warranties or covenants regarding the Reserve Agreement, the Reserve Fund or any other matters relating to or in connection with the Transaction;

(c) the Seller will provide notice of this Agreement and the proposed Reserve Agreement Assignment and Assumption to RBC (in the event that this Agreement is selected as the Successful Bid), and the Seller shall provide reasonable cooperation to the Buyer to assist the Buyer, but for certainty without the requirement to pay for any costs, expenses or fees, to obtain a consensual consent to the Reserve Agreement Assignment and Assumption from RBC, provided that for certainty no consent from RBC shall be required as a condition of Closing for the benefit of the Buyer;

(d) concurrently with or promptly after the Closing, at the Buyer's written request, the Seller shall make reasonable best efforts, and cooperate with the Buyer, to effect the transfer of the RBC Accounts to the Buyer; and

(e) the Seller shall, at the Buyer's written request, promptly furnish the Buyer with copies of such documents and information, including financial information, as the Buyer may reasonably request in connection with the Reserve Agreement and Security Agreement.

**8.6    Approvals and Consents**

(a) The Parties shall, as soon as reasonably practicable following the date hereof, seek all Consents and Approvals, make all such filings and deliver all such notices as may be required in respect therewith, including notices to each of the Governmental Authorities listed in Section 8.6 of the Disclosure Letter, and request any expedited processing available. The Parties shall use (and shall cause their respective affiliates to use) their respective commercially reasonable efforts to obtain the Competition Act Approval on or before the Outside Date.

(b) The Seller shall cooperate in and use reasonable best efforts to facilitate negotiation and completion of an assignment of the Licensed Air Miles IP to the Buyer, in lieu of an assignment of the Air Miles License Agreements to Buyer, upon the Closing.

(c) Without limiting the generality of the foregoing, with respect to the Competition Act Approval:

- 71 -

(i)     the Buyer shall, as soon as reasonably practicable, and in no event more than ten (10) Business Days after the date hereof, submit a request to the Commissioner for an Advance Ruling Certificate or, in the alternative, a No Action Letter in respect of the Transaction;

(ii)    if an Advance Ruling Certificate or No Action Letter shall not have been obtained within five (5) Business Days following the filing of the Buyer's request, then the Parties shall consider the advisability of making notification filings in accordance with Part IX of the Competition Act in respect of the Transaction and, if either party determines, acting reasonably, that such filings are advisable, shall each submit a notification filing within ten (10) Business Days of such determination; and

(iii)   the Buyer shall be responsible for the payment of any filing fees required to be paid in connection with any filing made in respect of the Competition Act Approval.

(d)   The Parties shall: (i) give each other reasonable advance notice of all material meetings or other oral communications with any Governmental Authority relating to the Competition Act Approval, and provide as soon as practicable and within any required time any additional submissions, information and/or documents requested by any Governmental Authority necessary, proper or advisable to obtain the Competition Act Approval; (ii) not participate independently in any such material meeting or other oral communication without first giving the other Party (or their outside counsel) an opportunity to attend and participate in such material meeting or other oral communication, unless otherwise required or requested by such Governmental Authority; (iii) if any Governmental Authority initiates an oral communication regarding the Competition Act Approval, promptly notify the other Party of the substance of such communication; (iv) subject to Applicable Laws relating to the exchange of information, provide each other (or their outside counsel) with a reasonable advance opportunity to review and comment upon and consider in good faith the views of the other in connection with all written communications (including any filings, notifications, submissions, analyses, presentations, memoranda, briefs, arguments, opinions and proposals) made or submitted by or on behalf of a Party with a Governmental Authority regarding the Competition Act Approval; and (v) promptly provide each other (or their outside counsel) with copies of all written communications to or from any Governmental Authority relating to the Competition Act Approval.

(e)   Each Party shall, at the other Party's request, furnish that other Party with copies of such documents and information, including financial information, as the requesting Party may reasonably request in connection with the obtaining of any Consents and Approvals contemplated by Sections 8.6(a) to  8.6(d).

(f)   Each of the Parties may, as advisable and necessary, reasonably designate any competitively or commercially sensitive material provided to the other under this Section 8.6 as "Outside Counsel Only Material". Such materials and the

- 72 -

information contained therein shall be given only to the outside legal counsel of the recipient and, subject to any additional agreements between the Parties, will not be disclosed by such outside legal counsel to employees, officers or directors of the recipient unless express written permission is obtained in advance from the source of the materials or its legal counsel.

(g)     Neither Party shall enter into any transaction, investment, agreement, arrangement or joint venture or take any other action, the effect of which would reasonably be expected to make obtaining the Competition Act Approval materially more difficult or challenging, or reasonably be expected to materially delay the obtaining of the Competition Act Approval.

(h)     The obligations of the Buyer to use its commercially reasonable efforts to obtain the Competition Act Approval does not require the Buyer or any affiliate thereof to propose, negotiate, effect or agree to, a sale, divestiture, license, or other disposition of any assets or business of the Buyer or its affiliates (including the Purchased Assets) or otherwise take any action that limits the freedom of action with respect to, or the Buyer's ability to retain any of the businesses, product lines or assets of the Buyer or its affiliates (including the Purchased Assets).

(i)     In the event of a Legal Proceeding relating to, arising from or in connection with the Transaction, each Party shall use commercially reasonable efforts to: (i) oppose or defend against such Legal Proceeding and/or (ii) appeal, overturn or have lifted or rescinded any Applicable Law relating to itself or any of its subsidiaries which may materially adversely affect the ability of the Parties to consummate the Transaction; and (iii) appeal or overturn or otherwise have lifted or rendered non-applicable in respect of the Transaction, any Applicable Law that makes consummation of the Transaction illegal or otherwise prohibits or enjoins either of the Parties from consummating the Transaction.

## 8.7     Access of the Seller to Books and Records

The Seller (including any receiver or trustee appointed in respect thereof) shall, for a period of six (6) years from the Closing Date, have access to, and the right to copy, at its expense, for *bona fide* business purposes and for purposes of any Insolvency Proceedings, litigation, or winding-up of the Seller, and during usual business hours, upon reasonably prior notice to the Buyer, all Books and Records relating to the Business, the Purchased Assets and the Assumed Liabilities that are transferred and conveyed to the Buyer pursuant to this Agreement. The Buyer shall retain and preserve all such Books and Records for such six (6) year period. Notwithstanding anything herein to the contrary, no such Books and Records shall be made available to the extent that it would: (a) unreasonably disrupt the operations of the Business or the Buyer; or (b) require the Buyer to disclose information subject to attorney-client privilege.

## 8.8     Further Assurances

Each of the Parties hereto shall promptly do, make, execute or deliver, or cause to be done, made, executed or delivered, all such further acts, documents and things as the other Parties hereto

- 73 -

may reasonably require from time to time for the purpose of giving effect to this Agreement and shall use commercially reasonable efforts and take all such steps as may be reasonably within its power to implement to their full extent the provisions of this Agreement. Upon and subject to the terms and conditions of this Agreement and subject to the directions of any applicable courts to the Seller, the Parties shall use their commercially reasonable efforts to take or cause to be taken all actions and to do or cause to be done all things necessary proper or advisable under Applicable Laws to consummate and make effective the Transaction, including using commercially reasonable efforts to satisfy the conditions precedent to the obligations of the Parties hereto.

**8.9**     **Tax Matters**

    (a)    The Buyer and the Seller agree to use commercially reasonable efforts to furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Business, the Purchased Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other required or optional filings relating to Tax matters, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution of any suit or other proceedings relating to Tax matters and for the answer to any governmental or regulatory inquiry relating to Tax matters.

    (b)    For purposes of any income Tax Return, the Buyer and the Seller agree to report the Transaction in a manner consistent with the Purchase Price allocation determined in accordance with Section 3.5, and the Buyer and the Seller shall not voluntarily take any action inconsistent therewith in any such Tax Return, refund claim, litigation or otherwise, unless required by applicable Tax laws. The Buyer and the Seller shall each be responsible for the preparation of their own statements required to be filed under the Tax Act and other similar forms in accordance with applicable Tax laws.

    (c)    All amounts payable by either Party to the other Party pursuant to this Agreement are exclusive of any HST, QST or any other federal, provincial, state or local or foreign value-added, sale, use, consumption, multi-staged, ad valorem, personal property, customs, excise, stamp, transfer, land or real property transfer, or similar Taxes, duties, or charges, or any recording or filing fees or similar charges (collectively, "**Transfer Taxes**"). All Transfer Taxes are the responsibility of and for the account of the Party required to pay such taxes under Applicable Laws. The Buyer and the Seller agree to cooperate to determine the amount of Transfer Taxes payable in connection with the Transaction. If a Party (the "**Collecting Party**") is required by Applicable Law or by administration thereof to collect any applicable Transfer Taxes from the other Party, such other Party shall pay such amounts to the Collecting Party concurrent with the payment of any consideration payable pursuant to this Agreement, and the Collecting Party shall remit or account for such Transfer Taxes to the applicable Governmental Authority on a timely basis and otherwise in accordance with Applicable Laws, unless the other Party qualifies for an exemption from any such applicable Transfer Taxes, in which case the other Party shall, in lieu of payment of such applicable Transfer Taxes to the Collecting

- 74 -

Party, deliver to the Collecting Party such certificates, elections, or other documentation required by law or the administration thereof to substantiate and effect the exemption claimed by the other Party.

(d)     If requested by the Buyer, in the event that either or both of subsection 184(2) and subsection 185.1(1) of the Tax Act would otherwise apply at any time to all or any part of any dividend or other amount paid by Travel Services before the Closing Time, Travel Services will file an election or elections under either or both of subsection 184(3) and subsection 185.1(2) of the Tax Act in a timely manner with the appropriate Governmental Authority such that no Tax is payable by Travel Services under either of Part III and III.1 of the Tax Act in connection with the declaration and payment of such dividend. The Seller agrees that it shall concur or shall cause the recipient of the relevant dividend to concur, as applicable, in the making of any election under either or both of subsection 184(3) and subsection 185.1(2) of the Tax Act to the extent that such Person received a dividend in respect of which the election applies, and will provide evidence of such concurrence to the Buyer on Closing.

(e)     If requested by the Buyer, the Seller and the Buyer shall jointly make the election provided for in paragraph 167(1)(b) of the *Excise Tax Act* (Canada) and any equivalent or corresponding provision under any applicable provincial or territorial legislation (including section 75 of *an Act respecting Québec sales tax* (Québec)), in prescribed form and within the required time period, to have subsection 167(1.1) of the *Excise Tax Act* (Canada) and any equivalent or corresponding provision under any applicable provincial or territorial legislation apply in respect of the sale and purchase of the Purchased Assets under this Agreement. The Buyer shall file the completed election form with the applicable Governmental Authority no later than the due date for the Buyer's HST or QST returns, as applicable, for the first reporting period in which HST or QST, as applicable, would, in the absence of this election, become payable in connection with the transactions contemplated by this Agreement. Notwithstanding such election and anything to the contrary in this Agreement, in the event it is finally determined by any relevant Governmental Authority that the Seller is liable to collect and remit HST or QST in respect of the sale of the Purchased Assets and the Business, the Buyer shall forthwith pay such HST or QST, as applicable, plus any applicable interest and penalties, to the Seller for remittance to the applicable Governmental Authority and the Buyer shall indemnify and save the Seller (and any present or former directors and officers of the Seller) harmless with respect to any Taxes and costs payable resulting from such determination. This indemnity shall survive the Closing Date in perpetuity.

(f)     If requested by the Buyer, the Seller and the Buyer will jointly execute, and each of them will file promptly following the Closing Date, an election under section 22 of the Tax Act and any corresponding provisions of any applicable provincial income Tax legislation, in prescribed form and within the required time period, with respect to any debts referred to in such section 22 and any corresponding provisions of any applicable provincial income Tax legislation. For the purposes of such elections, the Buyer, acting reasonably and in consultation with the Seller, will

- 75 -

designate the portion of the Purchase Price allocable to the debts in respect of which such elections are made. For greater certainty, the Seller and the Buyer agree to prepare and file their respective Tax Returns in a manner consistent with such election(s).

(g)    The Seller and the Buyer will jointly elect under subsection 20(24) of the Tax Act and any corresponding provisions of any applicable provincial income Tax legislation, in the prescribed manner and within the required time period, with respect to the amount of the Assumed Liabilities. For the purposes of such election(s), the Parties, acting reasonably, shall determine the elected amount and the Buyer and the Seller acknowledge that the Seller is transferring assets to the Buyer which have a value equal to such elected amount as consideration for the assumption by the Buyer of such obligations of the Seller.

(h)    The Seller and the Buyer shall make any other election or amended election under the Tax Act or any other Tax legislation that the Seller and the Buyer agree to make and reasonably determine is available and necessary or advisable and the parties agree to revise or amend any such elections to reflect any adjustment to the purchase price pursuant to Section 3.4.

(i)    All registration fees, transfer taxes and similar payments arising out of the completion of this transaction and not expressly addressed in this Agreement shall be paid by the Seller and the Buyer in accordance with Applicable Law or custom.

(j)    Notwithstanding any other provision of this Agreement, in the event that, as a result of a breach, modification or termination of this Agreement at any time, an amount, including damages and amounts payable under Section 9.2, is to be paid or forfeited by Seller, or a debt or other obligation is to be reduced or extinguished without payment by Seller on account of the debt or obligation and section 182 of the *Excise Tax Act* (Canada) applies to the amount to be paid, forfeited, reduced or extinguished, as the case may be, the amount shall be increased so that the amount received by the Buyer net of the applicable HST is equal to the amount that the Buyer would have received had section 182 of the *Excise Tax Act* (Canada) not applied.

## 8.10    Employee Matters

(a)    As soon as possible after the date hereof, and in any event within five (5) Business Days of the date hereof, the Seller shall provide the Buyer with a correct and complete list, as of the date set out therein:

(i)    of all employees of the Seller (the "**Employees**"), including the following information by employee: name; date of hire; title or position; grade/level; location; whether full-time, part-time or fixed term employment; eligibility for overtime pay; visa or work permit details (if any); whether on short-term or long-term disability or other leave; salary or hourly rate of pay; annual cash incentive eligibility and cash incentives received in each of the

- 76 -

previous three (3) years; annual vacation entitlement; annual sick leave entitlement; equity/deferred compensation incentive eligibility and incentives received in each of the previous three (3) years; and any other material compensation arrangements. For any employees who are on a short-term or long-term disability or other leave, such list shall set out their type of absence, length of absence, and expected return to work (if any);

(ii) of all contractors and consultants of the Seller, including the following information: date of engagement, general description of services provided, fee rate and annual fees paid in each of the previous three (3) years; and

(iii) a true and complete list of all Employee Plans.

(b) Prior to but conditional on Closing and with effect as of the Closing Time, the Buyer or its designee shall make written offers of employment to all of the Employees that are located in Canada, such offers of employment to be: (i) in respect of salary or hourly rate of pay and annual cash incentive opportunity, substantially similar, in the aggregate, as those existing with the Seller in respect of such Employees immediately prior to Closing for a period of one year following the Closing; (ii) in respect of working from home arrangements in Canada only, the same as those existing with the Seller in respect of such Employees for a period of six (6) months following the Closing, at which time they will be subject to the flexible work arrangements of the Buyer, and Buyer will determine whether each position is to be onsite, hybrid or remote, and such designation will be decided in good faith, and changes to Employee status as remote workers, if any, will contemplate a transition period of at least sixty (60) days; and (iii) in respect of benefits, on terms and conditions that are applicable to similarly situated employees of the Buyer for a period of one year following the Closing. Prior to the Closing Time, the Buyer may, in coordination and consultation with the Seller, send to each Employee an offer letter, which will be followed by materials relating to a background check, consistent with the offer letter and background check typically required by the Buyer and its Affiliates for similarly situated employees. The Seller shall assist the Buyer with obtaining Employee consents for such background checks. If any Employee requires a visa, work permit or other approval for their employment to continue with the Buyer or its designee following Closing, the Buyer or its designee shall use commercially reasonable efforts to promptly make any necessary applications and to secure the necessary visa, permit or other approval. Buyer shall not be required to make offers of employment to any employee of the Seller that is located in or a resident of the United States.

(c) All of the Employees who accept the Buyer's or its designee's offer of employment and commence active employment with the Buyer shall hereinafter be referred to as "**Assumed Employees**". The Buyer or its designee shall recognize all service of Assumed Employees with the Seller or, if longer, as recognized by the Seller. The Seller will cooperate with the Buyer and its designee, if any, in giving notice to the Employees concerning such matters referred to in this Section 8.10 as are

- 77 -

reasonable under the circumstances. The Seller and Buyer shall exercise reasonable efforts to persuade the Employees to accept the Buyer's offers of employment.

(d)     The Buyer or its designee shall assume and be responsible for all liabilities and obligations with respect to the Assumed Employees arising on or after their commencement of employment with the Buyer or its designee, including all severance pay, termination pay, pay in lieu of notice, damages and other liabilities, which will be provided in all cases in accordance with Applicable Law and, where applicable, in accordance with any written employment agreement.

(e)     Subject to the CCAA Proceedings, Seller shall remain solely responsible for the satisfaction of all claims for medical, dental, life insurance, health, accident or disability benefits brought by or in respect of current or former employees, officers, directors, independent contractors or consultants of the Seller or the spouses, dependents or beneficiaries thereof, which claims relate to events occurring on or before the later of: (i) the Closing Date; or (ii) the date of their commencement of employment or engagement with the Buyer or its designee. Seller also shall remain solely responsible for all claims under the *Workplace Safety and Insurance Act, 1997* (Ontario) (or the comparable legislation of any other jurisdiction) of any current or former employees, officers, directors, independent contractors or consultants of the Seller that relate to events occurring on or before the later of: (i) the Closing Date; or (ii) the date of their commencement of employment or engagement with the Buyer or its designee. Solely to the extent required by Applicable Law, including any order of the CCAA Court or the Bankruptcy Court, Seller shall pay, or cause to be paid, all such amounts to the appropriate persons as and when due.

(f)     Subject to the CCAA Proceedings, Seller shall be solely responsible, and neither Buyer nor its designee shall have any obligations whatsoever, for any compensation or other amounts payable to any current or former employee, officer, director, independent contractor or consultant of the Seller for any period relating to the service with Seller at any time before their commencement of employment with the Buyer or its designee, including liabilities and obligations related to any required notice of termination, termination or severance pay (required under Applicable Law or under contract), employment insurance, workplace safety and insurance/workers' compensation, Canada Pension Plan, salary or wages, accrued and unused vacation entitlements, sabbatical days and other paid time off, statutory holiday pay, overtime pay, payroll or employer health taxes, commissions, bonuses, employee benefit plan payments or contributions and any other Claims. Seller shall pay to Employees all such amounts due and owing to the date of Closing in the normal course, but for greater certainty shall not pay any amounts in respect of termination pay that becomes due and payable after the commencement of the CCAA Proceedings. Subject to the CCAA Proceedings, and to the Buyer's obligations as set out in this Section 8.10, Seller shall be and remain solely responsible, and neither Buyer nor its designee shall have any obligations whatsoever, for all liabilities and obligations related to the employment by the Seller of any Employees, including any such liabilities and obligations incurred

- 78 -

after the Closing Date, in respect of any Employee who: (i) rejects the Buyer's or its designee's offer of employment; (ii) receives an offer of employment from the Buyer or its designee but does not become an Assumed Employee; or (iii) resigns from employment with the Seller prior to their commencement of employment with the Buyer or its designee.

(g)     The terms of any offer of employment by the Buyer or its designee to any Employee who is absent from work as of the date of such offer due to a short or long-term disability, pregnancy, parental or any other statutory leave of absence may, in the sole discretion of the Buyer or its designee, specify that the offer of employment is conditional upon such Employee returning to work with any accommodations that may be required by Applicable Law no later than eighteen (18) months after the Closing Date, and each such Employee shall only become an Assumed Employee as of the date, if any, on which such Employee returns to work and shall remain an employee of the Seller until the earliest of (i) the date on which the Employee becomes an Assumed Employee (if applicable), or (ii) the appointment of trustee in bankruptcy in respect of the Seller. In the event that the Employee does not become an Assumed Employee within eighteen (18) months after the Closing Date, the Seller shall bear all resulting liabilities and obligations including any liabilities and obligations that relate to events occurring after the Closing Date.

(h)     The Assumed Employees shall cease to participate in all Employee Plans and shall be entitled to participate in Buyer's benefit plans, programs, policies and arrangements in accordance with the terms and conditions of such plans, with recognition of prior service for purposes of satisfying any waiting periods. The Buyer shall not assume any of the Employee Plans, and the Seller shall retain all rights, obligations and liabilities under and in relation to such Employee Plans.

**8.11    Fees and Expenses**

Except as expressly provided in this Agreement, including pursuant to Section 9.2 hereof, and subject to the terms of the DIP Term Sheet, all fees and expenses incurred in connection with the negotiation and settlement of this Agreement and the completion of the Transaction (excluding, for greater certainty, the DIP Facility and the DIP Term Sheet), including the fees and disbursements of counsel, financial advisors and accountants, shall be paid by the Person incurring such fees or expenses.

**8.12    Name Discontinuance**

On or promptly following the Closing Date, and except as may be required for purposes of any Insolvency Proceedings, the Seller and its affiliates shall discontinue use of the name "AIR MILES" and any variation thereof, except where legally required to advise that its name has been changed to another name or to refer to the historical fact that the Seller previously conducted the Business under the "AIR MILES" name.

- 79 -

**8.13    Release**

Notwithstanding any other provisions of this Agreement, effective as of the Closing Time, each of the Buyer and the Seller, on behalf of itself and its affiliates, does hereby forever release and discharge: (i) the Monitor and its affiliates and each of their respective present and former direct and indirect shareholders, officers, directors, partners, employees, advisors (including financial advisors and legal counsel) and agents; and (ii) such other Party and its affiliates (including the release of Travel Services by the Seller) and each of their respective present and former direct and indirect shareholders (excluding Bread and its present and former directors and officers), officers, directors, employees, advisors (including financial advisors and legal counsel) and agents (collectively, the "**Released Parties**") from any and all demands, claims, liabilities, actions, causes of action, counterclaims, expenses, costs, damages, losses, suits, debts, sums of money, refunds, accounts, indebtedness, rights of recovery, rights of set-off, rights of recoupment and liens of whatever nature (whether direct or indirect, absolute or contingent, asserted or unasserted, secured or unsecured, matured or not yet matured due or to become due, accrued or unaccrued or liquidated or unliquidated) and including all costs, fees and expenses relating thereto (collectively, "**Claims**") based in whole or in part on any act or omission, transaction, dealing or other occurrence existing or taking place on or prior to the Closing Time relating to, arising out of or in connection with, the Purchased Assets, the Business, the Assumed Liabilities, the SISP, the Transaction, the CCAA Proceedings, or the Chapter 11 Cases, save and except for Claims: (a) under this Agreement (including the acquisition of the Purchased Assets and assumption of the Assumed Liabilities by the Buyer) or any document ancillary thereto; (b) arising out of fraud, gross negligence or wilful misconduct of or by the Released Parties; and/or (c) relating to Bread. For greater certainty, the Seller is not releasing any of its affiliates pursuant to this Section 8.13, other than Travel Services.

**8.14    Wind-Up**

The Buyer acknowledges that following the Closing Date, the Seller may pursue further proceedings to wind-up its affairs, whether pursuant to further restructuring proceedings (including a plan in respect of a distribution of sale proceeds to its creditors), commencing proceedings pursuant to the *Bankruptcy and Insolvency Act*, R.S.C., 1985, c. B-3, as amended, or otherwise. Nothing in this Agreement shall prohibit the Seller from ceasing its operations or winding up its affairs at any time after the Closing Date. Any costs and expenses incurred by the Seller in connection with such proceedings shall be borne exclusively by the Seller, without any recourse to the Buyer, and the Buyer shall have no obligation to participate in (including to incur any costs in respect of), and shall be unaffected in all respects by, any such further proceedings.

**8.15    Reserve Agreement Reporting**

(a)    The Seller shall, on or before the 15th day following the end of each month after the date hereof, provide the Buyer with a notice setting out the Seller's estimate (the "**Funding Estimate**") of the funds required to be deposited in the Reserve Account in order to ensure that a Reserve Fund Deficiency will not arise in respect of the previous month's activities together with evidence that such funds have been deposited into the Reserve Account. The Funding Estimate shall be prepared on the

- 80 -

basis of the principles and the methodology that have been used by the Seller to prepare such estimates for its internal use prior to the date hereof.

(b)     The Seller shall, on the last Business Day of each month following the date hereof, provide the Buyer with a copy of the Trust Certificate prepared in respect of the previous month as well as evidence that sufficient funds have been deposited (if necessary) to ensure that a Reserve Fund Deficiency in respect of such month will not arise in respect of such month, based on the amounts set out in such Trust Certificate.

## 8.16     Replacement of BofA Letter of Credit

At or prior to the Closing, the Buyer shall replace that certain Letter of Credit No. 68182913 dated December 14, 2022 and issued to Regie des Alcools Des Courses des Jeux (the "**L/C**") in the amount of $100,000 Canadian dollars issued by Bank of America, N.A. with a parent guarantee, letter of credit, bond, indemnity, cash (if acceptable to the beneficiary thereof) or another non-cash credit assurance of a comparable and sufficient nature that satisfies the requirements of the beneficiary such that the Seller and Bank of America, N.A. shall have received evidence of the cancellation, surrender or return for cancellation of the L/C at or prior to Closing without any unreimbursed drawing having been made under the L/C; provided that for certainty, nothing contemplated by this Section 8.16 shall in any way affect or change the Purchase Price or any amount required to be paid by the Buyer hereunder.

## ARTICLE 9
## CCAA PROCEEDINGS

## 9.1     CCAA Proceedings

(a)     The Parties acknowledge and agree that the Seller shall apply to the Court by no later than March 10, 2023, for the Initial Order, substantially in the form of Schedule D hereto, and all Parties will use commercially reasonable efforts to have the Initial Order issued.

(b)     The Parties acknowledge and agree that the Seller shall apply to the Court by no later than March 20, 2023, for the A&R Initial Order, substantially in the form of Schedule E, and all Parties will use commercially reasonable efforts to have the A&R Initial Order issued.

(c)     The Parties acknowledge and agree that the Seller shall apply to the Court by no later than March 20, 2023, for the SISP Order, substantially in the form of Schedule F hereto, and all Parties will use commercially reasonable efforts to have the SISP Order issued. The Buyer acknowledges and agrees that the SISP is in contemplation of determining whether a superior bid can be obtained for the Purchased Assets or some alternative form of sale, investment or restructuring transaction in respect of the Seller, the Purchased Assets and/or the Business.

(d)     The Seller shall provide the Buyer for review, reasonably in advance of filing, drafts of such material motions, pleadings or other filing related to the process of

consummating the Transaction to be filed with the Court, including the motions for issuance of the Initial Order, A&R Initial Order, the SISP Order, an order pursuant to section 11.3 of the CCAA, and the Approval and Vesting Order, and shall promptly inform the Buyer of any notice, correspondence or court materials it receives from another Person with respect to any objections, concerns, or positions purportedly intended to be raised with the Court.

(e)     In the event an appeal is taken or a stay pending appeal is requested from the SISP Order, an order pursuant to section 11.3 of the CCAA, or the Approval and Vesting Order, the Seller shall promptly notify the Buyer of such appeal or stay request and shall promptly provide the Buyer a copy of the related notice of appeal or order of stay. The Seller shall also provide the Buyer with written notice of any motion or application filed in connection with any appeal from such orders. The Seller agrees to take all action as may be reasonable and appropriate to defend against such appeal or stay request and the Seller and the resolution of such appeal or stay request, provided that nothing herein shall preclude the Parties hereto from consummating the Transaction contemplated hereby, if the Approval and Vesting Order shall have been issued and has not been stayed and if the Buyer and the Seller, in their respective sole discretion, waive in writing the condition that the Approval and Vesting Order be Final.

**9.2     Expense Reimbursement and Break Fee**

In consideration for the Buyer's considerable expenditure of time and money and agreement to act as the initial bidder and the preparation of this Agreement, and in performing due diligence pursuant to this Agreement, in the event that: (i) the Transaction is not consummated for any reason other than a termination of this Agreement by the Seller pursuant to Section 10.3 or by mutual consent of the Buyer and the Seller pursuant to Section 10.1(b); and (ii) a transaction is selected as the Successful Bid in accordance with the SISP that is not this Transaction, the Buyer shall be entitled to: (A) an expense reimbursement for the Buyer's and its affiliates' documented reasonable out-of-pocket third party expenses incurred in connection with this Agreement and/or the Transaction in an aggregate amount equal to the amount of such expenses, plus applicable Taxes, up to a maximum of $1,000,000 (the "**Expense Reimbursement**") provided such expenses have not otherwise been paid or reimbursed pursuant to the terms of the DIP Term Sheet; and (B) a break fee in the amount of $3,000,000 (the "**Break Fee**"), which Expense Reimbursement and Break Fee shall be payable by the Seller to the Buyer on the date upon which closing occurs in respect of such alternative transaction; provided, however, that the Buyer shall not be entitled to payment of the Expense Reimbursement and Break Fee if no Successful Bid is selected in accordance with the SISP and the SISP terminates in accordance with its terms. The payment of the Expense Reimbursement and the Break Fee shall be approved in the SISP Order and shall be secured by a Court-ordered charge against the Seller's assets in priority to amounts secured by existing security other than amounts secured by the various charges approved by the Court in the Initial Order and/or the A&R Initial Order (the "**Expense Reimbursement and Break Fee Charge**"). Each of the Parties hereto acknowledges and agrees that the Expense Reimbursement and the Break Fee together represent a fair and reasonable estimate of the costs that will be incurred by the Buyer as a result of non-completion of the Transaction, and are not intended to be punitive in nature nor to discourage competitive bidding for the Business and/or the Purchased Assets, and

- 82 -

no Party shall take a position inconsistent with this Section 9.2. The Seller irrevocably waives any right it may have to raise as a defence that any such liquidation damages are excessive or punitive. Each of the Parties acknowledge and agree that the Expense Reimbursement in this Section 9.2 is an integral part of this Agreement and of the Transaction, and that without these agreements, the Buyer would not enter into this Agreement. Upon payment of the Expense Reimbursement and the Break Fee to the Buyer, the Buyer shall be precluded from any other remedy against the Seller at law or in equity or otherwise in respect of the disclaimer, repudiation, breach or termination of this Agreement; provided that nothing herein shall preclude any Party from seeking injunctive relief to restrain any breach or threatened breach of the covenants or agreements set forth in this Agreement or to compel specific performance of this Agreement.

## ARTICLE 10
## TERMINATION

**10.1    Termination – Buyer and Seller**

This Agreement may be terminated by the Buyer and/or the Seller at any time prior to Closing upon written notice to the other Party as follows:

(a)     if Closing does not occur on or before the Outside Date; provided, however, that the Party seeking to terminate this Agreement may not terminate pursuant to this Section 10.1(a) if the Closing's non-occurrence on or by the Outside Date is caused by such Party's failure to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it before the Closing Date;

(b)     subject to any approvals required from the Court or otherwise pursuant to any Insolvency Proceedings, by mutual written consent of the Seller and the Buyer;

(c)     if this Agreement is not selected as the Successful Bid (as determined pursuant to the SISP), or if the Court otherwise approves a transaction that is not this Agreement; provided, however, that the Party seeking to terminate this Agreement may not terminate pursuant to this Section 10.1(c) if the Agreement's non-selection as the Successful Bid or the Court's aforementioned non-approval of this Agreement is caused by such Party's failure to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it before the Closing Date; and

(d)     if the Court, or any other court of competent jurisdiction or Governmental Authority (including the Competition Bureau) takes action to restrain, enjoin or otherwise prohibit all or any of the transactions contemplated hereby and such action is not capable of opposition or appeal; provided that the Party seeking to terminate this Agreement may not terminate pursuant to this Section 10.1(d) if such Party did not make commercially reasonable efforts to oppose and appeal such action, or if the aforementioned action was caused by the acts or omissions of such Party such Party's failure to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it before the Closing Date.

- 83 -

**10.2     Termination – Buyer**

This Agreement may be terminated by the Buyer at any time prior to Closing upon written notice to the Seller as follows:

(a)     if any condition set forth in Section 7.1 or 7.2 is not satisfied, waived or performed on or before the earlier of: (i) the date specified therefor (or, in the case of the condition set forth in Section 7.2(b), within five (5) Business Days following the date specified therefor); or (ii) the Closing Date;

(b)     if there has been a material violation or breach by the Seller of any covenant, representation or warranty that would prevent the satisfaction of any condition set forth in Section 7.1 or 7.2 on the Closing Date and such violation or breach has not been waived by the Buyer or cured within seven (7) calendar days after written notice thereof from the Buyer, unless the Buyer is in material breach of their obligations under this Agreement;

(c)     if the CCAA Proceedings are terminated or a trustee in bankruptcy or a receiver is appointed in respect of the Seller and/or its assets, and such trustee in bankruptcy or receiver refuses to proceed with the Transaction; and

(d)     if the Seller, or any of its affiliates, request or support, or the Court approves, any amendments or modifications to the SISP that materially and adversely affect the rights and obligations of the Buyer pursuant to this Agreement.

**10.3     Termination – Seller**

This Agreement may be terminated by the Seller at any time prior to Closing upon written notice to the Buyer:

(a)     If any condition set forth in Section 7.1 or 7.3 is not satisfied, waived or performed on or before the earlier of (i) the date specified therefor or (ii) the Closing Date; and

(b)     if there has been a material violation or breach by the Buyer of any covenant, representation or warranty that would prevent the satisfaction of any condition set forth in Section 7.1 or 7.3 on the Closing Date and such violation or breach has not been waived by the Seller or cured within seven (7) calendar days after written notice thereof from the Seller, unless the Seller is in material breach of its obligations under this Agreement.

**10.4     Effect of Termination**

In the event of termination of this Agreement pursuant to Sections 10.1, 10.2 and/or 10.3 this Agreement shall forthwith become null and void, except as set forth in Sections 1.2 through 1.14, 9.2, 10.4 and Article 12, and nothing herein shall relieve any Party from liability for any breach of this Agreement prior to termination.

- 84 -

## ARTICLE 11
## CLOSING

**11.1    Location and Time of Closing**

The Closing shall take place at the Closing Time on the Closing Date by means of an electronic closing, or such other place or fashion as may be agreed in writing upon by the Parties hereto, in which the closing documentation will be delivered by email exchange of signature pages in PDF or functionally equivalent electronic format, which delivery will be effective without any further physical exchange of the originals or copies of the originals except as otherwise provided in this Agreement.

**11.2    Closing Deliveries**

(a)    At the Closing, the Seller shall deliver to the Buyer:

(i)    signature pages to each of the Closing Documents duly executed by the Seller;

(ii)    the documents required to be delivered by the Seller pursuant to Sections 7.1 and 7.2;

(iii)    certified copies of the resolutions duly adopted by the Seller's board of directors authorizing the execution, delivery and performance of this Agreement and each of the other agreements in connection with the Transaction, as well as any other approvals required for the Seller to consummate the Transaction;

(iv)    reasonable documentation evidencing the release, or authorizing the release, of any Encumbrances existing as of the Closing on any of the Purchased Assets, other than Permitted Encumbrances;

(v)    any certificates, duly executed elections or other documents required to be delivered pursuant to Section 8.9;

(vi)    the Trust Certificate, dated as of the Closing Date;

(vii)    reasonable documentation evidencing that the Seller properly withheld and remitted applicable Taxes on any Intercompany Loans (as defined in the DIP Term Sheet) imposed under the Tax Act and any other Applicable Laws; and

(viii)    actual possession of the Purchased Assets.

(b)    At the Closing, the Buyer shall deliver to the Seller:

(i)    signature pages to each of the Closing Documents duly executed by the Buyer;

- 85 -

(ii)    payment of the Purchase Price in accordance with Section 3.3, and in respect of any amount payable to the Seller to such account as specified by Seller in writing no less than two (2) days prior to the Closing Date, or otherwise in accordance with the Approval and Vesting Order;

(iii)    certified copies of the resolutions duly adopted by the Buyer's board of directors authorizing the execution, delivery and performance of this Agreement and each of the other agreements in connection with the Transaction, as well as any other approvals required for the Buyer to consummate the Transaction;

(iv)    any certificates, duly executed elections or other documents required to be delivered pursuant to Section 8.9;

(v)    the documents required to be delivered by the Buyer pursuant to Section 7.3; and

(vi)    an instrument of assumption of liabilities with respect to the Assumed Liabilities in a form satisfactory to the Seller, acting reasonably.

## ARTICLE 12
## GENERAL MATTERS

### 12.1   Confidentiality

The Buyer and the Seller acknowledge and agree that the terms of the Confidentiality Agreement are hereby incorporated by reference and shall continue in full force and effect until the Closing, at which time the obligations thereunder shall terminate. From and after the Closing, the Seller shall, and shall cause its affiliates to, hold, and shall use its reasonable best efforts to cause its or their respective Representatives to hold, in confidence any and all information, whether written or oral, concerning the Business, the Purchased Assets and Assumed Liabilities, except to the extent that Seller can show that such information: (a) is generally available to, and known by, the public through no fault of Seller, any of its affiliates or any of their respective Representatives; or (b) is lawfully acquired by Seller, any of its affiliates or any of their respective Representatives from sources that are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If Seller, any of its affiliates or any of their respective Representatives are compelled to disclose any information by judicial or administrative process or by other requirements of Applicable Law, Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information that Seller is advised by its counsel in writing is legally required to be disclosed; provided that Seller shall use its reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

### 12.2   Transaction Personal Information

(a)    The Buyer shall collect and use Transaction Personal Information prior to Closing only as necessary for purposes related to the Transaction and for the completion of such Transaction. Prior to Closing, the Buyer shall not disclose Transaction

- 86 -

Personal Information to any Person other than to its representatives who are evaluating and advising on the Transaction.

(b)     Prior to the Closing, the Parties shall protect and safeguard the Transaction Personal Information against Data Breaches, as required by Applicable Law and shall cause their representatives to protect and safeguard the Transaction Personal Information. If the Seller or the Buyer terminates this Agreement as provided herein, the Buyer shall promptly destroy all Transaction Personal Information in its possession or in the possession of any of its Representatives and affiliates, including all copies, reproductions, summaries or extracts thereof.

(c)     After the Closing, the Buyer shall provide any notices required by Applicable Law to individuals whose Transaction Personal Information was transferred by the Seller to the Buyer before or on the Closing.

**12.3     Public Notices**

No press release or other announcement concerning the Transaction shall be made by the Seller or by the Buyer without the prior consent of the other (such consent not to be unreasonably withheld); provided, however, that subject to the last sentence of this Section 12.3, any Party may, without such consent, make such disclosure if the same is required by Applicable Law (including the CCAA Proceedings and the Chapter 11 Cases) or by any stock exchange on which any of the securities of such Party or any of its affiliates are listed or by any insolvency or other court or securities commission or other similar regulatory authority having jurisdiction over such Party or any of its affiliates, and, if such disclosure is required, the Party making such disclosure shall use commercially reasonable efforts to give prior oral or written notice to the other, and if such prior notice is not possible, to give such notice immediately following the making of such disclosure. Notwithstanding the foregoing: (a) this Agreement may be filed by the Seller with the Court, subject to redacting confidential or sensitive information as permitted by Applicable Law; and (b) the Transaction may be disclosed by the Seller to the Court. The Parties further agree that:

(a)     the Monitor may prepare and file reports and other documents with the Court containing references to the Transaction and the terms thereof, which reports shall be posted on the Monitor's website; and

(b)     the Seller and its professional advisors may prepare and file such reports and other documents with any Insolvency Proceeding containing references to the Transaction and the terms thereof as may reasonably be necessary to complete the Transaction or to comply with their obligations in connection therewith. Wherever possible, the Buyer shall be afforded an opportunity to review and comment on such materials prior to their filing.

Each of the Parties may issue a press release announcing the execution and delivery of this Agreement, in form and substance mutually agreed to by all of the Parties. Notwithstanding anything herein to the contrary, each of the Parties shall be permitted to issue a press release or other announcement concerning the Transaction (without the prior consent of the other Party)

- 87 -

provided that all the information contained in such press release or other announcement shall be information that has previously been reviewed and consented to by the other Party.

**12.4    Assignment; Buyer Designees; Binding Effect**

(a)    Except in accordance with Section 12.4(b), no Party may assign its right or benefits under this Agreement without the consent of each of the other Parties hereto.

(b)    Prior to the Closing, the Buyer may designate, with prior written notice to the Seller at least ten (10) days prior to the scheduled date for the hearing of the Approval and Vesting Order, one or more affiliates who are residents of Canada for purposes of the Tax Act to, at the Closing: (i) to acquire all or part of the Purchased Assets (including, for certainty, all or part of the Travel Services Shares); and/or (ii) to assume all or part of the Assumed Liabilities, in which event all references herein to Buyer will be deemed to refer to such affiliates, as appropriate; provided, however, that: (A) no such designation will in any event limit, relieve or affect: (x) the obligations of the Buyer to pay the Estimated Purchase Price at Closing in accordance with Section 3.3; and/or (y) any other obligations of the Buyer under this Agreement to the extent not performed by such affiliates; and (B) if the Buyer shall have assigned all of its rights and obligations hereunder the Buyer shall, immediately following the Closing, be deemed fully released from all the Buyer's obligations hereunder except with respect to its obligations under Section 8.13.

(c)    This Agreement shall be binding upon and inure to the benefit of the Parties and their respective permitted successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third Person beneficiary rights in any Person or entity not a Party to this Agreement other than: (i) any affiliate(s) of the Buyer designated to acquire Purchased Assets and/or assume Assumed Liabilities in accordance with Section 12.4(b); and (ii) the Monitor; and (iii) the Released Parties, who shall be express third party beneficiaries of Sections 8.13 and 12.4 hereof.

**12.5    Notices**

Any notice, request, demand or other communication required or permitted to be given to a Party pursuant to the provisions of this Agreement will be in writing and will be effective and deemed given under this Agreement on the earliest of: (a) the date of personal delivery; (b) the date of transmission by email, with confirmed transmission and receipt (if sent during normal business hours of the recipient, if not, then on the next Business Day); (c)  two (2) days after deposit with a nationally-recognized courier or overnight service such as Federal Express; or (d) five (5) days after mailing via certified mail, return receipt requested. All notices not delivered personally or by email will be sent with postage and other charges prepaid and properly addressed to the Party to be notified at the address set forth for such Party:

(a)    If to the Buyer at:

BMO Bank of Montreal
First Canadian Place

- 88 -

100 King Street West
Toronto, Ontario
M5X 1A3

Attention:     Mark Pratt; Theresa Duckett
Email:         Matt.Pratt@bmo.com; Theresa.Duckett@bmo.com

with copies (which shall not in itself constitute notice) to:

Torys LLP
TD Centre
79 Wellington Street West, 30th Floor
Toronto, Ontario
M5K 1N2

Attention:     David Bish; Kevin Morris
Email:         dbish@torys.com; kmorris@torys.com

(b)     If to the Seller at:

Loyalty Ventures Inc.
8235 Douglas Avenue, Suite 1200
Dallas, Texas 75225

Attention:     General Counsel
Email: generalcounsel@loyalty.com

with copies (which shall not in itself constitute notice) to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036-6745
Facsimile: (212) 872-1002

Attention: Philip C. Dublin; Meredith A. Lahaie; Iain Wood; Alan L. Laves
Email: pdublin@akingump.com; mlahaie@akingump.com;
iwood@akingump.com; alaves@akingump.com

and

Cassels, Brock & Blackwell LLP
Scotia Plaza, Suite 2100
40 King Street West
Toronto, ON M5H 3C2

Attention: Ryan C. Jacobs; Jane O. Dietrich; Jeffrey Roy; Colin Ground
Email: rjacobs@cassels.com; jdietrich@cassels.com; jroy@cassels.com;
cground@cassels.com

- 89 -

Any Party may change its address for service from time to time by notice given in accordance with the foregoing and any subsequent notice shall be sent to such Party at its changed address.

**12.6    No Survival**

None of the representations and warranties of the Seller or the Buyer contained in Article, 4, Article 5 or Article 6 hereof, respectively, including the Disclosure Letter or any certificate or instrument delivered in connection herewith at or prior to the Closing, and none of the covenants contained in Article 8 to be performed on or prior to the Closing shall survive the Closing.  The Parties' respective covenants and agreements set forth herein that by their specific terms contemplate performance after Closing shall survive the Closing indefinitely unless otherwise set forth herein

**12.7    Counterparts; Electronic Signatures**

This Agreement may be signed in counterparts and each of such counterparts shall constitute an original document and such counterparts, taken together, shall constitute one and the same instrument. Execution of this Agreement by any of the Parties hereto may be effected by "wet ink" or electronic signature, and may be delivered by facsimile, email or internet transmission bearing such signature which, for all purposes, shall be deemed to be an original signature.

**[Remainder of page intentionally blank]**

**IN WITNESS WHEREOF** the Parties hereto have executed this Agreement as of the date first written above.

LOYALTYONE, CO.

By: _____
Name:  Shawn Stewart
Title: President

**<u>EXHIBIT B</u>**
**CCAA DIP TERM SHEET**

**EXECUTION COPY**

## DIP TERM SHEET

### Dated as of March 10, 2023

 **WHEREAS** the Borrower (as defined below) has requested and the DIP Lender (as defined below) has agreed to provide funding in order to fund certain obligations of the Borrower in the context of its proceeding under the *Companies' Creditors Arrangement Act* (Canada) (the "**CCAA**", and such proceeding, the "**Proceeding**") before the Ontario Superior Court of Justice (Commercial List) (the "**Court**") in accordance with the terms set out herein;

 **NOW THEREFORE** the parties, in consideration of the foregoing and the mutual agreements contained herein (the receipt and sufficiency of which are hereby acknowledged), agree as follows:

| | | |
|---|---|---|
| 1. | **DIP BORROWER:** | LoyaltyOne, Co. (the "**Borrower**"). |
| 2. | **DIP LENDER:** | Bank of Montreal (the "**DIP Lender**"). |
| 3. | **PURPOSE:** | As set out in Section 16(c) below. |
| 4. | **DIP FACILITY AND MAXIMUM AMOUNT** | A non-revolving, secured credit facility (the "**DIP Facility**") in the amount of US$70,000,000 (the "**Maximum Amount**"). For certainty, any interest or fees that are capitalized and added to the principal amount owing hereunder as contemplated by the terms hereof shall not constitute part of the Maximum Amount, and the Borrower is and shall be permitted to borrow up to the Maximum Amount without taking into account any such capitalized amounts, subject to the terms and conditions hereof.<br><br>Advances under the DIP Facility (a "**DIP Advance**") made in accordance herewith shall be deposited to the Borrower's current account with Bank of Montreal (set out in Section 9 of this DIP Term Sheet) or such other account(s) with a financial institution approved in advance by the DIP Lender (the "**Borrower's Account**") and withdrawn by the Borrower in accordance with the terms hereof. |
| 5. | **REPAYMENT:** | The aggregate principal amount owing under the DIP Facility, all accrued and unpaid interest, and all fees and expenses incurred by the DIP Lender as provided herein in connection with the DIP Facility (collectively, the "**DIP Obligations**") shall be repaid in full on the earliest to occur of: (i) the occurrence of any Event of Default hereunder that is continuing, has not been cured or waived in writing by the DIP Lender, in its sole discretion, and where the DIP Lender has notified the Borrower in writing that the DIP Obligations have been accelerated; (ii) the closing of one or more sale transactions for all or substantially all of the assets of the Borrower approved by an order of the Court, including in connection with the SISP (as defined below); (iii) the BMO Purchase Agreement is the successful bid in the SISP but is unable to be completed and closed due to the failure of any condition precedent to be satisfied by the closing date of the transaction contemplated by the BMO Purchase Agreement (the "**Closing Date**") which condition precedent has not been waived by the Borrower and/or the DIP Lender, as applicable, and (iv) June 30, 2023 (the "**Maturity Date**"). The Maturity Date may be extended at the request of the Borrower, following consultation |

with the Monitor, and with the prior written consent of the DIP Lender, in its sole discretion, for such period and on such terms and conditions as the Borrower and the DIP Lender may agree.

The commitment in respect of the DIP Facility shall expire on the Maturity Date and all DIP Obligations shall be repaid in full on the Maturity Date, without the DIP Lender being required to make demand upon the Borrower or to give notice that the DIP Facility has expired and/or that the DIP Obligations are due and payable.

All payments received by the DIP Lender shall be applied first to any fees and expenses due hereunder, then to accrued and unpaid interest and then, after all such fees, expenses and interest are brought current, to principal.

**6. CASH FLOW PROJECTIONS:**

The Borrower, in consultation with KSV Restructuring Inc., in its capacity as court-appointed monitor (the "**Monitor**") in the Proceeding, has provided to the DIP Lender the cash flow projections attached at Schedule "A" hereto, which are in form and substance satisfactory to the DIP Lender and which have been filed with the Court, reflecting the projected cash requirements of the Borrower for the 13-week period from March 10, 2023, through the period ending June 9, 2023, calculated on a weekly basis (the "**Cash Flow Projection**").

The Borrower shall keep the DIP Lender apprised of its cash flow requirements by providing: (i) an updated cash flow projection for the same period as the Cash Flow Projection by no later than 5:00 p.m. (Toronto time) on the Thursday of each second week ending after the week in which the initial DIP Advance occurs, such updated cash flow projection to be in a form consistent with the Cash Flow Projection (a "**Proposed Amended Cash Flow Projection**"); provided that the Borrower, at its option, may provide a Proposed Amended Cash Flow Projection on a more frequent basis, but in any event, not more than twice in any calendar week and (ii) on a weekly basis, (x) actual cash flow results from the immediately preceding one week period and (y) a comparison of the actual cash flow results from the immediately preceding one week period as against the DIP Agreement Cash Flow Projection (as defined below) for such week, such information described in this clause (ii) to be delivered to the DIP Lender weekly by no later than 5:00 p.m. (Toronto time) on the Thursday of each week.

The DIP Lender in its sole discretion may object to any Proposed Amended Cash Flow Projection that varies from the DIP Agreement Cash Flow Projection by providing notice to the Borrower and Monitor within two (2) business days of receipt of such Proposed Amended Cash Flow Projection. In the event that a Proposed Amended Cash Flow Projection is objected to by the DIP Lender, the Borrower may submit to the DIP Lender a further revised Proposed Amended Cash Flow Projection within two (2) business days of receipt of such a notice of objection, or such other time as the DIP Lender may agree to in writing.  On the date that is two (2) business days after receipt by the DIP Lender, unless and until a Proposed Amended Cash Flow Projection has been objected to by the DIP Lender in accordance herewith, the Proposed Amended DIP Agreement Cash Flow Projection

shall be deemed to be the DIP Agreement Cash Flow Projection for all purposes hereunder.

At any given time, the cash flow projection in force and effect (whether the Cash Flow Projection or any subsequent Proposed Amended Cash Flow Projection which has become effective and to which the DIP Lender has not objected in accordance herewith) shall be the "**DIP Agreement Cash Flow Projection**".

For greater certainty, the DIP Lender shall not be required to initiate any DIP Advances pursuant to a Proposed Amended Cash Flow Projection, nor is the Borrower entitled to utilize any DIP Advance to make payments set out in a Proposed Amended Cash Flow Projection, unless and until it has become effective in accordance with this Section 6.

**7.   AVAILABILITY UNDER DIP FACILITY:**

DIP Advances shall be in the minimum principal amount of $100,000 and in increments of $100,000 and are to be funded within two (2) business days following delivery of the drawdown certificate for the related DIP Advance in accordance with paragraph 8(e) below, unless within one (1) business day of delivery of such drawdown certificate the DIP Lender delivers to the Borrower and the Monitor a notice of non-consent to such DIP Advance as a result of one or more of the conditions precedent not being met or the occurrence of an Event of Default that is continuing and such notice shall include reasonable details outlining any such unsatisfied condition precedent or Event of Default. The DIP Lender may also consent to the making of a DIP Advance prior to the second (2nd) business day following delivery of the drawdown certificate by providing its written consent to same to the Monitor and the Borrower.

The proceeds of each DIP Advance shall be applied by the Borrower solely in accordance with the DIP Agreement Cash Flow Projections subject to the Permitted Variance, or as may otherwise be agreed to in writing by the DIP Lender, in its sole discretion, from time to time.

Notwithstanding anything to the contrary herein, the Borrower shall be prohibited from using the proceeds of any DIP Advance to pay: (i) any expenses that are not of a type of expense that falls within an expense line-item contained in the DIP Agreement Cash Flow Projection, subject to the Permitted Variance (and for certainty including the exceptions contained therein), (ii) professional fees of the Borrower or the Existing Lenders (as defined below) to contest, challenge or in any way oppose (or support any other person in contesting, challenging or opposing) the DIP Lender on the ARIO, SISP, SISP Order, or the Sale Approval and Vesting Order, (iii) the Restructuring Fee (as such term is defined in the engagement letter dated as of July 11, 2022 among PJT Partners LP and Akin Gump Strauss Hauer & Feld LLP) (the "**Restructuring Fee**") and (iv) the USD~$3,000,000 success fee (or similar) owing to the financial advisor of the Existing Lenders (the "**Success Fee**").

For the purposes of this DIP Agreement, "**Permitted Variance**" shall mean an adverse variance of not more than 15% of the aggregate disbursements in

the DIP Agreement Cash Flow Projection on a cumulative basis starting on the start date of the initial Cash Flow Projection referred to in the first paragraph of Section 7 above; provided, however, that the Permitted Variance calculation shall not take into account (i) the Expenses, (ii) the fees and expenses (and for certainty fees and expenses incurred in connection with the Borrower's Proceeding) of (x) the legal and financial advisors of the Borrower, (y) the Monitor and its counsel, and (z) the legal and financial advisors of the Existing Lenders (as defined below) (for certainty, proceeds of the DIP Facility may only be used to pay such fees and expenses incurred by the Existing Lenders if the consenting lenders execute and deliver support agreement(s) that binds all of the Existing Lenders, in form and substance satisfactory to the DIP Lender, supporting the SISP, the Court Orders and the BMO Transaction), or (iii) any amounts required to be paid by the Borrower into the reserve account (the "**Reserve Account**") pursuant to the Amended and Restated Redemption Reserve Agreement dated as of December 31, 2001 between Loyalty Management Group Canada Inc. and Royal Trust Corporation of Canada (the "**Reserve Agreement**").

| | |
|---|---|
| **8.   CONDITIONS PRECEDENT TO DIP FACILITY ADVANCES** | The following conditions precedent shall be satisfied, or waived in writing by the DIP Lender, in its sole discretion, prior to the initial DIP Advance hereunder: |

(a)   The initial DIP Advance shall be in an amount not greater than the amount set out in the DIP Agreement Cash Flow Projection (which for certainty shall not be greater than the Maximum Amount) and shall be subject to the terms and conditions hereof;

(b)   The Court shall have issued an amended initial order in substantially the form attached as Schedule "B" hereto (the "**ARIO**") on or before March 20, 2023, the effect of which, among other things, is to authorize and approve the DIP Facility on the terms and conditions hereof including without limitation the DIP Charge securing the principal amount of US$70,000,000 and the other DIP Obligations not constituting the principal amount thereof with the priority contemplated herein, and such ARIO shall have been obtained on notice to all parties entitled thereto pursuant to the CCAA or otherwise identified for such service by the DIP Lender;

(c)   Commensurate with the ARIO, the Court shall have issued an order (the "**SISP Order**") approving a sales and investment solicitation process (the "**SISP**") relating to the sale of all or substantially all of the assets of the Borrower, which: (i) SISP Order shall be substantially in the form set out in Schedule "C" hereto; and (ii) SISP shall be substantially in the form set out in Schedule "D" hereto;

(d)   None of the ARIO, the Intercompany Loan Order (as defined below) nor any other order in the Proceeding or the Chapter 11 Cases (as defined below) pertaining to the DIP Facility has been vacated,

- 5 -

stayed or otherwise caused to become ineffective or is amended in a manner prejudicial to the DIP Lender;

(e)     Delivery to the DIP Lender, with a copy to the Monitor of a drawdown certificate, in substantially the form set out in Schedule "E" hereto, executed by an officer on behalf of the Borrower, certifying, *inter alia*, that the proceeds of the DIP Advance requested thereby will be applied solely in accordance with the DIP Agreement Cash Flow Projection and Section 3 of the DIP Term Sheet, and that the Borrower is in compliance with the Court Orders (as defined below) and that no Default or Event of Default has occurred or is continuing;

(f)     There is no Default or Event of Default that has occurred and is continuing, nor will any such event occur as a result of the DIP Advance;

(g)     No material adverse change in the financial condition or operation of the Borrower or otherwise affecting the Borrower shall have occurred after the date of the issue of the ARIO; provided that the foregoing shall exclude changes to the Borrower's business or its performance (including without limitation collector redemption cadence) solely as a result of commencement, announcement or continuance of the Proceeding, the Chapter 11 Cases, announcement of the BMO Transaction (as defined below), announcement of the BL Transactions (as defined below), performance by the Borrower of its obligations under that certain purchase agreement (as may be amended from time to time, the "**BMO Purchase Agreement**") between the Borrower and a newly formed wholly owned direct or indirect subsidiary of BMO (the "**Purchaser**") setting out the terms of a transaction to purchase certain property and assets of, and assume certain liabilities of the Borrower (the "**BMO Transaction**"), performance by certain affiliates of the Borrower of their obligations under that certain purchase agreement (as may be amended from time to time, the "**BL Purchase Agreement**") between LVI Lux Financing S.A.R.L. ("**LVI Lux**") and Opportunity Partners B.V., setting out the terms of a transaction to purchase certain property and assets of, and assume certain liabilities of, LVI Lux and its subsidiaries (the "**BL Transaction**"), conducting the SISP (as defined below), or the Chapter 11 Cases;

(h)     Each of the representations and warranties made in this DIP Term Sheet shall be true and correct in all material respects as of the date made or deemed made (unless any representation and warranty is qualified by materiality, in which case it shall be true and correct in all respects as of the date made or deemed made);

(i)     There are no pending motions for leave to appeal, appeals, injunctions relating to the DIP Facility, or pending litigation seeking

to restrain, vary or prohibit the operation of all or any part of this DIP Term Sheet;

(j)     The DIP Lender has received, as and when required hereunder, all information to which it is entitled hereunder (including, without limitation, the information and cash flow projections required pursuant to Section 6 herein);

(k)     There shall be no liens ranking in priority to the DIP Charge except for: (i) Specified Permitted Encumbrances (as defined on Schedule "F"); and (ii) the Priority Charges (as defined below);

(l)     The Borrower shall have paid all statutory liens, trust and other government claims arising after the commencement of the Proceeding (but for greater certainty, not including any such claims in existence at the time of the commencement of the Proceeding) including, without limitation, source deductions, except, in each case, for any such amounts that are not yet due and payable or which are in dispute, in which case appropriate reserves have been made.

The following conditions precedent shall be satisfied, or waived in writing by the DIP Lender, in its sole discretion, prior to each subsequent DIP Advance hereunder:

(a)     Each DIP Advance (together with all previous DIP Advances) must be no greater in the aggregate than the Maximum Amount and shall be subject to the terms and conditions hereof;

(b)     Neither the ARIO, the SISP Order, the Intercompany Loan Order nor any other order in the Proceeding or the Chapter 11 Cases pertaining to the DIP Facility has been vacated, stayed or otherwise caused to become ineffective or is amended in a manner prejudicial to the DIP Lender;

(c)     Delivery to the DIP Lender with a copy to the Monitor of a drawdown certificate, in substantially the form set out in Schedule "E" hereto, executed by an officer on behalf of the Borrower, certifying, *inter alia*, that the proceeds of the DIP Advance requested thereby will be applied solely in accordance with the DIP Agreement Cash Flow Projection and Section 3 of the DIP Term Sheet, and that the Borrower is in compliance with the Court Orders and that no Default or Event of Default has occurred or is continuing;

(d)     There is no Default or Event of Default that has occurred and is continuing, nor will any such event occur as a result of the DIP Advance;

(e)     No material adverse change in the financial condition or operation of the Borrower or otherwise affecting the Borrower shall have occurred after the date of the issue of the ARIO; provided that the

forgoing shall exclude changes to the Borrower's business or its performance (including without limitation collector redemption cadence) solely as a result of commencement, announcement or continuance of the Proceeding, the Chapter 11 Cases, announcement of the BMO Transaction or BL Transaction, performance by the Borrower of its obligations under the BMO Purchase Agreement or BL Purchase Agreement, conducting the SISP or the Chapter 11 Cases;

(f)     Each of the representations and warranties made in this DIP Term Sheet shall be true and correct in all material respects as of the date made or deemed made (unless any representation and warranty is qualified by materiality, in which case it shall be true and correct in all respects as of the date made or deemed made);

(g)     There are no pending motions for leave to appeal, appeals, injunctions relating to the DIP Facility, or pending litigation seeking to restrain, vary or prohibit the operation of all or any part of this DIP Term Sheet;

(h)     The DIP Lender has received, as and when required hereunder, all information to which it is entitled hereunder (including, without limitation, the information and cash flow projections required pursuant to Section 6 herein);

(i)     There shall be no liens ranking in priority to the DIP Charge except for: (i) Specified Permitted Encumbrances; and (ii) Priority Charges;

(j)     The Borrower shall have paid all statutory liens, trust and other government claims arising after the commencement of the Proceeding (but for greater certainty, not including any such claims in existence at the time of the commencement of the Proceeding) including, without limitation, source deductions, except, in each case, for any such amounts that are not yet due and payable or which are in dispute, in which case appropriate reserves have been made; and

(k)     The Borrower shall at all times have diligently and in good faith implemented and conducted the SISP in accordance with the SISP Order.

Notwithstanding the foregoing or any other provisions of this DIP Term Sheet, to the extent that an emergency cash need arises in the Borrower's business that is not contemplated in the DIP Agreement Cash Flow Projection, the Borrower may request a DIP Advance from the DIP Lender by providing written particulars relating to such emergency cash need to the DIP Lender and the Monitor, which DIP Advance shall only be permitted with the prior written consent of the DIP Lender delivered to the Borrower

and the Monitor, in its sole and absolute discretion, and provided further that in no case shall the Maximum Amount be exceeded.

**9.    DISBURSEMENTS**

All proceeds of DIP Advances shall be deposited by the DIP Lender by way of direct deposit into the Borrower's US$ account with the DIP Lender bearing account number 4623105 (branch address being 100 King Street West, Toronto, Ontario) (subject to any change approved by the DIP Lender).

**10.    INTERCOMPANY LOANS**

Subject to the terms of this DIP Term Sheet (including, without limitation, the DIP Agreement Cash Flow Projection) and the ARIO, as applicable, the Borrower shall be permitted to use proceeds of DIP Advances to make first lien priming loans with superpriority administrative expense status (each, an "**Intercompany Loan**") to Loyalty Ventures Inc. (the "**Parent**") provided that the following conditions precedent shall be satisfied, or waived in writing by the DIP Lender, in its sole discretion, prior to the Borrower making any Intercompany Loan:

(a)    The quantum and timing of each Intercompany Loan shall be in accordance with the DIP Agreement Cash Flow Projection;

(b)    There shall be no Event of Default outstanding that has not been cured or waived in writing by the DIP Lender, in its sole discretion;

(c)    The Intercompany Loans shall have been approved by order (the "**Intercompany Loan Order**") of the U.S. Bankruptcy Court in the chapter 11 cases of the Parent and certain of its affiliates (the "**Chapter 11 Cases**") and given a first priority priming lien over all present and after-acquired property, assets and undertakings of the Parent (subject to exceptions specified in the Intercompany Loan Term Sheet) and superpriority administrative expense status, such order shall attach the Intercompany Loan Term Sheet and be in form and substance reasonably satisfactory to the DIP Lender (including as to use of proceeds); and

(d)    The Intercompany Loan Order shall provide that after (i) the occurrence and during the continuance of an Event of Default and the termination of the DIP Facility by the DIP Lender in accordance with Section 20 of this DIP Term Sheet and (ii) the Court having issued an order authorizing the DIP Lender to do so (such order sought by the DIP Lender on not less than three (3) business days' notice to the Borrower and the Monitor after the occurrence and during the continuance of an Event of Default), the DIP Lender shall have the right to instruct the Borrower to, and the Borrower acting at the direction of the DIP Lender shall, pursue all remedies against the Parent that are available to the Borrower as a lender under the Intercompany Loans, the Intercompany Loan Order and applicable law, in each case, solely to the extent that any DIP Obligations remain outstanding after the DIP Lender has exercised remedies against all other Collateral; and

(e)   The terms of the Intercompany Loan shall be set forth on a term sheet in form and substance reasonably satisfactory to the Parent, the Borrower and the DIP Lender (the "**Intercompany Loan Term Sheet**") that shall be attached as an exhibit to the Intercompany Loan Order.

The Borrower shall be permitted to withhold and remit applicable Taxes (as defined below) on any Intercompany Loans imposed under the *Income Tax Act* (Canada) and any other applicable law.

| | |
|---|---|
| **11.   VOLUNTARY PREPAYMENTS:** | The Borrower may prepay the DIP Obligations at any time prior to the Maturity Date in minimum amounts of $500,000 and in increments of $100,000 in excess thereof, without premium or penalty, and any amounts so prepaid may not be re-borrowed by the Borrower hereunder. |
| **12.   INTEREST RATE:** | The outstanding principal amount of all DIP Advances shall bear interest at a rate per annum equal to Base Rate (as defined below) plus 6.00% (the "**Interest Rate**"), and upon the occurrence and during the continuance of an Event of Default, the Interest Rate shall be increased by an additional 2% per annum, calculated and payable monthly in arrears on the last business day of each calendar month. |

The Borrower shall pay interest on the DIP Advances by adding such accrued interest to the principal amount of the DIP Obligations on the last business day of each calendar month. Amounts representing the interest payable hereunder that are added to the principal amount of the DIP Obligations shall thereafter constitute principal and bear interest in accordance with Section 12.

Interest on each DIP Advance shall accrue daily from and after the date of advance of such DIP Advance to the Borrower to, but excluding, the date of repayment, as well as before and after maturity, demand and default and before and after judgment, and shall be calculated and compounded on a daily basis on the principal amount of such DIP Advance and any overdue interest remaining unpaid from time to time and on the basis of the actual number of days elapsed in a year of 365 days.

For the purposes of the *Interest Act* (Canada), the annual rates of interest referred to in this DIP Term Sheet calculated in accordance with the foregoing provisions of this DIP Term Sheet, are equivalent to the rates so calculated multiplied by the actual number of days in a calendar year and divided by 365.

If any provision of this DIP Term Sheet or any ancillary document in connection with this DIP Term Sheet would obligate the Borrower to make any payment of interest or other amount payable to the DIP Lender in an amount or calculated at a rate which would be prohibited by law or would result in a receipt by the DIP Lender of interest at a criminal rate (as such terms are construed under the *Criminal Code* (Canada)) then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of

interest, as the case may be, as would not be so prohibited by law or so result in a receipt by the DIP Lender of interest at a criminal rate and any such amounts actually paid by the Borrower in excess of the adjusted amount shall be forthwith refunded to the Borrower.

For the purposes of this DIP Agreement, "**Base Rate**" means a fluctuating rate of interest per annum, expressed on the basis of a year of three-hundred and sixty-five (365) days or three-hundred and sixty-six (366), as applicable, which is equal at all times to the greater of (a) the base rate of interest (however designated) of the DIP Lender for determining interest chargeable by it on United States Dollar commercial loans in Canada and (b) the sum of (i) the Federal Funds Effective Rate and (ii) 1.00% per annum.

For the purposes of this DIP Agreement, "**Federal Funds Effective Rate**" means, for any day, an annual rate of interest, expressed on the basis of a year of 360 days, equal, for each day during such period, to the weighted average of the rates on overnight United States federal funds transactions with members of the Federal Reserve System arranged by United States federal funds brokers, as published for such day (or, if such day is not a business day, for the preceding business day) by the Federal Reserve Bank of New York or, for any day on which that rate is not published for that day by the Federal Reserve Bank of New York, the simple average of the quotations for that day for such transactions received by the DIP Lender from three United States federal funds brokers of recognized standing selected by it.

| | | |
|---|---|---|
| **13.** | **DIP SECURITY:** | All obligations of the Borrower under or in connection with the DIP Facility and this DIP Term Sheet shall be secured by a Court-ordered charge (the "**DIP Charge**") over all present and after-acquired property, assets and undertakings of the Borrower (including for greater certainty and without limitation, insurance proceeds, those assets set forth on the financial statements of the Borrower, the Intercompany Loans and all receivables and other indebtedness, obligations or other amounts owing to a Borrower in connection with the Intercompany Loans), including all proceeds therefrom and all causes of action of the Borrower (collectively, the "**Collateral**"). |

The DIP Charge shall be a priority charge which shall rank ahead of the liens securing the Existing Debt (as defined below) and all other liens, but shall be subject to and shall rank behind: (A) the Specified Permitted Encumbrances; (B) an administration charge (the "**Administration Charge**") in the maximum amount of CAD$3,000,000 to secure payment of the fees, expenses and disbursements of: (I) the Borrower's counsel, financial advisors and agents; and (II) the Monitor and its counsel and agents; (C) a charge in an amount not to exceed CAD$15,409,000 in favour of the officers and directors of the Borrower (the "**D&O Charge**") to secure the customary obligations and liabilities that they may incur in such capacity from and after the commencement of the Proceeding as a backstop to any available directors' and officers' insurance and to the extent that any funds in trust for such persons are not sufficient to satisfy such claims; (D) a charge in an amount not to exceed CAD$5,350,000 in favour of certain key employees to secure their entitlements under a key employee retention plan

(the "**KERP**", and such charge, the "**KERP Charge**"); (E) a charge in an amount not to exceed $6,000,000 in favour of the Borrower's financial advisor to secure its fees and expenses not otherwise secured by the Administration Charge (the "**FA Charge**", and together with the KERP Charge, the D&O Charge, the Administration Charge and the DIP Charge, collectively, the "**Court Ordered Charges**"); (F) any claims that would otherwise have priority to the foregoing debt claims including, for greater certainty, any purchase money security interests; and (G) any further claims having express priority ahead of the DIP Charge pursuant to the ARIO and to which the DIP Lender has consented in writing (the charges set out in the foregoing items (A) through (G) being collectively, the "**Priority Charges**").

"**Existing Debt**" means the debt owing as at March 10, 2023, in the aggregate principal amount of approximately US$665,000,000 (which for certainty, includes amounts outstanding under term and revolving credit facilities and outstanding letters of credit), plus interest, fees, costs and expenses payable in addition to such aggregate principal amount, under the credit agreement dated as of November 3, 2021 among Loyalty Ventures Inc., Brand Loyalty Group B.V., Brand Loyalty Holding B.V. and Brand Loyalty International B.V, as borrowers thereunder, the guarantors party thereto (including the Borrower), the lenders party thereto (the "**Existing Lenders**"), and Bank of America, N.A., as administrative agent, as amended by Amendment No. 1 to Credit Agreement (Financial Covenant) dated as of July 29, 2022 and by Consent, dated as of March 1, 2023 (such credit agreement as so amended is called the "**Existing Credit Agreement**").

|  |  |
|---|---|
| **14.   MANDATORY REPAYMENTS:** | The proceeds of any debt or equity issuance by the Borrower that occurs from and after the date hereof, and the proceeds of Collateral (for greater certainty, net of reasonable costs and closing adjustments, as applicable), including, without limitation, arising from: (a) any sale of Collateral out of the ordinary course of business (including for greater certainty, any sale of all or substantially all of the Collateral); or (b) insurance proceeds in respect of any damage, loss or destruction of the Collateral (collectively, the "**Net Proceeds**") shall be paid: (i) first, to satisfy the Priority Charges in the manner and order set out in the applicable Court Order; (ii) second, to satisfy the DIP Obligations; (iii) third, to satisfy other indebtedness and liabilities of the Borrower including the Existing Debt as may be ordered by the Court; and (iv) fourth, to the Borrower or such other persons as are entitled thereto in accordance with applicable law. |
| | The Maximum Amount shall be permanently reduced in an amount equal to the Net Proceeds so paid to the DIP Lender.  For greater certainty, any mandatory repayments shall not be subject to any premium or penalty. |
| **15.   REPRESENTATIONS AND WARRANTIES:** | The Borrower represents and warrants to the DIP Lender, upon which the DIP Lender relies in entering into this DIP Term Sheet, that subject to the entry of the ARIO: |
| | (a)      The Borrower is a corporation duly incorporated and validly existing under the laws of its governing jurisdiction and is duly |

- 12 -

qualified, licensed or registered to carry on business under the laws applicable to it in all jurisdictions in which the nature of its assets or business makes such qualification necessary, except where the failure to have such qualification, license or registration would not have a Material Adverse Effect.  For the purpose of this DIP Term Sheet, "**Material Adverse Effect**" means a material adverse effect on: (i) the financial condition, business or assets of the Borrower; or (ii) the ability of the Borrower to comply with its obligations hereunder or under any Court Order;

(b)     Subject to the granting of the ARIO, the Borrower has all requisite corporate or other power and authority to: (i) carry on its business; (ii) own property, borrow monies and enter into agreements therefor; and (iii) execute and enter into the DIP Term Sheet and observe and perform the terms and provisions thereof;

(c)     Subject to the granting of the ARIO, the execution and delivery of this DIP Term Sheet by the Borrower and the performance by the Borrower of its obligations hereunder has been duly authorized by all necessary corporate or other action and any actions required under applicable laws.  Except as has been obtained and is in full force and effect, no registration, declaration, consent, waiver or authorization of, or filing with or notice to, any governmental body is required to be obtained in connection with the performance by the Borrower of its obligations under this DIP Term Sheet;

(d)     Subject to the granting of the ARIO, this DIP Term Sheet has been duly executed and delivered by the Borrower and constitutes a legal, valid and binding obligation of the Borrower, enforceable against it in accordance with its terms, subject only to any limitation under applicable laws relating to (i) bankruptcy, insolvency, reorganization, moratorium or creditors' rights generally; (ii) the fact that specific performance and injunctive relief may only be given at the discretion of the courts; and (iii) the equitable or statutory powers of the courts to stay proceedings before them and to stay the execution of judgments;

(e)     The execution and delivery of this DIP Term Sheet by the Borrower and the performance by the Borrower of its obligations hereunder and compliance with the terms, conditions and provisions hereof, will not conflict with or result in a breach in any material respect of any of the terms, conditions or provisions of: (i) its constating documents (including any shareholders' agreements) or by-laws; (ii) any applicable laws; (iii) except as stayed pursuant to the Proceeding by the terms of the ARIO, any contractual restriction binding on or affecting it or its material properties; or (iv) any material judgment, injunction, determination or award which is binding on it;

(f)     The Borrower is in compliance with all applicable laws of each jurisdiction in which its business has been or is being carried on,

non-compliance with which would reasonably be expected to have a Material Adverse Effect;

(g)     There are no actions, suits or proceedings pending, taken or, to the Borrower's knowledge, threatened, before or by any governmental body or by any elected or appointed public official or private person in Canada or elsewhere, whether or not having the force of law, which would reasonably be expected to have a Material Adverse Effect and have not been stayed pursuant to the Proceeding;

(h)     The DIP Agreement Cash Flow Projection includes a provision for payment of all projected obligations of any kind whatsoever reasonably anticipated by the Borrower on the date hereof that, if not paid, could result in statutory liens ranking in priority to the DIP Charge, except for purchase money security interests;

(i)     As at the date of the ARIO, the Borrower has good and marketable title to all of the Collateral free from any liens except for: (i) Permitted Encumbrances, and for certainty after the issuance of the ARIO, the Priority Charges; and (ii) title defects or irregularities that do not, individually or in the aggregate, materially affect the operation of the business of the Borrower;

(j)     The Borrower has filed all material tax returns that are required to be filed and has in all material respects paid all taxes, interest and penalties, if any, which have become due pursuant to such returns or pursuant to any assessment received by it, except any such assessment that is being contested in good faith by proper legal proceedings.  Without limiting the foregoing, all employee source deductions (including in respect of income taxes, employment insurance and Canada Pension Plan) payroll taxes and workers' compensation dues are currently paid and up to date, subject to normal course accruals;

(k)     Except as previously disclosed in writing by the Borrower to the DIP Lender and set out on Schedule "G", there are no actions, suits or proceedings (including any tax-related matter) by or before any arbitrator or governmental authority or by any other person pending against or threatened against or affecting the Borrower that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect that have not been stayed pursuant to the Proceeding;

(l)     The Borrower maintains insurance policies and coverage that: (i) is sufficient for compliance with any applicable law and all material agreements to which it is a party; and (ii) provide adequate insurance coverage in at least such amounts and against at least such risks as are usually insured against in the same general area by persons engaged in the same or similar business to the assets and operations of the Borrower;

(m)     All factual information provided by or on behalf of the Borrower to the DIP Lender for the purposes of or in connection with this DIP Term Sheet or any transaction contemplated herein, is true and accurate in all material respects on the date as of which such information is dated or certified and remains true in all material respects as of the date provided and is not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not materially misleading at such time in light of the circumstances under which such information was provided.  With respect to any projections, future business plans or forward looking financial statements, the Borrower is not guaranteeing in giving this representation and warranty that the actual future results will be as forecast or projected (but, for greater certainty, the DIP Lender has all of its rights hereunder in the event that such actual future results are not as forecast or projected, including, without limitation, as provided for in Section 19(e) herein); and

(n)     As of the date hereof, the Borrower does not administer any pension plans and does not have any outstanding payment obligations in respect of special payments or amortization payments, including without limitation, in respect of pension plans, payments related to post-retirement benefits, solvency deficiencies or wind-up shortfalls in relation to any pension plan.

**16.    AFFIRMATIVE COVENANTS:**    The Borrower covenants and agrees to do the following until such time as the DIP Obligations are repaid in full:

(a)     Keep the DIP Lender apprised on a timely basis of all material developments with respect to the Collateral and the business and affairs of the Borrower;

(b)     Perform its obligations hereunder and under any other contract or agreement with the DIP Lender or any of its affiliates as and when required and in the manner required;

(c)     Use the proceeds of the DIP Facility (at all times solely in accordance with the terms hereof and the DIP Agreement Cash Flow Projections subject to the Permitted Variance) only for the limited purpose of facilitating the Proceeding, including the SISP and for the purpose of funding: (i) transaction costs and expenses incurred by the DIP Lender in connection with the DIP Facility; (ii) professional fees and expenses incurred by the Borrower (excluding for certainty, the Restructuring Fee and the Success Fee), and the Monitor in respect of the DIP Facility, the Proceeding and the Chapter 11 Cases in accordance with the terms of the DIP Facility and professional fees, and expenses incurred by the Existing Lenders in respect of the Proceeding and the Chapter 11 Cases (provided that the consenting lenders execute and deliver support agreement(s) that binds all of the Existing Lenders, in form and substance satisfactory to the DIP Lender, supporting the SISP, the Court Orders and the BMO Transaction); (iii) the operating costs,

expenses, capital expenditures and ordinary course liabilities (including, without limitation, wages, bonuses, vacation pay, active employee benefits and entitlements under the KERP) of the Borrower and LoyaltyOne Travel Services Co./Cie Des Voyages LoyaltyOne; and (iv) the making of the Intercompany Loans where the Parent requires the Intercompany Loans in order to fund the Chapter 11 Cases and its operating costs, capital expenditures and ordinary course liabilities including professional fees and expenses as specifically provided in the DIP Agreement Cash Flow Projection subject to the Permitted Variance;

(d)     Comply with the provisions of the court orders made in connection with the Proceeding (collectively, the "**Court Orders**" and each a "**Court Order**"), the Intercompany Loan Order and any other order entered in connection with the Chapter 11 Cases relating to the DIP Facility;

(e)     Preserve, renew and keep in full force Borrower's corporate or other existence and all material licenses, permits, approvals, etc. required in respect of their respective business, properties, assets or any activities or operations carried out therein;

(f)     Maintain the insurance in existence of the date hereof with respect to the Collateral;

(g)     Conduct its activities in accordance with the DIP Agreement Cash Flow Projection, subject to the Permitted Variance;

(h)     Promptly notify the DIP Lender and the Monitor of the occurrence of any Event of Default, or of any event or circumstance (a "**Default**") that may, with the passage of time or the giving of notice, constitute an Event of Default;

(i)     Promptly notify the DIP Lender and the Monitor of the commencement of, or receipt of notice of intention to commence, any action, suit, investigation, litigation or proceeding before any court, governmental department, board, bureau, agency or similar body affecting the Borrower;

(j)     Promptly after the same is available, but in no event later than the day that is two (2) business days prior to the date on which the same is to be served or if such advance notice is not possible then as soon as reasonably practicable prior to the date on which the same is to be served, provide copies to the DIP Lender of all pleadings, motion records, application records, judicial information, financial information and other documents filed by or on behalf of the Borrower in the Proceeding and the Chapter 11 Cases;

(k)     Subject to the CCAA and the Court Orders, comply in all material respects with all applicable laws, rules and regulations applicable to

- 16 -

its business, including, without limitation, health and safety, and environmental laws;

(l) Except where a stay of proceedings or Court Order otherwise applies, pay when due all statutory liens, trust and other Crown claims including employee source deductions, GST, HST, PST, employer health tax, and workplace safety and insurance premiums, but only with respect to: (i) payments that rank in priority to the DIP Charge; or (ii) payments that are otherwise authorized pursuant to the ARIO;

(m) Treat as unaffected the DIP Obligations in any plan of compromise or arrangement, proposal or any other restructuring whatsoever;

(n) At all times be and remain subject to the Proceeding until the DIP Obligations are irrevocably and unconditionally repaid in full, with no further right to DIP Advances;

(o) Ensure that all motion records, pleadings, application records, orders and other documents (the "**Court Documents**") filed, proposed, sought, served, and obtained by the Borrower or in respect of which the Borrower consents or does not object, in or in connection with the Proceeding or the Chapter 11 Cases shall be in form and substance reasonably satisfactory to the DIP Lender, and provide to the DIP Lender copies of such Court Documents as soon as practicable prior to any filing or service in the Proceeding, but in no event later than the day that is two (2) business days prior to the date on which the same is to be served or if such advance notice is not possible then as soon as reasonably practicable prior to the date on which the same is to be served;

(p) Subject to the CCAA and the Court Orders, grant the DIP Lender and its professional advisors reasonable access to the Collateral and their business, properties, and books and records; and

(q) Conduct the SISP strictly in accordance with its terms (including milestones and timelines) and strictly comply with the SISP Order.

**17. NEGATIVE COVENANTS:** The Borrower covenants and agrees not to do the following or permit any subsidiary to do the following while any DIP Obligations remain outstanding, other than with the prior written consent of the DIP Lender or pursuant to an Order of the Court:

(a) Transfer, lease or otherwise dispose of all or any part of its property, assets or undertaking except: (i) pursuant to any Intercompany Loans; (ii) where permitted pursuant to the ARIO; and (iii) where such transaction results in the repayment of DIP Obligations in accordance with the provisions herein under the paragraph entitled "Mandatory Repayments";

(b)     Make any payment of principal or interest in respect of any indebtedness outstanding prior to the commencement of the Proceeding ("**Existing Indebtedness**") other than as may be permitted or required herein or by a Court Order.

(c)     Create or permit to exist indebtedness for borrowed money other than: (i) Existing Indebtedness; (ii) debt contemplated by this DIP Facility; (iii) post-filing trade credit obtained in the ordinary course of business, in accordance with the DIP Agreement Cash Flow Projection;

(d)     Permit any new liens to exist on any Collateral other than the Priority Charges and Permitted Encumbrances;

(e)     Either: (i) change its name, amalgamate, consolidate with or merge into, or enter into any similar transaction with any other entity; or (ii) make any changes to its organizational documents that could be adverse to the DIP Lender;

(f)     Other than Intercompany Loans or as permitted by the terms of this DIP Term Sheet, make any acquisitions, investments or loans to any person or guarantee the obligations of any person, other than those in existence on the date hereof and disclosed to the DIP Lender in writing;

(g)     Enter into any transaction with any affiliate (including the Parent) other than: (i) any transaction on terms and conditions at least as favourable to the Borrower as could reasonably be obtained in an arms-length transaction, including ordinary course transactions with of LoyaltyOne Travel Services Co./Cie Des Voyages LoyaltyOne; (ii) those in existence on the date hereof and disclosed to the DIP Lender in writing; or (iii) any Intercompany Loans;

(h)     Pay any dividends, distributions or advances to shareholders of the Borrower, or any management bonus or similar payments (except for the KERP), except to the extent provided for in the DIP Agreement Cash Flow Projection;

(i)     Hold or use any bank accounts other than as set out on Schedule "H" or otherwise agreed to by the DIP Lender;

(j)     Engage in new businesses;

(k)     Change its fiscal year or accounting practices;

(l)     Issue any equity;

(m)     Take any action (or in any way support the taking of any action by another person) that has, or may have, a material adverse impact on the rights and interests of the DIP Lender, including, without limitation, any action in furtherance of challenging the validity,

enforceability or amount of the obligations owing in respect of the DIP Facility; and

(n)    except in accordance with the BMO Purchase Agreement or the SISP Order, commence, continue or seek any stakeholder or court approval for any sale, restructuring transaction or plan without the prior written consent of the DIP Lender in its sole discretion.

| | |
|---|---|
| **18.   INDEMNITY AND RELEASE:** | The Borrower agrees to indemnify and hold harmless the DIP Lender and each of its directors, officers, employees, agents, attorneys, advisors and affiliates (all such persons and entities being referred to hereafter as "**Indemnified Persons**") from and against any and all actions, suits, proceedings (including any investigations or inquiries), claims, losses, damages, liabilities or expenses of any kind or nature whatsoever (excluding indirect or consequential damages and claims for lost profits) which may be incurred by or asserted against or involve any Indemnified Person as a result of or arising out of or in any way related to or resulting from the Proceeding or the Chapter 11 Cases, this DIP Term Sheet or any advance made hereunder, and, upon demand, to pay and reimburse any Indemnified Person for any reasonable legal or other out-of-pocket expenses incurred in connection with investigating, defending or preparing to defend any such action, suit, proceeding (including, without limitation, any inquiry or investigation) or claim (whether or not any Indemnified Person is a party to any action or proceeding out of which any such expenses arise); provided, however, the Borrower shall not be obligated to indemnify pursuant to this paragraph any Indemnified Person against any loss, claim, damage, expense or liability to the extent it resulted from the gross negligence or willful misconduct of such Indemnified Person as finally determined by a court of competent jurisdiction. |

The indemnities granted under this DIP Term Sheet shall survive any termination of the DIP Facility.

The Borrower shall not contest, challenge or in any way oppose (or support any other person in contesting, challenging or opposing) the validity and enforceability of the DIP Obligations or any loan, security or other documents relating thereto.  The Borrower further covenants to, and does hereby, release the DIP Lender in its capacity as lender hereunder and its respective predecessors, successors, agents, advisors, representatives and assigns of and from all claims and liabilities relating to any act or omission prior to the date of this DIP Term Sheet.

| | |
|---|---|
| **19.   EVENTS OF DEFAULT:** | The occurrence of any one or more of the following events, without the prior written consent of the DIP Lender, shall constitute an event of default ("**Event of Default**") under this DIP Term Sheet: |

(a)    The issuance of an order terminating the Proceeding or lifting the stay in the Proceeding to permit the enforcement of any security against the Borrower or the Collateral (being Collateral with an aggregate fair market value as reasonably determined by the Borrower in excess of $500,000), or the appointment of a receiver

and manager, receiver, interim receiver or similar official or the making of a bankruptcy order against the Borrower or the Collateral (being Collateral with an aggregate fair market value as reasonably determined by the Borrower in excess of $500,000);

(b)    The issuance of an order granting a lien of equal or superior status to that of the DIP Charge, other than as provided in section 13 hereof;

(c)    The issuance of any Court Order: (i) staying, reversing, vacating or otherwise modifying the DIP Charge; or (ii) that adversely impacts or could reasonably be expected to adversely impact the rights and interests of the DIP Lender in connection with the Collateral or under this DIP Term Sheet or the ARIO, as determined by the DIP Lender, acting reasonably; provided, however, that any such order that provides for payment in full forthwith of all of the obligations of the Borrower under the DIP Facility shall not constitute an Event of Default;

(d)    Failure of the Borrower to pay any principal, interest, fees or any other amounts, in each case when due and owing hereunder (subject to a three (3) business day cure period in the case of interest, fees and any other amounts (other than principal amounts) due hereunder);

(e)    Any update to the DIP Agreement Cash Flow Projection required to be made in accordance with Section 6 hereof indicating that the Borrower would require additional funding above the Maximum Amount to meet its obligations at any time during the period of the DIP Agreement Cash Flow Projection;

(f)    Any representation or warranty by the Borrower herein or in any certificate delivered by the Borrower to the DIP Lender shall be incorrect or misleading in any material respect as of the date made or deemed made;

(g)    A court order is made (whether in the Proceeding, the Chapter 11 Cases or otherwise), a liability arises or an event occurs, including any change in the business, assets, or conditions, financial or otherwise, of the Borrower, that has or will have a Material Adverse Effect; provided that the forgoing shall exclude changes to the Borrower's business or its performance (including without limitation collector redemption cadence) solely as a result of commencement, announcement or continuance of the Proceeding, the Chapter 11 Cases, announcement of the BMO Transaction or BL Transaction, performance by the Borrower of its obligations under the BMO Purchase Agreement or BL Purchase Agreement, or conducting the SISP;

(h)     Any material breach of any Court Order upon receipt by the Borrower of notice from the DIP Lender of such breach by the Borrower;

(i)     Failure of the Borrower to perform or comply with any other term or covenant under this DIP Term Sheet and such default shall continue unremedied for a period of three (3) business days after the earlier of (i) delivery of notice given by the DIP Lender to the Borrower, with a copy to the Monitor or (ii) the Borrower's knowledge of such failure to perform or comply;

(j)     Any change of control of the Borrower;

(k)     The seeking or support by the Borrower, or the issuance, of any court order (in the Proceeding, the Chapter 11 Cases or otherwise) that is materially inconsistent with the terms of this DIP Term Sheet; or

(l)     Without limiting the foregoing, the SISP is not completed by the SISP Order Outside Date.

| | |
|---|---|
| **20.   REMEDIES:** | Upon the occurrence and during the continuance of an Event of Default, whether or not there is availability under the DIP Facility (a) without any notice to the Borrower, the Borrower shall have no right to receive any additional DIP Advances or other accommodation of credit from the DIP Lender except in the sole discretion of the DIP Lender; and (b) the DIP Lender may immediately terminate the DIP Facility and demand immediate payment of all DIP Obligations by providing such a notice and demand to the Borrower, with a copy to the Monitor.  With the leave of the Court sought on not less than three (3) business days' notice to the Borrower and the Monitor after the occurrence and during the continuance of an Event of Default, the DIP Lender shall have the right to enforce the DIP Charge and to exercise all other rights and remedies in respect of the DIP Obligations and the DIP Charge, including the right to realize on all Collateral and to apply to the Court for the appointment of a Court-appointed receiver (subject to the application of proceeds of realization to Priority Charges, as applicable), and, subject to the terms of the Intercompany Loan Order, the right to enforce the Intercompany Loan and to exercise all rights and remedies under any documents entered into in respect of the Intercompany Loans against the Parent consistent therewith. No failure or delay by the DIP Lender in exercising any of its rights hereunder or at law shall be deemed a waiver of any kind, and the DIP Lender shall be entitled to exercise such rights in accordance with this DIP Term Sheet at any time. No further Intercompany Loan shall be made by the Borrower after the occurrence of an Event of Default, unless such Event of Default is cured or waived in writing by the DIP Lender, or the DIP Lender otherwise agrees in writing. |
| **21.   FEES:** | The Borrower shall pay to the DIP Lender an upfront fee (the "**Upfront Fee**"), as compensation for making the DIP Facility available, in an amount equal to 2% of the Maximum Amount (being $1,400,000). The Upfront Fee shall be earned and payable upon execution and delivery of this DIP Term |

- 21 -

Sheet to the DIP Lender and approval of this DIP Term Sheet, the ARIO and the SISP Order by the Court. The Upfront Fee, once earned and payable, shall be non-refundable under all circumstances and shall be paid by adding the amount of such fee to the principal amount of DIP Obligations on the Closing Date. Amounts representing the Upfront Fee that are added to the principal amount of the DIP Obligations shall thereafter constitute principal and bear interest in accordance with Section 12.

The Borrower shall pay to the DIP Lender a standby fee (the "**Standby Fee**"), calculated at 1.25% per annum on the daily unadvanced portion of the DIP Facility. The Standby Fee shall be calculated and accrue daily from the date hereof. The Borrower shall pay the Standby Fee by adding the amount of such fee to the principal amount of DIP Obligations on the last business day of each calendar month. Amounts representing the Standby Fee that are added to the principal amount of the DIP Obligations shall thereafter constitute principal and bear interest in accordance with Section 12.

**22.   LEGAL FEES:**

The Borrower shall pay by wire transfer, within seven (7) days of receipt of a summary invoice, all reasonable and documented out-of-pocket expenses, including all reasonable legal expenses on a solicitor-client basis, incurred by the DIP Lender in connection with the Proceeding, this DIP Term Sheet and the DIP Facility, including those with any respect to any enforcement of the terms hereof or of the DIP Charge or otherwise incurred in connection with the DIP Facility (the "**Expenses**"), but for certainty excluding the DIP Lender's fees and expenses incurred in connection with the BMO Purchase Agreement and BMO Transaction.

Subject to Court approval of this DIP Term Sheet, all Expenses shall be non-refundable under all circumstances.

**23.   DIP LENDER APPROVALS:**

Any consent, approval, instruction or other expression of the DIP Lender to be delivered in writing may be delivered by any written instrument, including by way of email, by the DIP Lender pursuant to the terms hereof.

**24.   TAXES:**

All payments by the Borrower under this DIP Term Sheet to the DIP Lender, including any payments required to be made from and after the exercise of any remedies available to the DIP Lender upon an Event of Default, shall be made free and clear of, and without reduction for or on account of, any present or future taxes, levies, imposts, duties, charges, fees, deductions or withholdings of any kind or nature whatsoever or any interest or penalties payable with respect thereto now or in the future imposed, levied, collected, withheld or assessed by any country or any political subdivision of any country (collectively, "**Taxes**"), other than Taxes imposed on or measured by net income (however denominated), franchise Taxes, branch profits Taxes and any applicable Canadian withholding Taxes arising as a result of (i) the DIP Lender not dealing at arm's length (within the meaning of the *Income Tax Act* (Canada) ("**ITA**")) with the Borrower at the time of making such payment, or (ii) the DIP Lender being a "specified non-resident shareholder" (as defined in subsection 18(5) of the ITA) of the Borrower or not dealing at arm's length (for the purposes of the ITA) with a "specified shareholder" (as defined in subsection 18(5) of the ITA) of the Borrower,

except, in the case of (i) and (ii), (x) where the non-arm's length relationship arises, or (y) where the DIP Lender is a "specified non-resident shareholder" of the Borrower or does not deal at arm's length with a "specified shareholder" of the Borrower, in connection with or as a result of the DIP Lender having become a party to, executed, delivered, received payments under, performed its obligations under, received or perfected a security interest under, or received or enforced any rights under, any loan document.

**25. FURTHER ASSURANCES:**

The Borrower shall, at its expense, from time to time do, execute and deliver, or will cause to be done, executed and delivered, all such further acts, documents and things as the DIP Lender may reasonably request for the purpose of giving effect to this DIP Term Sheet. Without limiting the foregoing, the Borrower agrees that if so requested by the DIP Lender, acting reasonably, it shall promptly execute and deliver to the DIP Lender any general security agreement or other security documents securing its obligations to the DIP Lender hereunder in forms reasonable and customary for debtor in possession financings, provided however that the execution of any such security document shall not be a condition precedent to funding the Maximum Amount or DIP Advances hereunder.

**26. ENTIRE AGREEMENT; CONFLICT:**

This DIP Term Sheet, including the schedules hereto constitutes the entire agreement between the parties relating to the subject matter hereof.

**27. AMENDMENTS, WAIVERS, ETC.:**

No waiver or delay on the part of the DIP Lender in exercising any right or privilege hereunder will operate as a waiver hereof or thereof unless made in writing and delivered in accordance with the terms of this DIP Term Sheet. Any amendment to the terms of this DIP Term Sheet shall be made in writing and signed by the parties hereto.

**28. ASSIGNMENT:**

After the occurrence and during the continuance of an Event of Default, the DIP Lender may assign this DIP Term Sheet and its rights and obligations hereunder, in whole or in part, to any party acceptable to the DIP Lender in its sole and absolute discretion, provided that the Monitor shall have provided its prior written consent, including that the Monitor is satisfied that the proposed assignee has the financial capacity to act as DIP Lender.

Prior to the occurrence and continuance of an Event of Default, the DIP Lender shall not be permitted to assign its rights and obligations hereunder, in whole or in part, without the prior written consent of (i) the Borrower, such consent not to be unreasonably withheld; and (ii) the Monitor, including that the Monitor is satisfied that the proposed assignee has the financial capacity to act as DIP Lender.

Notwithstanding anything to the contrary in the DIP Term Sheet including without limitation Section 24, hereof, the DIP Lender shall be responsible for and shall indemnify and pay to the Borrower (and its officers and directors if applicable) on demand any costs and expenses incurred or arising in connection with any assignment of this DIP Term Sheet by the DIP Lender (including without limitation any applicable Taxes required to be paid by the Borrower (and its officers and directors if applicable) as a result

of the assignment), other than with respect to any assignment made after the occurrence and during the continuance of an Event of Default, and this indemnity shall survive the termination of the DIP Facility and repayment of the DIP Obligations.

Neither this DIP Term Sheet nor any right and obligation hereunder may be assigned by the Borrower.

| | |
|---|---|
| **29. SEVERABILITY:** | Any provision in this DIP Term Sheet that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction. |
| **30. COUNTERPARTS AND SIGNATURES:** | This DIP Term Sheet may be executed in any number of counterparts and by electronic transmission, each of which when executed and delivered shall be deemed to be an original, and all of which when taken together shall constitute one and the same instrument. Any party may execute this DIP Term Sheet by signing any counterpart of it. |
| **31. NOTICES:** | Any notice, request or other communication hereunder to any of the parties shall be in writing and be well and sufficiently given if delivered personally or sent by electronic mail to the attention of the person as set forth below: |

**(a) In the case of the Borrower:**

LoyaltyOne, Co.
351 King Street East
Suite 200
Toronto, Ontario M5A 0L6

Attention:     Shawn Stewart
Email:
                sstewart@loyalty.com

With a copy to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036-6745

Attention:     Philip Dublin, Meredith Lahaie, Alan Laves
Email:
                pdublin@akingump.com, mlahaie@akingump.com,
                alaves@akingump.com

And with a copy to:

Cassels Brock & Blackwell LLP
Scotia Plaza, Suite 2100

40 King St. W
Toronto, ON M5H 3C2

Attention:               Ryan Jacobs, Jane Dietrich, Michael Wunder
Email:

                         rjacobs@cassels.com, jdietrich@cassels.com,
                         mwunder@cassels.com

<u>And with a copy to the Monitor:</u>

KSV Restructuring Inc.
150 King Street West
Suite 2308, Box 42
Toronto, Ontario M5H 1J9

Attention:               David Sieradzki and Noah Goldstein
Email:

                         dsieradzki@ksvadvisory.com,
                         ngoldstein@ksvadvisory.com

<u>And with a copy to the Monitor's Counsel:</u>

Goodmans LLP
333 Bay Street
Suite 3400
Toronto, Ontario M5H 2S7

Attention:     Brendan O'Neill and Chris Armstrong
Email:         boneill@goodmans.ca, carmstrong@goodmans.ca

**(b) In the case of the DIP Lender:**

Bank of Montreal
100 King St West, 19th Floor
Toronto, Ontario, M5X 1A1

Attention:     Mike Johnson and Joshua Seager
Email:         michaelm.johnson@bmo.com, joshua.seager@bmo.com

<u>With a copy to:</u>

Torys LLP
79 Wellington Street East
Suite 3000
Toronto, ON  M5K 1N2

Attention: David Bish / Amanda Balasubramanian
Email:  dbish@torys.com / ABalasubramanian@torys.com

|  | Any such notice shall be deemed to be given and received, when received, unless received after 5:00 EST or on a day other than a business day, in which case the notice shall be deemed to be received the next business day. |
|---|---|
| **32.    GOVERNING LAW AND JURISDICTION:** | This DIP Term Sheet shall be governed by, and construed in accordance with, the laws of the Province of Ontario and the federal laws of Canada applicable therein. |
| **33.    CURRENCY AND JUDGMENT CURRENCY:** | Unless otherwise specified herein, all dollar amounts are in the lawful currency of the United States of America. The Borrower shall pay to the DIP Lender all payments on account of principal and interest hereunder in lawful money of the United States of America.<br><br>If in the recovery by the DIP Lender of any amount owing by the Borrower hereunder in any currency, judgment can only be obtained in another currency and because of changes in the exchange rate of such currencies between the date of judgment and payment in full of the amount of such judgment, the amount received by the DIP Lender is less than the recovery provided for under the judgment, the Borrower shall immediately pay any such shortfall to the DIP Lender and such shortfall can be claimed by the DIP Lender against the Borrower as an alternative or additional cause of action. |

*- signature pages follow -*

**IN WITNESS HEREOF**, the parties hereby execute this DIP Term Sheet as at the date first above mentioned.

**LOYALTYONE, CO.**

By: _____
     Name:  Shawn Stewart
     Title:   President

**BANK OF MONTREAL**

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

# EXHIBIT C
## BRANDLOYALTY TRANSACTION AGREEMENTS

**SALE AND PURCHASE AGREEMENT**

**PROJECT POINTS**

**EXECUTION COPY**

*EXECUTION COPY*

**CONTENTS**

1.  Definitions and Interpretation .................................................................................. 3
2.  Sale and Purchase of the Shares ............................................................................ 3
3.  Purchase Price ....................................................................................................... 4
4.  Pre-Completion Covenants ..................................................................................... 4
5.  Conditions Precedent .............................................................................................. 9
6.  Completion ............................................................................................................ 13
7.  Post-Completion Covenants ................................................................................. 15
8.  Due Diligence Review ........................................................................................... 17
9.  Seller's Warranties ............................................................................................... 17
10. Purchaser's Warranties ........................................................................................ 18
11. Authorisation ......................................................................................................... 18
12. Confidentiality ....................................................................................................... 18
13. Miscellaneous ...................................................................................................... 19
14. Governing Law and Dispute Settlement ............................................................... 23

Schedule 1    Definitions and interpretation ................................................................ 24
Schedule 2    Corporate structure ............................................................................... 30
Schedule 3    Term Sheet .......................................................................................... 33
Schedule 4    Bread and Lenders' Consents............................................................... 34
Schedule 5    Bridge Loan Documents ....................................................................... 35
Schedule 6    D&O Changes ....................................................................................... 36
Schedule 7    Form of Seller's and Seller's Parent's Closing Statement ..................... 37
Schedule 8    Seller's Warranties ............................................................................... 40
Schedule 9    Purchaser's warranties ......................................................................... 42
Schedule 10   Public Announcements .......................................................................... 43
Schedule 11   Data Room ............................................................................................ 44

*EXECUTION COPY*

**THIS SALE AND PURCHASE AGREEMENT (THE "AGREEMENT") IS MADE ON 1 MARCH 2023 BY AND BETWEEN:**

I.      **LVI LUX FINANCING S.À R.L.**, a private limited liability company (*société à responsabilité limitée*) incorporated under the laws of Luxembourg, having its registered office at 11-13 boulevard de la Foire, L-1528 Luxembourg and registered with the Luxembourg Trade and Companies Register under number B181593 (the "**Seller**"); and

II.     **OPPORTUNITY PARTNERS B.V.**, a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*), incorporated under the laws of the Netherlands with its corporate seat in 's-Hertogenbosch, the Netherlands, having its place of business at Deutersestraat 37, 5266 AW Cromvoirt, the Netherlands, and registered with the trade register of the Chamber of Commerce under number 66500427, (the "**Purchaser**");

the Seller and the Purchaser, are hereafter collectively referred to as the "**Parties**" and each individually, a "**Party**".

**RECITALS:**

A.      The Seller is the legal and beneficial owner of all issued and outstanding shares (the "**Shares**") in the capital of **APOLLO HOLDINGS B.V.**, a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*), incorporated under the laws of the Netherlands with its corporate seat in Amsterdam, the Netherlands, having its registered place of business at Koningsweg 101, 5211 BH 's-Hertogenbosch, the Netherlands, and registered with the trade register of the Chamber of Commerce under number 59143215 (the "**Company**").

B.      The Company, directly or indirectly, is the sole legal and beneficial owner of all issued and outstanding shares in the capital of the subsidiaries as set out in the corporate chart attached as <u>**Schedule 2**</u> (*Corporate structure*) (the "**Subsidiaries**", and together with the Company, the "**Group**" and the "**Group Companies**", and each individually, a "**Group Company**").

C.      The Group is active in the development, implementation and evaluation of tailor-made loyalty concepts and campaigns for high frequency retailers mostly in the supermarket industry and trading for retail- and production companies that deliver to this industry (the "**Business**").

50140800012928885852.6

D.     The Parties entered into that certain term sheet for share purchase agreement and bridge loan dated 13 February 2023 and attached hereto as **Schedule 3** (*Term Sheet*) (the "**Term Sheet**"), providing for the key terms regarding (i) a transaction pursuant to which the Purchaser will purchase and acquire all Shares from the Seller, and the Seller will sell and transfer the Shares to the Purchaser (the "**Transaction**") and (ii) a revolving credit facility of EUR 25,000,000 (twenty-five million euros) provided by the Purchaser (or any of its Affiliates) to the Group as a bridge loan for purposes of funding the working capital needs of the Business in the period between the date of this Agreement and the Completion Date (the "**Bridge Loan**").

E.     Prior to or on the date of this Agreement each of (A) that certain Consent and Release Agreement by and between Bread Financial Holdings, Inc., the Purchaser and the Seller's Parent (the "**Bread Consent**") and (B) the Lenders' Consent (as defined below), were entered into, copies of which are attached hereto in **Schedule 4** (*Bread and Lenders' Consents*).

F.     The Parties have reached agreement on the definitive terms and conditions under which they are willing to enter into the Transaction and therefore each of the Parties wishes to enter into this Agreement.

G.     Concurrently with the entering into of this Agreement, (i) the Purchaser as lender and Brand Loyalty International B.V. and Brand Loyalty Sourcing B.V. as borrowers, entered into the Bridge Loan agreement (the "**Bridge Loan Agreement**") and (ii) the Purchaser, Brand Loyalty Sourcing B.V. and the Agent (as defined below) entered into the intercreditor agreement including inventory pledge securing the obligations of the borrowers under the Bridge Loan (the "**Bridge Loan Pledge**"), both attached hereto in **Schedule 5** (*Bridge Loan Documents*).

H.     The Parties have complied with the provisions of the Social and Economic Council Merger Regulation (*SER-Fusiegedragsregels 2015*).

I.     Except as explicitly set out otherwise in this Agreement, the Seller and the Purchaser have obtained all internal and external approvals and consents required for (i) the entering into and execution of this Agreement and (ii) consummation of the Transaction.

**IT IS HEREBY AGREED AS FOLLOWS:**

1.     **DEFINITIONS AND INTERPRETATION**

In this Agreement, save where explicitly provided otherwise, capitalised words and expressions have the meanings specified or referred to in Paragraph 1 of **Schedule 1** (*Definitions and interpretation*). The provisions of this Agreement shall be interpreted in accordance with Paragraph 2 of **Schedule 1** (*Definitions and interpretation*), unless specifically provided otherwise in this Agreement.

2.     **SALE AND PURCHASE OF THE SHARES**

2.1.   **Sale and purchase**

Subject to the terms and conditions of this Agreement, the Seller hereby sells the Shares to the Purchaser and the Purchaser hereby purchases the Shares from the Seller.

2.2.   **Transfer**

Subject to the terms and conditions of this Agreement, the Seller shall transfer the Shares to the Purchaser, who shall accept such Shares, free from any and all Encumbrances, on the date on which the consummation of the Transaction in accordance with Clause 6 ("**Completion**") takes place (the "**Completion Date**"), by the execution of a customary notarial deed of transfer to be prepared by the Notary and negotiated between the Parties in good faith as soon as reasonably possible following the date of this Agreement (the "**Deed of Transfer**").

2.3.   **Effective Time**

Subject to Completion taking place, the sale and transfer of the Shares will have economic effect from 0.00 hours a.m. CET on the Completion Date (the "**Effective Time**") and, consequently, subject to the provisions of this Agreement, the benefit and risk of the Shares, together with the benefit and risk of the Group and the Business, will be for the account of the Purchaser as of the Effective Time.

2.4.   **Purchaser's nomination right**

The Purchaser shall be entitled to nominate at its own cost, by notice to the Seller delivered no later than three (3) Business Days prior to the Completion Date, an Affiliate of the Purchaser (the "**Purchaser's Nominee**"), to which all of the Shares will be transferred at Completion (instead of to the Purchaser itself), provided that such nomination shall not derogate from the Purchaser's obligations towards the Seller under this Agreement. In the event the Purchaser invokes its rights under this Clause 2.4 the relevant Clauses and provisions relating to the transfer of the Shares shall be deemed to read as such that the Purchaser's Nominee will be acquiring and accepting transfer of the Shares.

## 3.     PURCHASE PRICE

### 3.1.    Purchase Price

3.1.1.   The purchase price for the Shares (the "**Purchase Price**") will be USD 6,000,000 (six million US dollars).

3.1.2.   The consideration provided by the Purchaser to Seller pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Shares.

### 3.2.    Payment of the Purchase Price

3.2.1.   The Purchaser shall pay the amount of the Purchase Price to the Seller in cash at Completion in accordance with Clause 6.2 and without any deduction, set-off or suspension.

3.2.2.   Any payment made under this Agreement by or on behalf of the Seller to the Purchaser, or by the Purchaser to the Seller, shall be deemed to be an adjustment of the Purchase Price and shall be treated accordingly by the Parties in all relevant aspects, to the extent permitted by applicable Law.

## 4.     PRE-COMPLETION COVENANTS

### 4.1.    General conduct

Between the date of this Agreement and the Completion Date (the "**Interim Period**"), the Seller shall use its reasonable best efforts to cause each Group Company to carry on its part of the Business as a going concern in the Ordinary Course of Business and in a manner most likely to preserve its value. During the Interim Period and to the extent permitted by Law (including in particular competition Law), the Seller shall immediately notify the Purchaser of any fact, matter, circumstance or event outside the Ordinary Course of Business which it should reasonably understand to be of material importance to the Purchaser as purchaser of the Shares.

### 4.2.    Consent matters

4.2.1.   Notwithstanding Clause 4.1, to protect the value of the Group Companies in the Interim Period, the Seller shall procure that, during the Interim Period and to the extent permitted by Law, including in particular competition Law, none of the Group Companies carries out any of the following actions without the prior written consent of the Purchaser, which consent shall not be unreasonably withheld, delayed or made conditional:

   a. acquiring or agreeing to acquire any share(s) or other equity interest, or make any capital contributions to or investments in any person other than any Group Company;

b.  repay, redeem or repurchase, or allow to be repaid, redeemed or repurchased, any share capital of any Group Company to a person other than a Group Company;

c.  sell, transfer, issue or otherwise dispose of any share(s) of any Group Company;

d.  give any guarantee, indemnity, or otherwise agree to secure an obligation of any person other than for the benefit of the Group;

e.  disposing of any material assets (including cash outside the Ordinary Course of Business, but excluding the disposal or transfer of cash to a member of the Seller's Group other than any Group Company (whether in the Ordinary Course of Business or not)) or imposing any Encumbrance thereupon to or for the benefit of any person other than any Group Company; excluding Encumbrances currently existing under the Credit Agreement, the Bridge Loan Agreement and the Bridge Loan Pledge;

f.  entering into contracts or any similar binding obligation or commitment having a future liability in excess of EUR 1,000,000 (one million euros) in the aggregate;

g.  lend or borrow any money, other than under the Bridge Loan, in excess of EUR 500,000 (five hundred thousand euros);

h.  entering into, amending or terminating any Material Contracts;

i.  initiating or settling any litigation that is or could reasonably be expected to be material to the Business;

j.  hiring any employees for positions related to the Business that is out of the ordinary course of business;

k.  any dividend or any other distribution, whether by way of share redemption, repayment, or repurchase, share capital reduction, cancellation or otherwise, and any other payment in respect of any share capital, loan capital, bonds or other securities of any Group Company, in each case whether in cash, stock or in kind, declared, paid or made (whether actual or deemed) by any Group Company to any member of the Seller's Group;

l.  any waiver, deferral, discount or release by any Group Company of any amount, obligation or liability owed to any Group Company by any member of the Seller's Group or for the benefit of any member of the Seller's Group, except pursuant to Clause 4.4;

m.  any indebtedness or liability (agreed to be) incurred, assumed or indemnified by any Group Company to any member of the Seller's Group;

n.  the borrowing of any monies by any member of the Seller's Group from any Group Company;

o.  the acquisition or transfer by any Group Company from or to any member of the Seller's Group of any assets;

p.  any action or omittance that triggers or may trigger the enforcement by the relevant beneficiary of an Encumbrance granted by any Group Company; and

q.  the agreement or undertaking by any Group Company to do any of the matters set out in paragraphs a to p above.

4.2.2.   Any request for consent in connection with Clause 4.2.1 shall be made to the Purchaser by sending an email with a request for acknowledgment of receipt to Martijn ten Berge at martijn@oppartners.nl and Wieger Jansen at wieger@oppartners.nl. A written response to a request for consent must be provided by reply email to the sender of the email as soon as reasonably practicable and in any event within two (2) Business Days after receipt of the relevant request and, in case of an objection, setting out in reasonable detail the reasons for its objections, which must relate to the Business.

4.2.3.   If such written response is not received within such period, consent will be deemed to have been given by the Purchaser to the Seller. In the event the Purchaser timely and duly notifies the Seller of its objection, the Parties will as soon as reasonably possible discuss the proposed action and the Purchaser's objection with the objective of reaching agreement with regard to the action to be undertaken.

4.3.   **Permitted Actions**

The Seller shall not be in breach of any of Clause 4.1 or Clause 4.2 if and to the extent that the relevant Group Company undertakes or performs:

a.   any action in order to perform or meet any mandatory legal or contractual obligations existing as of the date of this Agreement, or in effect as of the date of this Agreement, or originating from the period prior to the date of this Agreement;

b.   any act or conduct which the relevant Group Company is required to take, or omit to take in order to comply with:

(i)    any Law, or any change or foreseeable change in Law;

(ii)   a request of any Governmental Authority; or

(iii)  the obligations under this Agreement;

c.   any act or conduct explicitly consented to by the Purchaser under Clause 4.2 and permitted under this Agreement; and/or

*EXECUTION COPY*

d.   any action in respect of which the relevant Group Company could not reasonably have acted otherwise without material detriment to, or without foregoing a material benefit to, any part of its Business.

### 4.4.    Intragroup arrangements, mutual releases and discharge

4.4.1.   Except as explicitly set out in this Agreement, the Seller undertakes to the Purchaser and, by means of an irrevocable third party undertaking for no consideration (*onherroepelijk derdenbeding om niet*), each Group Company that (i) all existing arrangements (including any outstanding balances) between the Seller or any member of the Seller's Group on the one hand and any Group Company on the other hand and, (ii) all assumptions, guarantees, indemnities, surety, letters of comfort, rights of recourse, security rights, attachments, Encumbrances or other assurances issued by, given by or binding on any Group Company on the one hand in relation to any obligations or liabilities of the Seller or any member of the Seller's Group on the other hand, shall be terminated without cost or early termination fees for the Purchaser or any Group Company, effective per Completion, on or prior to Completion.

4.4.2.   Subject to and effective per Completion:

a.   each of the Seller for itself and on behalf of each other member of the Seller's Group hereby absolutely, unconditionally and irrevocably covenant not to sue and fully, finally and forever completely releases and discharges the Purchaser and, by means of an irrevocable third party undertaking for no consideration (*onherroepelijk derdenbeding om niet*), each Group Company from any and all past, current and future claim, actions, obligations, liabilities, entitlements (legal and beneficial), demands and or causes of actions, of whatever kind or character, whether assertable directly or derivatively, whether now known or unknown which the Seller or any member of the Seller's Group has or might claim to have, or that could be asserted by or on behalf of the Seller or any member of the Seller's Group, against any Group Company or the Purchaser and will grant each Group Company and the Purchaser full and final release and discharge of and from any and all post, current and future claims, actions, obligations, liabilities, entitlements (legal and beneficial), demands and or causes of action, of whatever kind or character, whether now known or unknown other than pursuant to this Agreement; and

b.   the Purchaser for itself and on behalf of each other member of the Purchaser's Group (including the Group Companies) hereby absolutely, unconditionally and irrevocably covenant not to sue and fully, finally and forever completely releases and discharges the Seller and, by means of an irrevocable third party

50140800012928852.6

undertaking for no consideration (*onherroepelijk derdenbeding om niet*), each other member of the Seller's Group from any and all past, current and future claim, actions, obligations, liabilities, entitlements (legal and beneficial), demands and or causes of actions, of whatever kind or character, whether assertable directly or derivatively, whether now known or unknown which the Purchaser or any member of the Purchaser's Group has or might claim to have, or that could be asserted by or on behalf of the Purchaser or any member of the Purchaser's Group, against any member of the Seller's Group and will grant each member of the Seller's Group full and final release and discharge of and from any and all post, current and future claims, actions, obligations, liabilities, entitlements (legal and beneficial), demands and or causes of action, of whatever kind or character, whether now known or unknown other than pursuant to this Agreement.

4.4.3.   For purposes of this Clause 4.4 only, the term "Seller's Group" means the Seller and its Affiliates, including each of their employees, Representatives, agents or successors in title.

4.5.   **On-going information to the Purchaser during the Interim Period**

During the Interim Period and upon reasonable request of the Purchaser, the Seller shall, and will procure that each Group Company shall, (i) provide the Purchaser with specific and regular updates on the performance of the Business and answer any questions raised by the Purchaser in that respect, and (ii) as soon as possible notify the Purchaser if the Seller or any Group Company becomes aware of any fact, matter or circumstance which may have caused, or is likely to give cause to, a breach of the Clauses 4.1 or 4.2. For the avoidance of doubt, nothing in this Clause 4.5 should be interpreted as requiring the Seller or a Group Company to provide the Purchaser with any information that from a competition Law perspective would be deemed to be competitively sensitive in nature.

4.6.   **Finalisation of ancillary documents and Schedules**

Where any of the Schedules or ancillary document or agreement is not yet in agreed form at the date of this Agreement, the Seller and the Purchaser shall use their respective reasonable efforts and negotiate in good faith to finalise the same as soon as practicable after the date of this Agreement.

4.7.   **Execution of Notary Letter**

Ultimately on the last Business Day prior to the Completion Date the Parties and any other relevant party shall sign a customary notary letter to be prepared by the Notary and negotiated between the Parties in good faith as soon as reasonably possible following the date of this Agreement (the "**Notary Letter**").

5.    **CONDITIONS PRECEDENT**

5.1.    **Conditions Precedent**

The Seller and the Purchaser shall only be obliged to complete the Transaction and perform the actions set out in Clause 6.3 when the following conditions precedent have been fulfilled (or waived in accordance with Clause 5.3) by the Long Stop Date (and, where applicable, continues to be fulfilled) (the "**Conditions Precedent**"):

a.  Each of the Bread Consent and the Lenders' Consent being in full force and effect (the "**Consents Condition**");

b.  No Encumbrance granted by any Group Company being enforced by any relevant beneficiary, other than an Encumbrance granted by any Group Company to the Purchaser or Purchaser's Group (the "**Non-Enforcement Condition**");

c.  The BL Bridge Loan Consent Effective Date has occurred (the "**BL Bridge Loan Consent Condition**");

d.  The Seller's Warranties are true and accurate (the "**Seller's Warranties Condition**");

e.  The Purchaser's Warranties are true and accurate (the "**Purchaser's Warranties Condition**");

f.  All required notifications, filings and application with the Competition Authorities in connection with the Transaction ("**Merger Clearance Filings**") having been made, and each of the relevant Competition Authorities having either:

    (i)   issued a written statement or decision confirming that execution and performance of this Agreement does not fall within the scope of authority of the relevant Competition Authority (A) without referring the Transaction or any part thereof to another competition authority, or (B) referring the Transaction or any part thereof to another competition authority in accordance with relevant Law and one of the requirements listed in items (i) through (iii) having been fulfilled in respect of such other competition authority;

    (ii)  issued a written statement or decision unconditionally clearing the execution and performance of this Agreement; or

    (iii) not having issued a written statement or decision prior to expiry of the relevant waiting period or applicable time period under the relevant competition Laws thereby implying that unconditional clearance to the execution and performance of this Agreement has been given,

(the "**Merger Clearance Condition**"); and

g.  If and to the extent required to be made prior to consummation of the Transaction to comply with any mandatory Laws, any other regulatory notification, filing and application with any Governmental Authority in connection with the Transaction having been made (e.g. CFIUS), and each of the relevant Governmental Authorities having either:

   (i)   issued a written statement or decision confirming that execution and performance of this Agreement does not fall within the scope of authority of the relevant Governmental Authority (A) without referring the Transaction or any part thereof to another Governmental Authority, or (B) referring the Transaction or any part thereof to another Governmental Authority in accordance with relevant Law and one of the requirements listed in items (i) through (iii) having been fulfilled in respect of such other Governmental Authority;

   (ii)  issued a written statement or decision unconditionally approving, consenting to or otherwise clearing the execution and performance of this Agreement; or

   (iii) not having issued a written statement or decision prior to expiry of the relevant waiting period or applicable time period under the relevant Laws thereby implying that unconditional approval, consent or clearance (as the case may be) to the execution and performance of this Agreement has been given,

(the "**Regulatory Condition**").

## 5.2. Satisfaction of the Merger Clearance Condition and the Regulatory Condition

5.2.1.  All filings, requests and enquiries relating to the satisfaction of the Merger Clearance Condition set out in Clause 5.1.f shall be dealt with by the Purchaser also on behalf of, and in reasonable consultation with the Seller as provided for in this Clause 5.2.

5.2.2.  The Purchaser shall:

   (i)   file the Merger Clearance Filings with the Competition Authorities as soon as reasonably possible after the date of this Agreement and to the extent relevant, in compliance with any filing deadlines included in the relevant competition Laws;

   (ii)  promptly supply any additional information and documentation that may be requested by any Competition Authority;

(iii)    provide the Seller with drafts of the Merger Clearance Filings and all other material communications to, and from, the Competition Authorities and give the Seller two (2) Business Days to comment on them, and provide the Seller with final copies of all such communications, whereby: (i) the Seller shall make available to the Purchaser all information and documentation that the Purchaser may reasonably require to assess, make or supplement any Merger Clearance Filings with any Competition Authority in a correct and timely manner or answer any related questions by any Competition Authority within the applicable time limits, (ii) the Purchaser shall not submit any Merger Clearance Filings, or offers to, engage in material communications with, the Competition Authorities containing information pertaining to the Group or its shareholders without the Seller's prior written consent, such consent not to be unreasonably withheld, delayed or made conditional, and (iii) business secrets and other confidential information may be redacted by the Parties in exchanging drafts and final copies of communications, provided that such information will then be provided to the outside lawyers of either Party on a counsel-to-counsel basis without redaction; and

(iv)    use its reasonable best efforts to procure that the Merger Clearance Condition is satisfied in the first phase of the procedures promulgated by the Competition Authorities, and in any case as soon as possible, provided that the Purchaser shall not be obliged to make any divestment or implement any requirements of any Competition Authority or perform any behavioural remedies in order to obtain clearance from any Competition Authority.

5.2.3.    The Purchaser shall bear all filing fees and costs incurred in relation the Merger Clearance Filings. The Purchaser shall also bear all costs, penalties and fines resulting from not filing in any jurisdiction where it is determined that filing should have taken place unless such not filing was attributable to the Seller not complying with its obligations under this Clause 5.2.

5.2.4.    Notwithstanding Clause 5.2.2(iv), the Parties will refrain from carrying out any action or omitting anything that could cause delay or jeopardize the satisfaction of the Merger Clearance Condition, except where such action or omission is required by Law or a binding decision by (i) a court to which no appeal is possible or (ii) any Governmental Authority to which no objection is allowed.

5.2.5.    The provisions of this Clause 5.2 shall apply, as much as possible, *mutatis mutandis* to any notifications, filings, submissions or communications to any Governmental Authority made in connection with the Regulatory Condition.

5.2.6.   For the avoidance of doubt, where no Party has, prior to Completion, identified any aforementioned notifications, filings, submissions or communications being required to be made prior to consummation of the Transaction (in each case a "**Regulatory Filing Requirement**"), the Regulatory Condition shall be deemed satisfied.

## 5.3.   **Waiver of certain Conditions Precedent**

5.3.1.   The Consents Condition, the Non-Enforcement Condition, the BL Bridge Loan Consent Condition and the Seller's Warranties Condition may be fully or partly waived by the Purchaser in writing to the Seller.

5.3.2.   The Purchaser's Warranties Condition may be fully or partly waived by the Seller in writing to the Purchaser.

## 5.4.   **Long Stop Date**

5.4.1.   If (i) the Merger Clearance Condition has not been satisfied on or before the date falling 4 (four) months after the date of this Agreement (the "**Long Stop Date**"), (ii) to the extent a Regulatory Filing Requirement has been identified by either Party prior to the Long Stop Date, the Regulatory Condition has not been satisfied on or before the Long Stop Date, or (iii) the Consents Condition, the Non-Enforcement Condition, the BL Bridge Loan Consent Condition, the Seller's Warranties Condition or the Purchaser's Warranties Condition is not satisfied or waived in accordance with Clause 5.3 at any time on or prior to the Completion Date, each Party may at its own discretion, without being or becoming liable to the other Party, through a written notification to the other Party:

   a.   propose to postpone the Long Stop Date to another date (it being agreed that no Party shall be obliged to agree to such postponement); or

   b.   terminate this Agreement with immediate effect, except for the Surviving Clauses which shall survive such termination indefinitely and without prejudice to all other rights or remedies available, including the right to claim damages;

it being understood however, that the right to terminate this Agreement under this Clause 5.4 shall not be available to a Party if such Party has breached its obligations under Clauses 5.2 or 5.4 or has materially breached any of its other obligations under this Agreement, and such breach has contributed materially to the non-satisfaction of the relevant Condition Precedent. For the avoidance of doubt, termination of the Agreement as provided for herein shall not relieve any Party for a breach of this Agreement prior to the applicable termination date.

5.4.2. Each Party will notify the other Party in writing within three (3) Business Days once it becomes aware of (i) a Regulatory Filing Requirement existing, (ii) the satisfaction of the Merger Clearance Condition or the Regulatory Condition or (iii) any circumstance that will or is likely to result in a failure or delay to satisfy any Condition Precedent, accompanied by the relevant documentation.

## 6.   COMPLETION

### 6.1.   Date and place

Subject to the Conditions Precedent continuing to be satisfied, Completion shall take place at the offices of the Notary on the fifth (5th) Business Days after the date on which the Merger Clearance Condition and the BL Bridge Loan Consent Condition, and if applicable the Regulatory Condition has been satisfied, or as otherwise agreed between Parties.

### 6.2.   Payment

The Purchaser shall procure that the Purchaser Price has been transferred to and received on the Notary's Account in accordance with the Notary Letter no later than at 04.00pm CET on the Completion Date.

### 6.3.   Completion actions

6.3.1. After confirmation by the Notary that the Purchase Price has been received in the Notary's Account, the following shall occur on the Completion Date, in the order stated in this Clause 6.3 and further, to the extent relevant, in accordance with the Notary Letter:

  a. the Seller shall provide the Notary with the Company's shareholders register which reflects the Seller as the owner of the Shares and the Shares are not Encumbered (other than such Encumbrances on the Shares released pursuant to the Lenders' Consent), in which the release of Encumbrances on the Shares pursuant to the Lenders' Consent and the transfer of the Shares shall be registered;

  b. the Seller shall provide written evidence of payment of the amounts due by the Loan Parties to the Agent and the Term B Group (as defined in the Lenders' Consent) pursuant to Section 3(b)(ii) of the Lenders' Consent (the "**Lender Payment Amount**"), provided that the Seller shall be deemed to have complied with its obligations under this sub-clause b, if and to the extent (A) the Agent either for itself or also on behalf of the Term B Group (as defined in the Lenders' Consent), and to the extent relevant, the Term B Group (as defined in the Lenders' Consent) is or are (as the case may be) a party to the Notary Letter, and (B) the Notary Letter provides for the Lender Payment

Amount to be paid out of the Purchase Price received in the Notary's Account in accordance with 6.2;

c.  the Seller shall deliver to the Purchaser, with a copy to the Notary, the written resignations of each of the persons set out in **Schedule 6** (*D&O Changes*) stating that they resign from their respective board positions with the Group Companies as set out in that Schedule and that they waive any claims they have or may have against the Group Companies, effective upon the execution of the Deed of Transfer;

d.  the Seller shall procure the adoption of written resolutions to:

 (i)  grant full discharge to and accept the resignation of all members of the management boards of the Group Companies referred to in Clause 6.3.1.b, effective as per the execution of the Deed of Transfer; and

 (ii)  appoint the new members of the management boards of each of the Group Companies as set out in **Schedule 6** (*D&O Changes*), effective upon the execution of the Deed of Transfer;

e.  the Seller shall deliver to the Purchaser a written statement, substantially in the form of Schedule 7 (*Form of Seller's and Seller's Parent's Closing Statement*), in which (i) each of the Seller and the Seller's Parent affirms the terminations as referred to in Clause 4.4.1 and 4.4.2, and (ii) the Seller's Parent agrees as undertaking to procure compliance by itself and any member of the Seller's Group with the Seller's obligations set forth in Clauses 7.3 and 12;

f.  the Seller, the Purchaser and the Company shall each deliver to the Notary a duly executed power of attorney and, as and where required by the Notary, legalised and apostilled, authorising each other (deputy) civil law notary and employee associated with Houthoff Coöperatief U.A. to enter into and execute the Deed of Transfer on its behalf and know-your-customer information satisfactory to the Notary;

g.  the Seller, the Purchaser and the Company shall deliver to the Notary a written confirmation set out in the Notary Letter, instructing the Notary to transfer the Shares to the Purchaser;

h.  the Seller and the Purchaser shall cause the Shares to be transferred to the Purchaser by way of execution of the Deed of Transfer by the Notary; and

i.  the Seller and the Purchaser shall cause the Notary to hold the Purchase Price (*minus* the Lender Payment Amount if so agreed upon in the Notary Letter) for the benefit of the Seller, and to pay out all funds held in accordance with the Notary Letter.

6.3.2.   The effectiveness of each of the actions taken by or on behalf of the Purchaser pursuant to Clause 6.3.1 is conditional upon the occurrence of all actions required to be taken by the Seller and the Seller's Parent pursuant to Clause 6.3.1 and *vice versa*.

6.4.   **Breach of Completion obligations**

6.4.1.   If any Party fails to comply with any of its obligations under Clause 6.3, the non-defaulting Party shall be entitled, in addition and without prejudice to all other rights and remedies available to it (including any right to claim payment of damages), through a written notification to the defaulting Party:

   a.   to set a new time and date for Completion, which new Completion Date cannot be earlier than five (5) Business Days after the date originally scheduled for Completion, provided that Completion may not be deferred beyond the Long Stop Date without the consent of the other Party; or

   b.   to require the defaulting Party to proceed with, and effect, Completion to the extent practicable (taking into consideration the defaults that have occurred) and set a new date for the finalization of Completion through the effecting of the remaining obligations and actions as set out in Clause 6.3 on such date, which cannot be earlier than five (5) Business Days after the original Completion Date, provided that Completion may not be deferred beyond the Long Stop Date without the consent of the other Party.

6.4.2.   In the event Completion is wholly or partially deferred to a new date pursuant to Clause 6.4.1.a or 6.4.1.b:

   a.   the provisions of this Agreement shall apply as if that later date was originally set for Completion; and

   b.   if on such new date, any Party fails to comply with any of its obligations under Clause 6.3, Clause 6.4.1 shall apply *mutatis mutandis*, provided that in addition to the rights conferred to the non-defaulting Party under Clause 6.4.1, the non-defaulting Party shall also be entitled to terminate this Agreement with immediate effect, except for the Surviving Clauses which shall survive such termination indefinitely.

7.   **POST-COMPLETION COVENANTS**

7.1.   **Further Assurances**

On or after Completion, each Party shall, at its own expense, execute and perform (or procure to be executed and performed by any other relevant person) all such deeds, documents, acts and activities as may from time to time be required in order

to vest all the Shares in the Purchaser or as otherwise may be necessary for the consummation of the Transaction.

7.2. **Retention of records**

For a period of seven (7) years after the Completion Date, the Purchaser shall procure that each Group Company shall retain all books, records and other written information relating to such Group Company and, to the extent reasonably required by the Seller, the Purchaser shall allow the Seller access during normal office hours to these books, records and written information, including the right to make copies, at all times at the Seller's own expense, except where such access might result in a breach by the Seller of any applicable Law, or would cause undue disruption to the business activities of the Group Companies or their management (but in such event as soon as reasonably possible thereafter).

7.3. **Cooperation**

Following Completion, each Party shall (and shall cause their respective Affiliates to): (i) reasonably cooperate with any other Party in preparing any tax returns and regulatory or other filings which such other Party is responsible for preparing related to the Business or any Group Company; (ii) reasonably cooperate with any other Party in preparing for any audits of, or disputes with, any Governmental Authorities or other relevant third party regarding, any tax returns, filings, fines or claims relating to the Business or any Group Company; (iii) make available to any other Party and to any Governmental Authority as reasonably requested all information, records, and documents relating to any taxes, filings, fines or claims relating to the Business or any Group Company for which such other Party has or may have liability; (iv) provide timely notice to the other(s) in writing of any pending or threatened tax audits, tax assessments or claims for which the other(s) has, have or may have a liability; and (v) furnish the other(s) with copies of all correspondence received from any Governmental Authority or other relevant third party in connection with any tax audit or information request with respect to any such tax audit or assessment or any filings, fines or claims for which the other(s) has, have or may have liability. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall prohibit the Seller from ceasing its operations or winding up its affairs at any time after the Completion Date, it being acknowledged and agreed by the Purchaser that it is a possibility the Seller may wind up its affairs and liquidate and dissolve its existence as soon as reasonably practicable following the Completion Date.

50140800012928852.6

**8.    DUE DILIGENCE REVIEW**

8.1.    **Due Diligence Review**

8.1.1.    The Purchaser acknowledges and confirms that:

   a.  it has performed a review of the Disclosed Information (the "**Due Diligence Review**"); and

   b.  it has had opportunity to raise questions to the Seller in connection with the issues that it deemed relevant in order to take its decision to enter into this Agreement and carry out the Transaction which questions have been answered by the Seller.

8.1.2.    The Seller has no obligation to update any (part of the) Disclosed Information as of the date of this Agreement.

**9.    SELLER'S WARRANTIES**

9.1.    **Representations and warranties**

Subject to Completion occurring, the Seller represents and warrants to the Purchaser that the Seller's Warranties set out in Schedule 8 (*Seller's Warranties*) are true and accurate on the date of this Agreement and will be true and accurate on the Completion Date.

9.2.    **No other form of comfort**

9.2.1.    The Purchaser agrees that, save to the extent explicitly covered by a Seller's Warranty, no warranty, guarantee or any other form of comfort, whether express or implied, is given to the Purchaser concerning the Seller, the Shares, the Group Companies, the Business or any part of the Disclosed Information. The Purchaser agrees that no warranty, guarantee or any other form of comfort, whether express or implied, is given relating to any forward looking statements, forecasts, estimates, interpretations, analysis, projections, whether or not part of the Disclosed Information. The Purchaser acknowledges that none of the Seller's Warranties shall survive Completion and all rights, claims and causes of action (whether in contract or in tort or otherwise or whether at law or in equity) with respect thereto shall terminate upon Completion.

9.2.2.    The Purchaser acknowledges that, except for the Seller's Warranties, the Shares, and hence the Group Companies and the Business, are sold to the Purchaser as is, where is (*in de staat waarin het zich bevindt*).

9.2.3.    The Purchaser hereby waives its rights, if any, to invoke section 7:17 Dutch Civil Code with respect to this Agreement.

*EXECUTION COPY*

**10.    PURCHASER'S WARRANTIES**

10.1.    The Purchaser represents and warrants to the other Parties that the Purchaser's Warranties set out in **<u>Schedule 9</u>** (Purchaser's warranties) are, and will be, true and accurate on the date of this Agreement and on the Completion Date. In the event the Purchaser invokes its nomination rights pursuant to Clause 2.4, the Purchaser's Warranties shall be deemed given by the Purchaser with respect to the Purchaser and the Purchaser's Nominee (whereby any reference to the Purchaser in the Purchaser's Warranties shall be deemed a reference to the Purchaser and the Purchaser's Nominee).

10.2.    The Seller acknowledges that none of the Purchaser's Warranties shall survive Completion and all rights, claims and causes of action (whether in contract or in tort or otherwise or whether at law or in equity) with respect thereto shall terminate upon Completion.

**11.    AUTHORISATION**

Each of the Seller on behalf of itself and each member of the Seller's Group, and the Purchaser hereby represent and warrant that it has the power and authority to execute, deliver and perform this Agreement, and that this Agreement has been duly authorised by all necessary corporate action on the part of (i) the Seller on behalf of itself and each member of the Seller's Group, and (ii) the Purchaser, on behalf of itself and each member of the Purchaser's Group (including the Group Companies), respectively, and that this Agreement constitutes a legal, valid and binding obligation of each such party, and that the execution, delivery and performance of this Agreement by such party does not contravene or conflict with any provision or Law or of its charter or bylaws or any Agreement, instrument or order binding on such party.

**12.    CONFIDENTIALITY**

12.1.    No Party shall disclose or use any information regarding or in relation to the Agreement, the Transaction or the business of any other Party or any of its Affiliates, except:

a.  to the extent required by applicable Law or stock exchange regulations or any Governmental Authority and, to the extent reasonably possible, after consultation with the other Party about the timing and content of such disclosure;

b.  to professional advisors or auditors bound by a duty of confidentiality, to the extent necessary for any lawful purpose;

50140800012928852.6

c.   to the extent that the information is public knowledge without a breach of this Agreement and/or any applicable confidentiality agreement;

d.   as required to conduct the defence of a claim of a third party or to initiate or conduct any dispute on the basis of, and in accordance with, this Agreement;

e.   to any of its Affiliates; or

f.   for public announcements agreed between the Parties and made or sent by a Party to advise the press, employees, customers, suppliers or agents of the Group Companies of the acquisition of the Shares and the Business.

12.2.   Parties agree and acknowledge that, substantially simultaneously with this Agreement (i) the Seller's Parent will file a Form-8k current report with the Securities and Exchange Commission, and (ii) the Purchaser and the Group will jointly issue a press release, each in a form to be finalized in the Interim Period based on the preliminary drafts attached hereto as **Schedule 10** (*Public Announcement*).

## 13.   MISCELLANEOUS

### 13.1.   Notices

13.1.1.   Notwithstanding the right of each of the Parties to give notice in any other valid manner, notices shall be deemed to have been validly given if they have been sent, either by prepaid registered mail or by courier (with proof of delivery), to the following addresses (unless and until a Party notifies the other Party in accordance with this Clause 13.1 of another address):

13.1.2.   If to the Seller:

LVI Lux Financing S.à r.l.

Attn: Cynthia Hageman

11-13 boulevard de la Foire

L-1528 Luxembourg

Luxembourg

Email: generalcounsel@loyalty.com

*with     copy     to:*    *mlahaie@akingump.com;      skuhn@akingump.com;*
*alaves@akingump.com; c.zijderveld@houthoff.com; p.van.der.eijk@houthoff.com*

*EXECUTION COPY*

13.1.3.  If to the Purchaser:

Opportunity Partners

Attn: Martijn ten Berge and Wieger Jansen

Deutersestraat 37

5266 AW Cromvoirt

The Netherlands

Email: martijn@oppartners.nl and wieger@oppartners.nl

*with copy to:* mspelman@paulweiss.com; jweber@paulweiss.com; janlouis@burggraafhoekstra.com; tyshanti@burggraafhoekstra.com

### 13.2.  Assignment

Except as set forth in Clause 2.4, without the prior written consent of the other Party, no rights under or in connection with this Agreement can be assigned or encumbered (*goederenrechtelijk onoverdraagbaar en niet te bezwaren*) in accordance with Section 3:83(2) of the Dutch Civil Code, nor can any rights or obligations under this Agreement in any way be transferred.

### 13.3.  Entire agreement

This Agreement constitutes the entire agreement and understanding of the Parties with respect to its subject matter and replaces and supersedes all prior agreements, arrangements, undertakings or statements regarding such subject matter.

### 13.4.  Exclusion Dutch Civil Code provisions

The Parties hereby agree to exclude the applicability of Title 1 of Book 7 and article 89 of Book 6 of the Dutch Civil Code to the extent legally possible.

### 13.5.  Conflicting provisions

In the event of a conflict between any of the provisions of this Agreement on the one hand and any of the other ancillary agreements, the provisions of this Agreement shall prevail unless required by mandatory Law or explicitly agreed otherwise in this Agreement.

### 13.6.  Amendment

Any amendment or variation of this Agreement is not valid unless it is agreed between all Parties in writing. Each Party waives its right to seek amendment of this Agreement in court or in any other manner.

50140800012928852.6

13.7. **Notary**

The Purchaser acknowledges that the Notary is associated with Seller's legal counsel. The Purchaser is aware of the Dutch guidelines on associations between civil law notaries (*notarissen*) and lawyers (*advocaten*) established by the Board of the Royal Notarial Society (*Koninklijke Notariële Beroepsorganisatie*). The Purchaser explicitly agrees that the Seller may be presented by Houthoff Coöperatief U.A. in any matter relating to this Agreement and any disputes in connection therewith.

13.8. **Partial invalidity**

If any provision of this Agreement is or becomes invalid or non-binding, the Parties shall remain bound by all other provisions hereof. In that event, the Parties shall replace the invalid or non-binding provision by provisions that are valid and binding and that have, to the greatest extent possible, a similar effect as the invalid or non-binding provision, given the contents and purpose of such provision and this Agreement.

13.9. **Waiver**

No Party shall be deemed to have waived any of its rights under this Agreement unless such waiver has been made explicitly and in writing. Any waiver of any rights relating to a violation of the obligations contained in this Agreement shall not constitute a waiver of such rights relating to future violations contained in this Agreement.

13.10. **No rescission / nullification**

Except as explicitly provided for in this Agreement, each Party hereby explicitly and irrevocably waives the right:

a. to rescind (*ontbinden*), nullify (*vernietigen*) or otherwise terminate or amend this Agreement in whole or in part by way of an out-of-court declaration (*buitengerechtelijke verklaring*) or in any other manner; or

b. to seek the rescission (*ontbinding*) or nullification (*vernietiging*) or amendment in whole or in part of this Agreement in court.

13.11. **Effects of termination**

If this Agreement is terminated in accordance with its terms:

a. all documents and records that relate to a Seller or the Group Companies and that were furnished to the Purchaser or its advisors in anticipation of Completion shall be returned to the relevant Seller or the Group Companies, as the case may be, and the Purchaser shall not retain any copies of such documents and records; and

b. the Surviving Clauses shall survive such termination.

13.12. **Gross up**

Any sum payable under this Agreement shall be paid free and clear of all Tax Deductions and any other deductions and withholdings for whatever reason, except as required by Law. If any such sum is subject to a Tax deduction or withholding for whatever reason required by Law, such payment shall be increased to ensure that after the relevant deduction or withholding the relevant recipient receives a net amount equal to the amount it would have been entitled to if the sum payable under this Agreement would not have been subject to such deduction or withholding.

13.13. **Costs**

13.13.1. Unless this Agreement provides otherwise, all costs which a Party has incurred or will incur in preparing, concluding or performing this Agreement or in connection with the Transaction are for its own account.

13.13.2. The Purchaser shall bear all notarial fees in relation to the Transaction and any and all required transfer taxes, consent fees, transfer fees, change of control fees and third party filing fees in connection with the Transaction, the Bridge Loan and the Bridge Loan Pledge, other than consent fees, change of control fees and break fees payable to (i) the Agent, the Lenders or any party acting on any of their behalf pursuant to the Credit Agreement, or (ii) any other person that is not a supplier, customer, licensor, lessor or other business partner in relation to the Business.

13.14. **No third party beneficiaries**

This Agreement is concluded for the benefit of the Parties and their respective successors and permitted assigns, and nothing in this Agreement is intended to or implicitly confers upon any other person any right, benefit or remedy of any nature whatsoever, except to the extent explicitly stated in this Agreement (including the irrevocable third party undertakings for no consideration (*onherroepelijk derdenbeding om niet*) set forth in Clause 4.4 and Schedule 7 (*Form of Seller's and Seller's Parent's Closing Statement*)). In the event that any third party stipulation contained in this Agreement is accepted by any third party, such third party will not become a party to this Agreement.

13.15. **Counterparts**

This Agreement may be entered into by a Party by way of executing a separate counterpart, but it shall not be effective until each Party has executed at least one counterpart. Each counterpart, when executed, shall constitute an original, and all the counterparts shall together constitute one and the same instrument.

**14.    GOVERNING LAW AND DISPUTE SETTLEMENT**

14.1.    **Governing Law**

This Agreement (including Clause 14.2) shall be governed by and construed in accordance with the Laws of the Netherlands, explicitly excluding the conflict of laws provisions.

14.2.    **Dispute Settlement**

All disputes arising out of or in connection with this Agreement, if no amicable settlement can be reached between the Parties, will be exclusively submitted to the competent court of Amsterdam, the Netherlands.

*- Signature page SPA Project Points to follow -*

*- Signature page SPA Project Points -*

AGREED UPON ON THE DATE AT THE BEGINNING OF THIS AGREEMENT AND SIGNED IN COUNTERPARTS BY:

_____

**LVI Lux Financing S.à r.l.**

By: Jeffrey L. Fair

Position: Class A Manager

_____

**LVI Lux Financing S.à r.l.**

By: Stéphane Hépineuze

Position: Class B Manager

_____

**Opportunity Partners B.V.**

By:

Position:

*- Signature page SPA Project Points -*

**AGREED UPON ON THE DATE AT THE BEGINNING OF THIS AGREEMENT AND SIGNED IN COUNTERPARTS BY:**

_____

**LVI Lux Financing S.à r.l.**

By: Jeffrey L. Fair

Position: Class A Manager

_____

**LVI Lux Financing S.à r.l.**

By: Stéphane Hépineuze

Position: Class B Manager

_____

**Opportunity Partners B.V.**

By:

Position:

### SCHEDULE 1   DEFINITIONS AND INTERPRETATION

1.    **Definitions**

1.1.    In this Agreement, save where explicitly provided otherwise, capitalised words and expressions have the following meanings:

| | |
|---|---|
| **Affiliates** | an "Affiliate" of any person means any other person who, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such person; and for these purposes "controlling person" means any person who controls any other person; "control" (including the terms "controlling", "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management, policies or activities of a person whether through the ownership of securities, by contract or agency or otherwise; and for these purposes the term "person" is deemed to include a company and a partnership; for the avoidance of doubt, "Affiliate" includes shareholders holding an interest of at least fifty percent (50%), subsidiaries (*dochtermaatschappijen*) and group companies (*groepsmaatschappijen*) within the meaning of Sections 2:24a and 2:24b respectively of the Dutch Civil Code; |
| **Agent** | means the administrative agent under the Credit Agreement; |
| **Agreement** | this sale and purchase agreement; |
| **BL Bridge Loan Consent Condition** | has the meaning given in Clause 5.1.c; |
| **BL Bridge Loan Consent Effective Date** | has the meaning given in the Lenders' Consent; |
| **Bridge Loan** | has the meaning given in Recital D; |
| **Bridge Loan Agreement** | has the meaning given in Recital G; |

| | |
|---|---|
| **Bridge Loan Pledge** | has the meaning given in Recital G; |
| **Business** | has the meaning given in Recital C; |
| **Business Day** | any day (other than a Saturday or a Sunday) on which banks are open for normal banking business in New York (U.S.), Luxembourg, the Netherlands; |
| **Chamber of Commerce** | the Dutch Chamber of Commerce (*Kamer van Koophandel*); |
| **Company** | has the meaning given in Recital A; |
| **Competition Authorities** | means the German competition authorities as well as (i) any competition authorities to which the Transaction or any part thereof is referred in accordance with Clause 5.1.f(i) or (ii) the competition authorities in any other jurisdictions in which the Parties agree in writing that a filing is required; |
| **Completion** | has the meaning given in Clause 2.2; |
| **Completion Date** | has the meaning given in Clause 2.2; |
| **Conditions Precedent** | has the meaning given in Clause 5.1; |
| **Consents Condition** | has the meaning given in Clause 5.15.1.a; |
| **Credit Agreement** | means the credit agreement dated as of 3 November 2021, among *inter alios* Bank of America, N.A., as Agent, on behalf of the Lenders, the Seller and certain Group Companies identified therein; |
| **Data Room** | means the virtual data room prepared by the Seller and hosted with Intralinks an index of which is attached hereto as **Schedule 11** (*Data Room*) and in relation to which all Parties acknowledge receipt of the USB data driver or down load link made available to them by the data room provider prior to or on the date hereof; |
| **Deed of Transfer** | has the meaning given in Clause 2.2; |
| **Disclosed Information** | means the information that has been made available to the Purchaser in the Data Room; |

| | |
|---|---|
| **Due Diligence Review** | has the meaning given in Clause 8.1.1.a; |
| **Effective Time** | has the meaning given in Clause 2.3; |
| **Encumbrances** | any mortgage, pledge, charge, option, claim, right to acquire, conversion right, third party right, attachment (*beslag*), title retention or conditional sale arrangement outside the Ordinary Course of Business or an agreement, arrangement or obligation to create any of the foregoing; |
| **Governmental Authority** | means any international, supranational, European Union, national, provincial or local governmental body, regulatory body or authority exercising an executive, legislative, judicial, regulatory, administrative or other governmental function with jurisdiction in respect of the relevant matter; |
| **Group Companies** and **Group** | has the meaning given in Recital B; |
| **Interim Period** | has the meaning given in Clause 4.1; |
| **Law** | any international, European Union, national, state, provincial or local law, regulation, order, rule, statute, administrative order or treaty, or any other legal requirement; |
| **Lenders** | means the lenders under the Credit Agreement; |
| **Lenders' Consent** | means that certain consent entered into by and among the Seller's Parent, Brand Loyalty Group B.V., Brand Loyalty Holding B.V, Brand Loyalty International B.V., the Lenders and the Agent dated on the date hereof; |
| **Lender Payment Amount** | has the meaning given in Clause 6.3.1.b; |
| **Long Stop Date** | has the meaning given in Clause 5.4.1; |
| **Loss** | damages (*vermogensschade*) as meant in article 6:96 *et seq.* of the Dutch Civil Code suffered by the Purchaser or any of the Group Companies or the Seller's Group, as applicable; |
| **Material Contract** | means any agreement or arrangement to which any of the Group Companies is a party and which are material to the Business taken as a whole; |

| | |
|---|---|
| **Merger Clearance Condition** | has the meaning given in Clause 5.1.f; |
| **Merger Clearance Filings** | has the meaning given in Clause 5.1.f; |
| **Non-Enforcement Condition** | has the meaning given in Clause 5.1.b; |
| **Notary** | any civil law notary (*notaris*) of Houthoff Coöperatief U.A. or such civil law notary's substitute; |
| **Notary Letter** | has the meaning given in Clause 4.6; |
| **Notary's Account** | the third party bank account of the Notary as specified in the Notary Letter; |
| **Ordinary Course of Business** | means ordinary course of business consistent with past practices of the Group Companies up to the date of this Agreement, taking into consideration the distressed state of affairs of the Business; |
| **Parties** or **Party** | has the meaning given to it in the preamble of this Agreement; |
| **Purchase Price** | has the meaning given in Clause 3.1.1; |
| **Purchaser** | has the meaning given in the preamble of this Agreement; |
| **Purchaser's Nominee** | has the meaning given in Clause 2.4; |
| **Purchaser's Warranties** | the warranties as set out in Schedule 9 (*Purchaser's warranties*) |
| **Purchaser's Warranties Condition** | has the meaning given in Clause 5.1.e; |
| **Regulatory Condition** | has the meaning given in Clause 5.1.g; |
| **Representative** | in relation to a person, its directors, employees, legal advisor, financial advisor, accountant or other advisor or agent; |
| **Seller** | has the meaning given in the preamble of this Agreement; |

| | |
|---|---|
| **Seller's Group** | means the Seller and its Affiliates (excluding, as from Completion, each Group Company), including each of their employees, Representatives, agents or successors in title; |
| **Seller's Parent** | means **LOYALTY VENTURES INC.**, a corporation incorporated under the laws of Delaware, the United States of America, having its place of business at 8235 Douglas Avenue, Suite 1200, Dallas Texas, the United States of America; |
| **Seller's Warranties** | the warranties as set out in Schedule 8 (*Seller's Warranties*), and each of them a "**Seller's Warranty**"; |
| **Seller's Warranties Condition** | has the meaning given in Clause 5.1.d; |
| **Shares** | has the meaning given in Recital A; |
| **Subsidiaries** | has the meaning given in Recital B; |
| **Subsidiary Shares** | has the meaning given in paragraph 2.2 of Schedule 8 (Seller's *Warranties*); |
| **Surviving Clauses** | the following Clauses: 1 (*Definitions and Interpretation*), 12 (*Confidentiality*), 13 (*Miscellaneous*) and 14 (*Governing Law and Dispute Settlement*); and |
| **Transaction** | has the meaning given in Recital F. |

2. **Interpretation**

In this Agreement, unless specified otherwise:

a. "**Clause**", "**Recital**", "**Paragraph**", "**Schedule**" or "**Annex**" means a clause (including all subclauses), a recital, a paragraph, a schedule or an annex in or to this Agreement;

b. the Recitals, Schedules, Annexes and any other attachments to this Agreement form an integral part of this Agreement and shall have the same force and effect as if expressly set out in the body of this Agreement and a reference to this Agreement includes the Recitals, Schedules, Annexes to Schedules and any other attachments to this Agreement;

c. the headings are included for convenience of reference only and shall not affect the interpretation of this Agreement or of any provisions thereof;

d.    legal terms refer to Dutch legal concepts only, references to legal terms or concepts apply even where the concept referred to by such term does not exist outside the Netherlands and, if necessary, shall include a reference to the term in that jurisdiction outside the Netherlands that most approximates the Dutch term;

e.    the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

f.    a reference to a person includes any individual, corporation, entity, limited liability partnership, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organisation or government, whether or not having separate legal personality, and wherever incorporated or registered;

g.    references to books, records or other information shall include books, records or other information stored in any form, including electronic data carriers and any other form of data carrier;

h.    the singular includes the plural and vice versa, and each gender includes any other gender; and

i.    the words "as of" shall be deemed to include the date or moment in time specified thereafter.

3.    **Drafting**

The provisions of this Agreement shall not be interpreted adversely against a Party for the reason that such Party or any of its advisors was or were, or is or are deemed to have been, responsible for the drafting of that provision.

EXECUTION COPY

BRIDGE LOAN AGREEMENT

This bridge loan agreement (the "**Agreement**") is made on 1 March 2023 by and among:

1.  **OPPORTUNITY PARTNERS B.V.**, a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*), incorporated under the laws of the Netherlands with its corporate seat in 's-Hertogenbosch, the Netherlands, having its place of business at Deutersestraat 37, 5266 AW Cromvoirt, the Netherlands, and registered with the trade register of the Chamber of Commerce under number 66500427 (in its capacity as a lender, and together with any permitted assignee, the "**Lender**");

2.  **BRAND LOYALTY INTERNATIONAL B.V.**, a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*), incorporated under the laws of the Netherlands with its corporate seat in 's-Hertogenbosch, the Netherlands, having its place of business at Koningsweg 101, 5211 BH 's-Hertogenbosch, the Netherlands, and registered with the trade register of the Chamber of Commerce under number 17116091 ("**Brand Loyalty International**"); and

3.  **BRAND LOYALTY SOURCING B.V.**, a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*), incorporated under the laws of the Netherlands with its corporate seat in 's-Hertogenbosch, the Netherlands, having its place of business at Koningsweg 101, 5211 BH 's-Hertogenbosch, the Netherlands, and registered with the trade register of the Chamber of Commerce under number 1718752 ("**Brand Loyalty Sourcing**");

Brand Loyalty International and Brand Loyalty Sourcing are hereinafter individually also referred to as a "**Borrower**" and collectively as the "**Borrowers**". The Lender and the Borrowers are hereinafter individually also referred to as a "**Party**" and collectively as "**Parties**",

**WHEREAS:**

(A)     On or around the date of this Agreement, Opportunity Partners B.V. (such entity or the Purchaser Nominee (as defined in the SPA), as applicable, the "**Buyer**") entered into a sale and purchase agreement (the "**SPA**") pursuant to which the Buyer purchases all shares in the capital of Apollo Holdings B.V. (Dutch trade register number 59143215; the "**Target**") from LVI Lux Financing S.à r.l. (Luxembourg trade and companies register number B181593; the "**Seller**") with the transfer of such shares in the capital of the Target to the Buyer being subject to the satisfaction or waiver of certain conditions precedent set forth in the SPA (such transfer of such shares, the "**Completion**");

(B)     The Borrowers are indirect 100% subsidiaries of the Target;

(C)     The Borrowers, certain other members of the Target Group, Loyalty Ventures Inc., the Lenders (as defined in the Credit Agreement), and Bank of America, N.A. entered into that certain Credit Agreement, dated as of 3 November 2021 (as amended by that certain amendment agreement no. 1 to the Credit Agreement (Financial Covenant), dated as of 29 July 2022, as amended, supplemented and waived by that certain Consent by and among the Borrowers (as defined in the Consent), each Guarantor (as defined in the Credit Agreement), the Lenders (as defined in the Credit Agreement) party thereto and Bank of America, N.A., dated as of 1 March 2023 (the "**Consent**"), and as may be further amended, restated, supplemented, extended, or otherwise modified from time to time, the "**Credit Agreement**");

(D)     The Borrowers, the Target and the Target's other direct and indirect subsidiaries (the "**Target Group**") have the need for temporary funding of the working capital needs of the business of the Target Group in the period between the date upon which the SPA is executed by the Seller and the Lender and the Completion Date (as defined below); and

1

(E)     The Lender has agreed to provide a bridge loan in the amount of up to EUR 25,000,000 (twenty-five million euro) to the Borrowers to temporarily finance the working capital needs of the business of the Target Group under the terms and subject to the conditions set out in this Agreement and the Pledgor (as defined below) providing security for repayment of the Loan (as defined below) and interest accrued thereon by executing the ICA (as defined below).

**IT IS AGREED** as follows:

## 1.     DEFINITIONS AND INTERPRETATION

### 1.1.     Definitions

In this Agreement, save where explicitly provided otherwise, capitalized words and expressions have the meanings specified or referred to in the overview below:

"**BL Business**" has the meaning given to that term in the Consent.

"**Borrowers**" has the meaning given to that term in the preamble.

"**Brand Loyalty International**" has the meaning given to that term in the preamble under 2.

"**Brand Loyalty Sourcing**" has the meaning given to that term in the preamble under 3.

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for general business in the Netherlands.

"**Buyer**" has the meaning given to that term in recital A.

"**Change of Control**" means any of the following events (whether in one or in a series of related transactions): (i) the sale or issue of shares or securities or reorganization of a member of the Target Group (whether by that member of the Target Group or by shareholders of the Target Group) resulting in the Seller ceasing to, directly or indirectly, beneficially and/or legally hold the issued and outstanding shares or securities of the members of the Target Group as set out in schedule 2 to the SPA; (ii) merger or consolidation of any member of the Target Group with any person not being a member of the Target Group; and (iii) the sale of all or (in the reasonable opinion of the Lender) substantially all assets of the Target Group, unless in the case of each of clauses (i), (ii) and (iii) such event is (A) permitted under clause 8.3 hereto, (B) permitted under clause 4.3 of the SPA or consented to by the Lender in accordance with clause 4.2 of the SPA, or (C) the acquisition of the Target Group in accordance with the terms of the SPA.

"**Consent**" has the meaning given to that term in recital C.

"**Completion**" has the meaning given to that term in recital A.

"**Completion Date**" has the meaning given to that term in the SPA.

"**Credit Agreement**" has the meaning given to that term in recital C.

"**Credit Facility**" has the meaning given to that term in clause 2.1.1.

"**Encumbrance**" has the meaning given to that term in the SPA.

2

"**Event of Default**" means any event or circumstance specified as such in clause 6 (*Events of Default*).

"**Guarantor**" has the meaning given to that term in the Consent.

"**ICA**" the intercreditor agreement including inventory pledge as attached hereto as Schedule 1.

"**Lender**" has the meaning given to that term in the preamble under 1.

"**Loan**" means the aggregate of the principal amounts drawn and borrowed under the Credit Facility by the Borrowers and lent and paid by the Lender from time to time.

"**Maturity Date**" has the meaning given to that term in clause 4.1.

"**Maximum Commitment Amount**" means EUR 25,000,000 (twenty-five million euro).

"**Party**" has the meaning given to that term in the preamble.

"**Pledgor**" has the meaning given to that term in the ICA.

"**Seller**" has the meaning given to that term in recital A.

"**SPA**" has the meaning given to that term in recital A.

"**Target**" has the meaning given to that term in recital A.

"**Target Group**" has the meaning given to that term in recital D.

**1.2.    Interpretation**

a.    Unless a contrary indication appears, any reference in this Agreement to:

(i)    the "**Borrowers**", the "**Lender**" or any "**Party**" or any other person shall be construed so as to include its successors in title, permitted assigns and permitted transferees;

(ii)    "**assets**" includes present and future properties, revenues and rights of every description;

(iii)    this "**Agreement**" or any other agreement or instrument is a reference to this Agreement or other agreement or instrument as amended, novated, supplemented, extended, restated or otherwise modified;

(iv)    "**indebtedness**" includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

(v)    a "**person**" includes any individual, firm, company, corporation, government, state or agency of a state or any association, trust, joint venture, consortium or partnership (whether or not having separate legal personality);

(vi)    the singular includes the plural and vice versa;

(vii)    a provision of law is a reference to that provision as amended or re-enacted; and

3

(viii)   a time of day is a reference to Amsterdam time.

b.      Clause and Schedule headings are for ease of reference only.

c.      An Event of Default is "**continuing**" if it has not been waived or cured or otherwise remedied.

## 2.      THE CREDIT FACILITY

### 2.1.   Commitment

2.1.1.   On the terms and subject to the conditions of this Agreement, the Lender makes available to the Borrowers a revolving credit facility up to the Maximum Commitment Amount (the "**Credit Facility**").

2.1.2.   Upon request of the Borrowers, the Borrowers may draw, borrow and re-borrow, and the Lender will lend and pay to the Borrowers amounts of up to the Maximum Commitment Amount in increments of EUR 10,000 (ten thousand euro).

2.1.3.   The Lender shall make the amounts funded under the Credit Facility available by transferring each drawn amount into the following bank account of Brand Loyalty International and with the reference as described below; underlined provided that, solely with respect to the first draw down request made in accordance with Clause 2.1.2, the first draw down shall be subject to the Borrowers providing a written statement to the Lender concurrently with the first draw down (i) confirming that the Loan Parties (as defined in the Consent) have paid all invoices that the Loan Parties received for reimbursement of out-of-pocket fees, costs and expenses in accordance with Section 3(a)(vi) of the Consent; and (ii) attaching evidence of bank transfers relating to such payments made.

a.   Account Holder:          Brand Loyalty International B.V.

b.   IBAN:                    NL39DEUT0508486297.

c.   BIC:                     DEUTNL2AXXX

d.   Reference:               OP/BL Loan Agreement

### 2.2.   Purpose

The Borrowers shall apply all amounts drawn and borrowed under the Credit Facility solely towards the financing of the working capital needs of the business of the Target Group.

## 3.      INTEREST

### 3.1.   Rate

The Borrowers shall pay interest on the then-outstanding principal balance of the Loan, as of the drawdown date of each applicable advance made by the Lender, at a percentage per year of 10% (ten per cent).

### 3.2.   Calculation

Any interest under this Agreement will accrue from day to day and is calculated on the basis of the actual number of days elapsed and a year of 365 days.

**3.3.   Payment of interest**

The accrued interest shall be due and payable solely on the Maturity Date.

**4.   REPAYMENT AND PREPAYMENT**

**4.1.   Repayment of the Loan**

The Borrowers shall repay the Loan in full on the earlier of (i) 20 Business Days after the Completion Date and (ii) 3 Business Days after the date of termination of the SPA in accordance with its terms (the "**Maturity Date**").

**4.2.   Voluntary prepayment**

The Borrowers may, if they give the Lender not less than 3 Business Days' prior notice, prepay the whole or any part of the Loan.

**4.3.   Restrictions**

a.   Any notice of prepayment given by the Borrowers under Clause 4.2 (Voluntary prepayment) shall be irrevocable and shall specify the date or dates upon which the relevant prepayment is to be made and the amount of that prepayment.

b.   Any prepayment under this Agreement shall be made together with accrued and unpaid interest on the principal amount of the Loan that is prepaid but without premium or penalty.

**4.4.   Application of proceeds**

If the Lender receives a payment on the Maturity Date or a voluntary prepayment date, in each case, that is insufficient to repay all amounts then due and payable by the Borrowers to the Lender under this Agreement, the Lender shall apply that payment towards the obligations of the Borrowers in the following order:

a.   first, in or towards payment pro rata of any costs and expenses of the Lender due but unpaid under this Agreement;

b.   secondly, in or towards payment of any accrued interest and fees due but unpaid under this Agreement;

c.   thirdly, in or towards payment of principal due but unpaid under this Agreement; and

d.   fourthly, in or towards payment of any other sum but unpaid under this Agreement.

**5.   SECURITY**

As security for the repayment of the Loan and any other amount payable pursuant to this Agreement, Pledgor shall grant the Lender on the date of this Agreement a first ranking right of pledge over the Collateral (as defined in the ICA).

**6.   EVENT OF DEFAULT**

Each of the events or circumstances set out in this Clause 6 (*Events of Default*) is an "**Event of Default**" (save for Clause 6.10 (*Acceleration*)).

**6.1.   Non-payment**

The Borrowers do not pay on the applicable due date any amount payable pursuant to this Agreement at the place and in the currency in which it is expressed to be payable unless such payment is made within 5 Business Days of its due date.

**6.2.    Change of Control**

A Change of Control having occurred.

**6.3.    Liquidation event**

Any order made by any competent court or other relevant authority, or any resolution passed by or with respect to a member of the Target Group for the appointment of a liquidator (including a '*curator*'), administrator (including a '*bewindvoerder*') or receiver of, or individual or legal entity with a similar position or role in any jurisdiction in which such member of the Target Group is operating, or the winding up of, any member of the Target Group or a moratorium is imposed or declared over any or all of the assets and business of any member of the Target Group which is not frivolous or vexatious and is contested in good faith within 10 (ten) Business Days and not dismissed within 20 (twenty) Business Days of commencement.

**6.4.    Ceasing of business**

Any member of the Target Group ceases or suspends carrying on its business in its entirety or a material part of its business, except as permitted under clause 4.3 of the SPA or consented to by the Lender in accordance with clause 4.2 of the SPA.

**6.5.    Foreclosure**

Any encumbrancer (including any of the Lenders as defined in the SPA) takes possession of or a receiver, liquidator, supervisor, compulsory manager, administrator or similar official is appointed over any shares or securities of any member of the Target Group, or the whole or, in the reasonable opinion of the Lender, any material part of the assets of any member of the Target Group or a distress, execution or other process is levied or enforced upon or sued out against the whole or a material part of the assets of any member of the Target Group.

**6.6.    Encumbrance**

Creation of any Encumbrance over any shares, securities, other assets or the business of any member of the Target Group either by contract, tort, law, equity or pursuant to any other theory of law or otherwise, other than any Encumbrance (i) pursuant to this Agreement, (ii) the ICA, (iii) the existing Encumbrances under the Credit Agreement, or (iv) permitted under clause 4.3 of the SPA or consented to by the Lender in accordance with clause 4.2 of the SPA, as applicable.

**6.7.    Unlawfulness**

It becomes unlawful or impossible (i) for the Borrowers and/or the Pledgor to discharge any liability under this Agreement or to comply with any other material obligation under this Agreement or the ICA; or (ii) for the Lender to exercise or enforce any right under, or to enforce any security right created by or under, this Agreement or the ICA.

**6.8.    Change in priority (ranking)**

Any material provision of this Agreement proves to have been or becomes invalid or unenforceable, or any security right created by the ICA proves to have been or becomes invalid or unenforceable or, subject to the ICA, any such security right proves to rank or have ranked after, or loses its priority to, another security right of a third party (including the Lenders as defined in the SPA) or any other third party claim or interest.

**6.9. Obligations**

    a.    The Borrowers do not comply with any provision of this Agreement (other than those referred to in Clause 6.1 (Non-payment)).

    b.    No Event of Default under paragraph (a) above will occur if the failure to comply is capable of remedy and is remedied within 15 Business Days of the earlier of: (i) the Borrowers' receipt of written notice from the Lender in accordance with this Agreement; and (ii) the Borrower becoming aware of the failure to comply.

**6.10. Acceleration**

On and at any time after the occurrence of an Event of Default which is continuing the Lender may by notice to the Borrowers:

    a.    declare that all or part of the then-outstanding principal balance of the Loan, together with accrued and unpaid interest, and all other amounts accrued and unpaid under this Agreement be immediately due and payable, whereupon they shall become immediately due and payable; and/or

    b.    declare that all or part of the Loan be payable on demand, whereupon it shall immediately become payable on demand by the Lender.

**7.    COSTS AND EXPENSES; INDEMNITY**

**7.1. Transaction expenses**

Each Party will bear all costs and expenses (including legal fees) incurred by such Party in connection with the negotiation, preparation, execution and administration of this Agreement.

**7.2. Enforcement and preservation costs**

The Borrowers shall, within 3 Business Days of written demand, pay to the Lender the amount of all costs and expenses (including legal fees) incurred by the Lender in connection with the enforcement of, or the preservation of any rights under, this Agreement, the ICA or any other security created in connection with this Agreement and with any proceedings instituted by or against the Lender as a consequence of it entering into this Agreement, taking or holding any security created in connection with this Agreement, or enforcing those rights.

**8.    ASSIGNMENTS AND TRANSFERS**

**8.1. Borrowers**

No rights or obligations under or in connection with this Agreement can be assigned or encumbered (*goederenrechtelijk onoverdraagbaar en niet te bezwaren*) by any of the Borrowers in accordance with section 3:83(2) of the Dutch Civil Code (*Burgerlijke Wetboek*), nor can any rights or obligations under this Agreement in any way be transferred by any of the Borrowers, without the prior written consent of the Lender.

**8.2. Lender**

Subject to the ICA, the Lender shall have the right to assign and transfer its rights and obligations under this Agreement to an Affiliate (as defined in the SPA). To the extent necessary, each Borrower hereby grants its irrevocable and unconditional consent and co-operation to any such assignment or transfer in advance.

EXECUTION COPY

**8.3.    Anticipated transactions**

8.3.1.    The Lender acknowledges and agrees that (a) one or both Borrowers may transfer any assets forming part of the BL Business to a member of the Target Group that is a Guarantor and (b) the merger, de-merger, amalgamation, dissolution, liquidation or consolidation of one or both Borrowers with or into one or more Guarantors that are members of the Target Group (with the Guarantor being the surviving entity); provided that in no event shall any part of the BL Business be transferred outside of the Target Group (other than transfers in the ordinary course of the BL Business that are expressly permitted by the ICA or the Credit Agreement).

8.3.2.    Each Borrower undertakes and represents towards the Lender that:

a.    in the event of the merger or de-merger of one or both Borrowers with or into one or more Guarantors that are members of the Target Group (with the Guarantor being the surviving entity) in accordance with title 7 of Book 2 of the Dutch Civil Code, it shall procure that the notarial deed(s) of merger or de-merger, as the case may be, will explicitly provide that this Agreement will transfer to the surviving entity under universal title; and

b.    in the event of:

(i)    the merger or de-merger other than pursuant to title 7 of Book 2 of the Dutch Civil Code; or

(ii)    amalgamation, dissolution, liquidation or consolidation of one or both Borrowers with or into one or more Guarantors that are members of the Target Group (with the Guarantor being the surviving entity); or

(iii)    a transfer of any assets forming part of the BL Business from a Borrower to a member of the Target Group,

it shall, and shall procure that the surviving and/or receiving member(s) of the Target Group shall, immediately prior to such merger, de-merger, amalgamation, dissolution, liquidation, consolidation or transfer of assets, jointly enter into a Dutch law governed deed of transfer and assignment (*akte van contractsoverneming*) with the Lender which will provide for the transfer and assignment of this Agreement in accordance with section 6:159 of the Dutch Civil Code to any such member(s) of the Target Group. Any deed of transfer and assignment of this Agreement by a member(s) of the Target Group, which is not a mere transfer of all rights and obligations of this Agreement to the surviving and/or receiving member(s) of the Target Group in accordance with section 6:159 of the Dutch Civil Code, shall be subject to the consent rights of the Administrative Agent and the Required Lenders (in each case, as defined in the Credit Agreement), as applicable, set forth in Clause 13.5.

**9.    PAYMENT MECHANICS**

**9.1.    Payments to the Lender**

a.    On each date on which the Borrowers are required to make a payment under this Agreement, the Borrowers shall make the same available to the Lender for value on the due date.

8

b.   Payment shall be made to the following bank account of the Lender and with the reference as described below:

    (i)    Account holder:    Opportunity Partners B.V.

    (ii)    IBAN:    NL29 ABNA 0477 8244 63

    (iii)    BIC:    ABNANL2A

    (iv)    Reference:    OP/BL Loan Agreement

**9.2.   Business Days**

Any payment which is due to be made on a day that is not a Business Day shall be made on the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

**10.   INFORMATION UNDERTAKINGS**

The Borrowers shall inform the Lender in writing:

a.   of the occurrence of an Event of Default or an event, change or circumstance that occurs or threatens to occur that results in or could result in an Event of Default, promptly upon becoming aware thereof; and

b.   promptly upon the Lender's request, and to the extent permitted by applicable law (in particular competition law), such further information regarding the financial condition, assets and operations of any member of the Target Group as the Lender may reasonably request.

**11.   SET-OFF**

Subject to the ICA (if applicable), each Party may set off any obligation (whether or not due, actual or contingent) owed by a Party to the other Party under this Agreement against any obligation (whether or not due) owed by a Party to the other Party, regardless of the place of payment or currency of either obligation. If an obligation is in different currencies, such obligation will be converted at the market rate of exchange at the time, and for the purpose of, that set-off.

**12.   NOTICES**

**12.1.   Communications in writing**

Any communication to be made under or in connection with this Agreement shall be made in writing and, unless otherwise stated, may be made by email or letter.

**12.2.   Addresses**

The address and email address of each party to this Agreement for any communication or document to be made or delivered under or in connection with this Agreement is that as set out in the signature page to this Agreement or any substitute address or email address as that party may notify to the other party to this Agreement by not less than 5 Business Days' notice.

EXECUTION COPY

## 13. MISCELLANEOUS

### 13.1. Accounts

In any litigation or arbitration proceedings arising out of or in connection with this Agreement, the entries made in the accounts maintained by the Lender are prima facie evidence of the matters to which they relate, subject to proof of the contrary.

### 13.2. Certificates and determinations

Any certification or determination by the Lender of a rate or amount under this Agreement is, in the absence of manifest error, conclusive evidence of the matters to which it relates, subject to proof of the contrary.

### 13.3. Partial invalidity

If, at any time, any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

### 13.4. Remedies and waivers

No failure to exercise, nor any delay in exercising, on the part of the Lender, any right or remedy under this Agreement shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies provided by law.

### 13.5. Amendments and waivers

Any term of this Agreement may be amended, supplemented, varied, increased, extended, added, waived or consented to only with the written consent of the Lender and the Borrowers and, to the extent required by the ICA and the Consent, as applicable, the Administrative Agent and the Required Lenders (each term as defined in the Credit Agreement), as applicable.

### 13.6. Waiver

Each Party hereby explicitly and irrevocably waives, to the fullest extent permitted by law, any right it may have at any time to:

a. rescind (*ontbinden*), nullify (*vernietigen*) or otherwise terminate or amend this Agreement in whole or in part by way of an out-of-court declaration (*buitengerechtelijke verklaring*) or in any other manner; or

b. seek the rescission (*ontbinding*) or nullification (*vernietiging*) or termination or amendment in whole or in part of this Agreement in court.

### 13.7. Counterparts

This Agreement may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

## 14. GOVERNING LAW

This Agreement is governed by Dutch law.

15. **ENFORCEMENT**

The competent court of Amsterdam, the Netherlands, has exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute relating to the existence, validity or termination of this Agreement).

*- signature page and Schedule follow –*

SIGNATURE PAGE BRIDGE LOAN AGREEMENT

**The Borrowers**

_____

**Brand Loyalty International B.V.**

By: F.M.P. Bekkers

Title: Director

Address: Koningsweg 101, 5211BH 's-Hertogenbosch, the Netherlands

Attn.: Frank Bekkers

Email address: Frank.bekkers@brandloyalty-int.com

_____

**Brand Loyalty Sourcing B.V.**

By: **Brand Loyalty International B.V.**

Title: Director

By: F.M.P. Bekkers

Title: Director

Address: Koningsweg 101, 5211BH 's-Hertogenbosch, the Netherlands

Attn.: Frank Bekkers

Email address: Frank.bekkers@brandloyalty-int.com

Execution Version

# INTERCREDITOR AGREEMENT
# INCLUDING INVENTORY PLEDGE

dated 1 March 2023

among

## BRAND LOYALTY SOURCING B.V.
as Pledgor

and

## OPPORTUNITY PARTNERS B.V.
as Inventory Pledgee

and

## BANK OF AMERICA, N.A. as Administrative Agent

as Exisiting Pledgee

NautaDutilh

**Execution Version**

## CONTENTS

**Clause**                                                                                              **Page**

1.    Definitions and Interpretation ........................................................................................ 3

2.    Agreement and Creation of Pledge.................................................................................. 6

3.    Representations and Warranties ...................................................................................... 8

4.    Pledgor Undertakings ...................................................................................................... 8

5.    Inventory Pledgee Undertaking ..................................................................................... 10

6.    Authority to Require Possession .................................................................................... 10

7.    Enforcement .................................................................................................................... 11

8.    Licence to Enforce.......................................................................................................... 12

9.    Application of Proceeds .................................................................................................. 13

10.   Cancellation.................................................................................................................... 13

11.   Liability .......................................................................................................................... 14

12.   Costs ................................................................................................................................ 14

13.   Power of Attorney ........................................................................................................... 14

14.   Rights to Recourse and Subrogation .............................................................................. 14

15.   Miscellaneous ................................................................................................................. 14

16.   Governing Law and Jurisdiction .................................................................................... 18

Schedule 1 inventory...................................................................................................................... 19

**Execution Version**

**THIS AGREEMENT** is dated 1 March 2023 and made among:

1.  **BRAND LOYALTY SOURCING B.V.** a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*), having its corporate seat at 's-Hertogenbosch (address: Koningsweg 101, 5211 BH, 's-Hertogenbosch, the Netherlands, trade register number: 17187852) as pledgor (the "**Pledgor**");

2.  **OPPORTUNITY PARTNERS B.V.** a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*), having its corporate seat at 's-Hertogenbosch (address: Deutersestraat 37, 5203DK, 's-Hertogenbosch, the Netherlands, trade register number: 66500427) as grantee of a new pledge over the Collateral (the "**Inventory Pledgee**"); and

3.  **BANK OF AMERICA, N.A.** a national banking association organized under the laws of the United States of America, with its registered office at 100 North Tyron Street, Charlotte, North Carolina, 28255, United States of America as Administrative Agent and holder of an existing first ranking pledge granted over the Collateral (the "**Existing Pledgee**").

**WHEREAS**

(A)   On or about the date of this Agreement the Purchaser (as defined in the SPA) and LVI Lux Financing S.à r.l entered into a sale and purchase agreement (the "**SPA**") pursuant to which the Purchaser shall acquire all shares in the capital of Apollo Holdings B.V. (the "**Target**"), with the transfer of such shares being subject to the satisfaction or waiver of certain conditions precedent set forth in the SPA (the "**Sale**").

(B)   In connection with the Sale, the Inventory Pledgee has agreed to provide a revolving credit facility in an amount up to EUR 25,000,000 under the terms and conditions of that certain Bridge Credit Agreement (as defined below) to Brand Loyalty International B.V. and Brand Loyalty Sourcing B.V. (as borrowers) in order to temporarily finance the interim working capital needs of the (business of the) Target and its subsidiaries until consummation of the Sale.

(C)   The Pledgor owns all or substantially all of the inventory (*voorraad*) used in the business of the Target and its subsidiaries.

(D)   As security for the repayment of any and all amounts due and payable under the Bridge Credit Agreement it has been agreed that the Pledgor shall enter into this Agreement and, subject to the terms and conditions set forth herein, provide first ranking security over all its present and future inventory (*voorraden*).

**IT IS AGREED** as follows:

**1.**   **DEFINITIONS AND INTERPRETATION**

**1.1**   **Definitions Bridge Credit Agreement**

Unless otherwise defined in this Agreement, capitalised terms and expressions defined in the Bridge Credit Agreement or the Consent Letter, as applicable, have the same meanings when used in this Agreement (including the preamble and recitals).

3

## 1.2      Definitions

In this Agreement:

"**Agreement**" means this Intercreditor Agreement Including Inventory Pledge.

"**Bridge Credit Agreement**" means the EUR 25,000,000 bridge loan agreement, dated as of 1 March 2023, by and among the Inventory Pledgee as lender and Brand Loyalty International B.V. and Brand Loyalty Sourcing B.V. as borrowers

"**Clause**" means a clause in this Agreement.

"**Collateral**" means all present and future inventory (*voorraden*) owned (whether fully or conditionally) by the Pledgor, including the inventory kept at the locations listed in Schedule 1 (*Inventory*).

"**Consent Letter**" means that certain consent, dated as of 1 March 2023, by and among, among others, Loyalty Ventures, Inc. as company, Brand Loyalty Group B.V., Brand Loyalty Holding B.V. and Brand Loyalty International B.V. as Netherlands borrowers, each guarantor party thereto, each lender party thereto and Bank of America, N.A. as administrative agent.

"**DCC**" means the Dutch Civil Code (*Burgerlijk Wetboek*).

"**Enforcement Event**" means an Event of Default which is continuing and is, or has resulted in, a default as referred to in section 3:248 DCC with respect to the payment of the Secured Obligations and after the Inventory Pledgee has served a notice under clause 6.10 (*Acceleration*) of the Bridge Credit Agreement.

"**Existing Dutch Security Agreement**" means the Dutch security agreement, dated as of November 3, 2021, by and among, Apollo Holdings B.V. and its subsidiairies as listed therein as pledgors and the Existing Pledgee as pledgee.

"**Party**" means a party to this Agreement.

"**Pledge**" means any pledge created and any pledge purported to be created under or pursuant to this Agreement for the benefit of the Inventory Pledgee.

"**Sale**" has the meaning given thereto in recital (A) of this Agreement.

"**Schedule**" means a schedule to this Agreement.

"**Secured Obligations**" means all monetary payment obligations, whether present or future, actual or contingent, owed to the Inventory Pledgee under or in connection with the Bridge Credit Agreement.

"**SPA**" has the meaning given thereto in recital (A) of this Agreement.

"**Target**" has the meaning given thereto in recital (A) of this Agreement.

## 1.3      Construction and interpretation

(a)      A reference to any agreement, deed or other document is a reference to such agreement, deed or other document as amended, novated, supplemented, extended or restated.

4

(b)     A reference to the "**Inventory Pledgee**", the "**Existing Pledgee**" or the "**Pledgor**" shall be construed to include its respective successors or assigns.

(c)     A reference to "**Purchaser**" shall be construed to include the Purchaser' Nominee (as defined in the SPA).

(d)     The word "**includes**" and its derivatives means "includes, but is not limited to" and corresponding derivative expressions.

(e)     A "**person**" includes any individual, firm, company, corporation, government, state or agency of a state or any association, trust, joint venture, consortium, partnership or other entity (whether or not having separate legal personality).

(f)     A "**right**" against a person means a right to receive an amount of money from that person and any other right against that person.

(g)     An Event of Default is "**continuing**" if it has not been waived or cured or otherwise remedied in accordance with the Bridge Credit Agreement.

(h)     Capitalised terms and expressions denoting the singular shall include the plural and vice versa.

(i)     The words used in this Agreement to describe legal concepts, although in English, refer to concepts under the laws of the Netherlands only and the interpretation of those words under the laws of any country other than the Netherlands is to be disregarded.

**1.4     Intention of Parties**

The Pledgor, the Inventory Pledgee and the Existing Pledgee confirm that, with regard to this Agreement and the Existing Dutch Security Agreement, for as long as this Agreement remains in place:

(a)     in case of any conflict between the Existing Dutch Security Agreement and this Agreement, the provisions of this Agreement will take priority over the provisions of the Existing Dutch Security Agreement (for the avoidance of doubt, including when this would affect the priority of any security created under the Existing Dutch Security Agreement) provided such provisions do not affect the validity or enforceability of the Existing Dutch Security Agreement.

(b)     any reference to the respective ranking of security under the Existing Dutch Security Agreement (including, for the avoidance of doubt, any representations or warranty made by the Pledgor as to the respective ranking of certain security), should be understood to be a reference to the ranking as changed by this Agreement, as applicable; and

(c)     any representation or warranty made by the Pledgor stating that any Collateral is free of any limited right (*beperkt recht*) or attachment", that the Collateral has not been transferred, encumbered or attached in advance" or that the Pledgor has not agreed to a "transfer or encumbrance in advance", should be understood as a representation and warranty by the Pledgor which is qualified by the rights and obligations agreed to by the Pledgor and the other parties hereto under this

5

**Execution Version**

Agreement (including the change of ranking, if applicable) and the Existing Dutch Security Agreement.

## 2. AGREEMENT AND CREATION OF PLEDGE

### 2.1 Agreement to pledge Collateral

In accordance with the Bridge Credit Agreement, the Pledgor hereby agrees to pledge to the Inventory Pledgee, also by way of third party security (*derdenzekerheid*), on the terms of this Agreement, all Collateral, as security for the payment when due of the Secured Obligations.

### 2.2 Creation of pledge over Collateral

As security for the payment when due of the Secured Obligations, the Pledgor hereby pledges to the Inventory Pledgee all its Collateral. The Inventory Pledgee hereby accepts such pledge.

### 2.3 Ranking

(a) Notwithstanding the date, time, method or order of grant of a pledge over the Collateral, but subject to paragraph (b) below, the Pledge shall rank senior to the pledge created under or pursuant to the Existing Dutch Security Agreement. Subject to paragraph (b) below, each of the Parties, including the Existing Pledgee, irrevocably consent to (*stemmen in met*) the change of ranking such that the Pledge ranks senior to the pledge created under or pursuant to the Existing Dutch Security Agreement.

(b) The agreement on the change of ranking of the pledge created under or pursuant to the Existing Dutch Security Agreement and the Pledge set forth in paragraph (a) above terminates if and when any of the following events occur: (i) the Bridge Credit Agreement is terminated and all obligations due thereunder are paid in full, (ii) the SPA is terminated by agreement of the parties thereto, (iii) the SPA is terminated as a result of a material breach by the Purchaser, (iv) the Sale does not close within 4 months of the date of the SPA, due to the action or inaction of the Purchaser to consummate the Sale when it is required to do so under the SPA, (v) the Inventory Pledgee or the Purchaser violates the provisions of Clause 5 (*Inventory Pledgee undertaking*) (other than an immaterial inadvertent violation of clause (b) thereof that is not cured within three (3) Business Days after such violation) or Clause 15.2 (*Transfer of rights and obligations*) of this Agreement or (vi) the Inventory Pledgee fails to make any funding under the Bridge Loan Credit Agreement when required to do so by the terms thereof (provided the conditions to such funding have been satisfied) (any such event described in clauses (i), (ii), (iii), (iv), (v) or (vi) above, a "**Termination Event**"). Upon a Termination Event, the pledge created under or pursuant to the Existing Dutch Security Agreement and the Pledge take rank in accordance with their respective dates of creation.

### 2.4 Registration

(a) The Pledgor shall:

6

(i) promptly upon signing this Agreement, and in any event within two (2) Business Days thereof, submit this Agreement to the office of the Dutch tax authorities in Rotterdam for registration in accordance with the 1970 Registration Act (*Registratiewet 1970*), and provide the Inventory Pledgee and the Exisiting Pledgee with a copy of such request for registration; and

(ii) provide the Inventory Pledgee and the Existing Pledgee without delay with evidence that registration has been completed.

(b) The above obligations are without prejudice to the Inventory Pledgee's power by law to effectuate such registration itself.

## 2.5 Parties' intent

(a) The Pledgor confirms that each Pledge is intended to extend to, and shall not be affected by, any amendment, supplement, variation, increase, extension, addition or other event (however fundamental) of, to or affecting the Bridge Credit Agreement and/or of, to or affecting any facility or amount made available under the Bridge Credit Agreement, notwithstanding any other event that may affect the Secured Obligations, including any rescheduling of indebtedness under any facility, any accession of a party to or retirement of a party from the Bridge Credit Agreement, any deferral or redenomination of any amount owing under the Bridge Credit Agreement, any change in the purpose for which any facility or amount is made available, any addition of a new facility, any increase of the amount of a facility, or any increase in the margin, fee or commission or any other amount owing or accruing under the Bridge Credit Agreement, and shall extend to any fees, costs and/or expenses associated with any such amendment, supplement, variation, increase, extension, addition or other event, in each case provided such amendment, supplement, variation, increase, extension, addition or other event has been approved in writing by the Existing Pledgee and Required Lenders to the extent required by, and in accordance, with Clause 5 (*Inventory Pledgee undertaking*) of this Agreement.

(b) The Pledgor and the Inventory Pledgee confirm and agree that, to the extent the Secured Obligations are transferred to the Pledgor or any other person by way of subrogation or otherwise, whether in whole or in part, the Pledge shall not secure the Secured Obligations so transferred and neither the Pledgor nor any other person shall have the benefit of the Pledge or any rights of the Inventory Pledgee under this Agreement to the extent related to the Secured Obligations so transferred.

(c) It is the Parties' intention that this Agreement creates security interests over the Collateral, wherever located. However, if a court outside the Netherlands holds that pursuant to a rule of private international law applied by that court, the laws of any other jurisdiction apply to the creation and validity of a security interest over any of the Collateral under this Agreement, then the security interest over such Collateral is intended to be created under the laws of that other jurisdiction as well.

7

3.      **REPRESENTATIONS AND WARRANTIES**

Subject to certain limitations due to license agreements and purchase agreements and otherwise in respect of certain parts of the Collateral (in the ordinary course of business in line with past practice or, insofar it relates to the present agreements, as known to the Purchaser based on the information fairly disclosed in the Data Room (as defined in the SPA)), the Pledgor represents and warrants to the Inventory Pledgee that on the date of this Agreement:

(a)     it has full title to its Collateral (to the extent acquired prior to the moment of this representation) and power to dispose of and encumber that Collateral;

(b)     its Collateral is not subject to any limited right or other encumbrance other than the pledge created under or pursuant to the Existing Dutch Security Agreement, no offer has been made or agreement entered into to transfer or encumber its Collateral, whether or not in advance, other than under this Agreement or the Existing Dutch Security Agreement, and no attachment has been levied on its Collateral;

(c)     its Collateral is freely transferable and capable of being pledged;

(d)     the information set out in Schedule 1 (*Inventory*) or provided pursuant to Clause 4.1 (*Information*), is complete and correct;

(e)     subject to paragraph (c) of Clause 2.5 (*Parties' intent*), this Agreement creates, or with respect to Collateral to be acquired in the future will create, a valid pledge over its Collateral, but only to the extent such Collateral is located in the Netherlands at present,or, with respect to Collateral to be acquired in the future, on the date such Collateral is acquired by the Pledgor;

(f)     no corporate action or any other steps have been taken, nor any legal proceedings have been instituted, in relation to the application for or granting of a (provisional or final) suspension of payments or bankruptcy or the appointment of a receiver or similar officer for it or any or all of its assets (including Collateral);

(g)     it has obtained all approvals and consents required for entering into this Agreement; and

(h)     substantially all the inventory (*voorraad*) of the Pledgor is stored at a location in the Netherlands.

4.      **PLEDGOR UNDERTAKINGS**

4.1     **Information**

At the Inventory Pledgee's reasonable request and in such form as the Inventory Pledgee may designate, the Pledgor shall provide all information, evidence and documents relating to its Collateral which the Inventory Pledgee deems necessary to exercise its rights under this Agreement. If requested by the Inventory Pledgee (acting reasonably), the Pledgor shall update the information set out in Schedule 1 (*Inventory*).

**Execution Version**

**4.2    Inspection of Collateral and books and records**

The Inventory Pledgee shall be granted access to the premises of the Pledgor (and the custodian referred to in Schedule 1 (*Inventory*)) to inspect the Pledgor's Collateral and the Pledgor's books and records relating to the Collateral.

**4.3    Duty to notify third parties**

The Pledgor shall promptly notify any third party who claims an interest in any of its Collateral of the Pledge. This Clause 4.3 is without prejudice to the Inventory Pledgee's authority to notify such third parties of the Pledge.

**4.4    Duty to notify the Inventory Pledgee**

The Pledgor shall notify the Inventory Pledgee promptly of any circumstance of which it becomes aware which could adversely affect the Pledge or the value of its Collateral, including if:

(a)    an attachment is levied on its Collateral or part thereof and/or any claim is made or notice is given by any third party with respect to its Collateral or part thereof; and

(b)    an event analogous to any of the above occurs under the laws of any other jurisdiction with respect to the Pledgor or its Collateral or part thereof.

**4.5    Disposal and negative pledge**

The Pledgor shall not without the Inventory Pledgee's prior written consent:

(a)    other than in the ordinary course of business and on arm's length terms sell, transfer or otherwise dispose of some or all of its Collateral whether or not in advance (including by way of jobber sales);

(b)    create or permit to subsist, whether or not in advance, any limited right or other encumbrance on its Collateral or permit to subsist any attachment over its Collateral other than the pledge created under or pursuant to the Existing Dutch Security Agreement; or

(c)    other than in the ordinary course of business and on arm's length terms, vary the term of, waive, release, or take any other action in respect of its Collateral if that would have a material adverse effect on the Pledge.

**4.6    Undertakings applicable to the Collateral**

(a)    The Pledgor shall at its own expense keep its Collateral in good condition and shall insure them with reputable insurance companies to such an extent and against such risks as companies engaged in a similar business normally insure them. It shall provide copies of the relevant insurance policies to the Inventory Pledgee for review at the Inventory Pledgee's request.

(b)    Other than when such Collateral is in transit, the Pledgor shall not keep its Collateral at a location other than a location notified to the Inventory Pledgee.

(c)    The Pledgor undertakes that substantially all future inventory (*voorraad*) of the Target Group will be delivered and kept at a location in the Netherlands.

9

4.7     **Further assurances**

At the Inventory Pledgee's reasonable request, the Pledgor shall, at its own expense, provide any assurances to or for the benefit of the Inventory Pledgee and perform all acts which the Inventory Pledgee reasonably considers necessary for the creation or protection of the Pledge or to exercise, enforce, or have the full benefit of its rights under or in connection with this Agreement.

4.8     **Limitations to Pledgor's Undertakings**

For the avoidance of doubt, nothing in this Clause 4 (*Pledgor Undertaking*) shall be interpreted as requiring the Pledgor to provide the Inventory Pledgee with, or grant the Inventory Pledgee access to any information that from an applicable mandatory competition law perspective would be deemed to be competitively sensitive in nature and hence cannot be shared.

5.     **INVENTORY PLEDGEE UNDERTAKING**

(a)     (i) the Inventory Pledgee and Purchaser shall not enter into any amendments, supplements, variations, increases, extensions, additions, waivers or consents to this Agreement, the Bridge Credit Agreement, the Purchase Agreement, the Dutch Notarial Letter Agreement, the Dutch Notarial Deed of Transfer, any other principal BL Bridge Loan Document or any other principal BL Sale Document, as applicable, without the prior written approval of the Administrative Agent and the Required Lenders and (ii) no party to any of the documents listed in clause (i) hereof shall have entered into any new agreements, letters, or documents or have taken any actions with respect to the BL Business and BL Entities that alter, amend, or supplement the transactions contemplated in the Consent Letter, the BL Sale Documents or the BL Loan Documents in a manner adverse to the Existing Pledgee or the Required Lenders without the prior written approval of the Administrative Agent and the Required Lenders.

(b)     The Inventory Pledgee and the Purchaser shall not enter into any amendments, supplements, variations, increases, extensions, additions, waivers or consents to any non-principal BL Bridge Loan Document or any non-principal BL Sale Document, as applicable, that could change the terms thereof in a manner adverse to the Term B Group Lenders and/or the Administrative Agent (as determined by counsel for the Term B Group Lenders and the Administrative Agent, as applicable, in their reasonable discretion) without the prior written approval of the Administrative Agent and the Required Lenders (such approval of the Administrative Agent and the Required Lenders, as applicable, not to be unreasonably withheld or delayed).

6.     **AUTHORITY TO REQUIRE POSSESSION**

During the continuation of an Event of Default:

(a)     the Inventory Pledgee shall have the right to enter any location where Collateral is located and to require that the Collateral be brought into its possession or the possession of a third party appointed by it for this purpose;

10

(b)     the Inventory Pledgee is authorised (but not obliged) to discharge any outstanding claims of any supplier of Collateral to the Pledgor, and to enter into compromises, settlements and other agreements with such supplier on behalf and in the name of the Pledgor. Unless with the prior approval of the Inventory Pledgee, the Pledgor hereby undertakes not to take any of the actions described in the previous sentence (other than discharging any outstanding claims of any supplier in full) following the occurrence of an Event of Default which is continuing. The Pledgor and the Inventory Pledgee hereby agree that in case of discharge of the claim of a supplier as a result of a payment by the Inventory Pledgee, the Inventory Pledgee will by operation of law acquire the claim of such supplier vis-à-vis the relevant Pledgor by way of subrogation (as referred to in section 6:150(d) DCC), and that the Pledge will also secure the claim acquired from the supplier as a result of such subrogation; and

(c)     the Inventory Pledgee shall consult with and give notice to the Existing Pledgee at least 3 Business Days prior to the initial exercise of any rights as set out in paragraphs (a) and (b) of this Clause 6.

## 7.     ENFORCEMENT

### 7.1     Enforcement of the Inventory Pledge

(a)     Upon the occurrence of an Enforcement Event, the Inventory Pledgee may, without any further notice of default or other notice to the Pledgor being required:

(i)     sell any or all of the Collateral and take recourse against the proceeds of sale; and

(ii)     exercise any other right, remedy, power or discretion it may have under this Agreement or otherwise,

in each case in accordance with applicable law.

(b)     The Pledgor waives its right to file a request with the court under section 3:251(1) DCC to sell its Collateral in a manner other than as provided for in section 3:250 DCC.

(c)     The Inventory Pledgee shall not be obliged to notify the Pledgor of the sale or of how, where or when it will be or was conducted as provided for in section 3:249(1) DCC and 3:252 DCC.

(d)     The Inventory Pledgee is not obliged to enforce any other security right created under or in connection with the Bridge Credit Agreement prior to enforcement of the Pledge.

(e)     The Pledgor hereby irrevocably and unconditionally waives any right it may have or acquire under sections 3:233, 3:234, 6:139 and 6:154 DCC.

(f)     Upon the occurrence of an Enforcement Event the Inventory Pledgee shall promptly inform the Existing Pledgee of the occurrence of such Enforcement Event.

11

(g)    The Inventory Pledgee shall consult with and give written notice to the Existing Pledgee at least 15 Business Days prior to commencing to enforce its right of Pledge created under or pursuant to this Agreement in order to allow the Existing Pledgee, at its option, to (i) cure the Enforcement Event, (ii) repay the outstanding Secured Obligations on behalf of the Borrowers (as defined in the Bridge Credit Agreement), or (iii) take over the enforcement in accordance with Clause 7.2 (*Enforcement of the pledge under the Existing Dutch Security Agreement*) of this Agreement.

**7.2**    **Enforcement of the pledge under the Existing Dutch Security Agreement**

(a)    Notwithstanding the agreement on ranking in Clause 2.3 (*Ranking*) of this Agreement, the Existing Pledgee shall continue to have the right to enforce the pledge over the Collateral under the Existing Dutch Security Agreement in accordance with the terms of the Existing Dutch Security Agreement and sell the Collateral free from the Pledge, provided that Existing Pledgee shall refrain from enforcing such right prior to the occurrence of either a Termination Event or a bankruptcy or other insolvency event relating to the Pledgor.

(b)    The proceeds of any enforcement by either the Existing Pledgee or the Inventory Pledgee shall be distributed between the Existing Pledgee and the Inventory Pledgee in accordance with the ranking agreed in Clause 2.3 (*Ranking*) of this Agreement.

(c)    The Existing Pledgee shall consult with and give written notice to the Inventory Pledgee at least 15 Business Days prior to commencing to enforce its right of pledge over the Collateral.

(d)    The Existing Pledgee is not obliged to enforce any other security right prior to enforcement of the pledge over the Collateral under the Existing Dutch Security Agreement. The Inventory Pledgee hereby irrevocably and unconditionally waives any right it may have or acquire under section 3:234 DCC.

**8.**    **LICENCE TO ENFORCE**

(a)    Subject to paragraphs (b) and (c) below, the Pledgor hereby grants to the Inventory Pledgee a licence in respect of, or other right to use, its rights in relation to its Collateral, whether under licence, sub-licence, or other agreement, for the sole purpose of the Inventory Pledgee exercising any of its rights in accordance with paragraph (a) of Clause 7.1 (*Enforcement of the Inventory Pledge*) and the Inventory Pledgee performing any act that may be necessary, useful or desirable in connection therewith (each such licence a "**Licence to Enforce**").

(b)    Each Licence to Enforce:

    (i)    is granted without any liability for royalties or any other charge owing by the Inventory Pledgee to the Pledgor;

    (ii)    is irrevocable and non-exclusive; and

    (iii)    may only be used by the Inventory Pledgee after the occurrence of an Enforcement Event.

12

(c)     To the extent that a Licence to Enforce relates to any rights the Pledgor may have under licences, sub licences or any other agreements in relation to the Collateral, such Licence to Enforce shall only be granted to the extent that:

     (i)     such licences, sub licences or other agreements do not prohibit the granting of that Licence to Enforce; and

     (ii)    the Pledgor will not be in default under such licences, sub licenses, or other agreements as a result of the use by the Inventory Pledgee of that Licence to Enforce.

## 9.     APPLICATION OF PROCEEDS

The Inventory Pledgee, together with the Existing Pledgee and the Pledgor, shall apply the proceeds from the sale or the collection of any Collateral towards satisfaction of the Secured Obligations and the Secured Obligations (as defined in the Existing Dutch Security Agreement) in accordance with Clause 7.2(b) (*Enforcement of the pledge under the Existing Dutch Security Agreement*) of this Agreement, subject to applicable mandatory provisions of the laws of the Netherlands.

## 10.    CANCELLATION

(a)     The Inventory Pledgee is entitled to cancel any Pledge and any contractual arrangements set out in this Agreement in whole or in part by notice in writing to the Pledgor as provided for in section 3:81(2)(d) DCC. The Parties hereby agree that, upon the cancellation of the Pledge in whole by notice pursuant to this Clause 10, the remaining contractual rights and obligations created under this Agreement will be terminated without any further actions being required except for the rights and obligations under Clause (d) (*Liability*), Clause 12 (*Costs*), and Clause 16 (*Governing law and jurisdiction*) which will remain in full force and effect.

(b)     The Inventory Pledgee shall promptly inform the Existing Pledgee of the cancellation of any Pledge and any contractual arrangements set out in this Agreement.

(c)     The Existing Pledgee shall promptly inform the Inventory Pledgee of the cancellation of the pledge over the Collateral pursuant to the Existing Dutch Security Agreement.

(d)     The Parties hereby agree that (i) all continuing contractual rights and obligations of the Existing Pledgee under this Agreement and (ii) all continuing contractual rights and obligations of the Inventory Pledgee, solely as such rights and obligations relate to the Existing Pledgee, under this Agreement shall automatically terminate, without any further actions being required, on the BL Sale Release Effective Date, except for the rights and obligations under Clause 11 (*Liability*), Clause 12 (*Costs*), and Clause 16 (*Governing law and jurisdiction*) which will remain in full force and effect.

13

**Execution Version**

11.    **LIABILITY**

The Inventory Pledgee and the Existing Pledgee are not liable to the Pledgor for any loss or damage arising from any exercise of, or failure to exercise, their rights under this Agreement, except for gross negligence, bad faith or wilful misconduct of the Inventory Pledgee or the Existing Pledgee, as applicable.

12.    **COSTS**

Each of the Inventory Pledgee and the Existing Pledgee may charge the applicable obligors with respect to all costs, losses, claims and expenses of whatever nature incurred by them in connection with this Agreement.

13.    **POWER OF ATTORNEY**

(a)    The Pledgor hereby gives the Inventory Pledgee an irrevocable and unconditional power of attorney, with the right of substitution, to perform all acts, including acts of disposition, on behalf of the Pledgor which in the sole opinion of the Inventory Pledgee are necessary in order to have the full benefit of any Pledge (including performing any of the Pledgor's obligations under this Agreement and exercising any of the Pledgor's rights to and in connection with its Collateral).

(b)    In acting on behalf of the Pledgor pursuant to the power of attorney, the Inventory Pledgee may act as counterparty of the Pledgor even in the event of a conflict of interest.

14.    **RIGHTS TO RECOURSE AND SUBROGATION**

If and to the extent under any applicable law the Pledgor shall have any right to recourse against any Borrower or to subrogate in any rights of the Inventory Pledgee in connection with the exercise by the Inventory Pledgee of any of its rights under this Agreement or the performance by the Pledgor of its obligations under this Agreement, the Pledgor shall not exercise any such rights until all Secured Obligations have been irrevocably paid in full, and any such rights shall be subordinated to the Secured Obligations.

15.    **MISCELLANEOUS**

15.1    **No rescission, nullification or suspension**

To the extent permitted by law, the Pledgor hereby waives any right it may have at any time:

(a)    under sections 6:228 or 6:265 DCC or on any other ground (under any applicable law) to, in whole or in part, rescind or nullify, or otherwise terminate or amend this Agreement or to demand its rescission or nullification in legal proceedings or by way of an out of court declaration (*buitengerechtelijke verklaring*); and

(b)    under sections 6:52, 6:262 or 6:263 DCC or on any other ground (under any applicable law) to suspend the performance of any obligation under or in connection with this Agreement.

14

**Execution Version**

15.2 **Transfer of rights and obligations**

(a) The Pledgor cannot transfer any of its rights and/or obligations under or in connection with this Agreement or its contractual relationship under this Agreement without the prior written consent of the Inventory Pledgee and the Existing Pledgee.

(b) The Inventory Pledgee cannot transfer its contractual relationship under this Agreement in whole or in part to any person without the prior written consent of the Existing Pledgee.

(c) The Existing Pledgee cannot transfer its contractual relationship under this Agreement in whole or in part to any person without the prior written consent of the Inventory Pledgee.

15.3 **Notices**

Any notice or other communication under or in connection with this Agreement between the Inventory Pledgee and the Pledgor must be made in accordance with the Bridge Credit Agreement. Any notice or other communication under or in connection with this Agreement between the Inventory Pledgee and the Existing Pledgee shall be made in accordance with the following:

(a) Any such notice shall be made in writing and, unless otherwise stated, may be made by email or letter.

(b) The address and email address (and the department or officer, if any, for whose attention the communication is to be made) of the Inventory Pledgee and the Existing Pledgee for any such communication or document to be made or delivered under or in connection with this Agreement is that identified with its name below.

The Inventory Pledgee

| | |
|---|---|
| Name: | Opportunity Partners B.V. |
| Address: | Deutersestraat 37, 5266 AW Cromvoirt, the Netherlands |
| Attn: | Martijn ten Berge and Wieger Jansen |
| Email: | martijn@oppartners.nl and wieger@oppartners.nl |
| With copy to: | Burggraaf & Hoekstra B.V. |
| Address: | Honthorststraat 8A, 1071 DD Amsterdam, the Netherlands |
| Attn: | Jan Louis Burggraaf and Tyshanti de Jonge |
| Email: | JanLouis@burggraafhoekstra.com and tyshanti@burggraafhoekstra.com |

The Existing Pledgee

| | |
|---|---|
| Name: | Bank of America, N.A. |
| Address: | One Cowboys Way, Suite 500, Frisco, TX 75034, USA |

15

| | |
|---|---|
| Attn: | Tyler D. Levings |
| Email: | tyler.d.levings@bofa.com |
| With copy to: | Haynes and Boone LLP |
| Address: | 2323 Victory Avenue, Suite 700, Dallas, TX 75219 |
| Attn: | James Markus and Eli Columbus |

Email:   James.Markus@haynesboone.com and Eli.Columbus@haynesboone.com

| | |
|---|---|
| And, with copy to: | Gibson, Dunn & Crutcher LLP |
| Address: | 200 Park Avenue, New York, NY 10166-0193 |
| Attn: | Scott J. Greenberg and Linda L. Curtis |
| Email: | SGreenberg@gibsondunn.com and LCurtis@gibsondunn.com |

(c) Any such communication or document made or delivered by the Inventory Pledgee or the Existing Pledgee to another under or in connection with this Agreement will only be effective:

    (i) if by way of email, when actually received (or made available) in readable form; or

    (ii) if by way of letter, when it has been left at the relevant address or five Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address,

and, if a particular department or officer is specified as part of its address details provided under paragraph (b) above, if addressed to that department or officer.

(d) Any communication or document which becomes effective, in accordance with paragraphs (a) to 0 above, after 5.00 pm in the place of receipt, or, in the case of email, in the place in which the Party to whom the relevant communication is sent or made available has its address for the purpose of this Agreement, shall be deemed only to become effective on the following day.

(e) Any notice given under or in connection with this Agreement must be in English.

**15.4**     **Records and calculations of the Inventory Pledgee**

The books and records maintained by the Inventory Pledgee and any calculation or determination by the Inventory Pledgee of the existence and the amount of the Secured Obligations are conclusive evidence (absent manifest error) within the meaning of section 151 Dutch Code of Civil Procedure of the existence and the amounts of the Secured Obligations and other matters to which they relate.

**15.5**     **Partial invalidity**

If, at any time, any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or

16

enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

**15.6    Execution and amendments**

(a)    This Agreement may be signed in any number of counterparts.

(b)    This Agreement may only be amended or otherwise modified or waived by a written agreement executed by all of the Parties hereto.

(c)    Any signature (including, without limitation, (x) any electronic symbol, process or data attached to, or associated with, a contract or other record and adopted or otherwise used by a person with the intent to sign, authenticate or accept such contract or record and (y) any facsimile, .pdf or other digital record of a handwritten signature) to this Agreement or any other agreement, deed or document referred to in this Agreement or made pursuant to this Agreement through electronic means, shall have the same legal effect as a manually handwritten signature ("wet ink"). The Parties agree that any such signature through electronic means provides for a sufficiently reliable method of signing within the meaning of and in accordance with section 3:15a DCC. For the avoidance of doubt, the foregoing also applies to any amendment, supplement, extension or restatement of this Agreement or any other agreement, deed or document referred to in this Agreement or made pursuant to this Agreement.

**15.7    No implied waiver and no forfeiture**

(a)    Any waiver under this Agreement must be made by giving written notice to that effect.

(b)    Where the Inventory Pledgee does not exercise any right under or in connection with this Agreement (which includes the granting by the Inventory Pledgee to the Pledgor of an extension of time in which to perform its obligations under any of these provisions), this will not constitute a waiver or forfeiture of that right.

(c)    The rights of the Inventory Pledgee under this Agreement supplement any other right that the Inventory Pledgee may have under the laws of the Netherlands or any other law.

**15.8    Conflicts**

If there is a conflict between this Agreement and the Bridge Credit Agreement, this Agreement shall take priority over the provisions of the Bridge Credit Agreement.

**15.9    Continuing obligations**

The Existing Dutch Security Agreement shall remain in full force and effect and this Agreement shall merely effect the respective ranking of the relevant pledges created under the Existing Dutch Security Agreement to the extent set forth herein and effectuate the other changes explicitly agreed among parties in this Agreement.

**Execution Version**

**15.10   Security confirmation**

The Pledgor confirms that, subject to Clause 2.3 (*Ranking*) of this Agreement, any guarantee given and security created by it under the Existing Dutch Security Agreement continues to be in full force and effect.

**16.      GOVERNING LAW AND JURISDICTION**

(a)   This Agreement (including any change of ranking (*rangwisseling*)) and any Pledge shall be governed by the laws of the Netherlands (including (i) the obligation of the Pledgor as set out in Clause 2.1 (*Agreement to pledge Collateral*) to create the Pledge, notwithstanding the existence of a provision in the Bridge Credit Agreement stating that this obligation is to be governed by the laws of any other jurisdiction, and (ii) the submission to jurisdiction pursuant to paragraph (c) of this Clause 16).

(b)   If a Party is represented by an attorney in connection with the signing and/or execution of this Agreement or any other agreement, deed or document referred to in this Agreement or made pursuant to this Agreement, and the power of attorney is governed by the laws of the Netherlands, it is hereby acknowledged and accepted by each other Party that the existence and extent of the attorney's authority and the effects of the attorney's exercise or purported exercise of his or her authority shall be governed by the laws of the Netherlands.

(c)   The courts of Amsterdam, the Netherlands have exclusive jurisdiction to settle any dispute arising from or in connection with this Agreement (including a dispute regarding the existence, validity or termination of this Agreement) and to hear any action or application to a court regarding enforcement of the Pledge.

This Agreement has been entered into on the date stated at the beginning of this Agreement.

18

**SIGNATURES**

**THE PLEDGOR**

**BRAND LOYALTY SOURCING B.V.**

_____

By: **Brand Loyalty International B.V.**
Title: Director
By: F.M.P. Bekkers
Title: Director
Date:

**<u>EXHIBIT D</u>**
**<u>SISP</u>**

# Sale and Investment Solicitation Process

1. On March 10, 2023, the Ontario Superior Court of Justice (Commercial List) (the "**Court**") granted an order (the "**Initial Order**"), among other things, granting LoyaltyOne, Co. (the "**Applicant**") relief pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "**CCAA**").

2. On March [●], 2023, the Court granted (i) an order amending and restating the Initial Order (the "**ARIO**"), and (ii) an order (the "**SISP Approval Order**") that, among other things: (a) authorized LoyaltyOne, Co. (the "**Applicant**") to implement a sale and investment solicitation process ("**SISP**") in accordance with the terms hereof; (b) authorized and empowered the Applicant to enter into the Stalking Horse Purchase Agreement; (c) approved the Bid Protections; and (d) granted the Bid Protections Charge. Capitalized terms that are not otherwise defined herein have the meanings ascribed to them in the ARIO or the SISP Approval Order, as applicable. Copies of the ARIO and the SISP Approval Order can be found at https://www.ksvadvisory.com/experience/case/loyaltyone.

3. This SISP sets out the manner in which: (a) binding bids for executable transaction alternatives that are superior to the sale transaction contemplated by the Stalking Horse Purchase Agreement involving the business and assets of the Applicant and its subsidiary, LoyaltyOne Travel Services Co./Cie Des Voyages (together with the Applicant, the "**LoyaltyOne Entities**"), will be solicited from interested parties; (b) any such bids received will be addressed; (c) any Successful Bid (as defined below) will be selected; and (d) Court approval of any Successful Bid will be sought. Such transaction alternatives may include, among other things, a sale of some or all of the Applicant's assets and/or business and/or an investment in the Applicant, each of which shall be subject to all terms set forth herein.

4. The SISP shall be conducted by the Applicant with the assistance of PJT Partners LP (the "**Financial Advisor**") under the oversight of KSV Restructuring Inc., in its capacity as Court-appointed monitor (the "**Monitor**") of the Applicant and the Monitor shall be entitled to receive all information in relation to the SISP.

5. Parties who wish to have their bids considered must participate in the SISP as conducted by the Applicant with the assistance of the Financial Advisor.

6. The SISP will be conducted such that the Applicant and the Financial Advisor will (under the oversight of the Monitor):

   a) disseminate marketing materials and a process letter to potentially interested parties identified by the Applicant and the Financial Advisor;
   b) solicit interest from parties with a view to such interested parties entering into non-disclosure agreements (parties shall only obtain access to the data room and be permitted to participate in the SISP if they execute a non-disclosure agreement that is in form and substance satisfactory to the Applicant);
   c) provide applicable parties with access to a data room containing diligence information; and
   d) request that such parties (other than the Stalking Horse Purchaser or its designee) submit a binding offer meeting at least the requirements set forth in Section 8

below, as determined by the Applicant in consultation with the Monitor (a "**Qualified Bid**"), by the Qualified Bid Deadline (as defined below).

7.  The SISP shall be conducted subject to the terms hereof and the following key milestones:

    a)  the Court issues the SISP Approval Order approving the: (i) SISP and (ii) the Stalking Horse Purchase Agreement as the stalking horse in the SISP and the Applicant entering into same – by no later than March 20, 2023;[1]
    b)  the Applicant to commence solicitation process by no later than March 23, 2023;
    c)  Deadline to submit a Qualified Bid – 5:00 p.m. Eastern Time on April 27, 2023 (the "**Qualified Bid Deadline**");
    d)  Deadline to determine whether a bid is a Qualified Bid and, if applicable, to notify those parties who submitted a Qualified Bid of the Auction (as defined below) – by no later than 5:00 p.m. Eastern Time on May 1, 2023;
    e)  the Applicant to hold an Auction (if applicable) and select a Successful Bid – by no later than 10:00 a.m. Eastern Time on May 4, 2023;
    f)  Approval and Vesting Order (as defined below) hearing:
        o  (if there is no Auction) – by no later than May 15, 2023, subject to Court availability;
        o  (if there is an Auction) – by no later than May 18, 2023, subject to Court availability; and
    g)  closing of the Successful Bid as soon thereafter as possible and, in any event, by not later than June 30, 2023, provided that such date shall be extended by up to 90 days where regulatory approvals are the only material remaining conditions to closing (the "**Outside Date**").

8.  In order to constitute a Qualified Bid, a bid must comply with the following:

    a)  it provides for aggregate consideration, payable in full on closing, in an amount equal to or greater than US$165 million (the "**Consideration Value**"), and provides a detailed sources schedule that identifies, with specificity, the composition of the Consideration Value and any assumptions that could reduce the net consideration payable including details of any material liabilities that are being assumed or being excluded;
    b)  it includes an assumption of all obligations of the Applicant: (i) to consumers enrolled in the AIR MILES® Reward Program; and (ii) pursuant to the terms of that certain Amended and Restated Redemption Reserve Agreement dated December 31, 2001 and that certain Amended and Restated Security Agreement dated as of December 31, 2001, each such agreement between Loyalty Management Group Canada Inc. and Royal Trust Corporation of Canada;
    c)  as part of the Consideration Value, it provides cash consideration sufficient to pay: (i) all outstanding obligations under the DIP Term Sheet; (ii) any obligations in priority to amounts owing under the DIP Term Sheet, including any applicable charges granted by the Court in the Applicant's CCAA proceeding; (iii) an amount of US$5 million to fund a wind-up of the Applicant's CCAA proceeding and any further proceedings or wind-up costs; and (iv) an amount of US$4 million to satisfy the Bid Protections;

---

[1] To the extent any dates would fall on a non-business day, they shall be deemed to be the first business day thereafter.

d) closing of the transaction by not later than the Outside Date;

e) it contains:

    i. duly executed binding transaction document(s);

    ii. the legal name and identity (including jurisdiction of existence) and contact information of the bidder, full disclosure of its direct and indirect principals, and the name(s) of its controlling equityholder(s);

    iii. a redline to the Stalking Horse Purchase Agreement;

    iv. evidence of authorization and approval from the bidder's board of directors (or comparable governing body) and, if necessary to complete the transaction, the bidder's equityholder(s);

    v. disclosure of any connections or agreements with the LoyaltyOne Entities or any of their affiliates, any known, potential, prospective bidder, or any officer, manager, director, member or known equity security holder of the LoyaltyOne Entities or any of their affiliates; and

    vi. such other information reasonably requested by the Applicant or the Monitor;

f) it includes a letter stating that the bid is submitted in good faith, is binding and is irrevocable until closing of the Successful Bid; provided, that if such bid is not selected as the Successful Bid or as the next-highest or otherwise best Qualified Bid as compared to the Successful Bid (such bid, the "**Back-Up Bid**") it shall only remain irrevocable until selection of the Successful Bid;

g) it provides that the bid will serve as a Back-Up Bid if it is not selected as the Successful Bid and if selected as the Back-Up Bid it will remain irrevocable until the earlier of (i) closing of the Successful Bid or (ii) closing of the Back-Up Bid;

h) it provides written evidence of a bidder's ability to fully fund and consummate the transaction (including financing required, if any, prior to the closing of the transaction to finance the proceedings) and satisfy its obligations under the transaction documents, including binding equity/debt commitment letters and/or guarantees covering the full value of all cash consideration and the additional items (in scope and amount) covered by the guarantees provided by affiliates of the bidder in connection with the Successful Bid;

i) it does not include any request for or entitlement to any break fee, expense reimbursement or similar type of payment;

j) it is not conditional upon:

    i. approval from the bidder's board of directors (or comparable governing body) or equityholder(s);

    ii. the outcome of any due diligence by the bidder; or

    iii. the bidder obtaining financing;

k) it includes an acknowledgment and representation that the bidder (i) has had an opportunity to conduct any and all required due diligence prior to making its bid, and has relied solely upon its own independent review, investigation and inspection in making its bid, (ii) is not relying upon any written or oral statements, representations, promises, warranties, conditions, or guaranties whatsoever, whether express or implied (by operation of law or otherwise), made by any person or party, including the Applicant, the Financial Advisor, the Monitor and their respective employees, officers, directors, agents, advisors and other representatives, regarding the proposed transactions, this SISP, or any information (or the completeness of any information) provided in connection therewith, except as expressly stated in the proposed transaction documents; (iii) is making its bid on an "as is, where is" basis and without surviving representations or warranties of any kind, nature, or description by the Applicant, the Financial

Advisor, the Monitor or any of their respective employees, officers, directors, agents, advisors and other representatives, except to the extent set forth in the proposed transactions documents (iv) is bound by this SISP and the SISP Approval Order, and (v) is subject to the exclusive jurisdiction of the Court with respect to any disputes or other controversies arising under or in connection with the SISP or its bid;

l) it specifies any regulatory or other third-party approvals the party anticipates would be required to complete the transaction (including the anticipated timing necessary to obtain such approvals);

m) it includes full details of the bidder's intended treatment of the LoyaltyOne Entities' employees under the proposed bid;

n) it is accompanied by a cash deposit (the "**Deposit**") by wire transfer of immediately available funds equal to 10% of the Consideration Value, which Deposit shall be retained by the Monitor in an interest bearing trust account in accordance with the terms hereof;

o) it includes a statement that the bidder will bear its own costs and expenses (including legal and advisor fees) in connection with the proposed transaction, and by submitting its bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis; and

p) it is received by the Applicant, with a copy to the Financial Advisor and the Monitor, by the Qualified Bid Deadline at the email addresses specified on Schedule "B" hereto.

9.  The Qualified Bid Deadline may be extended by: (a) the Applicant for up to no longer than seven days with the consent of the Monitor; or (b) further order of the Court. In such circumstances, the milestones contained in Subsections 7 (d) to (f) shall be extended by the same amount of time.

10. The Applicant, in consultation with the Monitor, may waive compliance with any one or more of the requirements specified in Section 8 above and deem a non-compliant bid to be a Qualified Bid, provided that the Applicant shall not waive compliance with the requirements specified in Subsections 7 (a), (b), (c), (d)), (e)(i), (e)(ii), (e)(iv), (f), (k) or (n) without the prior written consent of the Stalking Horse Purchaser, acting reasonably.

11. Notwithstanding the requirements specified in Section 8 above, the transaction contemplated by the Stalking Horse Purchase Agreement (the "**Stalking Horse Bid**"), is deemed to be a Qualified Bid, provided that, for greater certainty: (i) no Deposit shall be required to be submitted in connection with the Stalking Horse Bid; and (ii) the Stalking Horse Bid shall not serve as a Back-Up Bid.

12. If one or more Qualified Bids (other than the Stalking Horse Bid) has been received by the Applicant on or before the Qualified Bid Deadline, the Applicant shall proceed with an auction process to determine the successful bid(s) (the "**Auction**"), which Auction shall be administered in accordance with Schedule "A" hereto. The successful bid(s) selected pursuant to the Auction shall constitute the "**Successful Bid**". Forthwith upon determining to proceed with an Auction, the Applicant shall provide written notice to each party that submitted a Qualified Bid (including the Stalking Horse Bid) of which Qualified Bid is the highest or otherwise best bid (as determined by the Applicant, in consultation with the Monitor) along with a copy of such bid.

13. If by the Qualified Bid Deadline, no Qualified Bid (other than the Stalking Horse Bid) has been received by the Applicant, then the Stalking Horse Bid shall be deemed the Successful Bid and shall be consummated in accordance with and subject to the terms of the Stalking Horse Purchase Agreement.

14. Following selection of a Successful Bid, the Applicant, with the assistance of its advisors, shall seek to finalize any remaining necessary definitive agreement(s) with respect to the Successful Bid in accordance with the milestones set out in Section 7. Once the necessary definitive agreement(s) with respect to a Successful Bid have been finalized, as determined by the Applicant, in consultation with the Monitor, the Applicant shall apply to the Court for an order or orders approving such Successful Bid and/or the mechanics to authorize the Applicant to complete the transactions contemplated thereby, as applicable, and authorizing the Applicant to: (a) enter into any and all necessary agreements and related documentation with respect to the Successful Bid; (b) undertake such other actions as may be necessary to give effect to such Successful Bid; and (c) implement the transaction(s) contemplated in such Successful Bid (each, an "**Approval and Vesting Order**"). If the Successful Bid is not consummated in accordance with its terms, the Applicant shall be authorized, but not required, to elect that the Back-Up Bid (if any) is the Successful Bid.

15. If a Successful Bid is selected and an Approval and Vesting Order authorizing the consummation of the transaction contemplated thereunder is granted by the Court, any Deposit paid in connection with such Successful Bid will be non-refundable and shall, upon closing of the transaction contemplated by such Successful Bid, be applied to the cash consideration to be paid in connection with such Successful Bid or be dealt with as otherwise set out in the definitive agreement(s) entered into in connection with such Successful Bid. Any Deposit delivered with a Qualified Bid that is not selected as a Successful Bid will be returned to the applicable bidder as soon as reasonably practicable (but not later than ten (10) business days) after the date upon which the Successful Bid is approved pursuant to an Approval and Vesting Order or such earlier date as may be determined by the Applicant, in consultation with the Monitor; provided, the Deposit in respect of the Back-Up Bid shall not be returned to the applicable bidder until the closing of the Successful Bid.

16. The Applicant shall provide information in respect of the SISP to consenting stakeholders who are party to support agreements with the Applicant (the "**Consenting Stakeholders**") on a confidential basis and who have agreed to not submit a bid in connection with the SISP, including (A) access to the data room, (B) copies (or if not provided to the Applicant in writing, a description) of any Qualified Bid, no later than one (1) calendar day following receipt thereof by the Applicant or its advisors and (C) such other information as reasonably requested by the Consenting Stakeholders or their respective legal counsel or financial advisors (including Piper Sandler Corp. and FTI Consulting Canada Inc. (collectively, the "**Lender FAs**")) or as necessary to keep the Consenting Stakeholders informed no later than one (1) calendar day after any such request or any material change to the proposed terms of any bid received, including any Qualified Bid, as to the terms of any bid, including any Qualified Bid, (including any changes to the proposed terms thereof) and the status and substance of discussions related thereto. The Financial Advisor shall consult with the Lender FAs in respect of the Applicant's conduct of the SISP and prior to the Applicant making decisions in respect of the SISP (and during an Auction include the Lender FAs in discussions with Qualified Bidders, where practicable).

6

17. The Applicant shall be permitted, in its discretion, to provide general updates and information in respect of the SISP to counsel to any creditor (each a "**Creditor**") on a confidential basis, upon: (a) the irrevocable confirmation in writing from such counsel that the applicable Creditor will not submit any bid in the SISP; and (b) counsel to such Creditor executing confidentiality agreements with the Applicant, in form and substance satisfactory to the Applicant and the Monitor.

18. Any amendments to this SISP may only be made by the Applicant with the written consent of the Monitor, or by further order of the Court, provided that the Applicant shall not amend the requirements specified in Subsections 7(a), (b), (c), (d)), (e)(i), (e)(ii), (e)(iv), (f), (k)  or (n) without the prior written consent of the Stalking Horse Purchaser, acting reasonably.

## SCHEDULE "A": AUCTION PROCEDURES

1. **Auction.**  If the Applicant receives at least one Qualified Bid (other than the Stalking Horse Bid), the Applicant will conduct and administer the Auction in accordance with the terms of the SISP. Instructions to participate in the Auction, which will take place via video conferencing, will be provided to Qualified Parties (as defined below) not less than 24 hours prior to the Auction.

2. **Participation.** Only parties that provided a Qualified Bid by the Qualified Bid Deadline, including, for greater certainty, the Stalking Horse Bid (collectively, the "**Qualified Parties**" and each a "**Qualified Party**"), shall be eligible to participate in the Auction. No later than 5:00 p.m. Eastern Time on the day prior to the Auction, each Qualified Party must inform the Applicant and the Monitor in writing whether it intends to participate in the Auction. The Applicant will promptly thereafter inform in writing each Qualified Party who has expressed its intent to participate in the Auction of the identity of all other Qualified Parties that have indicated their intent to participate in the Auction. If no Qualified Party (including the Stalking Horse Purchaser) provides such expression of intent, the highest or otherwise best Qualified Bid as determined by the Applicant, in consultation with the Monitor, shall be designated as the Successful Bid (as defined below).

3. **Auction Procedures.**  The Auction shall be governed by the following procedures:

   a. **Attendance.** Only the Applicant, the Qualified Parties, the Monitor, and Consenting Stakeholders, and each of their respective advisors will be entitled to attend the Auction, and only the Qualified Parties will be entitled to make any Overbids (as defined below) at the Auction;

   b. **No Collusion.** Each Qualified Party participating at the Auction shall be required to confirm on the record at the Auction that: (a) it has not engaged in any collusion with respect to the Auction and the bid process; and (b) its bid is a good-faith *bona fide* offer, it is irrevocable and it intends to consummate the proposed transaction if selected as the Successful Bid (as defined below);

   c. **Minimum Overbid and Back-Up Bid.** The Auction shall begin with the Qualified Bid that represents the highest or otherwise best Qualified Bid as determined by the Applicant, in consultation with the Monitor (the "**Initial Bid**"), and any bid made at the Auction by a Qualified Party subsequent to the Applicant's announcement of the Initial Bid (each, an "**Overbid**"), must proceed in minimum additional cash increments of US$1,000,000, and all such Overbids shall be irrevocable until closing of the Successful Bid; provided, that if such Overbid is not selected as the Successful Bid or as the Back-Up Bid (if any) it shall only remain irrevocable until selection of the Successful Bid;

   d. **Bidding Disclosure.** The Auction shall be conducted such that all bids will be made and received in one group video-conference, on an open basis, and all Qualified Parties will be entitled to be present for all bidding with the understanding that the true identity of each Qualified Party will be fully disclosed to all other Qualified Parties and that all material terms of each

subsequent Qualified Bid will be fully disclosed to all other Qualified Parties throughout the entire Auction; provided, however, that the Applicant, in its discretion, may establish separate video conference rooms to permit interim discussions among the Applicant, the Monitor and individual Qualified Parties with the understanding that all formal bids will be delivered in one group video conference, on an open basis;

e.    **Bidding Conclusion.** The Auction shall continue in one or more rounds and will conclude after each participating Qualified Party has had the opportunity to submit an Overbid with full knowledge and confirmation of the then-existing highest or otherwise best bid and no Qualified Party submits an Overbid; and

f.    **No Post-Auction Bids**. No bids will be considered for any purpose after the Successful Bid has been designated, and therefore the Auction has concluded.

## Selection of Successful Bid

4.    **Selection.** During the Auction, the Applicant, in consultation with the Monitor, will: (a) review each subsequent Qualified Bid, considering the factors set out in Section 8 of the SISP and, among other things, (i) the amount of consideration being offered and, if applicable, the proposed form, composition and allocation of same, (ii) the value of any assumption of liabilities or waiver of liabilities not otherwise accounted for in (i) above, (iii) the likelihood of the Qualified Party's ability to close a transaction by not later than the Outside Date (including factors such as: the transaction structure and execution risk; conditions to, timing of, and certainty of closing; termination provisions; availability of financing and financial wherewithal to meet all commitments; and required governmental or other approvals), (iv) the likelihood of the Court's approval of the Successful Bid, (v) the net benefit to the Applicant and its stakeholders and (vi) any other factors the directors or officers of Applicant may, consistent with their fiduciary duties, reasonably deem relevant; and (b) identify the highest or otherwise best bid received at the Auction (the "**Successful Bid**" and the Qualified Party making such bid, the "**Successful Party**").

5.    **Acknowledgement.** The Successful Party shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made within one business day of the Successful Bid being selected as such, unless extended by the Applicant in its sole discretion, subject to the milestones set forth in Section 7 of the SISP.

## SCHEDULE "B": E-MAIL ADDRESSES FOR DELIVERY OF BIDS

To the counsel for the Applicant:

rjacobs@cassels.com; jdietrich@cassels.com; jroy@cassels.com; cground@cassels.com; jbornstein@cassels.com; pdublin@akingump.com; skuhn@akingump.com; emcgrady@akingump.com; mlahaie@akingump.com; alaves@akingump.com

with a copy to the Financial Advisor:

baird@pjtpartners.com; daniel.degosztonyi@pjtpartners.com

and with a copy to the Monitor and counsel to the Monitor:

dsieradzki@ksvadvisory.com; ngoldstein@ksvadvisory.com; boneill@goodmans.ca; carmstrong@goodmans.ca

**<u>EXHIBIT E</u>**
**CCAA ARIO**

Court File No.

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| THE HONOURABLE | ) | WEEKDAY, THE # |
| | ) | |
| JUSTICE CONWAY | ) | DAY OF MARCH, 2023 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF LOYALTYONE, CO.

(the "**Applicant**")

**AMENDED AND RESTATED INITIAL ORDER**
**(Amending Initial Order Dated March 10, 2023)**

**THIS MOTION**, made by the Applicant, pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**"), for an Amended and Restated Initial Order was heard this day by judicial videoconference via Zoom.

**ON READING** the affidavit of Shawn Stewart sworn March **[●]**, 2023 and the Exhibits thereto (the "**Stewart Affidavit**"), the Pre-Filing Report of KSV Restructuring Inc. ("**KSV**") as the proposed monitor dated **[●]**, and the first report of KSV as the Court-appointed monitor of the Applicant (in such capacity, the "**Monitor**") dated March **[●]**, 2023, and on being advised that the secured creditors who are likely to be affected by the charges created herein were given notice, and on hearing the submissions of counsel for the Applicant, the Monitor, and the other parties listed on the counsel slip and no one appearing for any other party although duly served as appears from the affidavit of service of Alec Hoy sworn March **[●]**, 2023, and on reading the consent of KSV to act as the Monitor,

**SERVICE AND DEFINITIONS**

1.      **THIS COURT ORDERS** that the time for service of the Notice of Motion and the Motion Record is hereby abridged and validated so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.      **THIS COURT ORDERS** that capitalized terms used in this Order and not otherwise defined herein shall have the meanings ascribed to them in the Stewart Affidavit.

**APPLICATION**

3.      **THIS COURT ORDERS AND DECLARES** that the Applicant is a company to which the CCAA applies.

**PLAN OF ARRANGEMENT**

4.      **THIS COURT ORDERS** that the Applicant shall have the authority to file and may, subject to further order of this Court, file with this Court a plan of compromise or arrangement (hereinafter referred to as the "**Plan**").

**POSSESSION OF PROPERTY AND OPERATIONS**

5.      **THIS COURT ORDERS** that the Applicant shall remain in possession and control of its current and future assets, licences, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof (the "**Property**").  Subject to further Order of this Court, the Applicant shall continue to carry on business in a manner consistent with the preservation of its business (the "**Business**") and the Property.  The Applicant is authorized and empowered to continue to retain and employ the employees, consultants, contractors, agents, experts, accountants, counsel and such other persons (collectively "**Assistants**") currently retained or employed by it, with liberty to retain such further Assistants as it deems reasonably necessary or desirable in the ordinary course of business or for the carrying out of the terms of this Order.

6.      **THIS COURT ORDERS** that the Applicant shall be entitled to continue to utilize the central cash management system currently in place as described in the Stewart Affidavit or, with the prior written consent of the Monitor and the DIP Lender, and on prior notice to the Consenting Stakeholders (as defined in the Transaction Support Agreement) replace it with another substantially similar central cash management system (the "**Cash Management System**"), and

that any present or future bank providing the Cash Management System shall: (i) not be under any obligation whatsoever to inquire into the propriety, validity or legality of any transfer, payment, collection or other action taken under the Cash Management System, or as to the use or application by the Applicant of funds transferred, paid, collected or otherwise dealt with in the Cash Management System; (ii) be entitled to provide the Cash Management System without any liability in respect thereof to any Person (as hereinafter defined) other than the Applicant, pursuant to the terms of the documentation applicable to the Cash Management System; and (iii) be, in its capacity as provider of the Cash Management System, an unaffected creditor under the Plan (if any) with regard to any claims or expenses it may suffer or incur in connection with the provision of the Cash Management System.

7.     **THIS COURT ORDERS** that, subject to the terms of the Definitive Documents (as hereinafter defined), the Applicant shall be entitled but not required to pay the following expenses whether incurred prior to, on, or after the date of this Order:

(a)     all outstanding and future wages, salaries, employee and pension benefits, vacation pay and expenses payable prior to, on, or after the date of this Order, in each case incurred in the ordinary course of business and consistent with existing compensation policies and arrangements;

(b)     with the prior written consent of the Monitor, amounts owing for goods and services actually supplied to the Applicant, including, without limiting the foregoing, services provided by contractors, prior to the date of this Order, with the Monitor considering, among other factors, whether: (i) the supplier or service provider is essential to the Business and ongoing operations of the Applicant and the payment is required to ensure ongoing supply; (ii) making such payment will preserve, protect or enhance the value of the Applicant's Property or the Business; and (iii) the supplier or service provider is required to continue to provide goods or services to the Applicant after the date of this Order, including pursuant to the terms of this Order;

(c)     the fees and disbursements of any Assistants retained or employed by the Applicant, at their standard rates and charges;

(d)     all outstanding and future amounts related to honouring Collector obligations, whether existing before or after the date of this Order, including customer loyalty and reward programs, incentives, offers and benefits, in each case incurred in the ordinary course of business and consistent with existing policies and procedures; and

(e)      any amounts required to comply with the terms of the Reserve Agreement.

8.      **THIS COURT ORDERS** that, except as otherwise provided to the contrary herein and subject to the terms of the Definitive Documents, the Applicant shall be entitled but not required to pay all reasonable expenses incurred by the Applicant in carrying on the Business in the ordinary course after the date of this Order, and in carrying out the provisions of this Order, which expenses shall include, without limitation:

(a)      all expenses and capital expenditures reasonably necessary for the preservation of the Property or the Business including, without limitation, payments on account of insurance (including directors' and officers' insurance), maintenance and security services; and

(b)      payment for goods or services actually supplied to the Applicant on or following the date of this Order.

9.      **THIS COURT ORDERS** that the Applicant shall remit, in accordance with legal requirements, or pay:

(a)      any statutory deemed trust amounts in favour of the Crown in right of Canada or of any Province thereof or any other taxation authority which are required to be deducted from employees' wages, including, without limitation, amounts in respect of: (i) employment insurance; (ii) Canada Pension Plan; (iii) Quebec Pension Plan; and (iv) income taxes;

(b)      all goods and services or other applicable sales taxes (collectively, "**Sales Taxes**") required to be remitted by the Applicant in connection with the sale of goods and services by the Applicant, but only where such Sales Taxes are accrued or collected after the date of this Order, or where such Sales Taxes were accrued or collected prior to the date of this Order but not required to be remitted until on or after the date of this Order; and

(c)      any amount payable to the Crown in right of Canada or of any Province thereof or any political subdivision thereof or any other taxation authority in respect of municipal realty, municipal business or other taxes, assessments or levies of any nature or kind which are entitled at law to be paid in priority to claims of secured creditors and which are attributable to or in respect of the carrying on of the Business by the Applicant.

10.     **THIS COURT ORDERS** that until a real property lease is disclaimed in accordance with the CCAA, the Applicant shall pay, without duplication, all amounts constituting rent or payable as rent under real property leases (including, for greater certainty, common area maintenance charges, utilities and realty taxes and any other amounts payable to the landlord under the lease, but for greater certainty, excluding accelerated rent or penalties, fees or other charges arising as a result of the insolvency of the Applicant or the making of this Order) or as otherwise may be negotiated between the Applicant and the landlord from time to time ("**Rent**"), for the period commencing from and including the date of this Order, monthly in equal payments on the first day of each month, in advance (but not in arrears) or, with the prior written consent of the Monitor, at such other time intervals and dates as may be agreed to between the Applicant and landlord, in the amounts set out in the applicable lease.  On the date of the first of such payments, any Rent relating to the period commencing from and including the date of this Order shall also be paid.

11.     **THIS COURT ORDERS** that, except as specifically permitted herein and subject to the Definitive Documents, the Applicant is hereby directed, until further Order of this Court: (i) to make no payments of principal, interest thereon or otherwise on account of amounts owing by the Applicant to any of its creditors as of this date; (ii) to grant no security interests, trust, liens, charges or encumbrances upon or in respect of any of the Applicant's Property; and (iii) to not grant credit or incur liabilities except in the ordinary course of the Business.

**RESTRUCTURING**

12.     **THIS COURT ORDERS** that the Applicant shall, subject to such requirements as are imposed by the CCAA and subject to the terms of the Definitive Documents, have the right to:

(a)     permanently or temporarily cease, downsize or shut down any of its business or operations, and to dispose of redundant or non-material assets not exceeding $[•] in any one transaction or $[•] in the aggregate;

(b)     in accordance with paragraphs 12 and 13 of this Order, vacate, abandon or quit any leased premises and/or disclaim any real property lease and any ancillary agreements relating to the leased premises in accordance with Section 32 of the CCAA;

(c)     disclaim such other arrangements or agreements of any nature whatsoever with whomever, whether oral or written, as the Applicant deems appropriate, in accordance with Section 32 of the CCAA;

-6-

(d)     terminate the employment of such of its employees or temporarily lay off such of its employees as it deems appropriate; and

(e)     pursue all avenues of refinancing of its Business or the Property, in whole or part, subject to prior approval of this Court being obtained before any material refinancing,

all of the foregoing to permit the Applicant to proceed with an orderly restructuring of the Business.

13.     **THIS COURT ORDERS** that the Applicant shall provide each relevant landlord with notice of its intention to remove any fixtures from any leased premises at least seven (7) days prior to the date of the intended removal.  The relevant landlord shall be entitled to have a representative present in the leased premises to observe such removal and, if the landlord disputes the Applicant's entitlement to remove any such fixture under the provisions of the lease, such fixture shall remain on the premises and shall be dealt with as agreed between any applicable secured creditors, such landlord and the Applicant, or by further Order of this Court upon application by the Applicant on at least two (2) days' notice to such landlord and any such secured creditors. If the Applicant disclaims a lease governing a leased premises in accordance with Section 32 of the CCAA, it shall not be required to pay Rent under such lease pending resolution of any such dispute (other than Rent payable for the notice period provided for in Subsection 32(5) of the CCAA), and the disclaimer of the lease shall be without prejudice to the Applicant's claim to the fixtures in dispute.

14.     **THIS COURT ORDERS** that if a notice of disclaimer is delivered pursuant to Section 32 of the CCAA, then: (i) during the notice period prior to the effective time of the disclaimer, the landlord may show the affected leased premises to prospective tenants during normal business hours, on giving the Applicant and the Monitor 24 hours' prior written notice; and (ii) at the effective time of the disclaimer, the relevant landlord shall be entitled to take possession of any such leased premises without waiver of or prejudice to any claims or rights such landlord may have against the Applicant in respect of such lease or leased premises, provided that nothing herein shall relieve such landlord of its obligation to mitigate any damages claimed in connection therewith.

**TRANSACTION SUPPORT AGREEMENT**

15.     **THIS COURT ORDERS** that the Transaction Support Agreement is hereby approved and the Applicant is authorized and empowered to enter into the Transaction Support Agreement, nunc pro tunc, subject to such minor amendments as may be consented to by the Monitor and as may be acceptable to each of the parties thereto, and is authorized, empowered and directed to

take all steps and actions in respect of, and to comply with all of its obligations pursuant to, the Transaction Support Agreement.

16.     **THIS COURT ORDERS** that, notwithstanding the Stay Period (as hereinafter defined), a counterparty to the Transaction Support Agreement may exercise any termination right that may become available to such counterparty pursuant to the Transaction Support Agreement, provided that such termination right must be exercised pursuant to and in accordance with the Transaction Support Agreement.

**NO PROCEEDINGS AGAINST THE LOYALTYONE ENTITIES, THEIR BUSINESS OR THEIR PROPERTY**

17.     **THIS COURT ORDERS** that until and including May 18, 2023 or such later date as this Court may order (the "**Stay Period**"), no proceeding or enforcement process in any court or tribunal (each, a "**Proceeding**", and collectively, "**Proceedings**") shall be commenced or continued against or in respect of the Applicant, its wholly owned subsidiary LoyaltyOne Travel Services Co./Cie Des Voyages LoyaltyOne ("**Travel Services**" and together with the Applicant, the "**LoyaltyOne Entities**") or the Monitor, or their respective employees and representatives acting in such capacities, or affecting the Business or the Property, or the business or property of Travel Services, except with the written consent of the Applicant and the Monitor, or with leave of this Court, and any and all Proceedings currently under way against or in respect of any of the LoyaltyOne Entities or affecting the Business or the Property, or the business or property of Travel Services, are hereby stayed and suspended pending further Order of this Court or the prior written consent of the Applicant and the Monitor.

**NO EXERCISE OF RIGHTS OR REMEDIES**

18.     **THIS COURT ORDERS** that during the Stay Period, all rights and remedies of any individual, firm, corporation, organization, governmental unit, body or agency, or any other entities (all of the foregoing, collectively being "**Persons**" and each being a "**Person**") against or in respect of any of the LoyaltyOne Entities or the Monitor, or their respective employees and representatives acting in such capacities, or affecting the Business or the Property, or the business or property of Travel Services,  are hereby stayed and suspended except with the written consent of the Applicant and the Monitor, or leave of this Court, provided that nothing in this Order shall: (i) empower any of the LoyaltyOne Entities to carry on any business which it is not lawfully entitled to carry on; (ii) affect such investigations, actions, suits or proceedings by a regulatory

body as are permitted by Section 11.1 of the CCAA; (iii) prevent the filing of any registration to preserve or perfect a security interest; or (iv) prevent the registration of a claim for lien.

**NO INTERFERENCE WITH RIGHTS**

19.     **THIS COURT ORDERS** that during the Stay Period, no Person shall accelerate, suspend, discontinue, fail to honour, alter, interfere with, repudiate, rescind, terminate or cease to perform any right, renewal right, contract, agreement, lease, sublease, licence, authorization or permit in favour of or held by any of the LoyaltyOne Entities, except with the prior written consent of the Applicant and the Monitor, or leave of this Court.

**CONTINUATION OF SERVICES**

20.     **THIS COURT ORDERS** that during the Stay Period, all Persons having oral or written agreements with any of the LoyaltyOne Entities or statutory or regulatory mandates for the supply of goods and/or services, including without limitation all computer software, communication and other data services, centralized banking services, payroll and benefit services, accounting services, insurance, transportation services, utility, or other services, to the Business or any of the LoyaltyOne Entities, are hereby restrained until further Order of this Court from discontinuing, altering, interfering with, suspending or terminating the supply of such goods or services as may be required by any of the LoyaltyOne Entities or exercising any other remedy provided under the agreements or arrangements, and that any of the LoyaltyOne Entities shall be entitled to the continued use of its current premises, telephone numbers, facsimile numbers, internet addresses and domain names, provided in each case that the normal prices or charges for all such goods or services received after the date of this Order are paid by the applicable LoyaltyOne Entities in accordance with the normal payment practices of the applicable LoyaltyOne Entities or such other practices as may be agreed upon by the supplier or service provider and each of the Applicant and the Monitor, or as may be ordered by this Court.

**NON-DEROGATION OF RIGHTS**

21.     **THIS COURT ORDERS** that, notwithstanding anything else in this Order, no Person shall be prohibited from requiring immediate payment for goods, services, use of leased or licensed property or other valuable consideration provided on or after the date of this Order, nor shall any Person be under any obligation on or after the date of this Order to advance or re-advance any monies or otherwise extend any credit to the Applicant. Nothing in this Order shall derogate from the rights conferred and obligations imposed by the CCAA.

**NO PRE-FILING VS POST-FILING SET-OFF**

22.    **THIS COURT ORDERS** that, no Person shall be entitled to set off any amounts that: (i) are or may become due to the Applicant in respect of obligations arising prior to the date hereof with any amounts that are or may become due from the Applicant in respect of obligations arising on or after the date of this Order; or (ii) are or may become due from the Applicant in respect of obligations arising prior to the date hereof with any amounts that are or may become due to the Applicant in respect of obligations arising on or after the date of this Order, each without the consent of the Applicant and the Monitor or further order of this Court.

**PROCEEDINGS AGAINST DIRECTORS AND OFFICERS**

23.    **THIS COURT ORDERS** that during the Stay Period, and except as permitted by Subsection 11.03(2) of the CCAA, no Proceeding may be commenced or continued against any of the former, current or future directors or officers of any of the LoyaltyOne Entities other than Joseph L. Motes III and any other person who, at any time after November 5, 2021, has served as a director, officer, or employee of (i) Bread Financial Holdings, Inc. f/k/a Alliance Data Systems Corporation ("**Bread**") or (ii) any other entity that, at any time after November 5, 2021, was or is a direct or indirect subsidiary of Bread) (the "**Directors and Officers**") with respect to any claim against the Directors and Officers that arose before the date hereof and that relates to any obligations of any of the LoyaltyOne Entities whereby the Directors and Officers are alleged under any law to be liable in their capacity as the Directors and Officers for the payment or performance of such obligations, until a compromise or arrangement in respect of the Applicant, if one is filed, is sanctioned by this Court or is refused by the creditors of the Applicant or this Court.

**DIRECTORS' AND OFFICERS' INDEMNIFICATION AND CHARGE**

24.    **THIS COURT ORDERS** that the Applicant shall indemnify the Directors and Officers against obligations and liabilities that they may incur as a director or officer of any of the LoyaltyOne Entities after the commencement of the within proceedings, except to the extent that, with respect to any Director or Officer, the obligation or liability was incurred as a result of such Director's or Officer's gross negligence or wilful misconduct (the "**D&O Indemnity**").

25.    **THIS COURT ORDERS** that the Directors and Officers shall be entitled to the benefit of and are hereby granted a charge (the "**Directors' Charge**") on the Property, which charge shall not exceed an aggregate amount of $15,409,000, unless permitted by further Order of this Court,

as security for the D&O Indemnity provided in paragraph 24 of this Order. The Directors' Charge shall have the priority set out in paragraphs 46 and 48 hereof.

26.    **THIS COURT ORDERS** that, notwithstanding any language in any applicable insurance policy to the contrary: (i) no insurer shall be entitled to be subrogated to or claim the benefit of the Directors' Charge; and (ii) the Directors and Officers shall only be entitled to the benefit of the Directors' Charge to the extent that they do not have coverage under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 24 of this Order.

**APPOINTMENT OF MONITOR**

27.    **THIS COURT ORDERS** that KSV is hereby appointed pursuant to the CCAA as the Monitor, an officer of this Court, to monitor the business and financial affairs of the Applicant with the powers and obligations set out in the CCAA or set forth herein and that the Applicant and its shareholders, officers, directors, and Assistants shall advise the Monitor of all material steps taken by the Applicant pursuant to this Order, and shall co-operate fully with the Monitor in the exercise of its powers and discharge of its obligations and provide the Monitor with the assistance that is necessary to enable the Monitor to adequately carry out the Monitor's functions.

28.    **THIS COURT ORDERS** that the Monitor, in addition to its prescribed rights and obligations under the CCAA, is hereby directed and empowered to:

(a)    monitor the Applicant's receipts and disbursements;

(b)    report to this Court at such times and intervals as the Monitor may deem appropriate with respect to matters relating to the Property, the Business, the Definitive Documents, the Chapter 11 Cases, and such other matters as may be relevant to the proceedings herein;

(c)    assist the Applicant, to the extent required by the Applicant, in its dissemination, to (i) Bank of Montreal in its capacity as interim lender (the "**DIP Lender**") under the DIP Financing Facility (as hereinafter defined), and (ii) such parties as may be entitled to receive same pursuant to the Transaction Support Agreement, its counsel as and when required or permitted under the Definitive Documents or otherwise requested by the parties entitled to receive such information, acting reasonably, of financial and other information as agreed to between the Applicant and the DIP Lender which may

be used in these proceedings including reporting on a basis to be agreed with the DIP Lender;

(d)     advise the Applicant in its preparation of the Applicant's cash flow statements and reporting required by the DIP Lender, which information shall be reviewed with the Monitor and delivered to the DIP Lender and its counsel as and when required under the Definitive Documents, or as otherwise agreed to by the DIP Lender;

(e)     advise the Applicant in its development of the Plan and any amendments to the Plan;

(f)     assist the Applicant, to the extent required by the Applicant, with the holding and administering of creditors' or shareholders' meetings for voting on the Plan;

(g)     monitor all payments, obligations and transfers as between the Applicant and its affiliates or subsidiaries;

(h)     have full and complete access to the Property, including the premises, books, records, data, including data in electronic form, and other financial documents of the Applicant, to the extent that is necessary to adequately assess the Applicant's business and financial affairs or to perform its duties arising under this Order;

(i)     be at liberty to engage independent legal counsel or such other persons as the Monitor deems necessary or advisable respecting the exercise of its powers and performance of its obligations under this Order; and

(j)     perform such other duties as are required by this Order or by this Court from time to time.

29.     **THIS COURT ORDERS** that the Monitor shall not take possession of the Property and shall take no part whatsoever in the management or supervision of the management of the Business and shall not, by fulfilling its obligations hereunder, be deemed to have taken or maintained possession or control of the Business or the Property, or any part thereof.

30.     **THIS COURT ORDERS** that nothing herein contained shall require the Monitor to occupy or to take control, care, charge, possession or management (separately and/or collectively, "**Possession**") of any of the Property that might be environmentally contaminated, might be a pollutant or a contaminant, or might cause or contribute to a spill, discharge, release or deposit of a substance contrary to any federal, provincial or other law respecting the protection,

conservation, enhancement, remediation or rehabilitation of the environment or relating to the disposal of waste or other contamination including, without limitation, the *Canadian Environmental Protection Act*, the Ontario *Environmental Protection Act*, the *Ontario Water Resources Act*, the Ontario *Occupational Health and Safety Act* and regulations thereunder (the "**Environmental Legislation**"), provided however that nothing herein shall exempt the Monitor from any duty to report or make disclosure imposed by applicable Environmental Legislation.  The Monitor shall not, as a result of this Order or anything done in pursuance of the Monitor's duties and powers under this Order, be deemed to be in Possession of any of the Property within the meaning of any Environmental Legislation, unless it is actually in possession.

31.     **THIS COURT ORDERS** that the Monitor shall provide any creditor of the Applicant, the DIP Lender and the Consenting Stakeholders with information provided by the Applicant in response to reasonable requests for information made in writing by such creditor addressed to the Monitor.  The Monitor shall not have any responsibility or liability with respect to the information disseminated by it pursuant to this paragraph.  In the case of information that the Monitor has been advised by the Applicant is confidential, the Monitor shall not provide such information to creditors unless otherwise directed by this Court or on such terms as the Monitor and the Applicant may agree.

32.     **THIS COURT ORDERS** that, in addition to the rights and protections afforded to the Monitor under the CCAA or as an officer of this Court, the Monitor, its directors, officers, employees, counsel and other representatives acting in such capacities shall incur no liability or obligation as a result of the Monitor's appointment or the carrying out by it of the provisions of this Order, save and except for any gross negligence or wilful misconduct on its part.  Nothing in this Order shall derogate from the protections afforded to the Monitor by the CCAA or any applicable legislation.

33.     **THIS COURT ORDERS** that the Monitor, counsel to the Monitor, counsel to the Applicant, PJT Partners LP in its capacity as financial advisor to the Applicant (the "**Financial Advisor**"), and Alvarez & Marsal Inc. in its capacity as operational and restructuring advisor to the Applicant ( the "**Restructuring Advisor**") shall be paid their reasonable fees and disbursements, whether incurred prior to, on or subsequent to the date of this Order, in each case at their standard rates and charges, by the Applicant as part of the costs of these proceedings. The Applicant is hereby authorized and directed to pay the accounts of the Monitor, counsel for the Monitor, counsel for the Applicant, the Financial Advisor, and the Restructuring Advisor on a bi-weekly basis.

34.     **THIS COURT ORDERS** that the Monitor and its legal counsel shall pass their accounts from time to time, and for this purpose the accounts of the Monitor and its legal counsel are hereby referred to a judge of the Commercial List of the Ontario Superior Court of Justice.

**ADMINISTRATION CHARGE**

35.     **THIS COURT ORDERS** that the Monitor, counsel to the Monitor, the Applicant's counsel, the Financial Advisor and the Restructuring Advisor shall be entitled to the benefit of and are hereby granted a charge (the "**Administration Charge**") on the Property, which charge shall not exceed an aggregate amount of $3,000,000, unless permitted by further Order of this Court, as security for their professional fees and disbursements incurred at the standard rates and charges of the Monitor and such advisors, both before and after the making of this Order, provided however that any Transaction Fees earned by the Financial Advisor shall not be secured by the Administration Charge.  The Administration Charge shall have the priority set out in paragraphs 46 and 48 hereof.

**APPROVAL OF FINANCIAL ADVISOR AGREEMENT**

36.     **THIS COURT ORDERS** that the Agreement dated as of July 11, 2022 engaging the Financial Advisor and attached as Exhibit "R" to the Stewart Affidavit (the "**Financial Advisor Agreement**"), and the retention of the Financial Advisor under the terms thereof, is hereby ratified and approved and the Applicant is authorized and directed *nunc pro tunc* to make the payments contemplated thereunder when earned and payable in accordance with the terms and conditions of the Financial Advisor Agreement.

37.     **THIS COURT ORDERS** that the Financial Advisor shall be entitled to the benefit of and is hereby granted a charge (the "**Financial Advisor Charge**") on the Property, which charge shall not exceed an aggregate amount of US$6,000,000, as security solely for the Transaction Fees earned and payable pursuant to the terms of the Financial Advisor Agreement. The Financial Advisor Charge shall have the priority set out in paragraphs 46 and 48 herein.

**EMPLOYEE RETENTION PLANS**

38.     **THIS COURT ORDERS** that the Employee Retention Plans, as described in the Stewart Affidavit and attached as Exhibit "Q" to the Stewart Affidavit, is hereby approved and the Applicant is authorized to make the payments contemplated thereunder in accordance with the terms and conditions of the Employee Retention Plans.

39.     **THIS COURT ORDERS** that the employee beneficiaries under the Employee Retention Plans shall be entitled to the benefit of and are hereby granted a charge (the "**Employee Retention Plans Charge**") on the Property, which charge shall not exceed an aggregate amount of $5,350,000, unless permitted by further Order of this Court, to secure any payments to the employee beneficiaries under the Employee Retention Plans. The Employee Retention Plans Charge shall have the priority set out in paragraphs 46 and 48 herein.

**DIP FINANCING**

40.     **THIS COURT ORDERS** that the Applicant is hereby authorized and empowered to obtain and borrow under a credit facility from the DIP Lender (the "**DIP Financing Facility**") in order to finance the Applicant's working capital requirements, make intercompany loans to Loyalty Ventures Inc. and other general corporate purposes and capital expenditures, all in accordance with the Definitive Documents, provided that borrowings under the DIP Financing Facility shall not exceed the aggregate principal amount of US$70,000,000, unless permitted by further Order of this Court. For the avoidance of doubt, no amounts owing by the Applicant to the DIP Lender or its affiliates, in any capacity, as of the date herein, shall be set off against any amounts available to the Applicant under the DIP Financing Facility.

41.     **THIS COURT ORDERS** that the DIP Financing Facility shall be on the terms and subject to the conditions set forth in the term sheet entered into between the Applicant and the DIP Lender dated as of March **[9]**, 2023 and attached as Exhibit "P" to the Stewart Affidavit (the "**DIP Term Sheet**").

42.     **THIS COURT ORDERS** that the Applicant is hereby authorized and empowered to execute and deliver such credit agreements, mortgages, charges, hypothecs and security documents, guarantees and other definitive documents (collectively, with the DIP Term Sheet, the "**Definitive Documents**"), as are contemplated by the DIP Term Sheet or as may be reasonably required by the DIP Lender pursuant to the terms thereof, and the Applicant is hereby authorized and directed to pay and perform all of its indebtedness, interest, fees, liabilities and obligations to the DIP Lender under and pursuant to the Definitive Documents as and when the same become due and are to be performed, notwithstanding any other provision of this Order. Notwithstanding any other provision in this Order, all payments and other expenditures to be made by the Applicant to any Person (except the Monitor and its counsel) shall be in accordance with the terms of the Definitive Documents.

43.     **THIS COURT ORDERS** that the DIP Lender shall be entitled to the benefit of and is hereby granted a charge (the "**DIP Lender's Charge**") on the Applicant's Property up to the maximum amount of US$70,000,000 (plus accrued and unpaid interest, fees and expenses) to secure amounts advanced under the DIP Financing Facility, which DIP Lender's Charge shall not secure an obligation that exists before this Order is made. The DIP Lender's Charge shall have the priority set out in paragraphs 46 and 48 hereof.

44.     **THIS COURT ORDERS** that, notwithstanding any other provision of this Order:

(a)     the DIP Lender may take such steps from time to time as it may deem necessary or appropriate to file, register, record or perfect the DIP Lender's Charge or any of the Definitive Documents;

(b)     upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Term Sheet), whether or not there is availability under the DIP Financing Facility and notwithstanding any stay imposed by this Order: (i) without any notice to the Applicant, the Applicant shall have no right to receive any additional advances thereunder or other accommodation of credit from the DIP Lender except in the sole discretion of the DIP Lender; and (ii) the DIP Lender may immediately terminate the DIP Financing Facility and demand immediate payment of all obligations owing thereunder by providing such a notice and demand to the Applicant, with a copy to the Monitor;

(c)     with the leave of the Court, sought on not less than three (3) business days' notice to the Applicant, the Consenting Stakeholders and the Monitor after the occurrence and during the continuance of an Event of Default, the DIP Lender shall have the right to enforce the DIP Lender's Charge and to exercise all other rights and remedies in respect of the obligations owing under the DIP Financing Facility and the DIP Lender's Charge; and

(d)     the foregoing rights and remedies of the DIP Lender shall be enforceable against any trustee in bankruptcy, interim receiver, receiver or receiver and manager of the Applicant or the Property.

45.     **THIS COURT ORDERS AND DECLARES** that the DIP Lender shall be treated as unaffected in any plan of arrangement or compromise filed by the Applicant under the CCAA, or

any proposal filed by the Applicant under the *Bankruptcy and Insolvency Act* of Canada (the "**BIA**"), with respect to any advances made under the Definitive Documents.

**VALIDITY AND PRIORITY OF CHARGES CREATED BY THIS ORDER**

46.    **THIS COURT ORDERS** that the priorities of the Administration Charge, the Directors' Charge, the Employee Retention Plans Charge, the Financial Advisor Charge, and the DIP Lender's Charge (collectively, the "**Charges**"), as among them, shall be as follows:

> First – Administration Charge (to the maximum amount of $3,000,000);
>
> Second – Directors' Charge (to the maximum amount of $15,409,000);
>
> Third – Employee Retention Plans Charge (to the maximum amount of $5,350,000);
>
> Fourth – Financial Advisor Charge (to the maximum amount of US$6,000,000); and
>
> Fifth – DIP Lender's Charge (to the maximum amount of US$70,000,000, plus accrued and unpaid interest, fees and expenses).

47.    **THIS COURT ORDERS** that the filing, registration or perfection of the Charges shall not be required, and that the Charges shall be valid and enforceable for all purposes, including as against any right, title or interest filed, registered, recorded or perfected subsequent to the Charges coming into existence, notwithstanding any such failure to file, register, record or perfect.

48.    **THIS COURT ORDERS** that each of the Charges (all as constituted and defined herein) shall constitute a charge on the Property and such Charges shall rank in priority to all other security interests, trusts, liens, charges and encumbrances, and claims of secured creditors, statutory or otherwise (collectively, "**Encumbrances**") in favour of any Person notwithstanding the order of perfection or attachment; provided that the Charges shall rank behind Encumbrances in favour of (i) any Person with a properly perfected purchase money security interest under the *Personal Property Security Act* (Ontario) or such other applicable legislation, including without limitation Wells Fargo Equipment Finance Company and (ii) the Reserve Trustee in respect of the Reserve Security.

49.    **THIS COURT ORDERS** that except as otherwise expressly provided for herein, or as may be approved by this Court on notice to parties in interest, the Applicant shall not grant any

Encumbrances over any Property that rank in priority to, or *pari passu* with, any of the Charges, unless the Applicant also obtains the prior written consent of the Monitor, the Initial Consenting Stakeholders (as defined in the Transaction Support Agreement), and the beneficiaries of each of the Administration Charge, the Directors' Charge, the Financial Advisor Charge and the DIP Lender's Charge, and the Initial Consenting Stakeholders, or further Order of this Court.

50.     **THIS COURT ORDERS** that the Charges shall not be rendered invalid or unenforceable and the rights and remedies of the chargees entitled to the benefit of the Charges (collectively, the "**Chargees**") and/or the DIP Lender thereunder shall not otherwise be limited or impaired in any way by: (i) the pendency of these proceedings and the declarations of insolvency made herein; (ii) any application(s) for bankruptcy order(s) or receivership order(s) issued pursuant to the BIA or otherwise, or any bankruptcy order or receivership order made pursuant to such applications; (iii) the filing of any assignments for the general benefit of creditors made pursuant to the BIA; (iv) the provisions of any federal or provincial statutes; or (v) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing loan documents, lease, sublease, offer to lease or other agreement (collectively, an "**Agreement**") which binds the Applicant, and notwithstanding any provision to the contrary in any Agreement:

(a)     neither the creation of the Charges nor the execution, delivery, perfection, registration or performance of the Definitive Documents shall create or be deemed to constitute a breach by the Applicant of any Agreement to which it is a party;

(b)     none of the Chargees shall have any liability to any Person whatsoever as a result of any breach of any Agreement caused by or resulting from the creation of the Charges, or the execution, delivery or performance of the Definitive Documents; and

(c)     the payments made by the Applicant pursuant to this Order, the Definitive Documents and the granting of the Charges, do not and will not constitute preferences, fraudulent conveyances, transfers at undervalue, oppressive conduct, or other challengeable or voidable transactions under any applicable law.

51.     **THIS COURT ORDERS** that any Charge created by this Order over leases of real property in Canada shall only be a Charge in the Applicant's interest in such real property lease.

**SERVICE AND NOTICE**

52.     **THIS COURT ORDERS** that, subject to paragraph 53, the Monitor shall: (i) without delay, publish in the *National Post (National Edition)*, a notice containing the information prescribed under the CCAA in the form attached as Exhibit "Q" to the Stewart Affidavit (the "**Notice**"); and (ii) within five (5) days after the date of this Order, (A) make this Order publicly available in the manner prescribed under the CCAA, (B) send, in the prescribed manner, a copy of the Notice to every known creditor who has a claim against the Applicant of more than $1,000, and (C) prepare a list showing the names and addresses of those creditors and the estimated amounts of those claims, and make it publicly available in the prescribed manner, all in accordance with Subsection 23(1)(a) of the *CCAA* and the regulations made thereunder.

53.     **THIS COURTS ORDERS** that, notwithstanding paragraph 52 of this Order, Subsection 23(1)(a) of the *CCAA*, and the regulations made thereunder, with respect to consumers enrolled in the AIR MILES® Reward Program holding reward miles balances that would entitle them to redeem for items with a value of at least $1,000 (the "**Specified Collectors**"), the Monitor: (i) may satisfy the notice obligation in paragraph 52 (B) hereof by (A) causing the Applicant to email a copy of the Notice to the Specified Collectors at the current email address in the Applicant's records, or, if the Applicant does not have a current email address, (B) publishing the Notice in the manner set out in paragraph 52 hereof and on the case website set out in paragraph 54 hereof; and (ii) subject to further Order of the Court, shall not publish information it receives about the Specified Collectors from the Applicant, shall treat such information as confidential, and shall exclude such information from the list of creditors set out in paragraph 52 hereof.

54.     **THIS COURT ORDERS** that the E-Service Guide of the Commercial List (the "**Guide**") is approved and adopted by reference herein and, in this proceeding, the service of documents made in accordance with the Guide (which can be found on the Commercial List website at https://www.ontariocourts.ca/scj/practice/practice-directions/toronto/eservice-commercial/)   shall be valid and effective service. Subject to Rule 17.05, this Order shall constitute an order for substituted service pursuant to Rule 16.04 of the *Rules of Civil Procedure*, R.R.O. 1990. Reg. 194, as amended (the "**Rules of Civil Procedure**"). Subject to Rule 3.01(d) of the Rules of Civil Procedure and paragraph 13 of the Guide, service of documents in accordance with the Guide will be effective on transmission. This Court further orders that a Case Website shall be established     in     accordance     with     the     Guide     with     the     following     URL: https://www.ksvadvisory.com/experience/case/loyaltyone.

55.     **THIS COURT ORDERS** that if the service or distribution of documents in accordance with the Guide or the CCAA and the regulations thereunder is not practicable, the Applicant, the Monitor and their respective counsel and agents are at liberty to serve or distribute this Order, any other materials and orders in these proceedings, any notices or other correspondence, by forwarding copies thereof by prepaid ordinary mail, courier, personal delivery, facsimile transmission or electronic message to the Applicant's creditors or other interested parties at their respective addresses (including e-mail addresses) as last shown in the books and records of the Applicant and that any such service or distribution shall be deemed to be received on the earlier of (i) the date of forwarding thereof, if sent by electronic message on or prior to 5:00 p.m. Eastern Time (or on the next business day following the date of forwarding thereof if sent on a non-business day); (ii) the next business day following the date of forwarding thereof, if sent by courier, personal delivery, facsimile transmission or electronic message sent after 5:00 p.m. Eastern Time; or (iii) on the third business day following the date of forwarding thereof, if sent by ordinary mail.

56.     **THIS COURT ORDERS** that the Applicant, the Monitor and each of their respective counsel are at liberty to serve or distribute this Order, and any other materials and orders as may be reasonably required in these proceedings, including any notices or other correspondence, by forwarding true copies thereof by electronic message (including by e-mail) to the Applicant's creditors or other interested parties and their advisors, as applicable. For greater certainty, any such service or distribution shall be deemed to be in satisfaction of a legal or judicial obligation, and notice requirements within the meaning of Subsection 3(c) of the *Electronic Commerce Protection Regulations* (SOR/2013-221).

57.     **THIS COURT ORDERS** that, except with respect to any motion to be heard, and subject to further Order of this Court in respect of urgent motions, any interested party wishing to object to the relief sought in a motion brought by the Applicant or the Monitor in these *CCAA* proceedings shall, subject to further order of this Court, provide the service list in these proceedings (the "**Service List**") with responding motion materials or a written notice (including by e-mail) stating its objection to the motion and the grounds for such objection by no later than 5:00 p.m. (Eastern Time) on the date that is two (2) days prior to the date such motion is returnable (the "**Objection Deadline**"). The Monitor shall have the ability to extend the Objection Deadline after consultation with the Applicant.

**GENERAL**

58.    **THIS COURT ORDERS** that any interested party that wishes to amend or vary this Order shall be entitled to appear or bring a motion before this Court on not less than five (5) business days' notice to the Service List and any other party or parties likely to be affected by the Order sought; provided, however, that the Chargees and the DIP Lender shall be entitled to rely on this Order as granted and on the Charges and priorities set forth in paragraphs 44 and 46 hereof with respect to any fees, expenses and disbursements incurred and in respect of advances made under the Definitive Documents, as applicable, until the date this Order may be amended, varied or stayed.

59.    **THIS COURT ORDERS** that notwithstanding paragraph 58 of this Order, the Applicant or the Monitor may from time to time apply to this Court to amend, vary or supplement this Order or for advice and directions in the discharge of its powers and duties hereunder or in the interpretation of this Order.

60.    **THIS COURT ORDERS** that nothing in this Order shall prevent the Monitor from acting as an interim receiver, a receiver, a receiver and manager, or a trustee in bankruptcy of the Applicant, the Business or the Property.

61.    **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada or in the United States, to give effect to this Order and to assist the Applicant, the Monitor and their respective agents in carrying out the terms of this Order.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicant and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicant and the Monitor and their respective agents in carrying out the terms of this Order.

62.    **THIS COURT ORDERS** that each of the Applicant and the Monitor be at liberty and are hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order, and that the Monitor is authorized and empowered to act as a representative in respect of the within proceedings for the purpose of having these proceedings recognized in a jurisdiction outside Canada.

-21-

63.     **THIS COURT ORDERS** that the Initial Order of this Court dated March 10, 2023 is hereby amended and restated pursuant to this Order, and this Order and all of its provisions are effective as of 12:01 a.m. (Eastern Time) on the date of this Order without the need for entry or filing.

_____

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF LOYALTYONE, CO.

Court File No. ●

|  | **ONTARIO**<br>**SUPERIOR COURT OF JUSTICE**<br>**COMMERCIAL LIST**<br><br>PROCEEDING COMMENCED AT<br>TORONTO |
|---|---|
|  | **AMENDED AND RESTATED INITIAL ORDER**<br><br>**(Amending Initial Order Dated [●])** |
|  | **Cassels Brock & Blackwell LLP**<br>2100 Scotia Plaza<br>40 King Street West<br>Toronto, ON M5H 3C2<br><br>**Ryan Jacobs LSO#: 59510J**<br>Tel:   416.860.6465<br>rjacobs@cassels.com<br><br>**Jane Dietrich LSO#: 49302U**<br>Tel:   416.860.5223<br>jdietrich@cassels.com<br><br>**Natalie E. Levine LSO#: 64908K**<br>Tel:   416.860.6568<br>nlevine@cassels.com<br><br>Lawyers for the Applicant |

**<u>EXHIBIT F</u>**
**CCAA INITIAL ORDER**

Court File No.

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| THE HONOURABLE | **)** | FRIDAY, THE 10th |
|---|---|---|
| | **)** | |
| JUSTICE CONWAY | **)** | DAY OF MARCH, 2023 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF LOYALTYONE, CO.

(the "**Applicant**")

**INITIAL ORDER**

**THIS APPLICATION**, made by the Applicant, pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**"), for an Initial Order was heard this day by judicial videoconference via Zoom.

**ON READING** the affidavit of Shawn Stewart sworn March **[●]**, 2023 and the Exhibits thereto (the "**Stewart Affidavit**") and the pre-filing report dated March **[●]**, 2023 of the proposed monitor, KSV Restructuring Inc. ("**KSV**"), and on being advised that the secured creditors who are likely to be affected by the charges created herein were given notice, and on hearing the submissions of counsel for the Applicant, the proposed monitor, and the other parties listed on the counsel slip and no one appearing for any other party although duly served as appears from the affidavit of service of Alec Hoy sworn March **[●]**, 2023, and on reading the consent of KSV to act as the Monitor,

**SERVICE AND DEFINITIONS**

1.      **THIS COURT ORDERS** that the time for service of the Notice of Application and the Application Record is hereby abridged and validated so that this Application is properly returnable today and hereby dispenses with further service thereof.

2

2. **THIS COURT ORDERS** that capitalized terms used in this Order and not otherwise defined herein shall have the meanings ascribed to them in the Stewart Affidavit.

**APPLICATION**

3. **THIS COURT ORDERS AND DECLARES** that the Applicant is a company to which the CCAA applies.

**POSSESSION OF PROPERTY AND OPERATIONS**

4. **THIS COURT ORDERS** that the Applicant shall remain in possession and control of its current and future assets, licences, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof (the "**Property**"). Subject to further Order of this Court, the Applicant shall continue to carry on business in a manner consistent with the preservation of its business (the "**Business**") and the Property. The Applicant is authorized and empowered to continue to retain and employ the employees, consultants, contractors, agents, experts, accountants, counsel and such other persons (collectively "**Assistants**") currently retained or employed by it, with liberty to retain such further Assistants as it deems reasonably necessary or desirable in the ordinary course of business or for the carrying out of the terms of this Order.

5. **THIS COURT ORDERS** that the Applicant shall be entitled to continue to utilize the central cash management system currently in place as described in the Stewart Affidavit or, with the prior written consent of the Monitor, replace it with another substantially similar central cash management system (the "**Cash Management System**"), and that any present or future bank providing the Cash Management System shall: (i) not be under any obligation whatsoever to inquire into the propriety, validity or legality of any transfer, payment, collection or other action taken under the Cash Management System, or as to the use or application by the Applicant of funds transferred, paid, collected or otherwise dealt with in the Cash Management System; (ii) be entitled to provide the Cash Management System without any liability in respect thereof to any Person (as hereinafter defined) other than the Applicant, pursuant to the terms of the documentation applicable to the Cash Management System; and (iii) be, in its capacity as provider of the Cash Management System, an unaffected creditor under a plan (if any) with regard to any claims or expenses it may suffer or incur in connection with the provision of the Cash Management System.

6.     **THIS COURT ORDERS** that the Applicant shall be entitled but not required to pay the following expenses whether incurred prior to, on, or after the date of this Order:

(a)     all outstanding and future wages, salaries, employee and pension benefits, vacation pay and expenses payable prior to, on, or after the date of this Order, in each case incurred in the ordinary course of business and consistent with existing compensation policies and arrangements;

(b)     with the prior written consent of the Monitor, amounts owing for goods and services actually supplied to the Applicant, including, without limiting the foregoing, services provided by contractors, prior to the date of this Order, with the Monitor considering, among other factors, whether: (i) the supplier or service provider is essential to the Business and ongoing operations of the Applicant and the payment is required to ensure ongoing supply; (ii) making such payment will preserve, protect or enhance the value of the Applicant's Property or the Business; and (iii) the supplier or service provider is required to continue to provide goods or services to the Applicant after the date of this Order, including pursuant to the terms of this Order;

(c)     the fees and disbursements of any Assistants retained or employed by the Applicant, at their standard rates and charges;

(d)     all outstanding and future amounts related to honouring Collector obligations, whether existing before or after the date of this Order, including customer loyalty and reward programs, incentives, offers and benefits, in each case incurred in the ordinary course of business and consistent with existing policies and procedures; and

(e)     any amounts required to comply with the Reserve Agreement.

7.     **THIS COURT ORDERS** that, except as otherwise provided to the contrary herein, the Applicant shall be entitled but not required to pay all reasonable expenses incurred by the Applicant in carrying on the Business in the ordinary course after the date of this Order, and in carrying out the provisions of this Order, which expenses shall include, without limitation:

(a)     all expenses and capital expenditures reasonably necessary for the preservation of the Property or the Business including, without limitation, payments on account of insurance (including directors' and officers' insurance), maintenance and security services; and

4

(b)    payment for goods or services actually supplied to the Applicant on or following the date of this Order.

8.    **THIS COURT ORDERS** that the Applicant shall remit, in accordance with legal requirements, or pay:

(a)    any statutory deemed trust amounts in favour of the Crown in right of Canada or of any Province thereof or any other taxation authority which are required to be deducted from employees' wages, including, without limitation, amounts in respect of: (i) employment insurance; (ii) Canada Pension Plan; (iii) Quebec Pension Plan; and (iv) income taxes;

(b)    all goods and services or other applicable sales taxes (collectively, "**Sales Taxes**") required to be remitted by the Applicant in connection with the sale of goods and services by the Applicant, but only where such Sales Taxes are accrued or collected after the date of this Order, or where such Sales Taxes were accrued or collected prior to the date of this Order but not required to be remitted until on or after the date of this Order; and

(c)    any amount payable to the Crown in right of Canada or of any Province thereof or any political subdivision thereof or any other taxation authority in respect of municipal realty, municipal business or other taxes, assessments or levies of any nature or kind which are entitled at law to be paid in priority to claims of secured creditors and which are attributable to or in respect of the carrying on of the Business by the Applicant.

9.    **THIS COURT ORDERS** that until a real property lease is disclaimed in accordance with the CCAA, the Applicant shall pay, without duplication, all amounts constituting rent or payable as rent under real property leases (including, for greater certainty, common area maintenance charges, utilities and realty taxes and any other amounts payable to the landlord under the lease, but for greater certainty, excluding accelerated rent or penalties, fees or other charges arising as a result of the insolvency of the Applicant or the making of this Order) or as otherwise may be negotiated between the Applicant and the landlord from time to time ("**Rent**"), for the period commencing from and including the date of this Order, monthly in equal payments on the first day of each month, in advance (but not in arrears) or, with the prior written consent of the Monitor, at such other time intervals and dates as may be agreed to between the Applicant and landlord, in the amounts set out in the applicable lease.  On the date of the first of such payments, any Rent relating to the period commencing from and including the date of this Order shall also be paid.

10.     **THIS COURT ORDERS** that, except as specifically permitted herein, the Applicant is hereby directed, until further Order of this Court: (i) to make no payments of principal, interest thereon or otherwise on account of amounts owing by the Applicant to any of its creditors as of this date; (ii) to grant no security interests, trust, liens, charges or encumbrances upon or in respect of any of the Applicant's Property; and (iii) to not grant credit or incur liabilities except in the ordinary course of the Business.

**RESTRUCTURING**

11.     **THIS COURT ORDERS** that the Applicant shall, subject to such requirements as are imposed by the CCAA, have the right to:

(a)     terminate the employment of such of its employees or temporarily lay off such of its employees as it deems appropriate; and

(b)     pursue all avenues of refinancing of its Business or the Property, in whole or part, subject to prior approval of this Court being obtained before any material refinancing,

all of the foregoing to permit the Applicant to proceed with an orderly restructuring of the Business.

**NO PROCEEDINGS AGAINST THE LOYALTYONE ENTITIES, THEIR BUSINESS OR THEIR PROPERTY**

12.     **THIS COURT ORDERS** that until and including March 20, 2023 (the "**Initial Stay Period**"), or such later date as this Court may order (the "**Stay Period**"), no proceeding or enforcement process in any court or tribunal (each, a "**Proceeding**", and collectively, "**Proceedings**") shall be commenced or continued against or in respect of the Applicant, its wholly owned subsidiary LoyaltyOne Travel Services Co./Cie Des Voyages LoyaltyOne ("**Travel Services**" and together with the Applicant, the "**LoyaltyOne Entities**") or the Monitor, or their respective employees and representatives acting in such capacities, or affecting the Business or the Property, or the business or property of Travel Services, except with the written consent of the Applicant and the Monitor, or with leave of this Court, and any and all Proceedings currently under way against or in respect of any of the LoyaltyOne Entities or affecting the Business or the Property, or the business or property of Travel Services, are hereby stayed and suspended pending further Order of this Court or the prior written consent of the Applicant and the Monitor.

**NO EXERCISE OF RIGHTS OR REMEDIES**

13.     **THIS COURT ORDERS** that during the Stay Period, all rights and remedies of any individual, firm, corporation, organization, governmental unit, body or agency, or any other entities (all of the foregoing, collectively being "**Persons**" and each being a "**Person**") against or in respect of any of the LoyaltyOne Entities or the Monitor, or their respective employees and representatives acting in such capacities, or affecting the Business or the Property, or the business or property of Travel Services,  are hereby stayed and suspended except with the written consent of the Applicant and the Monitor, or leave of this Court, provided that nothing in this Order shall: (i) empower any of the LoyaltyOne Entities to carry on any business which it is not lawfully entitled to carry on; (ii) affect such investigations, actions, suits or proceedings by a regulatory body as are permitted by Section 11.1 of the CCAA; (iii) prevent the filing of any registration to preserve or perfect a security interest; or (iv) prevent the registration of a claim for lien.

**NO INTERFERENCE WITH RIGHTS**

14.     **THIS COURT ORDERS** that during the Stay Period, no Person shall accelerate, suspend, discontinue, fail to honour, alter, interfere with, repudiate, rescind, terminate or cease to perform any right, renewal right, contract, agreement, lease, sublease, licence, authorization or permit in favour of or held by any of the LoyaltyOne Entities, except with the prior written consent of the Applicant and the Monitor, or leave of this Court.

**CONTINUATION OF SERVICES**

15.     **THIS COURT ORDERS** that during the Stay Period, all Persons having oral or written agreements with any of the LoyaltyOne Entities or statutory or regulatory mandates for the supply of goods and/or services, including without limitation all computer software, communication and other data services, centralized banking services, payroll and benefit services, accounting services, insurance, transportation services, utility, or other services, to the Business or any of the LoyaltyOne Entities, are hereby restrained until further Order of this Court from discontinuing, altering, interfering with, suspending or terminating the supply of such goods or services as may be required by any of the LoyaltyOne Entities or exercising any other remedy provided under the agreements or arrangements, and that any of the LoyaltyOne Entities shall be entitled to the continued use of its current premises, telephone numbers, facsimile numbers, internet addresses and domain names, provided in each case that the normal prices or charges for all such goods or services received after the date of this Order are paid by the applicable LoyaltyOne Entities in accordance with the normal payment practices of the applicable LoyaltyOne Entities or such other

practices as may be agreed upon by the supplier or service provider and each of the Applicant and the Monitor, or as may be ordered by this Court.

**NON-DEROGATION OF RIGHTS**

16.     **THIS COURT ORDERS** that, notwithstanding anything else in this Order, no Person shall be prohibited from requiring immediate payment for goods, services, use of leased or licensed property or other valuable consideration provided on or after the date of this Order, nor shall any Person be under any obligation on or after the date of this Order to advance or re-advance any monies or otherwise extend any credit to the Applicant. Nothing in this Order shall derogate from the rights conferred and obligations imposed by the CCAA.

**PROCEEDINGS AGAINST DIRECTORS AND OFFICERS**

17.     **THIS COURT ORDERS** that during the Stay Period, and except as permitted by Subsection 11.03(2) of the CCAA, no Proceeding may be commenced or continued against any of the former, current or future directors or officers of any of the LoyaltyOne Entities other than Joseph L. Motes III and any other person who, at any time after November 5, 2021, has served as a director, officer, or employee of (i) Bread Financial Holdings, Inc. f/k/a Alliance Data Systems Corporation ("**Bread**") or (ii) any other entity that, at any time after November 5, 2021, was or is a direct or indirect subsidiary of Bread) (the "**Directors and Officers**") with respect to any claim against the Directors and Officers that arose before the date hereof and that relates to any obligations of any of the LoyaltyOne Entities whereby the Directors and Officers are alleged under any law to be liable in their capacity as the Directors and Officers for the payment or performance of such obligations, until a compromise or arrangement in respect of the Applicant, if one is filed, is sanctioned by this Court or is refused by the creditors of the Applicant or this Court.

**DIRECTORS' AND OFFICERS' INDEMNIFICATION AND CHARGE**

18.     **THIS COURT ORDERS** that the Applicant shall indemnify the Directors and Officers against obligations and liabilities that they may incur as a director or officer of any of the LoyaltyOne Entities after the commencement of the within proceedings, except to the extent that, with respect to any Director or Officer, the obligation or liability was incurred as a result of such Director's or Officer's gross negligence or wilful misconduct (the "**D&O Indemnity**").

19.     **THIS COURT ORDERS** that the Directors and Officers shall be entitled to the benefit of and are hereby granted a charge (the "**Directors' Charge**") on the Property, which charge shall not exceed an aggregate amount of $10,521,000, unless permitted by further Order of this Court,

as security for the D&O Indemnity provided in paragraph 18 of this Order. The Directors' Charge shall have the priority set out in paragraphs 30 and 32 hereof.

20.    **THIS COURT ORDERS** that, notwithstanding any language in any applicable insurance policy to the contrary: (i) no insurer shall be entitled to be subrogated to or claim the benefit of the Directors' Charge; and (ii) the Directors and Officers shall only be entitled to the benefit of the Directors' Charge to the extent that they do not have coverage under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 18 of this Order.

**APPOINTMENT OF MONITOR**

21.    **THIS COURT ORDERS** that KSV is hereby appointed pursuant to the CCAA as the Monitor, an officer of this Court, to monitor the business and financial affairs of the Applicant with the powers and obligations set out in the CCAA or set forth herein and that the Applicant and its shareholders, officers, directors, and Assistants shall advise the Monitor of all material steps taken by the Applicant pursuant to this Order, and shall co-operate fully with the Monitor in the exercise of its powers and discharge of its obligations and provide the Monitor with the assistance that is necessary to enable the Monitor to adequately carry out the Monitor's functions.

22.    **THIS COURT ORDERS** that the Monitor, in addition to its prescribed rights and obligations under the CCAA, is hereby directed and empowered to:

(a)    monitor the Applicant's receipts and disbursements;

(b)    report to this Court at such times and intervals as the Monitor may deem appropriate with respect to matters relating to the Property, the Business, the Chapter 11 Cases and such other matters as may be relevant to the proceedings herein;

(c)    have full and complete access to the Property, including the premises, books, records, data, including data in electronic form, and other financial documents of the Applicant, to the extent that is necessary to adequately assess the Applicant's business and financial affairs or to perform its duties arising under this Order;

(d)    be at liberty to engage independent legal counsel or such other persons as the Monitor deems necessary or advisable respecting the exercise of its powers and performance of its obligations under this Order; and

(e)     perform such other duties as are required by this Order or by this Court from time to time.

23.    **THIS COURT ORDERS** that the Monitor shall not take possession of the Property and shall take no part whatsoever in the management or supervision of the management of the Business and shall not, by fulfilling its obligations hereunder, be deemed to have taken or maintained possession or control of the Business or the Property, or any part thereof.

24.    **THIS COURT ORDERS** that nothing herein contained shall require the Monitor to occupy or to take control, care, charge, possession or management (separately and/or collectively, "**Possession**") of any of the Property that might be environmentally contaminated, might be a pollutant or a contaminant, or might cause or contribute to a spill, discharge, release or deposit of a substance contrary to any federal, provincial or other law respecting the protection, conservation, enhancement, remediation or rehabilitation of the environment or relating to the disposal of waste or other contamination including, without limitation, the *Canadian Environmental Protection Act*, the Ontario *Environmental Protection Act*, the *Ontario Water Resources Act*, the Ontario *Occupational Health and Safety Act* and regulations thereunder (the "**Environmental Legislation**"), provided however that nothing herein shall exempt the Monitor from any duty to report or make disclosure imposed by applicable Environmental Legislation.  The Monitor shall not, as a result of this Order or anything done in pursuance of the Monitor's duties and powers under this Order, be deemed to be in Possession of any of the Property within the meaning of any Environmental Legislation, unless it is actually in possession.

25.    **THIS COURT ORDERS** that the Monitor shall provide any creditor of the Applicant with information provided by the Applicant in response to reasonable requests for information made in writing by such creditor addressed to the Monitor.  The Monitor shall not have any responsibility or liability with respect to the information disseminated by it pursuant to this paragraph. In the case of information that the Monitor has been advised by the Applicant is confidential, the Monitor shall not provide such information to creditors unless otherwise directed by this Court or on such terms as the Monitor and the Applicant may agree.

26.    **THIS COURT ORDERS** that, in addition to the rights and protections afforded to the Monitor under the CCAA or as an officer of this Court, the Monitor, its directors, officers, employees, counsel and other representatives acting in such capacities shall incur no liability or obligation as a result of the Monitor's appointment or the carrying out by it of the provisions of this Order, save and except for any gross negligence or wilful misconduct on its part.  Nothing in this

Order shall derogate from the protections afforded to the Monitor by the CCAA or any applicable legislation.

27.     **THIS COURT ORDERS** that the Monitor, counsel to the Monitor, counsel to the Applicant, PJT Partners LP in its capacity as financial advisor to the Applicant (the "**Financial Advisor**"), and Alvarez & Marsal Inc. in its capacity as operational and restructuring advisor to the Applicant (the "**Restructuring Advisor**") shall be paid their reasonable fees and disbursements, whether incurred prior to, on or subsequent to the date of this Order, in each case at their standard rates and charges, by the Applicant as part of the costs of these proceedings.  The Applicant is hereby authorized and directed to pay the accounts of the Monitor, counsel for the Monitor, counsel for the Applicant, the Financial Advisor, and the Restructuring Advisor on a bi-weekly basis.

28.     **THIS COURT ORDERS** that the Monitor and its legal counsel shall pass their accounts from time to time, and for this purpose the accounts of the Monitor and its legal counsel are hereby referred to a judge of the Commercial List of the Ontario Superior Court of Justice.

**ADMINISTRATION CHARGE**

29.     **THIS COURT ORDERS** that the Monitor, counsel to the Monitor, the Applicant's counsel, the Financial Advisor and the Restructuring Advisor shall be entitled to the benefit of and are hereby granted a charge (the "**Administration Charge**") on the Property, which charge shall not exceed an aggregate amount of $2,000,000, unless permitted by further Order of this Court, as security for their professional fees and disbursements incurred at the standard rates and charges of the Monitor and such advisors, both before and after the making of this Order, provided however that any Transaction Fee earned by the Financial Advisor shall not be secured by the Administration Charge. The Administration Charge shall have the priority set out in paragraphs 30 and 32 hereof.

**VALIDITY AND PRIORITY OF CHARGES CREATED BY THIS ORDER**

30.     **THIS COURT ORDERS** that the priorities of the Administration Charge and the Directors' Charge (collectively, the "**Charges**"), as among them, shall be as follows:

> First – Administration Charge (to the maximum amount of $2,000,000); and

> Second – Directors' Charge (to the maximum amount of $10,521,000).

31.     **THIS COURT ORDERS** that the filing, registration or perfection of the Charges shall not be required, and that the Charges shall be valid and enforceable for all purposes, including as

against any right, title or interest filed, registered, recorded or perfected subsequent to the Charges coming into existence, notwithstanding any such failure to file, register, record or perfect.

32.     **THIS COURT ORDERS** that each of the Charges (all as constituted and defined herein) shall constitute a charge on the Property and such Charges shall rank in priority to all other security interests, trusts, liens, charges and encumbrances, and claims of secured creditors, statutory or otherwise (collectively, "**Encumbrances**") in favour of any Person notwithstanding the order of perfection or attachment; provided that the Charges shall rank behind Encumbrances in favour of (i) any Person with a properly perfected purchase money security interest under the *Personal Property Security Act* (Ontario) or such other applicable legislation, including without limitation Wells Fargo Equipment Finance Company, (ii) the Reserve Trustee in respect of the Reserve Security, and (iii) any Person that has not been served with notice of the application for this Order. The Applicant and the beneficiaries of the Charges shall be entitled to seek priority of the Charges ahead of any Encumbrances over which the Charges may not have obtained priority pursuant to this Order on a subsequent motion including, without limitation, on the Comeback Date (as defined below), on notice to those Persons likely to be affected thereby.

33.     **THIS COURT ORDERS** that except as otherwise expressly provided for herein, or as may be approved by this Court on notice to parties in interest, the Applicant shall not grant any Encumbrances over any Property that rank in priority to, or *pari passu* with, any of the Charges, unless the Applicant also obtains the prior written consent of the Monitor and the beneficiaries of the Administration Charge and the Directors' Charge, or further Order of this Court.

34.     **THIS COURT ORDERS** that the Charges shall not be rendered invalid or unenforceable and the rights and remedies of the chargees entitled to the benefit of the Charges (collectively, the "**Chargees**") shall not otherwise be limited or impaired in any way by: (i) the pendency of these proceedings and the declarations of insolvency made herein; (ii) any application(s) for bankruptcy order(s) or receivership order(s) issued pursuant to the BIA or otherwise, or any bankruptcy order or receivership order made pursuant to such applications; (iii) the filing of any assignments for the general benefit of creditors made pursuant to the BIA; (iv) the provisions of any federal or provincial statutes; or (v) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing loan documents, lease, sublease, offer to lease or other agreement (collectively, an "**Agreement**") which binds the Applicant, and notwithstanding any provision to the contrary in any Agreement:

(a)     the creation of the Charges shall not create or be deemed to constitute a breach by the Applicant of any Agreement to which it is a party;

(b)     none of the Chargees shall have any liability to any Person whatsoever as a result of any breach of any Agreement caused by or resulting from the creation of the Charges; and

(c)     the payments made by the Applicant pursuant to this Order and the granting of the Charges, do not and will not constitute preferences, fraudulent conveyances, transfers at undervalue, oppressive conduct, or other challengeable or voidable transactions under any applicable law.

35.     **THIS COURT ORDERS** that any Charge created by this Order over leases of real property in Canada shall only be a Charge in the Applicant's interest in such real property lease.

**SERVICE AND NOTICE**

36.     **THIS COURT ORDERS** that, subject to paragraph 37, the Monitor shall: (i) without delay, publish in the *National Post (National Edition)*, a notice containing the information prescribed under the CCAA in the form attached as Exhibit "Q" to the Stewart Affidavit (the "**Notice**"); and (ii) within five (5) days after the date of this Order, (A) make this Order publicly available in the manner prescribed under the CCAA, (B) send, in the prescribed manner, a copy of the Notice to every known creditor who has a claim against the Applicant of more than $1,000, and (C) prepare a list showing the names and addresses of those creditors and the estimated amounts of those claims, and make it publicly available in the prescribed manner, all in accordance with Subsection 23(1)(a) of the *CCAA* and the regulations made thereunder.

37.     **THIS COURTS ORDERS** that, notwithstanding paragraph 36 of this Order, Subsection 23(1)(a) of the *CCAA*, and the regulations made thereunder, with respect to consumers enrolled in the AIR MILES® Reward Program holding reward miles balances that would entitle them to redeem for items with a value of at least $1,000 (the "**Specified Collectors**"), the Monitor: (i) may satisfy the notice obligation in paragraph 36 (B) hereof by (A) causing the Applicant to email a copy of the Notice to the Specified Collectors at the current email address in the Applicant's records, or, if the Applicant does not have a current email address, (B) publishing the Notice in the manner set out in paragraph 36 hereof and on the website set out in paragraph 38 hereof; and (ii) subject to further Order of the Court, shall not publish information it receives about the

Specified Collectors from the Applicant, shall treat such information as confidential, and shall exclude such information from the list of creditors set out in paragraph 36 hereof.

38.     **THIS COURT ORDERS** that the E-Service Guide of the Commercial List (the "**Guide**") is approved and adopted by reference herein and, in this proceeding, the service of documents made in accordance with the Guide (which can be found on the Commercial List website at https://www.ontariocourts.ca/scj/practice/practice-directions/toronto/eservice-commercial/)   shall be valid and effective service. Subject to Rule 17.05, this Order shall constitute an order for substituted service pursuant to Rule 16.04 of the *Rules of Civil Procedure*, R.R.O. 1990. Reg. 194, as amended (the "**Rules of Civil Procedure**"). Subject to Rule 3.01(d) of the Rules of Civil Procedure and paragraph 13 of the Guide, service of documents in accordance with the Guide will be effective on transmission. This Court further orders that a Case Website shall be established in accordance with the Guide with the following URL: https://www.ksvadvisory.com/experience/case/loyaltyone.

39.     **THIS COURT ORDERS** that if the service or distribution of documents in accordance with the Guide or the CCAA and the regulations thereunder is not practicable, the Applicant, the Monitor and their respective counsel and agents are at liberty to serve or distribute this Order, any other materials and orders in these proceedings, any notices or other correspondence, by forwarding copies thereof by prepaid ordinary mail, courier, personal delivery, facsimile transmission or electronic message to the Applicant's creditors or other interested parties at their respective addresses (including e-mail addresses) as last shown in the books and records of the Applicant and that any such service or distribution shall be deemed to be received on the earlier of (i) the date of forwarding thereof, if sent by electronic message on or prior to 5:00 p.m. Eastern Time (or on the next business day following the date of forwarding thereof if sent on a non-business day); (ii) the next business day following the date of forwarding thereof, if sent by courier, personal delivery, facsimile transmission or electronic message sent after 5:00 p.m. Eastern; or (iii) on the third business day following the date of forwarding thereof, if sent by ordinary mail.

40.     **THIS COURT ORDERS** that the Applicant, the Monitor and each of their respective counsel are at liberty to serve or distribute this Order, and any other materials and orders as may be reasonably required in these proceedings, including any notices or other correspondence, by forwarding true copies thereof by electronic message (including by e-mail) to the Applicant's creditors or other interested parties and their advisors, as applicable. For greater certainty, any such service or distribution shall be deemed to be in satisfaction of a legal or judicial obligation,

and notice requirements within the meaning of Subsection 3(c) of the *Electronic Commerce Protection Regulations* (SOR/2013-221).

41.     **THIS COURT ORDERS** that, except with respect to the Comeback Hearing (as defined below), and subject to further Order of this Court in respect of urgent motions, any interested party wishing to object to the relief sought in a motion brought by the Applicant or the Monitor in these CCAA proceedings shall, subject to further order of this Court, provide the service list in these proceedings (the "**Service List**") with responding motion materials or a written notice (including by e-mail) stating its objection to the motion and the grounds for such objection by no later than 5:00 p.m. (Eastern Time) on the date that is two (2) days prior to the date such motion is returnable (the "**Objection Deadline**"). The Monitor shall have the ability to extend the Objection Deadline after consultation with the Applicant.

**COMEBACK HEARING**

42.     **THIS COURT ORDERS** that the comeback motion in these CCAA proceedings shall be heard on March **[●]**, 2023 (the "**Comeback Hearing**").

**GENERAL**

43.     **THIS COURT ORDERS** that any interested party (including the Applicant) may apply to this Court to vary or amend this Order on not less than five (5) calendar days' notice to the Service List and any other party or parties likely to be affected by the Order sought; provided, however, that the Chargees shall be entitled to rely on this Order as granted and on the Charges and priorities set forth in paragraphs 30 and 32 hereof with respect to any fees, expenses and disbursements incurred, as applicable, until the date this Order may be amended, varied or stayed.

44.     **THIS COURT ORDERS** that, notwithstanding paragraph 43 of this Order, the Applicant or the Monitor may from time to time apply to this Court to amend, vary or supplement this Order or for advice and directions in the discharge of its powers and duties hereunder or in the interpretation of this Order.

45.     **THIS COURT ORDERS** that nothing in this Order shall prevent the Monitor from acting as an interim receiver, a receiver, a receiver and manager, or a trustee in bankruptcy of the Applicant, the Business or the Property.

46.     **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada or in the United States, to give effect to this Order and to assist the Applicant, the Monitor and their respective agents in carrying out the terms of this Order.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicant and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicant and the Monitor and their respective agents in carrying out the terms of this Order.

47.     **THIS COURT ORDERS** that each of the Applicant and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order, and that the Monitor is authorized and empowered to act as a representative in respect of the within proceedings for the purpose of having these proceedings recognized in a jurisdiction outside Canada.

48.     **THIS COURT ORDERS** that this Order and all of its provisions are effective as of 12:01 a.m. (Eastern Time) on the date of this Order without the need for entry or filing.

_____

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF LOYALTYONE, CO.

Court File No. [●]

| | |
|---|---|
| | **ONTARIO**<br>**SUPERIOR COURT OF JUSTICE**<br>**COMMERCIAL LIST**<br><br>PROCEEDING COMMENCED AT<br>TORONTO |
| | **INITIAL ORDER** |
| | **Cassels Brock & Blackwell LLP**<br>2100 Scotia Plaza<br>40 King Street West<br>Toronto, ON M5H 3C2<br><br>**Ryan Jacobs LSO#: 59510J**<br>Tel:    416.860.6465<br>rjacobs@cassels.com<br><br>**Jane Dietrich LSO#: 49302U**<br>Tel:    416.860.5223<br>jdietrich@cassels.com<br><br>**Natalie E. Levine LSO#: 64908K**<br>Tel:    416.860.6568<br>nlevine@cassels.com<br><br>Lawyers for the Applicant |

**<u>EXHIBIT G</u>**
**CCAA TRANSACTION ORDER**

Court File No.

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

THE HONOURABLE ●       )           WEEKDAY, THE #

                            )

JUSTICE ●                 )       DAY OF MONTH, 2023

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF LOYALTYONE, CO.

(the "**Applicant**")

**APPROVAL AND VESTING ORDER**

**THIS MOTION**, made by the Applicant, pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**"), for an order approving the sale transaction (the "**Transaction**") contemplated by an asset purchase agreement between the Applicant and Bank of Montreal (the "**Buyer**"), dated **[●]**, 2023 (the "**Asset Purchase Agreement**") and vesting in the Buyer the Applicant's right, title, and interest in and to the Purchased Assets as defined in the Asset Purchase Agreement was heard this day by judicial videoconference via Zoom.

**ON READING** the Affidavit of Shawn Stewart, sworn **[●]**, 2023, and the Exhibits thereto, the **[●]** report of KSV Restructuring, Inc. ("**KSV**") in its capacity as the court-appointed monitor of the Applicant (the "**[●] Report**"), and such further materials as counsel may advise, and on hearing the submissions of counsel to the Applicant, counsel to the Monitor, counsel to the Buyer and counsel to [NAMES], and no one else appearing for any other party on the Service List although duly served as appears from the affidavit of service of **[●]** sworn **[●]**, 2023, filed:

**SERVICE AND DEFINITIONS**

1.      **THIS COURT ORDERS** that the time for service of the Notice of Motion and Motion Record herein is hereby abridged and validated so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.      **THIS COURT ORDERS** that capitalized terms used herein that are otherwise not defined shall have the meaning ascribed to them in the Asset Purchase Agreement and/or the Amended and Restated Initial Order made in these proceedings on March [●], 2023 (the "**A&R Initial Order**"), as applicable.

**APPROVAL OF TRANSACTION**

3.      **THIS COURT ORDERS AND DECLARES** that the Asset Purchase Agreement and the Transaction is hereby approved and the execution of the Asset Purchase Agreement by the Applicant is hereby authorized and approved, with such minor amendments as the Applicant, with the consent of the Monitor, may deem necessary. The Applicant is hereby authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the Transaction and for the conveyance of the Purchased Assets to the Buyer and the assumption of the Assumed Liabilities.

4.      **THIS COURT ORDERS AND DECLARES** that this Order shall constitute the only authorization required by the Applicant to proceed with the Transaction and that no shareholder or other approvals shall be required in connection therewith.

5.      **THIS COURT ORDERS** that the Applicant is authorized and directed to perform its obligations under the Asset Purchase Agreement and any ancillary documents related thereto.

**VESTING OF THE PURCHASED ASSETS**

6.      **THIS COURT ORDERS AND DECLARES** that upon the delivery of a Monitor's certificate to the Applicant (or its counsel) and to the Buyer (or its counsel) substantially in the form attached as **Schedule "A"** hereto (the "**Monitor's Certificate**"), all of the Applicant's right, title and interest in and to the Purchased Assets shall vest absolutely in the Buyer, free and clear of and from (a) the Excluded Claims; and (b) any and all security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages, trusts or deemed trusts (whether contractual, statutory, or otherwise), liens, executions, levies, charges, or other financial or monetary claims, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or

otherwise, including, without limiting the generality of the foregoing: (i) any encumbrances or charges created by the Initial Order, A&R Initial Order, the SISP Order, or any other orders made in these CCAA proceedings; (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system in any province or territory in Canada or the Civil Code of Quebec, including without limitation those registrations listed on **Schedule "B"** hereto; (iii) all Taxes assessed or that could be assessed, and any Claims or Encumbrances relating thereto, in respect of the Applicant or its business, property, and assets; and (iv) those claims listed on **Schedule "C"** hereto (all of which are collectively referred to as the "**Encumbrances**", which term shall not include the Permitted Encumbrances, listed on **Schedule "D"**), and, for greater certainty, this Court orders that all of the Encumbrances affecting or relating to the Purchased Assets are hereby expunged and discharged as against the Purchased Assets.

7.      **THIS COURT ORDERS** that all options, conversion privileges, equity-based awards, warrants, securities, debentures, loans, notes or other rights, agreements, or commitments of any kind whatsoever that are held by any Person that are convertible or exchangeable for any shares in the capital of Travel Services, or otherwise relating thereto, shall be deemed terminated and cancelled.

8.      **THIS COURT ORDERS** that except as expressly contemplated in the Asset Purchase Agreement and subject to the payment of any amounts required to be paid pursuant to Section 11.3 of the CCAA (or such other amount as agreed upon between the Buyer and the counterparty to the Assumed Contract), all Assumed Contracts will be and remain in full force and effect upon and following delivery of the Monitor's Certificate and completion of the Transaction, and no Person who is a party to an Assumed Contract may accelerate, terminate, rescind, refuse to perform or otherwise repudiate its obligations thereunder or enforce or exercise any right (including any right of set-off, dilution or other remedy) or make any demand under or in respect of any such arrangement, and no automatic termination or termination upon notice will have any validity or effect by reason of:

(a)      any event that occurred on or prior to the delivery of the Monitor's Certificate and is not continuing that would have entitled such Person to enforce those rights or remedies (including defaults or events of default arising as a result of the insolvency of the Applicant, or any of their Affiliates);

(b)      the insolvency of the Applicant, or any of its Affiliates, or the fact that the Applicant or any affiliate sought or obtained relief under the CCAA or any of their Affiliates sought or obtained any relief under Chapter 11 of the U.S. Bankruptcy Code;

(c)      any compromises, releases, discharges, cancellations, transactions, arrangements, reorganizations, or other steps taken or effected pursuant to the Asset Purchase Agreement or to effect the Transaction, or the provisions of this Order, or of any other Order of this Court in this CCAA proceeding, or any Order of the U.S. Bankruptcy Court under the Bankruptcy Code in respect of an Affiliate of the Applicant; or

(d)      any transfer or assignment, or any change of control of Travel Services arising from the Asset Purchase Agreement or the Transaction or the provisions of this Order.

9.     **THIS COURT ORDERS** that, as of the Effective Time and subject to the payment of any amounts required to be paid pursuant to Section 11.3 of the CCAA, (or such other amount as agreed upon between the Buyer and the counterparty to the Assumed Contract) all Persons shall be deemed to have waived any and all defaults of the Applicant then existing or previously committed by the Applicant, or caused by the Applicant, directly or indirectly, or non-compliance with any covenant, warranty, representation, undertaking, positive or negative covenant, provision, condition, or obligation, express or implied, in any Assumed Contract arising directly or indirectly from the insolvency of the Applicant, the filing by the Applicant under the CCAA, the Asset Purchase Agreement or the Transaction, including, without limitation, any of the matters or events listed in paragraph 9 hereof and any and all notices of default and demands for payment or any step or proceeding taken or commenced in connection therewith under an Assumed Contract shall be deemed to have been rescinded and of no further force or effect.

10.    **THIS COURT ORDERS** that from and after the Effective Time, any and all Persons shall be and are hereby forever barred, estopped, stayed and enjoined from commencing, taking, applying for, or issuing or continuing any and all steps or proceedings, whether directly, derivatively or otherwise, and including, without limitation, administrative hearings and orders, declarations and assessments, commenced, taken, or proceeded with or that may be commenced, taken, or proceeded with against the Buyer relating in any way to the Excluded Assets, Excluded Liabilities, Excluded Contracts, any Encumbrances (other than Permitted

Encumbrances), and any other claims, obligations, and other matters that are waived, released, expunged or discharged pursuant to this Order.

11.     **THIS COURT ORDERS** that for the purposes of determining the nature and priority of Encumbrances, the net proceeds from the sale of the Purchased Assets shall stand in the place and stead of the Purchased Assets, and that from and after the delivery of the Monitor's Certificate all Encumbrances shall attach to the net proceeds from the sale of the Purchased Assets with the same priority as they had with respect to the Purchased Assets immediately prior to the sale, as if the Purchased Assets had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the sale.

12.     **THIS COURT ORDERS AND DIRECTS** the Monitor to file with the Court a copy of the Monitor's Certificate, forthwith after delivery thereof to the Applicant and the Buyer, or to their respective counsel.

13.     **THIS COURT ORDERS** that the Monitor may rely on written notice from the Applicant and the Buyer regarding the fulfilment or waiver of conditions to closing under the Asset Purchase Agreement and shall have no liability with respect to delivery of the Monitor's Certificate.

**RESERVE ACCOUNT**

14.     **THIS COURT ORDERS** that, without limiting anything herein, Buyer shall acquire at the Effective Time all of the Applicant's right, title, interest, and powers, and assume all obligations, in, to, and under the Reserve Agreement and Security Agreement, and all accounts, deposits, funds and monies subject thereto including, for greater certainty, in respect of or related to the RBC Accounts and: (i) all Investments that are at any time or from time to time deposited with or specifically assigned to RBC or its agent by the Applicant for the purposes of the Reserve Agreement and all Investments derived from the Investment of any monies or other Investments which, in each case, are part of the Reserve Fund (as defined in the Reserve Agreement); (ii) without limiting (i), the right of the Applicant to be paid or receive any and all Redemption Fees (as defined in the Reserve Agreement) payable at any time or from time to time thereunder; (iii) all substitutions, accretions and additions to any of the monies or Investments described in the foregoing, including without limitation, all interest, dividends or other amounts earned or derived therefrom; (iv) all certificates and instruments evidencing the foregoing; (v) all proceeds of any of the foregoing of any nature and kind including, without limitation, goods, intangibles, documents of title, instruments, investment property, or other personal property; and (vi) goods, intangibles, documents of title, instruments, investment property, or other personal property and any other

assets or property forming part of the Reserve Fund, in each case free and clear of all Claims and Encumbrances whatsoever save and except for the Permitted Encumbrance in favour of RBC.

**PIPEDA**

15.      **THIS COURT ORDERS** that, pursuant to clause 7(3)(c) of the Canada *Personal Information Protection and Electronic Documents Act*, the Monitor and the Applicant are authorized and permitted to disclose and transfer to the Buyer all human resources and payroll information in the Applicant's records pertaining to the Applicant's past and current employees. The Buyer shall maintain and protect the privacy of such information and shall be entitled to use the personal information provided to it in a manner which is in all material respects identical to the prior use of such information by the Applicant.

16.      **THIS COURT ORDERS** that, notwithstanding:

     (a)      the pendency of these proceedings;

     (b)      any applications for a bankruptcy or receivership order now or hereinafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) (the "***BIA***") or other applicable legislation, in respect of the Applicant or its property, and any bankruptcy or receivership order issued pursuant to any such applications; and

     (c)      any assignment in bankruptcy made in respect of the Applicant,

the entering into of the Asset Purchase Agreement and the vesting of the Purchased Assets in the Buyer pursuant to this Order shall be binding on any trustee in bankruptcy or receiver that may be appointed in respect of the Applicant and shall not be void or voidable by creditors of the Applicant, nor shall it constitute nor be deemed to be a fraudulent preference, assignment, fraudulent conveyance, transfer at undervalue, or other reviewable transaction under the *BIA* or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

**REPAYMENT OF DIP FACILITY**

17.      **THIS COURT ORDERS** that concurrently with or immediately following delivery of the Monitor's Certificate, the Applicant shall indefeasibly and irrevocably repay, or cause to be repaid, in full in cash all obligations owing under the DIP Term Sheet (the "**DIP Distribution**") and that the Applicant is authorized to sign a direction at the time of closing the Transaction, in a form

acceptable to the Monitor, irrevocably authorizing the Buyer to pay the DIP Distribution directly to the DIP Lender. The DIP Distribution shall be free and clear of all Encumbrances and shall be binding on any trustee in bankruptcy or receiver that may be appointed in respect of the Applicant and shall not be void or voidable by creditors of the Applicant, nor shall it constitute nor be deemed to be a fraudulent preference, a transfer at undervalue, a fraudulent conveyance or other reviewable transaction under the BIA or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.   Following payment of the DIP Distribution in accordance with this paragraph, the DIP Lenders' Charge shall be automatically released and terminated without any further action.

**PAYMENT TO FINANCIAL ADVISOR**

18.     **THIS COURT ORDERS** that concurrently with or immediately following delivery of the Monitor's Certificate, the Applicant shall indefeasibly and irrevocably pay, or cause to be paid, in full in cash all obligations owing to the Financial Advisor as secured by the Financial Advisor Charge (the "**Financial Advisor Payment**").   The Financial Advisor Payment shall be free and clear of all Encumbrances and shall be binding on any trustee in bankruptcy or receiver that may be appointed in respect of the Applicant and shall not be void or voidable by creditors of the Applicant, nor shall it constitute nor be deemed to be a fraudulent preference, a transfer at undervalue, a fraudulent conveyance or other reviewable transaction under the BIA or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation. Following payment of the Financial Advisor Payment, the Financial Advisor Charge shall be automatically released and terminated without any further action.

**RELEASES AND OTHER PROTECTIONS**

19.     **THIS COURT ORDERS** that, effective as of the Closing Time, (a) the current and former directors, officers, employees, legal counsel, agents and advisors of the Applicant and LoyaltyOne Travel Services Co./Cie Des Voyages ("**Travel Services**") (other than Joseph L. Motes III and any other person who, at any time after November 5, 2021, has also served as a director, officer, or employee of (i) Bread Financial Holdings, Inc. f/k/a Alliance Data Systems Corporation ("**Bread**") or (ii) any other entity that, at any time after November 5, 2021, was or is a direct or indirect subsidiary of Bread); (b) the Monitor and its legal counsel and their respective present and former directors, officers, partners, employees, agents and advisors; (c) the Buyer, its

affiliates, and their respective current and former directors, officers, employees, agents, legal counsel and advisors; (d) the DIP Lender, its affiliates, and their respective current and former directors, officers, employees, agents, legal counsel and advisors; and (e) the Consenting Stakeholders and their respective current and former directors, officers, employees, legal counsel, agents and advisors (in such capacities, collectively, the "**Released Parties**" and each a "**Released Party**", which for greater certainty, do not include the Applicant or Travel Services) shall be deemed to be forever irrevocably released by the Releasing Parties (as hereinafter defined) and discharged from any and all present and future claims (including, without limitation, claims for contribution or indemnity), liabilities, indebtedness, demands, actions, causes of action, counterclaims, suits, damages, judgments, executions, recoupments, debts, sums of money, expenses, accounts, liens, taxes, recoveries, and obligations of any nature or kind whatsoever (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, matured or unmatured or due or not yet due, in law or equity and whether based in statute or otherwise) based in whole or in part on any act or omission, transaction, dealing or other occurrence existing or taking place on or prior to the Closing Time or undertaken or completed in connection with, in respect of, relating to, or arising out of (i) the Applicant, Travel Services, the business, operations, assets, property and affairs of the Applicant or Travel Services, wherever or however conducted or governed, the administration and/or management of the Applicant or Travel Services, or this CCAA Proceeding, or (ii) the Asset Purchase Agreement, the Closing Documents, the Transaction Support Agreement, any agreement, document, instrument, matter or transaction involving the Applicant or Travel Services arising in connection with or pursuant to any of the foregoing, and/or the consummation of the Transaction (collectively, subject to the excluded matters below, the "**Released Claims**"), which Released Claims shall be deemed to be fully, finally, irrevocably and forever waived, discharged, released, cancelled and barred as against the Released Parties; provided that, nothing in this paragraph shall waive, discharge, release, cancel or bar (x) any claim against a Released Party that is not permitted to be released pursuant to section 5.1(2) of the CCAA or claim with respect to any act or omission that is finally determined by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, or (y) any obligations of any of the Released Parties under or pursuant to the Asset Purchase Agreement, the Closing Documents, the Transaction Support Agreement, the Definitive Documents and/or any agreement, document, instrument, matter or transaction involving the Applicant or Travel Services entered into pursuant to the foregoing. "**Releasing Parties**" means any and all Persons (other than the Applicant and Travel Services and their respective current and former affiliates), and their current and former affiliates, current and former members, directors, managers, officers,

investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, participants, subsidiaries, affiliates, partners, limited partners, general partners, affiliated investment funds or investment vehicles, managed accounts or funds, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, management companies, advisory board members, investment fund advisors or managers, employees, agents, trustees, investment managers, financial advisors, partners, legal counsel, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

20.    **THIS COURT ORDERS** that, effective as of the Closing Time, the Released Parties shall be deemed to be forever irrevocably released by each of the Applicant and Travel Services, and discharged from, any and all Released Claims held by the Applicant or Travel Services as of the Closing Time, which Released Claims shall be deemed to be fully, finally, irrevocably and forever waived, discharged, released, cancelled and barred as against the Released Parties; *provided* that, nothing in this paragraph shall waive, discharge, release, cancel or bar (a) any claim against a Released Party that is not permitted to be released pursuant to section 5.1(2) of the CCAA or claim with respect to any act or omission that is determined by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence; or (b) any obligations of any of the Released Parties under or in connection with the Asset Purchase Agreement, the Closing Documents, the Transaction Support Agreement, the Definitive Documents and/or any agreement, document, instrument, matter or transaction involving the Applicant or Travel Services arising in connection with or pursuant to any of the foregoing.

21.    **THIS COURT ORDERS** that any Claim that is not released pursuant to clause (x) of paragraph 19 or clause (a) of paragraph 20 of this Order shall be irrevocably and forever limited solely to recovery from the proceeds of any insurance policies payable on behalf of the Applicant or Travel Services or their Directors and Officers in respect of any such Claim (each an "**Insurance Policy**"), and such claimants shall have no right to, and shall not, directly or indirectly, make any claim or seek any recoveries from any of the Directors or Officers in respect of any such Claim, other than enforcing their rights to be paid from the proceeds of the applicable insurance policies available to the Applicant or Travel Services. Nothing contained in this Order prejudices, compromises, releases or otherwise affects any right, defence or obligation of any insurer in respect of an Insurance Policy.

22.     **THIS COURT ORDERS** that nothing in this Order shall (i) prejudice, compromise, release, waive, discharge, cancel, bar or otherwise affect any present or future claim, liability, indebtedness, demand, action, cause of action, counterclaim, suit, damage, judgment, execution, recoupment, debt, sum of money, expense, account, lien, tax, recovery, and obligation of any nature or kind whatsoever (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, matured or unmatured or due or not yet due, in law or equity and whether based in statute or otherwise) against or in respect of Joseph L. Motes III and any other person who, at any time after November 5, 2021, has also served as a director, officer, or employee of (a) Bread or (b) any other entity that, at any time after November 5, 2021, was or is a direct or indirect subsidiary of Bread (collectively, the "**Excluded Parties**" and each, an "**Excluded Party**"), which Excluded Parties, for greater certainty, shall not be, and shall not be deemed to be, Released Parties, or (ii) limit recovery against any Excluded Party to the proceeds of any insurance policies.

**GENERAL**

23.     **THIS COURT ORDERS AND DECLARES** that the Applicant, the Monitor or the Buyer may apply to the Court as necessary to seek further orders and directions to give effect to this Order.

24.     **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada or in the United States to give effect to this Order and to assist the Applicant, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding or to assist the Applicant and the Monitor and their respective agents in carrying out the terms of this Order.

25.     **THIS COURTS ORDERS** that this Order and all of its provisions are effective as of 12:01 a.m. Eastern Standard/Daylight Time on the date of this Order without any need for filing or entry.

_____

**Schedule "A" – Form of Monitor's Certificate**

Court File No. _____

**ONTARIO
SUPERIOR COURT OF JUSTICE
COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF LOYALTYONE, CO. (the "**Applicant**")

**MONITOR'S CERTIFICATE**

**RECITALS**

A.      Pursuant to an Order of the Honourable Justice [●] of the Ontario Superior Court of Justice (Commercial List) (the "**Court**") dated [●], 2023 (as amended and restated, and as may be further amended and restated from time to time, the "**Initial Order**"), KSV Restructuring, Inc. was appointed as monitor of the Applicant (in such capacity, the "**Monitor**") in proceedings commenced by the Applicant under the *Companies' Creditors Arrangement Act*.

B.      Pursuant to the Approval and Vesting Order of the Court dated [●], 2023 (the "**Approval and Vesting Order**"), the Court approved the Asset Purchase Agreement between the Applicant and Bank of Montreal (the "**Buyer**") dated [●], 2023 (the "**Asset Purchase Agreement**"), providing for the vesting in the Buyer of all of the Applicant's right, title and interest in and to all of the Purchased Assets (as defined in the Asset Purchase Agreement), which vesting is to be effective with respect to the Purchased Assets upon the delivery by the Monitor to the Buyer (or its counsel) and the Applicant (or its counsel) of this Monitor's Certificate.

C.      Unless otherwise indicated or defined herein, capitalized terms used in this Monitor's Certificate shall have the meanings given to them in the Approval and Vesting Order and/or the Asset Purchase Agreement.

**THE MONITOR CERTIFIES** the following:

- 2 -

1.  The conditions to Closing set forth in the Asset Purchase Agreement have been satisfied or waived by the Applicant and the Buyer, as applicable.

2.  The Buyer has paid and the Applicant has received the Purchase Price, subject to applicable adjustments (if any), for the Purchased Assets payable on the Closing Date pursuant to the Asset Purchase Agreement and/or the Approval and Vesting Order.

3.  The Transaction has been completed to the satisfaction of the Applicant, the Monitor and the Buyer, respectively.

DATED at Toronto, Ontario this _____ day of _____, 2023.

**KSV RESTRUCTURING INC., solely in its capacity as Monitor of the Applicant and not in its personal capacity**

Per:  _____

      Name:

      Title:

**Schedule "B" – PPSA Registrations to be Released**

- *Personal Property Security Act* (Ontario) financing statement filed against the Applicant with registration number 20211027 1316 1590 1370 and reference file number 777686328 in favour of Bank of America, N.A., as Administrative Agent;

- *Personal Property Security Act* (Alberta) financing statement filed against the Applicant with registration number 21102717456 in favour of Bank of America, N.A., as Administrative Agent; and

- *Personal Property Security Act* (Nova Scotia) financing statement filed against the Applicant with registration number 35343458 in favour of Bank of America, N.A., as Administrative Agent.

**Schedule "C" – Encumbrances**

- Encumbrances granted by the Applicant pursuant to, and in connection with, the Credit Agreement and the other Loan Documents (as defined therein).

**Schedule "D" – Permitted Encumbrances**

1. Encumbrances in respect of the Reserve Agreement and the Security Agreement;

2. Encumbrances with respect to trust accounts required to be maintained by or for Travel Services under Applicable Law of the provincial travel and insurance regulators;

3. Encumbrances contained within any Assumed Contracts in favour of the counterparties to such Assumed Contracts;

4. Encumbrances associated with, and financing statements evidencing, the rights of equipment lessors under any of the Personal Property Leases that are registered under the PPSA;

5. Encumbrances in favour of the DIP Lender;

6. Encumbrances disclosed in a disclosure letter;

7. to the extent not included in the Encumbrances listed in #2 above in this Schedule "D", normal and customary rights of setoff or compensation upon deposits in favour of depository institutions, and liens of a collecting bank on cheques and other payment items in the course of collection; and

8. the right reserved to or vested in any municipality or government, or to any statutory or public authority, by the terms of any lease, license, franchise, grant or permit acquired by the Applicant or any statutory provision to terminate any such lease, license, franchise, grant or permit, or to require annual or other periodic payments as a condition to the continuance thereof.

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF LOYALTYONE, CO.

Court File No. ●

| | |
|---|---|
| | ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE**<br>**COMMERCIAL LIST**<br><br>PROCEEDING COMMENCED AT<br>TORONTO |
| | **APPROVAL AND VESTING ORDER** |
| | **Cassels Brock & Blackwell LLP**<br>2100 Scotia Plaza<br>40 King Street West<br>Toronto, ON M5H 3C2<br><br>**Ryan Jacobs LSO#: 59510J**<br>Tel:    416.860.6465<br>rjacobs@cassels.com<br><br>**Jane Dietrich LSO#: 49302U**<br>Tel:    416.860.5223<br>jdietrich@cassels.com<br><br>**Natalie E. Levine LSO#: 64908K**<br>Tel:    416.860.6568<br>nlevine@cassels.com<br><br>Lawyers for the Applicant |

**EXHIBIT H**
**SISP APPROVAL ORDER**

Court File No. CV-●

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE | ) | ●, THE ● |
| | ) | |
| JUSTICE CONWAY | ) | DAY OF MARCH, 2023 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF LOYALTYONE, CO.

(the "**Applicant**")

**SISP APPROVAL ORDER**

**THIS MOTION**, made by the Applicant pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, for an order, *inter alia*, approving the Sale and Investment Solicitation Process in respect of the business and assets of the Applicant and its affiliate, LoyaltyOne Travel Services Co./Cie Des Voyages LoyaltyOne, in the form attached hereto as **Schedule "A"** (the "**SISP**") and certain related relief, was heard this day by judicial videoconference via Zoom in Toronto, Ontario.

**ON READING** the affidavit of Shawn Stewart sworn March **[●]**, 2023 and the Exhibits thereto (the "**Stewart Affidavit**"), the pre-filing report of KSV Restructuring Inc. ("**KSV**") as the proposed Monitor, and the first report of KSV as the Court-appointed monitor of the Applicant (in such capacity, the "**Monitor**") dated March **[●]**, 2023, and on being advised that the secured creditors who are likely to be affected by the charge created herein were given notice, and on hearing the submissions of counsel for the Applicant, the Monitor, Bank of Montreal (the "**Stalking Horse Purchaser**"), and the other parties listed on the counsel slip, no one appearing for any other party although duly served as appears from the affidavit of service of Alec Hoy sworn March **[●]**, 2023,

2

**SERVICE AND DEFINITIONS**

1.      **THIS COURT ORDERS** that the time for service of the Notice of Motion and the Motion Record is hereby abridged and validated so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.      **THIS COURT ORDERS** that capitalized terms used in this Order and not otherwise defined herein shall have the meanings ascribed to them in the SISP, the Amended and Restated Initial Order of this Court dated March **[●]**, 2023 (the "**ARIO**") or the Stewart Affidavit, as applicable.

**SALE AND INVESTMENT SOLICITATION PROCESS**

3.      **THIS COURT ORDERS** that the SISP is hereby approved and the Applicant is hereby authorized and directed to implement the SISP pursuant to the terms thereof. The Applicant, the Monitor and the Financial Advisor are hereby authorized and directed to perform their respective obligations and to do all things reasonably necessary to perform their obligations thereunder, subject to prior approval of the Court being obtained before completion of any transaction(s) under the SISP.

4.      **THIS COURT ORDERS** that the Applicant, the Monitor and the Financial Advisor and their respective affiliates, partners, directors, officers, employees, legal advisors, representatives, agents and controlling persons shall have no liability with respect to any and all losses, claims, damages or liabilities of any nature or kind to any person in connection with or as a result of the SISP, except to the extent of losses, claims, damages or liabilities that arise or result from the gross negligence or wilful misconduct of the Applicant, the Monitor or the Financial Advisor, as applicable, in performing their obligations under the SISP, as determined by this Court in a final order that is not subject to appeal or other review.

5.      **THIS COURT ORDERS** that in overseeing the SISP, the Monitor shall have all of the benefits and protections granted to it under the CCAA, the ARIO and any other Order of this Court in the within proceeding.

**STALKING HORSE PURCHASE AGREEMENT**

6.      **THIS COURT ORDERS** that the Applicant is hereby authorized and empowered to enter into the purchase agreement dated March **[●]**, 2023 (the "**Stalking Horse Purchase Agreement**") between the Applicant and the Stalking Horse Purchaser attached as Exhibit "O" to the Stewart Affidavit, *nunc pro tunc,* and such minor amendments as may be acceptable to each of the parties thereto and in consultation with the Consenting Stakeholders, with the approval of the Monitor; provided that, nothing herein approves the sale and the vesting of any Property to the Stalking Horse Purchaser (or any of its designees) pursuant to the Stalking Horse Purchase Agreement and that the approval of any sale and vesting of any such Property shall be considered by this Court on a subsequent motion made to this Court if the transaction set out in the Stalking Horse Purchase Agreement is the Successful Bid pursuant to the SISP.

7.      **THIS COURT ORDERS** that, as soon as reasonably practicable following the Applicant and the Stalking Horse Purchaser agreeing to any amendment to the Stalking Horse Purchase Agreement permitted pursuant to the terms of this Order, the Applicant shall: (a) file a copy thereof with this Court; (b) serve a copy thereof on the Service List; and (c) provide a copy thereof to each SISP Participant (as hereinafter defined), excluding from the public record any confidential information that the Applicant and the Stalking Horse Purchaser, with the consent of the Monitor, agree should be redacted.

**BID PROTECTONS**

8.      **THIS COURT ORDERS** that the Bid Protections are hereby approved and the Applicant is hereby authorized and directed to pay the Bid Protections to the Stalking Horse Purchaser (or

to such other person as it may direct) in the manner and circumstances described in the Stalking Horse Purchase Agreement.

9.      **THIS COURT ORDERS** that the Stalking Horse Purchaser shall be entitled to the benefit of and is hereby granted a charge (the "**Bid Protections Charge**") on the Property, which charge shall not exceed US$4,000,000, as security for payment of the Bid Protections in the manner and circumstances described in the Stalking Horse Purchase Agreement.

10.      **THIS COURT ORDERS** that the filing, registration or perfection of the Bid Protections Charge shall not be required, and that the Bid Protections Charge shall be valid and enforceable for all purposes, including against any right, title or interest filed, registered, recorded or perfected subsequent to the Bid Protections Charge, notwithstanding any such failure to file, register, record or perfect.

11.      **THIS COURT ORDERS** that the Bid Protections Charge shall constitute a charge on the Property and the Bid Protections Charge shall rank in priority to all other Encumbrances in favour of any Person notwithstanding the order of perfection or attachment, other than (i) any Person with a properly perfected purchase money security interest under the *Personal Property Security Act* (Ontario) or such other applicable legislation, including without limitation Wells Fargo Equipment Finance Company; (ii) the Reserve Trustee in respect of the Reserve Security; and (iii) the Charges.

12.      **THIS COURT ORDERS** that except for the Charges or as may be approved by this Court on notice to parties in interest, the Applicant shall not grant any Encumbrances over any Property that rank in priority to, or *pari passu* with, the Bid Protections Charge, unless the Applicant also obtains the prior written consent of the Monitor and the Stalking Horse Purchaser, or further Order of this Court.

13.    **THIS COURT ORDERS** that the Bid Protections Charge shall not be rendered invalid or unenforceable and the rights and remedies of the Stalking Horse Purchaser shall not otherwise be limited or impaired in any way by: (i) the pendency of these proceedings and the declarations of insolvency made herein; (ii) any application(s) for bankruptcy order(s) or receivership order(s) issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) (the "**BIA**") or otherwise, or any bankruptcy order or receivership order made pursuant to such applications; (iii) the filing of any assignments for the general benefit of creditors made pursuant to the BIA; (iv) the provisions of any federal or provincial statutes; or (v) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing loan documents, lease, sublease, offer to lease or other agreement (collectively, an "**Agreement**") which binds the Applicant, and notwithstanding any provision to the contrary in any Agreement:

(a)    neither the creation of the Bid Protections Charge nor the execution, delivery, perfection, registration or performance of the Stalking Horse Purchase Agreement shall create, cause or be deemed to constitute a breach by the Applicant of any Agreement to which it is a party;

(b)    the Stalking Horse Purchaser shall not have any liability to any Person whatsoever as a result of any breach of any Agreement caused by or resulting from the creation of the Bid Protection Charge or the execution, delivery or performance of the Stalking Horse Purchase Agreement; and

(c)    the payments made by the Applicant pursuant to this Order, the Stalking Horse Purchase Agreement and the granting of the Bid Protection Charge, do not and will not constitute preferences, fraudulent conveyances, transfers at undervalue, oppressive conduct, or other challengeable or voidable transactions under any applicable law.

14.     **THIS COURT ORDERS** that the Bid Protection Charge created by this Order over leases of real property in Canada shall only be a charge in the Applicant's interest in such real property lease.

15.     **THIS COURT ORDERS AND DECLARES** that the Stalking Horse Purchaser, with respect to the Bid Protections Charge only, shall be treated as unaffected in any plan of arrangement or compromise filed by the Applicant under the CCAA, or any proposal filed by the Applicant under the BIA.

**PIPEDA**

16.     **THIS COURT ORDERS** that, pursuant to clause 7(3)(c) of the *Personal Information Protection and Electronic Documents Act*, S.C. 2000, c. 5 and any similar legislation in any other applicable jurisdictions the Monitor, the Applicant, the Financial Advisor and their respective advisors are hereby authorized and permitted to disclose and transfer to prospective SISP participants that are party to a non-disclosure agreement with the Applicant (each, a "**SISP Participant**") and their respective advisors personal information of identifiable individuals, but only to the extent required to negotiate or attempt to complete a transaction pursuant to the SISP (a "**Transaction**"). Each SISP Participant to whom such personal information is disclosed shall maintain and protect the privacy of such information and limit the use of such information to its evaluation for the purpose of effecting a Transaction, and, if it does not complete a Transaction, shall return all such information to the Monitor, the Financial Advisor or the Applicant, or, in the alternative, destroy all such information and provide confirmation of its destruction if requested by the Monitor, the Financial Advisor or the Applicant. Any bidder with a Successful Bid shall maintain and protect the privacy of such information and, upon closing of the Transaction(s) contemplated in the Successful Bid(s), shall be entitled to use the personal information provided to it that is related to the Business and/or Property acquired pursuant to the SISP in a manner that is in all material respects identical to the prior use of such information by the Applicant, and shall return

all other personal information to the Monitor, the Financial Advisor or the Applicant, or ensure that all other personal information is destroyed and provide confirmation of its destruction if requested by the Monitor, the Financial Advisor or the Applicant.

**GENERAL**

17.     **THIS COURT ORDERS** that this Order shall have full force and effect in all provinces and territories in Canada.

18.     **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal and regulatory or administrative bodies, having jurisdiction in Canada or in any other foreign jurisdiction, to give effect to this Order and to assist the Applicant, the Monitor, and their respective agents in carrying out the terms of this Order. All courts, tribunals and regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicant and the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order or to assist the Applicant and the Monitor and their respective agents in carrying out the terms of this Order.

19.     **THIS COURT ORDERS** that this Order and all of its provisions are effective as of 12:01 a.m. (Eastern Time) on the date of this Order without the need for entry or filing.


_____

**SCHEDULE "A"**
**SALE AND INVESTMENT SOLICITATION PROCESS**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF LOYALTYONE, CO.

| | Court File No. ● |
|---|---|
| | ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE**<br>**COMMERCIAL LIST**<br><br>PROCEEDING COMMENCED AT<br>TORONTO |
| | **SISP APPROVAL ORDER** |
| | **Cassels Brock & Blackwell LLP**<br>2100 Scotia Plaza<br>40 King Street West<br>Toronto, ON M5H 3C2<br><br>**Ryan Jacobs LSO#: 59510J**<br>Tel:    416.860.6465<br>rjacobs@cassels.com<br><br>**Jane Dietrich LSO#: 49302U**<br>Tel:    416.860.5223<br>jdietrich@cassels.com<br><br>**Natalie E. Levine LSO#: 64908K**<br>Tel:    416.860.6568<br>nlevine@cassels.com<br><br>Lawyers for the Applicant |

**EXHIBIT I**
**JOINDER AGREEMENT**

**[•]**, 2023

The undersigned ("Transferee") hereby acknowledges that it has read and understands the Transaction Support Agreement, dated as of **[•]**, 2023 (as amended, supplemented or otherwise modified from time to time, the "Agreement"), by and among the Company Parties and the Consenting Stakeholders. Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Agreement.

1.     Agreement to be Bound. The Transferee hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached hereto as Annex I (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof). The Transferee shall hereafter be deemed to be a "Consenting Stakeholder" and a "Party" for all purposes under the Agreement and with respect to all claims against and interests in the Company Parties held such Transferee.

2.     Representations and Warranties. The Transferee hereby makes the representations and warranties of the Consenting Stakeholder set forth in Section 7 of the Agreement to each other Party to the Agreement.

3.     Governing Law. This joinder agreement (the "Joinder Agreement") to the Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Transferee has caused this Joinder Agreement to be executed as of the date first written above.

Name of Transferor: _____

Name of Transferee: _____

By: _____

Name:

Title:

Address:

Email address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| Credit Agreement – Term A Loan | |
| Credit Agreement – Term B Loan | |
| Credit Agreement – Revolving Credit Exposure | |
| Equity Interests | |

**[Joinder Agreement Signature Page]**

**ANNEX I TO JOINDER AGREEMENT**
**TRANSACTION SUPPORT AGREEMENT**